UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                    :
SPECTRUM DYNAMICS MEDICAL                           :
LIMITED,                                            :
                                                    :
                                    Plaintiff,      :        18-cv-11386 (VSB)
                                                    :
                  - against -                       :        **OPINION & ORDER**
                                                    :
                                                    :
GENERAL ELECTRIC COMPANY, et al.,                   :
                                                    :
                                    Defendants.     :
                                                    :
---------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                │
│ DOC #:_____                       │
│ DATE FILED: ___6/1/2020___          │
└─────────────────────────────────────┘
```

Appearances:

Lisa Ann Cahill
Lisa Cahill PLLC
New York, NY

Jeffrey Handelsman
Neil F. Greenblum
Peter Branko Pejic
Greenblun & Bernstein, P.L.C.
Reston, VA

*Counsel for Plaintiff*

Marla R. Butler
Carl Wesolowski
Lauren Elizabeth Hogan
Thompson Hine
Atlanta, GA

Brian Philip Lanciault, Jr.
Thompson Hine
New York, NY

Jesse Leigh Jenike-Godshalk
Thompson Hine
Cincinnati, OH

*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Before me is Defendants General Electric Company, GE Healthcare, Inc., GE Medical

Systems Israel Ltd., Yaron Hefetz, Jean-Paul Bouhnik, Sergio Steinfeld, Arie Escho, and Nathan

Hermony's (together "Defendants") motion to dismiss Plaintiff Spectrum Dynamics Medical

Limited's First Amended Complaint. (Doc. 52). For the following reasons, Defendants' motion

to dismiss is GRANTED IN PART and DENIED IN PART.

## I.   **Factual Background**[1]

Plaintiff Spectrum Dynamics Medical Limited ("Plaintiff" or "Spectrum") is a limited

company organized under the laws of the British Virgin Islands.[2]  Since 1999, Spectrum has

developed and manufactured technology in the nuclear medicine space, resulting in an extensive

intellectual property portfolio. (FAC ¶¶ 71–72.) Included in Spectrum's portfolio are various

trade secrets relating to nuclear molecular imaging technologies, including Single Photon

Emission Computer Tomography ("SPECT") technology, and related sensitive proprietary

and/or confidential information.  (*Id.* ¶¶ 40, 71–72.)  Defendant General Electric Company is a

corporation organized under the laws of the State of New York, and having a principal place of

---

[1] This factual background is derived from the allegations in Plaintiff's First Amended Complaint ("FAC") and its exhibits. I assume the allegations set forth in Plaintiff's First Amended Complaint and its attachments to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.") However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings in this Opinion & Order.  In addition, in deciding whether there is personal jurisdiction over Defendant Hefetz, I rely on the affidavits and exhibits submitted by the parties in connection with Defendants' motion to dismiss. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (a court may rely on pleadings and affidavits at the pleadings stage to determine if plaintiff has made a prima facie showing of personal jurisdiction).  With the Court's leave, many of the documents filed in this action were filed under seal and docketed with partial redactions, including the First Amended Complaint.  Accordingly, this opinion is partially redacted consistent with the parties' requested redactions.

[2] Plaintiff's First Amended Complaint states that Plaintiff has multiple predecessors in interest, including Spectrum Dynamics Limited, a limited liability company organized under the laws of Delaware, as well as various other entities.  (*See* FAC ¶¶ 1, 10–23.)  For purpose of this Opinion & Order, I assume without deciding that Spectrum is indeed the successor-in-interest to these various entities, which Defendants do not dispute.

business in New York. (*Id.* ¶ 2.) Defendant GE Healthcare, Inc. is a division of General Electric

Company organized under the laws of the State of Delaware, and having a principal place of

business in New Jersey. (*Id.* ¶ 3.) Defendant GE Medical Systems Israel Ltd. is a limited

company organized under the laws of the State of Israel, and having a principal place of business

in Haifa, Israel. (*Id.* ¶ 4.)[3] Defendants Bouhnik, Steinfeld, Escho, Hermony, and Hefetz are all

citizens of the State of Israel. (*Id.* ¶¶ 5–9.)

In 2007, Spectrum launched the D-SPECT, which was the first cardiac-dedicated nuclear

medicine device to employ CZT[4] detectors. (FAC ¶ 73.) The Spectrum D-SPECT device was a

vast improvement over conventional cardiac dedicated SPECT devices because the D-SPECT

allowed a patient to be imaged while in a sitting position instead of lying down, and produced

higher image resolution with a shorter scan time. (*Id.* ¶¶ 73–77.) Beginning in or around 2009,

Spectrum was focused on developing a revolutionary new device called the VERITON, a SPECT

technology full-body multi-organ imaging device comprising a novel ███████████████████

███████████████████████████████████████████ (*Id.* ¶ 78.) In the same

year, Defendant GE Healthcare, Inc. began considering acquiring Spectrum or the Spectrum

nuclear molecular imaging business and technologies. (*Id.* ¶ 42.) To protect the parties'

respective interests in their intellectual property during due diligence discussions, on September

16, 2009, Spectrum and Defendant GE Healthcare, Inc. signed an agreement entitled the

---

[3] For purposes of this Opinion & Order, I will refer to Defendants General Electric Company, GE Healthcare, Inc., and GE Medical Systems Israel LTD collectively as "GE."

[4] CZT is not defined in the First Amended Complaint. Spectrum's website states that CZT stands for Cadmium Zinc Telluride, a semiconductor. *See D-SPECT Cardiac Imaging System*, Spectrum Dynamics Medical (last visited May 31, 2020), available at https://www.spectrum-dynamics.com/wp-content/uploads/2016/10/D-SPECT-Brochure-Final-Singles-y052016-Web.pdf. Other sources state that "Cadmium zinc telluride CZT (sometimes written as CdZnTe) is a room temperature semiconductor that directly converts x-ray or gamma photons into electrons and holes. It is a unique semiconductor compared with silicon and germanium detectors, in that cadmium zinc telluride CZT operates at room temperature and can process >100 million photons/second/mm^2." *See, e.g., About CZT: cadmium zinc telluride*, Kromek (last visited May 31, 2020), https://www.kromek.com/cadmium-zinc-telluride-czt/.

Amended and Restated Mutual Confidentiality and Non-Use Agreement. (*Id.* ¶¶ 42–44; Doc. 38,

Exhibit 1 ("NDA").)

> The NDA's recitals provisions include the following language:

> [The parties] desire to exchange or provide access to their respective Information to each other and their respective directors, officers, employees, agents, consultants, advisors and representatives ("Representatives") for the sole purpose of evaluating a possible relationship between Company and Spectrum (the "Purpose") and to induce such disclosure desire to undertake certain obligations of confidentiality.

(NDA, at ¶ E.)[5]  The NDA includes a "Confidentiality" section listing the parties' obligations.

The "Confidentiality" section states in relevant part:

> 1.1  Each party shall:  (i) Hold Information of the other party in strict confidence; (ii) exercise appropriate caution to maintain its secrecy; (iii) to use the same degree of care to prevent unauthorized use of such Information as used to protect Receiving Party's own confidential information; and (iv) not to disclose, discuss, communicate or transmit such Information to others, except to its Representatives to the extent necessary for the performance of the Purpose and then only so long as such persons agreed to be bound by the terms of this agreement.  The Receiving Party shall be liable to the Disclosing Party for any failure by the Receiving Party's Representatives to treat the Information in the same manner as the Receiving Party is obligated to treat such Information under the terms of this Agreement and shall otherwise be responsible for any breach of this Agreement by such Representatives.

> 1.2  Each party shall use Information of the other party solely for the Purpose and not use the Information or any part, portion or element thereof, or any idea, concept, invention, technique, discovery or design deriving from the Information in any way whatsoever other than for the Purpose.

(*Id.* ¶ 1.)  However, the NDA includes certain exclusions from the confidentiality obligations,

including when a party can reasonably demonstrate that relevant information was independently

known prior to any disclosure under the NDA, independently disclosed by a third party who is

not subject to the NDA, independently developed without reference to information disclosed

---

[5] "NDA" refers to the Amended and Restated Mutual Confidentiality and Non-Use Agreement, attached to the First Amended Complaint as Exhibit 1.  (Doc. 38-1.)  The "Company" referred to in the NDA is Defendant GE Healthcare, Inc.

pursuant to the NDA, or made public by the other party or through the public domain. (*Id.* ¶ 2.1.)

Under the NDA, the parties consented to the "jurisdiction of the state or federal courts located in the Borough of Manhattan, County of New York, State of New York," and waived their "right to a trial by jury." (*Id.* ¶ 6.) The NDA's "Governing Law" provision also states that the "Agreement and its terms [] shall be governed by and construed in accordance with the laws of the State of New York, United States of America without regard to its conflict of laws provisions." (*Id.* ¶ 9.)

Pursuant to the NDA, from 2009 to 2012 Spectrum disclosed various trade secrets related to the VERITON device to due diligence personnel at GE, including Defendants Jean-Paul Bouhnik, Sergio Steinfeld, Arie Escho, and Nathan Hermony, employees of GE Medical Systems Israel LTD. (FAC ¶¶ 58–59.) These disclosures took place at numerous in-person meetings and through on-going communications using email. (*Id.* ¶¶ 86–89, 91.) During discussions with Spectrum, GE's due diligence personnel expressed that GE's research and development budget was not sufficient to develop a new product to compete with the VERITON device, but that GE was interested in investing research and development funds into Spectrum. (*Id.* ¶¶ 92–93.) The parties also discussed a possible joint venture involving the technology. (*Id.* ¶ 95.) Eventually in 2012, GE proposed an acquisition of Spectrum's intellectual property, and bid on said acquisition in late 2012; however, GE's bid was rejected in favor of a competing bid. (*Id.* ¶¶ 97–98.)

