UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                    :
                                                  Docket #1:18-cv-11386-
SPECTRUM DYNAMICS MEDICAL LIMITED,        : VSB-KHP

                          Plaintiff,      :

  - against -                             :

 GENERAL ELECTRIC COMPANY, et al.,        : New York, New York
                                            December 18, 2020
                          Defendants.      :

                                            TELEPHONE CONFERENCE
------------------------------------- :

                     PROCEEDINGS BEFORE
         THE HONORABLE JUDGE KATHARINE H. PARKER ,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            RIVKIN RADLER LLP
                          BY:  GREGORY D. MILLER, ESQ.
                          25 Main Street
                          Court Plaza North - Suite 501
                          Hackensack, New Jersey 07601
                          201-287-2460

                          GREENBLUM & BERNSTEIN, P.L.C.
                          BY:  NEIL F. GREENBLUM, ESQ.
                              PETER BRANKO PEJIC, ESQ.
                          1950 Roland Clarke Place
                          Reston, Virginia 20191
                          703-716-1191


Transcription Service:    Carole Ludwig, *Transcription Services*
                          155 East Fourth Street #3C
                          New York, New York 10009
                          Phone:  (212) 420-0771
                          Email:  Transcription420@aol.com

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service

<u>APPEARANCES - CONTINUED:</u>

For Defendants:                THOMPSON HINE
                               BY:  MARLA R. BUTLER, ESQ.
                               Two Alliance Center
                               3560 Lenox Road NE, Suite 1600
                               Atlanta, Georgia 30326
                               404-541-2900

                               THOMPSON HINE LLP
                               BY:  JESSE L. JENIKE-GODSHALK, ESQ.
                               312 Walnut Street - 14th Floor
                               Cincinnati, Ohio 45202
                               513-352-6702

                               THOMPSON HINE LLP
                               BY:  BRIAN PHILIP LANCIAULT, JR.
                               335 Madison Avenue
                               New York, New York 10017
                               212-908- 3945

**<u>INDEX</u>**

**<u>E X A M I N A T I O N S</u>**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

**<u>E X H I B I T S</u>**

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

PROCEEDINGS                                    4

1   THE CLERK:  Calling case 18 civil 11386, Spectrum

2   Dynamics Medical vs. General Electric Company, the

3   Honorable Katharine H. Parker, presiding.

4   Beginning with counsel for the plaintiffs, can you

5   please make your appearance for the record?

6   MR. GREGORY MILLER:  Good morning, Gregory Miller,

7   Rivkin Radler LLP, on behalf of the plaintiff. Also with me

8   on the call is Neil Greenblum and Branko Pejic from the

9   Greenblum & Bernstein law firm. Good morning again.

10  HONORABLE KATHARINE H. PARKER (THE COURT):   Good

11  morning.

12  THE CLERK:  And counsel for the defendants, could

13  you please make your appearance for the record?

14  MS. MARLA BUTLER:  Yes. This is Marla Butler.  And

15  with me are my colleagues, Jesse Jenike-Godshalk and Brian

16  Lanciault, for defendants, from Thompson Hine.

17  THE COURT:  Good morning.

18  MS. BUTLER:  Good morning.

19  THE COURT:  Okay, so we are here today to talk about

20  two motions, the motion by Spectrum to (indiscernible) more

21  detailed infringement contentions, and the motion to serve

22  contention interrogatories. So what I'd like to first do is

23  talk about the detailed infringement contentions. I want to

24  understand a little bit more what Spectrum is saying. And

1

2    this ties a little bit into the trade-secret issue that --

3    a claim, I believe, that Spectrum has asserted.

4           So, Mr. Miller, are you going to be speaking for

5    your client?

6           MR. MILLER:  Actually, it will be Mr. Branko Pejic

7    who will be making our argument today.

8           MR. BRANKO PEJIC:  Good morning, your Honor.

9           THE COURT:  Okay. So before we get started, let me

10   just remind everybody that this call is open to the press

11   and public on a listen-only basis. We are making a

12   recording. If you'd like a transcript, you have to order it

13   within three days. The Court otherwise prohibits the

14   recording and rebroadcasting of court conferences. And I'd

15   ask all the parties to keep their phones on mute unless

16   they're speaking.  And for the benefit of any court

17   reporter who may transcribe the transcript, please state

18   your full name before you speak.

19          All right, so I'll first hear from Spectrum.

20          MR. PEJIC:  Good morning, your Honor.  This is

21   Branko Pejic.  And I will first speak to the motion seeking

22   more detailed infringement contentions from defendants.

23   Basically, what Spectrum's trying to do here is streamline

24   the case such that we don't end up in a situation where

25   we're having to take seventy depositions and all the other

1

2 things that are associated if contention interrogatories

3 are not served.

4          But specifically, with respect to the infringement

5 contentions, this is an interesting situation where

6 Spectrum claims that these patents are the result of

7 misappropriated trade secrets. And to the extent that

8 defendants seek to stretch the claim scope to cover the

9 accused device, those claims are invalid as obvious.

10         One of the things that complicates the fact of the

11 detailed contention inter -- not contention

12 interrogatories -- I'm sorry -- the infringement

13 contentions under the local patent rules is the plaintiffs

14 have just identified a device and certain claims that are

15 infringed without explaining where the feature on the

16 device is, as well as whether the claim is being construed

17 under Section 112 as means plus function. Further, the

18 defendants do not state whether the infringement is direct

19 or literal or even under the doctrine of equivalence.

