Case 1:18-cv-11386-VSB-KHP   Document 179   Filed 01/28/21   Page 1 of 67



KI                 COLUMBUS        NEW YORK

CLEVELAND        DAYTON        WASHINGTON, D.C.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 01/28/2021

January 27, 2021

**MEMO ENDORSED**

> The Clerk of Court is requested to seal the
> transcript currently on ECF #176. The Court
> Reporter is directed to make the proposed
> redactions set forth in Exhibit 1 that is attached
> to this order.
>
> **APPLICATION GRANTED**
>
> *Katharine H Parker*
>
> **Hon. Katharine H. Parker, U.S.M.J.**
>
> **01/28/2021**

*VIA ECF*
Hon. Katharine H. Parker
United States Magistrate Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:  *Spectrum Dynamics Medical Limited v. General Electric Company, et al.*,
     Case No.: 18-cv-11386 (VSB)

Dear Judge Parker:

    On behalf of Defendant General Electric Company ("GE"), we write pursuant to Federal Rule of Civil Procedure 5.2(e), Your Honor's Individual Rule of Practice III(d), and the parties' Stipulated Confidentiality and Protective Order (the "Protective Order") (Doc. 156) to request that certain lines contained in Document Number 176, the transcript of the parties' appearance before Your Honor on January 8, 2021, be redacted and filed under seal. GE respectfully requests that before the transcript is made publicly available, the court reporter be directed to redact the statements at page 42, lines 18 through 25, page 43, lines 2 through 6, lines 10 through 12, and lines 17 through 25, and page 44, lines 2 through 10 of the transcript. The proposed redaction is set forth in Exhibit 1 hereto. Plaintiff does not object to this request.

    The presumption of public access to judicial documents can be overcome if countervailing factors warrant confidentiality. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006); *see also Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 598 (1978). Sealing of records may be justified to preserve "higher values," including the need to protect an entity from competitive injury. *Lugosch*, 435 F.3d at 124; *see also Tropical Sails Corp. v. Yext, Inc.*, No. 14-cv-7582, 2016 U.S. Dist. LEXIS 49029, at *10-11 (S.D.N.Y. Apr. 12) (risk of "competitive injury is sufficiently serious to warrant protection" of proprietary business information). Consistent with this, courts routinely permit sealing and redaction of competitively sensitive proprietary business information. *See, e.g.*, *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015); *Encyclopedia Brown Prods., Ltd. v. Home Box Office. Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998); *see also Nixon*, 435 U.S. at 598 (recognizing need to seal information that might "harm a litigant's competitive standing").

    Here, the discussion in the transcript (Doc. 176 at 42:18-25, 43:2-6, 43:10-12, 43:17-25, 44:2-10) concerns GE's development of a certain product that is not publicly available. That information is competitively sensitive and proprietary information of GE that, if disclosed, would pose a substantial risk of harm to GE. and constitutes "Highly Confidential – Attorneys' Eyes Only" information under the Protective Order. (Doc. 156). This is the sort of competitively sensitive information that courts consistently protect from disclosure. *See, e.g.*, *Ferring B.V. v.*

Marla.Butler@ThompsonHine.com  Fax: 404.541.2905  Phone: 404.407.3680

THOMPSON HINE LLP
ATTORNEYS AT LAW

Two Alliance Center
3560 Lenox Road, Suite 1600
Atlanta, Georgia 30326-4266

www.ThompsonHine.com
Phone:  404.541.2900
Fax:  404.541.2905



*Allergan, Inc.*, No. 12-cv-2650, 2017 U.S. Dist. LEXIS 150239, at *16 (S.D.N.Y. Sep. 7) (granting motion to seal documents containing proprietary information related to product development); *Encyclopedia Brown*, 26 F. Supp. 2d at 612 (sealing documents reflecting sensitive trade secret information). This is particularly the case where, as here, the information to be sealed was not relevant to the Court's resolution of any issue. *Cf. Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F. 3d 132, 143 (2d Cir. 2016) (denying sealing request where documents were "highly relevant to the exercise of Article III judicial power").

GE's request is narrowly tailored to protect GE's highly confidential information and does not deprive the public of access to critical information. GE respectfully requests that the Court permit GE's requested redaction in the publicly available version of the January 8, 2021 transcript (Doc. 176).



Very truly yours,

/s/ *Marla R. Butler*
THOMPSON HINE LLP
Marla R. Butler
Carl Wesolowski (*pro hac vice*)
Lauren Hogan (*pro hac vice*)
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
Tel.: (404) 541-2900
Fax: (404) 541-2905
Marla.Butler@ThompsonHine.com
Carl.Wesolowski@ThompsonHine.com
Lauren.Hogan@ThompsonHine.com

Brian Lanciault
335 Madison Avenue, 12th Floor
New York, New York 10017
Tel.: (212) 344-5680
Fax: (212) 344-6101
Brian.Lanciault@ThompsonHine.com

Jesse Jenike-Godshalk (*pro hac vice*)
312 Walnut Street, Suite 1400
Cincinnati, Ohio 45202
Tel.: (513) 352-6700
Fax: (513) 241-4771
Jesse.Godshalk@ThompsonHine.com

Jeffrey Metzcar
Discovery Place
10050 Innovation Drive
Miamisburg, Ohio 45342
Tel. (937) 443-6841
Fax (937) 430-3781
Jeff.Metzcar@thompsonhine.com

*Attorneys for Defendants*
*General Electric Company, GE Healthcare,*
*Inc., GE Medical Systems Israel Ltd., Jean-*
*Paul Bouhnik, Sergio Steinfeld,*
*Arie Escho, and Nathan Hermony and for Non-*
*Party Yaron Hefetz*

cc:  All Counsel of Record via ECF

```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #1:18-cv-11386-
SPECTRUM DYNAMICS MEDICAL LIMITED,  :  VSB-KHP

                    Plaintiff,      :

   - against -                      :

GENERAL ELECTRIC COMPANY, et al.,   :  New York, New York
                                       January 8, 2021
                    Defendants.     :
                                       TELEPHONE CONFERENCE
------------------------------------ :

                    PROCEEDINGS BEFORE
          THE HONORABLE JUDGE KATHARINE H. PARKER,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          RIVKIN RADLER LLP
                        BY:  GREGORY D. MILLER, ESQ.
                        25 Main Street
                        Court Plaza North - Suite 501
                        Hackensack, New Jersey 07601
                        201-287-2460

                        GREENBLUM & BERNSTEIN, P.L.C.
                        BY:  NEIL F. GREENBLUM, ESQ.
                             PETER BRANKO PEJIC, ESQ.
                        1950 Roland Clarke Place
                        Reston, Virginia 20191
                        703-716-1191


Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES - CONTINUED:

For Defendants:            THOMPSON HINE
                           BY:  MARLA R. BUTLER, ESQ.
                           Two Alliance Center
                           3560 Lenox Road NE, Suite 1600
                           Atlanta, Georgia 30326
                           404-541-2900

                           THOMPSON HINE LLP
                           BY:  JESSE L. JENIKE-GODSHALK, ESQ.
                           312 Walnut Street - 14th Floor
                           Cincinnati, Ohio 45202
                           513-352-6702

                           THOMPSON HINE LLP
                           BY:  BRIAN PHILIP LANCIAULT, JR.
                           335 Madison Avenue
                           New York, New York 10017
                           212-908- 3945

None

None

|   |   |   |
|---|---|---|
| 1 | PROCEEDINGS | 4 |

2          THE CLERK:  Calling case 18 civil 11386, Spectrum

3 Dynamics Medical vs. General Electric Company, the

4 Honorable Katharine H. Parker, presiding.

5          Beginning with counsel for the plaintiffs, could

6 you please make your appearance for the record?

7          MR. GREGORY MILLER:  Good morning, your Honor,

8 Gregory Miller from Rivkin Radler LLP, on behalf of the

9 plaintiff. And also with me on the line is Neil Greenblum and

10 Branko Pejic from the Greenblum & Bernstein.

11          HONORABLE KATHARINE H. PARKER (THE COURT):  Hello.

12          MR. NEIL GREENBLUM:  Good morning.

13          MR. BRANKO PEJIC:  Good morning.

14          THE CLERK:  And counsel for the defendants, could

15 you please make your appearance for the record?

16          MS. MARLA BUTLER:  Yes. This is Marla Butler for

17 defendants.  And with me on the line are Jesse Jenike-

18 Godshalk and Brian Lanciault, all three of us from Thompson

19 Hine.

20          THE COURT:  Good morning.

21          MS. BUTLER:  Good morning.

22          THE COURT:  Okay, before we get started, just the

23 same rules apply.  Keep your phones on mute, unless you're

24 speaking, for the benefit of everybody's reception, clarity of

25 hearing each other.  We are making an official recording of

PROCEEDINGS                                        5

 1
 2    this conference so you can order a transcript. It has to be
 3    ordered within three days. This line is open to the press and
 4    public on a listen-only basis, and court rules prohibit the
 5    recording and rebroadcasting of court conferences. Violations
 6    of this rule may result in sanctions.  And, finally, please
 7    state your name before you speak so that any court reporter
 8    that's asked to transcribe knows who's speaking. Thank you.
 9              MR. MILLER:  Thank you, your Honor.
10              THE COURT:  Okay, so I have now had an opportunity
11    to spend many, many hours looking through all of your
12    various submissions. I had previously looked at the claim
13    contentions, but I took another look through them in light
14    of the invalidity contentions. And I also have taken a look
15    at all of the other submissions.  And I have a bunch of
16    things on my personal agenda for this case that I wanted to
17    just kick off before we get started, the things that we
18    need to talk today.  We have about an hour and a half, and
19    so we may not get to everything.
20              One, I received the letter about the video
21    inspection, and I do want to talk about that first because
22    I do think that that's an important thing to be
23    accomplished, since it may help narrow some issues.
24              Two, I want to deal with the request by Spectrum
25    to serve the contention interrogatories. I reviewed

