# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                        Docket #18cv11386
 SPECTRUM DYNAMICS MEDICAL LIMITED,  : 1:18-CV-11386-VSB-KHP

                    Plaintiff,      :

   - against -                      :

 GENERAL ELECTRIC COMPANY, et al.,  : New York, New York
                                      February 25, 2021
                    Defendants.     :

----------------------------------- : TELEPHONE CONFERENCE

                      PROCEEDINGS BEFORE
               THE HONORABLE KATHARINE H. PARKER,
                 UNITED STATES MAGISTRATE JUDGE
APPEARANCES:

For Plaintiff:           RIVKIN RADLER LLP
                         BY:  GREGORY MILLER, ESQ.
                         25 Main Street, Suite 501
                         Court Plaza North
                         Hackensack, New Jersey  07601

                         GREENBLUM & BERNSTEIN, PLC
                         BY:  NEIL GREENBLUM, ESQ.
                              BRANKO PEJIC, ESQ.
                              JILL BROWNING, ESQ.
                         1950 Roland Clarke Place
                         Reston, Virginia 20191




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service.
```

```
APPEARANCES (Continued):

For Defendants:          THOMPSON HINE LLP
                         BY:  MARLA BUTLER, ESQ.
                         Two Alliance Center
                         3560 Lenox Road, NE, Suite 1600
                         Atlanta, Georgia  30326

                         THOMPSON HINE LLP
                         BY:  JEFFREY METZCAR, ESQ.
                         Discovery Place
                         10050 Innovation Drive, Suite 400
                         Dayton, Ohio  45342-4934

                         THOMPSON HINE LLP
                         BY:  JESSE JENIKE-GODSHALK, ESQ.
                         312 Walnut Street, 14th Floor
                         Cincinnati, Ohio  45202

                         THOMPSON HINE LLP
                         BY:  BRIAN LANCIAULT, JR., ESQ.
                         335 Madison Avenue
                         New York, New York  10017
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1                          PROCEEDINGS                    4

2              THE CLERK:  Calling case 18cv11386, Spectrum

3    Dynamics Medical versus General Electric Company.  The

4    Honorable Katharine H. Parker, presiding.  Starting with

5    counsel for the plaintiff, can you please make your

6    appearance for the record?

7              MR. GREGORY MILLER:  Good morning, Your Honor.

8    Gregory Miller, Rivkin Radler, on behalf of the

9    plaintiffs.  Also with me on the line, we have Neil

10   Greenblum, Branko Pejic and Jill Browning from Greenblum &

11   Bernstein.

12             HONORABLE KATHARINE H. PARKER (THE COURT):  God

13   morning.

14             THE CLERK:  And counsel for the defendants, could

15   you please make your appearance for the record.

16             MS. MARLA BUTLER:  Yes, this is Marla Butler and

17   with me on the call is Jeff Metzcar, Jesse Jenike-Godshalk,

18   and Brian Lanciault, all of us from Thompson Hine

19   representing the defendants.

20             THE COURT:  Good morning.  As you all know, we are

21   making an official recording of this call and you can order

22   a transcript within three days.  Also I'd ask that

23   everybody keep their phones on mute unless you're speaking

24   to eliminate background noise, and to state your name

25   before speaking for the benefit of a court reporter who may

                              PROCEEDINGS                    5

 1
 2   be asked to transcribe this call. The line is open to the
 3   press and public on a listen only basis and court rules
 4   prohibit the others from recording and rebroadcasting court
 5   conferences.  Violations of this rule may result in
 6   sanctions.

 7           You all have quite a lot of issues that you've
 8   raised in your letter from February 18.  We'll go through
 9   them today.  I want to put one issue, I want to deal with
10   one issue quickly and that relates to the request to admit.
11   I'm going to be issuing a short decision later today, but
12   I'm granting the protective order with respect to the
13   motion to dismiss -- with the motion for a protective
14   order, I'm sorry.  Because the requests were not
15   appropriate under Rule 36 and they are unduly
16   burdensome.  So you'll see my decision outlining the
17   reasons in more detail later today.

18           I also want to just address these letters.
19   There's a lot of, I think that these pre-conference
20   letters should be shorter. I don't want the letters to
21   be creating a lot of work for you.  They're intended
22   to really be summaries of issues to discuss. And if I
23   need additional briefing I'll, you know, take the
24   additional briefing.  So the joint letter should be
25   limited to six pages and if, and you'll have a chance

```
 1                           PROCEEDINGS                    6
 2  to raise issues and, again, if further briefing is
 3  needed, we can decide that at the conference. But
 4  going forward I want you to limit the letters to six
 5  pages and to a more summary of the issues to talk
 6  about.
 7          So going forward, let's talk about just the
 8  issues, we'll start with the plaintiff's issues in the
 9  letter.  First is the supplemental infringement
10  claims.  So what I -- I'm not quite sure what the
11  concern is from Spectrum so I'd like to hear from
12  plaintiffs on this.
13          MR. BRANKO PEJIC:  Sure, Your Honor, this is
14  Branko Pejic.  Basically what happened is Your Honor
15  was absolutely correct in asking the parties to have a
16  virtual inspection of the actual Veriton as sold and
17  offered for sale in the United States.  And that
18  revealed that the Veriton did not operate in the same way
19  as the mockup which was initially accused by GE. And so
20  GE, when they provided their supplemental infringement
21  contentions maintained the same infringement contentions
22  and accused the same mockup device of infringement that
23  could not be sold in the US. And moreover, ████████
    ████████████████████████████████████████████████████
    ████████████████████████████████████████████████████
```

1                           PROCEEDINGS                    7

2  ████████████████████████████████████████████████████

   ██████████████████████████████████████████████

   ████████████████████████████████████████████████████

   ██████████████████████████

6          THE COURT:  Okay, so let me just stop you for

7  a second. The mockup from the -- that was used in the

8  United States is not a real machine, is that, the real, is

9  that right, there's only one real machine that's in use in

10 the United States and it is identical to the one in Israel

11 that was demonstrated through video?

12         MR. PEJIC:  Yes.  For all materials intents and

13 purposes, correct, Your Honor.

14         THE COURT:  Okay.  And so the functionality

15 that you say the mockup, that the mockup had that the

16 actual device does not have is not functionality,

17 that's not something that is going to be sold in the

18 machine in the United States, is that correct?

19         MR. PEJIC:  It's not being sold -- correct, Your

20 Honor, it's not being sold in the machine. And

21 moreover, the mockup, as you said, wasn't even a

22 machine, it was running on display simulations and

23 software, just it's a completely different animal.

24         THE COURT:  Why were you, why was Spectrum

25 showing features that it's not selling, that doesn't

1                       PROCEEDINGS                    8

2  make sense to me?

3          MR. PEJIC:  Your Honor, they were not showing,

4  or selling, or offering for sale features because, in

5  fact, if documents we produced to the other side, we

6  couldn't offer this for sale based upon the

7  representations to the US government and customs. So

8  it was never offered for sale.  And furthermore, the

9  device, ████████████████████████████

   ████████████████████████ Essentially what it was doing is

11  showing how nimble the machine could be with the arms,

12  but it's not, it was never offered for sale. And it's

13  a different machine than what is actually being sold.

14  It didn't have --

15          THE COURT:  But that doesn't answer my

16  question.  What's the point of showing features or

17  what it could do if you can't purchase it with those

18  features?

19          MR. PEJIC:  Your Honor, I don't have an answer

20  for that. I haven't asked Spectrum. I just know that

21  they never intended that device to be offered for sale

22  or representative of what was actually going to be the

23  commercial device. I mean --

24          THE COURT:  That doesn't -- I understand what

25  you're saying, but it doesn't make any sense from a,

PROCEEDINGS                9

1

2  it doesn't make any sense that a business would have

3  people looking at a device functionality that it's not

4  offering.

5           MR. PEJIC:  But, Your Honor, we need to back

6  up a little bit because we're being very superficial

7  in our discussion. The claims of the 595 patent that

8  we're talking about, not only is the movement of the

9  arms, it's the ability to take information at certain

10  points and move the arms in certain places. And the

11  mockup can't do any of that, did not do any of that.

