# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: :

SPECTRUM DYNAMICS MEDICAL LIMITED, : Docket #18cv11386 1:18-CV-11386-VSB-KHP

Plaintiff, :

- against - :

GENERAL ELECTRIC COMPANY, et al., : New York, New York March 31, 2021

Defendants. :

-------------------------------------- : TELEPHONE CONFERENCE

PROCEEDINGS BEFORE
THE HONORABLE KATHARINE H. PARKER,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:

RIVKIN RADLER LLP
BY: GREGORY MILLER, ESQ.
25 Main Street, Suite 501
Court Plaza North
Hackensack, New Jersey 07601

GREENBLUM & BERNSTEIN, PLC
BY: NEIL GREENBLUM, ESQ.
BRANKO PEJIC, ESQ.
1950 Roland Clarke Place
Reston, Virginia 20191

Transcription Service: Carole Ludwig, *Transcription Services*
155 East Fourth Street #3C
New York, New York 10009
Phone: (212) 420-0771
Email: Transcription420@aol.com

Proceedings conducted telephonically and recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES (Continued):

For Defendants:            THOMPSON HINE LLP
                           BY:  MARLA BUTLER, ESQ.
                           Two Alliance Center
                           3560 Lenox Road, NE, Suite 1600
                           Atlanta, Georgia  30326

                           THOMPSON HINE LLP
                           BY:  BRIAN LANCIAULT, JR., ESQ.
                           335 Madison Avenue
                           New York, New York  10017

                           THOMPSON HINE LLP
                           BY:  JESSE JENIKE-GODSHALK, ESQ.
                           312 Walnut Street, 14th Floor
                           Cincinnati, Ohio  45202

# INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|

None

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|

None

THE CLERK: Calling case 18cv11386, Spectrum Dynamics Medical versus General Electric Company. The Honorable Katharine H. Parker, presiding. Beginning with counsel for the plaintiff, can you please make your appearance for the record?

MR. GREGORY MILLER: Good morning, Your Honor. Gregory Miller, Rivkin Radler, local counsel on behalf of the plaintiff. Also with me on the line is Neil Greenblum, Branko Pejic from Greenblum & Bernstein. Good morning.

HONORABLE KATHARINE H. PARKER (THE COURT): God morning.

THE CLERK: And counsel for the defendants, could you please make your appearance for the record.

MS. MARLA BUTLER: Yes, this is Marla Butler for the defendants and with me are Jesse Jenike-Godshalk, and Brian Lanciault, all of us from Thompson Hine.

THE COURT: Okay, good morning, everyone, nice to talk with you this morning. As a reminder, I ask you to keep your phones on mute unless you're speaking to eliminate background noise and remind you that you can order a transcript though it would have to be ordered within three days of today. And finally, this call line is open to the press and public on a listen only basis, and I

want to remind everyone on the call that the Court prohibits others from recording and rebroadcasting court conferences. Violation of this rule may result in sanctions.

So thank you all for submitting your status letters. The status letter, agenda letter and then I want to just talk briefly about the letter, Mr. Greenblum, that you submitted last night. But why don't we start first with the privilege issue because it seems that both sides have issues with the other side's privilege log. And it seems to me that the dispute, the disputes regarding the logs are not actually ripe, that both sides need to go back, take a look at their logs and potentially provide a little bit more information so that your adversaries can evaluate and determine whether there are particular challenges to that log. But I'd like to hear from the parties on this issue, let me hear first from Spectrum.

ATTORNEY FOR PLAINTIFF: Okay, thank you, Your Honor. As far as privilege log issue, Spectrum believes that its privilege log complies with the rules and truly the only dispute I think as far as the descriptions and the actual log, itself, is whether or not the Spectrum privilege log is required to include

the drive files.

Defendant's privilege log includes that, Spectrum's does not because we did not understand the local rules to require that. And we would seek Your Honor's guidance and to the extent we do update our privilege log, we would like your guidance to let us have an understanding whether we should include that. As far as the --

THE COURT: You're talking about the file names.

ATTORNEY FOR PLAINTIFF: Yes, the drive file names. Yes, Your Honor.

THE COURT: Right, okay, and that would identify the repository, for example, email or someplace else, what is that going to identify?

