LAW OFFICES

# GREENBLUM & BERNSTEIN, P.L.C.

PATENT, COPYRIGHT AND TRADEMARK MATTERS

1950 ROLAND CLARKE PLACE

RESTON, VA  20191-1411

TEL: (703) 716-1191

FAX: (703) 716-1180

EMAIL: gbpatent@gbpatent.com

www.gbpatent.com

NEIL F. GREENBLUM
BRUCE H. BERNSTEIN
JAMES L. ROWLAND
ARNOLD TURK ◇
MICHAEL J. FINK
STEPHEN M. ROYLANCE ◇
ROBERT W. MUELLER
WILLIAM E. LYDDANE
WILLIAM S. BOSHNICK *
PAUL A. BRAIER, Ph.D.
P. BRANKO PEJIC *
DANIEL B. MOON
BRUCE H. STONER, JR. ◇
ENOCH PEAVEY
SEAN C. MYERS-PAYNE, Ph.D.
STEVEN B. POLLICOFF *
BARRY I. HOLLANDER ‡
GARY V. HARKCOM *◇
JAMES P. BONNAMY
JILL M. BROWNING
WALTER SCHLAPKOHL, Ph.D.
NAOKO OHASHI *

HARRY J. GWINNELL◇
JEFFREY H. HANDELSMAN *
KENNETH H. SALEN ◇
SOK K. HONG ◇
TAI ‡
JEFFREY R. BOUSQUET ◇
GARY M. JACOBS ◇
JAMES A. GROMADA
SHAWN A. HAMIDINIA, Ph.D.
ALI M. IMAM *
CHAD E. GORKA
CHUONG T. NGUYEN *
                                        ‡
DANIELLE C. PFIFFERLING

_____

* ADMITTED TO A BAR
  OTHER THAN VA
‡ REGISTERED PATENT AGENT
◇ OF COUNSEL
△ SENIOR COUNSEL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/23/2021

July 22, 2021

**VIA ECF**

Hon. Katharine H. Parker
United States Magistrate Judge, Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 750
New York, New York 10007

APPLICATION GRANTED

*Katharine H Parker*

Hon. Katharine H. Parker, U.S.M.J.

7/23/2021

Re:     S*pectrum Dynamics Medical Limited v. GE;* Case No.: 18-cv-11386 (VSB)

Dear Magistrate Judge Parker:

We represent Plaintiff Spectrum Dynamics Medical Limited ("Spectrum") in the above-captioned matter. On behalf of Spectrum and Defendant General Electric Company ("GE"), we write pursuant to Federal Rule of Civil Procedure 5.2(e), Your Honor's Individual Rule of Practice III(d), and the parties' Stipulated Confidentiality and Protective Order (the "Protective Order") (Doc. 156) to request that several passages contained in Document Number 300, the transcript of the parties' appearance before Your Honor on June 30, 2021, be redacted and filed under seal. The parties jointly respectfully request that before the transcript is made publicly available, the court reporter be directed to redact the passages highlighted on pages 24-26, 30, 33, and 35 as set forth in Exhibit 1 hereto.

The presumption of public access to judicial documents can be overcome if countervailing factors warrant confidentiality. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006); *see also Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 598 (1978). Sealing of records may be justified to preserve "higher values," including the need to protect an entity from competitive injury. *Lugosch*, 435 F.3d at 124; *see also Tropical Sails Corp. v. Yext, Inc.*, No. 14-cv-7582, 2016 U.S. Dist. LEXIS 49029, at *10-11 (S.D.N.Y. Apr. 12) (risk of "competitive injury is sufficiently serious to warrant protection" of proprietary business information). Consistent with this, courts routinely permit sealing and redaction of competitively sensitive proprietary business information. *See, e.g., Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,

Hon. Katharine H. Parker                July 22, 2021                Page -2-

97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015); *Encyclopedia Brown Prods., Ltd. v. Home Box Office. Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998); *see also Nixon*, 435 U.S. at 598 (recognizing need to seal information that might "harm a litigant's competitive standing").

Here, the discussions in the transcript concern documents containing internal GE information and communications that are not publicly available and confidential details of Spectrum's involvement in an unrelated third-party proceeding. This information is competitively sensitive and proprietary information of GE or Spectrum, respectively, that, if disclosed, would pose a substantial risk of harm to GE or Spectrum, and constitutes "Highly Confidential – Attorneys' Eyes Only" information under the Protective Order.    (Doc. 156.). This is the sort of competitively sensitive information that courts consistently protect from disclosure. *See, e.g., Ferring B.V. v. Allergan, Inc*., No. 12-cv-2650, 2017 U.S. Dist. LEXIS 150239, at *16 (S.D.N.Y. Sep. 7) (granting motion to seal documents containing proprietary information related to product development); Encyclopedia Brown, 26 F. Supp. 2d at 612 (sealing documents reflecting sensitive trade secret information). This is particularly the case where, as here, the information to be sealed was not relevant to the Court's resolution of any issue. *Cf. Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F. 3d 132, 143 (2d Cir. 2016)(denying sealing request where documents were "highly relevant to the exercise of Article III judicial power").

The parties' request is narrowly tailored to protect highly confidential information and does not deprive the public of access to critical information. The parties respectfully request that the Court permit the requested redactions in the publicly available version of the June 30, 2021 transcript (Doc. 300).

Respectfully submitted,

*/Neil F. Greenblum/*

Neil F. Greenblum

cc:    All counsel of record (via ECF)
        {J734902 04884221.DOCX}

# Exhibit 1

SUBJECT TO PROTECTIVE ORDER: HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                      :
                                            :    Docket #1:18-cv-11386-
SPECTRUM DYNAMICS MEDICAL LIMITED,          :    VSB-KHP

                        Plaintiff,          :

  - against -                               :

GENERAL ELECTRIC COMPANY, et al.,           :    New York, New York
                                                 June 30, 2021
                        Defendants.         :
                                                 TELEPHONE CONFERENCE
------------------------------------ :


PROCEEDINGS BEFORE
THE HONORABLE JUDGE KATHARINE H. PARKER,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:              RIVKIN RADLER LLP
                            BY:  GREGORY D. MILLER, ESQ.
                            25 Main Street
                            Court Plaza North - Suite 501
                            Hackensack, NJ 07601


                            GREENBLUM & BERNSTEIN, P.L.C.
                            BY:  NEIL F. GREENBLUM, ESQ.
                                 PETER BRANKO PEJIC, ESQ.
                                 JILL BROWNING, ESQ.
                                 DANIELLE PFIFFERLING, ESQ.
                            1950 Roland Clarke Place
                            Reston, VA 20191


Transcription Service:      Carole Ludwig, *Transcription Services*
                            155 East Fourth Street #3C
                            New York, New York 10009
                            Phone:  (212) 420-0771
                            Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording; Transcript produced by
transcription service.

