# Exhibit 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ---------------------------------------x
 3   SPECTRUM DYNAMICS MEDICAL LIMITED,

 4                              Plaintiff,

 5                                    18-CV-11386 VSB
         -vs-
 6

 7   GENERAL ELECTRIC COMPANY, ET AL,

 8                              Defendants.
     ---------------------------------------x
 9
                             United States Courthouse
10                           White Plains, New York

11                           Friday, August 6, 2021
                             2:00 p.m.
12

13   B e f o r e:

14                           HONORABLE VERNON S. BRODERICK,
                             District Judge
15

16   A P P E A R A N C E S:

17
     RIVKIN RADLER, LLP
18       Attorneys for Plaintiff
     BY:  GREGORY D. MILLER, ESQ.,
19       JENNA ZOE GABAY, ESQ.,
         GENE YOUNG KANG, ESQ.
20

21   THOMPSON HINE
         Attorneys for Plaintiff as Counter-Claimant
22   BY:  MARLA R. BUTLER, ESQ.,
         JESSE L. JENIKE/GODSHALK, ESQ.
23       JEFFREY C. METZCAR, ESQ.,
         BRIAN P. LANCIAULT, JR., ESQ.
24

25
```

```
 1   A P P E A R A N C E S:   (Continued...)

 2
     GREENBLUM & BERNSTEIN, PLC
 3        Attorneys for Defendants
     BY:  NEIL F. GREENBLUM, ESQ.,
 4        DANIELLE PFIFFERLING, ESQ.,
          PETER BRANKO PEJIC, ESQ.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  So, Counsel, there are a couple of
 2  instructions and then I'm going to ask you for you to introduce
 3  yourselves officially for the record.
 4              First, as the court reporter just mentioned, please,
 5  if you are using speakerphone, I'd ask that you pick up the
 6  handset if you're going to be speaking.  Second, if you're not
 7  speaking, I'd ask you to mute your phone, so anyone who is not
 8  speaking, please mute your phone because it does create
 9  background noise that impedes the ability to get an accurate
10  record.  In addition, I would ask that when you do speak, please
11  identify yourself by name so that we can make sure that we have
12  an accurate record.
13              So I'd ask that Counsel, beginning with Plaintiff's
14  Counsel, please introduce themselves for the record.  Go ahead.
15              MR. MILLER:  Good afternoon, your Honor, again,
16  Gregory Miller, Rivkin Radler, on behalf of the Plaintiff
17  Spectrum.  Also with me today is Neil Greenblum, Branko Pejic,
18  and Danielle Pfifferling from the Greenblum & Bernstein law
19  firm.
20              THE COURT:  And for the Defense.
21              MS. BUTLER:  Good afternoon, your Honor, it's Marla
22  Butler from Thompson Hine for the Defendants, and with me are
23  Jeff Metzcar --
24              (Off-the-record discussion)
25              MS. BUTLER:  It's Marla Butler for the Defendants, and
```

Conf.                         Spectrum v. G.E.                    4

1   with me are Jeff Metzcar, Jessie Jenike-Godshalk, and Brian

2   Lanciault.

3            THE COURT:  All right.

4            So I asked for this conference, in part, to discuss

5   the correspondence that I had received, so let me just review

6   the three letters that I received in connection with today's

7   conference.

8            First, I received a letter from Plaintiff making a

9   request for additional pages with regard to a proposed motion

10  for preliminary injunction, seeking leave to file some

11  additional affidavits and additional pages with regard to those

12  filings.

13           On July 26th, I received the Defendant's response in

14  which it objected -- the Defendants objected in various ways,

15  including suggesting both to the numbers of pages, but also

16  objecting to the filing of the preliminary injunction motion at

17  all, and then I have the reply letter dated July 27th from the

18  Plaintiff.

19           And so are there any other correspondence that I have

20  not referenced, anything else, from the Plaintiff?

21           MR. MILLER:  No, your Honor.

22           THE COURT:  Okay, Mr. Miller, thank you.

23           From the Defense, Ms. Butler?

24           MS. BUTLER:  No, your Honor.

25           THE COURT:  Okay.

1              So I hope, and I apologize, but I issued an order
2   yesterday just -- and -- indicating certain questions that I'd
3   like to address today.  I'd like to take care of those questions
4   first, and then I will allow, first, Plaintiff to add anything
5   that they believe is appropriate to add in connection with
6   today's conference and then I'll allow the Defendant to do the
7   same.  In other words, I'm not in any way suggesting that the
8   parties won't be able to advise me of anything they deem
9   appropriate.
10             I guess before we jump into the questions, I just want
11  to make sure that things are -- in other words, things remain
12  the same, in other words, the parties' positions haven't
13  altered.
14             Is that correct, Mr. Miller?
15             MR. MILLER:  I believe that's correct, but let me
16  defer to Mr. Greenblum if that's okay, your Honor.
17             THE COURT:  Okay.  All right, Mr. Greenblum.
18             (Brief pause)
19             THE COURT:  Mr. Greenblum, you may still be on mute.
20             MR. MILLER:  I hope we didn't lose him, your Honor.
21             MR. GREENBLUM:  I started us off by not correcting
22  last time, so it's Neil Greenblum, and, your Honor, did you have
23  a question?  I'm sorry, I missed it.
24             THE COURT:  Yes, I'm sorry, I'm just asking if things
25  are status quo, in other words whether anything has changed with

1   regard to the parties' position since I received the letters.

2           MR. GREENBLUM:  Not as far as I know, your Honor.

3           THE COURT:  Okay.

4           All right, Ms. Butler.

5           MS. BUTLER:  No, your Honor, the position that we put

6   forth in the letter is the same.

7           THE COURT:  Okay.  All right.  So let's go through the

8   question and then I'll open it up for comments from Mr. Miller

9   or Mr. Greenblum and then the Defense, Ms. Butler.

10          (Brief interruption)

11          THE COURT:  So the first question was posed for GE, so

12  let me hear from Ms. Butler, and specifically relate to -- and,

13  Ms. Butler, do you have the questions in front of you?

14          MS. BUTLER:  I do, your Honor, and if I can, I can

15  address the series of questions under number one first.  Is that

16  okay?

17          THE COURT:  Yes, yes.  That's what I was asking, yes.

18          MS. BUTLER:  Okay, yes.

19          So it is the Defendant's position that your Honor can

20  and should prevent Spectrum from filing this motion for at least

21  two issues, and the first is that it would be --

22          (Off-the-record discussion)

23          MS. BUTLER:  So your Honor can and should prevent

24  Spectrum from filing this motion.  The first reason is because

25  it would be a preliminary injunction motion in name only, your

1  Honor.  There's nothing preliminary about it.  It's more akin to

2  a motion for summary judgment than a preliminary injunction

3  motion.  And the second reason is because the delay alone, your

4  Honor, is enough for this Court to find that any such motion, if

5  they want to call it a preliminary injunction motion, would be

6  futile.

7          So starting, your Honor, with the first point, that

8  it's not a preliminary injunction motion, the parties, your

9  Honor, are more than two-and-a-half years into this case, we're

10 a year into discovery, parties have exchanged hundreds of

11 thousands of documents, and have substantially completed

12 document production.  In its request in the letters submitted to

13 your Honor, Spectrum indicates that it intends to submit, quote,

14 voluminous facts --

15          THE COURT:  You know what, I'm sorry to interrupt, Ms.

16 Butler...

17          MS. BUTLER:  Yes.

18          THE COURT:  But I'm going to make the suggestion that

19 perhaps we can all dial back in and I'm hoping that we'll have a

20 better connection, and so in that way -- because I fear that

21 we're going to continue to have that background noise which I

22 think makes it -- you know, makes it impossible for the court

23 reporter to hear what we're saying when it flares up.

24          (Off-the-record discussion)

25          THE COURT:  Let's first try dialing back in.  If we

