**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SPECTRUM DYNAMICS MEDICAL
LIMITED,

                              Plaintiff,

            v.

GENERAL ELECTRIC COMPANY, GE
HEALTHCARE, INC., GE MEDICAL
SYSTEMS ISRAEL LTD., JEAN-PAUL
BOUHNIK, SERGIO STEINFELD, ARIE
ESCHO and NATHAN HERMONY

                              Defendants.

Case No.: 18-cv-11386 (VSB)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................... 1

II.     PLAINTIFF'S INEXCUSABLE DELAY IN BRINGING ITS MOTION ...................... 3

III.    FACTUAL BACKGROUND .................................................................................. 5

    A.    The 2009 NDA ............................................................................................. 5

        1.    Plaintiff Is Not a Party to the 2009 NDA ........................................ 5

        2.    Information in the Public Domain or Independently Developed by GE Is Not Protected Under The 2009 NDA ........................................ 7

    B.    Spectrum's Alleged Confidential Information Was Conceived and Publicly Disclosed by GE and Others Before the Due Diligence ......................... 8

        1.    The Moore et al. Publication ............................................................ 8

        2.    GE's '597 Patent .............................................................................. 9

        3.    The DeVito Patent ........................................................................... 12

        4.    Siemens' US 2005/0017182 ........................................................... 15

    C.    GE Was Already Investigating a General Purpose System, Based on GE's '597 Patent, with ███████████████ Before September 2009 ........................... 16

    D.    Before January 2012, GE Had Independently Developed the Idea of Using ████████ ████████████████████████████████████ ........................................................... 17

    E.    Spectrum's Alleged Confidential Information Included Known Features of Its Already-On-The-Market D-SPECT Machine ........................................ 19

    F.    Throughout the Due Diligence, Spectrum Placed Its Alleged Confidential Information Related to its ███████████ into the Public Domain ......................... 20

        1.    Spectrum's '685 Patent Application Disclosed Spectrum's ███████ 20

        2.    In 2011, Nathaniel Roth Published an Article Disclosing Spectrum's Efforts to Optimize the ██████████ for Brain Scans ........................................... 22

        3.    Spectrum's ███████████████████ Were Publicly Disclosed in 2012 and Are Not Used in StarGuide ................................................................. 24

        4.    Spectrum's '721 PCT Application Published in November 2013, Making the Details of its ██████████ Public ............................................. 26

    G.    GE Independently Invented the ████████████████████████ ........................... 28

    H.    GE Independently Selected the Use of ██████████████ ........................... 32

    I.    Spectrum's Claims Regarding Simulations Are False .......................................... 34

IV.    ARGUMENT ........................................................................................................ 36

    A.    Legal Standard ........................................................................................... 36

    B.    Plaintiff Is Not Likely to Succeed on the Merits ........................................ 39

        1.    Plaintiff does not have standing to maintain a claim for breach of the 2009 NDA. ........................................................................................... 39

2.      Plaintiff cannot establish that GE breached the 2009 NDA. ................... 41

C.     Plaintiff cannot establish irreparable harm .......................................................... 46

1.      Plaintiff's delay in filing its motion shows that Plaintiff is not suffering, and will not suffer, irreparable harm. ....................................................... 47

2.      Plaintiff has failed to make any showing – let along a strong showing – of irreparable harm. ......................................................................... 47

    a.     Loss of advantage of being the pioneer ........................................ 47

    b.     Loss of sales ............................................................................ 48

    c.     Price erosion ............................................................................ 49

    d.     Loss of market share ................................................................ 50

    e.     Loss of goodwill and reputation ................................................. 51

    f.     Threat of █████████ ............................................................. 53

    g.     Loss of competitive advantage .................................................. 54

D.     The balance of equities disfavors an injunction ................................................. 55

E.     The public interest would be harmed by entry of an injunction ........................... 57

V.    CONCLUSION .................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU v. Clapper*,
  804 F.3d 617 (2d Cir. 2015)....................................................................................37

*Alzal Corp. v. I.F.C. Int'l Freight Corp.*,
  No. 13-CV-2577 (PKC) (JO), 2015 WL 1298585 (E.D.N.Y. Mar. 23, 2015) .......................40

*Am. Cyanamid Co. v. U.S. Surgical Corp.*,
  833 F. Supp. 92 (D. Conn. 1992)..........................................................................55, 56

*Ass'n of Jewish Camp Operators v. Cuomo*,
  470 F. Supp. 3d 197 (N.D.N.Y. 2020).......................................................................38

*Aviles v. De Blasio*,
  No. 20 Civ. 9829 (PGG), 2021 WL 796033 (S.D.N.Y. Mar. 2, 2021)...................................39

*Caldwell Mfg. Co. N. Am., LLC v. Amesbury Group, Inc.*,
  No. 11-CV-6183T, 2011 WL 3555833 (W.D.N.Y. Aug. 11, 2011)..................................48, 50

*City of New York v. Mickalis Pawn Shop, LLC*,
  645 F.3d 114 (2d Cir. 2011)....................................................................................41

*CollaGenex Pharms., Inc. v. IVAX Corp.*,
  375 F. Supp. 2d 120 (E.D.N.Y. 2005) ..................................................................49, 57

*Convergen Energy LLC v. Brooks*,
  No. 20-cv-3746 (LJL), 2020 WL 5549039 (S.D.N.Y. Sept. 16, 2020) .................................36

*Demirayak v. City of N.Y.*,
  746 F. App'x 49 (2d Cir. 2018) ..........................................................................37, 38

*Dzhabrailov v. Decker*,
  No. 20-cv-3118 (PMH), 2020 WL 2731966 (S.D.N.Y. May 26, 2020)..................................38

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)..............................................................................................37

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  762 F. Supp. 480 (D. Conn. 1991)........................................................................39, 58

*Harper v. Cuomo*,
  No. 9:21-CV-0019 (LEK/ML), 2021 WL 1821362 (N.D.N.Y. Mar. 1, 2021)........................56

*IBM Corp. v. Johnson*,
  629 F. Supp. 2d 321 (S.D.N.Y. 2009)........................................................................37

*irth Sols., LLC v. Apex Data Sols. & Servs., LLC*,
   No. 18-CV-6884-FPG, 2019 WL 283831 (W.D.N.Y. Jan. 22, 2019) ..............................58, 59

*Krueger Int'l, Inc. v. Nightingale Inc.*,
   915 F. Supp. 595 (S.D.N.Y. 1996) ....................................................................................39, 57

*Lego A/S v. Best-Lock Constr. Toys, Inc.*,
   874 F. Supp. 2d 75 (D. Conn. 2012)..................................................................................39, 57

*Ligon v. City of N.Y.*,
   925 F. Supp. 2d 478 (S.D.N.Y. 2013)......................................................................................55

*Litwin v. OceanFreight, Inc.*,
   865 F. Supp. 2d 385 (S.D.N.Y. 2011)......................................................................................55

*Merck Eprova AG v. Brookstone Pharms., LLC*,
   No. 09 Civ. 9684 (RJS), 2009 U.S. Dist. LEXIS 130385
   (S.D.N.Y. Dec. 15, 2009)........................................................................................................51

*MMJK Inc. v. Ultimate Blackjack Tour LLC*,
   513 F. Supp. 2d 1150 (N.D. Cal. 2007) ..................................................................................50

*Monowise Ltd. v. Ozy Media, Inc.*,
   No. 17-CV-8028 (JMF), 2018 WL 2089342 (S.D.N.Y. May 3, 2018) ............................46, 47

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018)................................................................................................37, 38

*Napierski v. Guilderland Democratic Comm.*,
   No. 1:18-CV-0846, 2018 WL 3546175 (N.D.N.Y. July 24, 2018) ..........................................55

*New York v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)....................................................................................................38

*Nexus Pharms., Inc. v. Cent. Admixture Pharm. Servs.*,
   No. 20-01506-CJC(JDEx), 2020 WL 6555052, (C.D. Cal. Oct. 29, 2020)............................50

*P&G v. Ultreo, Inc.*,
   574 F. Supp. 2d 339 (S.D.N.Y. 2008)......................................................................................37

*Pado, Inc. v. SG Trademark Holding Co LLC*,
   No. 19-CV-6614 (RPK) (RER), 2020 WL 7625363 (E.D.N.Y. Dec. 22, 2020) ....................48

*Pass & Seymour, Inc. v. Hubbell, Inc.*,
   532 F. Supp. 2d 418 (N.D.N.Y. 2007)....................................................................................49

*Perry v. Floss Bar, Inc.*,
   No. 21 Civ. 685 (ER), 2021 WL 871436 (S.D.N.Y. Mar. 8, 2021)..........................................52

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
    237 F.3d 1359 (Fed. Cir. 2001)..................................................................49

*Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1998)......................................................................46

*Rosenstiel v. Rosenstiel,*
    278 F. Supp. 794 (S.D.N.Y. 1967) ............................................................55

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.,*
    749 F.2d 124 (2d Cir. 1984)......................................................................53

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010)........................................................................37

*SEC v. Unifund Sal,*
    910 F.2d 1028 (2d Cir. 1990)....................................................................37

*Steelite Int'l U.S.A., Inc. v. McManus,*
    No. 21-cv-2645 (LAK), 2021 WL 1648025 (S.D.N.Y. Apr. 27, 2021) .....................37, 58, 59

*Sunni, LLC v. Edible Arrangements, Inc.,*
    No. 14 Civ. 461 (KPF), 2014 WL 1226210 (S.D.N.Y. Mar. 25, 2014) ................................53

*Tom Doherty Assocs. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995)......................................................................38, 53

*Tough Traveler, Ltd. v. Outbound Prods.,*
    60 F.3d 964 (2d Cir. 1995)....................................................................39, 47

*W.B. Marvin Mfg. Co. v. Howard Berger Co.,*
    33 F. App'x 588 (2d Cir. 2002) .............................................................39, 57

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008)......................................................................................37

## I.     INTRODUCTION

This lawsuit and this way-past-due preliminary injunction motion are a brazen attempt by Plaintiff to snuff out its competition by asserting claims that are not supported by either the facts or the law. The contract upon which Plaintiff's lawsuit and this motion are based (the 2009 NDA) is a non-disclosure agreement that, like any legitimate non-disclosure agreement, only limits disclosure and use of information that is truly confidential. It does not restrict GE's use or disclosure of ideas that were independently developed by GE,[1] or that were placed in the public domain by third parties or by Spectrum itself.

In its motion, Plaintiff withholds from the Court facts which it certainly knows doom not just the breach of contract claim upon which its motion is based, but also every other claim set forth in its complaint. Spectrum did not invent the idea of a ███████████████████████ ████████████████████████████████████████████ That core idea, as Plaintiff well knows, was described in a patent application filed *by GE* in 2006, three years before the 2009 NDA. And Spectrum's ████████ epiphany was an epiphany only to Spectrum—as it had been described in publications going back to the 1970s, and ████████ ███████████████ before Spectrum presented the idea to GE. Nor did GE take from Spectrum the ████████████████████████████ used in GE's StarGuide. Both were invented by GE, and both were covered in patent applications filed before any alleged disclosure to GE by Spectrum. And the idea of using ███████████████████████████████? That is such an obvious design choice, independently (albeit easily) determined by GE, that it epitomizes the overreach of Plaintiff's motion.

But what makes Plaintiff's withholding of facts even more egregious is that Plaintiff is

---

[1] Throughout this brief, "GE" refers to Defendants collectively.

withholding from the Court Spectrum's own conduct. Spectrum itself took every opportunity it could find—***even during the due diligence discussions with GE***—to publish the very ideas that it now claims were confidential. Spectrum repeatedly broadcasted to the world the idea of a SPECT system with ███████████████████████████████████████████████ ████████. But Plaintiff's motion makes no mention of its 2010 U.S. patent application, 2011 IEEE article, and 2013 international patent application that disclosed to the world ***all*** the ideas that Plaintiff accuses GE of stealing. GE cannot steal what it already owned. But even if Plaintiff wants to pretend that it was not aware that these ideas had already been conceived by GE and others, the fact that its motion ignores its own prolific publication of these ideas is telling.

This lawsuit and the instant motion are implicitly and wrongly premised on the idea that, if Spectrum shared some bit of information with GE during the due diligence, GE is forever precluded from using that information—even if GE already possessed that information or Spectrum ultimately gifted that information to the world. That is not how the law—or the 2009 NDA—works. Plaintiff will not succeed on the merits of its breach of contract claim.

Nor will Plaintiff suffer irreparable harm if its motion is denied. Certainly, waiting two and a half years to file this motion makes Plaintiff's claim of irreparable harm suspect, to say the least. Moreover, each of the grave consequences that Plaintiff predicts will occur if it is forced to fairly and actually compete with GE is either completely unsupported by the facts (*e.g.*, Plaintiff "is threatened with the ██████████████████████") or compensable with money damages if Plaintiff somehow manages to prevail (*e.g.*, lost sales in a two-product market).

Plaintiff fares no better with the balance of the equities and the public interest. While Plaintiff could have filed its motion two and a half years ago, it waited until now—after GE was already manufacturing, marketing, selling, and shipping its StarGuide—to seek a worldwide injunction that would bring GE's sales to a screeching halt and leave Plaintiff with a monopoly. In

that scenario, the public would lose, and GE would be unfairly prejudiced by Plaintiff's delay. The only party that would benefit is Plaintiff—the party whose case is without merit and whose timing is designed to improperly monopolize the SPECT market.

Plaintiff's motion should be denied.

## II.   PLAINTIFF'S INEXCUSABLE DELAY IN BRINGING ITS MOTION

From the inception of this lawsuit in December 2018, Plaintiff understood that GE's StarGuide would be competing head-to-head against Spectrum's Veriton—thereby challenging Spectrum's monopoly. (*See* Doc. 2.) The complaint, pointing to the same allegedly misappropriated design features that are the subject of the instant motion, included allegations that GE "intend[s] to offer for sale and/or sell the Imitation Device in the United States and globally." (*Id.* ¶ 120; *see also id.*, ¶ 292 ("GE is thus alerting the market that its Imitation Device would be coming to the market.").) Plaintiff further alleged that GE had ***already*** begun to take efforts "to persuade current and future customers to stop or divert their purchasing decisions away from Spectrum's [Veriton] devices in favor of its own Imitation Device," thereby "seeking to ruin Plaintiff's exclusive 2018 market entry position." (*Id.* ¶¶ 121, 293.) Finally, Plaintiff included multiple allegations about the irreparable harm that it would allegedly suffer if GE's device were allowed to compete with its Veriton. (*Id.* ¶¶ 122, 286–300.) For these reasons, Plaintiff indicated in the complaint that it would seek a preliminary injunction. (*Id.* ¶ 333 & Prayer for Relief.)

Hence, at the time of filing its complaint over two and a half years ago, Plaintiff had ostensibly conducted a sufficient investigation such that it could allege that GE misappropriated Plaintiff's trade secrets in the development of StarGuide. And Plaintiff understood all the alleged harms that it believed would occur if GE's device entered the market. But Plaintiff did not move for a preliminary injunction.

Six months later, in May 2019, Plaintiff filed its amended complaint, and again included allegations about StarGuide's impending entry into the market and the irreparable harm to Plaintiff that would allegedly follow. (*See* Doc. 36 at ¶¶ 132–34, 475–89.) The First Amended Complaint, like the initial complaint, indicated that Plaintiff would seek a preliminary injunction. (*Id.* ¶ 507 & Prayer for Relief.) Still, Plaintiff did not move for a preliminary injunction.

A year and a half later, in December 2020, Plaintiff began "hearing rumors and receiving customers' input that GE is presenting an Imitation Device which they call StarGuide to various customers around the world." (Yoeli Dec. (Ex. 4) at ¶ 26; Yoeli Dep. (Ex. 305) at 69:1–23.)[2] And "[i]n February 2021, Spectrum first became aware of a StarGuide[] system that was installed in Orleans France." (Yoeli Dec. (Ex. 4) at ¶ 48.) Around this same time, on February 25, 2021, Plaintiff's counsel told Magistrate Judge Parker that "we are going to pursue a preliminary injunction against the GE device" because Plaintiff knew FDA approval was imminent[3] (Doc. 200 at 25:11-13; *see also id.* at 28:7–19). Plaintiff still did not move for a preliminary injunction.

Nor did Plaintiff move for a preliminary injunction in early March 2021, when StarGuide was presented at a virtual conference attended by two of Plaintiff's employees. (Yoeli Dec. (Ex. 4) at ¶ 27; Yoeli Dep. (Ex. 305) at 87:10–88:8). GE followed this up with a March 24, 2021 press release and web article, both of which announced that StarGuide was "[a]vailable for sale in EU countries."[4] (Ex. 11 at n.1; Ex. 37 at n.1.) Five days later, on March 29, 2021, the FDA approved GE's StarGuide device. (Yoeli Dec. (Ex. 4) at ¶ 26.) The following day, GE produced to Plaintiff the FDA application for the accused GE device. (Doc. 221 at 19:17–20:13.) Around this same

---

[2] GE's exhibits are numbered beginning at 300 to differentiate them from Plaintiffs' exhibits (Nos. 1-222).