On November 14, 2013, an international patent issued under the Patent Cooperation Treaty ("PCT") as PCT/IB2013/053721 (the "'721 PCT")[6] to the named inventors Shlomo Ben-

---

[6] The '721 Patent was filed as U.S. Application No. 14/399,975, and published as U.S. Patent Pub. No.

Haim and Benny Rousso, who assigned their rights in the '721 PCT to Spectrum's predecessor-in-interest, Spectrum Dynamics LLC. (*Id.* ¶ 23.) The '721 PCT publicly disclosed several of Spectrum's VERITON-related trade secrets, including Trade Secrets A, E, G, I, J, and N,[7] as well as portions of Trade Secret D. (*Id.* ¶¶ 23, 204, 259, 274, 313, 341, 356.) Prior to Spectrum's public disclosure of these trade secrets. ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ Plaintiff alleges that the ██████████ improperly discloses and/or claims Spectrum Trade Secrets A, B, and F. (FAC ¶¶ 205, 228, 301.) ██████████████████████████████████ ████████████████████████████████████ (FAC Ex. 3.) ████████████████████████████████████████████████ ██████████████████████ (*Id.*) Plaintiff alleges that the ████████ impermissibly discloses or claims Spectrum Trade Secrets A, F, G, and J, (FAC ¶¶ 208, 291, 314, 357), and further alleges that Defendants began work on the ██████████ prior to Plaintiff's publication of the '721 PCT, and therefore misappropriated and misused Spectrum Trade Secrets A, G, and J. After the filing of the ████████████ GE continued to prepare and file fifteen additional patent applications disclosing and/or claiming various other Spectrum trade secrets not disclosed in the '721 PCT. (*Id.* ¶¶ 197–446.)

---

2015/011970. (FAC ¶ 23.)

[7] Although Paragraph 404 of the First Amended Complaint appears to contain a typo by referencing Trade Secret J regarding the publication of Trade Secret N in the '721 PCT, Plaintiff admits in its opposition papers that the '721 PCT disclosed portions of Trade Secret N. (*See* Doc. 65, at 9.) I assume for purpose of this Opinion & Order that the reference to Trade Secret J in Paragraph 404 of the First Amended Complaint is intended to be a reference to Trade Secret N.

Plaintiff further alleges that while Defendants Bouhnik, Steinfeld, Escho, and Hermony were all members of the GE due diligence personnel, and therefore were exposed to Spectrum trade secrets under the terms of the NDA, (*id.* ¶¶ 459–60), Defendant Hefetz worked for GE as an outside consultant and was not present at due diligence meetings, (*id.* ¶¶ 448–54.) Nonetheless, Plaintiff alleges upon information and belief that "GE diligence personnel . . . disclosed proprietary and/or confidential Spectrum Information to [Defendant] Hefetz, who agreed to be bound by the terms of the [NDA]," (*id.* ¶ 448), as Hefetz "would have known the Spectrum Information and inventions that he was being given originated with Spectrum, that he was bound by the 2009 [NDA], and that the true inventors of the technology that he was claiming were Spectrum employees," (*id.* ¶ 454). Accordingly, Plaintiff claims that Hefetz "became a hub of misappropriated technical information which he used to write and file patents which incorporated, disclosed and claimed proprietary and/or confidential Spectrum Information." (*Id.* ¶ 453.)

In 2018, Spectrum heard rumors that GE was seeking to develop an imitation VERITON device, although GE denied these rumors. (*Id.* ¶¶ 122–24.) In particular, on May 3, 2018, a Spectrum employee called Hermony and suggested they meet over coffee, and during that meeting the employee directly confronted Hermony regarding GE's potential violations of the 2009 NDA. (*Id.*) Hermony represented that GE was doing nothing wrong, and that he did not wish to further discuss the matter. (*Id.*) However, on or about June 13, 2018, Spectrum employees observed that GE had actually built an imitation VERITON device when Spectrum employees were conducting a patient visit at ███████████████████████████. (*Id.* ¶ 128.) The imitation device's design and technology reflected features and configurations based upon information disclosed by Spectrum under the NDA. (*Id.* ¶ 131.) Spectrum subsequently

learned that GE had been demonstrating and discussing its device with key global opinion

leaders in the industry, and at trade shows, leading to a potential loss of sales for Spectrum. (*Id.*

¶ 133–40.) On June 26, 2018, another Spectrum employee confronted Hermony regarding

Spectrum's intellectual property concerns, and Hermony noted that there was a "leak" in the GE

organization. (*Id.* ¶ 143.) Based on this information, Plaintiff alleges that "instead of expending

its own resources to develop and refine its own SPECT technology, GE exploited,

misappropriated and misused the Spectrum Information . . . , to (i) accelerate development of

GE's own imitation [device] . . . to compete directly with Spectrum's VERITON, and (ii)

prepare and file patent applications incorporating and misappropriating, impermissibly disclosing

and misusing Spectrum Information for GE's own benefits and purposes" contrary to the NDA's

"Purpose." (*Id.*  ¶ 63; *see also id.* ¶ 179.)

## II.    **Procedural History**

Plaintiff filed the complaint in this action under seal on December 6, 2018. (Doc. 12.)

Defendants filed a motion to dismiss the complaint on March 11, 2019. (Docs. 22, 26, 27.)

After Defendants filed the initial motion to dismiss, I entered an Order setting an April 1, 2019

deadline for Plaintiff to file an amended complaint. (Doc. 25.) On March 18, 2019, I entered an

order extending Plaintiff's deadline to file the amended complaint to May 1, 2019, and set a

briefing schedule for Defendants' anticipated renewed motion to dismiss. (Doc. 30.) Plaintiff

requested permission to file the amended complaint partially under seal, (Docs. 31, 33), which I

granted, (Docs. 32, 35), and Plaintiff filed the First Amended Complaint with partial redactions

on May 15, 2019, (Doc. 38).[8]

---

[8] Plaintiff filed a document entitled "First Amended Complaint" on May 14, 2019. but the Clerk of Court labelled
the filing deficient and requested that it be refiled. (Doc. 36.)

8

On June 14, 2019, Defendants filed a motion to dismiss Plaintiff's First Amended Complaint. (Doc. 52.) The motion was supported by the Declaration of Yaron Hefetz ("Hefetz Decl."). (Doc. 53.) After I granted Defendants' request to file a memorandum of law with partial redactions, (Doc. 55), on June 18, 2019 Defendants filed their memorandum of law in support of their motion to dismiss, (Doc. 58). Plaintiff filed its opposition memorandum of law with partial redactions on July 17, 2019. (Docs. 63, 65.) On July 19, 2019, Plaintiff requested permission to supplement its opposition with an additional filing, (Doc. 67), which I granted, (Doc. 68). This motion became fully briefed on August 6, 2019, when Defendants filed their reply memorandum of law with partial redactions. (Docs. 70, 71.)

## III.   Legal Standards

### A.   *Personal Jurisdiction*

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens For A Better Environment*, 523 U.S. 83, 93–102 (1998)). On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ,*

9

*S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902

F.2d 194, 197 (2d Cir. 1990)). At the pleading stage a plaintiff need only make a prima facie

showing that jurisdiction exists, and that showing may be established solely by allegations. *Id.* at

84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("'In

order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a

prima facie showing that jurisdiction exists.'" (quoting *Licci ex rel. Licci v. Lebanese Canadian

Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013))).

    Courts may rely on materials outside the pleadings in considering a motion to dismiss for

lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir.

2001). If the court considers pleadings and affidavits submitted by the parties, the plaintiff's

prima facie showing "must include an averment of facts that, if credited by the ultimate trier of

fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept.

11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*,

616 F.3d 158, 163 (2d Cir. 2010)). "'The allegations in the complaint must be taken as true to

the extent they are uncontroverted by the defendant's affidavits.'" *MacDermid, Inc. v. Deiter*,

702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft

MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir.

1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in

the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the

contrary presentation by the moving party." *Seetransport Wiking*, 989 F.2d at 580 (citation

omitted).

### B.    *Failure to State a Claim*

    To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See Kassner*, 496 F.3d at 237. "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotations and citation omitted). A court "may also consider matters of which judicial notice may be taken" in ruling on a motion to dismiss. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.   Discussion

### A.  *Personal Jurisdiction*

Defendants move to dismiss the complaint as against Hefetz for lack of personal jurisdiction under Rule 12(b)(2). Plaintiff posits two arguments in support of personal

11

jurisdiction over Hefetz:  (1) that Hefetz has assigned patents to GE and signed a corresponding

assignment agreement which can be construed as a contract to provide goods in New York

sufficient to establish personal jurisdiction, (Doc. 67, at 2); and (2) that Hefetz was aware of the

obligations imposed under the NDA and therefore was subject to its forum selection clause,

(Doc. 65, at 17).  These arguments fail.

### 1.  Applicable Law

Under the law of both the Second Circuit and the Federal Circuit, "in cases involving a

non-consenting, out-of-state defendant, [courts] must ask first whether the defendant is subject to

the forum state's long-arm statute, and second whether the exercise of personal jurisdiction

would comport with due process." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d

379, 389 (S.D.N.Y. 2019) (citing *Hildebrand v. Steck Mfg. Co.*, 279 F.3d 1351, 1354 (Fed. Cir.