20 And --

21         THE COURT:  Well, Mr. Pejic, I'm looking right now

22 at what defendant has provided to you.  So there's two

23 devices, as I understand it, although they work very

24 similarly, and there's two patents at issue, as I

25 understand it.

```
 1
 2              MR. PEJIC:  Yes, your Honor.
 3              THE COURT:  Okay. And as I understand it, Spectrum
 4   is saying and brought this action saying that defendants
 5   stole certain trade secrets, and you identified those trade
 6   secrets in your Complaint, and Judge Broderick dismissed
 7   the claims as to certain trade secrets but other identified
 8   trade secrets are still in play. And you brought the claim
 9   saying that these were your trade secrets, that defendants
10   stole them and they used them for these two devices, right,
11   the imitation device, as you call it, and that they're
12   imitating the VERITON and the VERITON-CT?
13              MR. PEJIC:  That is correct, your Honor.
14              THE COURT:  Okay. So you've identified and the
15   Court has accepted certain of those trade secrets. And
16   you're saying that they were utilized in these allegedly
17   copycat machines. Now, the counterclaim is saying no, these
18   machines are based on our own technology, and you're saying
19   no, it's not and trying to invalidate their patent.
20              So we're talking about these machines.  And when
21   I'm looking at what defendant has provided, I see for
22   Patent 439 it has -- defendant has specifically identified
23   the particular claim from that patent and then it has
24   provided pictures of your machine with an explanation of
25   how GE believes that it infringes on its patent. Now,
```

1

2    presumably you know the trade secrets. I mean, I'm thinking

3    you can just take this chart and you can just put the trade

4    secrets right next to these claims that this is -- I'm

5    assuming that the trade secrets have to do precisely with

6    the same claims. Maybe I'm wrong about that, but I don't

7    understand what exactly is deficient at this stage of the

8    litigation with this pretty detailed chart that GE has

9    provided and including outlining specific pieces of the

10   VERITON, you know, encircling it and talking about how it

11   relates to the claim.

12          MR. PEJIC:  Your Honor, this is Branko --

13          THE COURT:  So if --

14          MR. PEJIC:  Oh, I'm sorry. Did I cut you off, your

15   Honor?

16          THE COURT:  No.  Go ahead.

17          I need a better explanation as to what is missing.

18          MR. PEJIC:  Okay. You are absolutely correct; and

19   in fact, in Spectrum's invalidity contentions that were

20   served earlier this week, we did exactly that.

21          THE COURT:  Okay.

22          MR. PEJIC:  But what is missing in, for example,

23   you talked about the detailed claim charts for Claim 1 of

24   the 439 patent, but the remaining claims defendants just

25   say, "See above," including for independent claims of

```
 1                    PROCEEDINGS                        9
 2   different scope. So, at a minimum, Spectrum believes that
 3   the defendants should provide a detailed claim chart for
 4   all the claims, not just independent Claims 1 of the 595
 5   patent and the 439 patent.  The claim charts were provided
 6   for just those two claims, not all the claims asserted.
 7            THE COURT:  Okay. But, as I understand -- like,
 8   for example, I'm looking at Claim 2 for the first patent in
 9   issue, patent in suit, which those are -- they're just
10   referencing the apparatus in Claim 1, and then they're
11   going into this description for this claim with the weight
12   compensation unit with the counterbalance, and then they're
13   describing -- so I think two is related to one but is
14   modifying it a little bit.  So I'm not -- can you explain a
15   little bit more --
16            MR. PEJIC:  Yes, your Honor. You're absolutely
17   right. And in doing Claim 1 and 2 in that manner is
18   appropriate because Claim 2 is a dependent claim from
19   Claim 1.
20            THE COURT:  Right.
21            MR. PEJIC:  So it is appropriate to reference
22   Claim 1. But if you'll turn the page, then, to look at
23   Claim 9, which is itself an independent claim having
24   different scope and different limitations, all that is
25   provided is a "See above." And what Spectrum believes is
```

1
2  it's appropriate to provide the same limitation-by-
3  limitation analysis for the independent claims because they
4  are of a different scope and contain different limitations.
5          THE COURT:  Okay. Okay, so what's really --
6          MR. NEIL GREENBLUM:  Your Honor --
7          THE COURT:  -- what you're saying is you need more
8  detail on the (indiscernible).
9          Okay, so --
10         MR. GREENBLUM:  Your Honor, this is Neil
11 Greenblum. I don't want to interfere with the dialogue that
12 you've been having, but since this is an early stage of the
13 case and your Honor has obviously studied the matter
14 carefully, there is a track that you're going down that I
15 just wanted to alert you to so that we don't get off on the
16 wrong foot.  The trade secrets that were disclosed we claim
17 are in the device, but they were also in many documents.
18 So it was not only in the device that these trade secrets
19 appear, some of them. And the patent issues, as at least we
20 see it, are separate from the trade secret issues even
21 though they involve the same patents and whatever. And so I
22 just wanted to -- I think your Honor is sort of assuming
23 that because we said their device incorporates our trade
24 secrets, that as a result of that, we already know what's
25 in their device, and we already know that it's in the

PROCEEDINGS                     11

1    patent.

2              THE COURT:  Right.

3              MR. GREENBLUM:  And what I think your Honor is

4    missing here is that when it comes to trade secrets, that's

5    one form analysis.  When it comes to patent infringement,

6    which is what's being alleged here, there's a different

7    analysis that takes place.  And with the patent

8    infringement part of the case, the claims -- you look at

9    the words. In other words, they may have disclosed our idea

10   totally in their patent, but when it comes to the question

11   of infringement, it's not the disclosure that counts only;

12   it's what they specifically claim.