```
 1                          PROCEEDINGS                    6
 2   everything; I've reviewed all of the interrogatories, and I
 3   have a decision on that.
 4              Three, we need to talk about the contentions. You
 5   have a Markman hearing scheduled in really the not-so-
 6   distant future.  And you need to start getting more
 7   specific as to the claims, the invalidity contentions, and
 8   frankly, how the trade secrets pertain to the two patents
 9   in suit but also to the other 17 or so patents that,
10   Spectrum, that you say have incorporated trade secrets. As
11   far as I can tell, the only trade secret that you related
12   to the patents are trade secret E as to patent 439, and
13   trade secret I as to patent 595.
14              Then I'd like to deal with the briefing that you
15   submitted regarding the two legal consultants, Kabinow and
16   Barakett. I've reviewed your submissions, and I have some
17   direction for you on that.
18              I also want to talk about a drop-dead date for
19   getting your ESI protocol in place, and there's a few other
20   issues that I wanted to talk with you about, just in terms
21   of case management. Have you talked about how many
22   depositions you're going to need? I wanted to understand
23   whether the documents and depositions will be in Hebrew
24   with translators or in English or some combination. I also
25   had some other questions about the upcoming Markman hearing
```

PROCEEDINGS                                    7

2  that's before Judge Broderick. Do you intend to offer any

3  extrinsic evidence at all or use experts for that? And I

4  also wanted to better understand whether you're

5  anticipating any potential privilege issues or

6  disqualification-of-counsel issues. So there's a lot of

7  different things that I think we need to talk about.

8         First, though, let's talk about the video

9  inspection. I received a letter from Spectrum proposing --

10 making some proposals as to timing and so forth. Have you

11 gotten -- since you submitted that letter, have you gotten

12 any better clarity about when a video inspection could

13 occur?

14        MR. BRANKO PEJIC:  Your Honor, this is Branko

15 Pejic for Spectrum. We have offered to defendants to make

16 video inspection available approximately within a week of

17 them proposing some dates. It'll take us as little bit of

18 lead time to set it up, and with the caveat that we don't

19 want to have multiple inspections.  And with that being

20 said, we're happy to move forward as expeditiously as

21 defendants would like.

22        THE COURT:  All right, so, first, I don't think

23 it's reasonable to say that there can never be another

24 inspection of the device.  So that's not -- I'm not going

25 to bar another in-person inspection right now. The purpose

```
 1              PROCEEDINGS                                    8
 2   of having a video inspection, which is not at all the same
 3   as an in-person inspection, is to help crystalize the
 4   issues and potentially eliminate some claims, because as I
 5   understand from your statements in the last conference, you
 6   don't think there's an infringement in that the claims are
 7   based on a device that's not actually the device that's in
 8   use in the United States and being off of the VERITON
 9   device that's being offered for sale in the United States.
10              So I am not going to bar an in-person inspection.
11   I want there to be an arranged video inspection; and it's
12   necessarily going to be not as good as an in-person
13   inspection because, you know, it's by video.  But I want
14   that to occur. And it's really -- I think you're
15   overstating how onerous it is. It's not going to be that
16   long of an inspection, but I do think to the point about
17   experts that you raised, I do think it's important for both
18   sides, if you are using some kind of expert in a consultant
19   or a testifying capacity, if you have one, that it probably
20   would be prudent to have them participate in the video
21   session if they're helping with -- I guess it would be more
22   likely to be a consulting expert at this point -- to just
23   participate in that video, again, to expedite things.
24              MR. MILLER:  In fact --
25              THE COURT:  So, Mr. Miller --
```

```
 1                        PROCEEDINGS                    9
 2            MS. BUTLER:  Your Honor --
 3            THE COURT:  -- you said that you have an expert,
 4   is that right, already?
 5            MR. PEJIC:  Pardon me, your Honor.  This is Branko
 6   Pejic. I don't know that I understood your question.
 7            THE COURT:  Oh, do you have an expert already
 8   designated, is that --
 9            MR. PEJIC:  The plaintiffs have identified an
10   expert, your Honor, but defendants have not.
11            THE COURT:  Okay, and who is your expert?
12            MR. PEJIC:  The expert that's been identified on
13   plaintiffs is Dr. Scott Metzler.
14            THE COURT:  Okay, and where is he located, in
15   Israel?
16            MR. PEJIC:  No, he's located in -- he's a
17   professor at Penn -- he's located in Philadelphia.
18            THE COURT:  Okay. Fine. All right, so let me hear
19   from you, Ms. Butler.
20            MS. BUTLER:  Yes, your Honor. Thank you. So I
21   guess just first, our understanding of the purpose of this
22   inspection has been exactly what your Honor just stated, to
23   determine if the device that is here in the United States
24   is so different from the device that is documented online
25   and elsewhere so that we can make a determination about
```

1 |
2 | whether it impacts our infringement case or not.
3 |          On the expert issue, we 100% agree that it would
4 | be ideal to have experts participate in this, or at least
5 | consulting experts, if not testifying experts. I'll just
6 | put out here that the holdup for us has been that we had an
7 | expert lined up.  That expert has not been disclosed yet.
8 | We recently ran into an issue with the prosecution bar in
9 | the Protective Order.  And so we are in the process of
10 | trying to identify another expert that impediment would
11 | not interfere.  And so that is the issue for us.
12 |          And, you know, our -- the way I see this, I will
13 | assume -- I'm assuming, and I think on this call getting
14 | clarity from you would be very helpful -- that we will be
15 | able to record this video; otherwise, we are in a
16 | situation where the parties are arguing about what was and
17 | wasn't seen.  And I think we avoid that by recording it.
18 | And as long as we can record it, it's our view that we can
19 | proceed without an expert onboard because we'll have the
20 | recording of the video to use with an expert once we get
21 | that person onboard.
22 |          THE COURT:  Okay. I  mean, I don't see any
23 | reason why it shouldn't be recorded. It can be subject to
24 | a Protective Order, of course, if you want; but it's
25 | actually a machine in use, so it's not as if it's not

1

2    something that anybody could really -- I mean, I know

3    people aren't walking into this -- you know, walking around

4    the machine, but it's offered for sale, so it's not as if

5    it's secret in that sense. So I do think it makes sense to

6    make that recording so everybody knows just what was shown

7    on the video for purposes of clarifying the infringement

8    claim.

9           So why don't you move to get that scheduled

10   hopefully before the end of this month? Because it's

11   really -- the Markman hearing is -- you know, these things

12   really, you're going to need to move expeditiously if

13   you're going to make all those deadlines.

14           MR. PEJIC:  Thank you, your Honor.  This is Branko

15   Pejic on behalf of Spectrum. We may have to designate the

16   video confidential or highly confidential, depending upon

17   the level of detail that defendants ask to see. I just

18   don't know what exactly they envision, whether it's just a

19   visual inspection or if they're going to ask for certain

20   operations. But we can cross that bridge, and I'm sure the

21   parties can compromise. But I just wanted to put that out

22   there.

23           THE COURT:  Yes, you can -- I have no problem with

24   you making the appropriate designations.  They can always

25   be challenged after the fact, but I don't see any reason to

```
 1                        PROCEEDINGS                    12
 2   be focused on, you know, on having a fight about
 3   confidentiality for this.  So good.  All right, so I think
 4   that issue is settled. You're going to endeavor to get that
 5   done this month.
 6             Now, the Protective Order, let's just talk about
 7   that for a second. Spectrum, you want your legal advisor,
 8   Kabinow to be your designated person, and then GE wants
 9   Barakett.
10             MR. PEJIC:  This is --
11             THE COURT:  Does Spectrum need Kabinow to
12   participate in this video inspection?  And the same
13   question for GE. Let's first hear from Spectrum.
14             MR. PEJIC:  This is Branko Pejic on behalf of
15   Spectrum. I think it's highly unlikely that Mr. Kabinow
16   would take part in any inspection. He is not a technical
17   person, as we've said in our papers, so I don't see any
18   reason why he would participate.
19             THE COURT:  Okay.  And what about for GE?
20             MS. BUTLER:  It's not likely that Mr. Barakett
21   would participate.
22             THE COURT:  All right, well, let me tell you,
23   nonetheless, since this is a relatively quick issue, what
24   my thoughts were. My thoughts were that -- I guess I --
25   let me first have a couple of questions for you,
```

1

2   Mr. Pejic, about Mr. Kabinow. As I understand it, there's

3   no inhouse legal counsel that Spectrum has, and so he

4   serves -- he's an outside counsel, but essentially he's

5   giving advice -- he's a dedicated outside attorney giving

6   general advice; is that right?

7            MR. PEJIC:  I think that calling him inhouse,

8   serving as de facto inhouse counsel might be overstating

9   the case. He is commercial counsel to Spectrum, who also

10  has other counsel in Switzerland and Israel.  And so he is

11  advised on technical issues -- sorry, not technical

12  issues -- contractual issues and commercial issues. But I

13  don't think he's -- well, I can state unequivocally he's

14  not dedicated to Spectrum.

15           THE COURT:  Is he admitted to practice in Israel?

16           MR. PEJIC:  No. My understanding is only in

17  Switzerland and France.

18           THE COURT:  So I don't understand the purpose --

19  what is his utility in the case; what's his role in the

20  case?

21           MR. PEJIC:  He understands and has been involved

22  with commercial aspects of this situation and will be able

23  to advise the client, and particularly us as trial counsel,

24  on nuances of commercial activity. He is to assist us as

25  much as he is to advise the client.