12  And the current device that Spectrum is selling also

13  doesn't do that.  So we're really here on, you know,

14  on frolic and detour. I'm not sure why this

15  infringement is being asserted.

16           You know, obviously I would have --

17           THE COURT:   On the 595.

18           MR. PEJIC:  Correct, Your Honor. And I'd have

19  to say the Veriton is commercially sold, let's not

20  infringe the 595 because defendants did not base their

21  infringement contentions on the commercial device.

22           THE COURT:  Well that I, that's the whole

23  purpose why you showed the commercial device.

24           MR. PEJIC:  Correct, Your Honor.

25           THE COURT:  So what does, what does GE have to

1                        PROCEEDINGS                    10

2    say about this and the 595 patent?

3          MR. JEFFREY METZCAR:  Yes, Your Honor, this is

4    Jeff Metzcar for the defendants.  So, as you know, GE

5    asserted infringement of the 595 based on a video, a public

6    demonstration of a product identified as the Veriton.

7          THE COURT:  Yes.

8          MR. METZCAR:  And that device showed arm movements

9    that were important to the 595 patent.  During the

10   inspection, Spectrum was keen to, you know, prove that the

11   actual product could not perform those arm movements. And

12   that's fine, but throughout the inspection they were

13   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

17         And moreover, you know, what was going on during

18   the inspection was not actual testimony. So GE promptly

19   served very targeted discovery requests after that

20   inspection to confirm that the device that is actually

21   sold in the United States cannot perform the functions

22   that were demonstrated in the United States.  We've

23   represented if Spectrum provides complete responses we

24   would be willing to potentially dismiss that 595 patent

25   from the case, we're just waiting for those responses.

```
 1                        PROCEEDINGS              11
 2            MR. PEJIC:  Your Honor, may I respond?
 3            THE COURT:  Let me just, I would like to just
 4   ask Mr. Metzcar a few questions.  So, Mr. Metzcar, if,
 5   I guess there's, in your mind is there a distinction
 6   as to whether or not there will be a device offered
 7   for sale in the United States that performs these
 8   functions versus whether it could potentially be modified
 9   to perform those functions?
10            MR. METZCAR:  Well, yes, Your Honor. The reason
11   why we thought it important to serve these discovery
12   requests is because there's a continuing duty to
13   respond or to supplement the response. Our concern is
14   if we just drop the patent immediately and Spectrum
15   has already demonstrated the ability to make a Veriton
16   move its arms in the way that infringes the 595
17   patent, you know, we don't want to drop the patent and
18   then have a software patch or update delivered the
19   very next week that allows the Veriton to perform in
20   an infringing way.  So we served the discovery
21   requests in the hope that Spectrum will clarity or
22   confirm that the device does not operate in the way it
23   was demonstrated and have a going forward obligation
24   to supplement those responses.
25            THE COURT:  Well, okay, so the discovery
```

                                PROCEEDINGS                    12

 1

 2    request is an interrogatory?

 3           MR. METZCAR:  We served 4 interrogatories and

 4    I believe 12 requests for admission that, again,

 5    they're very specifically targeted at confirming that

 6    the device that is sold in the United States, does not

 7    perform in the manner demonstrated in Chicago in 2018.

 8           THE COURT:  Okay.

 9           MR. METZCAR:  And quite frankly -- oh, I'm

10    sorry.  You know, the 30 day deadline to respond -- I'm

11    sorry, go ahead.

12           THE COURT:  So is there, is plaintiff going to

13    respond to that?  I assume that these --

14           MR. PEJIC:  Your Honor, in fact, we've already

15    produced 10 documents including the shipping invoices

16    and the manifests showing that the device was a mockup

17    that didn't have any of the features that would be

18    necessary to infringe the 595 patent. And in addition

19    to what we believe to be unequivocal statements and

20    testimony in the inspection, I mean I did understand

21    that to be pursuant to court order, so I do sort of

22    take a little offense at the implication that anyone

23    wasn't telling the truth. But, yes, we're also going

24    to respond to the RFAs and the interrogatories which

25    I'll note does have some contention aspects to them.

```
 1                        PROCEEDINGS                  13
 2  but we'll go ahead and respond to those. But then we
 3  anticipate GE dropping this 595 patent because it's
 4  not properly in suit --
 5            THE COURT:  Sure.
 6            MR. PEJIC:  And, if not, we really are
 7  considering seriously Rule 11 because plaintiffs, I
 8  mean defendant, GE, does not have a good faith basis to
 9  accuse the mockup infringement.
10            THE COURT:  Okay.  Well I think if you can provide
11  those answers GE can drop the claim.  In my mind it would be
12  without prejudice because if this suit ends and you
13  later infringe on the patent, you know, having nothing
14  to do with this case but sometime in the future, that
15  wouldn't preclude a future claim.
16            MR. METZCAR:  We would not require them to
17  provide a covenant not to sue, Your Honor, so I think
18  I agree with you.
19            THE COURT:  Yes.  Okay. So it seems like this
20  is really not an issue, this issue, one, in that this
21  claim related to the 595 patent may be, may be moot.
22            MS. BUTLER:  Your Honor, this is Marla Butler,
23  can I just make a point here that I think goes to this
24  issue which you expressed towards the beginning and
25  that's kind of trying to limit what these letters
```

1                          PROCEEDINGS                    14

2     cover and the issues that are before the Court.

3                THE COURT:  Yes.

4                MS. BUTLER:  This, Your Honor, is a perfect

5     example of something that is not a dispute and should

6     not be before Your Honor.  GE filed this claim based

7     on a public demonstration in Chicago of a device

8     without the information that was provided by counsel

9     after this suit was filed.  GE had a perfectly

10    legitimate basis for filing its counterclaim of

11    infringement of the 595 patent.  A demonstration of a

12    machine that we were told by counsel is representative

13    of a machine in the United States was shown to us. There

14    were statements by counsel during that video and GE made

15    clear that all we are looking for is the actual evidence

16    that just backs up those statements of counsel.  This is

17    an instance where we should have served these

18    interrogatories, requests for admissions, Spectrum

19    responded to them, and assuming those responses are

20    consistent with statements of counsel, the 595 patent will

21    be gone from this case.

22                But instead what we have is Spectrum's counsel

23    threatening Rule 11 sanctions without even having provided

24    the evidence that will allow GE to drop the patent. I just

25    wanted to say that's a perfect example of the kind of

```
 1                         PROCEEDINGS                    15

 2  thing that shouldn't be before the Court.

 3            MR. PEJIC:  Your Honor, may I respond?

 4            THE COURT:  No, no, no, I really don't want to

 5  engage in mudslinging and so forth, this is not,

 6  let's, I've already instructed the parties to just

 7  limit the letters to six pages, and I really only -- I

 8  really only want to deal with issues that are

 9  necessary to deal with in these conferences.  So I

10  think that we've dealt sufficiently with this issue

11  one and that within the next 30 days I'll expect that

12  GE is going to be withdrawing the 595 claim.

13            So now let's go onto this deposition of Mr.

14  Hefetz.  So this also appears to not be a dispute

15  because, as I understand it, GE is going to have him

16  appear, am I correct?

17            MR. PEJIC:  Your Honor, this is Mr. Pejic.  We

18  simply wanted to put this on the record so that the

19  agreement was memorialized. Because I don't know if

20  Your Honor is aware, but certainly Judge Broderick is,

21  that Mr. Hefetz has been a subject of motions to

22  dismiss and various other issues including dismissal

23  based upon no jurisdiction over him. And so it's

24  important to spectrum to get his discovery and so we

25  were moving under the Hague Convention knowing the
```

```
 1                        PROCEEDINGS                    16
 2  timeframes in play. And based upon defendants now
 3  representing that Mr. Hefetz will appear voluntarily,
 4  we're foregoing the ability to pursue the Hague and
 5  should they change their minds later we would be in a,
 6  how should I put it, in a bad place --
 7           THE COURT:  Okay, sure.  Okay, that's
 8  understandable and that's fine, and it's noted for the
 9  record that GE is going to arrange for his voluntary
10  production pursuant to Rule 30.
11           Okay, so now let's talk about this designation
12  of Dr. Turkington.
13           MR. PEJIC:  Yes, Your Honor --
14           THE COURT:  Also this is another issue that GE
15  says is not ripe yet. So what's going on with this.
16           MR. PEJIC:  Okay.  This is Branko Pejic again
17  for plaintiffs.  GE identified Dr. Turkington as an
18  expert under the protective order to have access to
19  Spectrum highly confidential information.  We went
20  through GE's documentation ███████████████████████
   ███████████████████████████████████████████████
   █████████████████████████████████████████████
   ████████████████████████████████████████████████████
   ████████████████████████████████████████████████████
   ███████████████████████████████████████████████████
```

1                          PROCEEDINGS                    17

2    ████████████████████████████████████████████████████

     ███████████████████████████████████   And so after showing all

4    that we brought our objections to plaintiff -- to GE.