ATTORNEY FOR PLAINTIFF: Your Honor, to be honest with you, I'm not technically savvy enough to understand or respond to that. It is defendants that have raised that as a deficiency in the Spectrum privilege log and I'd look to them to explain what that adds in description to what's already there.

THE COURT: Okay.

MR. GODSHALK: Sure, Your Honor, this is Jesse Godshalk on behalf of defendants. I mean since

Spectrum just kind of asked us to weigh in on that, happy to do so and explain what we are talking about there. The file name here in this case, we decided pretty early on that the vast majority of the documents in this case would be electronic documents. So, you know, as electronic documents they have file names. I mean, you know, for instance, it might be something like, you know, memorandumtothemanager.doc, and that's the name of that Word document, that's the file name.

THE COURT: Oh, you're talking about Word documents?

MR. GODSHALK: Well, I mean I'm talking about all of the documents, Your Honor, they all have file names. I mean so how they, you know, would appear on a computer screen if you opened a folder of electronic documents. And there might be Word documents in there, there might be PowerPoints, Excel spreadsheets, but they would all have, you know, they'd be listed, for instance, and you would see the file names there. And that's what we're talking about, the file names.

THE COURT: Whatever the document was saved under, whatever name it was saved under, that's what you're talking about?

MR. GODSHALK: That's correct.

THE COURT: Okay.

MR. GODSHALK: And the, I mean the reason why we want that information is because it is good information on the content of a document. I mean obviously documents are frequently named with titles that, you know, indicates what's in the file. I mean as a general rule of thumb. And given what we believe are the insufficient descriptions that Spectrum has otherwise provided in its privilege log. We think it's important to get the file names, to provide additional context for what these documents actually are and, you know, we cited a case in the agenda to support that parties should have to provide the file names. I think, you know, this shouldn't be a heavy lift.

In this day and age I would imagine that Spectrum would be able to auto populate this information from its document review software. So --

THE COURT: Yes, that's what I was going to ask, isn't this a, isn't this a metadata field?

MR. GODSHALK: Yes.

ATTORNEY FOR PLAINTIFF: Your Honor, may I respond? The only reason I'm asking for clarification is when Spectrum served its initial privilege log,

defendants raised some objections which we thought were not necessarily well founded, but we went ahead and issued a supplemental privilege log addressing defendants complaints. And now defendants, without raising these drive files in their initial complaint to the privilege log raise it in a second round of complaints. So it just sort of seems like a piecemeal way to cause more problems. And that's why I'd like the Court's direction on whether --

THE COURT: I see. Did you all produce metadata logs on the privilege documents, or is it just a log that was, is it a combination of metadata fields and then attorney fields, you know, filled in for the name of the privilege and the subject matter?

ATTORNEY FOR PLAINTIFF: The latter, I think, where it's not completely automated, I'll put it that that way.

MR. GODSHALK: This is Jesse Godshalk, that's correct, Your Honor, the latter.

THE COURT: Okay. Is there any other metadata field that the parties talked about producing for privileged documents that haven't been produced? Because it seems to me both sides should be producing the same information.

ATTORNEY FOR PLAINTIFF: Your Honor, this

complaint by defendants is the first time I'd heard about this being a deficiency in the privilege log so it was not contemplated initially.

THE COURT: Okay.

MR. GODSHALK: Your Honor, I will add though, this is Mr. Godshalk, I will add that in the parties' protective order, they included that with produced documents they would include a full panoply of metadata. So I mean the parties did essentially contemplate that in their, you know, document collection, review and production that we would be, you know, including a lot of metadata and I don't know why, you know, there is no good reason for, you know, including this metadata with the produced documents but, you know, withholding it for the privileged documents.

Now, certainly, if there is privileged material actually in the file name, then they wouldn't have to produce, wouldn't have to provide that, but I would assume that that is, you know, that would rarely if ever occur.

THE COURT: Right.

MR. GODSHALK: And so I don't know why they can't give us this information.

THE COURT: Right. Well I don't hear plaintiffs refusing, I hear them just asking for clarification. But, Mr. Godshalk, is this the only category of metadata that's missing in your view?

MR. GODSHALK: Yes.

THE COURT: Okay. And you have produced this, this field, for your privileged documents.

MR. GODSHALK: Okay.