<u>APPEARANCES - CONTINUED:</u>

For Defendants:            THOMPSON HINE
                           BY:  MARLA R. BUTLER, ESQ.
                           Two Alliance Center
                           3560 Lenox Road NE, Suite 1600
                           Atlanta, GA 30326

                           THOMPSON HINE LLP
                           BY:  JESSE L. JENIKE-GODSHALK, ESQ.
                           312 Walnut Street - 14th Floor
                           Cincinnati, OH 45202

                           THOMPSON HINE LLP
                           BY:  BRIAN PHILIP LANCIAULT, JR.
                           335 Madison Avenue
                           New York, NY 10017

                           THOMPSON HINE LLP
                           BY:  JEFFREY C. METZCAR, ESQ.
                           Austin Landing 1
                           10050 Innovation Drive, Suite 400
                           Dayton, Ohio  45342-4934

### INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                          PROCEEDINGS                     4

 2          THE CLERK:  Calling case 18cv11386, Spectrum

 3   Dynamics Medical versus General Electric Company; the

 4   Honorable Katharine H. Parker, presiding.

 5          Beginning with counsel for the plaintiffs, can you

 6   please make your appearance for the record?

 7          MR. GREGORY MILLER:  Good morning, Gregory Miller

 8   Rivkin Radler, on behalf of the plaintiff. And also with me

 9   from the law firm of Greenblum & Bernstein, we have Neil

10   Greenblum, Branko Pejic, Jill Browning, and Danielle

11   Pfifferling.

12          HONORABLE KATHARINE H. PARKER (THE COURT):  Good

13   morning.

14          MR. MILLER:  Good morning.

15          THE CLERK:  And counsel for the defendants, can

16   you please make your appearance for the record?

17          MS. MARLA BUTLER:  Yes, this is Marla Butler from

18   Thompson Hine, and with me are my colleagues, Jeff Metzcar,

19   Jesse Jenike-Godshalk and Brian Lanciault, also from Thompson

20   Hine for the defendants.

21          THE COURT:  Welcome.  So as a reminder, I ask you to

22   keep your phones on mute unless you're speaking to eliminate

23   background noise, and to state your names before you speak for

24   the benefit of any court reporter who is asked to transcribe

25   the recording of today's conference.  Also, I want to remind
```

PROCEEDINGS                    5

1
2  you that the court's conference line is open to the press and
3  public on a listen only basis and that court rules prohibit
4  others from recording and rebroadcasting court conferences.
5  Violations of this rule may result in sanctions.
6            So welcome, everyone, I hope you had a good June, I
7  can't believe it's already July. I am not sure whether it was
8  docketed yet but we are going to be able to convert these
9  conferences to in person conferences because of the changing
10 Covid protocol, and so I think that will be a good thing for
11 the counsel to get together, to see each other and to see the
12 Court in person. So that's going to be coming out.
13           You have a lot of items on your agenda letter. I'm
14 not sure we can get through all of them today, but I
15 understand from your more recent letter that you resolved some
16 of the items at your meet and confer on Monday.  So why don't
17 we start with Spectrum's topics and then we'll move on to GE's
18 topics, does that sound good?
19           MR. MILLER:  Very good, Your Honor.
20           MS. BUTLER:  Sounds good, Your Honor.
21           THE COURT:  Okay, so I guess, first, as I
22 understand it, Spectrum still has concerns about the
23 discovery and the speed of discovery. I was under the
24 impression that GE was nearly complete with its
25 production, so what exactly is the issue?

1

2         MR. BRANKO PEJIC:  This is Mr. Pejic, Your

3 Honor.  The issue is we're not sure how many documents

4 are coming. In late April, we were told that there was

5 about 10,000 documents to complete. Since then, GE has

6 produced about 23,000 documents which is almost 20

7 percent of their production.  So it looks like that

8 we're back loading discovery and we have no sense of

9 what's coming between here and July 15 while we're

10 trying to prepare for depositions.  And so we'd like

11 some clarity from defendants on whether July 15 is a

12 realistic close of substantial, close of document discovery,

13 and potentially how many more documents are coming,

14 because we've already received twice as many as we

15 were anticipating.

16         THE COURT:  Okay, so can somebody from GE

17 clarify what's going on?

18         MR. JESSE GODSHALK:  Yes, Your Honor, this is

19 Mr. Godshalk, I'm happy to. I mean, you know, frankly,

20 I had spoken with opposing counsel about this earlier

21 this week and they asked me if I believed that we

22 would substantially complete our production by July

23 15, and I said that we would. So I mean I have already

24 communicated that to opposing counsel.

25         With regard to what is still in the pipeline,

```
 1                      PROCEEDINGS                    7
 2  I told the Court and opposing counsel what was still
 3  in the pipeline at the last conference. I'm happy to
 4  do that again and I'll tell you that what is in the
 5  pipeline currently, we are going to make or planning
 6  to make another document production at the end of this
 7  week. It will have about 5,000 documents.  These are
 8  documents that were collected from Michael Gazinski
 9  (phonetic) and George Mashour (phonetic), these are
10  the documents that were stuck in Israeli customs.
11  We've, you know, since received those hard drives and
12  I think we've already produced some documents from
13  those custodians, but planning to produce the
14  remainder by the end of this week.
15          We have not yet produced the documents from
16  (indiscernible) Bar-Shalev (phonetic).  We may also
17  have some additional documents in response to
18  Spectrum's sixth set of requests for production but I
19  don't expect that volume to be large.  And as I
20  referenced during the last conference, we may have
21  some additional documents from our privilege review.
22  But again, I do not expect that volume to be large.
23          With regard to the number of documents that
24  we've produced since April 28, Your Honor, I did
25  provide an estimate at the April 28 conference that we
```

```
 1                          PROCEEDINGS                        8

 2   had 10,000 documents remaining.  You know, that was a

 3   good faith estimate but it wasn't a perfect

 4   calculation. And, furthermore, after I made that

 5   estimate, Spectrum served an additional 28 document

 6   requests and demanded that we collect documents from

 7   additional custodians, including Mr. Bar-Shalev. And

 8   even now, in the most recent agenda letter, they're

 9   demanding that we collect from an additional

10   custodian.

11           So I don't think Spectrum should be permitted

12   to demand that we produce more documents and then turn

13   around and request relief from the Court because the

14   number of documents that we've produced exceeds our

15   earlier estimates.

16           THE COURT:  Right.  Well the fact that you

17   produced more than you initially estimated is not

18   really a concern given that there's a continuing

19   document request and additional custodians. So I

20   understand it's just an estimate.  Okay, well it

21   sounds like, regardless, you're going to be

22   substantially complete by July 15 except it sounds

23   like there's this other potential custodian. So I

24   guess there's the Devine and Hodge Yia-Yia (phonetic).