```
 1  still have the same problem, then we'll just -- everyone needs
 2  to be cognizant to stop talking when that -- when we hear the
 3  noise in the background.
 4          All right, so I'm going to hang up and dial back in.
 5          (Brief interruption)
 6          THE COURT:  This is Judge Broderick.  Again, I would
 7  ask anyone who is not going to speak, please mute your phone.
 8          Let me just confirm that we have -- and we could go on
 9  the record.  Let me confirm that we have the parties on the
10  line, and, again, I'm just going to reference the individuals
11  who I know are going to be speaking.
12          Mr. Miller, are you on the line?
13          MR. MILLER:  I am here, your Honor.
14          THE COURT:  Okay.
15          Mr. Greenblum, are you on the line?
16          MR. GREENBLUM:  Yes, I am, your Honor.
17          THE COURT:  Okay.
18          Ms. Butler, are you on the line?
19          MS. BUTLER:  I am, your Honor.
20          (Off-the-record discussion)
21          THE COURT:  All right, Ms. Butler, why don't you
22  continue.
23          MS. BUTLER:  I will, your Honor, and when I am not
24  talking, I will make sure that my phone is on mute and I would
25  ask that the lawyers on my side do the same.
```

1          Can you hear me, your Honor?

2          THE COURT:  I can Ms. Butler.

3          MS. BUTLER:  So our position is that your Honor can

4  and should prevent Spectrum from filing this motion.  There's

5  nothing preliminary about it.  The delay alone, your Honor, is

6  enough to find that the motion would be futile.

7          As to the first point, your Honor, the parties are

8  two-and-a-half years into this case, we're a year into

9  discovery, hundreds of thousands of documents have been

10  produced, we've substantially completed document production.

11  What Spectrum proposes to do in this motion is to submit, quote,

12  voluminous facts and they want to use this motion to, quote,

13  satisfy the merits of Spectrum's misappropriation of trade

14  secrets and breach-of-contract claims, and they say in their

15  letter requesting these page extensions that the proof is

16  substantial and detailed.

17          Your Honor, what Spectrum is proposing here is to file

18  an early motion for summary judgment, and this Court has the

19  absolute right to use its inherent powers to control its docket,

20  to control its schedule, to ensure that the disposition of cases

21  is handled efficiently and orderly.  The Court can and should

22  provide a time period during which summary judgment motions

23  should be filed, and that, your Honor, should be upon the

24  completion of facts and expert discovery where it is positioned

25  right now in the Court's case schedule.

1              As to the delay, your Honor, Spectrum first learned

2    about GE's StarGuide product in June of 2018, over three years

3    ago.  In December '18, they filed an 88-page complaint detailing

4    the alleged misappropriation of trade secrets, saying that these

5    trade secrets are included in this device that they've known

6    about since June of 2018 and that these trade secrets are

7    included as patent applications that had been issued years

8    before they filed a complaint.  And in that original complaint

9    in December '18, they requested a preliminary junction in its

10   prayer for relief, asking to bar GE from using its trade

11   secrets, from marketing and selling this same device, and from

12   seeking FDA approval, and that point, your Honor, is important

13   because what that means is that in December 2018, they knew that

14   GE would be seeking FDA approval and they knew that GE would be

15   selling this device around the world, including in the United

16   States.

17              When they filed their amended complaint in May of

18   2019, 137 pages of allegations alleging trade-secret

19   misappropriation and breach of contract, again, seeking a

20   preliminary injunction to stop GE from using the trade secrets,

21   from marketing and selling this same device, and, again, from

22   seeking FDA approval.  As your Honor noted in the order that we

23   received yesterday, in February of 2021, Spectrum told

24   Magistrate Judge Parker that they would be seeking a preliminary

25   injunction, and here we are five -- what, six months later with

1  Spectrum now acting to file this motion.

2          Your Honor, a showing of probable irreparable harm

3  under the case law in the 2nd Circuit is the single most

4  important prerequisite for the issuance of a preliminary

5  injunction, and as Judge Engelmayer held in the *Goat Fashion*

6  case cited by Spectrum in their letter, in their reply letter,

7  unless adequately explained, delay alone may justify the denial

8  of a preliminary injunction.  There is no adequate explanation

9  for a three-year delay, your Honor, and when that delay is timed

10 to disrupt the schedule and create extreme inefficiency, as is

11 the case with this delay, the motion should not be permitted,

12 and that's precisely what we have here, a motion that's timed to

13 disrupt the schedule and create extreme inefficiency in this

14 case.

15         Judge Parker has ordered the parties to complete

16 fifteen fact depositions in September and October, and because

17 Spectrum is refusing to conduct depositions remotely, most of

18 these depositions are going to take place in Israel.  As

19 Spectrum has indicated, it's attempted to seek more than the ten

20 depositions allowed under the federal rules, so all of the

21 individuals from whom Spectrum intends to submit affidavits in

22 this so-called motion for preliminary injunction are individuals

23 who are set to be deposed in this case, their depositions have

24 already been -- the intent to depose these individuals has

25 already been provided to Spectrum, two as fact witnesses and two

1    as expert witnesses.  The fact witnesses are supposed to be

2    deposed in September and October and the expert witnesses would

3    be deposed as part of expert discovery, so would these witnesses

4    be deposed twice?  Should GE have to respond to 200 pages of

5    so-called preliminary injunction briefing while in the midst of

6    fifteen depositions, most of which will be halfway across the

7    world?

8           Your Honor, Spectrum took two-and-a-half years to

9    prepare a motion that it wants to file just as the parties are

10   entering the busiest part of this case.  This motion has nothing

11   to do with irreparable harm and everything to do with Spectrum

12   trying to obtain a tactical advantage, and for those reasons, we

13   think that you can and should prevent the motion from being

14   filed.

15          THE COURT:  Okay.

16          Now, with regard to the second question, which is if I

17   decide to allow the preliminary injunction to actually go

18   forward, is there a briefing schedule or page limit that the

19   Plaintiff -- and, again, I'm not at all...indicating, you know,

20   where I may come out and I understand that, you know, that in

21   advising me of what your position is, it's -- your first

22   position is that the motion is not appropriate, but what sort of

23   a schedule and how many pages would you think would be

24   appropriate from the defense point of view, Ms. Butler?

25          MS. BUTLER:  Yes, your Honor, and our issue is not so

1   much with the number of pages requested, but more so in the

2   timing of the motion and the number of pages requested is what

3   makes it clear that this is a summary judgment motion under the

4   guise of a preliminary injunction motion, but as far as schedule

5   is concerned, your Honor, it's our view that the Court's

6   inherent authority to control its docket and schedule also

7   permits the Court to put a schedule in place that doesn't

8   unnecessarily disrupt the existing schedule.

9          GE should not have to respond to this motion until

10  after all depositions are complete so that we don't have

11  multiple rounds of depositions and so that the schedule is not

12  up-ended, and, your Honor, as I understood your order of

13  yesterday, the suggestion that this be decided along with

14  summary judgment briefing as one possibility is what you

15  suggested, but it's Defendant's position that that's exactly how

16  it should happen, the motion should be decided along with the

17  summary judgment briefing and the pages -- in terms of page

18  limits, your Honor, it should be equal on both sides, but if

19  Spectrum wants to file this motion now, then it's Defendant's

20  position that Defendants should not have to respond to it until

21  after depositions are complete, and in terms of any hearing, it

22  should be conducted along with the summary judgment hearings at

23  that time, your Honor.

24          THE COURT:  All right.

25          With regard to question -- we'll move to question 3

Conf.                    Spectrum v. G.E.                    14

1  now, so are they -- so I'd ask, Ms. Butler, for you to address

2  the questions, three questions -- or the questions that make up

3  the third item.

4          MS. BUTLER:  I will, your Honor, and I will note as I

5  start that this information is highly confidential, attorneys

6  eyes only under a protective order.

7          THE COURT:  All right, let me just say, then, that all

8  of our -- then I would ask you to the extent you can to limit

9  your comments to things that wouldn't implicate that.  If it

10 does, then we can skip the question, because as a -- even though

11 we're doing this remotely, the public is entitled to listen in

12 and so it is like just as if we were in the courtroom and

13 someone was sitting there just watching.  You know, if we were

14 in the courtroom, I would -- I might -- and, again, I'm not

15 saying I would do this, but I might ask someone to step out for

16 the period of time that you would be talking about

17 attorneys'-eyes-only material.  I can't do that using this

18 technology and I actually -- so what I would suggest is the

19 following.

20         I will assume for purposes of this discussion that the

21 devices are, in fact, being marketed, if not sold, right now in

22 the United States.  I won't, I won't ask you to indicate how

23 much the devices would sell for.  I believe in some of the

24 submissions, without giving a number to it, that it was

25 indicated that these are not -- these are (inaudible) expensive

Conf.                        Spectrum v. G.E.

1  that we're talking about with StarGuide items.

2          So what I think we should do is skip this one, Ms.

3  Butler.  It's not critical in the sense -- I'm going to assume

4  that the sales are something that is happening and that GE is

5  pursuing its efforts.  Whether they've made any sales is a

6  different thing, but I'll just assume for purposes of our

7  conversation today, and I won't ask you to get into any more

8  details than that because I wouldn't be able to unring the bell,

9  so to speak, if this information is discussed on the record.

10          So why don't we --

11          MS. BUTLER:  Understood, your Honor.

12          THE COURT:  Does that make sense, Ms. Butler?

13          MS. BUTLER:  Yeah, it does make sense and I appreciate

14  that.  There is one thing that I can note, though, about GE's

15  efforts to market and sell its device that would not be highly

16  confidential and I think it's relevant here.  If I might.

17          THE COURT:  Yes.  Go ahead.

18          MS. BUTLER:  And that's, your Honor, that oftentimes,

19  and I think most of the time, there's a competitive process when

20  hospitals are looking to buy equipment, and in these situations,

21  Spectrum and GE are often going head to head in trying to sell

22  these devices.

23          So Spectrum has known for many months because they've

24  been competing with GE to get these -- they call them tenders,

25  for many months, they have been competing with GE to sell these

1  devices more recently in Europe, and so that goes, your Honor,

2  to this issue of delay.  It's not as if Spectrum just learned

3  last month that -- or last week that GE was looking to market

4  these devices.  Spectrum's employees have been out in the field

5  competing with GE for months with GE trying to sell its Starr

6  guide device and Spectrum trying to sell its VERITON device.

7  This is not news to Spectrum.

8          THE COURT:  I'm sorry, I did not un-mute myself when I

9  started speaking.

10          So I would say the following, we should move on to

11  number 4, but I would also say obviously, Mr. Miller, Mr.

12  Greenblum, to the extent you're responding to my questions, I

13  will give you also an opportunity to respond once I finish

14  hearing from Ms. Butler for the things that she may have raised

15  to the extent that you feel a response is necessary and it's not

16  covered in the questions that I have for the Plaintiff.  Okay.

17          Now, Ms. Butler, I'd ask you to move on to number 4.

18          MS. BUTLER:  Yes, your Honor, so you asked if

19  Spectrum's claims are to be filed by bench trial, why not skip

20  summary motions and proceed to trial.

21          And it's in large part, your Honor, because as I

22  mentioned, almost all of the witnesses in this case are overseas

23  in Israel, and we believe that we'd have strong arguments on

24  summary judgment where we'd be relying on documentary evidence

25  of public disclosures, independent invention by GE that would

1  greatly reduce, if not completely eliminate, issues for trial

2  such that we wouldn't have to bring these witnesses over to the

3  United States and the disruption that that would cause for them.

4        With respect to GE's infringement claim, your Honor,

5  so the -- yes, you're correct, you said am I correct that GE's

6  counterclaims are to be tried to a jury.  Yes, that is the case,

7  but we also believe that summary judgment will be appropriate

8  for that counterclaim as well.  The structure and operation of

9  Spectrum's device, which is the device that GE accuses of

10  infringement, is not reasonably in dispute.  You notice that

11  we're going to have a market hearing and there's going to be a

12  decision on claim construction, and we believe summary judgment

13  of infringement will be appropriate upon receiving the Court's

14  claim construction because the structure and operation of the

15  device is not so much in dispute.

16        I think the big dispute here revolves around claim

17  construction, and so we believe that use of summary judgment

18  motion practice in this case has a significant chance of

19  eliminating or -- excuse me, limiting the issues that would be

20  tried and potentially eliminating the need for the bench trial

21  on Spectrum 's claims or a jury trial on GE's claims altogether.

22        THE COURT:  Okay.  All right.  Thank you.

23        Now I intend to move to the Plaintiff, questions for

24  the Plaintiff, and then once I complete that, I will open it up

25  and -- for initially, I guess, the Plaintiff, since it's your --

1  it's the Plaintiff's application, to fill me in on anything else

2  you'd like to appraise me of related to the letters that have

3  been submitted, and then I'll -- Ms. Butler, I'll obviously give

4  you a chance to do the same and respond to anything that might

5  have been raised by Mr. Miller or Mr. Greenblum.

6          So let me, let me ask, with regard to the first

7  question, is it Mr. Miller or Mr. Greenblum who will be

8  responding?

9          MR. MILLER:  It will be Mr. Greenblum.

10          THE COURT:  Okay.  All right.  So --

11          MR. GREENBLUM:  Neil Greenblum, yes.

12          THE COURT:  Okay, Mr. Greenblum, why don't you go

13  ahead.  The questions mainly relate now to the issue of the

14  number of years the case has been pending and related questions

15  to that, that issue, it's basically irreparable harm, but why

16  don't you go ahead and deal with the first bullet point and can

17  there really be grounds for irreparable harm and what is the

18  irreparable harm that you believe will befall the Plaintiff if a

19  preliminary injunction is not granted.

20          Go ahead.

21          MR. GREENBLUM:  Thank you very much, your Honor.

22          So the question starts off with the case has been

23  pending for years, and the assumption is if it's been pending

24  for that long, is there really a basis now for irreparable harm.

25  That's how I understand the question.  So there are two

Conf.                    Spectrum v. G.E.                    19