[3] Plaintiff is seeking a ***worldwide*** injunction in its motion. Thus, the timing of approval ***in the United States*** has little relevance. StarGuide had already been approved and was on the verge of being sold in Europe.

[4] This is the point at which Plaintiff's damages expert asserts that Plaintiff began to experience irreparable harm. (Phillips Dep. at 156:2–17.)

time, GE also held a sales meeting with potential European customers to present the StarGuide, and Plaintiff learned of the meeting from its customers. (Yoeli Dep. (Ex. 305) at 78:17–79:24.)

Despite all of these forms of notice of GE's activities, Plaintiff still did not move for a preliminary injunction. Instead, Plaintiff waited until it had begun losing sales to GE's StarGuide device. (Yoeli Dec. (Ex. 4) at ¶ 48.) In other words, Plaintiff waited to see which product would fare better in the marketplace.

This Court has already noted that Plaintiff's motion is "highly atypical," given that the basis of its motion is the same as that set forth in its December 2018 Complaint. (Doc. 342 at 3.) GE agrees. If Plaintiff knew enough in December 2018 to file a lawsuit asserting claims for breach of contract, misappropriation of trade secrets, and a dozen additional causes of action, then Plaintiff knew enough to file a motion for a preliminary injunction then. Instead, Plaintiff chose to wait over two and a half years to do so. This delay alone warrants denial of Plaintiff's motion.

## III.   FACTUAL BACKGROUND

### A.   <u>The 2009 NDA</u>

#### 1.   **Plaintiff Is Not a Party to the 2009 NDA**

The "Spectrum" entity listed as a party to the Amended and Restated Mutual Confidentiality and Non-Use Agreement ("2009 NDA") is "Spectrum Dynamics Limited," a "limited liability company" purportedly "organized under the laws of Delaware" with an address at 22 Bareket Street, North Industrial Park, P.O. Box 3033, Caesarea, 20889 Israel. (Ex. 8 at 1.) However, no such entity has ever existed in Delaware. Nor is that entity the Plaintiff in this case.

Citing the declaration of its current CEO, Gilad Yoeli, Plaintiff asserts that "Spectrum is the successor-in-interest to the 2009 [NDA], and owns all of the Spectrum CI." (Doc. 356 at 15 n.2.) But Yoeli's declaration establishes nothing of the sort. Yoeli's declaration says nothing about how Plaintiff Spectrum Dynamics Medical Limited, a company organized under the laws of the

British Virgin Islands ("BVI") with "principal offices" in the BVI (Doc. 36 at ¶ 1), is the successor in interest to "Spectrum Dynamics Limited," a company "organized under the laws of Delaware" with an address in Israel. (Ex. 8 at 1.)

According to Yoeli's declaration, V-Target Technologies Ltd, an Israeli company, became Spectrum Dynamics (Israel) Limited, which was acquired by M. Maozos Ltd. and became SDMIL, still an Israeli company and *not* Plaintiff in this case. (Yoeli Dec. (Ex. 4) at ¶ 2.) Separately, V-Target LLC became Spectrum Dynamics LLC, and was acquired by Biosensors, which formed Plaintiff. (*Id.*) According to Yoeli's declaration, therefore, the succession of entities looks like this:



The entity named on the 2009 NDA—Spectrum Dynamics Limited—is closest in name to Spectrum Dynamics (Israel) Limited, which is not a predecessor to Plaintiff. (*See id.*) Spectrum Dynamics (Israel) Limited is, however, the entity whose employees allegedly invented the alleged trade secrets communicated to GE under the 2009 NDA. In its First Amended Complaint, Plaintiff alleges that Yoel Zilberstien and Nathaniel Roth are "[t]he joint inventors of all of the Spectrum Trade Secrets." (Doc. 36 at ¶ 23.) During the relevant time period, Zilberstien and Roth were employed by V-Target Technologies Limited and Spectrum Dynamics (Israel) limited—the Israeli entities that are *not* predecessors to Plaintiff. (*See* Ex. 309 (Zilberstien employment agreement with V-Target Technologies Limited); Ex. 310 (Zilberstien employment agreement with Spectrum Dynamics (Israel) Limited); Ex. 311 (Roth employment agreement with Spectrum Dynamics (Israel) Limited).) In his declaration filed in support of Plaintiff's motion, Zilberstien confirms his association with these Israeli entities, stating that he founded V-Target Technologies Ltd. and from

2008–2019 (which covers the period of the due diligence), he served as the General Manager of the "Israeli Operation of Spectrum." (Zilberstien Dec. (Ex. 3) at ¶¶ 2, 4.)

Therefore, Spectrum Dynamics (Israel) Limited was the Spectrum entity with "certain proprietary or confidential information and know-how" subject to the 2009 NDA (Ex. 8 at 1) and the likely party to the 2009 NDA. Spectrum Dynamics (Israel) Limited is not a predecessor to Plaintiff. (*See* Yoeli Dec. ¶ 2.)

### 2. Information in the Public Domain or Independently Developed by GE Is Not Protected Under The 2009 NDA

The 2009 NDA is explicit that any obligation to maintain confidentiality "shall not apply" to certain types of information. (Ex. 8 § 2.1). Among these exempt categories is any information "made public by Disclosing Party, or [that] is established to be part of the public domain." (*Id.*) Not only is publicly available information expressly excluded under the 2009 NDA, but any obligation to hold information in confidence ceases as soon as "such Information is in the public domain through no fault of a Receiving Party." (*Id.* § 7.) Thus, whether the information was exempt at the time the 2009 NDA was formed or later became exempt, the obligations in the 2009 NDA do not apply to any information that is in the public domain. (*See id.*)

A second category of exempt information is any information that "was independently developed by the Receiving Party . . . without reference to the Information of the Disclosing Party."[5] (*Id.* § 2.1). Therefore, neither party can limit the use or disclosure of ideas independently developed by the other party.[6]

---

[5] The remaining exempted categories are information "independently known to Receiving Party prior to the time of such disclosure" and information disclosed "by a third party who, to the knowledge of the Receiving Party, is not subject to a confidentiality agreement with, or other obligation of secrecy to, the Disclosing Party prohibiting such disclosure." (*Id.* § 2.1.)

[6] Plaintiff has previously argued that the 2009 NDA protects against two separate types of conduct, disclosure and use, and that the exemptions in the NDA apply only to disclosure and not to use. In other words, Plaintiff argues that, even if information made its way into the public domain, GE still could not use it. The Court rejected this interpretation of the NDA in its Opinion and Order on Defendants' Motion to Dismiss. (Doc. 73 at 24.)

**B.**     **Spectrum's[7] Alleged Confidential Information Was Conceived and Publicly Disclosed by GE and Others Before the Due Diligence**

GE and others in the industry have, for decades, been developing, publishing papers about and/or obtaining patents relating to the six concepts that Plaintiff alleges were disclosed to GE in due diligence and used in StarGuide. According to Plaintiff, those concepts are: █████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

(Doc. 356 at 17-18 (emphasis in original).)

**1.**     **The Moore et al. Publication**

In 1977, Hugh Stoddart at Union Carbide Corporation filed a patent application describing a SPECT brain scanner with 12 detectors in a ring formation that are capable of independent radial motion. (Ex. 312.) Figure 2 of Stoddart's U.S. Patent No. 4,209,700 is reproduced below.



*Id.* at GE_SDM_00061578.

In an article published in the Journal of Nuclear Medicine in 1984 ("Moore et al. Publication"), doctors at the Harvard Medical School and Brigham and Women's Hospital describe modifying Stoddart's 12-detector SPECT brain scanner (shown in Fig. 1 of the article)

---

[7] Throughout this brief, GE uses the term "Spectrum" to describe the entity engaged with GE in the 2009–2012 due diligence. As described in Section III.A.1 above, this entity appears to have been Spectrum Dynamics (Israel) Limited, which is not a predecessor-in-interest to Plaintiff.

by rotating the entire array of detectors on a gantry two times between scans "so that 36 effective angular projections would be acquired at 10° intervals instead of 12 projections 30° apart." (Ex. 313.) Thus, the general concept of using ███████████████████████████████████████ ████████████████████ is not only *not* new as Plaintiff alleges—it is downright old.

## 2.    GE's '597 Patent

Well before GE entered into the 2009 NDA, GE itself filed a patent application describing a ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ (*See* Ex. 314.) GE filed the application that led to U.S. Patent No. 7,592,597 ("the '597 patent") in 2006, three years before the 2009-2012 due diligence. (*See id.*) The application was published, and therefore fully available to Spectrum, in February 2008, a year and a half before the due diligence—and long before any evidence that Spectrum conceived of the ████████████████████████████████████ it later presented to GE.[8] (*Id.*)

Plaintiff argues that "Spectrum's vision was counter-intuitive to conventional thinking; namely - using ████████████████████████████████████████████ ████████████████████████████████████████ (Doc. 356 at 27 n.6) Plaintiff also claims that: ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ (*Id.* at 32.) But GE had made all of these discoveries years earlier and described them thoroughly in the '597 patent. The inventors of the '597 patent described the invention as "relat[ing] generally to nuclear medicine imaging, and more particularly, to efficiently imaging structures of interest with multiple imaging detectors

---

[8] GE's '597 patent issued on September 22, 2009, less than a week after the September 16, 2009 due diligence meeting between GE and Spectrum. (*See id.*)

having small fields of view." (Ex. 314 at 1:7-10.) They recognized that "[l]arge size imaging detectors . . . have limited maneuverability due to their geometry when positioned close to a patient." (*Id*. at 1:17-19.) Therefore, they described "a Nuclear Medicine (NM) imaging system which has a plurality of small imaging detectors mounted on a gantry." (*Id*. at 2:15-17.) They also explained that "pivoting motion [is] used to increase the effective FOV [(field of view)] of [each] imaging detector" and thereby "increase the sampling of the imaging data" because "[h]aving a largely sampled dataset may improve reconstruction and may reduce artifacts." (*Id*. at 5:41-51.)

With reference to FIGs. 1-3 of the '597 patent, which are reproduced below, the inventors are clear that any number of detectors could be used with the patented system: "it should be understood that two, three or more than four imaging detectors may be used." (*Id*. at 2:61-65; *see also id.* at GE_SDM_00570324 (FIGs 1-3).)



FIG. 1

Each detector is mounted to an arm, which the '597 patent calls "leg 122." (*Id*. at GE_SDM_00570318 (Fig. 2); *id*. at 5:52-53.) The detectors are "independently movable with respect to each other" (*id*. at 1:50-52) and move both radially (in toward the patient and back out toward the gantry) and in a swiveling/pivoting motion: "The radius controller 164 may move each of the first through N imaging detectors 102-108 closer to and further from a surface of the patient 142, and the pivot controller 118 may move the first through N imaging detectors 102-108 axially with respect to the patient 142." (*Id*. at 4:43-47; *see also id.* at 6:41-49; *id*. at GE_SDM_00570318

10

(Figs. 2, 3, showing pivoting/swiveling motion).)



In addition, the circular gantry can rotate: "For example, the gantry 110 may be formed as a closed ring or circle" and "[t]he gantry 110 . . . may be rotatable about the patient 142." (*Id.* at 3:25-28.) In summary, the '597 patent publicly disclosed:

> [E]fficiently imaging a structure of interest with an imaging system that has a plurality of imaging detectors with FOVs which may be smaller than the structure of interest. Each of the plurality of imaging detectors is small and may be separately positioned relative to the patient. The plurality of imaging detectors acquire images of the structure from different locations around the patient, and thus image data relevant to the structure of interest is acquired in a shorter period of time than with conventional large imaging detectors. Movement may be used during or between acquisitions to increase the effective FOV. The imaging detectors may be moved by pivoting axially and moving radially towards and away from the patient; the gantry may be rotated; … and/or the patient table may be moved.

(*Id.* at 9:15-30.)

The GE inventors also disclosed that this SPECT imaging system would use CZT detector tiles arranged together in "square" or "rectangular" shapes "composed of a plurality of CZT pixilated modules" where "each module may be 4x4 cm in size[.]" (*Id.* at 3:6-13.) Of course, █████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████ (*See* Peterson Dec. (Ex. 300) ¶¶ 37, 81.) And the '597 patent discloses that its ██████████████████████████████: (1) "parallel beam collimators" (Ex. 314 at 6:66; *id.* at GE_SDM_00570318 (Fig. 3)); (2) ███████████████ "constructed to be registered with the pixels of a pixelated detector such as CZT pixilated detector" (*Id.* at 3:65-67); and (3) ████

11

██████████████████████ "[f]lat sheets of tungsten cut into strips or vanes with material periodically removed to form a comb structure," where a first set of strips is "arranged parallel to one another along a first direction" and a second set of strips is "arranged parallel to one another in a second direction" which "may be perpendicular to the first direction." (*Id.* at 8:18-24.)

Finally, the '597 patent fully teaches an ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (*See id.* at 5:59-6:18.) Importantly, the ███████████

████████████████████████████████████████████

██████████████: "the rate of pivoting may be higher during parts of the pivoting range [] wherein the [] detector [] is aimed at the surrounding tissue. Thus, the [] imaging detector [] collects more data from the structure of interest than from the surrounding tissue." (*Id.* at 6:13-18.)

GE informed Spectrum of the '597 patent during the due diligence. (Mahameed Dec. (Ex. 304) at ¶¶ 22-24.) Riyad Mahameed, an engineering manager at GE during the due diligence ████

████████████████████████████████████████████████

██████████████████ (*See id.* ¶ 9.) Mr. Mahameed and GE's Arie Escho met with Spectrum's Yoel Zilberstien and Gilad Yoeli, and Mr. Mahameed explained that GE's goal in acquiring Spectrum was only to shorten the time to market, but that ████████████████████████████████

██████████████████ (*See id.* ¶¶ 23-24.) Mr. Mahameed described the '597 patent and explained that it ████████████████████████████████████████

████████████████████████ (*See id.* ¶ 24.)

### 3.     The DeVito Patent

Spectrum undoubtedly knew that the concept behind its Veriton product ████████████████

████████████████████████████████████████████ did not originate from Spectrum and was not confidential. ████████████████████████████████

███ In 2007, around the same time it was releasing its cardiac-specific D-SPECT device, which also used ██████████████████████, ████████████████████████████ ███ U.S. Patent No. 6,242,743 (Ex. 321), issued to Mosaic Imaging Technology, Inc., with Raymond DeVito listed as the first-named inventor ("the DeVito patent"). (*See* Exs. 319–320 (██████████████████).) The application that led to the DeVito patent was filed in 1998, and the patent issued in 2001, eight years before the GE/Spectrum due diligence. (*See* Ex. 321.) At a September 16, 2009 due diligence meeting with GE, Spectrum's Benny Rousso admitted, "I think we should also relate to the DeVito [ph] patent. The DeVito patent was licensed by -- to Spectrum by Raymond DeVito. It -- t's the – it's a patent relating to some aspects that we believe will cover some of the technology that we use and it was exclusive- -- exclusively licensed to us under an agreement with him." (Ex. 57 at 30:3-9.)

The DeVito patent teaches that "[c]onventional gamma camera detectors used for medical imaging have a large, flat field of view" and that "[m]any of the current problems in nuclear medicine imaging are caused by the large flat face of the conventional [SPECT] detector." (Ex. 321 at 1:49-50; 2:15-17.) Thus, with reference to Figs. 8 and 10 (*id.* at GE_SDM_00061680), which are reproduced below, the DeVito patent teaches a SPECT system having a plurality of "small detector modules" (identified by reference number 44) positioned in a closely packed ring that fully encircles the object of interest (reference number 64). (*Id.* at 5:48-49, 7:36-48)



Each of the detectors "swivel" to change their viewing direction—██████████████████ ████████████████████████████████ (*Id.* at 18:28-45.) At the September 16, 2009

meeting, Spectrum's Benny Russo acknowledged that the 2001 DeVito patent ████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ (Ex.

57 at 179:8-13 (emphasis added).)

In addition, ████████████████████████████████████████████████████

such as the "3-module column" depicted in FIG. 1 of the DeVito patent. (Ex. 321 at 17:43-65

("Each set of three axially adjacent modules 44 defines such a module column 27").) ████████
████████████████████████████████████████████████████████████████████████████
██████████████████████

████████████████████████████████████████████████████████████████ For

example, the DeVito patent describes ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████ (*Id.* at 10:9-18.) Thus, the DeVito

patent, ████████████████████████████████ (*see* Exs. 319-320), discloses every core concept behind

the Veriton, including: ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ (*See* Peterson Dec. (Ex.