2002).  The due process test comprises two inquiries:  (i) the minimum contacts test, and (ii) the

reasonableness inquiry.

"With respect to minimum contacts, [the court] must determine whether the defendant

has sufficient contacts with the forum state to justify the court's exercise of personal

jurisdiction." *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 164 (citing *Int'l Shoe Co. v.

Washington*, 326 U.S. 310, 316 (1945)).  This inquiry distinguishes between "specific"

jurisdiction and "general" jurisdiction.  Specific jurisdiction exists when "a [s]tate exercises

personal jurisdiction over a defendant in a suit arising out of or related to the defendant's

contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414

n. 8 (1984).  "A court's general jurisdiction, on the other hand, is based on the defendant's

general business contacts with the forum state and permits a court to exercise its power in a case

where the subject matter of the suit is unrelated to those contacts." *Queen Bee of Beverly Hills,

LLC*, 616 F.3d at 164 (citing *Helicopteros*, at 414–15 n. 9).  In determining the strength of the

contacts, the court should look to the totality of a defendant's contacts with the forum state. *Id.*

(citing *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No

single event or contact connecting defendant to the forum state need be demonstrated; rather, the

totality of all defendant's contacts with the forum state must indicate that the exercise of

jurisdiction would be proper." (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d

Cir. 1986))). Importantly, to establish specific jurisdiction, "[t]he relationship between the

defendant and the forum 'must arise out of contacts that the defendant *himself* creates with the

forum.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (citing

*Walden v. Fiore*, 571 U.S. 277, 284 (2014)). In other words, "[t]he 'minimum contacts analysis

looks to the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with

persons who reside there.'" *Id.* (citing *Walden*, 571 U.S. at 284). "And the same principles

apply when intentional torts are involved." *Id.* (internal quotation mark omitted).

With respect to the "reasonableness" inquiry, the court must assess whether the assertion

of personal jurisdiction comports with "traditional notions of fair play and substantial justice"—

that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the

particular case. *Int'l Shoe Co.*, 326 U.S. at 316. Courts "must evaluate the following factors as

part of this 'reasonableness' analysis: (1) the burden that the exercise of jurisdiction will impose

on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's

interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in

obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states

in furthering substantive social policies." *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 164–65

(citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987). "While the

exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum

contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a

compelling case that the presence of some other considerations would render jurisdiction

unreasonable.'" *Id.* at 165 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Consistent with due process, a court may also exercise personal jurisdiction over a

defendant who has consented to jurisdiction, *see Brown v. Lockheed Martin Corp.*, 814 F.3d 619,

625 (2d Cir. 2016), and, "[p]arties can consent to personal jurisdiction through forum-selection

clauses in contracts," *Days Inn Worldwide, Inc. v. Hazard Mgmt. Grp., Inc.*, No. 10 Civ.

7545(CM)(KNF), 2012 WL 5519356, at *3 (S.D.N.Y. Nov. 13, 2012). "While the Second

Circuit has not yet weighed in on this question, *see Magi XXI, Inc. v. Stato della Città del

Vaticano*, 714 F.3d 714, 723 n.10 (2d Cir. 2013), courts in this Circuit have held that parties to a

contract that includes a forum-selection clause may invoke that clause to establish personal

jurisdiction over a defendant that is not party to the contract but that is closely aligned with a

party." *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 258 (S.D.N.Y. 2019).

However, the "constitutional requirements [of personal jurisdiction] caution against a liberal

application of forum selection clauses to non-signatory defendants," and such application is

inappropriate where enforcement is not "foreseeable by virtue of the relationship between the

signatory and the [non-signatory] sought to be bound." *Arcadia Biosciences, Inc.*, 356 F. Supp.

3d at 395  (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Canal & Distribution S.A.S.*, No. 07

Civ. 2918 (DAB), 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010)); *see also Marano

Enterprises of Kansas v. Z-Teca Restaurants, L.P.*, 254 F.3d 753, 757 (8th Cir. 2001) (holding

that defendants could enforce a forum selection clause against a non-signatory plaintiff who was

"closely related to the disputes arising out of the agreements," meaning it was "foreseeable that

[the non-signatory would] be bound" to the agreements); *Lipcon v. Underwriters at Lloyd's,*

*London*, 148 F.3d 1285, 1299 (11th Cir. 1998) ("In order to bind a non-party to a forum selection

clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it

will be bound." (quoting *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)

(quoting *Manetti Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir. 1988)))).

"[T]he enforcement of the forum selection clause against the non-party must have been

foreseeable prior to suit, which implies that the non-signatory must have been otherwise involved

in the transaction in some manner." *Recurrent Capital Bridge Fund I, LLC v. ISR Sys. &*

*Sensors Corp.*, 875 F. Supp. 2d 297, 307–08 (S.D.N.Y. 2012) (wherein an officer and

shareholder of a closely held corporation was "closely related" to the corporation such that he

could be held to a subscription agreement's forum selection clause); *see also LaRoss Partners,*

*LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 156–57 (E.D.N.Y. 2012) (non-signatory to a

contract estopped from repudiating forum selection clause for purposes of personal jurisdiction

when the non-signatory "directly benefitted from the Agreement"); *In re Refco Inc., Sec. Litig.*,

No. 07-MDL 1902(JSR), 2009 WL 5548666, at *11 (S.D.N.Y. Nov. 16, 2009) (concluding that a

non-signatory "was closely related to the dispute such that it was foreseeable that [the non-

signatory] would be bound by the forum selection clauses," because the party was "intertwined"

with a signatory "and was responsible for carrying out their operations, including . . . the

execution of relevant documents").

## 2. Application

Here, Plaintiff asserts only specific personal jurisdiction over Defendant Hefetz.  Even

assuming Hefetz is subject to New York's long-arm statute, exercising personal jurisdiction over

Hefetz is not consistent with due process.[9]  Again, "[i]n judging minimum contacts, a court

---

[9] As a matter of constitutional avoidance, a court should normally "address the statutory bases of personal
jurisdiction prior to considering the constitutional limitations." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,

properly focuses on the relationship among the defendant, the forum, and the litigation," *Calder*

*v. Jones,* 465 U.S. 783, 788 (1984), and this "relationship . . . 'must arise out of contacts that the

defendant himself creates with the forum' . . . not the defendant's contacts with persons who

reside there.'" *Waldman v. Palestine Liberation Org.,* 835 F.3d 317, 335 (2d Cir. 2016) (quoting

*Walden,* 571 U.S. at 284–85). The only contacts Plaintiff cites linking Hefetz to New York are

Hefetz's patent assignment agreements with Defendant General Electric Company, "a New York

corporation." (Doc. 67, at 2.) The mere facts that (1) the General Electric Company is based in

New York and (2) has received patent assignments from Hefetz are insufficient to conclude that

Hefetz has sufficient minimum contacts with New York to warrant the exercise of personal

jurisdiction here, particularly when Plaintiff does not allege that Hefetz performed these

assignment agreements in New York. *See Navaera Scis., LLC v. Acuity Forensic Inc.,* 667 F.

Supp. 2d 369, 375 (S.D.N.Y. 2009) ("[T]he mere fact that an out-of-state defendant enters into a

contract with a company headquartered in New York does not establish the requisite minimum

contacts unless that contract projects the defendant into the New York market. Here Navaera

does not dispute that Acuity performed the contract and was paid solely in Canada, not in New

York."). Indeed, Hefetz's Declaration states that he is "not registered as a patent attorney or

patent agent in the U.S. and h[as] not acted as a patent agent or patent attorney in the U.S.,"

"[does] not regularly transact any business within the State of New York," and last visited New

York in 2010 as a tourist. (Hefetz Decl. ¶¶ 17–20.) Although asserting that I should not take the

_____

673 F.3d 50, 61 (2d Cir. 2012). However, Plaintiff has not pled that I have personal jurisdiction over Hefetz pursuant to New York's long-arm statute, nor argued which provisions of the statute are applicable in the instant case. Instead, Plaintiff relies on Hefetz's alleged consent to personal jurisdiction through the NDA's forum selection clause, supplemented by a letter regarding Hefetz's other alleged contacts. (*See* FAC ¶ 33; Doc. 67.) Accordingly, and because "[t]he [New York] state statutory and federal constitutional [personal jurisdiction] standards are [] not co-extensive," I proceed directly to the constitutional due process inquiry. *Cf. Licci ex rel. Licci,* 673 F.3d at 61 ("Where . . . the plaintiffs premise their theory of personal jurisdiction upon the New York long-arm statute, we first consider whether the requirements of the statute have been satisfied before proceeding to address whether the exercise of jurisdiction would comport with the Due Process Clause.").

Hefetz Declaration at face value, Plaintiff does not offer facts in opposition to its assertions. Accordingly, I find unpersuasive Plaintiff's argument that Hefetz's patent assignments and corresponding agreements constitute sufficient minimum contacts for purposes of personal jurisdiction.