13             THE COURT:  Right.

14             MR. GREENBLUM:  And so we will be arguing that we

15   don't do what's in those claims; and in order to do that,

16   we need the specificity that we feel it's lacking in order

17   to be able to respond and to get this case going on the

18   right track.  So I apologize for interrupting, but I just

19   wanted to point that out.

20             THE COURT:  Okay. Thank you. I understand the

21   distinction that you're making.  So -- but just so that I'm

22   clear, are you saying, Mr. Greenblum, that there are some

23   trade secrets that are not incorporated into the machine

24   and that are just separate trade secrets that were

1

2    disclosed?

3         MR. GREENBLUM:  You know, nothing having to do

4    with just the issue we're discussing today, but, sure,

5    there are many trade secrets that we -- we listed, I think,

6    16 of them or whatever, 18, 17 --

7         THE COURT:  Right.

8         MR. GREENBLUM:  -- that are disclosed

9    impermissibly in documents and patents.  And we claim that

10   they impermissibly disclosed these.  So what you're seeing

11   here, it just so happens that these two patents we claim

12   also disclosed our trade secrets. However, the -- and these

13   two patents -- I'll give you this piece of information so

14   that we don't get off on the wrong track -- these two

15   patents were filed shortly after -- shortly after -- they

16   were disclosed in a document of ours.  And the Courts

17   abjured distinction and said, well, these two patents, they

18   already were filed after you disclosed it, so I'll only let

19   you claim trade secret protection if you can establish for

20   these two that the defendant used the trade secrets before

21   you filed.  This is a bit of minutia, but I want to give

22   your Honor a sense that the patents and trade secrets, if

23   you conflate them, should conflate them, it gets confusing.

24        I think in this -- and I would respectfully submit

25   that in this part of the case, what we're talking about

1                              PROCEEDINGS                    13

2   today, the question is okay, you have a patent, it has

3   patent claims, did the defendant specify the elements of

4   each of the claims that are infringed.

5              THE COURT:  Okay.

6              MR. GREENBLUM:  And we submit they didn't. And

7   what concerns us -- what concerns us -- is that the three

8   drawings or photographs that were submitted are from three

9   different machines, your Honor.  They didn't explain that.

10  They were called VERITON. VERITON is a generic name for us.

11  And they are from three different machines. So we need more

12  specificity.

13             THE COURT:  Okay.  So are you saying that the --

14  are there more than -- so what's the other machine? There's

15  the VERITON --

16             MR. GREENBLUM:  No, I will --

17             THE COURT:  Well, what about the different names

18  of the different machines?

19             MR. GREENBLUM:  I will explain, your Honor. The

20  photographs that they provided are from videos.  Those

21  videos were mockup demonstrations. You don't infringe a

22  patent with a mockup video or a video of a mockup. You only

23  infringe a patent with an actual machine or a method of

24  using an actual machine. And what they did was they took

25  segments of different videos or photographs or

1   publications, threw them all on the page and said, you have

2   each of these three. But to infringe a patent -- to

3   infringe a patent -- you have to infringe in one claim all

4   of the elements of the claim in a single device.

5

6          THE COURT:  Sure.

7          MS. BUTLER:  Your Honor, might I respond for

8   defendants?

9          THE COURT:  So -- yes, Ms. Butler, go ahead.

10          MS. BUTLER:  Okay.  As to the issue of what

11   machines were identified, you know, I will note that these

12   are infringement contentions at the beginning of the case

13   based on publicly-available information.  And basically,

14   Mr. Greenblum's argument is that GE did not identify what

15   only Spectrum knows.  Right? So Spectrum apparently knows

16   that these are three different machines and that these are

17   mockups.  There's no indication of that in the public

18   record. GE has satisfied its requirement to identify the

19   device that is publicly named VERITON and the VERITON-CT;

20   GE has identified those devices and has met its obligation

21   under Patent Rule 6. Certainly, we will have more than a

22   year of discovery in this case and will have the

23   opportunity to uncover the various machines that

24   Mr. Greenblum alludes to.  But we have done what the rule

25   requires us to do.

| | |
|---|---|
| 1 | PROCEEDINGS                              15 |
| 2 | And I'll also point out that, you know, patent |
| 3 | issues, I agree with Mr. Greenblum on this point that the |
| 4 | patent issues are separate.  And whether or not GE has met |
| 5 | the requirements of Patent Rule 6 is completely separate |
| 6 | from the trade-secret allegations that are asserted in this |
| 7 | case, because, to the extent those trade-secret allegations |
| 8 | fail, GE's patent claims remain. |
| 9 | The last thing I'll point out is that as to |
| 10 | claims, I think it was nine of the example we were |
| 11 | discussing, Claim 9 of the first patent that's at Tab A, |
| 12 | Exhibit A, the elements of those claims are all found in |
| 13 | the claims that were charted above. Oftentimes when patent |
| 14 | claims are written, you will have ten different claims, and |
| 15 | maybe there are only five elements among those claims, but |
| 16 | they will be organized differently.  And so if you look at |
| 17 | Claim 9, which claims a gantry, for example, in the earlier |
| 18 | claim GE identified what the gantry was.  And if you look |
| 19 | to all of the elements of Claim 9, GE in the earlier claims |
| 20 | identified where all of those elements are located in the |
| 21 | Spectrum device. |
| 22 | So I will leave it at that at this point, your |
| 23 | Honor. |
| 24 | THE COURT:  Ms. Butler, are you saying that for |
| 25 | Claim 17, as well, that the same applies? |

```
 1
 2          MS. BUTLER:  Yes.
 3          THE COURT:  Because here 17 appears to be related
 4   to nine insofar as it's dealing with a camera system and
 5   describing the gantry, the movable column, the
 6   counterweight.
 7          MS. BUTLER:  So, yes, your Honor, all of the
 8   elements of Claim 17 are also found in Claims 1 and 2.
 9   Claim 17 is an independent claim, so it does not depend
10   from Claim 9. It's an independent claim; but if you look at
11   Claim 17, as an example, look at the last sentence of what
12   GE has in the right-hand column. It says, "Thus, when
13   Spectrum makes the accused product, it performs each step
14   of the claimed method of forming a camera system." And then
15   before it got to that sentence, it pointed to those
16   different elements in Claims 1 and 2 above.
17          You know, I'll also note that Spectrum on this
18   call has now narrowed its motion significantly. It brought
19   this motion claiming that GE did not identify whether the
20   claims were directly or indirectly infringed, even though
21   on the very first page of GE's contentions, GE says
22   Spectrum directly infringed and is continued to directly
23   infringe, and identified all of the claims.  And GE also
24   said Spectrum has contributed to and/or induced direct
25   infringement by others of those same claims. So, I mean,
```