```
 1                           PROCEEDINGS                    14
 2              THE COURT:  So it pertains to commercial.  Are you
 3    talking about the trade secret issues, then, that you
 4    raise?  Because if he's not a technical person, he's not
 5    going to be dealing with the patent rights or the patent
 6    infringement and inventorship; he's going to be dealing
 7    with --
 8              MR. PEJIC:  Not technical -- I'm sorry, your
 9    Honor, not at that technical level.  But as defendants have
10    raised and have argued that there are transactions that led
11    from the predecessors-in-interest to Spectrum.  And we will
12    have to be going through all of that and making proof to
13    your Honor, and part of the assistance of commercial
14    counsel is to assist us in putting that together.
15              THE COURT:  Okay, so let me just digest this for a
16    second so that I understand.  This guy was commercial
17    counsel to Spectrum but also to the predecessor-in-
18    interest; he was inhouse, and he understands the nature of
19    the transactions whereby the rights were transferred to
20    Spectrum's predecessor-in-interest and then to Spectrum.
21    And so you're saying you were not that familiar with the
22    corporate transactions and paperwork, and so that's what
23    you need his assistance on, more so on a consulting basis.
24    Is that correct?
25              MR. PEJIC:  Correct, your Honor. And there's no
```

question that he doesn't need to be a witness to speak to
any of those issues because there are actually business
people that were involved that can speak to those issues as
witnesses whose testimony wouldn't be subject to privilege
objections.

THE COURT:  Okay, and do you know whether he
was -- I assume, since he was inhouse at Spectrum, that
the bio --

MR. PEJIC:  Biosensors?

THE COURT:  Yes, biosensors, thank you; that
he -- was he involved in drafting or approving final
transaction documents?

MR. PEJIC:  That I don't know. I don't believe
so, but I don't know because there was always outside
counsel involved in the transactions, as well.

THE COURT:  Okay. I see. And now, that use of
Mr. Barakett is a little different. He's Israeli counsel,
is that right, Ms. Butler?

MS. BUTLER:  That's correct, your Honor. He is in
Israel, where the GE business unit at issue here is and
where all of the individually-named defendants are, as
well.  And so he will be integral to litigating this case
on a day-to-day basis because of his access to those
individuals.

PROCEEDINGS                          16

1
2          THE COURT:  Right. So he's going to help
3    translate or get documents over to you if there is any
4    privacy law issues or what have you; he's going to help
5    navigate that?
6          MS. BUTLER:  That is true, your Honor.
7          THE COURT:  Okay. So these are my thoughts. One,
8    with respect to Mr. Kabinow, my thought is that one way to
9    allay the concern of GE is to depose him. If you think
10   he's absolutely necessary to be deposed before he has
11   access to certain things, then you can take his deposition
12   out of turn and sooner rather than later; or,
13   alternatively, Spectrum can provide a more detailed chart
14   regarding its trade secrets before Mr. Kabinow gets access.
15   And either of those approaches will address the concerns.
16   And I do think, as we'll talk a little bit more in a
17   moment, that some greater detail is needed on the trade
18   secrets. So I do think that that can be accomplished
19   rather -- I think that that's just a solution, and so it's
20   just a matter of timing.
21          With respect to Mr. Barakett, I think there's
22   some easy solutions to address plaintiff's concern. One,
23   there was a concern raised that Mr. Barakett or his firm
24   would use information learned in this case, Attorney's Eyes
25   Only information learned in this case in litigation against

1

2    Spectrum in Israel.  And it seems to me that you can simply

3    agree that this information wouldn't be used in a

4    litigation in Israel concerning the subject matter of this

5    lawsuit or otherwise in contravention with the Protective

6    Order. And, similarly, he could agree not to share the

7    Attorney's Eyes Only information with colleagues within

8    his firm who are prosecuting [indiscernible] on behalf of

9    GE in Israel. And I think those kinds of agreements are an

10   easy way, or those solutions can allow both sides to have

11   their designated legal experts.

12        I don't know, Mr. Miller or Mr. Pejic?

13        MR. PEJIC:  Okay, this is Mr. Pejic. I guess I

14   will start off with Mr. Kabinow. I think identifying the

15   trade secrets is a preferrable route and look forward to

16   discussing that with your Honor because I believe that

17   that is on the subject of DI-117. And I do agree that,

18   your Honor, that the Protective Order issues with

19   Mr. Barakett can probably be resolved, as well.

20        THE COURT:  All right, Ms. Butler?

21        MS. BUTLER:  I agree with that. I think the trade

22   secrets route would be the way to go. I would just want to

23   have a full understanding of what plaintiff is going to be

24   required to do because if they are going to, you know,

25   provide some more specificity at this point and then

```
 1                      PROCEEDINGS                    18
 2  Mr. Kabinow gets access to GE's highly confidential
 3  information and then they further tweak or add to or
 4  otherwise change those trade secrets, then we've obviated
 5  the whole point of this solution.
 6           MR. PEJIC:  Your Honor, this is Mr. Pejic; may I
 7  please respond?
 8           THE COURT:  Yes.
 9           MR. PEJIC:  Okay.  First off, we are more than
10  happy to identify the trade secrets with specificity that
11  your Honor deems appropriate.  We think we have done very
12  well in identifying trade secrets A through Q in as much
13  detail as we could.  And those trade secrets as identified
14  in the First Amended Complaint aren't going to change.  We
15  aren't going to tailor those based upon discovery we
16  receive. Consistent with the law of trade secrets in the
17  Southern District as set out in the Unisystems case, we may
18  have additional trade secrets we discover through
19  discovery; but at this point in time, my understanding is
20  that we have complied and will comply with further detailed
21  descriptions, per your Honor's instruction.  We just don't
22  think it's appropriate to make everything at this point in
23  time final when no discovery has been provided.
24           THE COURT:  Sure, sure. I understand. It's like
25  after acquired evidence you could find out that, through
```

 1

 2   discovery, that in fact there was some more massive breach

 3   that has nothing to do with Mr. Kabinow. And, anyway, it

 4   sounds like Mr. Kabinow is not a technical person, he

 5   doesn't necessarily -- any refinement is not really going

 6   to be offered by Mr. Kabinow; it's going to be offered by

 7   the expert --

 8              MR. PEJIC:  Correct, your Honor.  And I don't know

 9   that Mr. Kabinow could even speak to the trade secrets if

10   deposed, to be honest with you.

11              THE COURT:  Okay. All right. So that's my

12   suggested solution.  And I assume, Ms. Butler, that you

13   have no issue with what I'm suggesting with respect to

14   Barakett?

15              MS. BUTLER:  I don't have an issue with that. I

16   think that's what he's required to do under the Protective

17   Order, anyway; and so he'd be agreeing to do what's

18   required under the Protective Order.

19              I do, though -- I would like a further

20   understanding of what Spectrum is going to be required to

21   do with respect to specificity of trade secrets. I'm

22   hearing Mr. Pejic say on the one hand that they have

23   already identified --

24              THE COURT:  Well, let's talk about that in a

25   moment.