5    We had our meet and confer and they told us that they

6    were imminently going to reach out to the Court and

7    seek to address our objections.  But we're sitting

8    here significantly later now not knowing whether GE

9    wants to maintain that or not. And, frankly, if they

10   tell us they're withdrawing Dr. Turkington without

11   prejudice to move again to have them brought under the

12   protective order, that's fine, but as it now stands,

13   they could file, you know, a brief on a Friday and

14   we'd be scrambling and blindsided. We just sort of

15   want to know --

16           THE COURT:  Well you can always, if you need

17   time to do something you don't need to scramble. I'm

18   not going to let you be blindsided. There's regular

19   monthly conferences and if you need additional time,

20   I'm not going to deny you additional time if there's

21   good reason for it.  So it seems as if this, this

22   issues is not ripe and when GE makes a decision about

23   whether it's going to utilize Dr. Turkington, I take

24   it GE still hasn't decided as of today?

25           MS. BUTLER:  That's correct, Your Honor, this

```
 1                        PROCEEDINGS              18
 2   is Marla Butler.  I'm sorry.  I'm sorry, Jesse, I cut
 3   you off, this was your issue, you go ahead.
 4           MR. JESSE JENIKE-GODSHALK:  That's okay, I'll
 5   just echo what Marla just said, this is Mr. Godshalk.
 6   Yes, we have not made a decision yet about, with
 7   regard to Dr. Turkington.
 8           THE COURT:  Okay.
 9           MR. PEJIC:  And this is Mr. Pejic, Your Honor,
10   thank you for letting us know that.  My concern was
11   under Your Honor's discovery rules with the two-day
12   turnaround, that we could get blindsided and have to
13   respond very expeditiously. But thank you for
14   clarifying and I think we're okay.
15           THE COURT:  And also I expect that counsel on
16   both sides will show each other courtesy. So if you
17   simply file a letter or ask your adversary, you know,
18   we'd like four days or whatever to respond to this,
19   you can always, I'm not going to deny reasonable
20   extensions of time, okay, particularly if it's a
21   complex, you know, complex issue.
22           MR. PEJIC:  Understood, thank you very much.
23           THE COURT:  So let's go to the next issue,
24   this production of documents regarding the dates of
25   conception. I think that with respect to the 595
```

1                          PROCEEDINGS                    19

2   patent sort of since that claim is going to be

3   withdrawn, we're really just talking about the 439

4   patent.  And as I understand it, GE has produced the

5   dates when it first contacted counsel about preparing

6   the patent prosecution and that would, that date would

7   give everyone an idea about when the concept, that the

8   concept was already baked and that, you know, you were

9   going to prepare it for this prosecution.

10          So what additional, what additional

11  information is GE producing because there's some

12  additional information that Spectrum has requested

13  here?

14          MR. JENIKE-GODSHALK:  Yes, Your Honor, this is

15  Jesse Godshalk.  So we have produced additional

16  documents.  At Spectrum's request we specifically went

17  looking for documents evidencing the conception of the

18  439 and 595. I think there was specifically a request

19  for lab notebooks and invention disclosures, drawings,

20  that sort of thing.

21          THE COURT:  Right.

22          MR. JENIKE-GODSHALK:  Yes.  We went looking

23  for that, we collected it, we produced it, you know, I

24  think, in fact, there's agreement between the parties

25  that we have produced documents that bear on the

```
 1                     PROCEEDINGS              20

 2  conception of the two asserted patents.

 3           THE COURT:  Okay.  So what else, Mr. Pejic, do

 4  you need with regard, let's just focus on the 439

 5  because I'm operating under the assumption that the

 6  595 is going away and that will reduce discovery,

 7  obviously?

 8           MR. PEJIC:  That would but there are two

 9  issues that are being somewhat mixed up here and we

10  have to unpeel the fact that separate and apart from

11  the 439 and 595 that were asserted, there are also the

12  misappropriated GE patents that are subject to

13  Spectrum's Section 256 correction of inventorship

14  claim.

15           THE COURT:  Um-hmm.

16           MR. PEJIC:  And we're entitled to know the

17  dates of conception of those additional 15 patents

18  because that bears directly on whether or not it's

19  independently invented or conceived of, as alleged by

20  GE, or whether that invention is truly based upon

21  Spectrum information and thus Spectrum should be named

22  or Spectrum individuals should at least be named as

23  co-inventors to those patents.

24           THE COURT:  Sure, I understand, but I don't

25  understand GE to be objecting to the production of
```

```
 1                          PROCEEDINGS              21
 2   that information. What I understand them to be saying
 3   is that they are collecting that information.
 4            MR. JENIKE-GODSHALK:  That's correct, Your
 5   Honor.
 6            MR. PEJIC:  Well, Your Honor, that's the first
 7   I've heard of that. And so I appreciate the
 8   representation and do we have a sense of when those
 9   documents will be produced?
10            MR. JENIKE-GODSHALK:  I'm not going to respond
11   to your question, that's not how this works.  But --
12            THE COURT:  So Mr. Godshalk, you're collecting
13   that information as to the 17 patents, is that right?
14            MR. JENIKE-GODSHALK:  That is correct, Your
15   Honor.  We have been collecting, in collecting
16   information from GE we have been collecting documents
17   ███████████████████████████████ and to the various
18   patents that are at issue.  We're collecting
19   everything we can get from GE on those issues. And
20   then we're individually reviewing the documents and
21   producing them.  And, you know, we've already produced
22   57,000 documents in this case and our review and
23   production continues.
24            THE COURT:  What's the volume that you're
25   reviewing right now, do you know?
```

```
 1                        PROCEEDINGS                    22

 2          MR. JENIKE-GODSHALK:  Ooh. You know, Your

 3  Honor, I don't.

 4          THE COURT:  Yes, I just wanted to get a sense

 5  of that, you know, if you have a million, if you have,

 6  you know, 500,000, just, 2 million, I don't know,

 7  because 17 patents is, that's a lot. So I just am, I

 8  don't have a good sense of what the volume, the volume

 9  would be.

10          MR. JENIKE-GODSHALK:  Yes, Your Honor, this is

11  Jesse Godshalk again.  You know, I just couldn't say.

12  I couldn't even, I don't even want to try to offer a

13  ballpark because I really just don't know what is

14  currently, you know, in the pool of documents that are

15  being reviewed. I just don't have a good sense of that

16  volume currently.

17          THE COURT:  So you don't know, I mean, but you

18  collected, you've collected information about these

19  patents and they're being reviewed, they're on the

20  platform now, or are you still collecting, as well?

21          MR. JENIKE-GODSHALK:  We are still collecting,

22  as well, Your Honor. I mean we have collected and are

23  continuing our collections.

24          THE COURT:  Okay.  So in, are the document

25  reviewers separately marking the documents as to what
```

|    |    |
|----|----|
| 1  | PROCEEDINGS                23 |

2  patents they belong to?

3          MR. JENIKE-GODSHALK:  No, we are not going at

4  that granular level because there are already I think

5  20 or 30 different issue tags that they are tagging.

6          THE COURT:  Yes, it can get very cumbersome if

7  there's too many issue tags.  Okay.  So and do you

8  know the rate of review?  I mean are you doing like 60

9  documents an hour or do you, how is it, is it taking

10  longer than normal or pretty average pace?