THE COURT: Correct, Your Honor.

ATTORNEY FOR PLAINTIFF: Your Honor, may I respond just briefly?

THE COURT: Sure.

ATTORNEY FOR PLAINTIFF: If this was so critical, may I ask defendants why they didn't raise it in the first round of privilege logs?

THE COURT: No, we're not going to get into, we're not -- perhaps that was an oversight but I think that this can be generated electronically pretty easily. So what I would ask plaintiffs to do is go back to your vendor and if you can have them generate the file names for the documents on the log, I think that that can be a, you know, an addenda to the log. So I don't want to have you create a lot of, make work. Going forward, you can include it in the log,

but for now I think it's sufficient if you generate these file names in the order that they appear on the log and you can give that to the defendants.

ATTORNEY FOR PLAINTIFF: Very good, Your Honor, I'll contact and we'll coordinate with our vendor to understand what we need to do.

THE COURT: Yes. I mean it's like a subject line, just providing more detail about the document. It would be equivalent to a subject line in an email I think.

MR. GODSHALK: Yes, Your Honor, that's correct.

THE COURT: Right. And you're producing subject lines in emails, is that right?

MR. BRANKO PEJIC: This is Branko Pejic, in documents that are produced?

THE COURT: Yes, and the log.

MR. PEJIC: Well in the logs, the logs have not had file names, they have descriptions and I'd have to look to see if it actually has titles of documents, that I don't know for sure.

THE COURT: No, what I'm saying is the re line in emails is a metadata field.

MR. PEJIC: Correct.

THE COURT: So I'm assuming that that is produced. Mr. Godshalk, am I correct about that?

MR. PEJIC: Well, Your Honor, in our log it is included, you know, in the file name field for the emails.

THE COURT: Right, okay.

MR. GODSHALK: Right.

MR. PEJIC: Could we get some, and this is Branko Pejic again, and this is meant to make sure that Spectrum goes forward as I guess efficiently as possible here. Could defendants please provide a description of exactly what they have produced so I can work with my vendor and make sure that we get this right the first time? So the criteria of the metadata that appears on defendant's privilege log in these drive descriptions, I want to match that but I don't want any ambiguity and us having to do this, you know, a second, third time.

THE COURT: Well I don't want you to have to redo it either. But basically it's a file name which would be document titles, or subject matter lines in emails. So the re line in emails. Those are the two things.

MR. PEJIC: And Jesse, can you confirm that

that is what appears in defendant's privilege log, do you mind, please?

MR. GODSHALK: Yeah, I mean I'm pretty sure that that is the case, I mean from my review of it, yeah.

MS. BUTLER: And this is Marla Butler, I mean I'm looking at the log and it's the ninth column, the document, defendant's privilege log that was attached to the agenda, it's hard to read because it's small. But in the ninth column from the left you will find the re line for emails and the file name for documents that are not emails.

THE COURT: All right, so that should be produced. And what I'd like you to do is once plaintiffs generate that and include that going forward, there should be no issue in terms of the formatting. But in terms of the actual, the actual disputes, how many documents are we talking about that are on the respective logs? Ms. Butler, how many are on your log approximately?

MS. BUTLER: Mr. Godshalk might know the answer to that question better than I do. Approximately how many entries do we have, Jesse?

MR. GODSHALK: You know, I'm not sure offhand,

I feel like it's in the three-hundreds. I know that Spectrum's log has 229 documents, I'm trying to pull this up right now to see kind of how high this is. It looks like defendant's log has 474 documents.

THE COURT: Okay. So, you know, for large productions I don't think that's, that doesn't sound like a crazy number to me. So I don't, it's not clear to me that either side is, has an issue where they feel that something's been over designated. And perhaps, I think it's premature to talk about that issue right now. Why doesn't defendant take a look at plaintiff's log and then, and plaintiff can take a look at defendant's log, and if there are issues we can talk about that next, tee it up for next time, but I want you to meet and confer on those issues.