25           MR. JESSE GODSHALK:  Correct, Your Honor.
```

1

2          MR. PEJIC:  Correct.  Your Honor, this is Mr.

3   Pejic.  We have I believe resolved the Mr. Hodge Yia-

4   Yia issue. We had asked defendants to provide search

5   terms to narrow the 90,000 hits we received after deduping

6   and defendants gave us a set of search terms. We've run them

7   and we have somewhere around 13,000 to 15,000 documents to

8   review and produce.  So I think that that issue has been

9   resolved.

10          THE COURT:  Okay, great, and when do you expect to

11  be able to produce them, by July 15?

12          MR. PEJIC:  Oh, certainly by then, Your Honor.

13          THE COURT:  Okay, great.  And what about

14  Devine. So he's in-house counsel to GE?

15          MR. PEJIC:  Correct, Your Honor.  This is Mr.

16  Pejic, correct, Your Honor.

17          THE COURT:  Okay.  So this all pertains to the

18  claw back issue that's pending before the Court, is

19  that right?

20          MR. PEJIC:  Very much, Your Honor.

21          THE COURT:  Okay.  So why don't you summarize

22  your position, Mr. Pejic, and then I'll hear from GE

23  on this.

24          MR. PEJIC:  Our position is, and this was

25  drafted before receiving defendant's response to the

1

2    claw back, but it still remains true that there are no

3    entries on the privilege log that would evidence

4    anything as far as a request for legal advice from Mr.

5    Devine or him providing any such information. And the

6    problem there is that Mr. Hefetz who was the recipient

7    of this information, he is a custodian and presumably

8    his documents have been searched and produced. We've

9    received about 2,000 documents from him as a

10   custodian, but any documents that he had that evidence

11   those discussions with Mr. Devine are not on the

12   privilege log. And so we believe it would be

13   appropriate for GE to search Mr. Devine's records

14   because as an in-house counsel he wears two hats and

15   not everything he does is privileged. And so not

16   everything we'd be seeking would be privileged and

17   would help understand his role in this boot camp. And,

18   additionally, any entries of communications with Mr.

19   Hefetz would be on the privilege log and would

20   substantiate the claims of privilege as they relate to

21   the 2004 boot camp.

22           THE COURT:  Okay, but Mr. Devine has, there's

23   going to be a lot of different privileged type of

24   communications in his email because he's in-house IT

25   counsel. So that's, are you suggesting that the search

```
 1                        PROCEEDINGS              11

 2   be restricted to a very confined set of

 3   communications?

 4        MR. PEJIC:  Yes, Your Honor, in fact, we'd be

 5   happy to provide search terms.

 6        THE COURT:  What do you think that, why do you

 7   think that he has relevant information?

 8        MR. PEJIC:  Well he supposedly organized and

 9   prepared a Power Point that was presented at the 2004 boot

10   camp, but he prepared this power point along with Gil

11   Kovalski, I'm sorry about the pronunciation, who is just an

12   inventor and businessperson and, for instance, that actual

13   Power Point has been withheld as privilege but we have no

14   idea who attended the meetings, who it was presented to. And

15   we believe that even that document isn't privileged in

16   totality because it was authored by a businessperson and an

17   in-house corporate counsel. So we would believe that that

18   would shed a lot of light on what was said at that 2004 boot

19   camp and give a broader understanding of whether what we

20   believe is a commercial statement is actually a privileged

21   statement and a response to a request for legal advice.

22        THE COURT:  Well so the Power Point that's at

23   issue was, is on the privilege log?

24        MR. PEJIC:  Correct, Your Honor, but it only

25   has two authors and no recipients.
```

```
 1                         PROCEEDINGS                    12
 2              THE COURT:  Okay.  Because it sounds like it
 3    wasn't sent to anybody, it sounds like it was shown at
 4    a meeting.
 5              MR. PEJIC:  Correct, Your Honor.
 6              THE COURT:  So do you know what happened at
 7    the meeting, are there agendas or anything else?
 8              MR. PEJIC:  We've received approximately ten
 9    documents or so related to that meeting and we have a
10    list of proposed attendees and Mr. Devine did not take
11    part in that aspect of it.  And we have one slide deck
12    that doesn't shown Mr. Devine, and other than that, we
13    have some follow-up emails and none of which actually
14    refer to Mr. Devine.  And what was discussed there was
15    presumably business strategy as well as some legal
16    strategy. We're not saying that there's no privileged
17    information in that Power Point, we're just saying
18    it's highly unlikely that that Power Point is
19    privileged in its entirety.  And so that's just
20    another reason why we believe it would be appropriate
21    to search Mr. Devine's records pursuant to a very
22    limited search.
23              THE COURT:  Let me hear from GE on that?
24              MR. BRIAN LANCIAULT:  Your Honor, this is Mr.
25    Lanciault.  I think, you know, part of the issue here
```

 2  is, you know, the parties are producing privilege logs

 3  on a rolling basis.  So I suspect, and Mr. Godshalk

 4  alluded to this earlier, that, you know, we're still

 5  doing a privilege review and there might be some

 6  residual documents produced from that. There's, of

 7  course, going to be more documents logged that will

 8  probably shed some light on this.

 9          The other point is that, you know, to the

10  extent there are non-privileged, you know, documents

11  about this boot camp, as Mr. Pejic acknowledged, you

12  know, Gil Kovalski is a non-attorney, he's a custody

13  who we've collected from, we've produced non-

14  privileged files from his, documents from his files.

15  And so, you know, we think that, it's GE's position

16  that to go further to collect from Mr. Devine who, you

17  know, is lead IP counsel or was lead IP counsel during

18  the relevant time at GE is, you know, more burdensome

19  and outside the scope of Rule 26 where we're going to

20  have to sift through thousands of likely privileged

21  and potentially not relevant documents, you know,

22  simply for I guess the exercise of logging them to,

23  you know, to satisfy what seems to be Spectrum's

24  curiosity here.

25          We have documents from attendees at the boot

1

2  camp. As he said, they have an email that shows the

3  attendees or some of the attendees that were there and

4  otherwise, you know, we'll be logging whatever

5  additional files we have that involve Mr. Devine to

6  the extent they're privileged, to the extent they're

7  not, and they, you know, they'll be produced.

8          THE COURT:  Okay.  So I don't believe that

9  it's appropriate at this point to add Mr. Devine as a

10 custodian. You have not received all of the privilege

11 logs yet and, furthermore, you have received non-

12 privileged documents related to the meeting, Mr.

13 Pejic, and you can depose individuals about what

14 happened at the meeting and then after those

15 depositions, after you've had a look at the full

16 privilege log, then maybe you would have a better

17 case. But right now you haven't demonstrated why the

18 information would be not redundant or proportional to

19 the needs of the case given the other information

20 that's been produced about this meeting. And also,

21 it's premature, the request is premature because the

22 production of documents regarding the meeting is not

23 done.

24          So I'm not going to require GE to take a look

25 at, to add Mr. Devine as a custodian. If later in

| | PROCEEDINGS                                    15 |
|---|---|
| 1 | |

PROCEEDINGS                                    15

1

2 discovery there's good cause to revisit this, you can

3 raise it again, but at this point I don't think you've

4 made the case to add him as a custodian.

5          MR. PEJIC:  Okay, this is Mr. Pejic, thank

6 you, Your Honor. May I ask one question of defendants,

7 though, can they please confirm that they're not withholding

8 a list of the attendees or any agenda from that 2004 boot

9 camp?  Because we certainly haven't received anything like

10 that.  We've had --

11          THE COURT:  Well, again, Mr. Pejic, that's

12 something you can talk about with a meet and confer. What

13 I've heard is that they are not done producing the documents

14 yet. So both sides have a requirement to let you know if

15 they're withholding documents, so I don't think we need to

16 take up more time on this.

17          So let's go to GE's agenda items. So, one, GE

18 thinks that it's missing documents.  So it's not clear to me

19 whether this issue has been fully resolved from your letter.

20 It seems like some of the things have been resolved but not

21 all, so who wants to address this from GE's side?

22          MR. JEFFREY METZCAR:  Good morning, Your Honor,

23 this is Jeff Metzcar.  You're correct, the parties had

24 a meet and confer on this issue on Monday. I believe

25 that we've made progress on some of the items but

1

2   there is one particular category of documents that I

3   think we need to raise with you now.  Defendants have

4   requested documents pertaining to two recent disputes

5   between the plaintiff and a related entity, Molecular

6   Dynamics.

7           Molecular Dynamics claims that it, not the

8   plaintiff, possesses the right to use the trade

9   secrets in this case and, therefore, that plaintiff's

10  Veriton product infringes Molecular Dynamics'

11  intellectual property rights.  You know, the fact,

12  well, the facts and arguments that Molecular Dynamics

13  would present in those disputes to support its claim

14  that plaintiff does not have the right to make and

15  sell the Veriton and does not have the right to use

16  the very trade secrets that plaintiff has accused GE

17  of misappropriating, those facts and arguments would

18  be highly relevant to this case. Not only to

19  plaintiff's standing, but also to the issue of

20  plaintiff's request for damages.

21          So during the last conference with this Court,

22  plaintiff, plaintiff's counsel represented that it was

23  not withholding any responsive documents. Now we know

24  that plaintiff is withholding all documents relating

25  to this category on the basis of relevance, and that's