```
 1   components to that, and one is where do we stand in the case

 2   and, second of all, is there irreparable harm.

 3           Am I correct, your Honor, that's how you've posed the

 4   question?

 5           THE COURT:  Well, I mean, I think it is -- that is

 6   correct, but I think they're not necessarily -- I wouldn't

 7   necessarily view them as separate, I mean, they implicate each

 8   other, but why don't you proceed and if I -- I may have

 9   questions as you're going along, but go ahead.

10           MR. GREENBLUM:  Okay, your Honor.

11           So, first of all, the issue here is sale, when did

12   they start to sell, and until that point in time, until that

13   point in time, oh, yes, there were breaches, many that we're

14   discovering now in the course of discovery, but this is not

15   about a patent disclosure or something of the sort.  This is

16   about sales, ███████████████████████████████████████████████

17   ██████████████████████████████ and that is the irreparable harm.

18   Now I'll go into it.

19           So, first of all, the -- just by way of background,

20   Spectrum began advertising and promoting VERITON in 2017.  They

21   got their FDA approval, their 510K approval in April of 2018, so

22   they've been selling now for a little bit over three years.  In

23   June of 2018, the -- what we called at that time the imitation

24   device was discovered at the Rambam Hospital in Haifa, Israel,

25   and then suit was filed in December of 2018, and because of
```

 1  motions and whatever, it didn't get started really until a year

 2  later.

 3          And for your information, the documentary discovery

 4  closed, substantial discovery closed, on June the 15th, and

 5  there were issues here of slow walking of production of

 6  documents and whatever, but I'm not going to go into that other

 7  than to say that we did not get key documents into well, well

 8  into the discovery process.

 9          The lawsuit was filed on December 6th, 2018, and then

10  there was an amended complaint in 2019, and then on December

11  18th, when the issue was raised before Judge Parker, she said

12  the issue of preliminary injunction, it hasn't even been cleared

13  by the FDA yet, so what are you talking about.  January 22nd,

14  the FDA received a 510K application from StarGuide.

15          Are you familiar with a 510K?  Are you familiar with

16  what that is?

17          THE COURT:  I am not, but if you want to give a brief

18  explanation, you can, but --

19          MR. GREENBLUM:  Sure.

20          THE COURT:  Go ahead.

21          MR. GREENBLUM:  Sure, in a sentence or two, it's a

22  document that describes the device to a certain level of detail

23  so that the FDA can decide whether or not to approve the device.

24          Now, these kinds of applications are more I'll call

25  them summary in nature than new drug applications, which I'm

1   sure your Honor is aware of, and those go before -- those are

2   the...pharmaceutical cases where there's a great deal of

3   information provided in the 510k's -- I'm sorry, the ANDA it's

4   called, not so with the 510k's, so we knew that they had

5   received an application for what would be called the StarGuide.

6   In a meet-and-confer on January 26th, we were told that the FDA

7   approval for the 510K for the StarGuide is not imminent, and I

8   can cite you to the transcript January 27, 2021 hearing, page

9   32, lines 3 through 8.

10          The first time that GE received any kind of technical

11  documents from GE to our knowledge was February 9, 2021.  On

12  February 25th, 2021, before a hearing with Magistrate Parker, I

13  asked whether there were any StarGuide sales in America right

14  now to determine whether sales are imminent.  Ms. Butler, "I

15  don't know the answer to that question," transcript page 29,

16  line 19.

17          Then on February the 25th, before a hearing before

18  Judge Parker when discussing preliminary injunction, she said "I

19  don't know about the timing of this, of this preliminary

20  injunction motion that you're contemplating, I don't know

21  whether it makes sense to do that, to have that kind of a motion

22  practice now, we're seeking injunctive relief in the suit

23  generally so that this relief you can get, but I'm not sure I

24  can successfully ask for an injunction motion at this point when

25  the FDA is just contemplating it, and if the FDA does approve

1  it, as I understand it, it costs a lot of money to build these

2  machines and some time to build them, so if there is FDA

3  approval, that doesn't mean the machine is necessarily going to

4  be marketed or sold the next day.  Any motion for a preliminary

5  injunction, I think, would be -- a preliminary injunction would

6  be moot if the FDA doesn't approve the device."  That was

7  February 25th, 2021.

8        March 6th, we get the first information of a

9  presentation of the StarGuide machine and that happens in

10  Orleans, France.  Then on March 24th, GE promoted the StarGuide

11  in a press release.  We still don't have any details you

12  understand.  There's no details here.  We don't have any kind of

13  specifications.  We don't have any information about what traces

14  are in there.  On March 29th, GE receives FDA 510K approval for

15  the StarGuides.  A day later, GE produces their 510K documents.

16  Now we start to get to the, to the...I'll call it a high-level

17  description of what's going on in the product.

18        And so the way the 510K works is that the FDA looks to

19  see, the FDA looks to see whether or not the device that you're

20  selling, that you're proposing, is going to be similar to what

21  is on the market, and they use Spectrum as the comparison

22  device, and then...it's on March 30th that we find -- that we

23  get the documents, and even then, those are just 510K documents,

24  so then what happens is we go through exchanges and

25  meet-and-confers, whatever, to get down to the nitty-gritty, so

1  of course -- that's starting in April, and we had to go through

2  a tremendous amount of effort and time to piece together e-mails

3  to prove what we were saying.

4        Now, we first learned of what we think may be the beta

5  units in June 11, 2021.  June 16, we first learn of the first

6  confirmed sale of the StarGuide.  Now, opposing counsel said

7  we've known about this, this is her word, for months, for many

8  months I think she said, we've known about this, but I'm not

9  sure what she means by that.  I do know that we did not know

10 what was in the machine until we received the documentary

11 discovery which ended June 15th so that our expert could go in

12 and figure out what was what.

13        Now, there's something you should realize about --

14 there's an overlay on this.  There's an overlay on this whole

15 case.

16        The origin of this dispute, if you will, goes back to

17 2009.  It was a non-disclosure agreement in 2009, and that

18 non-disclosure agreement had, I'm going to call it some unusual

19 provisions in it, and in order to understand the timing of this

20 case, it's helpful to be aware of what was in that agreement.

21        That agreement provided, first of all, that there

22 would be parallel development, and that is in paragraph 5.  In

23 other words, GE was getting information from us as part of a due

24 diligence, from Spectrum as part of the due diligence.  It was

25 intense, two hundred people in GE participated at one point, and

Conf.                      Spectrum v. G.E.                     24

```
 1   -- or at least signed non-disclosure agreements, and they

 2   reserved for themselves the right to do parallel, independent,

 3   mind you independent, but parallel, development, so just because

 4   we saw things that we assume came from us, we had no way of

 5   knowing that because it could have been the result of their own

 6   parallel development.

 7            Second of all, in paragraph 7 of the 2009 agreement,

 8   and this is a clause that I've never seen before in their

 9   agreement, GE is allowed to use information it gleans during the

10   due diligence after six years.  I'm going to put it in

11   parentheses, assuming they didn't use it during the six years

12   impermissibly.  So here we are in 2018 and it's hard to know,

13   are they just putting something out there that they saw for the

14   first time?  I'm sorry, that they're doing for the first time in

15   2018?  Twelve -- six years after the end of the due diligence

16   and therefore it's okay?  We couldn't know that.  The only way

17   we could know that was by the documents, and that's why the

18   document pre-discovery in this case is so critical.