300) ¶¶ 20–27.)

Although each claim of the DeVito patent expressly excludes ████████████████████████
████████████████████████████████████████████████ the DeVito patent nevertheless

acknowledges that the detectors in conventional SPECT systems typically "orbit the patient or the

object of interest in order to sample from many locations." (Ex. 321 at 1:23-27.)

### 4.      Siemens' US 2005/0017182

Plaintiff's VP of Research and Development, Nathaniel Roth, claims that Spectrum introduced "2 major innovations" for collimators "for the first time" in 2007. (Roth Dec. (Ex. 5) ¶ 12.) The first was a ████████████████████████████████████████████ ██████████████████████████████████████████████████ (*Id.*) The second, he claims, was ████████████████████████████████████████████████ █████████████████████████████████████████████████████ (*Id.*)

Plaintiff's technical expert, Dr. Scott Metzler, further embellishes: ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ (Metzler Dec. (Ex. 1) ¶¶ 25-26.)

One could easily be forgiven, after reading these claims, for coming away with the mistaken impression that Spectrum invented ██████████████████████ by solving a manufacturing riddle that had plagued the industry—forcing everyone except Spectrum to use ██████████████████████████ Nothing could be further from the truth.

U.S. Patent Application Publication No. 2005/0017182, entitled "REGISTERED COLLIMATOR DEVICE FOR NUCLEAR IMAGING CAMERA AND METHOD OF FORMING THE SAME", assigned to Siemens Medical Solutions USA, was filed on July 25, 2003, published on January 27, 2005, and teaches "a grid of collimation square holes formed by a plurality of elongated, metal sheets arranged in a grid pattern" where "[e]ach of the metal sheets has evenly spaced slots into which other sheets are inserted." (Ex. 322.) The ████████████████ ██████████████████████████████ are shown below in Figs. 1A and 1B of the published

application, respectively:





(*Id.* at GE_SDM_00739363). Siemens' published application also discloses that the ███████████ ███████████████████████████████████████████████████ "such as tungsten." (*See id.* ¶ 0024.) Thus, Spectrum's 2007 idea of ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████, was already disclosed in Siemens' 2003 patent application.

Siemens' patent claims covering its registered ██████████████████████ were rejected by the USPTO as being obvious in light of prior art and subsequently abandoned. (*See* Ex. 323 (Office action rejection); Ex. 324 (Notice of Abandonment).) Thus, all of the features disclosed above were dedicated to the public.

C.    **GE Was Already Investigating a General Purpose System, Based on GE's '597 Patent, with ████████████████ Before September 2009**

Plaintiff claims to have first disclosed its concept for a ████████████████████ ████████ at a meeting in September 2009. (Doc. 356 at 21.) Plaintiff further claims that, before this meeting, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████ (*Id.* at n.5). That is not correct. Although Plaintiff was able to locate and selectively present one document from GE's files that briefly shows such a concept, that single document hardly tells the whole story of the GPC concepts GE was investigating at the time. ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ (Ex. 325).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████ (*Id.*) ██████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ (*Id.*) Thus,

not only had GE filed the '597 patent in 2006 disclosing a ███████████████████

████████████████████████████████ (*see* Ex. 314), ██████████████████

██████████████████████████████████████████████████████

████████████████ (*See* Ex. 325; *see also* Bouhnik Dec. (Ex. 302) ¶¶ 12, 42.)

**D.**      **Before January 2012, GE Had Independently Developed the Idea of Using** ████████████████████████████████████████████

In its Opening Brief, Plaintiff states that, by the time of a January 24-26, 2012 meeting

with GE, ████████████████████████████████████████████████

███████████████████████████████████ that Spectrum disclosed at the

September 16, 2009 meeting. (Doc. 356 at 29.) As an initial matter, Spectrum could have looked

to the Moore et al. Publication to see that a SPECT scanner with ███████████████████████

████ had already been built. (*See* Ex. 313 at GE_SDM_00058315.)

By the time of the January 2012 meeting, however, ████████████████████████

████████████████████████████████████████ ████████████

████████ (*See* Bouhnik Dec. (Ex. 302) ¶¶ 46–47.) ████████████████

████████████████████████████████████████████ (Ex. 199)

██████████████████████████████████████████████████████

█████████████ (Doc. 356 at 19.) ████████████████████████████

██████████████████████████████████████████████████████

17

████████████████████████████████████████████ (*Id.* (citing Ex. 199 at GE_SDM_00286401).) ███████████████████████████████████████████████████

███████████████████████████████████████████ (*see* Ex. 199 at GE_SDM_00286401; Bouhnik Dec. (Ex. 302) ¶ 41), when Spectrum, by its own allegations, did not communicate its idea of █████████ until January 2012. (Doc. 356. at 29.) ██████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

(Bouhnik Dec. (Ex. 302) ¶¶ 42–43; *see also* Ex. 327 at GE_SDM_00258168.) Spectrum's idea of ███████████ was not an original idea.

After Spectrum proposed in September 2009 a ████ like the one disclosed in GE's '597 patent, but with ████████, ██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ (Ex. 154 at GE_SDM_00005377.) ███████████████████

██████████████████████████████████████████████████

████████████████████ (*See* Ex. 328 at GE_SDM_00366667.)[9] ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████ (*See id.* at GE_SDM_00366665.) ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████ (*Id.* at GE_SDM_00366664; *see also* Bouhnik Dec. (Ex. 302) ¶ 46.) ██████

████████████████████████████████████████████ (Ex. 328.)

---

[9] █████████████████████████████████████████████████████████████████████████ (*Id.*)



(*See* Bouhnik Dec. (Ex. 302) ¶ 47; *see also* Ex. 329.)

(Ex. 329.)

(Ex. 330; *see also* Bouhnik Dec. (Ex. 302) ¶ 47.)

### E.   Spectrum's Alleged Confidential Information Included Known Features of Its Already-On-The-Market D-SPECT Machine

Plaintiff acknowledges that "[t]he VERITON® is based on technology developed for the D-SPECT®[.]" (Doc. 356 at 2.) The D-SPECT, which launched in 2007 (*id.* at 1), used several features that Plaintiff accuses GE of misappropriating, including

(*Id.* at 11.)

All these features of D-SPECT were publicly known before the 2009-2012 due diligence. For example, Spectrum's founder Shlomo Ben Haim authored a paper, submitted in 2008 and published in 2009, describing the D-SPECT in detail. (Ex. 331.) In the paper, Mr. Ben Haim disclosed to the world that "[t]he D-SPECT system uses solid-state CZT detectors[.]" (*Id.* at GE_SDM_00455173.) He also disclosed that the D-SPECT uses "tungsten parallel-hole collimators" that have "square holes." (*Id.* at GE_SDM_00455168.) Finally, he disclosed "[e]ach collimated detector column rotates and translates (a maximum of 110°) independently[.]" (*Id.*)

Another paper, also published in 2009, described D-SPECT as "us[ing] pixilated CZT detector arrays." (Ex. 332 at GE_SDM_00454846.) The authors explained that "each column [of the D-SPECT] is fitted with square, parallel hole, high sensitivity collimators . . . fabricated from tungsten." (*Id.*) The article described the (*Id.*) The photographs of the

D-SPECT machine and its █████████, published in the article for the world to see, were provided "courtesy of Spectrum Dynamics, Haifa, Israel." (*Id.* at GE_SDM_00454848.)

**F.**      **Throughout the Due Diligence, Spectrum Placed Its Alleged Confidential Information Related to its ████████ into the Public Domain**

While Spectrum was developing its ████, which eventually became the Veriton, its principals were contributing to articles and filing patent applications disclosing every feature of the ████—down to the smallest details—including the same features that Plaintiff accuses GE of misappropriating. These disclosures occurred during and immediately after the due diligence period.

**1.**      **Spectrum's '685 Patent Application Disclosed Spectrum's ████████**

On June 3, 2010, less than nine months after the September 2009 meeting with GE, and amid the due diligence, Spectrum filed a patent application for a "Method and System of Optimized Volumetric Imaging" (the "'685 application"). (Ex. 333.)[10] The inventors are Yoel Zilberstien, Nathaniel Roth, Benny Rousso and Shlomo Ben Haim—all Spectrum principals and all present at the September 2009 meeting with GE, during which they revealed what Spectrum argues in its Opening Brief was confidential Spectrum information. (Ex. 55 at SDML_012797740). The '685 application published on February 3, 2011, placing all its disclosures into the public domain. (*See* Ex. 333.) It is a teaching document that reveals almost every detail of the GPC that Spectrum had contemplated as of the filing date. (*See* Peterson Dec. (Ex. 300) ¶¶ 44–52.) Clearly, Spectrum had decided that it was time to try to obtain a patent rather than keep the features of the GPC confidential.

The '685 application teaches a SPECT imaging system that includes: (i) "a plurality of extendable detector arms each . . . having a detection unit having at least one radiation detector"

---

[10] The '685 application issued on December 25, 2012 as U.S. Patent No. 8,338,788.

which move "along a linear path" (i.e., radially); and (ii) a "circular gantry" "which supports the plurality of extendable detector arms" and "rotates the plurality of detector arms around the body of the patient." (Ex. 333 ¶¶ 0010, 0019.)

According to the '685 application, "FIGS. 2B-2D are sectional schematic illustrations of a plurality of detection units mounted on a circular gantry which may change the proximity of detection units from the body of a patient[.]" (*Id.* ¶ 0055.) Remarkably, ███████████ ████████████████████████████████████████████████ ████████████████████████████████ (*See* Ex. 55 at SDML_01279781-783; Peterson Dec. (Ex. 300) ¶¶ 46–47.) For example, reproduced below is FIG. 2B of the '685 application side-by-side with the same drawing presented by Spectrum to GE at the September 2009 meeting, showing the ████████████████████████████



Ex. 333 at GE_SDM_00346942          Ex. 55 at SDML_01279781

The detectors described in the '685 application are configured as ████████████████ "[E]ach detection unit comprises an array of a plurality of radiation detectors, each set to move in [a] sweeping motion." (Ex. 333 ¶ 0033; *id.* at GE_SDM_00346946 (FIG. 5A) (████████████ ████████████████████████████).) Each radiation detector within the detector column may be a pixelated "cadmium zinc telluride (CZT) detector[]" with a "parallel hole collimator" ████████████ (*Id.* ¶¶ 0007, 0077, 0091.) And the '685 application discloses that its "scanning is adapted to focus on a predefined region of interest" which may be "defined

automatically and/or manually." (*Id.* ¶ 0116.)

In sum, in its '685 application, Spectrum disclosed a ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ (*See id.*) These

concepts, already disclosed in GE's '597 patent prior to the September 2009 meeting, were placed

in the public domain again when Spectrum's '685 application published on February 3, 2011.[11]

### 2. In 2011, Nathaniel Roth Published an Article Disclosing Spectrum's Efforts to Optimize the ████████ for Brain Scans

After Spectrum filed its '685 application, it collaborated throughout the rest of 2010 and

into 2011 with a team at University College London ("UCL") to simulate and optimize the ███

configuration. (*See* Roth Dep. (Ex. 306) at 48:11-18, 165:22-166:14; Ex. 334 (research plan "to

work closely with Spectrum Dynamics" for "combined whole body/brain imaging" and

"investigate the use of various collimator configurations that might be used on the system"); *see*

*also* Exs. 335–339.) As part of that work, Spectrum and UCL evaluated the optimal number of

detector columns for performing a brain scan. Specifically, they "simulated SPECT systems with

different numbers of detectors; 12, 13, 14, and 15 detectors placed at radial positions of 114, 127,

139, [and] 152 mm, respectively." (Ex. 342 at GE_SDM_00013160). The results of that analysis

were published in November 2011 in an article co-authored by the UCL team and Spectrum's

Nathaniel Roth for the Institute of Electrical and Electronics Engineers ("IEEE") titled, "Assessing

Possible Use of CZT Technology for Application to Brain SPECT ("Roth's 2011 IEEE Article").

---

[11]When Spectrum's '685 patent application was reviewed by a patent examiner, the examiner presented GE's '597 patent to the inventors as prior art that anticipated the patent claims sought by Spectrum. (*See* Ex. 340.) In responding to the examiner's description of GE's '597 patent, the inventors (Zilberstein, Roth, Rousso and Ben Haim) acknowledged that the '597 patent "teaches the ***pivoting*** of radiation detectors at distal ends of ***extendable arms***, and that these arms are supported by and may be ***rotated around a patient*** along a gantry." (Ex. 341 at GE_SDM_00544698 (emphasis added).)

(*Id.*) The article discloses to the world almost every detail of Spectrum's GPC design[12] that Plaintiff now argues was misappropriated by GE.

███████████████████████████████████████████████, the article describes simulations of a SPECT system having multiple "CZT detector arrays placed in a circle around the patient" where "[t]he detectors can rotate about their own axis," to scan over the object. (Ex. 342 at GE_SDM_00013159.) And just like the ████████████████████████████ the article disclosed: (1) "Transaxially, the detector arrays are 4 cm wide, consisting of 16 CZT pixels, and axially they are assumed to be long enough to cover the whole brain" (i.e., ████████████████████████████████████████████████; (2) "Each detector is equipped with a Tungsten collimator"; (3) "Collimator bore dimensions were fixed to the basic CZT pixel dimensions (2.46 mm)" (i.e., the collimators were square hole and ████████████████████████); (4) "Parallel-hole collimators were used, with bore lengths of 18, 24.5, 30 and 35 mm"; (5) "Each detector is . . . contained in an 80 mm diameter cylinder"; and (6) "The whole gantry can also rotate in order to fill gaps between the detectors." (*Id.* at GE_SDM_00013159-160; *see also* Peterson Dec. (Ex. 300) ¶¶ 59-60.)

But perhaps most importantly, Roth's 2011 IEEE Article discloses that ███████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ (*Compare* Ex. 342 at GE_SDM_0013160, *with* Doc. 356 at 29-30). Specifically, Roth disclosed:

---

[12] During his deposition, Nathaniel Roth claimed that ██████████████████████████████ ███████████████████ (*See* Roth Dep. (Ex. 306) at 21:23–22:25.) That is not true, as evidenced by the communications between ████████████

██████████████████████(Ex. 343 at SDML_00846058.) ██████████████████████████████████ ██████████████████████(*Id.* at SDML_00846057.)

"The best results were obtained with the smallest number of detectors (12)." (Ex. 342 at GE_SDM_00013160.)

Plaintiff alleges that by the time the parties reengaged in discussions at a January 24–26, 2012 meeting, ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████ (Doc. 356 at 29–30.) ████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ (*see* Section III.D, *supra*) ██████████████████████████████████████████████████

██████████████████████████████████ (Ex. 342 at GE_SDM_00013160.)

### 3. Spectrum's ████████████████████ Were Publicly Disclosed in 2012 and Are Not Used in StarGuide

Plaintiff alleges, ████████████████████████████████████████████████████

████████████████████████ (Doc. 356 at 18.) Plaintiff also alleges that this ██████████████

███████████████████████████████ (*Id.* at 11.) Plaintiff cherry-picks ██████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ (*Id.* at 14, 22.) But these ████████████████ were publicly disclosed in 2012. And, in any event, the ████████ ██████████████ was developed *by GE* and is disclosed in GE's '597 patent.

In 2012, with the assistance of Brian Hutton (UCL), and in cooperation with the University of Lisbon, Filipa Costa published a dissertation study entitled "EVALUATION OF THE D-SPECT SYSTEM: Region Centric Acquisition and Tracer Kinetics" ("The 2012 Hutton Publication"). (Ex. 374.) Brian Hutton is one of the authors of the 2011 Roth IEEE Article who

collaborated with Spectrum's Nathaniel Roth to simulate Spectrum's ███ configuration. (*See* Ex.
342.) After his work with Roth, during which he learned details of Spectrum's ███ and the D-
SPECT, Hutton contributed to the 2012 Hutton Publication.

The 2012 Hutton Publication teaches all ████████████████

████████████████████████████████████████

██████████████████████: "In order to know which ROI should be selected,
a pre-scan is always done before each imaging process, to identify the position of the heart in
relation to the chest and also to set the angle limits of scanning for each detector." (Ex. 374 at
GE_SDM_00739396; Peterson Dec. (Ex. 300) at ¶ 64.) ████████████████

████████████████████████████████ (Ex. 374 at
GE_SDM_00739406 ("a ROI and a FOV can be selected"); Peterson Dec. (Ex. 300) at ¶ 64.) ███
██████████████████████████ as depicted in Fig. 3.4 of the
Publication. (Ex. 374 at GE_SDM_00739412–14 (Fig. 3.4); Peterson Dec. (Ex. 300) at ¶ 64.)