With respect to the NDA's forum selection clause, it is undisputed that Hefetz was not a signatory to the NDA, and that Hefetz is not an employee of General Electric.  (FAC ¶¶ 447–49.) Accordingly, unless Plaintiff has sufficiently demonstrated that it was foreseeable that Hefetz could be subject to suit in New York under the terms of the NDA, I cannot exercise personal jurisdiction over Hefetz.  In this regard, I find Judge Jed S. Rakoff's recent opinion in *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379 (S.D.N.Y. 2019) particularly instructive.  In *Arcadia*, the plaintiff alleged personal jurisdiction on the basis of an NDA containing a mandatory New York forum selection clause.  *See id.* at 389.  Although the defendant challenging personal jurisdiction was not a party to the NDA, the plaintiff argued that the defendant was nevertheless "bound by the forum selection clause because the NDA provide[d] that 'all [defendant's] Affiliates shall be deemed to have assented to the terms and conditions of this Agreement notwithstanding the lack of any additional written agreement to that effect.'"  *Id.*  Judge Rakoff rejected this argument, as the signatory and non-signatory defendants were only horizontally-related business entities,[10] and the plaintiff "ha[d] not even made a showing that the [non-signatory defendant] was aware of the forum selection clause."  *Id.* at 395–96 & n.12 (emphasis in original).  The instant case presents the same issues.

The NDA contains similar language to that discussed in *Arcadia*.  For example, the

---

[10] In *Arcadia*, the non-signatory defendant was a joint venture formed in part by a company that was a wholly owned subsidiary of a French company.  *See id.* at 387.  The signatory defendant in *Arcadia* was also a wholly owned subsidiary of that same French company.  *See id.*

NDA's confidentiality provisions state that each party shall "not [] disclose, discuss,

communicate or transmit such Information to others, except to its Representatives to the extent

necessary for the performance of the Purpose and then only so long as such persons agreed to be

bound by the terms of this agreement." (NDA ¶ 1.1.)  The NDA further states that when entering

the agreement, the parties "desire[d] to exchange or provide access to their respective

Information to each other and their respective . . . representatives," among them "directors,

officers, employees, agents, consultants, [and] advisors." (*Id.* at ¶ E.)  Accordingly, the NDA

anticipated the parties' sharing of information with independent consultants like Hefetz, and

provided safeguards for doing so.  However, what is relevant for constitutional purposes is not

whether the parties to an agreement find it foreseeable that a third party could be bound by the

agreement's forum selection clause; rather, "the foreseeability that is critical to due process

analysis . . . is that the defendant's conduct . . . [is] such that he should reasonably anticipate

being haled into court" in the relevant forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

474 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Here, like in *Arcadia*, Plaintiff has not made a showing that Hefetz was aware of the NDA or its

forum selection clause.  Instead, Hefetz's Declaration states that he has "never signed, or agreed

to the terms of, the [NDA]," "[b]efore the present lawsuit . . . , had never seen a copy of the

[NDA], nor was aware of it," "[has] never assumed duties, obligations, or liabilities under the

[NDA]," and "[has] not authorized anyone to enter into the [NDA] on [his] behalf." (Hefetz

Decl. ¶¶ 6–10.)  For these reasons, Hefetz further declared that he "did not foresee that [he]

could possibly be subject to the forum selection clause in the [NDA] and that th[is] [l]awsuit

could be brought against [him] in the State of New York." (*Id.* ¶ 11.)  Plaintiff's contrary

allegations are made upon information and belief, and thus need not be taken as true in the face

of Hefetz's Declaration. *Cf. MacDermid, Inc.*, 702 F.3d at 727 ("The allegations in the

complaint must be taken as true to the extent they are uncontroverted by the defendant's

affidavits." (internal quotation marks omitted)).  That GE had a duty under the NDA to make

sure its representatives agreed to be bound to the terms of the NDA is not sufficient to exercise

personal jurisdiction over Hefetz, especially when Plaintiff's case is premised on GE's breaches

of its obligations under the NDA.[11]  Accordingly, I find that I cannot exercise personal

jurisdiction over Hefetz, and grant Defendants' motion to dismiss Plaintiff's case against Hefetz

pursuant to Rule 12(b)(2).  Additionally, I exercise my discretion to deny Plaintiff's request for

jurisdictional discovery regarding personal jurisdiction over Hefetz, as Plaintiff has not made the

requisite showing that such discovery is warranted.

### B.   *Preemption*

Defendants argue that Plaintiff's state law claims are preempted by federal patent law.

Specifically, Defendants argue that Plaintiff's state law claims are each based on claims of

inventorship because "each claim hinges on Plaintiff showing that it owns or possesses rights in

the [Spectrum Trade Secrets] that Defendants then misappropriated, misused, or impermissibly

exploited by disclosing and claiming the [Spectrum Trade Secrets] in the" relevant patents.

(Doc. 58, at 19.)  Although I agree with Defendants that preemption is warranted with respect to

Plaintiff's conversion and civil conspiracy to commit conversion claims, I find that Plaintiff's

other state law claims are not preempted.

"In addressing matters of preemption, the Federal Circuit has explained that 'although

---

[11] My conclusion with respect to personal jurisdiction over Hefetz does not mean that GE is insulated from liability for Hefetz's actions with respect to the Spectrum Trade Secrets.  Although Plaintiff has not demonstrated that it was foreseeable to Hefetz that he could be subject to the provisions of the NDA, GE agreed to the provisions in the NDA stating that it "shall be liable . . . for any failure by [its] Representatives to treat the Information in the same manner as [it] is obligated to treat such information under the terms of the [NDA] and shall otherwise be responsible for any breach of th[e] [NDA] by such Representatives."  (NDA ¶ 1.1(i).)

federal patent law plainly does not provide for explicit preemption . . . a state may not offer

patent-like protection to intellectual creations that would otherwise remain unprotected as a

matter of federal law.'" *Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 159

(E.D.N.Y. 2016) (quoting *Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298,

1305 (Fed. Cir. 2003)). "If a plaintiff bases its [] action on conduct that is protected or governed

by federal patent law, then the plaintiff may not invoke the state law remedy, which must be

preempted for conflict with federal patent law." *Hunter Douglas, Inc. v. Harmonic Design, Inc.*,

153 F.3d 1318, 1335 (Fed. Cir. 1998), *overruled on other grounds by Midwest Industries, Inc. v.*

*Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999). Accordingly, the Federal Circuit has

held that "the field of federal patent law preempts any state law that purports to define rights

based on inventorship." *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*, 600 F.3d 1347,

1353 (Fed. Cir. 2010) (quoting *Am. Cyanamid*, 196 F.3d at 1372); *see also James v. J2 Cloud*

*Servs. Inc.*, No. 2:16-cv-05769-CAS(PJWx), 2018 WL 6092461, at *4 (C.D. Cal. Nov. 19,

2018); *Speedfit LLC*, 226 F. Supp. 3d at 160 ("[A] state law claim that either seeks 'patent-like'

protections not provided by federal patent law, or turns on a determination of inventorship, is

preempted by federal patent law."). "By that same token, claims that can be established without

reference to patent inventorship . . . are generally not preempted by federal patent law." *Regents*

*of Univ. of California v. Chen*, No. 16-cv-07396-EMC, 2017 WL 3215356, at *7 (N.D. Cal. July

26, 2017) (internal quotations omitted).

In discussing federal jurisdiction over patent cases pursuant to 28 U.S.C. § 1338(a), the

Federal Circuit has routinely held that claims for trade secret misappropriation and breach of

contract carry burdens of proof that "can be met without requiring the resolution of a substantial

issue of patent law." *Uroplasty, Inc. v. Advanced Uroscience, Inc.*, 239 F.3d 1277, 1280 (Fed.

Cir. 2001). Accordingly, "patent law is not essential" to such claims, because patent law is not a

necessary element of such claims. *Id.* (citing *Christianson v. Colt*, 486 U.S. 800, 809 (1988));

*see also Am. Tel. & Tel. Co. v. Integrated Network Corp.*, 972 F.2d 1321, 1324 (Fed. Cir. 1992)

("AT&T alleges breach of contract and breach of fiduciary duty . . . , and misuse and

misappropriation of proprietary information by the disclosure to [defendant] and eventual

publication of the information contained in the patent. . . . These are traditional contract and tort

claims" that do not arise under the patent laws); *Consolidated World Housewares, Inc. v. Finkle*,

831 F.2d 261, 265 (Fed. Cir. 1987) ("That a contract action may involve a determination of the

true inventor does not convert that action into one 'arising under' the patent laws."). Indeed, the

primary authority Defendants cite to the contrary, *Intellisoft, Ltd. v. Acer Am. Corp.*, No. 17-cv-

06272-PJH, 2018 WL 6421872, (N.D. Cal. Dec. 6, 2018), was squarely rejected by the Federal

Circuit on appeal. *See Intellisoft, Ltd. v. Acer Am. Corp.*, 955 F.3d 927 (Fed. Cir. 2020). In

*Intellisoft*, the Federal Circuit held that a plaintiff's misappropriation of trade secrets claim did

not rest on federal patent law because the determination of a plaintiff's ownership of a trade

secret under California law was distinct from the question of inventorship under federal patent

law. *See id.* at 932 ("[O]wnership under state law did not require proof of patent inventorship.

The ownership issue thus did not necessarily depend on patent laws."); *see also Krauser v.

BioHorizons, Inc.*, 753 F.3d 1263, 1265–67, 1269 (Fed. Cir. 2014) ("A claim of ownership does

not necessarily require consideration of patent law inventorship.").