 1
 2   it's almost like the motion was written without having
 3   reviewed the contentions that are in front of it. I think
 4   the only issues that really are in dispute is whether those
 5   Claims 9 and 12, whether GE properly referred to Claims 1
 6   and 2.  And for the reasons I just described, I think we
 7   did properly refer to those claims.
 8            And the only other issue that appears to be in
 9   dispute is whether GE was required at this stage to
10   indicate whether the claims were to be construed under
11   Section 112-6 of the patent statute. In other words,
12   they're arguing that GE should have provided its claim
13   construction position in its infringement contentions, even
14   though, number one, nothing in the rule even remotely
15   requires that; and, number two, there's a whole section of
16   the Scheduling Order that's devoted to claim construction.
17            THE COURT:  Right.  And you --
18            MS. BUTLER:  Both of these issues --
19            THE COURT:  -- you're going to have the Markman
20   hearing in June.
21            MS. BUTLER:  That's right.  And so neither of
22   these issues has merit, your Honor, and we'd request that
23   this motion be denied.
24            MR. PEJIC:  Your Honor, this is --
25            THE COURT:  Can I ask you one question --

```
1                    PROCEEDINGS                    18

2              MR. PEJIC:  --  may I please respond?

3              THE COURT:  In a moment. I have another question

4    for Ms. Butler.

5              Ms. Butler, how much do these machines cost? I'm

6    afraid to ask.

7              MS. BUTLER:  And, your Honor, we don't -- I don't

8    know how much the VERITON, the accused VERITON and VERITON-

9    CT systems cost. They're new to the market, and I don't --

10   my client might have that information; your Honor, I don't.

11   Perhaps Spectrum's counsel would.

12             THE COURT:  Okay.  And how much do GE's

13   machines -- and what are you calling your machines?

14             MS. BUTLER:  ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████

19             THE COURT:  Okay.  And --

20             MS. BUTLER:  But they are -- to the extent the

21   point is are they very expensive machines, and the answer

22   to that would be yes.

23             THE COURT:  Yes, right. That's my assumption,

24   million-dollar machines or something. Okay.

25             So is that Mr. Greenblum, you wanted to respond?
```

1

2          MR. GREENBLUM:  Well, that was Mr. Pejic, but I

3    was just saying I would like to direct the Court to -- I

4    think the issue is becoming clearer.  The claims are not

5    all of the claims of the same scope. Your Honor realizes

6    the reason that we have different claims is because they

7    are all a different scope. If any of them are of the same

8    scope, they're invalid as being repetitive.

9          THE COURT:  Right.

10         MR. GREENBLUM:  So Claim 1 was used as the model.

11   Claim 1 uses the phrase "a column attached to a gantry."

12         THE COURT:  Yes.

13         MR. GREENBLUM:  Okay. Claim 9, which Ms. Butler

14   just referred to, calls for a column extending from the

15   gantry.  That will prove to be an issue in the case.  And

16   what Spectrum feels it's entitled to is to have a clear

17   statement as to each claim so that we go off on the track

18   for purposes of Markman or whatever where we know that they

19   are saying, yes, we abstain from it, and also we're

20   attached from it -- attached to it.  So that's a good

21   example of the need for a little more specificity in the

22   submission that GE made. It's not there, so we're led to

23   assume that they consider "extend from" and "attached to"

24   as being the same thing.  That's the way they've got it

25   now.  But it shouldn't be that way.  They should have to

```
 1                      PROCEEDINGS                    20

 2   address each element of a claim.

 3           MS. BUTLER:  Can I respond to that point, your

 4   Honor?

 5           THE COURT:  Hold on. I want to ask Mr. Pejic a

 6   question.

 7           MS. BUTLER:  Yes.

 8           THE COURT:  So I'm -- looked at this extend

 9   from -- you know, I'm not a patent expert, and I'm

10   certainly not an expert on any of these technical issues.

11   So what more do you -- I guess I don't quite understand

12   what more you need at this point in the litigation. You

13   know, here you've got the camera system comprising of the

14   gantry. So you understand what the gantry is.  The column

15   extending -- okay, so it's extending and has a movable

16   radiation detector and a counterbalance weight to apply

17   force.  So I guess, you know, you said in your letter you

18   need to understand more limitations.  What more at this

19   point do you not understand?

20           MR. PEJIC:  WE would want them to say -- to point

21   to when they did their infringement contentions, that they

22   say here's the elements, with an arrow -- I'm using that

23   figuratively, "with an arrow" -- and this is where it

24   extends.  That's it; that's all we're asking.

25           THE COURT:  But where it extends?
```

1

2              MR. PEJIC:  In other words, point to the extension

3     that you're talking -- you say it extends, so just point to

4     it. "See, here is where it extends," not to leave it to us

5     to look at the picture and figure out how they are

6     construing it. For them to say, "Here is the element. You

7     see it extends, and here is where it extends." That's it.