```
1
2          MS. BUTLER:  Okay.
3          THE COURT:  We'll just --
4          MS. BUTLER:  Yes.
5          THE COURT:  -- this is the way I want to go with
6     these two individuals. But before we get to that, there's a
7     few other things we can knock off pretty quickly, so I want
8     to do that first.
9          With respect to the scheduled Markman hearing
10    before Judge Broderick, does GE intend to offer any
11    extrinsic evidence, any expert testimony with respect to
12    that?
13         MS. BUTLER:  So GE does not believe that expert
14    testimony is needed. Now, if -- and -- on either side -- if
15    Spectrum is permitted to call an expert, then I'm sure GE
16    will call an expert because we'll need an expert to
17    respond. But GE's position is that expert testimony is not
18    needed to construe these claims which your Honor has seen.
19    And, again, this is not complicated stuff here.
20         THE COURT:  Okay, and so you're contemplating that
21    really all that's going to be needed would be -- in terms
22    of evidence -- would be the information and communications
23    filed with the patent office and the patent and so forth,
24    intrinsic evidence?
25         MS. BUTLER:  Yes, your Honor.
```

| | |
|---|---|
| 1 | PROCEEDINGS                          21 |
| 2 | THE COURT:  Okay. |
| 3 | MS. BUTLER:  Yes. |
| 4 | THE COURT:  Same question for Spectrum:  Are you |
| 5 | anticipating that any extrinsic evidence would be used or |
| 6 | experts? |
| 7 | MR. PEJIC:  At this point, your Honor, I don't |
| 8 | believe -- this is Mr. Pejic again -- I don't believe so. |
| 9 | But it is possible, depending upon what the disputed claim |
| 10 | terms turn out to be.  And that's something we aren't going |
| 11 | to know for a couple of weeks.  But we can certainly be |
| 12 | much more definitive when we understand that. |
| 13 | THE COURT:  Okay. But for now, both sides seem to |
| 14 | think that that's not going to be needed. So that's a good |
| 15 | thing. |
| 16 | Okay, next.  For the -- are there going to be any |
| 17 | depositions needed prior to the Markman hearing? Let me ask |
| 18 | Mr. Pejic. |
| 19 | MR. PEJIC:  I don't believe so, your Honor. At |
| 20 | this point in time I can't think of any. |
| 21 | THE COURT:  And are the depositions that you're |
| 22 | contemplating going to be in English, Hebrew, or some |
| 23 | combination? |
| 24 | MR. PEJIC:  Depositions after the Markman, not |
| 25 | related to the Markman, your Honor? |

1

2          THE COURT:  Yes, correct.

3          MR. PEJIC:  That is going to be up to the folks at

4    GE. I don't know what their language capabilities are, and

5    currently there is 70 individuals that are involved in the

6    diligence process.  So I do anticipate there probably are

7    going to be language issues, but I don't know the

8    particularities as to each of those individuals that would

9    potentially be subject to a deposition.

10         THE COURT:  Well, you're not taking 70 depositions

11   in this case, so let's just --

12         MR. PEJIC:  Your Honor, that was the purpose of

13   why we would like to serve the contingent interrogatories

14   that I assume we'll be discussing later. Just trying to

15   streamline that.

16         THE COURT:  We'll be discussing later, but there's

17   no way you're taking 70 depositions.

18         MR. PEJIC:  I think, your Honor, we don't want to.

19         THE COURT:  So, Ms. Butler, from the witnesses or

20   potential witnesses on the GE side, do you know how many of

21   them are fluent in English, or do you have any sense of

22   that?

23         MS. BUTLER:  We don't have a good sense of that. I

24   mean, all of them can speak English, but whether or not

25   that fluency is sufficient for them to be comfortable in a

1

2  deposition context yet, your Honor, I don't know yet.

3         THE COURT:  Okay. All right, that's fine.

4         In terms of the number of depositions, from GE's

5  standpoint, what is your estimate of the number of

6  depositions that GE would require, both for defense of the

7  claims against GE and the prosecution of the

8  [indiscernible] claims -- excluding experts' testimony.

9         MS. BUTLER:  Yes.  So I don't think this is the

10  typical case where, you know, ten depositions per side

11  would do it. I do think that, in many respects, these are

12  kind of two separate cases because each could really stand

13  on its own. And while there's some overlap, there are a lot

14  of issues that don't overlap in the trade secret case and

15  the infringement case. But I think that 15 depositions, I

16  think at this point, would do it.  And we're talking fact

17  depositions, is that correct, your Honor?

18         THE COURT:  Yes, fact depositions.

19         MS. BUTLER:  Okay.

20         THE COURT:  So what I'd like both sides to do is

21  to break down the cases; you know, the trade secret and

22  related claims, as well as the inventorship claims that

23  don't pertain to the two patents in suit, and then the

24  patent claim.  And what I'd like is for you to have a meet-

25  and-confer to sketch out preliminarily who are the key

1

2  people in each -- with respect to those components and

3  figure out if there's any overlap. Because although there

4  is a Scheduling Order in this case, it's really not very

5  detailed, and I do think it's important to have that

6  discussion now because that's also going to help determine

7  who are custodians of electronic information, and it will

8  be a helpful exercise in figuring out who are the witnesses

9  with those separate components.

10         And I want you to have a conversation about that

11  this month and to -- and this is not going to be a final

12  thing, but I want you to sketch out, you know, who are some

13  of the key people.  Some of them are already known because

14  Spectrum has identified a number of people already in

15  various documents who were part of due diligence, who were

16  the inventors or alleged inventors, and the other patents;

17  and GE also knows, you know, who some of the key people

18  are. So I think -- have you exchanged your initial

19  disclosures yet? Remind me.

20         MR. PEJIC:  Yes, your Honor. This is Mr. Pejic --

21         MS. BUTLER:  We have.

22         THE COURT:  And are the initial disclosures broken

23  down in those components?

24         MR. PEJIC:  I don't believe to that

25  granularity -- this is Mr. Pejic again.  They are broken

```
 1
 2   down, but I'm not sure to that level of specificity between
 3   trade secret and patent. I would have to look.
 4             THE COURT: Yes, that's what I want you to do,
 5   take a look at your initial disclosures.  And I want you to
 6   both supplement them with a little bit more granularity and
 7   to have a little discussion about that, because I think
 8   that will aid in planning out further discovery as you go
 9   on and determine, you know -- and then you can help -- I
10   think what I want you to do is determine who is a priority
11   for issues that need to be decided first, who are the
12   priority witnesses or the key witnesses, because you surely
13   know who some of those people are right now.  And people
14   may be added or removed, but I want you to have that
15   conversation and get to a little bit more granularity, and
16   I want you to submit something to me about that before the
17   next conference.
18             ESI protocol, I assume that there'll be an ESI
19   protocol that's put in place and --
20             MR. PEJIC:  Your Honor, this is Mr. Pejic. I don't
21   want to interrupt, but I just wanted to make sure when you
22   say in the letter before the next hearing, is that the
23   January 20th conference call we have scheduled?  Just to
24   make sure.
25             THE COURT:  Yes.
```

```
 1
 2            MR. PEJIC:  Very good. Thank you, your Honor.
 3            THE COURT:  With respect to the ESI protocol,
 4    you're going to need one. Have you talked at all about ESI?
 5            MS. BUTLER:  Your Honor, this is Marla Butler. I
 6    believe the Protective Order has -- well, it definitely
 7    has ESI provisions in it.  And if my understanding of what
 8    you mean by "ESI protocol is correct, I think that protocol
 9    is built into the Protective Order that your Honor has
10    already signed off on.
11            MR. PEJIC:  This is Mr. Pejic --
12            THE COURT:  So you're all --
13            MR. PEJIC:  I think I agree, but I look forward to
14    your Honor's direction.
15            THE COURT:  Okay. I just want to make sure that
16    you have -- that you're satisfied that you're not going to
17    have a lot of disputes regarding electronic searches and so
18    forth.  And I want to direct you to -- I have a detailed
19    talking points or discussion topics document on my web
20    page.  And so I just would ask that each side take a look
21    at that and just think about whether there needs to be any
22    further supplementation or any issues that might need to be
23    anticipated. I think that's less urgent than some of the
24    other things that we're talking about. But just take a look
25    at that and make sure that, if there are issues, that you
```

1

2      talk about them to try to minimize ESI disputes going

3      forward, okay?

4               MR. PEJIC:  Very good, your Honor.

5               MS. BUTLER:  Will do, your Honor.

6               THE COURT:  All right, now, let's talk about the

7      interrogatories. Even though I'm usually paperless, in fact

8      you all gave me so many papers and so many charts, I have

9      printed them out. Okay, so the contention interrogatories,

10     having reviewed all of these interrogatories, I believe

11     that they are largely inappropriate at this time, and they

12     are not consistent with the rules in this district for the

13     purpose -- you know, for this stage of the case, and I

14     don't think that they're designed to minimize discovery.

15              So there are many of the interrogatories that are

16     seeking documents, and really, the information can be

17     obtained through documents or, alternatively, through

18     deposition more efficiently than what you've posed. I mean,

19     in this district we really don't use interrogatories like

20     this, and particularly at the early stage of the case.  And

21     some of the interrogatories really could be significantly

22     narrowed. For example, interrogatory number one, you could

23     say, you know, "Provide the individuals with knowledge and

24     information about GE's decision to enter into diligence

25     activities." That would be appropriate.

PROCEEDINGS                    28

```
 1
 2          MR. PEJIC:  Okay.
 3          THE COURT:  If you want to have those -- if you
 4  want to have them identify those people with knowledge and
 5  information.
 6          Interrogatory two, if you want, "Identify a person
 7  with knowledge and information about who are the GE
 8  diligence personnel who had access to Spectrum's
 9  information." That would be appropriate.
10          Now, I don't know whether you want to revise all
11  of these just to identify the people with knowledge and
12  information, but by revising the interrogatories to ask
13  about the people with knowledge and information as to the
14  subject of each interrogatory, you therefore can, with
15  those responses, determine, better determine who are the
16  deponents that you want to depose.
17          MR. PEJIC:  Thank you, your Honor.
18          THE COURT:  Or, alternatively, it -- maybe there's
19  30(b)(6) depositions that you need to take.
20          So I don't think these interrogatories are
21  appropriate. I think if you want to revise them consistent
22  with our rules, you can do that; but that may not be
23  necessary given the exercise I've asked you to engage in
24  regarding, you know, giving more granularity to the
25  potential witnesses in each of the different categories of
```

```
1
2    claims in the case -- claims and counterclaims, I should
3    say.
4              MR. PEJIC:  Understood.
5              MS. BUTLER:  Your Honor -- sorry, I didn't meant
6    to talk over anyone.
7              THE COURT:  Go ahead, Ms. Butler.
8              MS. BUTLER:  Thank you.  So I will just note that,
9    I guess reminding folks that this activity took place in
10   the 2009-2012 time frame. For GE to identify individuals
11   who may have had knowledge of certain subject matters, what
12   we will have to do, to the extent, you know, we haven't
13   identified those individuals already through what we've
14   done, we're going to have to look to documents to do that.
15   And that really does get into, you know, Rule 33d land. And
16   so I just want to make clear that, you know, in order to
17   answer interrogatories of the type that you just gave as
18   examples, GE will be looking to the same documents that we
19   have produced and are still producing to Spectrum.
20             THE COURT:  All right, well, I disagree that it's
21   33d land. I do think at this point you should know who some
22   key witnesses are; and pursuant to the federal rules, you
23   would be required to supplement.  And so, certainly, to the
24   extent you learn that there's somebody else who's
25   knowledgeable, the interrogatory that I'm suggesting is
```