11          MR. JENIKE-GODSHALK:  I think it's about an

12  average pace. I think we have a team of just maybe

13  five or six reviewers and I mean we've been making

14  productions, you know, pretty sizable productions

15  every, maybe every three weeks.

16          THE COURT:  Okay.  Okay. So when do you

17  anticipate completing the production?

18          MR. JENIKE-GODSHALK:  I mean I guess I don't

19  have a date for you right now, Your Honor, just

20  because, again, I'm not sure exactly how many

21  documents we still have in the hopper. And I know that

22  we are still collecting from at least one person I can

23  think of. So I mean I guess I don't have a clear date

24  in mind at this moment.

25          THE COURT:  Okay.  So what I'd like GE to do

```
 1                    PROCEEDINGS              24
 2  is at the next case status conference, I'd like you to
 3  have a report on where you are on the collection and
 4  what your estimated completion date is for the
 5  production of documents. And I, by then the 595 claim
 6  should go away and I don't know if you'll be able to,
 7  you know, segregate and remove those documents from
 8  the review set because that would obviously cut review
 9  time.  So but if you could have your document folks
10  take a look at that and be prepared to report on that.
11          Similarly, I want to ask Spectrum where it is
12  on its production.  You just did a large production of
13  350,000 documents?
14          MR. PEJIC:  Yes, Your Honor.
15          THE COURT:  Is that the entirety or are you
16  still collecting and reviewing as well?
17          MR. PEJIC:  I think we have two more
18  custodians to review. I don't know if we have their
19  documents yet. I believe we do, I know I've had that
20  discussion so it's in the process. But we have gone
21  and I believe we're substantially complete.  Maybe,
22  don't hold me to it, but I think 60 percent, 70
23  percent complete.
24          THE COURT:  Okay, so I'd like you, I'd like
25  Spectrum, as well, to be able to report at the next
```

1                          PROCEEDINGS                      25

2   case management conference as to where you are and

3   what your estimated completion date is. Because once

4   the parties have exchanged all these documents, then

5   you can really get to the, you know, depositions. And

6   it's going to be important to complete this for claim

7   construction as well.

8            MR. PEJIC:  Your Honor, this is Mr. Pejic.

9   One point, and we'll get to it a little bit later, but

10  we have mentioned that we were thinking about and

11  considering, well we are going to pursue a preliminary

12  injunction against the GE device and right now we're

13  seeing very little ████████████████████████████████

    ████████████████████████████████ We don't have any manuals,

15  software manuals, and we've asked for this quite a bit

16  as part of the technical discovery. But we would ask

17  that GE endeavor to provide that in a timely manner,

18  as well.

19            THE COURT:  Okay, let me hear from GE on this.

20            MR. JENIKE-GODSHALK:  Yes, Your Honor, this is

21  Jesse Godshalk again. We just produced recently our,

22  the so-called technical documents. And that was 35,000

23  documents. So my understanding is that many of those

24  documents or most, perhaps all relate to the so-called

25  accused GE device, ███████████████ So I don't understand

1                          PROCEEDINGS                    26

2  the, you know, the accusation that there are few

3  documents relating to that device. I mean they should

4  have tens of thousands of documents about the device.

5          THE COURT:  Okay, when were those produced?

6  When were those produced, Mr. Godshalk?

7          MR. JENIKE-GODSHALK:  I believe it was either

8  February 8 or February 9.

9          THE COURT:  Okay.  So, Mr. Pejic, have you had

10  a chance to look at those documents?

11          MR. PEJIC:  Yes, Your Honor, and most of those

12  documents, as I was going to say, relate to the

13  development of the device. And I, you know, we do have

14  some problems with that production but it is providing

15  relative responsive information. But what we're not

16  seeing is the subsection of that discovery ███████████

███████████████████████████████████████████████████

███████████████████

19          THE COURT:  Okay. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

22          MR. JENIKE-GODSHALK:  Your Honor, I'm not

23  sure. I mean I would assume that there was something

24  that, I mean I guess I should say as to your first

25  question, I'm not sure. I assume that there was a

1               PROCEEDINGS                27

2  ████████████████████████████ Certainly,

3  two the extent that there was, that is something that

4  we are collecting and would produce. I mean we are

5  collecting, as I said, all documents relating to this

6  device. So, ████████████████████████

   ███████████████████████████ that, you

8  know, we will, we have collected it or will collect it

9  and are producing it.

10      THE COURT:  Okay, but let me ask, I mean this

11 isn't, I guess there's two things, two thoughts I have

12 about this. One, it shouldn't be difficult to get

13 ████████████████████████. And, two, any

14 motion for a preliminary injunction I think would be,

15 a preliminary injunction would be moot ████████

   █████████████████████

17      So I'm not, so Mr. Pejic, I don't know about

18 the timing of this, of this preliminary injunction

19 motion that you're contemplating. I don't know whether

20 it makes sense to do that, to have that kind of motion

21 practice now.  You're seeking injunctive relief in the

22 suit generally, so that is relief you can get, but I'm

23 not sure of the necessity for an injunction motion at

24 this point █████████████████████████████

   ████████████████████ as I understand it, it costs a

```
 1                        PROCEEDINGS                    28
 2   lot of money to build these machines and some time to
 3   build the machines. ███████████████████████  that
 4   doesn't mean the machine is necessarily going to be
 5   marketed or sold the next day. But maybe I'm wrong
 6   about --
 7            MR. PEJIC:  Your Honor, this is Mr. Pejic.  GE
 8   can certainly tell us differently, but my
 9   understanding is GE is actively, how should I say,
10   engaging people in regards to launching the imitation
11   device. And also, ████████████████████████████████
     ██████████████████████████████████████████████████
     ██████████████████████████  So I think it's
14   highly unlikely ██████████████████  and our concern
15   is GE is taking orders now and is going to be ready to
16   enter the market certainly almost immediately ████████
     ███████████  and at that point in time the opportunity
18   for a preliminary injunction, you know, has been
19   missed, you know, you can't un-ring a bell.
20            THE COURT:  Well, the Court can order
21   injunctive relief and cancel the orders if it's
22   infringing.
23            MR. GREENBLUM:  Your Honor, this is Neil
24   Greenblum, if I could just add one thing?
25            THE COURT:  Sure.
```

PROCEEDINGS                    29

1

2          MR. GREENBLUM:  If GE will tell us, if counsel

3    for GE will tell us that there are no machines in

4    America right now, that might -- that might address

5    your concern.

6          THE COURT:  But that's what I thought that

7    they previously represented.  Ms. Butler, am I

8    correct?

9          MS. BUTLER:  ████████████████████████████

     ███████████████████████████████████  I'm sorry, this is Ms.

11   Butler for the transcript.

12         THE COURT:  Right.

13         MS. BUTLER:  So I don't know the answer to that

14   question. We can certainly find out, but I don't know how

15   the presence of that machine in the United States tells us

16   anything about the appropriateness of a preliminary

17   injunction or any of the other issues.

18         MR. GREENBLUM:  It says whether or not sales are

19   imminent ██████████████████████████

20         THE COURT:  Right, but this is a risk taken on

21   by GE actually, as I see it, Mr. Greenblum and Mr. Pejic,

22   the risk is GE -- if GE spends money on this machine and

23   loses this suit, then it's wasted a whole lot of money.

24         MR. GREENBLUM:  Well, Your Honor --

25         THE COURT:  You're seeking an injunction.

1                          PROCEEDINGS                    30

2   Regardless, what I'd like GE to do is to locate ████

    ████████████████████████████████ and to produce

4   that. If it was already, you know, already intending

5   to produce it, that should be easy to locate and

6   produce that before the next conference.

7           MS. BUTLER:  We can do that, Your Honor.

8           THE COURT:  Okay, thank you.

9           MR. GREENBLUM:  Your Honor, this is Neil

10  Greenblum again.  I think that Your Honor is

11  overlooking the fact that ██████████████████████████

    ██████████████████████████████████ it's proof of

13  the trade secret misappropriation.  And so ██████████

    █████████████████████████████████████████████████████

    █████████████████████████████████████████████████████

    ████████████████ we assert has misappropriated features in

17  it. And related to that --

18          THE COURT:  Okay, so you're getting this

19  information and I've ordered, █████████████████████

    ████████████████████████████████, the production

21  to be expedited before the next conference. So you'll

22  have a chance to look at it and then to the extent you

23  want to make a motion, then you can make a motion.