MR. GODSHALK: Well, Your Honor, this is Mr. Godshalk, I mean we already carefully looked at Spectrum's privilege log and provided a letter that very clearly laid out specific deficiencies. Spectrum responded and basically said it was not going to address any of those, it was not going to make any changes in response to those. And the parties have already met and conferred on that. I just don't know, you know, what else we can do to try to, you know, get

this done. I mean this is a matter, these are deficiencies in, really in the content. I mean we're still fighting over, you haven't even provided us with, you know, sufficient information or, you know, sufficient statements. I mean we're not even at the point of saying, you know, give us that document because that's clearly not privileged or something like that. And so I think that's kind of where we are in this.

THE COURT: Right. So what I'm hearing is it's premature for the Court to rule on anything or to have any briefing motions to compel. But, for example, I do see that GE has, that Spectrum has raised that there are entries on GE's privilege log where there is no attorney, for example. So those are ones that parties often have concerns about, so you'll need to meet and confer on those.

MR. PEJIC: And, Your Honor, this is Mr. Pejic. Mr. Godshalk is correct as to where we are procedurally, but he is completely wrong on the fact that Spectrum did not say we weren't going to do anything. That is why I asked Your Honor earlier for classification on the drive files because my understanding from defendants was the big difference

between our privilege logs was the fact that they had included the drive files which provided more information and cured any potential deficiencies in the descriptions.

THE COURT: Okay, well, I'm not sure about that in terms of the descriptions, it may be that the parties hone in on a few of the entries, perhaps entries where there is no attorney and require some more specific explanation. But again, I think you call can meet and confer on these issues over the next --

MR. GODSHALK: Your Honor? Your Honor, this is Mr. Godshalk, if we could, just one point if we could get a little bit of Court guidance on I think it would be very helpful. And I understand, you know, your encouragement to us to try to work this out. In Spectrum's privilege log under assertions of privilege they have frequently asserted in its, quote, "attorney-client privileged and/or work product," and the issue we have with that is that it's not clear to us whether they are asserting just attorney-client privilege, just work product or both. I mean it appears that they're hedging, they're leaving their options open and, you know, we think we're entitled to a clear answer for each document, you know, is it

attorney-client privilege, is it work product or is it both. And they have basically dismissed this complaint as, you know, just mere semantics but it's not. I mean we want to know for each document which privilege, specific privilege is being asserted on a document by document basis. And without that I really just don't see us being able to, you know, move forward in a productive manner in evaluating their privilege log.

THE COURT: Mr. Pejic?

MR. PEJIC: Your Honor, I do believe that to be semantics because this is the first time I've ever had this issue raised on a privilege log in my career. But if Your Honor instructs that and/or is improper here, as I also told defendants during the meet and confer, we will certainly go back and render whatever, you know, we'll correct whatever but I just didn't realize that the and/or issue was an issue to be honest.

THE COURT: Well if you're ever bringing, it's an issue because if you're, if you are going to bring a motion to the Court, the Court is evaluating the privileges asserted, have you asserted both, have you asserted one or the other because sometimes one applies and the other doesn't apply. And there's

certain, certain waivers that may apply to attorney-client that don't necessarily apply to work product. So this is something that is important to tease out. For example, if there's not attorneys in the communication it's less likely for the communication to be attorney-client privilege, but perhaps it is work product. But again, work product, as you know, has to be in anticipation of litigation or in connection with litigation. So I think it is important to have that distinction.

MR. PEJIC: I fully understand, Your Honor, and thank you for the clarification, we will resolve that issue. I do, I honestly apologize because I've never had that be an issue.

MR. PEJIC: Okay.

THE COURT: So let's next talk about the production, GE's production. I'm not sure this is an issue, where, GE has said that it has, I'm assuming by today you have produced a number of the things that Spectrum is looking for and you're continuing on a rolling basis, is that correct?

MR. GODSHALK: That is correct, Your Honor, this is Jesse Godshalk. I mean our position on this is that, you know, these documents that Spectrum is

focused on currently the documents relating to the [REDACTED]. I mean we have produced a large volume of documents relating to the [REDACTED] I'd say tens of thousands of documents relating to this, including [REDACTED] And, you know, we are continuing our collections and productions and I would suspect that, you know, there will be additional documents relating to the [REDACTED] in our additional productions.

THE COURT: What about documents pertaining to the other patent that Spectrum has identified, why are you on the collection of those?