```
1                          PROCEEDINGS                    17

2  why we bring the issue to the Court's attention.

3            THE COURT:  Okay, let me hear from Spectrum.

4            MR. PEJIC:  Okay, this is Mr. Pejic.  ▮▮▮▮▮▮▮
```

1                          PROCEEDINGS                    18

13          MR. PEJIC:  This is Mr. Pejic, correct, Your

14   Honor.

15          THE COURT:  Okay.  And so, and what is the

16   stage where the, what's the status of those two

17   separate disputes?

18          MR. PEJIC:  This is Mr. Pejic again, the BBI

19   action was resolved in Spectrum's favor and the Court

20   found that the party is seeking a worldwide freeze

21   order to keep Spectrum from selling the business or

22   otherwise conducting commercial activities was denied

23   for a lack of evidence. And one of the interesting

24   things that makes it very clear that ownership was not at

25   issue is in the final order the judge, the high court

1
2  judge there in the BBI said that the official transcript
3  indicates that "The learned judge had some difficulty
4  navigating the facts of the applicable law.  Learned
5  counsel for the applicants affirmed the judge's initial
6  understanding that the worldwide freeze order was being
7  sought in support of a claim by applicants over ownership
8  of intellectual property rights. That understanding was
9  erroneous. The worldwide freeze order was being sought in
10 support of a claim for damages for breach of contract.
11 Consequently, it would appear learned counsel for the
12 applicants and the learned judge were speaking at cross
13 purposes for a large part of the hearing.  Later in the ex
14 parte hearing the learned judge realized the correct basis
15 for the application, he then accepted apparently
16 uncritically the applicant's assertion quantum of their
17 damages would be at least $100 million, whilst contained
18 in an affidavit no cogent basis for this or any other
19 figure was set out in this evidentiary vehicle." And then
20 that said, "The lack of solid evidence of a risk of real
21 dissipation is pivotal in my respectful judgment and
22 requires a discharge of the worldwide freeze order. That
23 will be the order of the Court."  And that was in favor of
24 Spectrum. So the judge --
25          THE COURT:  So and that's the opinion that you

1                          PROCEEDINGS                    20

2   produced to GE?

3            MR. PEJIC:  Yes, Your Honor.

4            THE COURT:  Okay, and then what's the status

5   of the other issue?

6            MR. PEJIC:

11          THE COURT:  Yeah, I don't see, I don't see the

12    relevance of this other dispute beyond the opinions

13    that are issued, in my view that this is

14    disproportionate to the needs of this case. If, you

15    know, if it, you know, you can certainly subpoena

16    somebody from these other entities to the extent that

17    they think the trade secrets at issue in this case are

18    their trade secrets, but I would think if that were

19    the case they may be, you'd be making yourself, GE

20    would be making itself a target. I take it these,

21    because these trade secrets are something that

22    Spectrums is saying that GE isn't properly using.

23          MR. METZCAR:  Well, Your Honor, this is Jeff

24    Metzcar again, you know, we've been attempting to get

25    these documents since December of 2020, and the reason

1   
2   why we've attempted to get them from plaintiff is

3   because the other entity involved, Molecular Dynamics,

4   is, I believe, a Bermuda entity. So obtaining

5   discovery from them is not something that would be

6   simple.

7         We've been trying to get these documents, as I

8   said, since December of 2020, and we repeatedly asked

9   whether Spectrum was withholding any of these

10  documents on the basis of relevance, or any of its

11  objections. As you know, we brought this up with the

12  Court in the last conference and we were told over and

13  over again that it was not withholding any responsive

14  documents.  Only now have we learned that they are

15  being withheld on the basis of relevance and this

16  issue could have been addressed long, long ago.  And

17  now we, you know, we find it prejudicial to GE to have

18  to attempt to obtain the same information from a third

19  party in Bermuda.

20        THE COURT:  Well I don't, as I said, I don't,

21  I don't believe that GE's made the case that these

22  documents are relevant and proportional to the needs

23  of the case. So I'm not going to require production of

24  documents in this dispute, apart from the opinion, so

25  that you understand the outcome of those disputes. And

|     |     |
| --- | --- |
| 1   | PROCEEDINGS                    24 |

2  certainly you can explore in deposition, if you want,

3  a little bit more information to learn about that.

4  And if you learn some information that would render

5  some of those documents important, you can re-raise it

6  with me. But right now I don't see how producing all

7  the underlying documents in those actions is relevant

8  and (indiscernible).

9          Okay --

10         MS. BUTLER:  Your Honor, this is Marla Butler,

11  can we just request then that Spectrum produce that

12  opinion immediately upon its release?  As the parties

13  are preparing to proceed with depositions, any delay

14  in getting that opinion once it issues would make it

15  more difficult for us to use it in this litigation.

16         THE COURT:  Sure, yes, Spectrum should produce

17  the opinion within a week after it receives it.

18         MS. BROWNING:  Thank you, Your Honor, and we

19  will do so. The only proviso I have with respect to

20  that is if there is any confidential information of a

21  third party, that we don't have the, you know, the

22  ability to provide to third parties about violating

23  the confidentiality concerns of the Swiss arbitration,

24  we would redact that out. But we will produce it, you

25  know, as soon as we can.

1

2          THE COURT:  Sure.

3          MS. BROWNING:  Within a week.

4          THE COURT:  In seven days.  If it needs to be

5   redacted pursuant to a Swiss court order then, you

6   know, that's, for confidentiality reasons, that's

7   okay.

8          MS. BUTLER:  Your Honor, if I could make one

9   other point in that regard, I think, you know, the

10  amount of redactions might really take out a lot of

11  the substance. And if the party --

12         THE COURT:  It's all hypothetical now, we

13  don't even know what, we have no idea what it is, so

14  let's table this issue and see what happens. We don't

15  even know when, I mean we have no idea when the Swiss

16  authorities are going to issue this. In my experience,

17  the Swiss legal processes move like molasses, so it

18  may not be, it may not be in one or two months, it

19  could be longer. So let's see when they issue it and

20  then you can see if anything needs to be redacted, and

21  then you can raise the issue, but let's not argue

22  about hypotheticals right now.

23         Okay, so then this was the key issue, I think

24  the other issues were resolved related to documents

25  that GE was seeking, is that right?

1

2        MR. METZCAR:  This is Jeff Metzcar again, I

3    think we have made progress and nothing else needs to

4    be addressed on this call.

5        THE COURT:  Okay.  Now I want to hear more

6    about depositions, have you scheduled depositions,

7    what's coming up?

8        MR. PEJIC:  Your Honor, plaintiffs have one

9    more issue that got skipped as we were going between

10   letters and it deals with the alternate channels of

11   communication. And my colleague, if the Court will

12   indulge us, my colleague, Ms. Pfifferling, I'm sorry,

13   will be addressing it.

14       THE COURT:  Okay.

15       MS. DANIELLE PFIFFERLING:  Your Honor, this is

16   Ms. Pfifferling. This issue is on the agenda letter on

17   page 2, the second full paragraph.

18       THE COURT:  Okay.

19       MS. PFIFFERLING:  And this relates to the

20   alternate communication channels and this really does

21   relate to the interrogatory that Spectrum served and that

22   is Exhibit E.  And if you have that exhibit handy --

23       THE COURT:  Yes, hang on, let me just go to it,

24   I have the judgment, okay, go ahead.

25       MS. PFIFFERLING:  So Exhibit E is Spectrum's

1                           PROCEEDINGS                    27

2     interrogatory number 4, on page 2 it really defines

3     alternate communication channels. And there we are