19            I'll add because it goes to -- since we're on this

20   agreement, I'll just point out that in response to one of your

21   later questions, there's a question of a bond.  Paragraph 6 of

22   the same agreement provides that there is to be no bond, and I

23   should add parenthetically there that that provision, which is

24   somewhat unusual, but I've seen it before, was the result of

25   negotiations because Spectrum realized that if GE breached the
```

1  agreement, they would never be able to have the funds to put

2  together a bond, so that was a negotiated provision and no bond.

3          Now back to, heh, your question, so it is -- so we are

4  -- what this whole PI is about is the sale, and until we got the

5  documents, we could not know, first of all, whether there was

6  independent development, we couldn't know whether this was

7  because it was after -- when they started.  We don't know -- I

8  mean, we think we know now, we're not sure, but we think we know

9  now as to when they started.  We don't think it was 2018 and we

10 think it was considerably earlier.  So with that as background,

11 the documents became -- and that's why we were asking the

12 magistrate about this, Magistrate Parker about this, can we use

13 these documents in this way for a PI.

14         So I think that the notion that everybody knew about

15 this and whatever, no, it's what was in the machine and the

16 specific confidential information that was used in the machine,

17 and you could only know it by looking at the documents and

18 tracing those documents -- and we'll talk about that later why

19 we need so many pages.  As your Honor knows, it's very, very

20 complicated to prove a fraud, here -- getting -- leaving aside

21 the fraud part of the case, this is like a fraud.  We have to

22 prove or establish what the confidential information is, that we

23 developed it, that we gave it to them, that this guy gave it to

24 this guy, this guy gave it to this guy, this guy put it in the

25 machine and the machine -- the final machine has it.  To do that

1  takes a lot of pages, and I apologize.

2          So that is, I think, my response to the first

3  question, and if I've confused you, will you ask me questions or

4  should I go on?

5          THE COURT:  No, I do have some follow-up because of

6  the -- related to what you've said.  I understand the basic

7  parameters.

8          As I understand it, the -- because of the -- and I'll

9  say this again, based on what you said, because of the vagaries

10 of the NDA that was entered into in 2009 that allowed for both

11 parallel development as well as allows for GE to -- it sounds

12 like -- let me just ask, so the provision about the six years,

13 is that basically -- it sounds like that GE would be permitted

14 to use Spectrum's intellectual property after six years had

15 passed that had been conveyed as part of the NDA process.

16          Is that an accurate statement?

17          MR. GREENBLUM:  Ah, but I must add that that is

18 assuming that they weren't using it impermissibly during the six

19 years.

20          THE COURT:  Understood.  Understood.  And I'm just

21 really referencing it so that I have a better understanding for

22 the argument for the preliminary injunction, so that goes to

23 your argument relating to the delay, but let me ask, what is

24 the, what is the...you know, what is the...irreparable harm.  In

25 other words --

1          MR. GREENBLUM:  Oh, that's the second part.

2          THE COURT:  But, I mean, I guess because the last

3   bullet point is aren't monetary damages sufficient.  You know,

4   that's really -- I'd like to hear from you on that.

5          MR. GREENBLUM:  Okay, I apologize, so that's the

6   second part of the story.  Let me go into that.

7          So Spectrum is a small company today with 120

8   employees.  As a result of investment, it was able to develop

9   its first product.  It's only a two-product company.  It was

10  able to develop its first product, what's called the D-SPECT,

11  that's D, dash, S-P-E-C-T, and began selling that product in

12  2007.  That product is relevant to the discussion because when

13  GE saw the sales that it was losing in the marketplace because

14  of the Spectrum technology, it started its negotiations in 2009

15  to buy the company or buy the technology, whatever, so Spectrum

16  has had a long experience using the technology that it

17  developed.  I would call it an experiential asset that it had

18  and that GE wanted desperately.

19         When GE made an offer to purchase the company, it was

20  not accepted.  GE, we maintain, misappropriated the confidential

21  information and trade secrets, whatever you want to call it, and

22  they did that, and the only way to know that they did that was

23  through documents.  I know because I constantly, constantly, was

24  concerned that this case seemed so lopsided that how on earth

25  could it be, and it wasn't until we got the documents that it

1  was true.

2         Okay, what Spectrum then did was ████████████

3  ████████████████████  the machine in dispute here, and

4  ████████████████████  it's a small company,

5  developing this VERITON technology.  It took them ███████

6  ██████████████████████.  The VERITON went on the

7  market in 2018 and it has been well received and sales are

8  ramping up.

9         Now, I want to be clear, the Spectrum technology at

10 issue here has been characterized by -- from the Defendant's

11 people as revolutionary and the -- there is no other system like

12 it.  There are other SPECT systems, Phillips, Siemens, other

13 companies, but this particular type of imaging system, you know,

14 with the arms that come down and all of that, this particular

15 type of imaging system, there's only one company that has it,

16 Spectrum, and it's been plowing the field that's been showing

17 the marketplace that this is a viable technology and a valuable

18 technology and its sales have been ramping up.

19        Now, it's sort of strange for me to be arguing at this

20 stage details like this, but I guess I'm -- you know, heh, if

21 not now, then when.

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████  What do

1  I mean by that? ████████████████████████████████████

2  ████████████████████████████████████████████████

3  █████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████

8          First of all, customers say "this looks exactly like

9  the GE product" or "the GE product looks exactly like you, what

10 gives, what gives." ███████████████████████████████

11 ████████████   What gives.  The two companies are therefore, as

12 Ms. Butler said, in head-to-head competition, and these tenders,

13 tenders cost -- I don't think we're giving anything away that's

14 super confidential here, ███████████, plus over the years of

15 service about the same amount.

16        ██████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████

19 ████████████████████████████████████████

20 █████████████████████████████████  If we wait until

21 summary judgment, which Ms. Butler now says is at the end of the

22 case, ██████████████████████████████████████

23 █████████████████████████████████████████

24 ██████████████████████████████████████████████████

25 ████████████████████████████████████████

Conf.                        Spectrum v. G.E.

1              The entry of GE into the marketplace with a look-alike

2    product is resulting in tremendous market uncertainty.  People

3    are asking what's going on.  I mean, it -- I've been in this

4    industry a long time.  It's very, very unusual to have two

5    products that are so unique and unusual and look exactly -- or

6    almost exactly the same and functionally be almost exactly the

7    same.  Oh, yes, there are some differences, but almost exactly

8    the same.

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ███████████████████████████████████████████████

13   █████████████████████████████████████████████████████████

14   ████████████████████████████████████  Customers are

15   saying "who really did invent this."  ████████████████████

16   █████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████████

18   ███████████████████████████

19             These systems when they are installed, the installed

20   base lasts seven to twelve years.  During that time, customers

21   that buy other equipment, other SPECT equipment, are likely to

22   buy from the same company because they want -- they don't want

23   to have, you know, numerous types of equipment for their

24   technicians, they want to have one type of equipment if they

25   can, so every sale that's lost now has the potential to make

Conf.                    Spectrum v. G.E.

1  that customer off limits for seven to twelve years. ████████

2  ███████████████████████████████████████████████████████████

3  ████████████████████████

4             THE COURT:  Let me, let me ask on that last point,

5  what, you know, what is that -- and to the extent you -- what is

6  that, what is that based on?

7             In other words, as I understand it, Spectrum has been

8  selling its VERITON product, as you indicated, since 2018, so

9  assuming that there are a certain number of sales that have been

10 done, from your comments, those entities are, you know, there's

11 a seven-to-twelve year time frame when presumably, based upon

12 your comments, the -- those purchasers would be looking to

13 Spectrum during that time frame.

14            So are you referring to sort of the future sales to

15 new customers?  Is that, is that what you're referring to? ████████

16 ████████████████████████████████████████████████████████████

17 ████████████████

18            MR. GREENBLUM:  Yes.  Yes.

19            THE COURT:  Okay.  So --

20            MR. GREENBLUM:  And when -- I'm sorry.

21            THE COURT:  I'm sorry, no, go ahead.

22            MR. GREENBLUM:  So what is a little bit unusual here

23 and a little bit difficult is that, in effect, I'm trying to

24 argue a motion, heh, which is 60 pages...

25            THE COURT:  Yeah.