████████████████ "the fraction of time spent viewing the ROI": a "proportion of
scan time on ROI (SPR)" may be set to "a value between 0 and 1, . . . to define the time, in
percentile, that the detector will spend scanning the ROI." (Ex. 374 at GE_SDM_00739406–07;
Peterson Dec. (Ex. 300) at ¶ 65). For example, "a scan proportion on ROI (SPR) equal to 0.6,
simulat[es] a D-SPECT system that spends approximately 60% of the scanning time inside the
ROI and the rest outside of the FOV." (Ex. 374 at GE_SDM_00739412-14 (Fig. 3.4); Peterson
Dec. (Ex. 300) at ¶ 65.)

To the extent Plaintiff is using the term ████████████████

████████████████████████████████████████

██████████████ (*see* Metzler Dec. (Ex. 1) ¶¶ 141-143), the 2012 Hutton Publication also
discloses that feature in detail. Specifically, with reference to Fig. 2.14, the 2012 Hutton

Publication teaches ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████ (Ex. 374 at GE_SDM_00739407; Peterson Dec. (Ex. 300) at ¶ 66.) Thus, ██

███████████████████ that Plaintiff alleges GE misappropriates were fully publicly disclosed

in the 2012 Hutton Publication.

The ████████ that Spectrum actually disclosed to GE during due diligence to ██████████

██████████████████████████████████████████ (Doc. 356 at 24-25 (citing Ex. 65); Metzler

Dec. (Ex. 1) ¶¶ 63-64; Roth Dec. (Ex. 5) ¶ 46.) Any use by GE of the ████████████ during the

due diligence was at Spectrum's request and was part of the process of evaluating Spectrum's

technology. (*See, e.g.*, Ex. 66 at SDML_00038352–53.)

███████████████████████████████████████ (Peterson Dec. (Ex. 300) ¶¶ 69–72, 74.)

███████████████████████████████████ disclosed in GE's '597 patent in which each detector

has an independent scanning rate and spends a greater percentage of scan time scanning a selected

ROI. (*Id.* ¶¶ 72, 74; *see also* Bouhnik Dec. (Ex. 302) ¶¶ 50, 52-56_; Ex. 314 at 5:59–6:18.) Indeed,

Plaintiff's expert, Dr. Metzler, admits that GE's scan pattern is ***not*** the ████████████████ (*See*

Metzler Dep. (Ex. 308) at 134:6-13 ("[Q.] That's not the ████████████, right? A. No."); Metzler

Dec. (Ex. 1) ¶ 139.) In any event, the ████████ was also publicly disclosed in 2012. (Ex. 374; Ex.

380 at GE_SDM_00440101, GE_SDM_00440122-23; Peterson Dec. (Ex. 300) at ¶ 74.)

### 4.   Spectrum's '721 PCT Application Published in November 2013, Making the Details of its ████████████ Public

In May 2013, Spectrum filed a 122-page international patent application ("the '721 PCT

application"), titled "Nuclear Medicine Tomography Systems and Methods." (Ex. 344.) The

inventors are Zilberstien, Roth, Rousso and Ben Haim—the same Spectrum principals listed as

inventors on Spectrum's '685 patent application. (*Id.*) The application published, making its full

contents available to the world, on November 14, 2013. (*Id.*) It disclosed every detail of Spectrum's

26

████ that Plaintiff claims GE misappropriated (Doc. 356 at 17-18) except the details of Spectrum's ████████████—which GE does not use and has not disclosed. Indeed, Plaintiff admitted in the First Amended Complaint that the '721 PCT application made its alleged trade secrets public. (Doc. 36 at ¶¶ 197, 204, 259, 274.)

With reference to Figures 6A and 6B of the '721 PCT application, █████████████ ██████████████████████████ (*compare* Ex. 76 *with* Ex. 344 at GE_SDM_00380855), the '721 PCT application discloses to the public ████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████ (Ex. 344 at 10:26-27, 26:25-26), ████████████████████████ ████ "to rotate the detector heads around the subject carrier to provide 360-degree coverage around the patient carrier with substantially no gaps for a selected bore size." (*Id.* at 11:4-6.)

The '721 PCT application teaches that "extension and/or retraction of the individual detector heads may be achieved . . . for example, with . . . a stepper motor" (*id.* at 51:11-13) and "the detector arrays are counterbalanced on the linear actuator arms so the force needed to extend the detector arrays is acceptably small . . . using a stepper motor." (*Id.* at 31:29-32:1.) Specifically, with reference to Figures 6E and 6F, the '721 PCT application teaches: "A weight 632 chosen to balance the weight of detector head 622 and arm 626 is moveably mounted on rail 628 and attached to arm 626 for example, by a suitable pulley arrangement." (*Id.* at 51:26-27.) Thus, when driven, "the detector head and counterweight move in opposite directions" with very little force. (*Id.* at 52:9-11.)

Spectrum's '721 PCT application also teaches that ██████████████████████ ████████████████████████████████████████ ████ (*See id.* at 16:9-10, 22:27-30.) Specifically, the application offers ████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ (*See id.* at 47:29–48:5; Peterson Dec.

(Ex. 300) ¶ 81.) As Dr. Peterson explains, and as indicated in GE's '597 patent, ██████████

██████████████████ (*Id.*) Thus, ██████████████████ as described in the '721 PCT

application, is █████████████████████ (*Id.*)

Spectrum's '721 PCT application also disclosed to the public ████████████████

████████████████████████████████ The '721 PCT application teaches that: "the

collimator septa are formed of tungsten" (Ex. 344 at 17:17); ██████████████████

████████████████████████████████ an "egg-crate" ████ (*id.* at 67:27-

68:6); "the collimator cells are square" (*id.* at 15:10); "the septa length may be different in the X

and Y direction" (i.e., ██████████████████) (*id.* at 69:10); "the collimator septa are aligned

with the pixel-pitch of the detector, i.e., the septa are positioned at the borders of each pixel" (*id.*

at 75:25-26); and ██████████████████ (*id.* at 76:16-25 ("[T]he septa pitch is smaller

than the pixel pitch, for example according to an integer ratio of 1:2 . . . This may be achieved by

positioning one or more additional septa at the middle of a pixel to provide multiple collimator

cells within each pixel.")) Also, the '721 PCT application discloses that "the collimator may be

formed of tungsten septa about 0.2mm in thickness, and having 1.03 mm square cells, with a pitch

of 1.23mm and height in the Z-direction of 14.5mm, and overall horizontal septa of 10.8 mm." (*Id.*

at 70:3-6.) ██████████████████████████████ (Ex. 345) ██████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ (*See* Bouhnik Dec. (Ex. 302)

¶¶ 57, 63–65.)

**G.     GE Independently Invented the** ██████████████████████

Plaintiff claims that the ████████████████████████████████████

███████████████████████████████████████████████ (Doc. 356

at 14 (emphasis added).) ████████████████████████████████████

████████████████████████████████████████████████ (*Id.* at

17 (emphasis added).)[13] But Spectrum disclosed to the public every detail of ████████████

█████████████████ (*See, e.g.*, Exs. 333, 342, 344.) And during the due diligence,

Spectrum did not disclose to GE the ███████████████████████████

██████████████████ (*see* Metzler Dep. (Ex. 308) at 71:20-72:10; 75:3-13), ███████

████████████████████ (*See, e.g.*, Bouhnik Dec. (Ex. 302) ¶¶ 16, 26, 34; Mahameed

Dec. (Ex. 304) ¶ 15.) In any event, GE independently developed the idea of ██████████

███████████████████ (*See* Ex. 346.)

 Except for the ██████████████████ every feature of the Veriton ████████ that

Plaintiff identifies as having been misappropriated by GE was publicly disclosed during due

diligence in Spectrum's own '685 application and Roth's 2011 IEEE Article—█████████

██████████████████████████ (*See* Ex. 333 ¶¶ 0007, 0091; Ex. 342 at

GE_SDM_00013159-160.) And, as addressed above in Section III.F.4, ██████████████

████████████ was publicly disclosed for use in the ████ in Spectrum's '721 PCT no later than

November 2013 (*see* Ex. 344), ███████████████████████████████

(Bouhnik Dec. (Ex. 302) ¶¶ 57, 63–65.) Therefore, Spectrum placed every detail of its ████████

in the public domain.

 Moreover, Spectrum did not disclose details of its ████████ to GE during the due

diligence. According to Nathaniel Roth, Plaintiff's VP of Research and Development, the

---

[13] ███████████████████████████████████████████████████
████████████████ (See Metzler Dep. (Ex. 308) at 60:11-18.) ████████
██████████████████████████████████ (*See* Bouhnik Dec
(Ex. 302) ¶ 57; *see also* Ex. 48 at GE_SDM_00440338 ████████████████████.)

innovation of a ███████████████████████████████████████████

███████████████ (Roth Dep. (Ex. 306) at 43:21-44:12, 63:23-64:20; Roth Dec. (Ex. 5) ¶ 16.)

Yet Spectrum never disclosed the concept of █████████████████████. (Bouhnik Dec.

(Ex. 302) ¶¶ 16, 26, 34; Jansen Dec. (Ex. 303) ¶¶ 9, 12, 21, 25; Mahameed Dec. (Ex. 304) ¶ 15.)

 Plaintiff vaguely claims that Exhibit 76, sent to GE after the January 2012 meeting,

██████████████████████████████ (Doc. 356 at 31.) However, Exhibit 76 does

not ████████████████████████████████████████████████

███████████████████████████████ (Ex. 76 at SDML_00038494.)

Nowhere does it reveal that the proposed ████████████████████—which

Nathaniel Roth purports to be an entirely new invention from Spectrum. (*See* Roth Dep. (Ex. 306)

at 44:18-22.)

 Plaintiff alleges without explanation that "GE could easily use the information in this

presentation [Ex. 76] to calculate the ████████████████." (Doc. 356 at 31.)

However, Plaintiff's expert, Dr. Metzler, admitted that ██████████████████

████████████████████████████████████████████████████

██████████ (*See* Metzler Dep. (Ex. 308) at 71:20-72:10; 75:3-13.) █████████████

████████████████████████████████████████████████████

█████████████ (*See id.* at 82:3-12 (████████████████████); *see also id.* at

82:14-83:18, 86:13-88:20; *see also* Peterson Dec. (Ex. 300) ¶¶ 91–96.)

 Thus, the only evidence offered in support of Plaintiff's allegation that Spectrum disclosed

the concept of a ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████[14] (Roth Dec. (Ex. 5) ¶48 (emphasis added).) When pressed during his deposition, however, Mr. Roth ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████ (*See* Roth Dep. (Ex. 306) at 54:7-20, 55:14–56:8, 56:16-21, 61:11-17, 62:4–63:4.)

GE denies that Nathaniel Roth or anyone at Spectrum ever disclosed the concept of █████

████████████████ (*See* Bouhnik Dec. (Ex. 302) ¶¶ 16, 26, 34; Jansen Dec. (Ex. 303) ¶¶ 9, 12, 21, 25; Mahameed Dec. (Ex. 304) ¶ 15). Furthermore, GE would have remembered any such discussion with Spectrum because GE considers █████████████ to be GE's invention and had filed a patent application directed to ████████████ on December 28, 2011—***before*** the alleged discussions with Spectrum in 2012. (Ex. 346; *see also* Bouhnik Dec. (Ex. 302) ¶¶ 34, 58.) With reference to FIG. 5 of GE's application, which is reproduced below, GE teaches a

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ (*See* Ex. 346 ¶¶ 0016, 0034-0039, 0071.)



FIG. 5

---

██████████████████████████████████████████████████████████████████████

████████████████ (*See* Bouhnik Decl. ¶ 58; Ex. 347.)

Thus, GE was independently aware of ████████████████ before Plaintiff even alleges

that Spectrum disclosed the concept to GE. But regardless, Spectrum publicly disclosed the

concept of using a ████████████████████████ in its '721 PCT, which published almost

immediately after the due diligence. ████████████████████████████████

██████████████████████████████████████ (Bouhnik Dec. (Ex. 302) ¶¶ 57,

61–65.)

### H.    GE Independently Selected the Use of ████████████████

Plaintiff claims that, while it disclosed use of ████████████ at the September 16, 2009

meeting, Spectrum later determined that ████████████████████████████████

████████████████████████████ (Doc. 356 at 21; Roth Dec. (Ex. 5) ¶ 37.) That is not

entirely correct since, as Nathaniel Roth subsequently admitted, ████████████████████

██████████████████████████████████████████████████ (*See*

Roth Dep. (Ex. 306) at 134:8-135:19 ("████████████████████████████████

████████████") ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ (Doc. 356 at 36.) That too is not correct. ████████

██████████████████████████████████████████████████

████████████████████████████ (Bouhnik Dec. (Ex. 302) ¶¶ 49; Ex. 182.)

Whereas ████████████████████. And those two options are arguably the only two

reasonable options to choose from.

When selecting the ████████████████████████████████████████

██████████████████████████████████████████████ patent and

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ (Bouhnik Dec. (Ex. 300)

¶ 49.)

      Almost immediately after Spectrum initially proposed to ██████████████

██████████████████████████████████████████████

████████████ (Ex. 154 ("██████████████████████████

████████████████████"); Ex. 348 at GE_SDM_0036615 ("████████████████

██████████████████████████████████████████████

████████████████") .) Spectrum ████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ (Roth Dep. (Ex. 306)

at 135:3-19; Ex. 129 at SDML_01278783 (████████████████████████

██████████████████████████████████████████████).)

██████████████████████████████████████████████

██████████████████████████████████████████████

████████ (Bouhnik Dec. (Ex. 302) ¶ 49; Ex. 182 at GE_SDM_00319563 ("████████████

████████████████████████████").)

      Spectrum's proposal to try ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

## I.        Spectrum's Claims Regarding Simulations Are False

As defined by Plaintiff, "simulations" refer to "computer generated scans" that "are used to predict performance specifications that can be expected when running actual patient scans." (Doc. 356 at 26.) The process of producing a simulation includes four basic steps: (1) generating a digital phantom "to provide images to assess imaging performance" (*id.* at 28 n.7); (2) defining a system design to be tested within a simulation software; (3) using the simulation software to generate projection data based on the phantom and the configuration of the simulated imaging system; and (4) reconstructing the raw projection data into an image. (Jansen Dec. (Ex. 303) ¶ 7; *see also* Metzler Dep. (Ex. 308) at 148:8-150:3, 155:1-156:16.)



Plaintiff, and in particular Nathaniel Roth, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Roth Dec. (Ex. 5) ¶ 44 ("▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Doc. 356 at 24 ("▮▮▮▮▮▮▮▮▮▮ ▮▮▮"); *id.* at 28 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Roth Dep. (Ex. 306) at 107:2–112:4; 123:12-16; 124:16-25; 125:6-10.)

The truth is exactly the opposite—▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (Ex. 154; Ex. 349; Jansen Dec. (Ex. 303) ¶¶ 8-15; Bouhnik Dec. (Ex. 302) ¶¶ 15–16, 20–22; Peterson Dec. (Ex. 300) ¶¶ 100–101, 106, 109–111.) ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. 356 (▮▮▮▮▮▮▮▮▮



); Ex. 154 (                                                           ); Bouhnik Dec.

(Ex. 302) ¶¶ 16, 22; Jansen Dec. (Ex. 303) ¶ 9; Peterson Dec. (Ex. 300) ¶¶ 100, 102–105.)

                                       (*See* Jansen Dec. (Ex. 303) ¶¶ 15, 17; Peterson Dec. (Ex. 300) ¶¶ 112–

114, 118; Ex. 349; Ex. 154; Ex. 64; Ex. 60; Ex. 350; Ex. 351; Ex. 359.)

                    [15] (Peterson Dec. (Ex. 300) ¶¶ 114–118; Ex. 352.)

                                                 (Doc. 356 at 26);

        Although

                                           (Ex. 64),

              (*See* Ex. 353

                    ); Ex. 154 (

                                                                ); Ex. 69 at

GE_SDM_00005088-90 (

                                ); Jansen Dec. (Ex. 303) ¶¶ 17-21, 25-26, 28; Peterson Dec. (Ex.

---

[15] Documents produced by Plaintiff in discovery
                                    (Peterson Dec. (Ex. 300) ¶¶ 116-118.)

300) ¶¶ 114–118.)

████████████████████████████████████████████████

████████████████████████ (Roth Dep. (Ex. 306) at 125:11-126:5.) ████████████

████████████████████████████████████████████████

████████████████████████ (Doc. 356 at 38.) ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ (Doc. 356 at 36-37.) But, as already explained, all of these parameters of the

████ had already been made public ████████████████████████████

████████████████████████ (*See* Sections III.B, III.E-F, *supra*.) ████████████

████████████████████████████████████████████████

████████ (Bouhnik Dec. (Ex. 302) ¶ 39). ████████████████████████

████████████████████████████████ (*Id.* ¶¶ 38-39; *see also* Jansen Dec. (Ex. 303)

¶¶ 5-6, 31.) ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

(Bouhnik Dec. (Ex. 302) ¶ 38.) ████████████████████████████████

████████████████████████ (*Id.* ¶ 39) And GE did not gain any advantage from simulating a ████

████ that Spectrum had already made public through its patent filings. (*See* Exs. 333, 344.)