　　　If trade secret misappropriation and breach of contract claims do not necessarily "arise[]

under the federal patent laws," 28 U.S.C. § 1338(a), for jurisdictional purposes, I reject

Defendants' contention, for preemption purposes, that all of Plaintiff's claims are necessarily

claims of inventorship. Instead, determination of whether Plaintiff's state law claims are

preempted by federal patent law turns on the nature of Plaintiff's allegations, because state law claims are not preempted when they are "not based on plaintiff's assertion of intellectual property rights." *James*, 2018 WL 6092461, at *5. For example, claims which seek to remedy breaches of confidentiality agreements are not necessarily preempted by federal patent law, even when an alleged breach involves the use of confidential information to secure a patent, because such claims are based on the assertion of contract rights. *Cf. University of Colorado Foundation, Inc. v. American Cynamid Company*, 342 F.3d 1298, 1306 (Fed. Cir. 2003) ("[T]he Doctors' claim of unjust enrichment is a legal claim to remedy the breach of a contract implied in law for disclosure of their confidential manuscript in exchange for a promise not to disseminate the idea without the Doctors' consent. . . . The fact that Cyanamid improperly secured the '634 patent and used this patent to obtain incremental profits only pertains to restitution for the unjust enrichment claim."); *see also Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1478 (Fed. Cir. 1998) ("[S]tate law governs the maintenance of orderly contractual relations and this function is not preempted merely because patents and patent issues are presented in the substance of those contracts."); *Chen*, 2017 WL 3215356, at *8 (holding that breach of contract action involving patent assignments was not preempted by federal patent law). Here, Plaintiff alleges that "[p]ursuant to the [NDA], Spectrum provided GE . . . access to the Spectrum Information for the sole purpose of evaluating a possible relationship between [GE] and Spectrum, which Spectrum Information GE agreed 'constitute[d] valuable trade secrets.'" (FAC ¶ 496 (citing NDA ¶ C, E, F).) That Defendants made certain contractual representations related to Plaintiff's ownership of trade secrets, and further undertook contractual obligations regarding those trade secrets, are allegations sufficient to withdraw Plaintiff's breach of contract claim from the class of claims seeking "to define rights based on inventorship." *HIF Bio, Inc.*, 600 F.3d at 1353 (quoting *Am.*

22

*Cyanamid*, 196 F.3d at 1372).  Instead, Plaintiff merely seeks protections and remedies afforded

by state law for rights based in contract.  The same is true of Plaintiff's claims alleging

Defendants' misappropriation of trade secrets and ideas, because—as outlined in *Intellisoft*—

Plaintiff's allegations that it owned and possessed certain trade secrets, which Defendants

acknowledged in the NDA, stand separate and apart from allegations "purport[ing] to define

rights based on inventorship." *HIF Bio, Inc.*, 600 F.3d at 1353 (quoting *Am. Cyanamid*, 196 F.3d

at 1372).[12]  Accordingly, I find that Plaintiff's breach of contract action and misappropriation of

trade secrets claims are not preempted by federal patent law.

In contrast to these claims, Plaintiff's conversion and civil conspiracy to commit

conversion claims are based entirely on the issuance of the relevant patents and GE's having

been assigned the patents, to which Plaintiff claims "a superior right of possession," (Doc. 65, at

62). *See James*, 2018 WL 6092461, at *6 ("Plaintiff's conversion claim is preempted by federal

patent law because it is entirely based on plaintiff's claim that he is the rightful inventor and

owner of the [p]atent."); *Gerawan Farming, Inc. v. Rehrig P. Co.*, No. 1:11-cv-01273-LJO

BAM, 2012 WL 691758, at *7 (E.D. Cal. Mar. 2, 2012) (dismissing the plaintiff's conversion

claim because it was based on the misappropriation of his patent rights); *GE v. Wilkins*, No.

1:10-cv-00674-OWW-JLT, 2011 WL 3163348, at *8 (E.D. Cal. July 26, 2011) (explaining that a

conversion claim based on the misappropriation of patent rights is preempted by federal patent

---

[12] I also find that Plaintiff's unfair competition claim is not preempted by federal patent law "to the extent it is
premised on a misappropriation theory," because such a theory "does not turn solely on allegations that Defendants
infringed Plaintiff's [intellectual property rights]." *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 507
(S.D.N.Y. 2018).  Instead, such a theory is "'based on [allegations] of unfair commercial practices'" and "includes
additional elements not addressed by federal patent law." *Id.* (quoting *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d
1357, 1372 (Fed. Cir. 2013) (unfair competition claim not preempted by federal patent law where plaintiff alleged
that he had shared proprietary information with defendant, and defendant then made unauthorized copies of the
product for sale); *see also Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306–07 (Fed. Cir. 1999) (unfair
competition claim not preempted by federal patent law where it included a showing of unfair business practices,
such as "misleading, if not outright false, statements" by defendant).

law).

### C.    *Contractual and Quasi-Contractual Claims*

#### 1.  Claim I:  Breach of Contract

Defendants move to dismiss Plaintiff's breach of contract claim to the extent it alleges

breaches of the NDA's confidentiality provisions arising from Defendants' use or disclosure of

Spectrum Trade Secrets E, G, I, J, and N, because Plaintiff made these trade secrets public on

November 14, 2013, when the '721 PCT issued, disclosing the nature of these trade secrets.

Plaintiff argues that its publication of these trade secrets did not exempt Defendants from its

obligations not to use Plaintiff's information, and only excused Defendants' own disclosure of

the information.  I find that the parties' NDA is unambiguous on this point, and that Plaintiff's

strained distinction between Defendants' use and disclosure of Spectrum trade secrets is not

supported by the clear language in the contract.

As outlined in the factual background section, the NDA includes a list of

"Confidentiality" obligations, including (i) holding information in confidence; (ii) exercising

caution to maintain the secrecy of information; (iii) preventing unauthorized use; (iv) not

disclosing or discussing the information with others; and (v) not using the information in any

way whatsoever other than for the NDA's Purpose.  (*See* NDA ¶¶ 1.1–1.2.)  Additionally, the

"Exclusions" section of the parties' NDA states, in relevant part, that "[t]he obligation . . . to

maintain the confidentiality of Information shall not apply to any of the Information that [GE]

can reasonably demonstrate . . . is made public by [Spectrum], or is established to be part of the

public domain."  (*Id.* ¶ 2.1.)  Given the fact that the "Confidentiality" obligations prohibit both

unauthorized use and disclosure of Spectrum's trade secrets, it is clear from a plain reading of

the parties' contract language that "confidentiality" in the "Exclusions" section refers to the same

obligations.  Thus, I find unpersuasive Plaintiff's argument that the reference to "confidentiality"

in the exclusions section of the NDA excuses only Defendants' disclosure of Spectrum trade

secrets, but not Defendants' use of such information.  Accordingly, Defendant's motion to

dismiss Plaintiff's breach of contract claim with respect to these publicly disclosed trade secrets

is granted for claims arising after November 14, 2013.[13]

### 2.  Claim VI:  Breach of the Implied Covenant of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of

good faith." *Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*, No. 16-CV-5173 (KMK),

2019 WL 2006180, at \*14 (S.D.N.Y. May 7, 2019) (quoting *Arcadia Biosciences, Inc. v.*

*Vilmorin & Cie*, 356 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (quoting *Harris v. Provident Life &*

*Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002))).  "In order to find a breach of the implied

covenant, a party's action must directly violate an obligation that may be presumed to have been

intended by the parties." *Gaia House Mezz LLC v. State Street Bank & Trust Co.*, 720 F.3d 84,

93 (2d Cir. 2013) (internal quotations marks omitted); *see also Skillgames, LLC v. Brody*, 767

N.Y.S.2d 418, 423 (App. Div. 1st Dep't 2003) (stating that the implied covenant is "breached

when a party acts in a manner that, although not expressly forbidden by any contractual

provision, would deprive the other party of the right to receive the benefits under their

agreement" (internal quotation marks omitted)).  However, "New York law . . . does not

recognize a separate cause of action for breach of the implied covenant of good faith and fair

dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris*, 310

F.3d at 81.  "Therefore, when a complaint alleges both a breach of contract and a breach of the

---

[13] Although the parties have not raised this argument, the "Duration" section of the NDA further states that "[t]he parties' obligations and duties pursuant to this Agreement shall" expire once "such Information is in the public domain through no fault of [GE]." (*Id.* ¶ 7.) The "Duration" section's more general reference to "obligations" would seem to excuse Defendants' obligations entirely with respect to information that Spectrum publicly disclosed.

implied covenant of good faith and fair dealing based on the same facts, the latter claim should

be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)

(citing *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 n. 17 (2d Cir. 2011)); *see also*

*Nuance Commc'ns, Inc.*, 2019 WL 2006180, at *14; *Arcadia*, 356 F. Supp. 3d at 400; *JGB*

*(Cayman) Newton, Ltd. v. Sellas Life Sciences Grp. Inc.*, No. 18cv3095(DLC), 2018 WL

5266877, at *13 (S.D.N.Y. Oct. 23, 2018).

Attempting to state a claim for breach of the implied covenant of good faith and fair

dealing, Plaintiff alleges that Defendants obtained its trade secrets under false pretenses and

misappropriated, misused, and impermissibly exploited those trade secrets to develop the

imitation VERITON device, and to prepare and file patent applications.  (FAC ¶¶ 562–63.)

These allegations are duplicative of Plaintiff's breach of contract claims, as they are based on the

same express obligations under the NDA to use and disseminate the Spectrum Trade Secrets only

in compliance with the confidentiality and use provisions of the agreement, and rely on the same

alleged breaches.  (*See* FAC ¶¶ 498–503.)  Plaintiff also seeks the same relief for its implied

covenant claim as it does for its breach of contract claim, further underscoring the duplicative

nature of the claim.  Accordingly, Plaintiff's claim for breach of the implied covenant of good

faith and fair dealing is dismissed.  *See Nuance Commc'ns, Inc.*, 2019 WL 2006180, at *15

("Both claims are premised on the same set of facts.  Both claims refer to IBM's alleged

violations of its obligations under the contract.  And both claims seek the same remedy.