8              THE COURT:  Okay. So -- but I look at the picture

9     above, Mr. Pejic, in two, there's an arrow pointing to the

10    movable section, which I take it to mean the piece that's

11    extending.

12             MR. PEJIC:  Well, we --

13             THE COURT:  Is that not correct?

14             MR. PEJIC:  Well, that --

15             THE COURT:  And also above show the counterweight,

16    which looks to be -- it's a little unclear where that is.

17    Let me ask you something, Mr. Pejic. Is your machine, the

18    VERITON, now is that a machine that's being sold in the

19    market, and how much is it?

20             MR. PEJIC:  Okay.  So the mockups that were -- or

21    the figures that you have in front of you are from

22    magazines that depict what was shown, some of them, in

23    Europe.

24             THE COURT:  Okay.

25             MR. PEJIC:  Infringement has to be in the United

1    States, not in Europe.

2              THE COURT:  Okay.

3              MR. PEJIC:  So we are entitled to have the

4    plaintiff specify -- I'm sorry -- the defendants specify

5    that this mockup was a real device or it isn't. We're

6    entitled to have them say this is the device that's sold in

7    the United States.  They've said that, but they then

8    provide a video or a picture from something that is sold in

9    Europe.

10             THE COURT:  Okay, but can you answer my question?

11             MR. PEJIC:  Oh, sure.

12             THE COURT:  Are you selling this device --

13             MR. PEJIC:  Yes. Yes, it is --

14             THE COURT:  -- the VERITON, inside the states?

15             MR. PEJIC:  There is a VERITON device, of course,

16   that is sold in the United States. It costs, my

17   understanding, it's about a million dollars.

18             THE COURT:  And is it the VERITON and the VERITON-

19   CT?  What are sold in the United States?

20             MR. PEJIC:  There is a VERITON machine, and it has

21   attached to it what's called a "CT," a tent scan. The two

22   of them are sold together. So --

23             THE COURT:  Okay.

24             MR. PEJIC:  But the VERITON is the VERITON alone,

PROCEEDINGS                    23

1 and the VERITON is the VERITON that's sold together with

2 the CT.

3              THE COURT:  And are both versions being used in

4 the United States right now? They have FDA approval and

5 they're being --

6              MR. PEJIC:  Oh, they're approved. I don't know

7 which ones exactly have been sold.

8              THE COURT:  Okay. But do you know that -- so

9 they've been approved, and you know for a fact there are

10 some here in the United States.  Where are they?

11             MR. PEJIC:  Yes, oh, yes, there are some here in

12 the United States.  They're at two hospitals -- I'm not

13 sure which hospitals.  But I will tell you -- I will tell

14 you that the ones that are here do not what those mockups

15 from Europe show.

16             THE COURT:  Okay.

17             MR. PEJIC:  They don't do it.  They don't do it.

18             THE COURT:  So do you know what hospitals they're

19 at?

20             MR. PEJIC:  Pardon me?

21             THE COURT:  Sorry, you just told me that. You

22 don't know where they are?

23             MR. PEJIC:  Right. I don't know. I don't know

24 these ones.

1
2          THE COURT:  I mean, I'm assuming they're in some
3    major metropolitan area, Cedars Sinai in Los Angeles or,
4    you know, some of -- one New York City hospital that can
5    afford the machines.
6          MR. PEJIC:  Yes.
7          THE COURT:  And these are for cardiac patients
8    principally. So maybe one's at Weill Cornell in the city,
9    who knows. Okay.
10         MR. PEJIC:  Yes.
11         THE COURT:  So, Ms. Butler, has your client gone
12   to inspect any of the machines at the hospitals, the
13   VERITON machines?
14         MS. BUTLER:  Your Honor, as far as we understand,
15   there was a couple of things.  There is one machine that we
16   believe was sold in Boston.
17         THE COURT:  Okay.
18         MS. BUTLER:  And that's the one that we're aware
19   of.  And there was -- a lot of this is kind of based on
20   information that salespeople might have, for example. There
21   was either a sale or an offer for sale to the Mayo Clinic
22   in Rochester, Minnesota.
23         THE COURT:  Okay.
24         MS. BUTLER:  Getting in and seeing these machines
25   is not practical because companies have agreements with

1
2  hospitals that would not -- and these are in -- they're in

3  use -- right? It's not like we can go in and interrupt the

4  use of this machine to do an infringement inspection, which

5  is why we relied on the publicly-available information that

6  was available to our client.

7          What Spectrum seems to be doing here is choosing

8  to pick a fight about whether or not the device infringes

9  in the context of whether GE has met its requirements under

10 Local Patent Rule 6.  And I think in all of this

11 discussion, your Honor, we have missed the point that the

12 local patent rules actually don't require GE to provide any

13 claim charts. Right? I mean, they are clear in requiring

14 two things and two things only, that GE identify each claim

15 of each patent in suit that is alleged to be infringed and

16 that GE identify the product that infringes.  That is clear

17 by the express language of the patent rule, and it's clear

18 by the, albeit very limited, case law on this issue. But

19 that's all that GE has to provide.

20         Spectrum is arguing that even though GE provided

21 claim charts, that those claim charts aren't good enough,

22 when GE didn't have to provide those claim charts at all.