```
 1
 2    appropriate is to name some people, not every last single
 3    person who might have knowledge. You know, the point of
 4    this and the point of discovery is to get to the people who
 5    have the most, the key people.  And so if it turns out you
 6    need to supplement an interrogatory response, you can
 7    supplement it later on.  But, certainly, at this point, you
 8    must have at least one person who knows about --
 9              MS. BUTLER:  Absolutely.
10              THE COURT:  -- the subject better.
11              MS. BUTLER:  Absolutely, your Honor.  And I think
12    you're saying that you're not -- I guess it wouldn't be
13    requiring GE to identify every single person.  That makes
14    complete sense to me for GE to identify the key people,
15    absolutely. You know, we know who those people are. We're
16    still learning, and we understand an obligation to
17    supplement not only under the -- under Rule 33 as an
18    interrogatory, but under our initial disclosures, as well.
19    So GE is, of course, fine with that.
20              THE COURT:  And what I'm saying is under the local
21    rules pertaining to the interrogatories, the question is
22    identify persons with knowledge and information; it's not
23    all persons. I mean, that's --
24              MS. BUTLER:  Interrogatory number two is in fact
25    all persons.  That's why I'm raising it because that's how
```

PROCEEDINGS                          31

1    it's stated.

2           THE COURT:  But that's not appropriate because

3    that's not getting to what -- that's not useful, even, to

4    the parties propounding the interrogatory. You want to get

5    to the key people. So I am going to deny the request to

6    serve the -- I'm denying, I am denying the request to serve

7    the contention interrogatories. I'm directing the parties

8    to talk about the key people and to make their initial

9    disclosures a little bit more granular with respect to

10   potential witnesses as you now know, based on the current

11   facts.

12          And the, Mr. Pejic, if you think that you need a

13   few interrogatories identifying people with knowledge on

14   certain subjects, you can serve those, consistent with the

15   rule. But remember, there's a limitation on the number of

16   interrogatories.

17          MR. PEJIC:  Yes, your Honor.

18          THE COURT:  You may want to wait. Usually,

19   interrogatories I find are not that useful in practice.

20   Contention interrogatories can be propounded toward the end

21   of the case, and it may be more appropriate to do that, or

22   separately request to admit. And that can be done later on

23   in the case.

24          MR. PEJIC:  Understood, your Honor.

1

2      THE COURT:  Okay, so, now, we've gotten through a

3 lot of issues. Let's talk now about the claim contentions,

4 the invalidity contentions, the inventorship and the trade

5 secrets. All right, as I was going through all of this

6 stuff, I had a conversation with my law clerk Evan, who is

7 on the call, saying we should have an Excel spreadsheet

8 with all of this stuff, and then I thought you all should

9 create an Excel spreadsheet for me to keep it all straight,

10 because there's a lot of overlap; and, personally, I like

11 to see things laid out in an Excel spreadsheet.

12      But let me just first start with some of the trade

13 secret issues. So, Mr. Pejic, I have -- what I've done is

14 I've just created a list of the trade secrets that are

15 still in the case, based on Judge Broderick's opinion. And

16 the only one that I saw in your invalidity contentions were

17 E, pertaining to 439; and I, pertaining to 595. Are there

18 other trade secrets that you say were incorporated into

19 either of those two patents in suit?

20      MR. PEJIC:  I do not believe so. I'll confirm, but

21 I do not believe so. We would have included --

22      THE COURT:  Okay. Okay. So that's one thing that I

23 do want you to be very clear about now or before the next

24 conference.

25      Two, besides the two patents in suit, you identify

 1
 2   approximately 17 -- am I correct? -- 17 other GE patents
 3   that you believe have incorporated your trade secrets --
 4            MR. PEJIC:  That is correct.
 5            THE COURT:  -- is that correct?
 6            MR. PEJIC:  That is correct.
 7            THE COURT:  Okay.  So in your reply and
 8   counterclaim you identify some trade secrets with respect
 9   to some of those patents but not fully.  So what I wanted
10   to see is I want to see a chart where you have the 17
11   patents and you are tying trade secret A or B or C to those
12   patents. So if you -- so what I'm contemplating is some
13   kind of -- maybe it's -- an Excel is pretty easy to use,
14   but if you want to use some other format, you can. But what
15   I'm contemplating is something where you have the 17
16   patents down one column and then you have the trade secrets
17   A, B, C, D, E, you know, all of the ones that are still in
18   across the top, and then you, in the respective row and
19   column you can say this is used in this patent with respect
20   to claims -- because I assume that these trade secrets are
21   incorporated only with respect to certain claims in the
22   patents.
23            MR. PEJIC:  This is Mr. Pejic again, your Honor.
24   Some of the patents actually claim the technology, and
25   those are the patents that are subject to the correction

|     | PROCEEDINGS                                                      | 34 |
|-----|-----------------------------------------------------------------|----|

1  of inventorship as well as the trade secret

2  misappropriation; and there is a small subset of the

3  patents that do not claim but do disclose in the

4  specification the misappropriated trade secret. But this

5  information --

6       THE COURT:  Okay. So that needs --

7       MR. PEJIC:  I'm sorry, your Honor.

8       THE COURT:  I'd like to see that in the chart.

9       MR. PEJIC:  Yes, very much.  We actually have

10 something along those lines -- it's probably in Word -- but

11 we'll distill the information out of the Amended Complaint

12 into a chart form for you.

13      THE COURT:  Yes. So for each of those patents --

14 so every single one, and if it relates to inventorship, you

15 know, you need to make that clear if it's inventorship and

16 disclosure or just disclosure, that needs to be made clear,

17 and that's something that needs to be provided to GE.

18      MR. PEJIC:  Your Honor, this is actually all set

19 out in the First Amended Complaint in the discussion of --

20      THE COURT:  Right. I thought so. I thought --

21      MR. PEJIC:  -- but we will certainly distill it

22 for GE, as well.

23      THE COURT:  Yes. I thought that most of it was as

24 I was reading through it. But I think in chart format it

|     | PROCEEDINGS                                                      | 34 |
|-----|-----------------------------------------------------------------|----|

1   of inventorship as well as the trade secret

2   misappropriation; and there is a small subset of the

3   patents that do not claim but do disclose in the

4   specification the misappropriated trade secret. But this

5   information --

6        THE COURT:  Okay. So that needs --

7        MR. PEJIC:  I'm sorry, your Honor.

8        THE COURT:  I'd like to see that in the chart.

9        MR. PEJIC:  Yes, very much.  We actually have

10  something along those lines -- it's probably in Word -- but

11  we'll distill the information out of the Amended Complaint

12  into a chart form for you.

13       THE COURT:  Yes. So for each of those patents --

14  so every single one, and if it relates to inventorship, you

15  know, you need to make that clear if it's inventorship and

16  disclosure or just disclosure, that needs to be made clear,

17  and that's something that needs to be provided to GE.

18       MR. PEJIC:  Your Honor, this is actually all set

19  out in the First Amended Complaint in the discussion of --

20       THE COURT:  Right. I thought so. I thought --

21       MR. PEJIC:  -- but we will certainly distill it

22  for GE, as well.

23       THE COURT:  Yes. I thought that most of it was as

24  I was reading through it. But I think in chart format it

```
 1                      would be a little bit easier.
 2
 3                          And then with respect to these trade secrets --
 4                          MS. BUTLER:  Your Honor?
 5                          THE COURT:  Yes.
 6                          MS. BUTLER:  Your Honor, if I could just ask for a
 7      point of clarification on what Spectrum's going to be
 8      required to do? Are you requiring Spectrum to just
 9      identify, you know, trade secret A, for example, is found
10      in the 123 patent, or are you requiring Spectrum to say
11      trade secret A is disclosed in column 4, lines 20 through
12      25 of the 123 patent and is claimed in claim 3 of the 123
13      patent?
14                          MR. PEJIC:  I would assume it's the latter, Marla,
15      only --
16                          THE COURT:  Yes.
17                          MR. PEJIC:  -- because that's what --
18                          THE COURT:  It is the latter.
19                          MR. PEJIC:  -- is in the Complaint, that
20      information.
21                          MS. BUTLER:  Thank you, your Honor. Thank you,
22      your Honor.
23                          THE COURT:  Yes, yes, it's the latter; it's the
24      latter. And because I think that will provide actually a
25      lot of clarity for me, and I think that such a chart would
```

be extremely helpful to Judge Broderick when he's looking

at certain things for purposes of dispositive motions.

MR. PEJIC:  You bet, your Honor.

THE COURT:  So I would like to see it, I think he

should see it, and then frankly, that's -- we're going to

talk about the claims and the invalidity contentions in a

moment -- but I think that would be very, very helpful.

And then with respect to some of the trade

secrets, there's some of the trade secrets that are still

in the -- there's some of them where they were dismissed

for claims arising after November 13, 2013. So those are

trade secrets E, G, I, J, N. And so I guess what I think

also should potentially be included in the chart -- and

maybe you can't do it in Excel, maybe you have to do it in

a Word chart, that's fine -- I think you need to make

clear -- provide a little bit more detail about the timing.

Because I guess some of the patents that were filed by GE

were filed after the November 13 date, but the knowledge

was provided, what I understand Spectrum to be alleging is

that the knowledge was provided in earlier years, 2009

through 2012 and due diligence and that that knowledge

began to be used and prepared for the patents that were

filed after that date. That's what I understand

[indiscernible] to be saying, is that right?