24          MR. GREENBLUM:  Your Honor (indiscernible)

25  apprehension. The ██████████████████████ is a relatively

```
 1                        PROCEEDINGS                    31
 2   superficial document that does not include what's
 3   inside the machine to any specific degree.  That, it's
 4   a very big difference between that and a drug
 5   application. The ████████████ is at a very
 6   superficial level. And so what we need are the
 7   technical documents that went into the machine, and
 8   those are what we are not getting.
 9            THE COURT:  Well you've gotten 35,000
10   documents thus far, you've gotten GE's commitment to
11   produce it, it is producing, and you're going to get
12   -- so there is no dispute here, you're getting these
13   documents.  And at the next conference both sides are
14   going to tell me where you are in getting to
15   substantial completion. So you're getting these
16   documents.  So this is a premature issue.
17            MR. GREENBLUM:  Your Honor, as to the 595 --
18   you mentioned in passing that if the 595 drops out
19   that the documents related to it are not so relevant.
20   Whether or not GE is able to segregate them is a
21   different issue. But I will tell you once again, Your
22   Honor, the 595 is a misappropriated patent and so we
23   are entitled to documents relating to that fact.
24   Whether or not they are suing us on it or not, it's
25   one of --
```

1                          PROCEEDINGS                    32

2              THE COURT:  That's one of the 17 you're saying

3  has your --

4              MR. GREENBLUM:  Yes.

5              THE COURT:  Okay.  All right.  Okay, I'll

6  stand corrected on that.

7              Okay, so let's next go to item 7, this

8  protective order modification.

9              MR. PEJIC:  Your Honor, are we skipping 5?

10             THE COURT:  Five being the production of

11 documents evidencing GE's personnel's agreement to be

12 bound by the terms of the agreement?  Well I've

13 already told you what I'm doing with the RFAs --

14             MR. PEJIC:  Correct, Your Honor.  This is Mr.

15 Pejic. I just wanted to point out one thing. In the

16 documents that they have cited here, I've seen them,

17 there are no NDAs actually being provided that we've

18 located. And in particular, ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ that underlies this suit was

23 enforced.  So I, based upon this chart I can't tell

24 whether those people ████████████████████████████

██████████████████████████████████████████████

```
 1                      PROCEEDINGS                    33

 2  ▓▓▓▓▓   I mean one would argue that you can't agree to

 3  be bound by an agreement not in force. So those folks

 4  that got Spectrum information, you know, that's a

 5  technical violation even. So what we're --

 6            THE COURT:  So you've gotten your proof of a

 7  violation is what I'm hearing.

 8            MR. PEJIC:  It's a technical violation

 9  because, based upon what I see here, ▓▓▓▓▓▓▓▓▓▓▓▓

    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓ ▓▓▓▓▓▓

14            THE COURT:  Okay, so but what are we talking

15  about? It sounds like you have, you now have proof.

16  You're getting the proof, you're getting the

17  documents.

18            MR. PEJIC:  Well I don't know that I'm going

19  to get the NDAs. I've asked for them many times and

20  they have yet to be produced.

21            THE COURT:  Well if they can't produce them

22  and there's a violation, then that's the -- that's

23  your case, isn't it?

24            MR. PEJIC:  Your point is well taken, Your

25  Honor.
```

```
 1                      PROCEEDINGS                  34
 2          MR. BRIAN LANCIAULT:  Your Honor, this is Brian
 3   Lanciault for the defense. I do just want to clarify, you
 4   know, to Mr. Pejic's point, ███████████████████████████
     ███████████████████████████████████████████████████████
     ██████████████         But, further, I do just want to make clear
 7   for the record that the technical violation they're
 8   claiming here is not a claim that has been pleaded, you
 9   know, it's not in this case under the amended complaint.
10          MR. PEJIC:  This is Mr. Pejic.  I would beg to
11   differ, it was a breach of contract to --
12          THE COURT:  Okay, you know, counsel -- counsel,
13   we're not, we're not arguing about whether something is in
14   the pleadings or not here. Let's just go on to the
15   discovery issues.  So in terms of number 7, this
16   protective order modification, I guess what I -- what
17   I'm wondering is why do you, why is this modification
18   necessary or appropriate?
19          MR. PEJIC:  Well our concern is in bringing,
20   in seeking the PI in this suit, the Court may find or
21   rule that it's, we're not, we can't bring it and it's
22   too late, or we can't bring it without leave under
23   Rule 15.  And so in that situation, we would be forced
24   to seek the preliminary injunction -- the preliminary
25   injunction in a companion and related case. And in
```

```
 1                         PROCEEDINGS                    35
 2   that sense we don't want to have to go through
 3   discovery again, we would just like to use the
 4   discovery here in pursuing that preliminary injunction
 5   in a companion case.
 6             THE COURT:  Well we've already talked about
 7   the -- we've already talked about the preliminary
 8   injunction --
 9             MR. PEJIC:  Correct, Your Honor.
10             THE COURT:  So I think that this is, you need
11   to get the information because you don't even have the
12   information yet to move on this basis.  That's what
13   I'm hearing.
14             MR. PEJIC:  Your Honor, this is Mr. Pejic,
15   Your Honor is pointing out the dilemma we face.
16             THE COURT:  So I'm not going to rule on
17   modifying the, modifying the protective order at this
18   point, it's premature. You're getting documents and
19   then we'll take it from there.
20             MR. PEJIC:  Understood, Your Honor.
21             THE COURT:  Let's move on to defendants'
22   topics, this is the specificity of the charts of trade
23   secrets. I have a copy of the chart, it's pretty detailed.
24   So I'm not sure, in terms of what GE is requesting, I
25   think it's a, I don't know that it's appropriate, this
```

PROCEEDINGS                           36

is not really a discovery issue for the Court to rule

on.  What I understand Spectrum to have done is it's

outlined its trade secrets and the chart is very

specific, you know what they are, but Spectrum raises

a good point here that if in the course of discovery

it learns that there's non, learns from nonpublic

information that there is some other trade secret that

was misappropriated, why should they be barred from

asserting that? I mean they could assert it is as a

new claim, I suppose, a new cause of action, but why

wouldn't that be, why would it be inappropriate to add

that?  It's one thing to say they're not adding any,

unless they discovery something through previously,

you know, nonpublic information, a totally different

trade secret.

        So I don't know that this really requires a

ruling right now.  There's no specific changes that

Spectrum is proposing. I'm not inclined to allow

discovery or to limit claims that are hypothetical at

this point.

        MS. BUTLER:  Your Honor, this is Ms. Butler.

This issue I think is much narrower than perhaps is

apparent from the parties' letter.  We're not

addressing in that letter and what we're bringing to

PROCEEDINGS                                    37

1
2  the Court at this point any subsequent alleged trade
3  secrets that Spectrum wants to assert.  We'll stay
4  that for when they, if and when they want to assert
5  them.  Our focus is really on the trade secrets that
6  are in the case right now.
7          Your Honor I think agreed with us to some
8  extent at least that the trade secrets that were in
9  the amended complaint could use some more specificity.
10 And what we got from Spectrum in this February 2nd
11 table of trade secrets, were certainly they added
12 documents that purport to show these alleged trade
13 secrets, ████████████████████████████████████

   ███████████████████████████████████████████████████

   ███████████████████████████████████████████████████

   ██████████████████████████  And we're fine with that, Your
17 Honor, but our concern is we need to start building
18 our defense and we need some boundaries around what
19 these alleged trade secrets that are in the case right
20 now, what exactly they are.
21          And so all we're looking for is just
22 confirmation that as to trade secrets I think A
23 through R that are in this table of trade secrets that
24 was produced to us and provided to the Court, these
25 are the trade secret and Spectrum is bound to its

1                          PROCEEDINGS                    38

2   description of those trade secrets so that we can

3   start building our defense. I'm not addressing any

4   additional trade secrets that they may try to insert

5   into the case at a later time.