MR. GODSHALK: Yes, Your Honor. Yes, Your Honor. We, actually, we focused heavily on that over the last month given the, you know, subject matter of the last conference. I can tell you that after the last conference we finished up collections from, you know, two custodians that we've been working on and began collections from an additional six custodians with a focus on those other patents. And particularly we're going to named inventors of those other patents.

So, you know, we very much, you know, had a focus on that area on our collections in the month of March.

THE COURT: Okay, so when do you anticipate completing review and production of those documents concerning the other patent?

MR. GODSHALK: Yes, Your Honor. I mean in general we are planning to substantially complete our document production by the end of April, and we've discussed that with our vendor. I mean we feel about 80 percent certain that we will substantially complete our production by the end of April. But I feel even more certain that we can get this done by mid-March.

MS. BUTLER: Mid-May.

MR. GODSHALK: Mid-May.

THE COURT: Mid-May, okay. Okay, and where is Spectrum on its production?

MR. PEJIC: One question, Your Honor, this is Branko Pejic for defendants. Do you have a sense of what volume of documents you'll be producing, because you've produced about 80,000 to date and what percentage of your total production do you think that is?

MR. GODSHALK: You know, Mr. Pejic, we can discuss this offline, but, you know, I don't have

those types of figures at my fingertips.

MR. GREENBLUM: Your Honor, this is Neil Greenblum, may I speak?

THE COURT: Yes.

MR. GREENBLUM: I've been pressing GE on this issue to tell them how much we should anticipate and at this stage it seems to me it's not unreasonable for GE to make a statement to the Court of we're 50 percent complete or 80 percent complete. I mean we just can't understand that we're at this stage of discovery and we can't get an answer of where they stand.

THE COURT: So, okay, Mr. Godshalk, how many custodians have you collected from, how many remain to be collected from approximately?

MR. GODSHALK: Yeah, Your Honor, yes, I think that approximately, I think it's about 18 that we've collected from but I should say that there are a few of those where we've had a custodian interview where we interviewed them about what documents they have, but the process that we have set up, they need to receive a drive then in the mail and then we set up a separate interview with our vendor where the documents are actually put onto the drive and then sent back to

us.

So when I say, you know, for some of those, the collection process is not 100 percent complete yet, and there may be, so of those 18 maybe two or three where we still need to actually kind of complete the collection. And then there are at least another two that I know we want to collect from, and in addition to that there are a number of targeted searches and connections that we need to run (indiscernible) a, you know, big, let's grab everything but, you know, it's going back, in many cases it's going back to people we've already collected from and getting, you know, narrow categories of documents, in some cases getting, you know, newer documents. So that's kind of the status of things.

THE COURT: And do you have an idea how much, what's the volume in terms of the documents left on the review platform?

MR. GODSHALK: Well what's currently on the review platform is I think about several thousand but, as I said, I mean there's still, of the custodian interviews and collections that we did from six custodians in March, I think that five of those six,

those documents have not yet hit the review platform, and I'm not certain of the volume that those will produce. I don't think it's going to be huge, but I just, you know, I can't be certain of the volume.

In addition, I mean in terms of some of the uncertainties here, I mean opposing counsel served an additional 22 requests for production just this past Friday, and because of the Passover holiday I haven't even had an opportunity to confer with the potential custodians about those requests yet. So I mean it's things like that, I'm just not even sure what kind of, you know, volume I'm going to have to collect on those requests, they're brand new. I mean --

THE COURT: So what I'm hearing is you're maybe about halfway done?

MR. GODSHALK: I think we're probably more than halfway but, you know, maybe if I had to guess, I mean I guess the number that's coming to mind is like 60 percent.

THE COURT: Okay.

MS. BUTLER: Your Honor, this is Marla Butler. We would like to receive that information from Spectrum, as well. I'll just note that while Spectrum has indicated that we haven't provided that

information to Spectrum, Spectrum hasn't provided that information to us either and we'd like a sense of the volume of their production that remains, as well.

THE COURT: All right, so, Mr. Greenblum, do you have a sense of that?

MR. PEJIC: This is --

MR. GREENBLUM: Yes, go ahead, Branko and then I have something to say.

MR. PEJIC: Neil, if you'd like to respond to Marla, go ahead, and then I'll take on the question.