4     defining it as being a server, database, FTP site,

5     file sharing services, local drives, removable storage

6     drives, network drives and also cloud based files. And

7     then on page 3, we do give non-limiting examples of

8     any alternate communication channels. And these are where

9     you see the Romanettes, ███████████████████████

10    ████████████████  whether you're on, (iii) ████████████████████  (iv)

11    General Electric, which seems to be a password, (v) which

12    is  ██████████  (vi)  ██████████  and (vii) which is  ████████

13    But these are examples, we are citing GE's Bates ranges as

14    examples of what we are calling alternative communication

15    channels.

16            THE COURT:  Okay.

17            MS. PFIFFERLING:  But then if you turn to our

18    interrogatory number 4, which his on page 5, what

19    we're asking GE is just to identify any of these

20    alternate communication channels that were used by the

21    GE diligence personnel to send, receive, store

22    information related to the Spotlight Project, which

23    was the due diligence project, and the Star Guide

24    Project, which is GE's imitation device.

25            And if you look at Exhibit D, which is GE's

1

2  response to our rog 4, let me know when you have that

3  open?

4          THE COURT:  Yes.

5          MS. PFIFFERLING:  So on page 5 of Exhibit D,

6  that is GE's objections. Page 6 is their substantive

7  response. Paragraph 1, that last sentence, they just

8  simply identify very broad and general network drives

9  which is email, FTP sites, (indiscernible) local

10 drives, computer drives and GE networks. That is not

11 what our interrogatory was asking for, they were using

12 very broad and general terms, we're asking for the

13 specific locations and drives where this information

14 was stored. We did have a meet and confer, we asked

15 defendants about it, they seemed to be confused on the

16 meaning of alternate communication channels when we were

17 very specific regarding that definition, and then they

18 responded in their rog with just a very broad and general

19 language. And we would like for them to supplement their

20 Exhibit B, which is their rog response to number 4, to

21 supplement, to be very specific, similar to how Spectrum was

22 with defining this term, be very specific on these network

23 drives where this information was stored.

24         And also, if you look at the next paragraph and

25 GE's response, they do say that this information can be

PROCEEDINGS                          29

1

2  obtained through the metadata accompanying these documents

3  that they have produced.  And they said that they have,

4  including the folder paths, however, we just discovered last

5  night when we were looking at folder paths for some of the

6  documents, there is text in that folder path. However,

7  that text for the folder path and text in the file

8  name is exactly the same. And so it appears that

9  actually the text in the folder path that was

10 provided, that is not the text of the folder path,

11 that seems to be the text of the file name.  And we

12 had our vendor go back and check the original load

13 files from GE's production and confirm that they have

14 not produced the folder paths of their documents. So

15 we're asking now for GE to supplement their rog

16 response number 4 and also provide an overlay of what

17 documents that they have produced, provide an overlay

18 of the folder path.

19         THE COURT:  Okay.  So well it sounds like this

20 is new information about the folder paths, that there

21 seemed to have been some hiccup in that, but let me

22 hear from GE on this.

23         MR. GODSHALK:  Yeah, Your Honor, this is Jesse

24 Godshalk.  Right, with regard to the folder path

25 issue, I mean certainly I can have our vendor look at

1
2   that, this is the first I've heard of it, I didn't
3   know we had an issue with regard to that. but with
4   regard to the other things that were raised, Your
5   Honor, this term, alternate communication channels,
6   quite frankly, it is probably the most confusingly
7   defined term that I have ever come across in my
8   practice.  It is two sentences long -- it's two
9   sentences, each with multiple subparts and footnotes
10  stretching for more than a page of text. And read
11  literally, the term encompasses all channels of
12  communication, so that would be telephone, phone,
13  mail, wire, computers, any type of, you know, like
14  subgroups within computers, whether it's networks,
15  that GE used during the due diligence period from 2009
16  to 2012, and in developing its spec device over the
17  past decade. So we're looking for all channels of
18  communication that GE used for more than a ten year
19  period. That is so broad and difficult to pin down
20  that it is unworkable.
21          The definition that they've provided also is
22  internally inconsistent because it includes as
23  examples of means of communication, things that are,
24  such as external storage devices that are not means of
25  communication. So I mean they've defined it as means

1
2   of communication and then included examples that are
3   not means of communication. So I don't know, we don't
4   know, what is actually within the scope of this term.
5   And, you know, we told them that in writing and in our
6   meet and confers and we tried our best to provide a,
7   you know, reasonable response to interrogatory number
8   4.
9          You know, if they actually want us to list,
10  for instance, every single phone number, every single
11  laptop, every single network device that GE has used
12  in its development of its spec device and during due
13  diligence over more than a ten year period, quite
14  frankly, I think that's disproportionate to the needs
15  of the case. I don't even know how, Your Honor, I
16  would go about doing that.  I mean the number of hours
17  involved, I couldn't even begin to estimate how long
18  it would take for me to figure out, and many of these
19  things probably do not even exist anymore. I mean the
20  computers that were being used in 2009, they probably
21  do not exist. In fact, I am sure that there are of
22  them that simply do not exist, they've been retired,
23  destroyed. I don't know how I would go back and figure
24  out what computer equipment was being used more than a
25  decade ago.

1

2          THE COURT:  So let me, I don't even understand

3   why this is needed, why does Spectrum need this

4   information?

5          MS. PFIFFERLING:  Your Honor, if you could

6   look at the Exhibit C, let me know when you have that

7   ready?

8          THE COURT:  C as in cookie?

9          MS. PFIFFERLING:  Yes.

10          THE COURT:  Yes.

11          MS. PFIFFERLING:  So in Exhibit C, ████████

████████████████████████████████████████████████████████

████████████████████  And that (indiscernible) below

14   that, ████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████  So we were trying

21   figure out what was this ██████████████████████████

22   keep in mind Yaron was one of the key players, he's an

23   inventor on some of those GE patents and he was also

24   an outside consultant for GE.  So we're trying to

25   understand how GE was, you know, communicating with

1

2   these external consultants because it seems that this

3   was not a form of communication that's not on GE's

4   server.

5           THE COURT:   I have a very specific question,

6   why don't, I mean you can just ask a deponent, you

7   know, what was this. A lot of times this just means

8   like there was a, you know, a tunnel email, a

9   protected email chain, but let me --

10          MR. GREENBLUM:   Your Honor, this is Neil

11  Greenblum, can I just add one thing?

12          THE COURT:   Sure.

13          MR. GREENBLUM:   Let's remember that this case

14  is about misappropriation of trade secrets and it's

15  premature now to give you all of the examples where

16  this has happened. But remember that a number of

17  individuals, when they want to talk about what they

18  are doing, say let's go off to our private channel for

19  this. So this is not a case of just harassing, I want

20  Your Honor to realize we're just not harassing GE to

21  waste their time, these were the key individuals,

22  they're communicating information that they shouldn't

23  have been communicating at this time period. That's

24  the point, this time period, should not have been

25  communicating. And they know they're doing something