1         MR. GREENBLUM:  Here in front of you now and you're

2 saying is this really true, and I'm basing it upon information

3 that we've gotten and that is in, that is in the brief, but if I

4 don't get to file the brief, you don't get to know this, so --

5         THE COURT:  Let's -- so let's -- let me -- so I'll

6 accept the, the, the comments you made and that you anticipate

7 that the argument would be that, in essence, at least as far as

8 I'm hearing it, ███████████████████████████████████████████████

9 ████████████████████████████████████████████

10    ████████████████████████████████████

11    ███████████████████████████████████████████████████

12 ████████████████████

13         Now, are you saying, and let me ask just a...are you

14 saying, allowed to sell its product, are you limiting -- are you

15 saying allowed to sell its product full stop?  In other words,

16 anywhere in the world?  Or are you saying --

17         MR. GREENBLUM:  Yes.  Yes.  Yes.  The way these

18 markets distribute, it's generally a third in the U.S., a third

19 in Europe, and a third in Asia, and, yes, all of the sales, all

20 of the sales, are subject to the same issue.

21         THE COURT:  Okay.  All right.  Let me just see if

22 there's any questions related to number one.

23         MR. GREENBLUM:  I'm not finished yet, but...

24         THE COURT:  Okay, well, why don't you --

25         MR. GREENBLUM:  ███████████████████████████████████████

Conf.                        Spectrum v. G.E.                    33

1   ██████████████████████

2          THE COURT:  Okay, why don't you continue.

3          MR. GREENBLUM:  Okay.

4          The whole idea of market momentum, the first-mover

5   advantage, is going to be lost.  I mean, we could expect that if

6   GE respected the agreement, they would come out with a

7   look-alike product, ██████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ██████████████████████████████

12         THE COURT:  Okay.

13         With regard to the second question that relates to the

14  *Goat Fashion* case that you cited, cited in the letter, is that

15  something, Mr. Greenblum, you're going to be addressing, or is

16  that something that Mr. Miller is going to address?

17         MR. GREENBLUM:  No, I'm going to be addressing all the

18  questions.

19         THE COURT:  Okay.  All right.

20         MR. GREENBLUM:  Okay, your second question -- hold on

21  a second...so this is the issue of delay.  Is that correct, your

22  Honor?  That's what you were driving at?

23         And you asked whether there were any settlement

24  discussions?  There were not.  But I have told you already the

25  reasons for the delay.  We could not do it until we had the

Conf.                    Spectrum v. G.E.                         34

1  documentary evidence and until the FDA approved.  It couldn't be

2  done.  It's as simple as that.  Judge Parker noted it and we

3  stand by it.  It could not be done.

4          The fact that we suspected it, we would have gotten --

5  heh, we would have gotten blown out.  We don't know anything.

6  We don't know what's in there.  We had to know what was in the

7  device and the only way we could know what was in the device is

8  when we got these documents, and even then, I should tell you,

9  we had to then match them up with what we saw in the 510K to be

10 sure that it's in the device.  Because we're going after the

11 device.  This is not about what they did with the trade secrets

12 along the way internally and all of that.

13         You've asked for cases.  Frankly, I've thought a lot

14 about it.  We have cases here where the courts take into account

15 investigation as to -- as a factor in, in a...in evaluating

16 delay and so let me just go --  if you would like to hear the

17 cases that we're aware of, I will tell them to you.

18         First of all, there is *Sanofi v. Apotex,* which is an

19 NDA case, a drug case, where they were accused of waiting until

20 there was FDA approval, and that's in a different context, the

21 ANDA context and the court said no approval, no delay.

22         Let me see here...the *Fisher-Price* case, that's

23 *Fisher-Price v. Well-Made Toy.*  If you want the cite, I can give

24 it to you, 25 F.3d 119.  And in that case, the Court looked to

25 two factors in deciding whether the delay was reasonable and

1  they looked to, one, the investigation that was necessary and,

2  two, the fact that there was some inklings beforehand.  The

3  question was when did this become imminent, when was the harm

4  imminent, and at that point, the Court says you take into

5  account the severity of the change of circumstance, and that's

6  what happened here.

7          Let's see here...

8          (Brief pause)

9          MR. GREENBLUM:  I have others.

10         THE COURT:  Well, why don't we -- because I think I

11 understand a little bit better the nature of the claim and the

12 cases that you cited, or will cite I should say, why don't we

13 move on to...the next question.  I think you -- at least my --

14 let me say what my understanding is.

15         Your argument, I take it, in essence, is that it

16 wasn't until you had gotten a certain amount of document

17 discovery, including the FDA-type materials, until you were able

18 to, as I think you put it, see what's inside the StarGuide

19 product, that that...well, let me ask, I mean, I guess there's a

20 difference between potential infringement and the issue we're

21 talking about here, which is a preliminary injunction, but let

22 me ask this.

23         So when does Spectrum allege it first became -- first

24 learned about the StarGuide and its potential infringement?

25         MR. GREENBLUM:  Well, the only time -- remember what I

1  said earlier on, which is the 2009 NDA puts a big question mark

2  over everything, which is we didn't know whether this was the

3  result of independent development, if this was a result of the

4  six years, having sunset, the sunset provision, we didn't know

5  that until we got the documents.  Those documents came to us in

6  the March, April, May time frame, at late as June, and it was

7  during that period that going through these documents and

8  connecting the dots that we realized this is really bad.  This

9  is really as bad as it seems.

10         I mean, we could have come in here earlier, your

11  Honor, and we could have found out that, no, they, they designed

12  around us.  I don't know that that would be permissible, but in

13  any event, they designed around us.  We couldn't know.  We

14  couldn't know what they -- what of our information they were

15  using.  It's as simple as that, we couldn't know.

16         THE COURT:  Okay.  I think I've an understanding based

17  on your prior answers of what your answer would be to question

18  4.

19         Is there anything that you would add -- so the comment

20  is what would provide justification for the argument that

21  Spectrum could not have brought the instant motion for

22  preliminary injunction until after GE came to market with the

23  StarGuide, which Spectrum understands to be in June of 2021.

24         I take it that you -- I heard you mention previously

25  that explanation.  Do you have anything to add to that?

1          MR. GREENBLUM:  No.

2          THE COURT:  Okay.

3          Well, what would be your response to question 5, which

4   is why isn't this the preliminary injunction and then run the

5   round of motion for summary judgment or what would occur at a

6   bench trial.

7          MR. GREENBLUM:  I've had trouble with -- heh, heh, I

8   had trouble with the question.  I view this as they come to

9   market, they're hurting our clients badly in the marketplace,

10  and I have an obligation to ask the Court to intercede now.

11         Now, the fact that it's complicated, that there's a

12  lot of pages doesn't convert this into anything, this is a need

13  for immediate relief, and I realize that it doesn't fall at a

14  great time, but that's the way it is.  Those are the facts.  And

15  --

16         THE COURT:  I'm sorry.

17         MR. GREENBLUM:  Go ahead.

18         THE COURT:  No, finish your thought.

19         MR. GREENBLUM:  Okay.

20         You know, look, I could go into the fact that the

21  standard for preliminary injunction is different than summary

22  judgment, that it's a more liberal standard, et cetera, et

23  cetera, but none of that dictated what we're doing.  None of it.

24  The only thing that dictates what we're doing is is that the

25  ████████████████████████████████████████████████████

1        ██████████████████████████    That's the problem.

2              THE COURT:  So let me --

3              MR. GREENBLUM:  Yeah.

4              THE COURT:  -- ask this with regard to, you have a --

5    if I were to allow the filing of this motion, is there a -- I

6    asked a similar question of Ms. Butler, what is your -- what

7    would the schedule look like?

8              In light of everything that we -- that is going on

9    right now, the discovery, the Markman hearing, you know...by

10   discovery, I mean the depositions, both, you know, the initial

11   depositions of fact witnesses as well as subsequent deposition

12   of experts, where would this motion -- what would the schedule

13   look like from, from the Plaintiff's perspective?

14             MR. GREENBLUM:  I would -- first of all, the single

15   most important thing to me and to my client is that their place

16   in the market be preserved.  We're talking here about

17   potentially a year to the end of discovery, to the end of -- to

18   preparation for trial and whatever after that, and so we're

19   talking here about a year-and-a-half, and during that

20   year-and-a-half GE is not going to lose much, they are not going

21   lose -- well, ██████████████████████████ you know, maybe

22   -- heh, heh, maybe I'm wrong on that, but that's a lot.  I

23   should tell you ██████████████████████.  And the -- well,

24   we think they did.

25             The -- I, I have to leave this to the discretion of