## IV.    ARGUMENT

### A.    <u>Legal Standard</u>

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'"

*Convergen Energy LLC v. Brooks*, No. 20-cv-3746 (LJL), 2020 WL 5549039, at *18 (S.D.N.Y.

Sept. 16, 2020) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). "The purpose of a

preliminary injunction is . . . to preserve the relative positions of the parties." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quotation marks omitted).

"The movant seeking a preliminary injunction must establish that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (considering motion for preliminary injunction on trade secrets claims); *accord Demirayak v. City of N.Y.*, 746 F. App'x 49, 51 (2d Cir. 2018); *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).[16]

While the irreparable-harm factor is often emphasized, it remains the movant's burden to establish all four factors; a failure of proof on any of the four can serve as the basis for denying the motion. *See*, *e.g.*, *ACLU*, 804 F.3d at 625 (explaining that motion for preliminary injunction was denied because movants "have not shown a likelihood of success on the merits"); *Steelite Int'l U.S.A., Inc. v. McManus*, No. 21-cv-2645 (LAK), 2021 WL 1648025, at *13 (S.D.N.Y. Apr. 27, 2021) ("[B]ecause plaintiffs have not demonstrated that [defendant]'s conduct is anything but legitimate competition, the public interest will be best served by denying the preliminary injunction."); *IBM Corp. v. Johnson*, 629 F. Supp. 2d 321, 337–38 (S.D.N.Y. 2009) (denying motion for preliminary injunction because balance of equities weighed against imposition of injunction); *P&G v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 356 (S.D.N.Y. 2008) ("Having concluded that [movant] has failed to meet its burden of demonstrating 'a likelihood of irreparable harm if the requested relief is denied,' the Court need not consider the [other factors]." (citation omitted)).

---

[16] Plaintiff relies on an outdated preliminary injunction standard that was common in this Circuit prior to 2010. *See*, *e.g.*, *SEC v. Unifund Sal*, 910 F.2d 1028, 1038 n.9 (2d Cir. 1990) (requiring "a showing of possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief"). But in 2010, following *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) and *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), the Circuit shifted to the now-familiar four-factor test. *See Salinger v. Colting*, 607 F.3d 68, 81–82 (2d Cir. 2010). Plaintiff's cited standard undermines the necessity of demonstrating a likelihood of success on the merits, but failure to make that showing is grounds for denying a motion for preliminary injunction. *See*, *e.g.*, *ACLU*, 804 F.3d at 625 (explaining that motion for preliminary injunction was denied because movants "have not shown a likelihood of success on the merits").

Additionally, movants must "meet a higher standard where . . . an injunction will alter, rather than maintain, the status quo." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995); *see also Demirayak*, 746 F. App'x at 51 ("A heightened standard applies when a movant seeks a preliminary injunction that either alters the status quo or would provide the ultimate relief sought in the underlying action."); *Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 211 (N.D.N.Y. 2020) ("[T]he . . . heightened standard may also be required when the preliminary injunction is 'mandatory' in that it would 'alter the status quo by commanding some positive act,' as opposed to being 'prohibitory' by seeking only to maintain the status quo.").

Here, Plaintiff seeks to "enjoin GE from manufacturing, marketing and selling the StarGuide," but GE is already doing these things—and has been for months. (Phillips Dep. (Ex. 307) at 28:11–19 (GE has "begun selling StarGuide."); Yoeli Dec. (Ex. 4) ¶ 26 (in late 2020 and early 2021, Plaintiff learned that GE was marketing StarGuide to customers); *id.* at ¶ 50 (discussing "if the StarGuide is allowed to continue to sell"); Yoeli Dep. (Ex. 305) at 78:17–23 (Plaintiff first learned in March or April 2021 that GE was offering the StarGuide for sale in Europe); Ex. 37 at SDML_01281533 n.1 (March 24, 2021 web article stating that StarGuide is "available for sale in EU countries"); Doc. 364 at 38:21 (Plaintiff's counsel stating that GE sold three StarGuide devices).) Because Plaintiff is requesting an injunction that would alter the status quo, the heightened standard applies.

Under the heightened standard, "the movant must show a 'clear' or 'substantial' likelihood of success on the merits and make a 'strong showing' of irreparable harm." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citations omitted); *see also N. Am. Soccer League*, 883 F.3d 37; *Ass'n of Jewish Camp Operators*, 470 F. Supp. 3d at 211; *Dzhabrailov v. Decker*, No. 20-cv-3118 (PMH), 2020 WL 2731966, at *4 (S.D.N.Y. May 26, 2020).

Unnecessary delay can prevent a movant from demonstrating multiple factors. Delay may

"standing alone, . . . preclude the granting of preliminary injunctive relief because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995); *see also Ethicon, Inc. v. U.S. Surgical Corp.*, 762 F. Supp. 480, 505 (D. Conn. 1991) ("[P]laintiffs waited over one year after acquiring the rights to the '773 Patent to file their motion for preliminary injunction, making implausible plaintiffs' assertions of serious, non-compensable injury."). Similarly, "delay is relevant in balancing the hardships." *W.B. Marvin Mfg. Co. v. Howard Berger Co.*, 33 F. App'x 588, 592 (2d Cir. 2002) (finding balance of hardships weighed against injunction where plaintiff waited until after defendant's product was on the market to seek injunction based on trade dress claim). This is because a delay in bringing litigation—or in moving for a preliminary injunction—"undercuts [Plaintiff's] claim about the degree of its hardship" when balancing the hardships. *Lego A/S v. Best-Lock Constr. Toys, Inc.*, 874 F. Supp. 2d 75, 106 (D. Conn. 2012); *see also Krueger Int'l, Inc. v. Nightingale Inc.*, 915 F. Supp. 595, 613 (S.D.N.Y. 1996) ("Plaintiff's delay in bringing this action tips the equities in favor of defendant, which will suffer considerable economic harm if forced to cancel its [existing contracts]."). As in these cases, Plaintiff's unnecessary delay prevents it from being able to demonstrate multiple factors for an injunction. Thus, Plaintiff's motion should be denied.

  **B.**  <u>**Plaintiff Is Not Likely to Succeed on the Merits**</u>

    **1.**  **Plaintiff does not have standing to maintain a claim for breach of the 2009 NDA.**

  At the preliminary injunction stage, a plaintiff bears the burden of demonstrating standing to the same extent as on a motion for summary judgment. *Aviles v. De Blasio*, No. 20 Civ. 9829 (PGG), 2021 WL 796033, at *15 (S.D.N.Y. Mar. 2, 2021) (quoting *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020)). Plaintiff's motion is based on GE's alleged breach of the 2009 NDA. (Doc. 356 at 5, 55–56.) For Plaintiff to have standing to assert this claim, it must

show that it is a signatory to the 2009 NDA or a successor-in-interest. *See Alzal Corp. v. I.F.C. Int'l Freight Corp.*, No. 13-CV-2577 (PKC) (JO), 2015 WL 1298585, at \*5-6 (E.D.N.Y. Mar. 23, 2015) (dismissing claim for breach of contract because plaintiff was "not involved in the transactions at issue" and was not a successor-in-interest). The 2009 NDA was signed by "Spectrum Dynamics Limited." (Ex. 8.) Plaintiff Spectrum Dynamics Medical Limited, a BVI entity that did not exist until 2016 (Doc. 36 at ¶ 1), has not presented evidence that it is a successor-in-interest. Therefore, Plaintiff has not set forth evidence to establish that it has standing.[17]

At the outset of its Memorandum, Plaintiff misidentifies itself as "Plaintiff Spectrum Dynamics Limited ('Plaintiff' or 'Spectrum')," when Plaintiff is actually Spectrum Dynamics Medical Limited. (Doc. 356 at 1.) Throughout its Memorandum, Plaintiff continues to refer to itself loosely as "Spectrum" and attribute to itself actions that took place before Plaintiff even existed. For example, Plaintiff attributes the pre-2007 development of D-SPECT and the 2009–2012 development of the GPC concept to "Spectrum" (Doc. 356 at 20–33.) But, according to Yoeli's declaration, Plaintiff did not come into existence until 2016 (Yoeli Dec. (Ex. 4) ¶ 2.)

While Yoeli's declaration does constitute an admission that Plaintiff is not a party to the 2009 NDA, it nonetheless raises more questions than it presents answers. While it recites two chains of successive entities—one leading to Plaintiff and the other not—"Spectrum Dynamics Limited," the signatory to the 2009 NDA, is in neither chain. (*Id.*) Plaintiff may point to the declaration of Jim Haisler, submitted with its First Amended Complaint, to argue that "[t]he named Spectrum entity to the 2009 [NDA] should have been Spectrum Dynamics LLC." (Doc. 36-19 ¶ 9.) But that declaration, whether considered on its own or together with Yoeli's declaration, is

---

[17] Plaintiff's entire "argument" for why it has standing to bring a breach of contract claim under the 2009 NDA is found in footnote 2 of its Memorandum, where it says, "Spectrum is the successor-in-interest to the 2009 [NDA], and owns all of the Spectrum CI." (Doc. 356 at 15 n.2.) Should Plaintiff present actual argument on the issue of standing in its Reply, GE requests leave to file a surreply to address that new argument.

insufficient to demonstrate Plaintiff's standing for at least two reasons.

First, Haisler's testimony is inconsistent with all the facts surrounding it and represents a belated attempt to revise history. The 2009 NDA lists "Spectrum Dynamics Limited" as a signatory and provides an Israeli address for the entity. (Ex. 8 at 1). As Haisler admits, that address was the address of Spectrum Dynamics (Israel) Limited (Doc. 36-19 ¶ 9), the Israeli business that employed both Zilberstien and Roth (Exs. 310-311), the alleged inventors of the Spectrum trade secrets and confidential information at issue. And, according to Yoeli, Spectrum Dynamics (Israel) Limited was acquired by M. Maozos and became SDMIL—an entity that is not Plaintiff. (Yoeli Dec. (Ex. 4) ¶ 2.)

Second, Yoeli presents this alleged chain of entities without citation to a single document that shows that the 2009 NDA was among the assets transferred from the signatory of the 2009 NDA to the Plaintiff in this case. Yoeli's testimony amounts to nothing more than a lay person's unsubstantiated account of several complex legal transactions.[18] As such, Plaintiff is unlikely to prove that it has rights under the 2009 NDA. For this reason, its motion should be denied.

### 2.    Plaintiff cannot establish that GE breached the 2009 NDA.

Everything that Plaintiff argues was misappropriated by GE was either (1) independently developed by GE; (2) placed in the public domain by Spectrum or others; and/or (3) was never used by GE. Therefore, Plaintiff cannot prove that GE breached the 2009 NDA.[19]

---

[18] During Yoeli's deposition, both Yoeli and Plaintiff's counsel treated standing as a mixed question of law and fact. Throughout his deposition, when questioned about his declaration and the transfer of assets among various entities, Yoeli testified that he was not an attorney. (*See* Yoeli Dep. (Ex. 305) at 15:18, 19:12, 123:16–17, 154:21–22.) And when Yoeli was asked about transfers of assets, Plaintiff's counsel objected on the grounds that the question "[c]alls for a legal conclusion." (*Id.* at 159:17–160:8.)

[19] "[D]istrict courts must take care to ensure that injunctive relief is not overbroad." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011). "[I]njunctive relief should be narrowly tailored to fit specific legal violations." *Id.* (internal quotation marks omitted). Thus, even if Plaintiff could prove that GE likely breached the 2009 NDA by misappropriating one of the alleged trade secrets at issue here, this would not justify enjoining "GE from manufacturing, marketing, and selling the [entire] StarGuide [device] anywhere in the world," as Plaintiff requests in its motion. (Doc. 356 at 59.)

██████████████████████████████████████████████ This concept was already in the public domain before the due diligence, was further independently developed by GE even before signing the 2009 NDA, and, ██████████████████████████ ████████████████, was repeatedly placed in the public domain by Spectrum. Therefore, any use by GE does not violate the 2009 NDA. (*See* Ex. 8 §§ 2.1, 7.)

The 1977 Stoddard patent application describes ████████████████████████ ██████████████████████ (Ex. 312.) Also, GE's '597 patent, filed in 2006, describes "two, three or more than four imaging detectors" (Ex. 314 at 2:61-65) that move radially (*id.* at 4:43-47) and "independently . . . with respect to each other." (*Id.* at 1:50-52.) ████ ████████████████████████████████████ (Ex. 327 at GE_SDM_00285168) ████████████████████████████ ████ (Ex. 328 at GE_SDM_00366664; Exs. 329-330.)

When Spectrum finally settled on a ████████████, it disclosed the concept publicly in the 2011 Roth Article (Ex. 342 at GE_SDM_00013160) and again in its '721 PCT application (Ex. 344 at 51:11-13.) This same '721 PCT application also placed in the public domain the use of a ██████████████████████ (*Id.* at 31:29-32:1, 51:26-27, 52:9-11.)

████████████████████████████████ ████████ This concept was already independently developed by GE and was repeatedly placed in the public domain by Spectrum. Therefore, any use by GE does not violate the 2009 NDA. (*See* Ex. 8 §§ 2.1, 7.)

GE's '597 patent, filed in 2006, discloses use of "4x4 cm" ██████████████ "rectangle." (Ex. 314 at 3:6-13.) ████████████ ████████████████████ ██████████████████████████████████████ (Peterson

Dec. (Ex. 300) ¶¶ 81; Bouhnik Dec. (Ex. 302) ¶ 49; Ex. 182 at GE_SDM_00319563 ("███████████

███████████")]

In any event, Spectrum placed this idea in the public domain. The '721 PCT application

describes ███████████ (Ex. 344 at 47:29–48:5), ███████████

███████████ (Peterson Dec. (Ex. 300) ¶ 81.)

███████████ This concept was already in the public domain before the due

diligence, was independently developed by GE, and was repeatedly placed in the public domain

by Spectrum. Therefore, any use by GE does not violate the 2009 NDA. (*See* Ex. 8 §§ 2.1, 7.)

The DeVito patent—filed in 1998 and published in 2001—describes a SPECT system that

uses of a plurality of "small detector modules" ███████████. (Ex. 321

at 5:48-49, 7:36-48); *id.* at Figs. 8, 10.) The detectors "swivel." (*Id.* at 18:28-45.) Spectrum

acquired rights to the DeVito patent ███████████

(Ex. 57 at 179:8-13 ("███████████

███████████

███████████

███████).)

GE's '597 patent also describes ███████████. (Ex. 314 at 4:43-47, 6:41-49; *see also*

*id.* at Figs. 2, 3.) ███████████

███████████ (Ex. 325 at SDM_00286902.)

Finally, Spectrum repeatedly placed the concept of ███████████ into the public

domain. Mr. Ben Haim of Spectrum authored an article, which published in 2009, describing the

███████████ (Ex. 331 at GE_SDM_00455168.) Spectrum

described the ███████████ in its '685 application (Ex. 333 ¶ 0033; *id.* at FIG.

5A.) Spectrum again described ███████████ in the 2011 Roth Article. (Ex. 342 at

GE_SDM_00013159 ("The detectors can rotate about their own axis, in order to scan over the object.").) And Spectrum *again* disclosed ███████████ in its '721 PCT application. (Ex. 344 at 10:26-27, 26:25-26.)

███████████████ Spectrum's ██████████ was repeatedly placed in the public domain by Spectrum and others. ██████████████████████████

████████ Therefore, GE did not violate the 2009 NDA ███████████████████████

████████ (*See* Ex. 8 §§ 2.1, 7.)

Plaintiff argues that ███████████████████████████████████

██████████████████████████████████████ (Doc. 356 at 17.) Plaintiff alleges it disclosed details of its █████████████████████████████████

██████████████████████████ (Doc. 356 at 31.) ███████████████████

██████████████████████████████ was publicly disclosed during due diligence in Spectrum's own '685 application and Roth's 2011 IEEE Article. (*See* Ex. 333 ¶¶ 0007, 0091; Ex. 342 at GE_SDM_00013159-160.) And Spectrum's '721 PCT application disclosed ███████████████████████████ (*See* Section III.F.4 *supra*.) Siemens' 2003 patent application also disclosed and dedicated to the public what Nathan Roth describes as ██████████████████████████ (*See* Section III.B.4, *supra*.)