Therefore, the implied-covenant claim is duplicative."); *EFG Bank AG, Cayman Branch v. AXA*

*Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 93–94 (S.D.N.Y. 2018) (dismissing as duplicative

implied covenant claim where "[t]he gravamen" of each claim "[was] the exact same" and where

the damages sought were identical).

### 3. Claim VII: Unjust Enrichment

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Where the existence of an enforceable contract is disputed, "Rule 8(d)(2) of the Federal Rule of Civil Procedure permits a plaintiff to plead claims for breach of contract and, in the alternative, claims for quantum meruit and unjust enrichment." *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 243 (S.D.N.Y. 2013). However, "where there is a valid and enforceable contract between the parties, and the subject matter of the unjust enrichment claim is covered by the contract," a court must dismiss the unjust enrichment claim. *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494, 516 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Maryland Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000) ("The notion of unjust enrichment applies where there is no contract between the parties . . . ."); *Opternative, Inc. v. Jand, Inc.*, No. 17 Civ. 6936 (JFK), 2018 WL 3747171, at *7 (S.D.N.Y. Aug. 7, 2018) ("Under New York law, the existence of a valid contract typically bars recovery based on the quasi-contract theory of unjust enrichment.").

Here, the NDA governs the parties' relationship with respect to the use and disclosure of Plaintiff's trade secrets, a fact that Defendants do not dispute. Nor do Defendants dispute the existence of a valid contract; in fact, Defendants rely on the NDA's language when arguing for the dismissal of certain of Plaintiff's breach of contract claims. (*See* Doc. 58, at 4–6, 21.) Plaintiff's unjust enrichment claim simply repeats the allegations used to state its breach of contract claim. Accordingly, the subject matter of Plaintiff's unjust enrichment claim is covered by the NDA, and the claim must be dismissed as duplicative of Plaintiff's breach of contract

27

claim. *See Opternative, Inc.*, 2018 WL 3747171, at *7 ("[B]ecause Opternative seeks to 'simply

duplicate' a conventional contract claim for Warby Parker's breach of the NDAs, the unjust

enrichment claim is dismissed with prejudice." (quoting *Marshall v. Hyundai Motor Am.*, 51 F.

Supp. 3d 451, 472 (S.D.N.Y. 2014)); *AFP Mfg. Corp. v. AFP Imaging Corp.*, No. 17-CV0392

(NSR), 2018 WL 3329859, at *11 (dismissing unjust enrichment claim with prejudice where the

only evidence plaintiff offered in support of its claim was a "restatement of the evidence that it

provided in furtherance of its breach of contract claim").

### D.    *Claims II, IV, V, and X:  Misappropriation of Trade Secrets, Misappropriation of Ideas, Unfair Competition, and Negligence*

#### 1.  Whether the Claims Are Duplicative

Under New York law, where a plaintiff and defendant are parties to a contract, an action

in tort cannot lie unless the plaintiff alleges "that the defendant breached a duty independent of

its duties under the contract" by going "beyond a mere breach of the contract and act[ing] in such

a way that a trier of fact [can] infer that it willfully intended to harm the plaintiff." *Carvel Corp.*

*v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003); *see also Opternative, Inc. v. JAND, Inc.*, No. 17 Civ.

6936 (JFK), 2019 WL 624853, at *3 (S.D.N.Y. Feb. 13, 2019).  Here, Plaintiff has provided

sufficient allegations of Defendants' willful misconduct to defeat dismissal of its

misappropriation of trade secrets, misappropriation of ideas, and unfair competition claims.

Plaintiff alleges that in 2018, it confronted GE after hearing rumors that GE was seeking

to develop an imitation VERITON device in violation of the NDA, and GE denied these rumors.

(FAC ¶¶ 122–24.)  In particular, in May of 2018, a Spectrum employee met Hermony for coffee

and directly confronted him regarding GE's potential violations of the NDA.  (*Id.*)  However,

Hermony represented that GE was complying with its obligations, and that he did not wish to

further discuss the matter.  (*Id.*)  Despite these representations, on or about June 13, 2018,

Spectrum employees observed that GE had actually built an imitation VERITON device, (*id.* ¶ 128), and Spectrum subsequently learned that GE had been demonstrating and discussing its imitation device with key global opinion leaders in the industry and at trade shows, (*id.* ¶ 133–40). Despite his previous assurances that GE was not in breach of the NDA, on June 26, 2018, Hermony stated to a Spectrum representative that there was a "leak" in the GE organization. (*Id.* ¶ 143.) The timeline of Hermony's representations in conjunction with GE's development of an imitation VERITON device are sufficient at this stage to plausibly infer that Defendants willfully intended to harm the Plaintiff.[14] *Cf. Opternative, Inc.*, 2019 WL 624853, at *5 (concluding that misappropriation and unfair competition claims were not duplicative where defendant knowingly misrepresented its product development efforts).

With regard to Plaintiff's negligence claim, Plaintiff alleges that "Defendants negligently failed to exercise the duty of care required under the 2009 [NDA] resulting in the improper disclosure and misuse of" Plaintiff's information. (FAC ¶ 614.) Plaintiff's negligence claim is entirely based on the duties outlined in the NDA, and fails to identify any legal duty independent of those adopted in the NDA. Accordingly, Plaintiff's negligence claim is dismissed as duplicative of its breach of contract claim. *See Waterville Inv., Inc. v. Homeland Sec. Network (NV Corp.)*, No. 08-CV-3433 (JFB), 2010 WL 2695287, at *7 (E.D.N.Y. July 2, 2010) (dismissing negligence claim as duplicative because "plaintiff identifie[d] no duty breached by defendants apart from the duty to compensate plaintiff under the Agreement"); *cf. Chase Manhattan Bank, N.A. v. Remington Prods., Inc.*, 865 F. Supp. 194, 200 (S.D.N.Y. 1994) ("New York does not recognize a cause of action for negligent performance of a contract." (citing

---

[14] I note that Plaintiff's misappropriation of trade secrets, misappropriation of ideas, and unfair competition claims are made against all Defendants in group pleading format. Although I find Plaintiff's allegations of willfulness to be sufficient at this stage, Plaintiff will need to present Defendant-specific evidence to survive summary judgment on its claims with respect to each Defendant.

*Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987))), *aff'd* 71 F.3d 407

(2d Cir. 1995)).

### 2.  Whether the Claims are Time-Barred

Defendants argue that because the applications for the ███████████ were filed in

late 2012, certain of Plaintiff's causes of action are time-barred.  Affirmative defenses, such as a

statute of limitations defense, "often require[ ] consideration of facts outside of the complaint

and thus [are] inappropriate to resolve on a motion to dismiss." *Kelly–Brown v. Winfrey*, 717

F.3d 295, 308 (2d Cir. 2013).  However, "[a]n affirmative defense may be raised by a . . . motion

to dismiss . . . if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross

Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *see also Konowaloff v. Metro. Museum of Art*, 702

F.3d 140, 146 (2d Cir. 2012).  Here, although Defendants have raised the issue as to whether

their patent filings in late 2012 were sufficient to alert Plaintiff to certain causes of action, thus

rendering these claims time-barred, Plaintiff has identified certain allegations that could support

equitable tolling, and bases its claims on multiple factual theories.  These factual question render

determination of the statute of limitations issue inappropriate at this stage.  Accordingly,

Defendants' motion to dismiss based upon statute of limitations is denied at this stage without

prejudice to renewal at a later stage. *See Cortes v. City of New York*, 700 F. Supp. 2d 474, 482

(S.D.N.Y. Mar. 30, 2010) (holding that because "the statute of limitations is an affirmative

defense not required to be negated on the face of the pleadings, and . . . [the] [p]laintiff has

proffered arguments and evidence that might support a finding of waiver or grounds for equitable

tolling, [the] [d]efendants's motion is denied insofar as it is premised on statute of limitations

grounds, without prejudice to renewal of their limitations defense in later summary judgment

motion practice or at trial"); *see also Uni-Sys., LLC v. United States Tennis Ass'n, Inc.*, 350 F.

Supp. 3d 143, 178 (E.D.N.Y. 2018) (denying motion to dismiss misappropriation of trade secrets

claims on statute of limitations grounds because the briefing "prematurely raised factual

disputes").

### 3.  Plaintiff's Trade Secrets

Defendants seek to dismiss Plaintiff's state law misappropriation of trade secrets claim on

the basis that Plaintiff's alleged trade secrets are in actuality new product ideas that are not

protected under New York law.  I disagree.

Under New York law, "[a] trade secret is any formula, pattern, device or compilation of

information which is used in one's business, and which gives the owner an opportunity to obtain

an advantage over competitors who do not know or use it." *Faiveley Transp. Malmo AB v.*

*Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188

F.3d 38, 44 (2d Cir. 1999)).  In determining whether information constitutes a trade secret, New

York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the
> extent to which it is known by employees and others involved in the business; (3)
> the extent of measures taken by the business to guard the secrecy of the information;
> (4) the value of the information to the business and its competitors; (5) the amount
> of effort or money expended by the business in developing the information; (6) the
> ease or difficulty with which the information could be properly acquired or
> duplicated by others.