23 I'll note that Mr. Greenblum or Mr. Pejic -- I don't recall

24 at this point who it was -- mentioned Spectrum's invalidity

25 contentions, your Honor, which are basically the mirror

1

2  image of the infringement contentions.

3          THE COURT:  Sure.

4          MS. BUTLER:  And in those invalidity contentions

5  they said -- this is a quote -- None of the Court's present

6  orders nor Local Patent Rule 7 requires Spectrum to

7  disclose claim charts providing a limitation-by-limitation

8  invalidity analysis, comparing the limitations of the

9  asserted claims to the prior art. So Spectrum is here today

10 arguing that GE was not only required to provide claim

11 charts, but it had to be claim charts that included

12 information that wasn't publicly available.  And they, on

13 the other hand, are not required to provide claim charts

14 under the analogous local rule for invalidity contentions.

15          This is a manufactured --

16          THE COURT:  Okay.  Well, I --

17          MS. BUTLER:  -- dispute, your Honor.

18          THE COURT:  Okay. So I understand the point about

19 what's required now, but I'm just thinking practically,

20 because the purpose of some of these disclosure rules is to

21 try to focus discovery and limit discovery and avoid

22 exchange of trade secrets and other information if there's

23 not really a potential for a claim.  So what I'm hearing

24 Mr. Pejic say is that the pictures that you have, the

25 publicly-available pictures that you believe show an

 1
 2  infringing product are not at all like the VERITON sold in
 3  the United States.  That's kind of hard for me to believe,
 4  Mr. Pejic, because I can't believe it would vary so much
 5  from what you were showing in Europe.  So I'm not quite
 6  understand -- I don't quite understand why there would be
 7  any kind of significant variation in the machines. Can you
 8  explain to me what is different?
 9          MR. PEJIC:  Well, yes, your Honor. This is
10  Mr. Pejic. What was shown in Europe was a product that had
11  not been approved and was undergoing development.  And it
12  was being shown in various shows. What is telling, though,
13  as far as the difference between mockups and what is
14  actually sold is defendants do cite the VERITON brochures
15  in their infringement contentions but do not apply any of
16  those brochures to the independent claims. So to the extent
17  that there is public information that describes the actual
18  VERITON that's being sold in the US, defendants don't avail
19  themselves of that information in alleging infringement of
20  the independent claims, nor do defendants use those
21  brochures to back up the pictures that they are showing of
22  the mockups.
23          THE COURT:  But do the brochures have pictures
24  like -- that could be used in a mockup?
25          MR. PEJIC:  The brochures talk about the

1
2  functionality and operation of the machine; and to the
3  extent it does not have a picture, defendants certainly
4  could cite any provision from the brochure saying that it
5  has -- that VERITON has this functionality and point to the
6  picture.  But they don't avail themselves of that.
7          THE COURT:  So you're saying the brochures that
8  are publicly available do describe the actual machine
9  that's in the US?
10          MR. PEJIC:  They relate to and describe.  I don't
11  know at what level of complete detail, but they are
12  representative of the VERITONs sold and offered for sale
13  and sold in the US.
14          MS. BUTLER:  Can I respond to that, your Honor?
15          THE COURT:  Yes.
16          MS. BUTLER:  So to the extent -- we did look at
17  the brochures.  There is very little depth to those
18  brochures.  We went to publicly available information that
19  provided the most detail.  So there are some instances
20  where there was relevant information from the brochure; and
21  when the brochure did not provide detailed-enough
22  information, we went to the videos.
23          But as a practical matter, your Honor mentioned
24  that you're looking to kind of figure out what's practical
25  here.

```
 1                            PROCEEDINGS                    29
 2            THE COURT:  Right.
 3            MS. BUTLER:  I'd like to propose a solution in
 4   that regard.  So we've mentioned that Spectrum has served
 5   invalidity contentions.  And GE has now served infringement
 6   contentions, which we believe more than satisfy what the
 7   rules require.  But to the extent Spectrum feels that it
 8   would be beneficial for us to flesh out, for example,
 9   Claims 9 and 17 of our chart for the 439 patent, GE would
10   be willing to do that. But then we believe that Spectrum
11   then should also provide claim charts for all of the prior
12   art that it listed in its invalidity contentions. In other
13   words, we should go one way or the other here. If Spectrum
14   wants GE to flesh out Claims 9 and 17 so that Spectrum
15   knows where the column is extending from the gantry --
16   right? -- GE will be willing to point that out. But then in
17   its invalidity contentions instead of listing dozens of
18   prior art references with no claim charts attached,
19   Spectrum should be providing claim charts that compare
20   those prior art references to the asserted claims, as well.
21            MR. PEJIC:  Your Honor, may I respond?
22            THE COURT:  Yes. And I want to know, when you
23   respond, I also want you to tell me are there more patents
24   at issue in Spectrum's affirmative claims.
25            MR. PEJIC:  Okay.  First, the first thing I'd like
```

to state is I appreciate defendants' attempts to move the

ball forward, but one of the problems with the proposal is

what prior art is relevant will depend completely upon how

the claims are construed by the Court, as your Honor is

well aware.  So what defendants are now trying to seek to

require Spectrum to do is what they are also seeking to

make Spectrum do with the contention interrogatory

identifying trade secrets. But --

          THE COURT:  Wait a minute. Isn't that a little

cute? Because you brought your affirmative claim seeking a

declaration about inventorship.  So, you know, it's not --

          MR. PEJIC:  Your Honor -- I'm sorry -- I'll try

to -- let me unpack that. If a claim is construed one way,

the VERITON would not infringe, and the prior art would not

invalidate. If construed another way, that could implicate

potential infringement as well as additional prior art.