```
1
2          MR. PEJIC:  This is Mr. Pejic; yes, your Honor,
3   that's absolutely correct.
4          THE COURT:  Okay.  And so I think you're going to
5   need to be clear about that because there may be some
6   patents where that argument doesn't apply. So you need to
7   make clear, with respect to the timing, if there's some
8   patents where you're [indiscernible] you need to make clear
9   as to the timing whether you're making that kind of
10  allegation as to all of the 17 patents or just some of them
11  so that that statute-of-limitations issue is teased out a
12  little bit more. Okay?
13         MR. PEJIC:  Very good, your Honor. One quick
14  point, question on clarification. How should we provide
15  this chart to your Honor?
16         THE COURT:  Well, first I want you to provide it
17  to the other side; and then I think what you need to do is
18  provide it to me. You can provide it under seal since it's
19  involving a trade secret.  So what you can do is just file
20  it with the request to seal, and I'll grant that request.
21  But there needs to be that request to seal.
22         MR. PEJIC:  Understood, your Honor.  Thank you.
23         MR. GREENBLUM:  Your Honor, this is Neil
24  Greenblum. If I could just --
25         THE COURT:  -- would be very helpful in discovery
```

```
1                          PROCEEDINGS                    38
2    conferences going forward. Okay.
3              Who was that?
4              MR. GREENBLUM:  Your Honor, this is Neil Greenblum
5    for plaintiff. Just one point, just to close the loop for
6    you so that you can get a more complete picture.  The two
7    patents that are in suit were the two patents that were
8    filed after the disclosure; and therefore after that date
9    there is no trade secret.  Those are the two patents that
10   we're being sued upon.
11             THE COURT:  Right. I understand.
12             MR. GREENBLUM:  Okay. Thank you.
13             THE COURT:  I understand. But there's other
14   patents that you're claiming inventorship for or that
15   incorporate your trade secrets, and they were all applied
16   for and obtained at different dates along the way.  And I
17   don't know if this statute-of-limitations issue applies to
18   any of those.
19             MR. GREENBLUM:  Understood.
20             THE COURT:  So that's what needs to be teased out
21   and clarified.
22             Now, with respect to some of the trade secrets
23   seem to me to be very general. So, for example -- and GE
24   pointed this out -- trade secret Q. That seems to me to be
25   a very general statement. It seems to me that many kinds of
```

1

2    computer devices or other electronic devices do need

3    something, the generic system mentioned, in Q. And so in

4    reading through all of the materials, I understand that

5    VERITON has a specific type of Q system. And I think there

6    needs to be a little bit more clarity on what's the novelty

7    or the particular secret pertaining to that system.  That,

8    to me, doesn't seem quite specific enough. I'm not a

9    technical person at all, but I know that this is -- you

10   know, the subject matter of Q is an issue for many, many

11   machines.

12          MR. PEJIC:  Your Honor, this is Mr. Pejic. One of

13   the things that will help flesh this out is actually

14   letting the contention interrogatory, which I think your

15   Honor is actually granting right now in putting together

16   this chart, but our response will cite the specific

17   documents that show the specific trade secret. We were not

18   able to do that in the Complaint for obvious reasons and

19   having exhibits.  But that's our intention, is to further

20   clarify in those situations the level of what the trade

21   secret was to satisfy your Honor.

22          THE COURT:  Okay, that's perfect.  So if you're

23   going to cite to documents, that's fine; but be particular

24   about it because it's going to be one or two particular

25   aspects of that Q system, right, that are unique, clearly.

PROCEEDINGS                    40

 1
 2          MR. PEJIC:  Yes, your Honor. We will tie it to the
 3    sections of the GE patents that we cite and discuss.
 4          THE COURT:  Wonderful. Okay. So I think that will
 5    provide a lot of clarity for the Court, as well, to
 6    understand what you're talking about.
 7          And let me just see here.  These are just
 8    examples.  And so I'm looking at -- similarly, I'm looking
 9    at O, trade secret O. I assume that there is the
10    methodology for optimization, that there's something
11    particular about it, because obviously, the subject matter
12    of that methodology is something that is done and has been
13    done, perhaps not through this type of device before, this
14    type of imaging before, but -- so maybe that's -- I don't
15    know, again; but it seems to me that that could be a little
16    bit more specific.
17          MR. PEJIC:  Yes, your Honor. This is Mr. Pejic
18    again. In fact, if you'll note for just trade secret O, we
19    talk about it being disclosed at certain meetings and
20    communications. And those will be what we will be citing.
21    We will be further -- as part of our identification, we'll
22    be further supplementing that to identify and tie the trade
23    secret further to what has been misappropriated.
24          THE COURT:  Great. Perfect. Okay.
25          MR. PEJIC:  And just one thing, your Honor. As far

```
 1
 2    as getting through all these trade secrets, there's still
 3    no discovery being provided by defendants based upon this
 4    discussion we're having now on identification of trade
 5    secrets. How are we going to handle that?
 6              THE COURT:  Well, let me get through -- we're
 7    going to handle that in a second. I mean, you know what you
 8    know based on the patents that have been filed, that you've
 9    identified, right?
10              MR. PEJIC:  Correct.
11              THE COURT:  And so they've been disclosed in those
12    patents.
13              MR. PEJIC:  Correct, your Honor.
14              THE COURT:  So that's the thing, so --
15              MR. PEJIC:  But what we don't know is what is
16    included in the GE device that has not been approved yet.
17    We have no discovery of that, and we don't know what's
18    inside it, although we do believe, based upon information
19    and belief and what is shown in the GE patent, that there's
20    also misappropriated trade secrets incorporated into the GE
21    device.
22              THE COURT:  Of other -- okay, into the --
23              MR. PEJIC:  Into the device itself.  And --
24              THE COURT:  -- what you're calling --
25              MR. PEJIC:  -- trade secrets we've identified in
```

                              PROCEEDINGS                    42

 1  the Complaint.  We just don't have discovery of the device.

 2          THE COURT:  You're calling it the imitation

 3  device --

 4          MR. PEJIC:  Yes, your Honor.

 5          THE COURT:  -- is what you're calling it.

 6          So is that imitation device -- and I'm just going

 7  to use your language now -- that's one of the patents or

 8  patent applications that you've identified, is that

 9  correct?

10          MR. PEJIC:  No.

11          THE COURT:  It's one of the 17 --

12          MR. PEJIC:  I'm sorry --

13          THE COURT:  -- no.

14          MR. PEJIC:  -- the GE device is a culmination of a

15  number of the trade secrets we believe that have been

16  misappropriated. And as far as a patent, I am not sure what

17  your Honor's referring ████████████████████████████████████

    ███████████████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ██████████████

22          THE COURT:  ████████████████████████████████████████

    ███████████████████████████████████████████████████████████

    ██████████████████████

    ███          ████████████████████████████████████████████



```
 1                    PROCEEDINGS                43

 2  ████████████████████████████████████

 3       THE COURT:  ██████████████████████████

 4  █████████████████████████████████████████████

 5  █████████████████████████████████████████████

 6  █████████████████████████████████████████████

 7       MR. PEJIC:  The GE -- no, my understanding --

 8       MS. BUTLER:  Your Honor --

 9       MR. PEJIC:  -- and Ms. Butler can correct me --

10  █████████████████████████████████████████████

11  █████████████████████████████████████████████

12  █████████████████████████████████████████████

13       THE COURT:  Right. Okay. So, Ms. Butler, can you

14  give me some clarification about this so I can understand

15  it?

16       MS. BUTLER:  Yes, your Honor. So Mr. Pejic is

17  correct; ██████████████████████████████████████

18  █████████████████████████████████████████████

19  █████████████████████████████████████████████

20  █████████████████████████████████████████████

21  █████████████████████████████████████████████

22  █████████████████████████████████████████████

23       MR. PEJIC:  ███████████

24       MS. BUTLER:  ██████████████████████████

25  ██████████████████████████████████████
```

```
 1                          PROCEEDINGS                    44
 2  ████████████████████████████████████████████████████████
 3  ████████████████████████████████████████████████████████
 4  ████████████████████████████████████████████████████████
 5  ████████████████████████████████████████████████████████
 6  ████████████████████████████████████████████████████████
 7  ████████████████████████████████████████████████████████
 8           THE COURT: ██████████████████████████████████
 9  ████████████████████████████████████████████████████████
10  ████████████████████████████████████████████████████████
11           So what documents are public about --  public
12  pertaining to the GE device?
13           MS. BUTLER:  So, your Honor, none.  And this
14  really gets to the crux of our request that Spectrum
15  identify its trade secrets with specificity because
16  Spectrum filed this case alleging that 17 of its trade
17  secrets are in this device, but by Spectrum's own
18  allegations, it saw this device, you know, through -- this
19  is a quote -- "casual observation" through an open door at
20  a hospital in Israel.  And then, after coming to the
21  conclusion based on that casual observation of this device
22  that they had no access to, they asserted 17 trade secrets
23  in this case and then want to turn around and now seek all
24  of the detailed information about the technical workings of
25  this machine before it identifies those trade secrets with
```

1

2  specificity.

3        And so while, you know, our argument is, you know,

4  it's certainly not that Spectrum can't identify perhaps

5  some later trade secret if it discovers something in GE's

6  discovery, but if Spectrum has alleged that these 17 trade

7  secrets are in this device, then tell us what those trade

8  secrets are; and you don't need GE's technical information

9  to do that because they're your trade secrets.  They're

10  their trade secrets, and they should tell us specifically

11  what those trade secrets are and not look to our device to

12  find them.

13        THE COURT:  Okay. So let me just ask some

14  clarifying questions. Mr. Pejic, the trade secrets that are

15  still in the case all seem to have pertinence to the

16  patents in suit.

17        MR. PEJIC:  They --

18        THE COURT:  Or at least two of them do have

19  pertinence to the patents in suit, and they all have

20  pertinence to the VERITON and the VERITON-CT, right?

21        MR. PEJIC:  I don't know. If we're talking about

22  the patents that GE has, those patents misappropriate one

23  or more of the Spectrum trade secrets.  And you'll see this

24  in the chart. And I don't know how the VERITON relates to

25  those patents.  There are two patents in suit that GE has

1        asserted against the VERITON but none others.

2             THE COURT:  Okay, so the VERITON -- let me just

3  restate things for my own clarification and my own

4  understanding.  The VERITON and the VERITON-CT, as I

5  understand it, are the scanning machines that can take

6  different scans -- the person, the patient gets some sort

7  of radioactive material that then goes through the body,

8  their organs, and then they're put in the machine and the

9  cameras on the machine or the detectors on the machine then

10  create an image that is -- that Spectrum says is a state-

11  of-the-art image for doctors or radiologists to take a look

12  at to see if there's a problem with the heart or other

13  organs in the body or the brain or whatever part of the

14  body it's looking at.

15             MR. PEJIC:  You're correct, your Honor.

16             THE COURT:  And it's -- is that right? That's the

17  machine?

18             MR. PEJIC:  Yes, you're correct.

19             THE COURT:  In layperson's terms.  And I, myself,

20  as I'm sure people on this call, have been in machines like

21  an MRI machine or have seen on TV people going into an MRI

22  or a CAT scan machine, and they are on a table and they go

23  into -- they get rolled into some kind of scanner and it

24  makes all kinds of clanky noises and then it goes on for

1

2  however amount of time, and then an image pops up on the

3  computer. So this is of that ilk, the VERITON is of that

4  ilk but it's using radiation for the imaging; is that

5  right?  That's the --

6          MR. PEJIC:  Fair enough, your Honor.

7          THE COURT:  -- aspect of it? Okay. And so the

8  alleged imitation device, as Spectrum believes it is, is

9  essentially -- you're saying it's doing the same thing.

10 It's doing the -- you think it's that kind of device using

11 radiation to create images, all the same kinds of images

12 that the VERITON can do.

13         MR. PEJIC:  And using Spectrum technology to do

14 so, yes, your Honor.

15         THE COURT:  And using the technology, okay. But

16 you don't have --

17         MS. BUTLER:  Can I make a point?

18         THE COURT:  But there's no patent application,

19 and there's no public documents that you've -- that

20 describe the GE machine in more detail, is that correct?

21         MR. PEJIC:  You're correct, your Honor.  All we

22 have is GE's patent applications and patents, which we

23 reasonably believe relate to their device, but we have had

24 no discovery, and there's nothing public about their

25 device.

| 1 | PROCEEDINGS | 48 |

2          THE COURT: Okay. So as I understand it, the 17

3 or so patents that you've identified, you think some or all

4 of that technology may -- that uses your trade secrets,

5 according to you, has been incorporated into this imitation

6 device, is that right?

7          MR. PEJIC: Yes. This is Mr. Pejic. You're

8 correct, your Honor.

9          THE COURT: Okay, fine. All right, Ms. Butler, go

10 ahead.

11          MS. BUTLER: I was just going to say that, you

12 know, what your Honor described, the type of device that

13 the VERITON is, it's a spect machine, and this technology

14 generally has been around, I believe, since the '70s or

15 '80s. And that's why I just want to make the point clear

16 that the device itself, the type of imaging that the

17 VERITON device does is not new --

18          THE COURT: Right. I understand --

19          MS. BUTLER: -- which makes it --

20          THE COURT: Yes. I understand that the type of

21 imaging is not new. What I understand this case to

22 pertain to is particular technology that is alleged to

23 improve the clarity of the images or to improve the

24 usefulness of the device or make it more multifunctional

25 or cheaper or more safe.