6           THE COURT:  Okay.  Well I think, I think I've

7   already stated that Spectrum is bound by the trade

8   secrets as described in this chart.  But as Spectrum

9   points out, to the extent there are additional

10  documents located that support the use of fact of the

11  trade secrets as described, of course they can add

12  documents, that's --

13          MS. BUTLER:  Understood.

14          THE COURT:  (indiscernible) that.

15          MS. BUTLER:  Understood, Your Honor. And that

16  is, we're not challenging that, we're not asking the

17  Court to say that they can't add documents. We

18  understand that discovery is ongoing. It's really just

19  as to the description of the trade secret so that we

20  know what the boundaries are so that we can start

21  building our defense.

22          MR. GREENBLUM:  Your Honor?

23          THE COURT:  Yes.

24          MR. GREENBLUM:  This is Neil Greenblum, can I

25  add one thing?

```
 1                        PROCEEDINGS                    39

 2              THE COURT:  Sure.

 3              MR. GREENBLUM:  Last time I ended off by

 4    giving you a history of the case, I'm not going to do

 5    that.  But Your Honor should be aware that there are

 6    two categories of information, there are trade secrets

 7    and then there's what's called Spectrum confidential

 8    information.

 9              THE COURT:  Um-hmm, sure.

10              MR. GREENBLUM:  Spectrum confidential

11    information is information that was provided to GE of,

12    I'll be very basic, hey, GE, we're going to be making

13    a machine and it's going to have these features,

14    whatever they are.  That knowledge alone was knowledge

15    that was protectable, that was protected and

16    protectable.  And so this is, as I said the other day,

17    these trade secrets are one aspect, but the fact that

18    we have timelines, that we did simulations, that we

19    did all kinds of analysis that we provided to them,

20    that's, they should not be allowed to sell the machine

21    because they knew we were going to sell a machine of

22    this type. And they then --

23              THE COURT:  I don't really understand that.

24              MR. GREENBLUM:  Okay.

25              THE COURT:  Just because you are, you can't
```

1                         PROCEEDINGS                    40

2   get rid of competition because, just because they know

3   that you're developing something, so what?  That's

4   not, I don't think that's what the law says. They

5   can't use your confidential information, you know, to

6   compete against you, that would be unfair competition.

7   But --

8           MR. GREENBLUM:  That's exactly what happened

9   here, Your Honor.  The very piece --

10          THE COURT:  Okay, that will be subject to

11  proof.

12          MR. GREENBLUM:  Of course. And at the, in this

13  case the very people, Your Honor, who did the due

14  diligence, were the people we now see who planned

15  their project. So there's a very basic issue here --

16          THE COURT:  Okay, that's what you'll argue,

17  but there is no issue on the trade secrets. On the

18  trade secrets, as they're described in the chart, and

19  you did provide a lot of detail in that chart, those

20  are the trade secrets at issue. I understand it's

21  separate from, from confidential information that

22  doesn't rise to the level of trade secret but, you

23  know, that's subject to, you've got to get discovery

24  on that.

25          MR. GREENBLUM:  That's all I wanted to say,

```
 1                        PROCEEDINGS                    41
 2  thank you, Your Honor.
 3           THE COURT:  Okay.  Okay, so then, let's see,
 4  where are we next.  Next is the deficiencies in
 5  Spectrum's document production. So here this seems to
 6  me to be somewhat of a nonissue because there was this
 7  large production that GE hasn't had time to go
 8  through. So what I, what I'd like to do is to just
 9  table this issue about deficiencies until GE has had
10  time to go through until next, until you have a meet
11  and confer about this. But over the next month, what I
12  want both sides to do is focus on getting to
13  substantial completion, being prepared to report on
14  it, and then you can talk about deficiencies. But
15  right now it seems to me this is a premature issue.
16           MS. BUTLER:  Might I respond to that, Your
17  Honor, this is Ms. Butler?
18           THE COURT:  Sure.
19           MS. BUTLER:  Your Honor, we certainly had
20  raise deficiencies in a letter to Spectrum's counsel
21  and the deficiencies is not the issue that we're
22  intending to seek some clarification on. In response
23  to our deficiency letter, we got a response from
24  Spectrum's counsel indicating that they were producing
25  $350,000 documents which is a very large volume of
```

PROCEEDINGS                    42

documents, even in a case of this size. And so all we
asked is for before we start, because the review of
these documents will be lengthy and very expensive for
GE to review not 350,000 pages, 350,000 documents.

So before we begin this review, all we ask
Spectrum's counsel is to confirm that this is not a
document dump. That they didn't just run some keyword
searches and then whatever came up pull out the lawyer
names and produce the documents, but that they
actually engaged in the process that we understand is
required in this Court to review individual documents
for relevance.

We have asked Spectrum's counsel that question
directly three separate times and we have not gotten
an answer yes or no. This reeks of a document dump,
Your Honor, and what we want to avoid is a situation
where GE spends potentially $100,000 reviewing 350,000
documents to learn that it's a document dump and then
we're before Your Honor seeking fees for that conduct.
If we can confirm that they reviewed each individual
document for relevance, it's a nonissue. If they
didn't, it's a document dump, then we want them to fix
it before we engage in this process of review.

THE COURT:  Okay.

```
 1                        PROCEEDINGS                 43
 2            MR. PEJIC:  Your Honor, can I respond?
 3            THE COURT:  Well, first of all, let me tell
 4    both sides what I expect is that you'll be
 5    identifying, normally under the rules you're
 6    identifying the base numbers of documents that are
 7    responsive to various document requests. Have the
 8    parties done that?
 9            MR. PEJIC: No, Your Honor.
10            THE COURT:  Has Spectrum done that?
11            MR. PEJIC:  Neither party has, Your Honor.
12            THE COURT:  Well why not?
13            MR. PEJIC:  I'm speaking, this is Branko
14    Pejic, I'm speaking for myself is I didn't understand
15    that to be the procedure and I apologize if it is.
16            MS. BUTLER:  And for GE, Your Honor, this is
17    Marla Butler again, I will say that with a case this
18    size, given the magnitude of issues, you know, I have
19    done what you just described in cases that didn't have
20    as many issues and as many documents.  My view here is
21    that taking that on in a case of this magnitude
22    honestly would be pretty burdensome for both sides and
23    is not likely, that list of Bates numbers honestly is
24    not likely to be very accurate because of the volume
25    of documents and the number of issues here. And so
```

1                           PROCEEDINGS                    44

2   that's why we didn't request that of Spectrum. We are

3   taking on the burden for documents that are produced

4   by Spectrum of reviewing the documents and

5   determining, you know, what they relate to ourselves.

6            You know, what we did note in that first

7   kind of production of less than 2,000 documents that

8   Spectrum has made so far is that there are a lot of

9   documents that are completely unrelated to this case

10  and we don't want that to be the case for this

11  enormous production of 350,000.

12           THE COURT:  Well is Spectrum making a

13  relevance determination, are its document reviewers

14  doing that exercise?

15           MR. PEJIC:  Your Honor, we have worked with

16  the client to identify what we believe to be the

17  relevant sets of files. We have produced them. We have

18  been over inclusive, but what I'm actually hearing

19  here is Your Honor asked the parties about ESI a

20  couple of hearings ago and I think the parties

21  misunderstood each other as to the procedure for

22  production set out in the protective order. And I'd

23  ask Your Honor that perhaps the parties should engage

24  in a discussion of keyword searches and that may

25  resolve this issue here.  Because I think that that's

1                          PROCEEDINGS                    45

2   what I'm hearing.

3           THE COURT:  That's not what you're hearing,

4   Mr. Pejic.  So if, this doesn't have to do with

5   keywords, this has to do with once you've collected

6   and segregated the review population, then your

7   document reviewers are marking them as responsive or

8   nonresponsive, relevant or not relevant to the

9   document request --

10          MR. PEJIC:  And we did that to the best of our

11  ability and I'd note in looking at GE's production,

12  we're finding several documents, well (indiscernible)

13  lots of documents that are irrelevant, lots of dupes,

14  and --

15          THE COURT:  Well, unfortunately in ESI, and

16  unfortunately in discovery, the technology is not

17  perfect. And so often duplicates, you know, the

18  deduping is not perfect. And much of discovery ends up

19  producing marginally relevant or potentially

20  irrelevant documents. I mean this is the real problem

21  with electronic discovery and discovery in general.