MR. GREENBLUM: Well, you know, this is the, you know, we did it so you do it --

THE COURT: I don't want to have a tit-for-tat conversation between counsel, I just want to hear from plaintiffs about what they've produced and what they, what percentage they have left.

MR. GREENBLUM: At this point I think we've produced over 700,000 documents, about 10 times as many documents as GE has produced.

THE COURT: Okay, the number, itself, I'm not, I don't really hold much stake in the number of documents because parties may have different numbers of documents, you know. I mean it's just certain custodians generate more documents than others and so

the number of documents really is not necessarily meaningful. What's meaningful is what, you know, how many custodians have you collected from and how much of their data have you produced?

MR. GREENBLUM: Okay, I'll leave that to Branko as to the number of custodians.

MR. PEJIC: Thank you, Your Honor, this is Branko again. The reason why we were concerned about the volume that GE is producing is because of the fact that they've produced about 80,000 documents to date. And, you know, with 30 days, you know, we're going to start deposition and so I really didn't want 100,000 documents being dumped at the end of March. And so that's our concern in trying to get a sense of it.

THE COURT: I understand.

MR. PEJIC: Turning to the production of what Spectrum has done, and I will tell you how we structured it because of the way the case is structured so we can then talk about what's left to do which I think is minimal is we phased our discovery in three sets as technical discovery/trade secrets, then custodians, and finally in the broader picture all the other administrative ancillary stuff. So as far as the technical trade secret documents I think we are

complete there or 95. We have searched all the custodians that we think were relevant which is the founder of the company, the CEO, the chief technical officer and the head of sales, and both the chief technical officer and the founder are the named inventors or the alleged inventors of the trade secrets.

And these, to understand, Spectrum has two products, which is the D-SPECT as well as the Veriton and these development activities have been ongoing for decades. So we produced emails from 2005 to 2015 and maybe a little bit longer temporally for those four individuals and that was that huge production. And we are substantially through the administrative stuff and I would presume that we would produce less than 100,000 more documents. And as far as substantially complete I think we're past 90 percent now.

THE COURT: Okay. Okay, good. Now in terms of the, I think the last issue in the agenda relates to the 595 patent information. I think that this is not actually a dispute at this point, but so I don't think we really need to spend much time on it. Right now it's not at issue in the case.

So let's talk next about this disclosure. Mr.

Greenblum, you submitted this letter with the attachment under seal. This is a former employee. I assume it's somebody, a person of interest, a potential witness in the case, is that right?

MR. GREENBLUM: That's correct, Your Honor.

THE COURT: All right, is there any, I'm not sure what GE's position is on this, if any?

MS. BUTLER: Your Honor, we just received this last night, we're looking at it, it was provided to the Court supposedly in case it was an inadvertent disclosure. We will look into whether it was an inadvertent disclosure and we will respond accordingly. But I'll add, Your Honor, there is one agenda item that is remaining, I think it's very important that we discuss, related to the document production, if I can address that?

THE COURT: Sure.

MS. BUTLER: So, Your Honor, on our last call we raised the concern that Spectrum had dumped 350,000 documents on GE and you advised at that point that GE needed to go back and look at the production. And we have, and we've started reviewing those documents. And we've confirmed that this is the definition, Your Honor, of a document dump. We started by reviewing

the first 2,000 or so documents in Spectrum's production of 350,000 documents. We ran searches through the remaining documents. And our finding of relevance rate, Your Honor, of less than 15 percent and really closer to 10 percent, so that means across these two productions of about 430,000 documents, around 385,000 of them are not relevant to this case and should not have been produced.

I want to explain how we know for sure that Spectrum has not been reviewing documents on a document by document basis because of the types of documents that we're finding in the production. And over the last few days I've personally reviewed many of these documents myself, and I want to describe to you some of the documents that we're finding. And I will let you know that I'm going to save the best for last here.

The vast majority of these documents are emails. At least the beginning of the production goes back to 2007, the NDA here wasn't signed until 2009, and every single document is designated highly confidential. In the protective order there's two tiers, confidential or highly confidential, there's been no review for proper designation, but here's the

types of documents that we're finding.

Among the emails, [redacted] [redacted]. We're finding [redacted]. We're finding [redacted]. We're finding [redacted]. [redacted] [redacted]. Emails regarding invoicing for [redacted]. [redacted]. There are hundreds of thousands of emails, Your Honor, that fall into these types of categories with no relevance to this litigation.