```
 1                        PROCEEDINGS                 34
 2   wrong and they're going off channel, that's what this
 3   is about.
 4            THE COURT:  I understand that point, but I
 5   want to ask GE, looking at Exhibit C, have you
 6   inquired with anybody from GE Healthcare, Gil Kovalski
 7   or Jean-Paul Bouhnik ███████████████
        ████████████  is, do they know?
 9            MR. GODSHALK:  Your Honor, this is Jesse
10   Godshalk again, I mean I, we did not specifically show
11   this document, for instance, to Gil Kovalski or Jean-Paul
12   Bouhnik and say ██████████████████████████
13   but I can tell you that we performed collection interviews
14   that I participated in of both of these individuals and
15   asked them about every possible location for, you know,
16   documents that are responsive and that will be relevant in
17   this case.  And asked them, for instance, you know, about
18   network drives, shared drives, you know, any sort of
19   location for, you know, electronic data, where is it and
20   how do we get it.  So, yeah, that's what we did, Your
21   Honor.
22            THE COURT:  Okay.  So what I'd like you to do
23   is I'd like you just to ask these individuals was
24   there some other, do they know what this refers to and
25   were there, I'm going to refer to it as offline
```

```
 1                       PROCEEDINGS                    35
 2  communications about the issues here in the case,
 3  right, about this patent or other trade secrets. Just
 4  ask and see.
 5          MR. GODSHALK:  Okay.
 6          THE COURT:  Okay?
 7          MR. GODSHALK:  Yes.
 8          THE COURT: I think first do that because the
 9  interrogatory as phrased is overbroad and not
10  proportional to the needs of the case. I do understand
11  why plaintiffs are asking the question, let's start
12  with you interviewing these folks and seeing if there
13  were private offline communications that GE doesn't
14  know about, that you didn't know about before.
15  Sometimes, you know, even the best witness interviews,
16  you learn something new during the course of a
17  litigation, right?
18          MR. GODSHALK:  Yes, Your Honor.
19          THE COURT:  Okay, so why don't you check on
20  that and then we'll take it from there.
21          MR. GODSHALK:  Will do.
22          THE COURT:  So let's next hear about the, I
23  want to hear next about the deposition schedule.
24          MR. PEJIC:  Well, Your Honor, this is Mr.
25  Pejic and Spectrum, well, Spectrum and GE have been
```

PROCEEDINGS                                36

talking for a while on the various issues.  Weeks ago
we exchanged lists of witnesses.  GE objected to
Spectrum's number of witnesses and has not provided
the availability of the witnesses while the parties
are negotiating what deposition limits are in place.
So to date, I'm not aware of GE actually sending
anything to Your Honor, but Spectrum last night filed
its proposal for deposition limits. And the reason,
and it expresses the reason why Spectrum's position is
proper in view of the complexity of the case and the
number of witnesses and explains how defendant's offer
that's currently on the table, it's our understanding,
although they haven't submitted anything to the Court,
of 12 total fact depositions, is just unworkable
because, at the end of the day, defendants have listed
12 people on their initial disclosures and if Spectrum
is limited to 12 depositions, GE is unilaterally
handcuffing Spectrum on who they have to depose. And
to top this off, GE also refuses to agree that a trial
witness can't appear unless they are previously
deposed. Spectrum had made that proposal to help limit
the number of witnesses because that would give us
some comfort if we didn't take a deposition of someone
that they wouldn't appear at trial to contradict any

```
 1                    PROCEEDINGS              37

 2   testimony.

 3        But I think that Spectrum has set our position

 4   out in our letter and I'm happy to speak to any

 5   questions Your Honor might have about that, but I

 6   don't know how to respond to GE because there is not

 7   currently anything on the table that I'm aware of.

 8        THE COURT:  Okay, well, I mean what I want to

 9   know is I want to hear from GE, why haven't you gotten

10   back to dates. There's clearly some witnesses that

11   both sides know need to be deposed and those

12   depositions should be scheduled.

13        MS. BUTLER:  Yes, Your Honor, so neither side

14   has provided availability of their witnesses. We've

15   given names to Spectrum of the individuals we'd like

16   to depose, we haven't gotten availability of those

17   witnesses either. The reason GE hasn't provided

18   availability is because we believe we needed to iron

19   out what the limits of depositions were going to be.

20   Spectrum has identified 16 people that it wants to

21   depose and it indicated that they're leaving the door

22   open to depose more. So until we know how many

23   depositions are going to be permitted in this case, we

24   don't know whose availability we should be looking to

25   discover.
```

```
 1                      PROCEEDINGS                    38
 2          On June 3, Your Honor, we suggested to
 3  Spectrum that the parties submit to Your Honor a joint
 4  letter with the parties' differing views on what the
 5  deposition limits should be so that Your Honor could
 6  decide it and we could move to scheduling. We asked
 7  Spectrum to join us in that pleading at least three
 8  times over the course of the month and what we got
 9  yesterday was a last minute letter from Spectrum with
10  obviously no time for GE to provide a response with
11  its position as it relates to deposition limits. But
12  here is GE's position as it relates to limits.
13          So, you know, the 120 hours that Spectrum has
14  proposed, if we're looking at 7 hour depositions that
15  would be 17 depositions. Or if Spectrum wanted to
16  depose witnesses for only 4 hours, that would be a
17  total of 30 depositions. And the reason that's
18  problematic is not only because the number of
19  witnesses and depositions that far exceed what the
20  Federal Rules of Civil Procedure allow, but combine
21  that with Spectrum's insistence that GE bring all of
22  its witnesses to the United States for deposition in
23  person. So Spectrum could decide to depose 30 GE
24  individuals and depose those individuals for 2 hours, 3
25  hours and require them to travel to the United States for
```