```
 1  the Court.  I understand that there's a lot of things going on,
 2  but ████████████████████████████████████████████████████████
 3  ███████  You know, the facts are the facts, we didn't time it this
 4  way, this is the way it happened, so maybe I'm putting you now
 5  -- now, I will say that at the end of this, the person who's
 6  handling the page-limit issue is Danielle Pfifferling in the
 7  firm and I believe she does have a comment on this issue, but
 8  I'll just say to you, your Honor, the facts are the facts the
 9  way they fell out, not the way that the schedule reads or
10  anything like that.
11          THE COURT:  Okay, let me ask this, then, a follow-up
12  question.  With regard to the individuals that you intend to --
13  I can't remember, I think it was -- was it four?  Declarations
14  that you were seeking?
15          MR. GREENBLUM:  I think that --
16          THE COURT:  So there are four affidavits that you were
17  seeking to file and obviously at additional pages for the brief,
18  and those affidavits, are those the individuals that -- and I
19  apologize, I know there were some names that were mentioned, but
20  are those the individuals that -- from whom you intend to get
21  affidavits, are they individuals who are part of the deposition
22  schedule, either fact witnesses or experts?
23          MR. GREENBLUM:  Well, the Court has -- we only have, I
24  think, five witnesses all together, it's a small company, so
25  it's my understanding, subject to somebody from my team jumping
```

1  in, that we're going to be doing these depositions September,

2  October, and our guys should be finished by then.

3          THE COURT:  Well, I guess my question goes to the

4  following; in terms of the timing of the filing of this motion,

5  was it your intention to try and file it before the individuals

6  are deposed or, or -- I'm just trying to figure out in the

7  end...

8          MR. GREENBLUM:  Okay.

9          THE COURT:  And, again, I haven't made a decision with

10 regard to this, how it would work within the schedule that is

11 currently -- we currently have and/or so that we wouldn't have,

12 as Ms. Butler mentioned, two rounds of potential depositions, if

13 --

14         MR. GREENBLUM:  No.  No -- I'm sorry, I cut you off.

15         THE COURT:  No, go ahead, if you have a thought on

16 that...

17         MR. GREENBLUM:  No, I just -- there was no

18 gamesmanship at all on this.  We expect to be able to file this

19 within a week, at the most two weeks, so that would be before

20 these depositions occur, so they can, they can depose these

21 people on this all they want.

22         THE COURT:  But I guess -- heh, heh, but then wouldn't

23 there -- in other words, are you saying you file -- so you

24 basically have it locked and loaded, in other words, you already

25 have the gun preparing the papers and then --

1            MR. GREENBLUM:  Yeah.

2            THE COURT:  And so -- let me just finish my thought

3  and then I'll, I'll hear from you.

4            So you would file the motion and is it the idea that

5  the individuals would then be deposed both in terms of their,

6  their affidavits that they filed, as well as deposed about

7  anything else, and I'm not sure what else there would

8  necessarily be, but any other information at that time?

9            In other words, it would be a combined deposition

10 related to the -- your preliminary injunction motion and the

11 deposition related to the case as a general matter.

12           Is that what you were positioning?

13           MR. GREENBLUM:  I think so, yeah.

14           THE COURT:  Okay.  Okay.  I think I know the -- I

15 mean, I was basically -- we were talking around question,

16 question 6 and I think I have an understanding of what your

17 arguments would be, and, again, I guess what I would say is

18 there are many things that are done in cases that by necessity

19 aren't particularly efficient and that I would...add -- and

20 sometimes that's just the way it is.

21           But let me, let me ask, is there anything -- I mean,

22 is there anything you want to say about...the bond issue, I

23 think, you've addressed.  Anything you want to say about the

24 last question, which is the technology tutorial, and I think I

25 know the answer, but I'll allow you to answer the question if

1  you want to.

2          MR. GREENBLUM:  Your Honor, if you know the answer, I

3  would hope you would give it to me because I was going to say I

4  didn't really understand the question.  I didn't think there was

5  any connection at all.  I, I...

6          THE COURT:  Well, then, that's the answer.  And then

7  again -- I mean, from your perspective, again, the...all right.

8          So let me ask, Mr. Greenblum, concerning whether there

9  are additional points that you'd like to make relating to this,

10  relating to this issue, anything that you haven't addressed that

11  you want to emphasize to me at this point.

12          MR. GREENBLUM:  Well, is this the point to address

13  what opposing counsel said or is it not appropriate at this

14  point?

15          THE COURT:  Yes, you can do that now.  Yes.

16          MR. GREENBLUM:  Okay, so --

17          THE COURT:  I've already --

18          MR. GREENBLUM:  Okay, your question 1, as I saw it,

19  had four parts to it and I didn't hear an answer to any of the

20  four parts other than that the authority you have is your

21  inherent authority.  After that, are you arguing that harm is

22  not imminent, didn't hear it.  Are you arguing that there's no

23  irreparable harm, didn't hear it.  Are you arguing that I should

24  be prevented from even submitting a preliminary injunction, I

25  guess they are saying that.  Don't let 'em do it, but I would