In any event, Spectrum never actually disclosed these details—███████████████ ██████████████ to GE during the GE diligence. (Bouhnik Dec. (Ex. 302) ¶¶ 16, 26, 34; Jansen Dec. (Ex. 303) ¶¶ 9, 12, 21, 25; Mahameed Dec. (Ex. 304) ¶ 15.) ███████████████ ████████████████████████████████████████████████████ ██████████████████████████ (Metzler Dep. (Ex. 308) at 22:19-23:1, 82:3-82:18, 86:13-88:20.) And GE independently developed, and filed a patent application for, a ██████████████████ (*See* Ex. 346.)



███████████████ This concept was already in the public domain before the due diligence, was independently developed by GE, and was repeatedly placed in the public domain by Spectrum. Therefore, any use by GE does not violate the 2009 NDA. (*See* Ex. 8 §§ 2.1, 7.)

The 1984 Moore et al. Publication describes ████████████████████████████ ████████████████████████████████████ (Ex. 313 at GE_SDM_00058314.) The ████ in GE's '597 patent, filed in 2006, ████: "For example, the gantry 110 may be formed as a closed ring or circle" and "[t]he gantry 110 . . . may be rotatable about the patient 142." (Ex. 314 at 3:25-28.)

As with its other purported "trade secrets," Spectrum itself placed the concept of a ████████ ████ in the public domain several times. Spectrum's '685 application describes a SPECT system that "rotates the plurality of detector arms around the body of the patient." (Ex. 333 ¶¶ 0010, 0019.) Roth's 2011 IEEE Article describes a SPECT system in which "[t]he whole gantry can also rotate in order to fill gaps between the detectors." (Ex. 342 at GE_SDM_00013159–160). And the SPECT system described in the '721 PCT includes a gantry which "rotate[s] the detector heads around the subject carrier to provide 360 degree coverage around the patient carrier with substantially no gaps for a selected bore size." (Ex. 344 at 11:4-6.)

████████████████████: Spectrum's ███████████████ was placed in the public domain no later than 2012. And GE independently developed the ███████ █████ ███████ Therefore, GE did not violate the 2009 NDA ████████████████████ ███████████ (*See* Ex. 8 §§ 2.1, 7.)

The 2012 Hutton Publication placed into the public domain ███████████████ ████████████████████████ (*See* Ex. 374; Peterson Dec. (Ex. 300) at ¶¶ 61-67.) To the extent Plaintiff argues that GE uses the ████████████████████ ████████████████████████████████████████ (Metzler Dep.

(Ex. 308) at 134:6-13.) Instead, the ████████ ███████████ was independently developed by GE and covered in GE's '597 patent. (Ex. 314, at 5:59-6:18; *see also* Peterson Dec. (Ex. 300) ¶¶ 69, 72, 74.) And even the ████████████ was disclosed to the public in 2012. (Ex. 380 at GE_SDM_00440101, GE_SDM_00440122–23; Peterson Dec. (Ex. 300) at ¶ 74.)



████████ Plaintiff asserts that ████████████████████████████████ ██████████████████████████████████████████████████████████ ████████ (Doc. 356 at 36-43.) But this assertion has no factual support. ████████████ ██████████████████████████████████████████████████████████ (Ex. 154; Ex. 200 Ex. 349; Jansen Dec. (Ex. 303) ¶¶ 5-6, 8-16; Bouhnik Dec. (Ex. 302) ¶¶ 14–16, 18–22; Peterson Dec. (Ex. 300) ¶¶ 100–101, 106–107, 111.) ████████████████████ ████████ (*see*, *e.g.*, Exs. 64, 359), ████████████████████████████████ (Peterson Dec. (Ex. 300) ¶¶ 113–118; Ex. 352.) ████████████████████████ ████████████████████████

### C.  Plaintiff cannot establish irreparable harm

As discussed above, Plaintiff must make a "strong showing" of irreparable harm. To show irreparable harm, Plaintiff "must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Rodriguez v. DeBuono*, 175 F.3d 227, 230 (2d Cir. 1998). As demonstrated below, Plaintiff cannot show irreparable harm under any standard, but especially where, as here, a heightened standard applies. Because Plaintiff has "fail[ed] to show irreparable harm, [the] [C]ourt need not even address the remaining elements of the test" for a preliminary injunction. *Monowise Ltd. v. Ozy Media, Inc.*, No. 17-CV-8028 (JMF), 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018). Plaintiff's motion should simply be denied.

1.   **Plaintiff's delay in filing its motion shows that Plaintiff is not suffering, and will not suffer, irreparable harm.**

Delay may "standing alone, . . . preclude the granting of preliminary injunctive relief because the failure to act sooner . . . suggests that there is, in fact, no irreparable injury." *Tough Traveler*, 60 F.3d at 968. "There is no bright-line rule for how much delay is too much, but courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Monowise*, 2018 WL 2089342, at *2 (internal quotation marks omitted) (collecting cases).

Plaintiff alleged in its December 2018 complaint that "GE's continued use of Spectrum's trade secrets to unfairly compete with Spectrum would cause irreparable harm to Spectrum." (Doc. 2 ¶ 300.) And Plaintiff has been aware of GE's market activities since at least December 2020. (*See* Section II, *supra*.) Yet Plaintiff waited until July 20, 2021 to request leave to file the over-sized briefing for its motion for preliminary injunction. (*See* Doc. 302.) Standing alone, this delay shows that Plaintiff is not suffering irreparable harm.

2.   **Plaintiff has failed to make any showing – let along a strong showing – of irreparable harm.**

Plaintiff alleges several types of irreparable harm. GE addresses each type below.

a.   **Loss of advantage of being the pioneer**

Plaintiff argues that, if the Court does not grant a preliminary injunction, Plaintiff will lose its first-mover advantage in the market—an advantage it acquired as the pioneer in the field. (Doc. 356 at 47.) Plaintiff, however, has not shown it is enjoying—or will lose—a first-mover advantage. Plaintiff relies upon the declarations of Yoeli and Phillips. (*Id.*) Yoeli states only that "StarGuide . . . would be expected to erode Spectrum's . . . advantage of being the pioneer" and that "Spectrum will stand to lose critical first-to-market momentum." (Yoeli Dec. (Ex. 4) ¶¶ 37, 43.) "The[se] conclusory allegations are unsupported by any evidence, and as such, cannot

47

establish irreparable harm." *Caldwell Mfg. Co. N. Am., LLC v. Amesbury Group, Inc.*, No. 11-CV-6183T, 2011 WL 3555833, at *4 (W.D.N.Y. Aug. 11, 2011). Phillips addresses the first-mover advantage in only a single paragraph of his declaration that contains no citation to any underlying evidence. (Phillips Dec. (Ex. 2) ¶ 14.) When asked during his deposition what first-mover advantages Plaintiff currently has, Phillips "identified a few examples of the first-mover advantage that *might* pertain to Spectrum." (Phillips Dep. (Ex. 307) at 71:5–15 (emphasis added).) When asked what evidence this was based on, Phillips could not point to any particular evidence, stating only that he relied on his "business understanding" and on his "general understanding of Spectrum's operations" from his discussions with Plaintiff's employees. (*Id.* at 72:17–73:8.) Thus, Plaintiff has failed to prove that it is enjoying a first-mover advantage or that it will lose any such advantage. And even if it could make such a showing, the loss of this advantage can be compensated through an award of damages. (Putnam Dec. (Ex. 301) ¶ 56.)

### b.  Loss of sales

Plaintiff alleges it will lose two types of sales: (1) sales of Veriton devices; and (2) follow-on sales of applications and software. (Doc. 356 at 47–48.) However, courts have held that such losses typically will not support a preliminary injunction because they are quantifiable and therefore can be redressed with money damages. *See*, *e.g.*, *Pado, Inc. v. SG Trademark Holding Co LLC*, No. 19-CV-6614 (RPK) (RER), 2020 WL 7625363, at *3 (E.D.N.Y. Dec. 22, 2020) ("As a general matter, lost sales can be remedied through damages at the close of a case."); *Caldwell*, 2011 WL 7625363, at *3 ("Proof of . . . lost sales alone [is] insufficient to establish irreparable harm." (internal quotation marks omitted)). Using Plaintiff's own evidence and the damages framework advocated by Plaintiff's own damages expert, Plaintiff's lost sales of the Veriton can be quantified. (Putnam Dec. (Ex. 301) ¶¶ 49–52.) While Plaintiff's damages expert argues otherwise, he admitted at deposition that he has not previously opined as an expert on irreparable

harm and that he did not even attempt to quantify Plaintiff's damages. (Phillips Dep. (Ex. 307) at 19:22–20:6, 92:23–93:2.)

With regard to alleged loss of follow-on sales of applications and new software, such losses are too "remote" and "speculative." (Putnam Dec. (Ex. 301) ¶¶ 32–33 (quoting *Rodriguez*, 175 F.3d at 230).) As Phillips testified, the applications and software at issue do not yet exist, but Plaintiff "intends to develop" them in the future. (Phillips Dep. (Ex. 307) at 106:3–110:18; Phillips Dec. (Ex. 2) ¶ 24.) And, as Yoeli testified, "it is hard to predict what applications or new software will be developed." (Yoeli Dec. (Ex. 4) ¶ 35.) Finally, Phillips opined that this category of damages "carr[ies] a greater risk of being dismissed [by this Court] as speculative." (Phillips Dep. (Ex. 307) at 106:17–110:18; Phillips Dec. (Ex. 2) ¶ 24.) Because these alleged losses are remote and speculative, they cannot serve as the basis for a preliminary injunction.[20]

### c.    Price erosion

Citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359 (Fed. Cir. 2001), Plaintiff argues that likelihood of price erosion is evidence of irreparable harm. (Doc. 356 at 49.) As subsequent cases have noted, however, the *Purdue* court presumed irreparable harm. *Pass & Seymour, Inc. v. Hubbell, Inc.*, 532 F. Supp. 2d 418, 433 (N.D.N.Y. 2007); *CollaGenex Pharms., Inc. v. IVAX Corp.*, 375 F. Supp. 2d 120, 130–31 (E.D.N.Y. 2005). Where, as here, there is no presumption of irreparable harm, evidence of price erosion standing alone is insufficient to establish irreparable harm. *See CollaGenex*, 375 F. Supp. 2d at 131; *see also Pass*, 532 F. Supp. 2d at 433 (quoting and following *CollaGenex*).

In any event, Plaintiff has not put forth sufficient evidence of price erosion. Phillips opines that price erosion is likely because, *inter alia*, ███████████████████████████

---

[20] Plaintiff also argues that a loss in sales could hurt Plaintiff's valuation and make it difficult to ████████ ███████████████████ (Doc. 356 at 48.) These alleged harms are similarly remote and speculative, among other defects. (*See* Putnam Dec. (Ex. 301) ¶ 44; Phillips Dep. (Ex. 307) at 103:22–104:16.)

███████████████████ (Phillips Dec. (Ex. 2) ¶ 19.) ██████████████████████████████

████████████████ ████████████████████████████████████ (*Id.*)[21] ██████████████

██████████████████████████████████████ is unlikely to erode prices for the

Veriton, particularly because buyers in "the higher segment of the market" where StarGuide and

Veriton compete are "willing to pay a premium." (Yoeli Dec. (Ex. 4) ¶ 32; Phillips Dec. (Ex. 2)

¶ 6 & n.12.)

But even if price erosion were likely, Plaintiff has failed to show that such harm cannot be

compensated by an award of damages. (Putnam Dec. (Ex. 301) ¶¶ 53–54.) Phillips offers a half-

hearted opinion on this issue: "[i]t ***would be reasonable to expect*** an award of price erosion

damages to Spectrum ***may be deficient***." (Phillips Dec. (Ex. 2) ¶ 22 (emphasis added); *see also*

Phillips Dep. (Ex. 307) at 91:23–92:15.) But he also admitted that he had not even attempted to

calculate Plaintiff's likely price erosion damages. (Phillips Dep. (Ex. 307) at 92:17–20.) Thus,

Plaintiff has failed to show that it is likely to suffer irreparable price erosion.

### d.    Loss of market share

Plaintiff argues that, absent an injunction, it will lose market share. (Doc. 356 at 49–50.)

"A loss in market share can be calculated and compensated in most instances," such that it is not

irreparable. *Nexus Pharms., Inc. v. Cent. Admixture Pharm. Servs.*, No.: SACV 20-01506-

CJC(JDEx), 2020 WL 6555052, at *14 (C.D. Cal. Oct. 29, 2020). This is particularly true where

there are only two competitors in the market. *Caldwell*, 2011 WL 6555052, at *6 (citing *MMJK*

*Inc. v. Ultimate Blackjack Tour LLC*, 513 F. Supp. 2d 1150, 1157 (N.D. Cal. 2007) for the

proposition that "presence of only two competitors in market suggests that any lost market share

would be recoverable, and monetary damages would sufficiently compensate plaintiff's damages

---

[21] In calculating the average price for Veriton, Phillips excluded discounted sales but did not investigate whether any of Plaintiff's sales were at marked up prices that should also be excluded as outliers. (Phillips Dep. (Ex. 307) at 89:13–16.) This may have resulted in an inflated average price.

if plaintiff prevailed"); *see also Merck Eprova AG v. Brookstone Pharms., LLC*, No. 09 Civ. 9684 (RJS), 2009 U.S. Dist. LEXIS 130385, at *16–17 (S.D.N.Y. Dec. 15, 2009) (if defendant's product were removed from the market following final judgment, plaintiff's product would recapture market share because plaintiff would be "the only producer . . . on the market").

According to Plaintiff's own damages expert, there are only two competing companies— GE and Plaintiff—and two competing products—StarGuide and Veriton—in the relevant market segment. (Phillips Dec. (Ex. 2) ¶ 9; Phillips Dep. (Ex. 307) at 134:5–13.) Therefore, loss of market share can be calculated and compensated with money damages (Putnam Dec. (Ex. 301) ¶¶ 49–52), and it is insufficient to establish irreparable harm.[22]

### e.      Loss of goodwill and reputation

Plaintiff claims that it is suffering irreparable harm to its goodwill and reputation. (Doc. 356 at 50–52.) As an initial matter, the Court should note the irony of this claim. Plaintiff has already damaged the reputation and goodwill of GE and of the StarGuide specifically by issuing and widely distributing a press release that mischaracterized this Court's order on GE's motion to dismiss (Doc. 73) and disparaged GE generally. (Ex. 381.) As a result, a French court recently found that Plaintiff had engaged in unlawful conduct. (Ex. 387.)

In any event, in support of its claim, Plaintiff first points to its supposed loss of the first-mover advantage, which Defendants addressed above (Section IV.C.2.a, *supra*). ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

(Ex. 22.) ██████████████████████████████████████

(Phillips Dec. (Ex. 2) ¶ 16.) This inference is unreasonable because, as Phillips admitted, it is

---

[22] Further, while Plaintiff claims that it is likely to lose ███████ of its Veriton sales to StarGuide (Doc. 356 at 50), the sales history to date shows that these percentages are not realistic. In head-to-head competition with StarGuide, Plaintiff has won at least ███ of sales. (*See* Mahameed Dec. (Ex. 304) ¶ 27; *see also, e.g.*, Ex. 385.)

unclear ████████████████████████ (Phillips Dep. (Ex. 307) at 74:10–78:15

(████████████████████████████████████████).)

Plaintiff also points to testimony from Yoeli that "I understand from key opinion leaders, who are Spectrum's current customers, that Spectrum's reputation as a reliable supplier is being harmed by the release of StarGuide, as they now believe that ████████████████ ████████████████████████████████" (Yoeli Dec. (Ex. 4) ¶ 40.) This statement is hearsay. *See Perry v. Floss Bar, Inc.*, No. 21 Civ. 685 (ER), 2021 WL 871436, at *7 n.14 (S.D.N.Y. Mar. 8, 2021) ("[T]he Court can, and will, put limited weight on these statements because they are hearsay."). And, when Yoeli was asked which "key opinion leaders" and "customers" he was referring to, he could only identify a single individual by name. (Yoeli Dep. (Ex. 305) at 136:1–20.) Further, Plaintiff is not "independent" even now; it is owned by CITIC Private Equity ("CITIC"). (*Id.* at 140:20–141:9.) CITIC is "a leading Chinese asset manager" with a "private equity portfolio of more than 100 companies." (Ex. 357.) In the 2021 PEI 300 Global Private Equity Rankings—which are based on the total capital raised by the world's top private equity funds—CITIC ranked 59th overall and 5th in the Asia-Pacific region. (*See* Ex. 358.) ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ (Putnam Dec. (Ex. 301) ¶ 43.) As Yoeli himself avers, "the overwhelming majority of customers naturally prefer to buy from a well-known, established supplier in the multi-purpose SPECT market, like GE, who also has much larger resources, long lasting relationships with customers, and a better cost structure." (Yoeli Dec. (Ex. 4) ¶ 43.)