*Id.* (quoting *N. Atl. Instruments, Inc.*, 188 F.3d at 44).  "[T]he most important consideration [is]

whether the information was secret." *See Lehman v. Dow Jones, & Co., Inc.*, 783 F.2d 285, 298

(2d Cir. 1986).  Although "secrecy is a question of fact," *id.*, courts have held that there can be

no trade secret protection, as a matter of law, if the secrecy is necessarily lost when the design or

product is placed on the market. *See Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173,

1176–77 (2d Cir. 1993) (finding that hotel room design concept was not a trade secret because it

would be publicly disclosed once the hotel room was built, marketed and occupied), *abrogated*

*on other grounds by Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000);

*Speciner v. Reynolds Metals Co.*, 279 F.2d 337, 337–38 (2d Cir. 1960) (affirming finding that a window design was not a trade secret where the features "were readily apparent from a casual inspection of the plaintiff's window which was available on the open market"); *Blank v. Pollack*, 916 F. Supp. 165, 175 (N.D.N.Y.1996) (finding a window crank not to be a trade secret because it is "a device, that upon marketing and sale is open to public inspection of all of its features").

I cannot conclude as a matter of law, on a motion to dismiss, that the secrecy of Plaintiff's alleged trade secrets is necessarily lost because the VERITON device has been placed on the market. Plaintiff's trade secrets include a series of highly innovative medical device components, designs, and methods used in the medical imaging field. Plaintiff took measures to protect the secrecy of its information, including entering into the NDA with Defendants. Although Plaintiff intends to market these alleged trade secrets in the form of the VERITON imaging device, the highly specialized nature of Plaintiff's technology is not analogous to the products discussed in *Hudson Hotels Corp.* or *Speciner*, the nature of which could be discerned from a casual inspection. Accordingly, because Defendants have failed to demonstrate why Plaintiff's technology would be "easily ascertainable by the public," I reject Defendants' argument at this stage. *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499 (S.D.N.Y. 2002).

However, consistent with my conclusion in Part IV(C)(1), Plaintiff made trade secrets E, G, I, J, and N public through the November 14, 2013 publication of the '721 PCT. Having publicly disclosed these trade secrets, Plaintiff is no longer afforded trade secret protection under New York law, and cannot proceed on its misappropriation claims with respect to these trade secrets for claims arising after November 14, 2013.

### E.   *Claims VIII and IX: Fraud, and Aiding and Abetting Fraud*

#### 1. Heightened Pleading Standard

"Allegations of fraud are subject to a heightened pleading standard" pursuant to Federal

Rule of Civil Procedure Rule 9(b), and must be pled "with particularity." *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192, 197 (2d Cir. 2013); Fed. R. Civ. P. 9(b). Accordingly, such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata*, 723 F.3d at 197 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). "In addition, the plaintiff must allege facts that give rise to a *strong* inference of fraudulent intent." *Id.* (emphasis in original) (internal quotaton marks omitted). Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind . . . may be alleged generally." Fed. R. Civ. P. 9(b). However, this "relaxation of Rule 9(b)'s specificity requirement regarding condition of mind" is not "a license to base claims of fraud on speculation and conclusory allegations." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 290–291 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Finally, "[w]hile Rule 9(b) requires that 'the circumstances constituting fraud' be 'state[d] with particularity,' Fed. R. Civ. P. 9(b), it does not require factual pleadings that demonstrate the *probability* of wrongdoing." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). "At the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Id.* (emphasis in original).

### 2. Discussion

"Under New York law, a plaintiff must plead the following five elements to allege a

33

claim that relies on a theory of fraudulent misrepresentation: '(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff.'" *Opternative, Inc.*, 2019 WL 624853, at *3 (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)); *see also Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (stating the elements of a fraud claim under New York law). The elements of an aiding-and-abetting fraud claim brought under New York law are: (1) an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance to the fraud. *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014).

Plaintiff alleges that Defendants made a material misrepresentation when representing to Plaintiff "during the 2009-2012 due diligence period, . . . that GE's R&D budget was insufficient to develop its own CZT-based general SPECT system, and [GE] was therefore [] looking to Spectrum to provide the technology that GE needed." (FAC ¶ 585.) Plaintiff further alleges that "Defendant Hermony also conveyed . . . , during the due diligence period, that any cooperation with Spectrum would be paid for in part out of GE's R&D budget, but that GE could not undertake the necessary R&D to develop a CZT-based general SPECT system on [its] own." (*Id.* ¶ 587.) Plaintiff states that based on these representations, Spectrum was willing to divulge all the details of its business and technology during the due diligence period, (*id.* ¶ 588), but that it never would have disclosed its confidential information if it had the slightest notion that GE intended to misappropriate its technology by developing an imitation VERITON device and pursuing patents based on Spectrum's technology, (*id.* ¶ 590).

These allegations are insufficient to state with particularity the circumstances surrounding GE's alleged fraud. The First Amended Complaint states that Plaintiff "disclosed the Spectrum

Information to numerous GE diligence personnel" "[p]ursuant to the non-disclosure and non-use provisions of the [NDA]," which was signed on September 16, 2009. (*Id.* ¶ 58; NDA Preamble.) Indeed, "[a]fter execution of the [NDA] and continuing until approximately the end of 2012, the Spectrum and GE diligence personnel conducted numerous in-person meetings and engaged in on-going communications via email exchanges wherein Spectrum divulged the 'keys to the kingdom' in the form of Spectrum information." (FAC ¶ 86.) Disclosures involving Spectrum's D-SPECT technology occurred as early as June 2010, as well as disclosures involving the design and development of the next generation of Spectrum's technology, which included the VERITON. (*Id.* ¶¶ 87–88.) Given this context, Plaintiff's allegation that Defendants made material misrepresentations "during the 2009-2012 due diligence period" is not sufficient to allege, with particularity, that the statements were made at a time which would have induced Plaintiff to disclose its trade secrets. (*Id.* ¶ 585.) Instead, the facts as alleged demonstrate that Plaintiff was "willing to completely open up and divulge" its information based on the "enhanced protections of the 2009 [NDA]." (*Id.* ¶ 94.) Without more specific allegations regarding when Defendants made the alleged misrepresentations, to whom the alleged misrepresentations were made, and the conditions under which these misrepresentations were made, Plaintiff cannot meet the particularity requirement of Rule 9(b). *Cf. Opternative, Inc.*, 2019 WL 624853, at *1, 5 (sustaining allegations of fraud because misrepresentations regarding parallel product development took place "before the parties had entered into their [] NDA" and preceded plaintiff's disclosures under the NDA, and were made in response to plaintiff's specific requests for assurances).

Second, Plaintiff has failed to plausibly allege a strong inference of fraudulent intent. As the First Amended Complaint states, Defendants represented that instead of developing their own

SPECT technology, they wanted to pursue an acquisition of or joint venture with Spectrum. (*Id.* ¶¶ 95–98.) Indeed, this was the purpose of the NDA. In March 2012, GE's outside counsel even prepared a Joint Development Agreement, and in a later proposal in 2012, "GE was prepared to pay a very substantial sum to acquire the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, along with royalty payments." (*Id.* ¶ 97.) In addition, GE made a formal bid to purchase Spectrum in or around 2012 to 2013; however, Plaintiff rejected the bid in favor of a bid by a company called Biosensors. (*Id.* ¶ 98.) Based on these facts as alleged by Plaintiff, GE followed through on its representations that it intended to invest in Spectrum, negating Plaintiff's allegation that Defendants' representations leading up to GE's rejected bid were pretext for gaining access to and misappropriating Plaintiff's technology. *See Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made.").[15]

### F.   *Claim XIII: Fraud on the United States Patent and Trademark Office*

#### 1. Jurisdiction

Defendant moves under Rule 12(b)(1) to dismiss Plaintiff's claim for fraud on the United States Patent and Trademark Office, arguing that no controversy exists sufficient to establish standing under the Declaratory Judgment Act. Plaintiff's thirteenth claim seeks a declaratory judgment that Defendants obtained their patents through fraud on the United States Patent and Trademark Office ("PTO"). I find that Plaintiff has adequately alleged standing at this stage.

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may

---

[15] Because I find that Plaintiff has failed to adequately plead an underlying fraud, I also dismiss Plaintiff's claim of aiding and abetting fraud.

Case 1:18-cv-11386-VSB Document 73 Filed 06/02/20 Page 37 of 43

declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The party seeking relief under the Declaratory Judgment Act must demonstrate constitutional standing under Article III of the United States Constitution because declaratory judgment jurisdiction extends only to actual [c]ases and [c]ontroversies." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks omitted). The Federal Circuit has stated, in the patent context, that standing is properly established when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008) (quoting *MedImmune, Inc.*, 549 U.S. at 127). "The mere existence of a potentially adverse patent does not cause an injury nor create an imminent risk of an injury . . . ." *Prasco, LLC*, 537 F.3d at 1338. Similarly, "the Supreme Court has emphasized that a fear of future harm that is only subjective is not an injury or threat of injury caused by the defendant that can be the basis of an Article III case or controversy. Rather, it is the reality of the threat of . . . injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Id.* at 1338–39 (citations omitted). Accordingly, "[r]ather than a purely subjective fear or the mere existence of a potentially adverse patent alone, the alleged injury at the root of most justiciable declaratory judgment controversies in the patent context is a restraint on the free exploitation of non-infringing goods, or an imminent threat of such restraint." *Id.* at 1339 (internal quotations omitted). In the usual case, "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without a license under the patent, an Article III case

37

or controversy will arise and the party need not risk a suit for infringement by engaging in the

identified activity before seeking a declaration of its legal rights." *SanDisk Corp. v.*

*STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). Indeed, "the trend is to find an

actual controversy, at least where the declaratory judgment plaintiff's product arguably practices

a patent and the patentee has given some indication it will enforce its rights." *Diamonds.net LLC*

*v. Idex Online, Ltd.*, 590 F. Supp. 2d 593, 598 (S.D.N.Y. 2008) (collecting cases);

   Here, Plaintiff has come forward with sufficient evidence to properly establish

jurisdiction at this stage. Although on April 3, 2019, counsel for Spectrum sent GE a letter

asking for clarification as to "whether GE intend[ed] to sue Spectrum for infringement of its

patents in the nuclear medicine space," (FAC Ex. 27), the history of correspondence between the

parties and representations made by GE in previous letters demonstrate that Spectrum's "product

arguably practices a [GE] patent and [that] [GE] has given some indication it will enforce its

rights." *Diamonds.net LLC*, 590 F. Supp. 2d at 598. For example, in an October 12, 2018 letter

to Spectrum's counsel, counsel for GE noted "that Spectrum [] ha[d] been telling potential

customers that Spectrum [] ha[d] patents that [would] prevent other companies like GE from

developing and selling systems that compete with Spectrum['s] [] Veriton systems." (FAC Ex.