And so that is why in most situations you're certainly

allowed to amend any of your contentions after claim

construction.

          MS. BUTLER:  But, your Honor, they did not provide

claim charts for the vast majority of the prior art

references in their invalidity contentions.  And the

rules -- the rules --

          MR. PEJIC:  (Indiscernible)

1
2          MS. BUTLER:  -- are that infringement contentions
3    and invalidity contentions are both to be served at the
4    beginning of this case.  So if we're trying to be practical
5    and provide as much information up front as possible, then
6    GE can flesh out Claims 9 through 17 -- 9 and 17, and
7    Spectrum should provide claim charts for its invalidity
8    contentions.
9          Your Honor, I want to just point out I do have a
10   conference with a federal court in Minnesota at 11 o'clock.
11   I just wanted to inject that here for time purposes as
12   we're diving more and more into these --
13         THE COURT:  Yes.
14         MS. BUTLER:  But I do think that that -- if we're
15   trying to provide -- figure out a way to give information
16   more up front, then let's do it, but let's do it both ways.
17         MR. PEJIC:  Your Honor, may I --
18         THE COURT:  Well, that's --
19         MR. PEJIC:  -- may I please finish?
20         THE COURT:  Well, hold on a second. I'm of the
21   view that there should be more information provided by both
22   sides up front so that you can get going and understand
23   what, you know, what each other is saying.  So plaintiff
24   definitely has an idea, because you've identified the trade
25   secrets that you think defendant has disclosed, and you

1

2   also have some ideas about the patent because you've

3   asserted the inventorship, you know, claim; and now you

4   have the invalidity claims.

5        So I think both sides need to provide some more

6   detail.  And I do think that the -- it's not just 9 and 17,

7   because there's some ones in the second patent also --

8        MR. PEJIC:  Right, your Honor.

9        THE COURT:  -- that need to be -- that a little

10  bit more detail would need to be provided.  So, for

11  example, 7 -- I mean, 7 does have a chart.  But there may

12  need to be a little bit more detail in 7, 8, 10, 11 and 18

13  of the second patent. And it does seem to me that you might

14  be able to get a photograph or some photographs of the

15  machine that's in use in Boston.

16       MS. BUTLER:  Your Honor, if Spectrum --

17       THE COURT:  I understand that you can't reverse-

18  engineer it, you can't go in to do that. But, I mean, why

19  can't you get a photograph of it?

20       MS. BUTLER:  Because, your Honor, it's a private

21  hospital that would -- I don't think would allow a bunch of

22  lawyers to come in and stop their actual use of the machine

23  to do that. But I will say that if Spectrum arranges for

24  that, GE would be happy to do that. But I honestly don't

25  believe that GE can just call up the hospital and say that,

1
2    "We've got this lawsuit against Spectrum. We need to stop
3    using this machine to image patients so that we can come in
4    and do an infringement analysis."
5              THE COURT:  Yes.  But the machine is probably not
6    in constant use, particularly now when the hospitals are
7    filled with COVID patients and not even seeing patients,
8    you know, for -- I'm not exactly sure what the situation is
9    in Boston, but because of the particular crisis we're in
10   right now, you may actually have, you know, a time period
11   where there can be a few pictures taken because people
12   might not be coming in to use that machine right now, you
13   know, because they're focused on the COVID patients.  So
14   since there's very few of these machines, it seems to me
15   that that's something that could be done and should be
16   done.  And it also seems to me that plaintiff could provide
17   some more details about their invalidity claims at this
18   point so you can join issues, if you will on --
19             MR. PEJIC:  Your Honor --
20             THE COURT:  -- on your respective claims.
21             MR. PEJIC:  -- your Honor, if I may? You're basing
22   your suggestion that we provide additional information on
23   our invalidity claims. I don't know that you've seen our
24   invalidity analysis, but we'd be glad to submit it to you.
25             THE COURT:  Okay.

1

2          MR. PEJIC:  And if you look at -- I mean, you seem

3   to be drawing an equivalence here between what the

4   plaintiff did and what the defendant did, and that's based

5   upon defendant counsel's assertion. But I think if you look

6   at what we did, you will see that we were extremely

7   detailed -- extremely detailed -- in our invalidity

8   analysis based upon the key documents that we say teaches

9   everything. In those few cases where --

10         THE COURT:  Okay.

11         MR. PEJIC:  -- there some question, we specify by

12  page and line the prior art.  We then went -- what opposing

13  counsel was referring to was we said, so we think this

14  knocks it all out, this knocks it all out; but we said to

15  the extent that there is need for reference for the general

16  state of the art -- the general state of the art -- we

17  didn't apply them against the claims -- we said this is the

18  general state of the art, and we listed these documents.

19  We did not apply them because what we assert is invalid is

20  specified in great detail -- you can see it, page and line

21  numbers.