```
 1                      PROCEEDINGS                        49
 2            MS. BUTLER:  Correct.
 3            THE COURT:  There are particular improvements to
 4   that existing technology that have combined in the VERITON
 5   and that -- that's what I understand that it involves; is
 6   that right?
 7            MR. PEJIC:  Yes, fair enough again, your Honor.
 8            MS. BUTLER:  That's correct, your Honor. And the
 9   one other point I wanted to make that extends from that
10   is, you know -- and I know that we are expecting now to
11   get more specific identification of trade secrets from
12   Spectrum -- but another reason why that's important is
13   because all of that prior art is relevant to determining
14   what Spectrum is now calling a trade secret, whether it was
15   in fact new, whether it was known before Spectrum claims it
16   came up with it.  And there is a full body of art that
17   relates to that.
18            MR. PEJIC:  May I --
19            THE COURT:  Right. Okay.
20            MR. PEJIC:  -- ask what prior art, Ms. Butler? I
21   don't understand. Art's not part of the trade secret case.
22            THE COURT:  We're going to get to that in a
23   second.  But let me just go with the trade secrets for now
24   because I think that's an important piece because this all
25   has to do with inventorship, and it bleeds into and
```

 1
 2   overlaps to some extent with the patent piece.

 3            Okay, so in the chart that I want Spectrum to

 4   create I want you to provide that greater granularity, tie

 5   it to the various patents that you've identified, provide

 6   citations or documents to the more specific claims within

 7   the patent or the specific improvement, because it's

 8   unclear to me, when I'm looking at it -- and we'll go to

 9   the claim contentions next -- exactly what we're talking

10   about, because I do understand that this type of imaging,

11   this spect imaging, has been around; it's not totally clear

12   to me what's novel in --

13            MR. PEJIC:  Well, one thing, your Honor, while it

14   may have been around for a while, the fact that there are

15   still patents being filed and issued on the technology, you

16   know, shows, as your Honor has observed, that even though

17   this technology is known, there are certain things that

18   are new, novel and patent or trade secret protectable,

19   still.

20            THE COURT:  Right, right. Sure, I understand.

21   And I'm glad science continues to make improvements on

22   things. So that's what I need -- and think about it, this

23   chart should be -- you should be relating this to

24   particular things so even the Court could say, "Oh, I

25   understand what you're talking about now."

| | PROCEEDINGS | 51 |
|---|---|---|

1

2       So now that there's a Protective Order in place,

3 now that you're not talking about a pleading, I want you

4 to lay that out in a chart format.

5       Now let's go to the claim --

6       MR. PEJIC:  Your Honor, may I ask for one moment?

7 Where does this leave, again, discovery by GE? Because GE

8 continues to refuse to provide technical discovery,

9 including technical discovery of the 439 and 595 patents,

10 which they've asserted as a patent plaintiff here. We don't

11 have --

12       THE COURT:  Okay, so --

13       MR. PEJIC:  -- invention disclosure records,

14 nothing related to them.  And they refuse to provide that,

15 in addition to all other technical discovery.

16       THE COURT:  Okay. Hold on because I want to tell

17 you what I want to get to as to the claim contentions and

18 the invalidity contentions.  And then we're going to talk

19 about what may be needed and all -- I think that the --

20 hang on here, let me get the -- I'm just getting my papers

21 out.

22       All right, so what I think is that the trade

23 secret chart that I'm asking you to put together, I think

24 that can be put together without regard to the video

25 inspection.  But it seems to me that the video inspection

PROCEEDINGS                    52

1
2   should occur before there's additional clarification to the
3   claim contention and the invalidity contentions pertaining
4   to the two patents in suit.
5           MR. PEJIC:  Very good.
6           THE COURT:  And that's because I think that
7   they're separate, you know, they're separate types of
8   issues. So I do think that the --
9           MR. PEJIC:  Plaintiff --
10          THE COURT:  So the video inspection that we talked
11  about earlier in the conference I think may eliminate, from
12  what I understand, may eliminate or narrow the patent
13  infringement claims.  And --
14          MR. PEJIC:  That's true, your Honor, but that
15  still doesn't mean we're not entitled to discovery of the
16  patents from the party asserting the patents.
17          THE COURT:  Absolutely.  But you have the patents,
18  right?  Do you have --
19          MR. PEJIC:  We have the patents; we don't have the
20  invention disclosure records, any of the inventor
21  notebooks, all the typical discovery that's given in a
22  patent infringement case.
23          THE COURT:  You don't have the intrinsic stuff,
24  the back-and-forth with the patent office and the stuff
25  that you use for a Markman hearing.

PROCEEDINGS                                    53

1

2          MR. PEJIC:  But what we also don't have is dates

3    of conception, dates of reduction to practice, which will

4    all dictate what is prior art, as well.

5          THE COURT:  Okay, but do you have the documents

6    that would be used at a Markman hearing?

7          MR. PEJIC:  We do have the file wrapper, your

8    Honor, yes.

9          THE COURT:  Okay.  That's the critical thing that

10   I think you need right now in advance of the Markman

11   hearing, because the Markman hearing is going to then

12   further clarify the claims that are actually in contention.

13         MR. PEJIC:  Correct, but the asserting claim

14   should not relate to the discovery that's due from the

15   inventors and the inventor notebooks.  Any asserted claim,

16   your Honor, I would --

17         THE COURT:  Well, I think --

18         MR. PEJIC:  -- entitles a accused infringer to

19   such discovery.

20         THE COURT:  Absolutely. I think that this is just

21   a matter of timing and prioritizing what we're doing.  So

22   let's just finish this discussion. So I think -- how long

23   will it take you to do this trade secret? It sounds like a

24   lot of the chart you already have in place together. Do you

25   think you can complete that within three weeks or so, by