22  And it's a real problem with overbroad requests. So to

23  the extent that parties don't target the request and

24  are worried about incomplete collection and

25  production, there's a tension there and it results in

```
 1                    PROCEEDINGS                  46
 2   these much larger productions, much larger time, you
 3   know, longer time to review things. And, you know,
 4   most of what's produced is never, ever used at trial
 5   or in depositions.  And I think everybody on the call
 6   are serious lawyers and know this to be true.
 7           So I think that there is nothing more to talk
 8   about in this issue, on this issue. It sounds like
 9   most sides have review teams that are reviewing for
10   relevance or not relevant and let's move on.
11           MS. BUTLER:  Your Honor, can I just ask one
12   question on this?  Do I understand Mr. Pejic to have
13   confirmed that their review team is reviewing on a
14   document by document basis each document for relevance
15   and responsiveness?
16           MR. PEJIC:  To be honest with you, Your Honor,
17   I don't understand that question. Because the first
18   aspect is, the question is, is this like the old days
19   when you sit in the conference room with a banker's
20   box of documents and look at each one, no, we did not
21   do that. But if GE's question is did we get the
22   documents and review them, and then produce them after
23   running searches for both relevance and privilege,
24   yes, that's what we did. And to the extent that
25   they're complaining about these junk files or whatever
```

PROCEEDINGS                    47

they are, as I told Your Honor, I'm not good with

technology but the parties did agree how the documents

were supposed to be produced and that's pursuant to

the protective order. And I've offered at every level

if they would like us to remove certain files, happy

to do so, but in my experience, it's been you do not

touch documents after they have been through the

vendor and to be produced because there's imbedded

stuff, there's different things, and the next thing

you know we're in a big fight and a motion to compel

because a video doesn't work.

        THE COURT:  But your, you have a document

review team, do you not?

        MR. PEJIC:  Correct.

        THE COURT:  And that document review team is

marking documents on a review platform from

production, is that correct?

        MR. PEJIC:  Correct, Your Honor.

        MS. BUTLER:  But, Your Honor, are they

reviewing each of, are they reviewing --

        THE COURT:  This is, I don't really want to

have this discussion anymore because you need to look

at the documents, Ms. Butler, and it sounds to me like

they have a review team in process. If the review team

1
2  is not looking at individual documents, I don't know

3  what they would be doing, otherwise would be doing.

4  There are search terms applied, there's a review of

5  documents and they're produced. So that's, there is no point

6  in a review team if you're just doing a document dump. So

7  this matter is, we've talked enough about it.

8         Let's move on to the specificity of the invalidity

9  contentions. Here, with respect to the 595 patent, that may

10  be, I guess what I'd want to understand, the 595 patent,

11  you're saying, Spectrum is saying still has trade secrets in

12  it but GE may be withdrawing its patent infringement claim

13  as to that patent. So what is it that, what is the issue

14  here, Ms. Butler?  Spectrum says this argument is not

15  really, this is a nonissue now?

16         MS. BUTLER:  Your Honor, and I'll limit my

17  discussion to the 439 patent, assuming that we're not

18  going to get complete responses from Spectrum and

19  we'll be able to withdraw the 595 patent.  But in

20  Spectrum's invalidity contentions as they stand right

21  now, Spectrum has identified, I think it's 11 or so

22  individual references that Spectrum calls, quote,

23  "invalidating prior art to the asserted claims of the

24  439 patent."  In other words, they've identified these

25  11 or so references as each invalidating the 439

```
 1                          PROCEEDINGS                    49
 2   patent.
 3            THE COURT:  Okay.
 4            MS. BUTLER:  Spectrum's produced one claim
 5   chart for only one of those references, and that's
 6   what we've been referring to as the 721 PCT
 7   application.  All we are asking, Your Honor, is for
 8   clarification -- well, I take that back, we're not
 9   asking just for clarification, we are asking spectrum
10   to do one of two things. Either for the other 10
11   references that they did not chart, to provide claim
12   charts for them.  Because GE has no way of knowing
13   which element of which claim is found where in each of
14   those prior art references. So we want Spectrum to
15   either chart all of those references, or we want
16   Spectrum to amend its invalidity contentions to be
17   consistent with what's it's been telling the Court on
18   these calls. And that is that there is only one
19   invalidating reference that they're asserting for the
20   721, or for the 439 patent, and that's that 721 PCT,
21   and these other 10 references that they're contentions
22   call very clearly invalidating prior art, they're not
23   actually asserting those as invalidating references.
24            THE COURT:  Okay.
25            MR. PEJIC:  Your Honor, this is Branko Pejic,
```

```
 1                        PROCEEDINGS              50
 2   may I respond?
 3            THE COURT:  Yes, please.
 4            MR. PEJIC:  We've been down this road 10 times
 5   at least, maybe counsel isn't familiar with patent
 6   law, but we've made it very clear in the claim charts
 7   which are primary references, which if the references
 8   apply to the limitations, and in view of the state of
 9   the art. The state of the art is not being applied
10   against the claims, themselves, the state of the art
11   is showing what one skilled in the art would have
12   known at the time of invention. And that's the proper
13   analysis for an obviousness analysis.  So there's
14   nothing improper.
15            We'll go ahead and make that more clear but,
16   frankly, I thought it was absolutely clear out of the
17   claim charts. But if defendants' counsel wants to
18   continue to muddy the waters, we're more than happy to
19   clear that up.
20            THE COURT:  Okay, again, I would prefer that
21   you stop the mudslinging type presentation. I just
22   want to know whether or not, you know, you can provide
23   clarification on which element of which claim is
24   addresses in the prior art. And if the 10 references
25   to the other prior art aren't applicable, then you
```

PROCEEDINGS                    51

should say so.

          MR. PEJIC:  And this is Mr. Pejic, Your Honor,
I thought that was clear from the claim charge that
calls that the state of art and doesn't apply them to
the claim limitations. Because that's just been my
practice for the past couple of decades with these
things.  But we'll --

          THE COURT:  Okay, so what I'm hearing from you
is that there's one prior art and the other things are
just state of the art?

          MR. PEJIC:  Yes.  To show what one skilled in
the art would have known at the time of invention.

          THE COURT:  So the one that you've noted, that
is, in fact, the reference, the 721 PCT, that's the
prior art?

          MR. PEJIC:  Yes, we refer to those as primary
references because they serve the basis of the
rejection or the invalidity argument.

          THE COURT:  Okay, so if you can just make that
clarification on your claim chart, then we'll, I think
that should satisfy GE.

          MR. PEJIC:  Thank you, Your Honor.

          MS. BUTLER:  Your Honor, I think that will.
Just so we're 100 percent clear, that list of

1                              PROCEEDINGS                    52

2   invalidating prior art references, it lists, and I

3   counted them while Mr. Pejic was talking, it lists ten

4   individual references and then it says state of the

5   art.  So in other words, we're not talking about the

6   reference to state of the art, we're talking about

7   those other nine references on page two of the

8   pleading, not in the charts, itself, because they

9   didn't provide charts for them, on page two of the

10  pleading those non-charted nine references should

11  either be removed or claim charts should be provided

12  for them.

13            MR. PEJIC:  No.  No, no, no, no.

14            THE COURT:  So what I want to understand, Mr.

15  Pejic, is what are those nine references, are those

16  other --

17            MR. PEJIC:  Those are the state of the art.

18  Honestly, I don't have the contentions, the claim

19  charts in front of me, but I'm representing to the

20  Court that those are state of the art and they're not

21  primary references being applied.