And then, Your Honor, there are the PowerPoints that were produced, and how do we know for sure that those PowerPoints were not reviewed for relevance. There's a 41 slide presentation on [redacted] [redacted]. There's a 31 slide presentation with pictures of [redacted]. These are just examples of many, many, many documents in the production.

But then, Your Honor, there's the [redacted] in the production. There's a PowerPoint presentation that's titled, [redacted] And, you know, you can stop me when you feel like you've heard enough here, but in that presentation there's a, there are

pictures of [redacted], there's an image of a [redacted] [redacted]. There's pictures of [redacted] [redacted]. There's another PowerPoint presentation with cartoon drawings of [redacted] [redacted]. This particular --

THE COURT: Okay --

MS. BUTLER: So you get the point, Your Honor.

THE COURT: Mr. Pejic, what's going on, why would these documents be included in the production?

MR. PEJIC: I'd like to see a list of them, Your Honor, this is the first I've heard any of this. I can say I've talked to my people and we have run searches for relevance and for privilege and pulled those documents. If GE would like to cite those documents to me I can take a look and try to explain it. But I can say --

THE COURT: But the point is, but the point is, Mr. Pejic, you don't just pull the documents using the search terms, you review them and exclude ones that are not relevant. I mean the search terms are a way to cull the documents to a reasonable group to review for relevance. They're ones that the search terms hopefully will hit on relevant documents but it

doesn't necessarily mean that all the hits are relevant and that's what the attorney review team is for.

MR. PEJIC: And, Your Honor, I don't know why these would have been picked up on the relevance reviews. I mean there might be something in an email address, it might be something in the string, I can't speak to the specific documents. I can say we found similar rates and I have not looked for ████████, of course, but similar rates of irrelevant documents from GE and when pressed on that they told us, well, that just happens, you have more.

MS. BUTLER: Your Honor --

THE COURT: There's always, unfortunately, because of the broad standard of relevance and because of the way that parties craft their Rule 34 requests, in most litigations the vast majority of things produced is marginally relevant. That's the problem with e-discovery right now, and I'm sure counsel would agree with me that in almost every case the vast majority of stuff produced is not stuff that you're going to use on summary judgment or at trial.

MS. BUTLER: And, Your Honor, I agree -- sorry.

THE COURT: And so the idea is to try to limit the production of that stuff. I don't know how to do it better other than to encourage lawyers to be extremely precise with their document requests. But lawyers don't do that, they're afraid to hone in that carefully and search terms are a very crude way to rule, you know, to identify relevant documents, but that's what we have.

MS. BUTLER: Your Honor, if I can respond -- if I can respond?

THE COURT: Hang on, hang on.

MS. BUTLER: Yep, this is our issue.

THE COURT: So hang on. So let me ask Spectrum, I thought I had asked last time and I thought I had received an answer that once the search terms are applied you have actual people looking at them, at the documents pulled, to tag them for relevance, privilege, et cetera. Is my understanding, correct?

MR. PEJIC: Your Honor, this is Branko Pejic, I did not understand to have said we looked at every document, I said we ran searches and reviews. And GE has asked for over a decade of emails and it would be disproportional for us to have to look at each and every one of those hundreds of thousands of emails

when the document production request is that broad. We have done what we think is reasonable and if GE would like to point out the specific documents we are happy to understand how the hits actually occurred. But it would just not be, it would be unjust and manifestly unfair to require spectrum to look at each of hundreds of thousands of documents that have been requested by GE.

THE COURT: I don't understand, Mr. Pejic, you've provided documents, you don't even know the documents that are included in what you produced?

MR. PEJIC: I know them by, I can identify them by folder and custodian and understand what they related to and beyond that I don't know that I can speak to those details because I was not involved on the day to day review. I can certainly, you know, talk to those people or we can provide a different, a subsequent explanation, but at this point in time I can speak to the high level review and how it was done.

THE COURT: I'd like to understand a little bit more about how the review was done. I also don't understand why everything would be labeled highly confidential.

MR. PEJIC: Because this is a trade secret case, Your Honor, and any disclosure of a trade secret by Spectrum could potentially destroy that trade secret.