```
 1                                 PROCEEDINGS                39
 2   deposition. We think that is overly burdensome on GE and
 3   we think that depositions of individuals who are in Israel
 4   should take place remotely.  One thing that we have
 5   learned in this pandemic is that remote depositions do
 6   work. The technology has gotten more efficient, more
 7   proficient and we think that witnesses who are in
 8   Israel should not have to undergo the incredible
 9   disruption personally and professionally to come here
10   to the United States to be deposed.
11            On this issue of the parties or Spectrum
12   insisting that only witnesses that have been deposed can
13   testify at trial, Your Honor, what that does is it puts
14   in the hands of one party who the other party can call
15   to trial. So if Spectrum wants to prevent GE from
16   calling an important witness, Spectrum could just
17   choose not to depose that witness.
18            Trial witnesses are determined by who the
19   parties disclose. GE has served disclosures with the
20   individuals that we believe at this time may be
21   testifying at trial.  And so what GE is proposing is
22   12 individual depositions per side, and if we wanted
23   to turn that into hours, Your Honor, GE would be happy
24   to do that.  So, you know, 7 hour deposition limit
25   times 12, 84 hours of depositions.  But on top of
```

```
1                           PROCEEDINGS                    40

2    that, GE is agreeing that each side would get 25 hours

3    of 30(B)(6) depositions.  We think that those two

4    components combined are perfectly sufficient, 12

5    individual depos or 84 hours, plus 25 hours of

6    30(B)(6) deposition are sufficient to cover the issues

7    in this case.

8               THE COURT:  Um-hmm.

9               MR. PEJIC:  Your Honor, this is Mr. Pejic, may

10   I respond?

11              THE COURT:  Yes.

12              MR. PEJIC:  Okay, as an initial matter, GE

13   seems to be picking and choosing from Spectrum's

14   proposal. Spectrum's proposal sets out that if the

15   depositions are taken remotely they can be up to 10

16   hours, and so that is 12 depositions.  And as far as

17   the witnesses in Israel, Spectrum has said that we're

18   willing to travel to Israel to take the depositions,

19   we would not require the GE witnesses to come to the

20   US.

21              And, moreover, Ms. Butler made it very clear

22   with the 12 deposition limit and their initial

23   disclosures, Spectrum fully intends to depose everyone

24   on GE's initial disclosure list. I mean it would be

25   malpractice otherwise because those folks don't always
```

1                          PROCEEDINGS                    41

2   show up at trial as witnesses. What we're concerned

3   about is the fact that we can't depose anyone under

4   GE's offer other than those listed on their initial

5   disclosures such that in reality it's GE that's

6   dictating who can be deposed, because Spectrum would

7   be remiss if we didn't depose everyone on GE's initial

8   disclosures.  So it's really illusory in the sense

9   that GE's 12 deposition limit handcuffs Spectrum and

10  requires them to take depositions only of the people

11  identified by GE without the ability to take

12  additional depositions, where it is GE has the ability

13  to take significantly more depositions of Spectrum

14  because Spectrum has four individuals listed on their

15  initial disclosures.

16          So this truly is a situation where there's a

17  huge disproportionality.  Spectrum tried to strike a

18  middle line here to give both parties some flexibility

19  and add proportionality and fairness to the offers,

20  and that's why we have proposed 120 hours if done

21  remotely. If the parties agreed to take the

22  depositions in person, we're willing to talk about

23  that being a 7 hour limit and reevaluating the hour

24  limit. And here, in this case, remote depositions

25  aren't going to be as simple as other situations

PROCEEDINGS                    42

1
2  because it involves highly technical information,
3  people with English as a second language and perhaps,
4  you know, very strong accents, and also could involve
5  translation issues. There's no way we could take a 7
6  hour deposition with translation issues. And the
7  documents are likely going to be a lot of schematics
8  and engineering drawings because of the technical
9  nature of everything, which does not lend itself to
10 being put on screens. It's very hard to read and how
11 could you magnify and everything else.
12        So at the end of the day, Spectrum is willing
13 to work with GE and certainly insure that the limits
14 are appropriate and I think that that, we submit that
15 that's what we've done in our letter.
16        THE COURT:  Okay, so what I want you to do is
17 I want you to schedule some depositions in August and
18 September. I certainly encourage you to cooperate to
19 have virtual where they make sense, but I also
20 understand why both sides may want to have some of
21 these in person.  In terms of the limit, I don't -- I
22 understand what GE is saying, that you want to have a
23 limit before you schedule, but at the same time,
24 that's a little bit arbitrary because what's important
25 is to get to the merits of the case, who are the key

PROCEEDINGS                    43

1
2    witnesses that Spectrum wants and that GE wants, and
3    why are they important, why are the depositions not
4    redundant, why are they proportional to the needs of
5    the case.  So I don't know, I don't have that
6    information.  What I, I mean I have the letter, but I
7    don't, maybe I'm missing it --
8              MS. BUTLER:  Can I offer a suggestion, Your
9    Honor?
10             THE COURT:  What I think I need to know is I
11   need to have, I need to understand who are the
12   witnesses that Spectrum presently wants to depose and
13   what is the, what are the topics on which they want to
14   be deposed.  And then who are the witnesses that GE
15   presently wants to depose, that's what I want to
16   understand.
17             In terms of the limit, 25 hours of 30(B)(6)
18   seems reasonable to me because that's, you know,
19   that's more than three days really of deposition on
20   30(B)(6) topics. So that seems to me to be reasonable,
21   25 hours of 30(B)(6) for each side. In terms of the
22   individual fact witnesses though, I really don't, you
23   know, I understand 12, I understand 12, why you're
24   proposing a limit of 12, but it may be that some
25   additional ones are needed. And 7 versus 10 hours,

1
2   there may be some witnesses that are shorter and some

3   that are longer. And I appreciate that there can be a

4   slowdown because of translation issues.

5          So what I'd like is for, personally, I think

6   that you should meet and confer a little bit more on

7   this. I think what plaintiff should do is provide the

8   list of people you currently think that you want to

9   depose and GE should also provide the list of people

10  it wants to depose.  And then if you have a, if you

11  want to exchange 30(B)(6) notices you should do that,

12  and then you can have a more informed discussion about

13  whether some of the people should be taken off and

14  limits from that perspective. I think that's a better

15  way to go about it because you're going to be focusing

16  on the information that you need rather than arbitrary

17  limits.

18         MR. PEJIC:  Understood, Your Honor.

19         MS. BUTLER:  And, Your Honor, we do have the

20  list of individuals that Spectrum wants to depose and

21  Spectrum has our list of individuals that we want to

22  depose. We can certainly provide 30(B)(6) topics, as

23  well. And just because I know that the parties since

24  June 2 have been trying to resolve this issue, can we

25  at least get some direction from the Court as to how

PROCEEDINGS                    45

```
1                           PROCEEDINGS                    45
2   many witnesses we can start scheduling depositions
3   for?  Because if Spectrum sticks to the 16 and we're
4   still at, you know, 12 depositions, then we don't know
5   which witnesses we should prioritize, if there's a cap
6   for now at least.
7           THE COURT:  How many witnesses are on GE's
8   list?
9           MS. BUTLER:  Five, Your Honor, plus Rule
10  30(B)(6).
11          THE COURT:  Okay, and Spectrum has 16 plus
12  30(B)(6)?
13          MS. BUTLER:  Exactly.
14          THE COURT:  Yes, so right now schedule 10, you
15  can schedule 10 each, that's consistent with the
16  rules, and then let's talk about what's next.
17          MS. BUTLER:  That sounds good, Your Honor.
18          MR. PEJIC:  Your Honor, this is Mr. Pejic, I
19  just want to point out that 16 depositions is only 4
20  individuals not listed on GE's initial disclosures. So
21  we --
22          THE COURT:  I understand that, Mr. Pejic,
23  you're going to get discovery that is relevant and
24  proportional and that you need to prosecute the claim.
25  You're going to get that, that's going to be
```