```
 1  say, your Honor, if -- I think the details that I've given you
 2  is the type of detail that you shouldn't have to believe me, you
 3  should believe the documents and the testimony and the
 4  affidavits, and I would say the same here for opposing counsel.
 5  In other words, you have the inherent authority because you're
 6  the judge to do anything you want, but it seems to me that that
 7  question has not been answered.
 8            Let's see if there was any -- at least three of the
 9  four parts were not answered.
10            And basically I think that my final point is that you
11  are, you are being asked here to prejudge a filing without
12  seeing the filing.  In other words, I think that today I've
13  made -- I hope that I have made a serious case for why this is
14  something that should be briefed and considered by your Honor,
15  to use your discretion to do so, I realize it's solely your
16  discretion, but ███████████████████████████████████████
17            That's it.
18            THE COURT:  Okay.  All right, thank you.  Now, let me
19  turn back to Ms. Butler.
20            You can obviously respond to things that Mr. Greenblum
21  has said, but I'll also allow you to, you know, say -- put any
22  -- emphasize anything that you'd like to with regard to your
23  position with regard to the application being made by Spectrum,
24  putting aside not directly the page numbers, that your principal
25  concern is the motion itself.
```

1          Go ahead.

2          MS. BUTLER:  Yes, your Honor.  Thank you.

3          So Mr. Greenblum started out his argument saying that

4    GE was, ████████████████████████

5          Your Honor, Spectrum knew the sales were coming.  They

6    saw the device at a hospital in Israel in June 2018, over three

7    years ago.  They absolutely know that the only reason that that

8    device was there was because it was being investigated as part

9    of the further development so that it could be put on the market

10   for sale.  Spectrum has been competing against GE, with this

11   device, for many months in Europe.

12         Mr. Greenblum raised this issue of FDA approval, so,

13   first of all, he acknowledged that approval was March 29th and

14   they learned then that it was approved and here we are still

15   many months later, but, your Honor, that issue of FDA approval

16   was really a red herring.  FDA approval only relates to sales in

17   the United States.  As I noted, Spectrum has been competing with

18   GE for many months in Europe with this device, so the damage to

19   which Mr. Greenblum points, ████████████████████████████

20   ███████████████████████████, is a direct result of

21   Spectrum's delay in seeking to bring this motion.

22         Mr. Greenblum contends that I didn't answer the

23   questions enumerated under number one about irreparable harm and

24   whether it's imminent.  Your Honor, the issue of delay goes

25   directly to the issues of irreparable harm and whether that

Conf.                    Spectrum v. G.E.                    45

 1  alleged harm is imminent.

 2          The delay here has been extensive, three years, more

 3  than three years, since they learned about this device, knowing

 4  that it was being sold, knowing that it was going to compete

 5  with Spectrum's VERITON device.  That delay cancels out any

 6  argument of irreparable harm and that irreparable harm is

 7  certainly not imminent.

 8          Mr. Greenblum's main argument is that Spectrum needed

 9  to wait to see the documents that were produced in this case.

10          Spectrum filed an 88-page complaint in December of

11  2018, 137-page amended complaint a few months later, alleging

12  that GE was -- had misappropriated seventeen trade secrets and

13  specifically alleged that these seventeen trade secrets were in

14  the device, were being used by GE in the device that Spectrum

15  has known about since June of 2018.  If they knew enough to

16  allege in a complaint, under Rule 11, that this device that

17  they've known about for three years was using its trade secrets,

18  they knew enough to file for preliminary injunction at that

19  time.  They certainly knew enough to allege that they had a

20  right to it.

21          Your Honor, the way I understand preliminary

22  injunction motions work, the way they have been done in my

23  experience is there is briefing, but then there's some degree of

24  discovery, document discovery and depositions, that are

25  conducted on an expedited basis at the beginning of the case,

1  and then there's an evidentiary hearing so that the Court can

2  make a decision about whether or not this relief should be

3  granted at the beginning of the case rather than after discovery

4  has proceeded to conclusion.

5          Your Honor, if parties had to wait until discovery was

6  complete in cases before they could file a motion for

7  preliminary injunction, the result would be absurd.  You'd have

8  parties that would be completing discovery and filing motions

9  for preliminary discovery at the same time or shortly before

10 motions for summary judgment are to be filed.  That's not how

11 preliminary injunctions work.  If Spectrum knew enough to allege

12 in its initial complaint and in its amended complaint that GE's

13 StarGuide device included its seventeen trade secrets, it should

14 have moved for preliminary injunction then because Spectrum knew

15 that this device would be on the market and they knew that it

16 would be competing with their own VERITON device.

17         While Mr. Greenblum cites the fact that ███████████

18 ███████████████████, that could have been prevented if

19 Spectrum had filed a motion for preliminary injunction at the

20 beginning of the case when motions for preliminary injunction

21 should be filed and if they had been successful in filing such a

22 motion.  The delay is the reason for the harm that Mr. Greenblum

23 points to right now.

24         I'll also note that in their complaint, Spectrum

25 claims lost profit.  This goes to the issue -- and I won't

1  belabor it, but this goes to the issue of whether or not money

2  damages are sufficient.  This case is no different than any

3  other case when you've got two different -- when you've got,

4  well, at least two, competing products on the market and one

5  party is arguing lost profit.  That's exactly what Spectrum is

6  arguing here.  There's no indication that this case is any

7  different from any other competitor case such that money damages

8  would not be appropriate.

9       And just to clear up a couple of things that -- from

10 Mr. Greenblum's discussion, so you asked if the witnesses for

11 whom Spectrum intends to submit affidavits are also on the

12 discovery schedule, on the deposition schedule, in this case,

13 and the answer is yes.

14      So Spectrum has indicated there are two employees, one

15 is Nathaniel Roth and another is Spectrum's CEO, (inaudible).

16 Both of them are slated to be deposed in this case.  The other

17 two affidavits that Spectrum has indicated they wanted to file

18 here are from their technical expert and their damages expert,

19 who will, of course, be deposed in this case.  And that is why,

20 your Honor, to the extent Spectrum is allowed to file this

21 motion now -- and, as you noted, locked and loaded, right?  So

22 they can drop this motion, 200 pages worth of briefing, on GE at

23 this stage in the case, rather than have GE respond to that

24 motion now should Spectrum be allowed to file it -- GE should be

25 permitted to wait until the depositions of these affiants are

1 taken in the course of the schedule that is already in place in

2 this case, then GE can respond to the motion, and to the extent

3 that there's an evidentiary hearing that your Honor desires,

4 that evidentiary hearing should take place at the same time as

5 any hearing on the parties' respective motions for summary

6 judgment.

7          So, you know, just to wrap it up, your Honor, Spectrum

8 knew since June of 2019 that GE had a competing device that was

9 about to hit the market.  They've been competing against GE for

10 this device for many months in Europe, and here they are now,

11 right before depositions are getting ready to start, the busiest

12 time in this case, before the Markman hearing, ready to drop a

13 200-page locked-and-loaded motion for preliminary injunction on

14 GE.  It would disrupt the case, it would disrupt the case

15 schedule, and GE should not have to respond to it at this time.

16          THE COURT:  Okay, thank you.

17          Let me ask, Mr. Greenblum, do you have anything else,

18 denials to add?

19          MR. GREENBLUM:  Yes, only that at the end of each

20 presentation by opposing counsel, the word is "let's put it

21 together with summary judgment" and "let's have summary judgment

22 at the end of the case," so you have two opposing views here.

23 Let's not do this at all until the end of the case or let's do

24 it now when -- 'now' in quotes, when the real need for it is.

25          The initial complaint was done based upon information

Conf.                        Spectrum v. G.E.                        49

1   and belief, but there is no way, there is no way with what we

2   knew in 2018 that we would have been entitled to a preliminary

3   injunction for the reasons I mentioned, the non-disclosure

4   agreement that said they could do it after six years, we didn't

5   know, so it was really when we get the documents that, that much

6   of what was said, in fact, almost all of what was said, in the

7   complaint was confirmed, and much, much more.

8            The lost profits, I can't imagine anybody filing a

9   complaint that wouldn't ask for lost profits in addition to an

10  injunction, I can't imagine it, and then I guess I want to

11  conclude with the following.

12           Your Honor, you've gotta take everything --

13  respectfully, you've gotta take everything into account, and we

14  have here a case where I think when you see the briefing, the

15  facts are uncontrovertible.  Once we got the documents, we knew

16  what they were doing and it is as bad as we thought.  And I

17  think that you have to take everything into account, you know,

18  all of the case law and balancing and all of this, you've gotta

19  take into account how serious what was done here is as part of

20  your consideration.

21           That's all I have to say.

22           THE COURT:  All right.

23           MS. BUTLER:  Your Honor, if I could make one more

24  point?  Is that okay?

25           (Brief interruption)