Finally, Plaintiff argues that there is "customer confusion" between the StarGuide and Veriton. (Doc. 356 at 51–52.) Plaintiff, however, does not explain what type of confusion it is

referring to or why this confusion would harm Plaintiff's reputation or goodwill. Plaintiff points to only one specific example of "customer" confusion—a six-word comment on LinkedIn. (*Id.* at 52.) That comment is, of course, hearsay. And based on information provided by LinkedIn, Yoeli testified that the declarant is an employee of a company that competes with Plaintiff—rather than a customer. (Yoeli Dep. (Ex. 305) at 104:11–19.) Thus, this is not evidence of customer confusion.

Even if Plaintiff could prove harm to its reputation or goodwill, "[d]amage to reputation alone cannot constitute irreparable harm; the plaintiff must also show that such damage is difficult to quantify." *Sunni, LLC v. Edible Arrangements, Inc.*, No. 14 Civ. 461 (KPF), 2014 WL 1226210, at *11 (S.D.N.Y. Mar. 25, 2014). Plaintiff has simply failed to do so.

**f.** ██████████████████████

Plaintiff argues that ████████████████████████████████ (Doc. 356 at 53.)

It points to testimony from Yoeli that, as a result of StarGuide's market entry, ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Yoeli Dec.

(Ex. 4) ¶ 44; *see also* Phillips Dec. (Ex. 2) ¶¶ 26–30 (assessing reasonableness of Yoeli's testimony).) This is not the same as ████████████████████ *See Tom Doherty*, 60 F.3d at 37 (cited by Plaintiff) (explaining irreparable harm exists "where a party is threatened with the loss of a business" such as being "threatened with termination of its franchise by the manufacturer"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2d Cir. 1984) (cited by Plaintiff) (granting injunction where Plaintiffs "stand to lose their business forever"); *Sunni,* 2014 WL 1226210, at *10 (acknowledging that "[l]oss of a business can constitute irreparable harm," but denying injunctive relief because plaintiffs did not stand to lose their entire business and could instead be monetarily compensated for any lost sales during the pendency of the action).

53

Further, while Plaintiff claims ████████████████████████████████, this assertion is unsupported by actual evidence and, therefore, speculative. (Putnam Dec. (Ex. 301) ¶¶ 36–41.) And while Plaintiff claims ███████████████████████████████████ ████, that is what Plaintiff is now. Yoeli described "niche players" as "small companies that had very limited sales" and held less than 10% of the overall SPECT market. (Yoeli Dep. (Ex. 305) at 142:16–143:4.) Plaintiff currently holds about ████ of the overall SPECT market, as it did in 2010 after launching the D-SPECT (*id.* at 144:17–145:5), and it sells devices that compete within certain niches or segments in the larger market. (Phillips Dec. (Ex. 2) ¶ 6.) ███████████████████ ██████████████ (Ex. 38 (████████████████████████████████████ █████████████████████).) While Plaintiff may aspire to someday become "a formidable player in the market" holding a ████████ market share (Yoeli Dep. (Ex. 305) at 144:2–8), it has submitted no evidence to support these figures, and any injury here is both remote and speculative.

### g.    Loss of competitive advantage

Plaintiff argues that, by using Plaintiff's confidential information in breach of the 2009 NDA, ███████████████████████████████████████ gained an undeserved "head-start." (Doc. 356 at 53–55.) Nothing could be further from the truth.

As an initial matter, GE did not use Plaintiff's confidential information in breach of the 2009 NDA. (*See* Section IV.B.2, *supra*.) Further, GE has not gained a "head-start." Plaintiff began selling the Veriton in 2018 (Yoeli Dep. (Ex. 305) at 152:16–19)—years before the StarGuide entered the market. (*See* Mahameed Dec. (Ex. 304) ¶ 26 (entered market February 2021).) And as Yoeli notes, GE has more resources than Plaintiff and can, thus, develop products faster. (Yoeli Dec. (Ex. 4) ¶ 34 ("Given GE's resources, it will be able to make any developments at a faster pace compared to Spectrum."); *id.* ¶ 43 ("GE . . . has much larger resources"); Yoeli Dep. (Ex. 305) at 129:16–130:20.) ████████████████████████████████████

StarGuide would not have entered the market years after Veriton.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (Phillips Dec. (Ex. 2)

¶ 30 & App. 2.5 (comparing R&D numbers in Ex. 10, Ex. 19, and Ex. 39).)

For all of the foregoing reasons, Plaintiff has not carried its burden of making a strong showing of irreparable harm. As a result, the Court should deny Plaintiff's motion.

### D.    The balance of equities disfavors an injunction

"Given that a preliminary injunction is an extraordinary remedy never awarded as of right, it would be inappropriate to award such an injunction if doing so would result in an arrangement less fair to the parties than the status quo, such as an arrangement in which the hardship imposed on one party outweighed the benefit to the other." *Ligon v. City of N.Y.*, 925 F. Supp. 2d 478, 539–40 (S.D.N.Y. 2013). Hence, courts must consider a balance of the equities, which "means a balance of the hardships against the benefits." *Napierski v. Guilderland Democratic Comm.*, No. 1:18-CV-0846 (GTS/DJS), 2018 WL 3546175, at *3 (N.D.N.Y. July 24, 2018); *see also Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 802 (S.D.N.Y. 1967) ("To be most importantly considered are the hardship to plaintiff if the injunction be granted, the benefit to plaintiff and the relative hardship to which a defendant will be subjected." (citation omitted)). "A preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 401 (S.D.N.Y. 2011).

A preliminary injunction that prevents a company from offering its goods on the open market works great hardships. *See*, *e.g.*, *Am. Cyanamid Co. v. U.S. Surgical Corp.*, 833 F. Supp. 92, 124 (D. Conn. 1992). Here, GE would be completely prevented from offering its StarGuide product on the market and, according to Plaintiff's own damages expert, GE would be driven out of the ███████████████████████████ market. (Phillips Dec. (Ex. 2) ¶ 9; Phillips

Dep. (Ex. 307) at 134:5–13.) This would leave GE with zero opportunities ███████

████████████████████████ (Putnam Dec. (Ex. 301) ¶ 60.) ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████ (*See* Phillips Dec. (Ex. 2) ¶ 30 & App. 2.5.) ███████████

█████████████████████████ (*See*, *e.g.*, Ex. 354 at GE_SDM_00000496 (████████

████████); Ex. 355 at GE_SDM_00168078 (██████████████████████).) And, based on

the evidence presented by Plaintiff's own damages expert, ███████████████████

██████████████████ Putnam Dec. (Ex. 301) ¶ 59.)

For its part, Plaintiff points to "price erosion, loss of sales, and loss of market share" as the hardships it could allegedly suffer if no injunction is granted—in other words, the normal dangers of open market competition. (Doc. 356 at 56.) But the prospect of a plaintiff losing sales on the open market generally does not outweigh the hardships imposed when a defendant is altogether barred from offering its products for sale. *See*, *e.g.*, *Am. Cyanamid*, 833 F. Supp. at 124 (balance of hardships weighed against injunction despite "evidence in the record that the increased competition generated by [Defendant]'s entry into the market will cause [Plaintiffs] to lose sales and market share"). Instead, plaintiffs seeking an injunction must demonstrate "real hardship" if the injunction is not granted, "such as being 'driven out of business . . . before a trial could be held.'" *Harper v. Cuomo*, No. 9:21-CV-0019 (LEK/ML), 2021 WL 1821362, at *5 (N.D.N.Y. Mar. 1, 2021). Plaintiff has made no such showing here.

Instead, Plaintiff makes a half-hearted attempt to argue it is "█████████████████

████████████" and that ███████████████████████ (Doc. 356 at 53, 56.) These assertions

are supported by *no evidence*. Plaintiff's own damages expert admitted that he did "not undertake an effort to show a likelihood that Spectrum ████████████████ (Phillips Dep. (Ex. 307) at

145:3–7.) And regardless of what occurs with the Veriton device, Plaintiff sells another successful product—the D-SPECT. (Yoeli Dec. (Ex. 4) ¶¶ 19–21.) On similar facts, courts have found that a plaintiff would not suffer loss of its business in the absence of an injunction. *See CollaGenex*, 375 F. Supp. 2d at 139–40.

Additionally, Plaintiff's delay in moving for a preliminary injunction "undercuts [Plaintiff's] claim about the degree of its hardship." *Lego*, 874 F. Supp. 2d at 106. Where a plaintiff waits until a defendant has already engaged with buyers, that delay "tips the equities in favor of defendant, which will suffer considerable economic harm if forced to cancel its contract with [buyers] or to immediately re-tool to alter its design for the . . . contract." *Krueger*, 915 F. Supp. at 613 (noting that prospective buyer would "also be unfairly prejudiced in the delay in receiving products occasioned solely by the late assertion by [Plaintiff] of its [claim]"); *see also W.B. Marvin*, 33 F. App'x at 592 (denying preliminary injunction motion where plaintiff waited until after defendant's product was already on market). Plaintiff has known, since at least June 2018, that GE was developing StarGuide, yet it waited to bring this motion until after all development was complete and when it would cause GE the most harm. Indeed, by the time Plaintiff filed its motion, ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████ (*See* Mahameed Dec. (Ex. 304) ¶¶ 26-27; Ex. 386.) Even absent this delay, the balance of equities tips in GE's favor. Taking the delay into account, the equities weigh heavily in GE's favor, and no injunction should issue.

### E.   The public interest would be harmed by entry of an injunction

Currently, customers in the "super premium" segment of the market for SPECT devices have a choice between GE's StarGuide and Plaintiff's Veriton devices. (*See* Phillips Dep. (Ex. 307) at 52:23–54:1 (referring to Veriton as the "next best alternative" on the market to StarGuide).) An injunction would remove that choice, leaving Plaintiff a monopoly. (*See id.* at 134:5–18,

151:4–25 (describing Veriton's sole position in the super premium segment if an injunction were to issue); Doc. 356 at 58 (arguing that GE sells another device in this segment but that the device has "lesser capabilities" and "does not compete directly with the VERITON"); Doc. 36 ¶ 482 (explaining that GE's StarGuide threatens "Spectrum's exclusive 2018 market entry position")).

New York federal courts have recognized that "[s]ince competition is generally held to benefit the public, any reduction in competition must be considered against the public interest." *Steelite*, 2021 WL 1648025, at *12 (internal quotation marks omitted). An injunction that provides one litigant with a monopoly is particularly harmful to the public interest and provides sufficient grounds for denying the injunction. *See Ethicon*, 762 F. Supp. at 509 (denying preliminary injunction because the moving party "currently controls most of the market for disposable trocars, and should the court grant its motion, it would effectively enjoy a monopoly"). This is because "the public interest in a free and open competition between two exceptional companies is significant." *Id.*

Plaintiff asserts—without any support—that granting it a monopoly would not be a disservice to the public because "trial is set for August 2023," so the injunction would last "just two years." (Doc. 356 at 57.) While this argument ignores the possibility of any delays in the trial date, more fundamentally there is no duration of monopoly that is beneficial to the public; *any* monopoly is harmful because "the public interest is in the continuing competition between the parties." *Ethicon*, 762 F. Supp. at 509.

That Plaintiff could lose customers to GE—customers who would otherwise be forced to do business with Plaintiff under its monopoly control—is not a valid concern to the public. *See irth Sols., LLC v. Apex Data Sols. & Servs., LLC*, No. 18-CV-6884-FPG, 2019 WL 283831, at *9 (W.D.N.Y. Jan. 22, 2019) (rejecting argument that "loss of customers" was valid under either the balance of hardships or public interest factors). Instead, the public is best served by allowing GE

to "conduct[ ] its ordinary business." *Id.*

Plaintiff also completely misses the mark when asserting that it is "renovating its manufacturing and R&D premises . . . in anticipation of increased acceptance adoption [*sic*] of the VERITON" meaning there would allegedly be "no supply disruptions occasioned by the preliminary injunction." (Doc. 156 at 58.) Here, Plaintiff substitutes its *own* interest in selling more machines for that of the public, which is instead benefitted by market competition. That Plaintiff has expanded its ability to sell its own machine would be cold comfort to those consumers who would have no choice in the market because of an artificial monopoly created by an injunction.

Plaintiff suggests that this lack of choices would not hurt consumers because there is only one difference between StarGuide and Veriton and that difference, called theranostics, has "no perceptible impact on patient care." (Doc. 356 at 59.) In support, Plaintiff cites a single footnote from Phillips' declaration (Phillips Dec. (Ex. 2) ¶ 9 n.21), which does not directly support Plaintiff's argument. Further, Phillips testified at deposition that he did not know if theranostics is the only feature that differentiates the StarGuide and Veriton and did not know if theranostics impacts patient care. (*See* Phillips Dep. (Ex. 307) at 51:3–23, 54:2–18.) Theranostics does impact patient care (Ex. 37 at SDML_01281532–33), ███████████████████████████ ████████████████████ (Ex. 20 at GE_SDM_00169878) such that, if the Court were to grant an injunction, consumers would be deprived of a different and arguably superior product (Putnam Dec. (Ex. 301) ¶ 63).

Because granting an artificial monopoly to Plaintiff would be harmful to the public, Plaintiff's motion should be denied. *See Steelite*, 2021 WL 283831, at *13 ("[B]ecause plaintiffs have not demonstrated that [defendant]'s conduct is anything but legitimate competition, the public interest will be best served by denying the preliminary injunction.").

## V.    CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiff's motion for preliminary

injunction.

Dated: Atlanta, Georgia
         October 26, 2021

Respectfully submitted,

**THOMPSON HINE LLP**

/s/ *Marla R. Butler*
Marla R. Butler
Carl Wesolowski (*pro hac vice*)
Lauren Hogan (*pro hac vice*)
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
Tel.: (404) 541-2900 • Fax: (404) 541-2905
Marla.Butler@ThompsonHine.com
Lauren.Hogan@ThompsonHine.com

Jesse Jenike-Godshalk (*pro hac vice*)
312 Walnut Street, Suite 2000
Cincinnati, Ohio 45202
Tel.: (513) 352-6700 • Fax: (513) 241-4771
Jesse.Godshalk@ThompsonHine.com

Brian Lanciault
335 Madison Avenue, 12th Floor
New York, New York 10017
Tel.: (212) 344-5680 • Fax: (212) 344-6101
Brian.Lanciault@ThompsonHine.com

Jeffrey C. Metzcar (*pro hac vice*)
THOMPSON HINE LLP
Discovery Place
10050 Innovation Drive, Suite 400
Dayton, Ohio 45342
Telephone: (937) 443-6600
Jeff.Metzcar@ThompsonHine.com

*Attorneys for Defendants*
*General Electric Company, GE Healthcare,*
*Inc., GE Medical Systems Israel Ltd., Jean-*
*Paul Bouhnik, Sergio Steinfeld, Arie Escho,*
*and Nathan Hermony and for Non-Party*
*Yaron Hefetz*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the *Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction* was served today by electronic mail upon the following:

> Neil F. Greenblum, Esq.
> P. Branko Pejic, Esq.
> Jeffrey H. Handelsman, Esq.
> Danielle Pfifferling, Esq.
> GREENBLUM & BERNSTEIN, P.L.C.
> 1950 Roland Clarke Place
> Reston, Virginia 20191
> (703) 716-1191
> ngreenblum@gbpatent.com
> bpejic@gbpatent.com
> jhandelsman@gbpatent.com
> dpfifferling@gbpatent.com
>
> Gregory D. Miller, Esq.
> Jenna Gabay, Esq.
> Rivkin Radler LLP
> 25 Main Street
> Court Plaza North
> Hackensack, NJ 07601
> gregory.miller@rivkin.com
> jenna.gabay@rivkin.com
>
> *Attorneys for Spectrum Dynamics Medical Limited*