24.) The letter further stated that these representations "expos[ed] [Spectrum] to legal liability

anywhere in the world where these threats [were] made." (*Id.*) In addition, counsel for GE

stated "as [Spectrum] is well aware, GE has a formidable portfolio of patents in the nuclear

medicine space," and that, "[a]s GE's relationship with [Spectrum] continue[d] to sour, GE

[would] have no choice but to prioritize comparison of [Spectrum's] systems to the many nuclear

medicine inventions owned by GE." (*Id.*) The fact that both Spectrum and GE have begun

marketing their respective CZT devices, in conjunction with GE's threatening letters and the

parties' failed communication regarding the scope of their intellectual property and

corresponding liability, gives rise to more than a purely subjective fear of future harm.

Accordingly, I find that "the facts alleged, under all the circumstances, show that there is a

substantial controversy, between parties having adverse legal interests, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment." *Prasco, LLC*, 537 F.3d at 1336;

*see also Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 899, 901 (Fed. Cir. 2008)

(finding actual controversy based in part on "threatening letters" and "behavioral observations");

*Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1366, 1370 (Fed. Cir. 2007) (finding actual

controversy based on letter from licensor threatening "to protect its rights").

### 2.  Pleading Requirements

Defendants move to dismiss Plaintiff's claim of fraud on the PTO because Plaintiff has

failed to meet the particularity requirements of Rule 9(b).[16] I find that Plaintiff has supplied

adequate factual allegations at this stage to meet Rule 9(b)'s pleading requirements, and deny

Defendants' motion to dismiss Plaintiff's thirteenth claim.

To succeed on its claim, Plaintiff must demonstrate that (1) an individual associated with

the filing and prosecution of a patent application made an affirmative misrepresentation of a

material fact, failed to disclose material information, or submitted false material information; and

(2) the individual did so with a specific intent to deceive the PTO. *Star Scientific, Inc. v. R.J.*

*Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008). Such allegations must meet the

---

[16] Although Defendants construe Plaintiff's thirteenth cause of action as a claim for inequitable conduct before the PTO, Plaintiff states in its opposition brief that its claim is one for independent fraud on the PTO. (Doc. 65, at 63.) Plaintiff, however, has provided no authority for the existence of such a claim, or its elements. In any case, the Federal Circuit has stated that "inequitable conduct" is "a broader concept than fraud," that must still be pled with particularity under Rule 9(b). *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009) (quoting *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003)). Accordingly, I apply the heightened pleading standards discussed by the Federal Circuit in *Exergen Corp.*

heightened pleadings standards of Rule 9(b), meaning the plaintiff "must identify the specific

who, what, when, where, and how of the material misrepresentation or omission committed

before the PTO." *Exergen Corp.*, 575 F.3d at 1328. "A pleading that simply avers the

substantive elements of [a claim], without setting forth the particularized factual bases for the

allegation, does not satisfy Rule 9(b)." *Id.* at 1326–27.

Plaintiff alleges, in group pleading format, that Hefetz and the other individual

defendants "have engaged in a systematic and continuous effort to intentionally and fraudulently

misappropriate," (FAC ¶ 640), Spectrum's intellectual property, including through patent

applications "prepared by Defendant Hefetz," (FAC ¶ 650), and submitted to the PTO.  Plaintiff

further alleges that "[i]n each of the [] applications for the Section 256 GE Patent(s)," and other

GE patents, the individual defendants and Hefetz "concealed and did not identify the true

inventor(s) of the claimed inventions," (FAC ¶ 652), who were in fact Spectrum employees.

However, Plaintiff further specifies that Bouhnik, Steinfeld, and Escho—individuals who

received Spectrum's proprietary and confidential information pursuant to the NDA—submitted

declarations to the PTO stating that they were the inventors of certain GE inventions, but failed

to disclose that certain information in their patent applications was derived from the 2009 to

2012 due diligence meetings with Spectrum.  (FAC ¶¶ 653–654.)  In addition, throughout the

First Amended Complaint, Plaintiff specifies which trade secrets these defendants were

individually exposed to, and how the trade secrets corresponded to information on which the

defendants relied when filing their patent applications.  (*See* FAC ¶¶ 195–466.)  Thus, Plaintiff

has "identif[ied] the specific [information] that was allegedly known to the applicant and not

disclosed." *Exergen Corp.*, 575 F.3d at 1327.

Plaintiff has also provided "sufficient allegations of underlying facts from which a court

may reasonably infer that [certain defendants] (1) knew of the withheld material information or

of the falsity of the material misrepresentation, and (2) withheld or misrepresented this

information with a specific intent to deceive the PTO." *Id.* at 1328–29. For example, Plaintiff

alleges that Bouhnik, Steinfeld, and Escho "each attended in-person due diligence-related

meetings with Spectrum," (FAC ¶ 459), and "each had full access to the Spectrum Information

under . . . the non-disclosure and non-use provisions of the [NDA]," (*id.* ¶ 460). Furthermore,

the circumstances here demonstrate that GE and its employees conducted extensive due diligence

on Spectrum's technology in hopes of acquiring the technology, and offered a "substantial sum

to acquire the Spectrum Information, including Spectrum Trade Secrets and inventions embodied

therein, along with royalty payments." (*Id.* ¶ 97.) Therefore, Plaintiff has provided facts from

which one could reasonably infer that GE intended to manufacture its own devices incorporating

Spectrum technology. In addition, GE made a formal bid to purchase Spectrum in or around

2012 to 2013, but was rejected, and Bouhnik, Steinfeld, and Escho began filing their patent

applications soon thereafter. (*Id.* ¶ 98.) Therefore, I can reasonably infer that Bouhnik,

Steinfeld, and Escho knew of the origin of the Spectrum information contained in their patent

applications, and did not accidentally fail to disclose the origin of the information. *Cf. Exergen

Corp.*, 575 F.3d at 1331 (rejecting inference of deceptive intent based on allegation that applicant

cited prior art in one patent application but failed to cite the same prior art in a subsequent

application, which only supported an inference of negligence).

Because I find that Plaintiff has met the pleading requirements of Rule 9(b) with respect

to its thirteenth cause of action as against Defendants Bouhnik, Steinfeld, and Escho,

Defendants' motion to dismiss the claim against these defendants is denied. However, I grant

Defendants' motion to dismiss Plaintiff's claim as against Defendant Hermony.

**V.**    **Jury Demand**

Defendant further moves to strike Plaintiff's jury demand. Plaintiff waived its "right to a trial by jury" by signing the NDA, (NDA ¶ 6), a fact which it does not dispute, but argues that its jury demand should be preserved because Hefetz did not knowingly waive his right to a jury trial. (Docs. 72–74.) However, I have dismissed Hefetz from this action for lack of personal jurisdiction. Therefore, I strike Plaintiff's jury demand. *See Westminster Sec. Corp. v. Uranium Energy Corp.*, 255 F. Supp. 3d 490, 496 (S.D.N.Y. 2017) (stating "there is plentiful authority explicitly holding that a jury demand does not override a contractual jury waiver" and collecting cases).

**VI.**    **Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' motion to dismiss Claims I (Breach of Contract), and II (Misappropriation of Trade Secrets) is DENIED IN PART, but GRANTED with respect to Trade Secrets E, G, I, J, and N for claims arising after November 13, 2013; Defendants' motion to dismiss Claims III (Defend Trade Secrets Act), IV (Misappropriation of Ideas), and V (Unfair Competition) is DENIED; and Defendants' motion to dismiss Claim XIII (Fraud on the PTO) is DENIED only as to defendants Bouhnik, Steinfeld, and Escho. Defendants' motion to dismiss all claims against Hefetz is GRANTED; and Defendants' motion to dismiss Claims VI (Breach of Implied Covenant), VII (Unjust Enrichment), VIII (Fraud), IX (Aiding and Abetting Fraud), XI (Conversion), and XII (Civil Conspiracy to Commit Conversion) is GRANTED. Defendants' motion to strike Plaintiff's jury demand is also GRANTED.

The parties shall meet and confer and, no later than June 12, 2020, shall submit a proposed redacted version of this Opinion & Order to the chambers inbox

42

(brodericknysdchambers@nysd.uscourts.gov), to be filed on the public docket.

Defendants shall file an answer to the First Amended Complaint within thirty (30) days of the entry of this Opinion & Order.

The Clerk of Court is respectfully directed to file this Opinion & Order under seal visible only to the parties, and close the open motion at Document 52.

SO ORDERED.

Dated: June 1, 2020
        New York, New York

Vernon S. Broderick
United States District Judge