22         THE COURT:  Okay.

23         MR. PEJIC:  And so I would suggest that before --

24  I would ask that your Honor hold in abeyance a general

25  request that we get more specific -- that you take a look

```
 1                       PROCEEDINGS                    35
 2   at them --
 3              THE COURT:  Okay.
 4              MR. PEJIC:  -- and we would submit them to you.
 5              THE COURT:  All right, so --
 6              MR. PEJIC:  And as to --
 7              THE COURT:  -- why don't -- can you submit them by
 8   Monday?
 9              MR. PEJIC:  Sure, sure.
10              THE COURT:  Okay. Why don't --
11              MR. PEJIC:  And as to -- okay. And as to your
12   Honor's suggestion about looking at the machine, I'd like
13   to think about it and discuss it with my client, but this
14   might be a way to eliminate this part of the lawsuit very
15   quickly.
16              THE COURT:  Right.
17              MR. PEJIC:  And -- which is what I think your
18   Honor is going to. If Greenblum is telling you that it's
19   not sold like that here, then why are we here?
20              THE COURT:  Right.
21              MR. PEJIC:  And so I'd like to discuss it with my
22   client and see if we can arrange for something like your
23   Honor is proposing --
24              THE COURT:  I mean --
25              MR. PEJIC:  -- and we --
```

1

2        THE COURT:  -- (indiscernible) spend money on --

3  if the machine is not as it's appearing, then, you know,

4  let's provide that information.  That's --

5        MR. PEJIC:  That's right.

6        THE COURT:  Okay.  So why don't you talk to your

7  client and send me the invalidity contentions that you did

8  on Monday. I'll hold the ruling in abeyance.  And talk with

9  your client next week, and I want you to talk with

10  defendants about getting some photographs and some, you

11  know -- and then I want you to send me a status letter the

12  following week, because I'm mindful that it's Christmas Eve

13  and Christmas on Thursday and Friday of next week.  So I

14  don't -- you know, I don't know what the schedule will be

15  with your clients and the hospital and whatever. So I'd

16  like you to get me a status letter by the 31st.  And I'd

17  like you to work cooperatively about this because just some

18  photographs may provide some -- you know, and I don't know

19  what other -- you may be aware, plaintiff may be aware of

20  more public information that will provide a little bit more

21  understanding for the defendants.  And maybe, you know,

22  maybe that will really narrow the issues. So let's --

23        MS. BUTLER:  Your Honor --

24        THE COURT:  Yes.

25        MS. BUTLER:  Your Honor, just in light of the

```
 1                                     PROCEEDINGS                    37
 2   time, I just wanted to inject one more request, and that is
 3   that when Spectrum submits to you its invalidity
 4   contentions on Monday, that the parties be permitted just
 5   two pages to discuss why Spectrum's invalidity contentions
 6   should be supplemented to the same level of detail that
 7   it's requesting GE's infringement contentions be
 8   supplemented.
 9           THE COURT:  Sure, that's fine.
10           Can you submit that by the 24th?
11           MS. BUTLER:  Yes.  So two pages for each party,
12   just to make sure that we're all on the same page in letter
13   format -- in a letter is fine?
14           THE COURT:  A letter is fine. File it on ECF. If
15   something needs to be under seal, just follow the
16   procedures to that.
17           MS. BUTLER:  Will do, your Honor.
18           MR. PEJIC:  And, your Honor, Branko Pejic. One
19   last thing that I know we're not going to get to today --
20           THE COURT:  Right.
21           MR. PEJIC:  -- but it's defendants' Motion 117,
22   defendant still has not produced any technical discovery as
23   the weeks pass.  And, you know, that is hampering
24   Spectrum's ability to make its case.
25           THE COURT:  Right. I understand.
```

```
 1                                 PROCEEDINGS                          38

 2              MR. PEJIC:  And we --

 3              THE COURT:  I read those contention

 4    interrogatories.  Some of them are too broad.  And we'll

 5    have to talk about it in another conference. We do have

 6    conferences scheduled out, but I'll look to see if I can

 7    get you in in early January -- because I think our next

 8    conference is late January -- so we can iron this out and

 9    you can get going. Okay?

10              MR. PEJIC:  Understood. But this is actually

11    defendants' Motion 117, not --

12              THE COURT:  Right.

13              MR. PEJIC:  -- plaintiff's motion.

14              THE COURT:  I understand -- I understand. You want

15    them to answer your contention interrogatories.

16              MR. PEJIC:  No, we would -- no --

17              THE COURT:  You want to serve the contention --

18              MR. PEJIC:  Defendants have asked the Court for

19    permission to serve contention interrogatories requiring --

20              THE COURT:  Right.

21              MR. PEJIC:  -- plaintiffs to identify all their

22    trade secrets before any technical discovery is produced.

23    This is despite the fact that we have identified trade

24    secrets A through Q in the First Amended Complaint --

25              THE COURT:  Right, right.
```

| | |
|---|---|
| 1 | PROCEEDINGS                                39 |
| 2 | MR. PEJIC:  -- which has (indiscernible) two |
| 3 | motions to dismiss. |
| 4 | THE COURT:  Right. I understand. |
| 5 | MR. PEJIC:  -- bit at the apple.  And we're |
| 6 | sitting here, you know, being denied proper discovery. |
| 7 | THE COURT:  I understand. |
| 8 | MS. BUTLER:  Your Honor, can I leave this for my |
| 9 | colleague, Mr. Jenike-Godshalk to handle so that I can jump |
| 10 | off this call and onto the next? |
| 11 | THE COURT:  Actually, yes, but we're going to end |
| 12 | the conference, and we're just going to table this issue |
| 13 | until early January.  And I'm going to get another |
| 14 | conference on. Okay? |
| 15 | MR. PEJIC:  Thank you, your Honor. |
| 16 | MS. BUTLER:  Thank you, your Honor. |
| 17 | THE COURT:  All right, so I'm going to table it. |
| 18 | I'll look forward to your submissions.  And we're |
| 19 | adjourned. Thanks, everybody. |
| 20 | MS. BUTLER:  Thank you. |
| 21 | MR. PEJIC:  Thank you, your Honor. |
| 22 | (Whereupon, the matter is adjourned.) |
| 23 | |
| 24 | |
| 25 | |

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Spectrum Dynamics Medical Limited v. General Electric, Docket #18-cv-11386-VSB-KHP, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____

                Carole Ludwig

Date:    December 21, 2020