```
 1
 2   the end of the month?
 3           MR. PEJIC:  I [indiscernible] your Honor, maybe
 4   even sooner.
 5           THE COURT:  Okay. Great. So I want you to prepare
 6   that before the end of January, and I want the video
 7   inspection to happen before the end of January.
 8           Now, let's now talk about these claim contentions.
 9   After the video inspection, GE is going to need, it sounds
10   like, or it may need to make a clarification to its claim
11   contention. And I don't know how extensive those changes
12   would be. So what I'd like to do is have GE revise its
13   claim contentions within 14 days after the video
14   inspection.  And if you need more time because of, you
15   know, whatever is shown or what-have-you, that you can let
16   me know that.
17           MS. BUTLER:  Absolutely, your Honor, we're happy
18   to do that.
19           THE COURT:  Okay. Now, with respect to the patent
20   and this idea of when they were first conceived, I guess
21   what -- I imagine that's a date that is -- again, I'm not
22   an expert in patent law, so I just -- so just speak up if
23   I've gotten something wrong -- that applies to both sides.
24   But the -- I assume that the date first conceived is
25   pertaining, like, when the inventor says, "Eureka! This is
```

1

2    the new novel way I'm going to use this and put it into the

3    device."

4              MR. PEJIC:  Correct, your Honor.

5              THE COURT:  But I also imagine that that date is

6    somewhat hard to pin down when you're talking about a

7    continuum, when you're talking about people who are

8    involved in the field, skilled in this art and are

9    constantly working to improve products.  And so that it may

10   be --

11             MR. PEJIC:  Yes, your Honor, you're absolutely --

12             THE COURT:  -- [indiscernible]

13             MR. PEJIC:  and that's why typically in these

14   patent infringement cases the patentee provides inventor

15   notebooks and development records and that type of

16   information because that is the actual discovery and

17   information that will dictate the "Eureka" moment as your

18   Honor characterized it.

19             THE COURT:  Yes. So -- all right.  And so these

20   patents were filed in 2014.

21             MR. PEJIC:  Right.

22             THE COURT:  So let me ask you, Ms. Butler, do you

23   know now when there was a first draft of the patent

24   application, or, like, do you know when the patent

25   prosecution started?

 1

 2          MS. BUTLER:  So, your Honor, we are in the process

 3   of gathering and producing this information. My colleague,

 4   Mr. Godshalk, sent Mr. Pejic and email over the last couple

 5   of days that said that we were considering their request to

 6   pull this information out kind of separate from the

 7   technical documentation related to GE's system and produce

 8   it. And we are in the process of searching for, gathering

 9   and producing information, technical information, like

10   invention disclosures, etc., to the extent they're not

11   privileged -- understand oftentimes they're privileged.

12   But we're in the process of gathering that information to

13   produce it.

14          MR. PEJIC:  Okay.  And so is --

15          THE COURT:  Because it seems -- I'm sorry, go

16   ahead, Mr. Pejic. What were you saying?

17          MR. PEJIC:  -- inventor notebooks, as well,

18   because those would be contemporaneous with any invention

19   disclosure and not be privileged.

20          MS. BUTLER:  I'm not sure if Mr. Pejic is

21   directing that question to me.

22          MR. PEJIC:  I'm just asking you because you

23   mentioned invention disclosure agreements, but I'm just

24   seeking clarity of whether GE would be producing develop

25   records like inventor notebooks that would at least

1
2  reflect the same type of information that would be an

3  invention disclosure statement, which I typically don't

4  find to be privileged.  But to the extent it is, the

5  inventor notebooks and develop records would be

6  contemporaneous.

7          MS. BUTLER:  To the extent they exist and would be

8  responsive to Spectrum's document requests related to the

9  439 and 595 patents, GE is looking for and will produce

10 those documents.

11         THE COURT:  Okay.  Good.  So I want you to

12 prioritize that because what I understand is that this

13 information will clarify, as well, some of the prior art

14 that Spectrum has identified and whether some of it is out

15 the window. Is that fair to state, Mr. Pejic?

16         MR. PEJIC:  That's -- yes, your Honor, you're

17 correct.

18         THE COURT:  Okay. So -- and it seems to me that, I

19 mean, at the very least, GE knows when it sent an email to

20 its patent prosecution counsel to say, "Hey, we have a new

21 patent, 439; this is what -- you know, let's get started on

22 it." You know the date when that communication occurred,

23 for sure, you know.

24         MS. BUTLER:  So we can find that out, your Honor.

25 And I just want to just state -- and I've got to look into

1  
2  this further -- but I believe both of these patents are

3  post AIA patents, so they were filed after the America

4  Invents Act, which changed the patent system to kind of a

5  first inventor file, the first to file system, which may

6  have an impact on the priority dates.

7          THE COURT:  Right.

8          MS. BUTLER:  So all these records may not be

9  relevant, anyway. I'm not saying that we're not going to

10 produce them, because I think they're potentially relevant

11 to other issues besides the date of the invention.

12         THE COURT:  Right.

13         MS. BUTLER:  But I do want to make that point so

14 we don't end up going down that path if we shouldn't.

15         THE COURT:  Right, right, yes, no, I understand.

16 But it seems to me that this is an important thing to kind

17 of square away because it can potentially narrow discovery,

18 narrow issues and then get rid of some of the prior art

19 that's not pertinent.  And so the sooner you can get --

20 even if you just find out, you know, some of these dates

21 that you know when the patent prosecution, you know, when

22 the person was first engaged to apply for, you know, and

23 has not yet put together all of 439, but you know when

24 that date was, that gives you a little bit of information.

25 You could just convey that on the phone, I suppose, and

1

2    then it could be -- and that may help expedite what

3    plaintiffs are doing in terms of what they need to do for

4    some of their invalidity contentions and what he needs.

5              So I do want you to prioritize finding this

6    information so that -- and producing this information

7    because I think it's then going to relate to the invalidity

8    pieces. So let's see, all right, so I'm looking at 439 and

9    I'm looking at the claim chart and now I'm looking at the

10   invalidity. So for the invalidity pieces -- you have this

11   prior art that you're talking about; a lot of it is this

12   PCT721.

13             MR. PEJIC:  Yes, your Honor.

14             THE COURT:  And you have -- in some places you're

15   more detailed with figures and stuff than others. And, for

16   example, you have a picture of this camera. I don't know,

17   for example, the camera, the picture that you have on

18   page 7 of 164131, the specific camera, it's not clear to me

19   if this is in -- like, I don't know the extent to which

20   these patents have this type of camera. I think that you're

21   talking specifically about this, not the camera per se but

22   the counterweight; is that right?

23             MR. PEJIC:  And if that's the 439, yes, your

24   Honor.

25             THE COURT:  The counterweight feature. So, I mean,

```
 1
 2  again, I think just in physics, counterweights and pulley
 3  systems are not unusual; they've been around for a while.
 4  It's not clear to me what's novel about this particular,
 5  you know --
 6          MR. PEJIC:  I think your Honor is seeing the point
 7  that Spectrum's trying to make is that these patents are
 8  invalid over the prior art, including the PCT.
 9          THE COURT:  Okay. Well, I mean, I think --
10          MR. PEJIC:  That's exactly what our argument is,
11  your Honor.
12          THE COURT:  Okay. So -- okay, so --
13          MS. BUTLER:  Your Honor, can I respond?
14          THE COURT:  Sure.
15          MS. BUTLER:  So I think that the issue with
16  Spectrum's invalidity contentions are bigger than even
17  just, you know, a picture without explanation that you
18  pointed out. If you look, your Honor, at the cover pleading
19  of the Spectrum invalidity contentions and you look on
20  page 2, you know, there is -- it's 1A, it says prior art --
21          THE COURT:  Well, okay, I actually want to look at
22  the chart.  Exhibit A is really more useful --
23          MR. PEJIC:  And, your Honor --
24          THE COURT:  -- to me.
25          MS. BUTLER:  Your Honor, if I could finish
```

without --

MR. PEJIC: -- she's misrepresenting the fact --

MS. BUTLER: -- Mr. Pejic interrupting me.

MR. PEJIC: -- they're mixing the --

MS. BUTLER: If I could finish?

MR. PEJIC: -- the primary references, and that is inappropriate. If you look at the charts, it's very clear what's being applied. And there is no --

THE COURT: Mr. Pejic --

MR. PEJIC: -- truth to the assertion that there's 20 pieces of prior art being asserted but not applied.

MS. BUTLER: If I could --

THE COURT: Mr. Pejic, please don't interrupt. Let Ms. Butler finish. Everybody will have their chance.

Ms. Butler?

MS. BUTLER: Thank you, your Honor. So if you look on page 2 of that cover pleading, under 1A it says, "The invalidating prior art to the asserted claims of the 439 patent includes," and the very first reference listed there is that 721 application for which Spectrum did provide a claim chart. But following that first bullet are ten or so additional prior art references that Spectrum is claiming here are invalidating.

THE COURT: Okay. So this is --

| | |
|---|---|
| 1 | PROCEEDINGS 62 |
| 2 | MS. BUTLER: And they've provided no chart. |
| 3 | MR. PEJIC: Your Honor, may I -- |
| 4 | THE COURT: Okay. So this is -- hang on. |
| 5 | MR. PEJIC: -- and first I apologize -- |
| 6 | THE COURT: No. |
| 7 | MR. PEJIC: -- for interrupting Ms. Butler. |
| 8 | THE COURT: Yes. |
| 9 | MR. PEJIC: But this is a sore point between the |
| 10 | parties because we've explained -- |
| 11 | THE COURT: I want you to hold that point because |
| 12 | I have another conference. And so we've gotten through a |
| 13 | bunch of things today. We have another conference coming |
| 14 | up. So a couple of things. You have on your to-do before |
| 15 | we next meet, you've got to get the video inspection; you |
| 16 | have dates -- Spectrum has a date to clarify the trade |
| 17 | secrets and with a chart by the end of January; and GE has |
| 18 | a date where it needs to provide greater clarification as |
| 19 | to its claim contentions after the video. You need to |
| 20 | figure out whether something's changed. And that has to |
| 21 | happen 14 days after the video inspection. |
| 22 | So I think I need to -- I think that once these |
| 23 | things happen, we can then talk a little bit more about the |
| 24 | validity chart. And so I want to table the discussion of |
| 25 | the invalidity chart, which is going to need some |

```
 1                        PROCEEDINGS                    63

 2   refinement. We're going to have to table that to our next

 3   conference. Okay? So work on the things that I've talked

 4   about today, and then we'll talk again later this month.

 5            MR. PEJIC:  Thank you, your Honor.

 6            MS. BUTLER:  Thank you, your Honor.

 7            THE COURT:  All right, thanks, everybody.

 8            MR. PEJIC:  Take care.

 9            THE COURT:  Bye-bye.

10            (Whereupon, the matter is adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                                                64

 2

 3                    C E R T I F I C A T E

 4

 5           I, Carole Ludwig, certify that the foregoing

 6   transcript of proceedings in the case of Spectrum Dynamics

 7   Medical Limited v. General Electric, Docket #18-cv-11386-

 8   VSB-KHP, was prepared using digital transcription software

 9   and is a true and accurate record of the proceedings.

10

11

12

13   Signature_____Carole Ludwig_____

14                    Carole Ludwig

15   Date:    January 11, 2021

16

17

18

19

20

21

22

23

24

25
```