22            THE COURT:  Okay.

23            MR. PEJIC:  And to the extent that these claim

24  charts aren't clear enough, we will supplement them

25  and make that clear that we have primary reference and

```
 1                        PROCEEDINGS                    53
 2   then what the state of the art is showing what one
 3   skilled in the art would know.
 4          THE COURT:  All right, and make clear that
 5   this is the only primary art you're relying on, or
 6   these are the only primary arts, you know, if it's
 7   more than one. But if it's just this one make that
 8   clear, okay?
 9          MR. PEJIC:  Absolutely, Your Honor, I'll try
10   to make it as clear as I have on the phone.
11          THE COURT:  Okay, thank you.  So let's look at
12   the next issue which is the requests for admit, I've
13   already addressed that.  Then the access to former
14   employees, I'm not sure I'm happy with either party's
15   solution.  It seems to me that Spectrum can talk with
16   former employees and in each case there's some ethical
17   guidelines for counsel where, you know, you identify
18   who you are and that you would tell any employee,
19   former employee or supervisory employee that you are
20   not seeking and you do not want them, you are
21   instructing them not to reveal privileged information.
22   But it seems to me, the way I've handled this before,
23   is that there's just an agreed upon, agreed upon
24   statement that's provided and as in my former life as
25   a litigator, if this exercise was being done, counsel
```

1                           PROCEEDINGS                    54

2   who was reaching out to those, that population, would

3   want to have something documented about what warning

4   was said to avoid any kind of blame of overreach or

5   ethical violation. So it seems to me that this perhaps

6   should just be dealt with as what is the statement

7   that would be made or the warning, if you will, that

8   would be made to the former employee before talking

9   with the former employee.

10           MS. BUTLER:  Your Honor, we're happy to kind

11  of work with Spectrum to come up with something in

12  that regard.  Our main concern is that oftentimes, you

13  know, these employees may have been gone from GE for a

14  long time. And they may have information that is

15  privileged information but individuals, especially

16  when they've been separated from the organization for

17  some time, may not, number one, appreciate what

18  exactly is a privileged communication, and number two,

19  may not even recall that its privileged.  And so what

20  we're trying to do is get in front of this to avoid a

21  former employee unwittingly communicating privileged

22  information.

23           The second thing that we're trying to

24  accomplish here is that, so Spectrum has already sued

25  five individual employees of GE.  In other words,

```
 1                      PROCEEDINGS                    55

 2   they're passed suing individuals for misappropriation.

 3   And we think that it's important for any former

 4   employee, before they have a conversation with

 5   Spectrum's counsel with the lawyers that sue

 6   individuals for misappropriation, for them to

 7   understand the implications of that phone call.

 8           What we don't want is this combination of them

 9   divulging privileged communications not knowing that

10   they're privileged and walking themselves into being

11   sued by Spectrum. And so we believe that it makes

12   sense for the protocol that we've set up to avoid, or

13   that we have suggested, Your Honor, to avoid both of

14   those concerns.

15           MR. PEJIC:  Your Honor --

16           THE COURT:  I think, hang on a second. I think

17   it's unnecessarily burdensome, what you're proposing.

18   Let me just, and just hang on one second because I

19   have another case where I just did something like

20   this, I'm just looking now.  Just bear with me for a

21   moment.  I think this is it, hang on.

22           Okay, so what I've done recently is that

23   parties are, say parties are free to interview former

24   employees who are not represented by counsel,

25   providing that the requesting party does not exert
```

1

2  undue influence on the former employee, and advises

3  the former employee prior to any substantive

4  communication that the requesting party is an attorney

5  in this lawsuit and specify what party they represent,

6  that the former employee is under no obligation to

7  speak with counsel and that any conversations are

8  voluntary.  That the former employee should not

9  disclose any confidential or privileged information,

10 and that the former employee is free to seek

11 representation of counsel.  And then the term

12 privileged information obviously would mean attorney-

13 client privilege communication or work product.  And

14 confidential information I think, you know, you can

15 put a plain language. So it would be information not

16 generally known or available to the public that is

17 used directly for business, provides the entity with

18 an economic advantage, and that the entity takes

19 reasonable effort to protect from public disclosure.

20 And should any former employee inadvertently disclose

21 privilege or confidential information, that

22 information shall automatically be deemed protected by

23 the protective order. And if the, if there is an

24 inadvertent disclosure there will be a notification to

25 the other side.

PROCEEDINGS                    57

1

2          And so that's what I've done in the past, that

3  kind of order.  And I think something like that could

4  work well here.

5          MR. PEJIC:  Your Honor, for Spectrum I think

6  that that's a great approach.

7          MS. BUTLER:  Your Honor, GE can work with

8  that. I think that the devil is in the details, so to

9  speak, the parties will have to get together and agree

10  on, you know, the script or whatever we call it. But

11  we are obviously going to work with Spectrum to get to

12  something agreeable.

13          THE COURT:  Well what I can do is I can simply

14  issue an order. I have done this very, I have done

15  this recently and I can issue an order like this. And

16  if you want a modification of it or agree to a

17  modification of it, you can, of course, do that and

18  propose it to me.  I'm thinking about making it easier

19  for you so that you don't have to get into disputes

20  about it.

21          MR. PEJIC:  Your Honor, this is Mr. Pejic for

22  Spectrum, I think that that's a great approach and we

23  would appreciate Your Honor's guidance.

24          MS. BUTLER:  Your Honor, the only reservation

25  or hesitation I have is the issue of confidential

1                           PROCEEDINGS                     58

2  information.  All of these individuals are GE

3  engineers who are working on products, and until it's

4  public all if it's confidential.  And I would just

5  want to make sure that the definition --

6              THE COURT:  (indiscernible) because we're

7  talking about former.

8              MS. BUTLER:  That's right.  But what they did

9  while they were at GE -- absolutely, Your Honor, but

10 what they did while they were at GE, they're engineers

11 working on then developing GE products. And at least

12 at that time, those details were confidential. And to

13 put, I just want to have a definition of confidential

14 that -- that makes sure that that's clear.

15             THE COURT:  So what I'm going to do is I'm

16 going to issue an order about this, a protocol. And if

17 you have some issue with it, you can raise it with me

18 and I'll consider a modification. But I'll include a

19 definition of confidential information similar to what

20 I've stated which is a pretty conventional definition.

21 And remember, this is information that's got to be

22 provided to the individual and so it's also got to be

23 in plain language.

24             MS. BUTLER:  Understood, Your Honor.

25             THE COURT:  Most people are not lawyers,

1                          PROCEEDINGS                    59

2   right?  So you don't want to, you don't want to track

3   whatever language you have, you know, in an NDA that

4   you have with your employees that they may sign,

5   because that thing probably is three pages, four pages

6   long or longer with all kinds of legalese, and that's

7   really not going to be helpful to either side. So I

8   think you want to have a simple but clear direction as

9   to what is confidential, right?

10             MR. PEJIC:  Yes, Your Honor, thank you.

11             THE COURT:  Okay, so I'll issue this order and

12  it will be, to the extent GE thinks that there's some

13  serious issue with it, you can write to me and I'll

14  consider a modification. But the order will be

15  intended to protect each side's confidential and

16  proprietary information and trade secrets, as well as

17  privileged information.

18             Okay, so I think we are done with the issues

19  that were in your letter.  And going forward, just to

20  repeat what you all need to do, over the next month I

21  want you to focus on the document production and be

22  prepared to report where you are and when you will be

23  completed, you know, have greater clarity on that. I

24  want you to limit your letter, your agenda letter to

25  six pages and I want you to focus on this 595 patent

```
 1                          PROCEEDINGS                    60

 2   issue so that you can determine whether that

 3   counterclaim, the patent claim is coming out of the

 4   case.  Okay?

 5           Anything further from plaintiffs?

 6           MR. PEJIC:  This is Mr. Pejic, Your Honor, I

 7   don't believe so, thank you very much for your time.

 8           THE COURT:  Anything further from GE?

 9           MS. BUTLER:  Nothing from GE, Your Honor.

10           THE COURT:  Okay, great.  I hope everybody has

11   a good day, we're adjourned.

12                  (Whereupon, the matter is adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

61

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Spectrum Dynamics

Medical Limited versus General Electric Company, et al.,

Docket #18cv11386, was prepared using digital transcription

software and is a true and accurate record of the

proceedings.


Signature_____

                    Carole Ludwig

Date:      February 26, 2021