THE COURT: I understand that, but that means that you haven't actually evaluated whether something is highly confidential, confidential or not confidential. There's certainly some documents in the review that aren't the, in the highest category.

MR. PEJIC: And, Your Honor, you're correct and we haven't produced every document as highly confidential. We've certainly produced all the documents that were focused on technical discovery that evidenced the trade secrets as highly confidential, absolutely. And the emails that relate to those have been designated highly confidential.

MS. BUTLER: That's not true, Your Honor. That's not true.

THE COURT: What I want for Spectrum to do is to provide me with a letter providing a little bit more detail about the actual review process so that I understand what's been done.

MR. PEJIC: Yes, Your Honor.

THE COURT: Okay. Can you provide that to me

within two weeks?

MR. PEJIC: We'll endeavor to do so, we should be able to.

THE COURT: Okay.

MS. BUTLER: Your Honor, can I just, for a point of clarification, I, we have been asking for Spectrum to confirm that documents were reviewed on a document by document basis. I think we finally heard on this call that they haven't been. That, instead, they ran search terms and produced documents that hit those search terms.

MR. PEJIC: All right, let me respond to that. Your Honor --

MS. BUTLER: I'm not finished. I'm not finished. I'm not finished.

MR. PEJIC: You're mischaracterizing --

MS. BUTLER: I'm not finished. I'm not finished.

THE COURT: Hang on, Mr. Pejic. Ms. Butler, keep it short.

MS. BUTLER: Understood. And so what I am hoping this letter will make clear is whether or not Spectrum did what we believe they were required to do as the plaintiff in this case who brought this case,

and as GE has done, review documents on an individual basis to make a determination about relevance, responsiveness and confidentiality designation. Because we have been asking for that for so long, I am just asking that this letter include the extent to which Spectrum has done that for its productions, and Jesse, you might have to help me on the number, the 350,000 document production and the 80,000 document production. Those are the ones where every document is labeled highly confidential and it includes hundreds of thousands of emails with no relevance to this case covering issues like [REDACTED] [REDACTED], all of which are designated highly confidential. We want those issues addressed in this letter.

MR. PEJIC: And, Your Honor --

THE COURT: All right, Ms. Butler, thank you for your comment. What I'm going to ask, I don't really want to hear any more argument on this, so Mr. Pejic, in your letter just let me know the process and what the process was for identifying relevant responsive documents and what the process was for designated confidential and privileged, okay?

MR. PEJIC: Yes. And could we, could I please

ask for the same from defendants because --

THE COURT: No, we don't, we are -- no, I want that, I want --

MR. PEJIC: Your Honor, they --

THE COURT: I'm not going to require that right now of GE. So I'd like you to provide that information, GE is at 50-60 percent of its production and let them focus on that right now.

MR. PEJIC: Okay, but they've already clawed back privileged documents which shows they didn't review every document individually. And that's why I would ask --

MS. BUTLER: That's not true.

THE COURT: Counsel, I don't want to have an argument between counsel on this conference, that's not appropriate. Look, I'm not saying, nor am I going to hold, that every single document, that you have to have a linear review of every single document, that's not always the case. it really depends on the types of documents that are being pulled and so forth. But there has to be, there has to be an evaluation for responsiveness and relevance that is reasonable within the meaning of the Federal Rules.

So, Mr. Pejic, I want your letter to address

that. And let me, for the last, the last issue I want to address today is whether GE has any, is there any other item that GE wanted to raise with respect to this disclosure? I'm not sure why this email is an inappropriate disclosure, but --

MS. BUTLER: I don't know that it is, Your Honor, but with Spectrum having raised the issue in a filing with the Court we will certainly look into it and make sure that the communications comply with Your Honor's order regarding communicating with former employees.

THE COURT: Okay. All right, so thank you all, I think this is all of the issues. I'll look forward to your letter, Mr. Pejic, and to our next call. As I said, I want you to focus on the completing, getting substantial completion this month of the document production and resolving any privilege issues.

Thanks, everyone, and have a good day. We're adjourned.

(Whereupon, the matter is adjourned.)

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Spectrum Dynamics Medical Limited versus General Electric Company, et al., Docket #18cv11386, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____Carole Ludwig_____

Carole Ludwig

Date: April 1, 2021