```
 1
 2   proportional, but I need to understand a little bit
 3   more who these additional ones, you know, are and
 4   whether they're necessary. But go ahead and schedule
 5   up to 10 and I want you to exchange 30(B)(6) topics
 6   within the next, let's see, the 4th of July holiday is
 7   upon us so I want you to exchange those 30(B)(6)
 8   topics by July 14.
 9           MS. BUTLER:  Will do, Your Honor.
10           THE COURT:  Okay?
11           MR. PEJIC:  Yes, Your Honor.
12           THE COURT:  So do a simultaneous exchange so
13   that you understand, because I think that's important,
14   too, it may be that some of the fact witnesses will
15   actually answer some of the 30(B)(6) topics, as well,
16   and you all should know that.  And I hear why it may
17   make sense to conduct some depositions in Israel.
18   Israel fully, you know, they have a very high
19   vaccination rate, so I'm not sure what the situation
20   is with travel to Israel now, so you may, if there's
21   going to be depositions in Israel, you obviously
22   should schedule them to happen at, you know, a time
23   where you don't have to make multiple trips.
24           MR. PEJIC:  Yes, Your Honor.
25           THE COURT:  So I want you to take a look at
```

```
 1                    PROCEEDINGS                  47
 2   that, take a look at the 30(B)(6), and then I will
 3   make a decision about the additional depositions. But,
 4   from my perspective, 7 to maybe 10 hours is not
 5   necessarily problematic, particularly when you're
 6   dealing with a translator and some of these technical
 7   things.  Obviously, you should try to be strategic
 8   about the questions in your depositions, try to limit
 9   them to 7 hours but, as we all know as litigators,
10   sometimes you need just a little bit of extra time. So
11   I expect the sides to cooperate on that.
12            MS. BUTLER:  Will do, Your Honor. One
13   question, Spectrum filed a letter last night to the
14   Court proposing deposition limits and so we've got
15   three days I guess to respond to that.  Are you
16   expecting a response to that letter or would you like
17   us to wait until, you know, the parties have kind of
18   hopefully made some progress on this, just how would
19   you like us to handle that letter?
20            THE COURT:  I don't want you to respond to
21   that letter because right now what I'm asking you to
22   do is exchange those deposition topics and talk about
23   scheduling of up to ten of the witnesses.  And,
24   Spectrum, you can prioritize which ones. And this does
25   not at all mean that you can't depose other people,
```

```
 1                      PROCEEDINGS                48
 2  I'm not making that decision yet, but prioritize,
 3  okay?
 4            MR. PEJIC:  Yes, Your Honor, thank you very
 5  much.
 6            THE COURT:  And then we can address it at the
 7  next, I mean by this time we'll be able to address it
 8  at the next status conference.
 9            MS. BUTLER:  Understood, Your Honor.
10            THE COURT:  Okay?
11            MR. PEJIC:  Thank you, Your Honor, very good.
12            THE COURT:  Okay, anything else that Spectrum
13  would like to raise?
14            MS. BROWNING: Your Honor, actually this is one
15  other issue that we would like to raise and we have
16  not raised this with the other side, so I apologize
17  for that. But you had originally offered before to
18  take on some of the motions or pending items that were
19  in this case.  And we actually would like to propose,
20  and obviously we'll give, you know, this is somewhat
21  up to GE as well, but we would like to propose that
22  you take on the pending motion to dismiss, Mr. Hefetz
23  as a defendant. It's currently pending with the
24  District Court Judge, but we, if it's possible we
25  would be amenable to having you take that over and
```

PROCEEDINGS                    49

1   decide it?

2

3   THE COURT:  Okay, so why don't you all discuss

4   that, if you want me to handle that motion you can

5   submit a consent for a particular motion and you can

6   submit that at any time, okay?  But you don't have to

7   make any decisions right now, if you want that to

8   happen then submit that I would say, what's the date

9   of that motion, that was --

10   MR. PEJIC:  This is Mr. Pejic, it was this

11   spring, Your Honor, I apologize, this just became

12   apparent during the discussion today, but I don't have

13   the docket number. We're happy to provide it to Your

14   Honor.

15   THE COURT:  Hold on, I have the partial motion

16   to dismiss the counterclaim.

17   MR. PEJIC:  Yes, that would be the pleading,

18   Your Honor.

19   MS. BROWNING:  Right, with discovery advancing

20   we just would like the ruling on Hefetz, you know,

21   being in the case, and also to insure that there are

22   no, you know, documents being withheld because he is

23   still pending with this motion.

24   THE COURT:  Yeah, hold on a second. Okay,

25   well, regardless, if you want me to do it and you want

```
 1                      PROCEEDINGS                    50

 2   a consent for that particular motion, you should

 3   submit the consent form within a week.

 4        MS. BUTLER:  And, Your Honor, this is Marla

 5   Butler for the defendants, and we'll obviously talk to our

 6   clients about what they'd like to do in that regard.

 7        THE COURT:  Absolutely, no repercussions if you

 8   don't consent, there's no problem if you don't want to. If

 9   you want to, you can and Judge Broderick will sign, you

10   know, sign off on it.

11        MS. BUTLER:  And, Your Honor, just to the point

12   that Ms. Browning made, so Mr. Hefetz, we have made

13   clear to Spectrum that he will be made available for

14   deposition.  We are representing him, we have searched

15   his files, there's no Hefetz documents that are being

16   withheld on the basis of, you know, him not being a

17   party to this case. So there's no substantive

18   consequence to that ruling not having been decided

19   yet, just so that that's clear.

20        THE COURT:  There's no rush from

21   (indiscernible).

22        MS. BUTLER:  Exactly, Your Honor, because we

23   are, we're representing him, he's going to appear for

24   deposition, we searched his documents.

25        THE COURT:  Okay, that's fine. So like I said,
```

```
 1                         PROCEEDINGS                   51
 2   there's no, there's no repercussions for not
 3   consenting, if you want to, you can.  So you can think
 4   about that, all right?
 5           MS. BROWNING:  Thank you, Your Honor.
 6           THE COURT:  Okay, anything else from GE?
 7           MS. BUTLER:  Nothing from us.  Mr. Godshalk,
 8   have I left anything off?
 9           MR. GODSHALK:  No, I don't believe so.
10           MS. BUTLER:  Have a great July 4, Your Honor.
11           THE COURT:  Okay, great, have a good July 4,
12   everyone, we're adjourned.
13           (Whereupon, the matter is adjourned.)
14
15
16
17
18
19
20
21
22
23
24
25
```

52

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Spectrum Dynamics

Medical Limited v. General Electric Company et al, Docket #

18-cv-11386-VSB-KHP, was prepared using digital

transcription software and is a true and accurate record of

the proceedings.




Signature_____*Carole Ludwig*_____

               Carole Ludwig

Date:    July 1, 2021