```
 1            THE LAW CLERK:  This is Judge Broderick's clerk, he
 2  sometimes will lose service and then dial right back in, so
 3  maybe if everyone could just...stay right where they are for the
 4  moment and I imagine he'll dial back in soon.  If I hear from
 5  him otherwise, I'll inform the parties.
 6            MS. BUTLER:  Thank you.
 7            (Brief pause)
 8            THE COURT:  Hi, Judge Broderick.  I apologize, I got
 9  dropped from the call.
10            Let me just confirm, Ms. Butler, are you on?
11            MS. BUTLER:  I am, your Honor.
12            THE COURT:  Okay.  And Mr. Greenblum, are you on?
13            MR. GREENBLUM:  Yes, your Honor.
14            THE COURT:  And Mr. Miller, are you still on also?
15            MR. MILLER:  I am, your Honor.
16            THE COURT:  And do we still have the court reporter?
17            THE COURT REPORTER:  We do.
18            THE COURT:  Okay.  All right.
19            So if we could -- Ms. Butler, you were just about to
20  say something when my phone decided it was time to leave the
21  call, so let me hear from you, what were you going to say.
22            MS. BUTLER:  Thank you, Your Honor, just two quick
23  points.
24            To this issue of whether or not Spectrum needed
25  documents in this case to establish that their trade secrets had
```

1  supposably been misappropriated, setting aside the issue that

2  that's not how, in my understanding, how motions for preliminary

3  injunction work, that you don't wait until you get all the

4  discovery in a case to file a motion for preliminary injunction,

5  setting that aside, and I won't get into the details because I

6  know this is an open record, but Spectrum's very first trade

7  secret, their Trade Secret A, has everything to do with what can

8  be seen on a device visually by just looking at the device, and

9  if your Honor were to look at the amended complaint, you'll see

10  how they described Trade Secret A and the picture of the GE

11  device which they say misappropriates Trade Secret A, there were

12  no documents that were necessary for Spectrum to know what GE's

13  device looked like, so this idea that they needed all of the

14  documents to confirm misappropriation is just not true and it's

15  not, it's not based in fact.

16         The last point, your Honor, is that, you know, GE does

17  believe that if this motion is filed that we should not have to

18  respond to it until after discovery is otherwise complete, but

19  if your Honor would be inclined to allow Spectrum to file this

20  motion and to have GE respond relatively quickly, then what we

21  would ask for would be a delay in the schedule of the case, to

22  hold off on the fifteen-plus depositions that are supposed to

23  take place over the next couple of months, so that GE can take

24  this 200-page filing and actually be in a position to respond

25  substantively to it.

```
 1              THE COURT:  Okay.

 2              Let me, let me just get, Mr. Greenblum, your response

 3  to the latter, the last comment made by GE's counsel, in other

 4  words, with regard to pausing the schedule with regard to the

 5  depositions while there's briefing and I guess discovery,

 6  perhaps discovery also related to the PI application is done.

 7              Do you have any thoughts with regard to that, Mr.

 8  Greenblum?

 9              MR. GREENBLUM:  Only to the extent that it's a bit

10  one-sided, but I, I understand the need to postpone certain

11  depositions.  I would ask that rather than fifteen, that we get

12  the opportunity to depose the same number of deponents as GE

13  does on I'll call it a mini-deposition schedule, and then go to

14  -- and then they can respond.  That makes sense to me.

15              THE COURT:  All right.

16              Well, this is what I intend to do.  I'm going to

17  digest what everyone has said today, so initially I thought

18  about operating on two, two tracks, in other words, having you

19  meet and confer concerning a potential schedule so that I could

20  see what that would look like, but rather than do that, I'm

21  going to deal with the issue in short order.

22              I'm going to take it under advisement now of the

23  application both in terms of the page-number request, but in

24  terms of the filing of the motion at all, understanding that

25  I've only had oral argument based upon the letters that have
```

1  been submitted, I'll provide you with my decision related to

2  that early, early next week, and at that point, depending upon

3  which way it goes, I will provide instructions in my, in my

4  order concerning the next steps that the parties wish to take.

5          I think, I think it makes sense to do it this way so

6  that it gives me some time to think over what everyone has said

7  today, as well as -- and then provide the parties with their

8  marching orders.

9          Does that, does that make sense from your perspective,

10  Mr. Miller and Mr. Greenblum?

11          MR. GREENBLUM:  Yes, it does, your Honor.

12          THE COURT:  All right.

13          And Ms. Butler?

14          MS. BUTLER:  Yes, your Honor.

15          THE COURT:  And so -- and by early next week, I'm

16  talking about, you know, by Tuesday, so that there won't be any

17  substantial delay in whatever the parties want to do, whatever

18  the party -- I direct the parties the next step should be.

19          Thank you very much for jumping on the phone and

20  responding to my questions, understanding, even though it was, I

21  know, only submitted yesterday, I appreciate it.

22          Is there anything else that we need to deal with today

23  from the Plaintiff's perspective?

24          MS. PFIFFERLING:  Yes, your Honor, yes, your Honor.

25  This is Danielle Pfifferling on behalf of Plaintiff Spectrum,

1  just one topic just for full disclosure regarding the PI memo

2  and affidavits if we are allowed to file that.

3           Just for full disclosure, I believe that your, your

4  local civil rules do allow for the brief and up to five

5  affidavits with page limits on those, and in our letter dated

6  July 20th, we did not mention a fifth affidavit, which we intend

7  to file with our PI brief if we're allowed, and that affidavit

8  is ten pages, it's within your limits, and so that's why the

9  affidavit was not mentioned in our letter dated July 20th, so we

10 just wanted to let you know about that before the closure.

11          THE COURT:  All right.

12          MS. PFIFFERLING:  So just in totality, it would be

13 five affidavits total, with the one that was not mentioned and

14 that was ten pages.

15          THE COURT:  Okay, and is that -- the individual that

16 wasn't mentioned in the letter, is that person also someone who

17 is subject to be deposed in September or October?

18          MS. PFIFFERLING:  Yes.

19          THE COURT:  Okay.

20          MR. GREENBLUM:  And, Judge, just one formality, in the

21 event -- to the extent that you permit us to file the brief,

22 there's, there's the issue of redaction and all of that, and I

23 believe that the procedure that's set forth is that we go back

24 to the other side and we negotiate the redactions with them, can

25 we ask that we be permitted to submit it under seal and then

1  deal with the redactions?  As we have with the other side

2  consistently throughout the case.

3          THE COURT:  I would say -- I mean, again, are you

4  saying -- I mean, here's the, here's the...the issue.

5          Are you saying, Mr. Greenblum, that you would file the

6  papers entirely under seal or are you saying that you'd file it

7  consistent with what you've done in the past and that there

8  would be redactions and then you would -- I, I guess I'm not

9  sure exactly what, what you're proposing.

10         MR. GREENBLUM:  I think, your Honor, that given the

11 fact that so much of the brief, so much of the brief, is going

12 to be redacted, I think eighty-five percent of it is what we

13 estimated, that it almost...it, it, it's sort of like an empty

14 exercise to now negotiate with the other side about, about this.

15         We haven't had difficulties in the past, the parties

16 have been understanding of one another in this regard, and I

17 would suggest that here it would be most efficient if we could

18 just file it and then deal with the other side on that.

19         THE COURT:  Okay.  All right.  What I would say is the

20 following.

21         I would like to think about that.  I don't anticipate

22 taking a different course than has already been taken in, in

23 this case already, but I will -- to the extent I allow the

24 motion to go forward, I'll indicate in my order of next week my

25 position with regard to redaction.

Conf.                           Spectrum v. G.E.                          56

```
 1              MR. GREENBLUM:  Thank you, Your Honor.

 2              THE COURT:  And that way, the parties will have it in

 3    front of them.

 4              Okay, all right, well, thank you, everyone, for

 5    getting on the phone and responding to my questions.  We'll

 6    stand adjourned.  Please everyone stay safe.

 7              Certified to be a true and accurate transcript.

 8                          [signature: Tabitha Dente]

 9              _____

10                     TABITHA DENTE, SR. COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```