Dated:  October 26, 2021                    */s/ Brian P. Lanciault*

**Appendix A**

**Index of Defendants' Exhibits**

| Exhibit Number | Description |
|---|---|
| 300 | Declaration of Todd Peterson, Ph.D. dated October 25, 2021 (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 300-1 | Dr. Todd Peterson *Curriculum Vitae* |
| 301 | Declaration of Jonathan D. Putnam, Ph.D. dated October 26, 2021 (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 301-1 | Dr. Jonathan Putnam *Curriculum Vitae* |
| 301-2 | Putnam List of Materials Considered (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 301-3 | GE Historical and Projected "Stargate" Annual R&D (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 302 | Declaration of Jean-Paul Bouhnik dated October 26, 2021 (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 303 | Declaration of Floris Jansen dated October 25, 2021 (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 304 | Declaration of Riyad Mahameed dated October 26, 2021 (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 305 | Deposition of Gilad Yoeli (Transcript) (September 17, 2021) |
| 306 | Deposition of Nathaniel Roth (Transcript) (September 30, 2021) |
| 307 | Deposition of Eric Phillips (Transcript) (September 24, 2021) |
| 308 | Deposition of Scott Metzler, Ph.D. (Transcript) (September 24, 2021) |
| 309 | Document titled "Yoel Zilberstien old V-Target employment agreement.pdf" (SDML_00036046 - SDML_00036060). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 310 | Document titled "Spectrum Dynamics - Yoel Zilberstien - Employment Agreement - CLEAN - 9-7-12.doc" (SDML_00860300 - SDML_00860316). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |

| Exhibit Number | Description |
|---|---|
| 311 | Document titled "Employment Agrmt Nathaniel Roth.pdf" (SDML_00031912 - SDML_00031923). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 312 | U.S. Patent No. 4,209,700 to Stoddart et al. (GE_SDM_00061576 - GE_SDM_00061610). |
| 313 | Publication titled "Carbide 1970 Publication.pdf" by Moore et al. (GE_SDM_00058314 - GE_SDM_00058317). |
| 314 | U.S. Patent No. 7,592,597 to Hefetz et al. (GE_SDM_00570315 - GE_SDM_00570327). |
| 315 | PowerPoint titled "GEMS_Company Presentation_OCS_12-03-19 - JP.pptx" (GE_SDM_00362118 - GE_SDM_00362224). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 316 | PowerPoint titled "Growth Board CZT Business Model.ppt" (GE_SDM_00547982 - GE_SDM_00547984). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 317 | PowerPoint titled "MIU3 CZT Update Feb 2011 v1.ppt" (GE_SDM_00424808 - GE_SDM_00424859). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 318 | Document titled "SD New contract - cost reduction.pdf" (GE_SDM_00346895 - GE_SDM_00346939). (Confidential) |
| 319 | ██████████████████████████████████████ (GE_SDM_00001783 - GE_SDM_00001791). (Confidential) |
| 320 | ██████████████████████████████████████ (GE_SDM_00001792 - GE_SDM_00001805). (Confidential) |
| 321 | U.S. Patent No. 6,242,743 to DeVito et al. (GE_SDM_00061677 - GE_SDM_00061705). |
| 322 | U.S. Patent Application No. Application No. 10/627,844, to Joung et al. (Siemens), filed July 25, 2003, Pub. No. 2005/0017182, published January 27, 2005. (GE_SDM_00739362 - GE_SDM_00739368). |
| 323 | USPTO Action Rejection to U.S. Patent Application No. 10/627,844 to Joung et al. (Siemens) (GE_SDM_00739484 - GE_SDM_00739494). |

| Exhibit Number | Description |
|---|---|
| 324 | Notice of Abandonment (U.S. Patent Application No. 10/627,844) (GE_SDM_00739482 - GE_SDM_00739483). |
| 325 | Email dated June 17, 2009 from Ira Blevis to Riyad Mahameed, Jean-Paul Bouhnik, and Jonathan Sachs RE:  summary: GP-czt  (GE_SDM_00286902 - GE_SDM_00286902). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 326 | NOT USED |
| 327 | PowerPoint titled "Patent - JP 2008.ppt" (GE_SDM_00285162 - GE_SDM_00285168). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 328 | Email dated August 4, 2010 from Floris Jansen to Jean-Paul Bouhnik, and Alexander Ganin RE:  RE: spotlight visit - review of simulation (GE_SDM_00366664 - GE_SDM_00366669). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 329 | PowerPoint titled "GPCZT options.ppt" (GE_SDM_00317988 - GE_SDM_00317991). |
| 330 | Email dated September 13, 2010 from Nathan Hermony to Jean-Paul Bouhnik, and Riyad Mahameed  RE:  RE GPCZT options.ppt (GE_SDM_00733818 - GE_SDM_00733818). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 331 | Publication titled "A Novel High-Sensitivity Rapid-Acquisition Single-Photon Cardiac Imaging Camera" by Gambhir et al. (GE_SDM_00455167 - GE_SDM_00455175). |
| 332 | Publication titled "Advances in technical aspects of myocardial perfusion SPECT imaging" by Slomka et al. (GE_SDM_00454843 - GE_SDM_00454864). |
| 333 | U.S. Patent Application No. 12/792,856, to Zilberstein et al., filed June 3, 2010, Pub. No. 2011/00266855, published February 3, 2011 (GE_SDM_00346940 - GE_SDM_00346966). |
| 334 | Document titled "Work plan for 2010 related to Spectrum Dynamics.doc" (SDML_00242735 - SDML_00242736). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |

| Exhibit Number | Description |
|---|---|
| 335 | Email dated June 12, 2010 from Jim Haisler to Yoel Zilberstien, Sharon Alon, Gilad Yoeli, and yuris@medinvestgroup.com RE:  RE Project Spotlight - Onsite Agenda - ██████████   (SDML_00243500 - SDML_00243504). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 336 | Email dated October 28, 2010 from Nathaniel Roth to Brian Hutton and Yoel Zilberstien RE: ████████████ (SDML_00799144 - SDML_00799144). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 337 | Email dated November 10, 2010 from Nathaniel Roth to Brian Hutton, Kjell Erlandsson, Rafael Baavour, and Yoel Zilberstien RE: ████████████ - meeting summary 09112010, including attachment "20101109 Meeting Summary - UCL Simulation work.doc" [Native File Attachments Omitted] (SDML_00803699 - SDML_00803704). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 338 | Email dated February 3, 2011 from Nathaniel Roth to Gilad Yoeli, and Yoel Zilberstien RE:  Simulation Brian, including one attachment, "███sim_3211.pptx" (SDML_00830909 - SDML_00830913). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 339 | Email dated March 14, 2011 from Nathaniel Roth to Elizabeth Howell RE:  RE GPC simulator (SDML_01170826 - SDML_01170827). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 340 | USPTO Action on Application No. 12/792,856 dated March 6, 2012 (GE_SDM_00543560 - GE_SDM_00543576) (excerpted from GE_SDM_00532370). |
| 341 | Response to USPTO Action on Application No. 12/792,856 by Jason H. Rosenblum, dated September 6, 2012 (GE_SDM_00544687 - GE_SDM_00544731) (excerpted from GE_SDM_00532370). |
| 342 | Publication titled "Assessing possible use of CZT technology for application to brain SPECT" by Erlandsson, Howell, Roth, and Hutton (GE_SDM_00013159 - GE_SDM_00013163). |
| 343 | Email dated May 6, 2011 from Brian Hutton to Yoel Zilberstien, Nathaniel Roth, and Kjell Erlandsson RE:  RE IEEE MIC submission (SDML_00846057 - SDML_00846059). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 344 | International Patent Application No. PCT/IB2013/053721, International Publication Number WO 2013/168111 A2 to Roth et al. filed May 8, 2013 and published November 14, 2013 (GE_SDM_00380755 - GE_SDM_00380876). |

| Exhibit Number | Description |
|---|---|
| 345 | Email dated December 13, 2011 from Nathaniel Roth to Sajed Haj-Yahya RE: FW ▮ collimator length (SDML_01516211 - SDML_01516211). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 346 | U.S. Patent Application No. 13/338,930 to Wartski et al., filed December 28, 2011, Pub. No. US 2013/0168567, published July 4, 2013 (GE_SDM_00739466 - GE_SDM_00739479). |
| 347 | Email dated March 1, 2011 from Ira Blevis to Osnat Zak, Nurit Wartski, Jean-Paul Bouhnik, Tzachi Rafaeli, Aharon Peretz, and Reuven Brenner RE: RE MBI collimator Optimization, including attachment spreadsheet titled "collimatorsummaryTable GE-GM.xls" (GE_SDM_00739480 - GE_SDM_00739481). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 348 | Email dated August 29, 2010 from Riyad Mahameed to Sabrina Solomon and Jean-Paul Bouhnik RE: FW: ▮ (GE_SDM_00366615 - GE_SDM_00366618). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 349 | Email dated August 2, 2010 from Yoel Zilberstien to Shuchi Varandani and Jim Haisler RE: FW: Yoel (GE_SDM_00005355 - GE_SDM_00005358). (Confidential) |
| 350 | Email dated August 4, 2010 from Nathaniel Roth to Floris Jansen, Alexander Ganin Yoel Zilberstien, Ran Ravhon, and Shuchi Varandani RE: GPC Simulation (SDML_00342681 - SDML_00342681). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 351 | Email dated August 16, 2010 from Nathaniel Roth to Ran Ravhon RE: FW ▮ ▮ (SDML_01168729 - SDML_01168730). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 352 | Email dated August 4, 2010 from Nathaniel Roth to Ran Ravhon and Rafael Baavour RE: GE ▮ (SDML_01168571 - SDML_01168571). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 353 | Email dated June 23, 2010 from Yoel Zilberstien to Floris Jansen RE: Yoel (SDML_00724323 - SDML_00724323). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 354 | PowerPoint titled "Stargate Sii 2017 priorities - Personal Sep 13, 2016 meeting.pptx" (GE_SDM_00000493 - GE_SDM_00000506). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |

| Exhibit Number | Description |
|---|---|
| 355 | Document titled "DOC2182184 Stargat M1 Review10Oct2018.FINAL.pdf" by Reuven Brenner (GE_SDM_00168029 - GE_SDM_00168089). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 356 | Email dated June 12, 2010 from Yoel Zilberstien to Sharon Alon, Gilad Yoeli, Jim Haisler, and Yuri RE:  RE Project Spotlight - Onsite Agenda - ███████ (SDML_00243496 - SDML_00243499). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 357 | CISION PR Newswire article dated November 27, 2018, called "CITICPE Co-Wins Best Global Private Equity Fund Gold Award at 2018 Private Equity Exchange & Awards." (GE_SDM_00739955 - GE_SDM_00739957). |
| 358 | CITIC webpage news release dated June 6, 2021 called, "CPE Ranks 59th on PEI 300 – the Company's Highest Ranking in Six Years." (GE_SDM_00739958 - GE_SDM_00739959). |
| 359 | Email dated August 30, 2010 from Floris Jansen to Nathaniel Roth, Jean-Paul Bouhnik, Ravindra Manjeshwar, and Ran Ravhon RE:  RE: ███████, [Native Attachments Omitted] (GE_SDM_00366607 - GE_SDM_00366614). (Confidential) |
| 360 | Email dated August 31, 2010 from Floris Jansen to Jean-Paul Bouhnik RE:  RE: SD lesion sizes (GE_SDM_00366595 - GE_SDM_00366596). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 361 | Email dated September 15, 2010 from Floris Jansen to Nathaniel Roth, Yoel Zilberstien, Jean-Paul Bouhnik, Ravindra Manjeshwar, Alexander Ganin, and Riyad Mahameed RE:  RE: GPC simulation, [Native Attachments Omitted] (GE_SDM_00108519 - GE_SDM_00108524). (Confidential) |
| 362 | Email dated January 29, 2006 from Yoel Zilberstien to Martin Sandler RE:  RE Yoel (SDML_00486114 - SDML_00486114). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 363 | Email dated January 30, 2012 from Jean-Paul Bouhnik to Nathaniel Roth and Riyad Mahameed RE:   RE Striatal digital phantom (SDML_01179877 - SDML_01179877). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 364 | Email dated February 6, 2012 from Arie Eshco to Arie Eshco, Yoel Zilberstien, Nathaniel Roth, Riyad Mahameed, Jean-Paul Bouhnik, Sergio Steinfeld, Sinan Awad, and Sabrina Solomon RE: ███████, assumption and planning (GE_SDM_00133809 - GE_SDM_00133809). (Confidential) |

| Exhibit Number | Description |
|---|---|
| 365 | Email dated February 6, 2012 from Arie Eshco to Arie Eshco, Riyad Mahameed, Yoel Zilberstien, Jean-Paul Bouhnik, Sabrina Solomon, Reuven Brenner, Aharon Peretz, Nathan Hermony, and Nathaniel Roth RE: ▇▇▇▇ follow up (GE_SDM_00133810 - GE_SDM_00133810). (Confidential) |
| 366 | Email dated February 9, 2012 from Riyad Mahameed to Jean-Paul Bouhnik RE: FW: Draft, including 1 attachment spreadsheet titled "▇▇▇ Riyad - SD Feb 9.xls" (GE_SDM_00289722 - GE_SDM_00289724). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 367 | Email dated February 13, 2012 from Jean-Paul Bouhnik to Nathaniel Roth Riyad Mahameed, Aharon Peretz, Reuven Brenner, Arie Eshco RE: acceptance, including 1 attachment titled "acceptance.ppt" (SDML_00377316 - SDML_00377318). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 368 | Email dated February 15, 2012 from Jean-Paul Bouhnik to Nathaniel Roth, and Yoel Zilberstien RE: RE acceptance (SDML_00377553 - SDML_00377554). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 369 | Email dated February 14, 2012 from Riyad Mahameed to Jean-Paul Bouhnik, and Lana Volokh RE: FW: Draft - Urgent, including 1 attachment titled "▇▇▇ ▇▇▇ work - 0A.ppt" (GE_SDM_00289466 - GE_SDM_00289472). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 370 | Email dated February 24, 2013 from Gil Kovalski to Reuven Brenner RE: FW: recon, including 2 attachment titled "A Novel High Sensitivity_Gambhir.pdf" and "Performance evaluation of D-SPECT- a novel SPECT system for nuclear card....pdf" (GE_SDM_00017483 - GE_SDM_00017510). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 371 | Email dated September 5, 2012 from Riyad Mahameed to Gil Kovalski and Jean-Paul Bouhnik RE: Re: stargate short term plan (GE_SDM_00366835 - GE_SDM_00366835). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 372 | Email dated July 6, 2016 from Jean-Paul Bouhnik to Arie Shahar and Moshe Levy RE: RE: Stargate Apollo resolution.xlsx, including 1 attachment Spreadsheet titled "collimator design for GPC July 2016.xlsx" (GE_SDM_00199580 - GE_SDM_00199583). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |

| Exhibit Number | Description |
|---|---|
| 373 | Document titled "Assessing possible use of CZT Technology for application in brain SPECT" by Kjell Erlandsson, Elizabeth Howell, and Brian Hutton (SDML_00846077 - SDML_00846078). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 374 | Publication titled "Evaluation of the D-SPECT System: Region Centric Acquisition and Tracer Kinetics" by Filipa Alexandra Pina Barrento Da Costa (2012 Hutton Publication) (GE_SDM_00739369 - GE_SDM_00739465). |
| 375 | Email dated June 13, 2010 from Nathaniel Roth to Yoel Zilberstein RE: What do you think? Should we show to GE?, including 1 attachment titled "UCL dpect_sim.ppt" (SDML_00342266 - SDML_00342268). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 376 | PowerPoint titled "UCL dspect_sim.pptx" (SDML_01274427 - SDML_01274444). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 377 | Email dated June 13, 2010 from Yuri Shoshan to Yoel Zilberstein RE: RE Project Spotlight - Onsite Agenda - ███████████ (SDML_00722657 - SDML_00722660). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 378 | Email dated August 4, 2010 from Yoel Zilberstein to Adi Nahmani and Nathaniel Roth RE: RE ████████████ (SDML_00733710 - SDML_00733710). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 379 | Email dated November 9, 2010 from Nathaniel Roth to Kjell Erlandsson and Brian Hutton RE: ████████████, including 1 attachment titled "SPECTRUM DYNAMICS - FIRST GPC SIMULATION.pdf" (SDML_01274551 - SDML_01274571). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 380 | Publication titled "Evaluation of the D-SPECT System: Geometry Considerations and Respiratory Motion" by Debora Sofia Almeida Silva Salvado (GE_SDM_00440076 - GE_SDM_00440193). |
| 381 | Document entitled "A Message from Spectrum Dynamics Medical" by Gilad Yoeli (GE_SDM_00653873 - GE_SDM_00653874). |
| 382 | Document titled "██████.pdf" by kerlands (SDML_01061823 - SDML_01061841). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |

| Exhibit Number | Description |
|---|---|
| 383 | Email dated June 1, 2011 from Nathaniel Roth to Kjell Erlandsson RE:  RE presentation (SDML_01172247 - SDML_01172247). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 384 | Email dated October 10, 2012 from Jean-Paul Bouhnik to Einat Binyamin, Gil Kovalski, and Yariv Grobshtein RE:  RE_ ████████ - first guesses (GE_SDM_00366825 - GE_SDM_00366825). (HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY) |
| 385 | Gilad Yoeli LinkedIn Profile Screen Capture (GE_SDM_00740094 – GE_SDM_00740096). |
| 386 | Document titled "StarGuide Orders.pdf" (GE_SDM_00740097). (HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY) |
| 387 | Decision of the Judicial Court of Versailles dated September 14, 2021 in the matter GE Medical Systems v. Jerome Lavaure et al., No. RG 21/00930-Portalis No. DB22-W-B7F-QCBU, with translation (GE_SDM_00740098 – GE_SDM_00740119). |