## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPECTRUM DYNAMICS MEDICAL LIMITED, <br><br> Plaintiff, <br><br> v. <br><br> GENERAL ELECTRIC COMPANY, GE HEALTHCARE, INC., GE MEDICAL SYSTEMS ISRAEL LTD., JEAN-PAUL BOUHNIK, SERGIO STEINFELD, ARIE ESCHO and NATHAN HERMONY <br><br> Defendants. | Case No.: 18-cv-11386 (VSB) |

## DEFENDANTS' SUR-REPLY IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.     PLAINTIFF HAS FAILED TO PROVE ITS STANDING .................................................. 1

    A.     Plaintiff Is Not a Successor-in-Interest to the 2009 Agreement ............................. 1

    B.     Plaintiff Has Not Proven Ownership of the Alleged IP Assets .............................. 2

II.    PLAINTIFF ATTEMPTS TO REDEFINE ITS ALLEGED TRADE SECRETS CONTRARY TO THE FACTS, THE LAW, AND THIS COURT'S ORDERS.............. 5

III.   CONCLUSION.............................................................................................................. 10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co.*,
   1 F. Supp. 3d 224 (S.D.N.Y. 2014) ...................................................................................9, 10

*sit-up Ltd. v. IAC/Interactive Corp.*,
   No. 05 Civ 9292 DLC, 2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ......................................8

*Monovis v. Aquino*,
   905 F. Supp. 1205 (W.D.N.Y. 1994) ......................................................................................9

*Schroeder v Cohen*,
   No. 652183/2013, 2017 N.Y. Misc. LEXIS 4516 (N.Y. Sup. Ct. Nov. 14,
   2017) .......................................................................................................................................10

With the Court's permission (Doc. 396), Defendants offer this sur-reply for the limited purpose of addressing new issues and exhibits raised in Plaintiff's reply.

## I.     PLAINTIFF HAS FAILED TO PROVE ITS STANDING

In its reply, Plaintiff reveals for the first time the documentary evidence upon which it bases its claim of standing. Those documents, however, are provided with essentially no explanation and raise more questions than provide answers. On this record, the Court should find that Plaintiff has failed to prove standing for two independent reasons: (1) Plaintiff has not acquired rights under the 2009 Agreement; and (2) Plaintiff does not own the IP assets at issue.

### A.     Plaintiff Is Not a Successor-in-Interest to the 2009 Agreement

The 2009 Agreement was executed in the name of "Spectrum Dynamics Limited" by Jim Haisler as CEO. (Ex. 8 at 6.) The address provided for Spectrum Dynamics Limited in the 2009 Agreement is 22 Bareket Street, North Industrial Park, P.O. Box 3033, Caesarea, 20889 Israel. (*Id.* at 1.) Plaintiff admits that this is the address of "Spectrum Dynamics (Israel) Ltd." (Ex. 431 ¶ 9.)

The 2009 Agreement states that it is an "Amended and Restated" agreement with reference to three earlier agreements in 2004, 2005, and 2008. (Ex. 8 at 1.) The 2004 agreement is in the name of ███████████████████████████████. (Ex. 442.) The 2005 agreement is also in the name of ████████████████████████████████████████ (Ex. 443 (emphasis added).) The 2008 agreement is in the name of ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ (Ex. 444.) From these straightforward and undisputed facts, Defendants conclude that the party to the 2009 Agreement is also Spectrum Dynamics (Israel) Ltd. – identified simply as Spectrum Dynamics Limited.

Plaintiff opposes this obvious conclusion with a self-serving declaration from Jim Haisler claiming that the real party to the 2009 Agreement is Spectrum Dynamics LLC, the U.S. parent company of Spectrum Dynamics (Israel) Ltd. This distinction is critical because Plaintiff claims that the ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Doc. 378 at 4; Yoeli Dec. (Ex. 4) ¶ 2.)

The sole explanation provided by Mr. Haisler for why he believes Spectrum Dynamics LLC is the actual party to the 2009 Agreement is that the agreement contains an "inadvertent typo." (Ex. 431 ¶ 6.) That argument does not hold water. First, the 2009 Agreement refers to "Spectrum Dynamics Limited" not once, but twice – in the introduction and the signature block. That is not a typo. Second, the 2009 Agreement provides the address of Spectrum Dynamics (Israel) Ltd. in Israel, rather than the address of Spectrum Dynamics LLC in the United States. That is not a typo. The most plausible explanation is <u>not</u> that the 2009 Agreement incorrectly identifies both the party's name and address. The most plausible explanation is the simplest one: "Spectrum Dynamics Limited" refers to "Spectrum Dynamics (Israel) Ltd." ████████████████████████ ████████████████████████

Plaintiff is not a successor of Spectrum Dynamics (Israel) Ltd. (*See* Yoeli Dec. (Ex. 4) ¶ 2.) Nor has Plaintiff offered any evidence of any assignment of rights under the 2009 Agreement from Spectrum Dynamics (Israel) Ltd. to Plaintiff. To the contrary, Plaintiff admits that the ██████ ████████████████████████████████████████████████████████ ████████ (*Id*.) Therefore, Plaintiff lacks standing to sue Defendants for breach of the 2009 Agreement.

**B.    <u>Plaintiff Has Not Proven Ownership of the Alleged IP Assets</u>**

Plaintiff claims that ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ (Doc. 36 ¶¶ 12-14.) Plaintiff fails, however, to demonstrate any legal

mechanism by which ownership of those assets transferred to Plaintiff.

Using a convoluted chart in which arrows represent "[t]ransfer of all assets and IP including

Spectrum Confidential Information," Plaintiff's reply shows that the ████████████████████

█████████████████████████████████████████████████████ (Doc.

378 at 4.) Plaintiff's chart also shows – *without any explanation* – ██████████████████████

██████████████████████████████████████████████████████████

████████████████████████ (*Id.*) Upon inspection, however, that agreement (Ex. 418) ██

█████████████████████████████████████████████████████ Perhaps that

is why Plaintiff withheld its documentary evidence of standing until its reply brief, hoping that this

important discrepancy would slip by unnoticed and unaddressed.

There are at least three V-Target entities that are relevant here: (1) V-Target Technologies

Ltd.; (2) V-Target LLC; and (3) V-Target (Israel) Ltd. ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████ (Ex. 435 at ¶¶ 1.1, 1.4, 1.5; Ex. 445 at 3.)

██████████████████████████████████████████████████████████

██████████████████████████████████████████████ that Plaintiff attached as

Ex. 418 to its reply. █████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████



(Ex. 446 at SDML_00020791, ¶ 3.)

(Ex. 447.)

(*Id*. (emphasis added).)

(Ex. 448.)

t (Ex. 418)

(Ex. 449 at SDML_00465376(emphasis added).) To the best of Defendants' knowledge, Plaintiff has never produced a signed copy of that agreement, and none exists.

However, Plaintiff has offered no explanation or evidence that such an agreement was ever completed. Therefore, Plaintiff has failed to show that ownership of the assets at issue passed

to Plaintiff rather than M. Maozos Ltd. and has failed to carry its burden of demonstrating standing.[1]

## II.  PLAINTIFF ATTEMPTS TO REDEFINE ITS ALLEGED TRADE SECRETS CONTRARY TO THE FACTS, THE LAW, AND THIS COURT'S ORDERS

Defendants are being forced to play whack-a-mole as Plaintiff abruptly changes its legal theories and the definition of its confidential information. Plaintiff's opening brief states: "this Motion focuses on the following features" and then lists six separately enumerated features (i.e., "the 6 main concepts") that Plaintiff claims Defendants misused in violation of the 2009 Agreement. (Doc. 356 at 14, 17-18, 21). In response, Defendants demonstrated that each of the six features was either already known to Defendants or publicly disclosed during, and immediately after, the due diligence period between the parties. Plaintiff cannot reasonably dispute that the six features were disclosed to the public, as Defendants have shown, so Plaintiff completely changes course by asserting a new trade secret in reply.

Stating that "[a] trade secret can exist in a combination of characteristics and components, each of which by itself, is in the public domain" (Doc. 387 at 5 (emphasis added)), Plaintiff argues that the public disclosure documents identified by Defendants are legally insufficient because they: (*i*) are not directed to "a whole body CZT SPECT scanner"; and (*ii*) do not disclose "the *entirety* of the Spectrum ███████████" within a single reference. (Doc. 378 at 1, 5, 7-8 ("GE does not cite to a *single* document that discloses a *whole body* CZT SPECT scanner that includes *every* feature Spectrum's Motion emphasizes.") (emphasis added).) The premise of Plaintiff's argument is that

---

[1] Plaintiff's argument that it must have standing because ██████████████████████████████████ ████████████ is a bridge too far. (*See* Doc. 387 at 3.) ████████████████████████████████████ ███████████████████ (Ex. 402 ¶¶ 1-2.) ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ (*See* Doc. 356 at 29-30.) Whatever GE did or did not believe Spectrum Dynamics LLC would eventually develop and/or own is irrelevant.

the specific *combination* of the six features for a "whole body" CZT SPECT scanner is unique and, therefore, a trade secret. The Court must reject this claim because it is contrary to the law, the facts, and this Court's prior orders.

Plaintiff first described its alleged trade secrets when it filed its Complaint in December 2018, more than three years ago. (Doc. 2.) Precisely out of concern that Plaintiff would change the definition of its trade secrets as the case progressed, Defendants sought leave in October 2020 to serve an interrogatory requiring Plaintiff to identify *each* alleged trade secret with specificity. (Doc. 117 at 2-3.) Magistrate Judge Parker, consistent with case law in this district, ordered Plaintiff to "provide a detailed chart reflecting the trade secrets that were allegedly disclosed and/or used" by GE. (Doc. 171.) She also explained that Plaintiff was "going to be bound by how they've described" their alleged trade secrets in the chart.[2] (Doc. 182 at 24:23-24.)

On February 2, 2021, Plaintiff produced the chart, which describes ██ discrete trade secrets. (Doc. 185.) Defendants have relied on those descriptions to prepare their defense over the past eleven months. In August 2021, Spectrum filed its Motion for Preliminary Injunction, identifying six features that roughly correspond to six individually identified trade secrets in Plaintiff's earlier chart:

---

[2] In opposing Defendants' request to file this sur-reply, Plaintiff argued that it is not really bound by its trade secret chart, quoting Magistrate Judge Parker: "Spectrum raises a good point here that *if in the course of discovery it learns* that there's non [sic], learns from nonpublic information that there is *some other trade secret* that was misappropriated, why should they be barred from asserting that?" (Doc. 389 at 2 (emphasis added).) Judge Parker, however, was merely posing a question; she was not making any ruling and certainly was not backtracking on her statement that Plaintiff would be bound. Indeed, Judge Parker continued: "I think I've already stated that Spectrum is *bound by the trade secrets as described in this chart*." (Doc. 200 at 38:6-8 (emphasis added).) Even assuming that Judge Parker was leaving open the possibility of Plaintiff adding a truly new trade secret, Plaintiff has not pointed to any new facts or nonpublic evidence it learned in discovery that would justify adding a new trade secret consisting of the specific combination of six previously identified individual features. Nor could anything learned in discovery possibly justify limiting the individually described trade secrets in Plaintiff's chart to the context of a ████████ █████ as Plaintiff is attempting to do now. Plaintiff alleged in its First Amended Complaint that its Veriton was a "full-body multi-organ scanning SPECT device" (Doc. 36 at ¶ 79) and that GE was developing an "Imitation Device" (*id.* at ¶ 63). Thus, if Plaintiff really believed that its individually identified features were trade secrets in the context of a full-body or whole body scanner, it could have asserted this in its trade secret chart.

| Plaintiff's Opening Brief (Doc. 356 at 17-18) | Plaintiff's Table of Trade Secrets (Doc. 185) |
|---|---|
|  | |

Thus, Plaintiff's attempt to distinguish Defendants' public disclosure documents on the basis that they are not directed to whole body scanners is contrary to Judge Parker's directive that Plaintiff would be bound by the descriptions in its chart of trade secrets.[4] Nor does the chart identify as a separate trade secret the specific combination of the six features that Defendants have now demonstrated to be public information. Thus, Plaintiff's attempt

---

[3] Consistent with all of the trade secrets listed in Plaintiff's chart, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[4] Defendants also dispute Plaintiff's contention that systems like the ones disclosed in GE's '597 patent and the DeVito patent are not general purpose cameras or capable of performing whole body scans. One of the developers of GE's StarGuide, Jean-Paul Bouhnik, and GE's expert, Dr. Todd Peterson, both specifically testified that GE's '597 patent teaches a general purpose system for imaging structures of interest, where the structure of interest could be the whole body. (Peterson Dep. (Ex. 430) at 90:16-91:7; Bouhnik Dep. (Ex. 426) at 90:18-92:5.) Furthermore, Plaintiff's reply *completely* fails to respond to Defendants' discussion of Spectrum Dynamics' own '685 publication (Doc. 369 at 20-22), which is also directed to a ▮▮▮▮▮▮▮▮▮▮▮ capable of performing whole body scans.

to combine these six features into a new trade secret is revisionist history and contrary to Judge

Parker's order that Plaintiff provide a detailed chart reflecting each of its trade secrets.

Plaintiff's formulation of a new trade secret—after 3 years of litigation—is also contrary

to law. "New York and Second Circuit law establish that compilation trade secrets are protectable

but . . . the law requires the trade secret claimant to describe the secret with sufficient specificity

that its protectability can be assessed and to show that its compilation is unique." *sit-up Ltd. v.*

*IAC/Interactive Corp.*, No. 05 Civ. 9292 DLC, 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008).

"Specificity is required <u>at the moment of divulging</u> so that the party to whom the secret is revealed

understands the contours of the secret information and does not inadvertently or purposefully

transgress its boundaries." *Id*. at *11 (emphasis added). Similarly,

> specificity is required before the court so that the defendant can defend himself
> adequately against claims of trade secret misappropriation and can divine the line
> between secret and non-secret information, and so that a jury can render a verdict
> based on a discriminating analysis of the evidence of disclosure and
> misappropriation.

*Id*.

Despite numerous opportunities throughout this case, Plaintiff has never identified a trade

secret composed of the specific combination of six features. Nor has Plaintiff pointed to any

evidence that, during the due diligence period, it notified GE that the specific combination of the

six features that are now the focus of Plaintiff's motion was a protected trade secret. Indeed,

Plaintiff does not cite to a single document provided to GE during due diligence that even includes

all six features of the claimed combination. Instead, Plaintiff cobbles together the combination

from a variety of different disclosures on a variety of different dates. (*See*, *e.g*., Doc. 356 at 25

(citing Ex. 65 [June 30, 2010 email] for disclosure of ███████████████████) and at 31

(citing Ex. 76 for January 2012 disclosure of ███████████████████).) These facts

are particularly important here since GE was also working in this field, had its own patents directed

to general purpose SPECT scanners, and was collaboratively working with Spectrum Dynamics to evaluate *different* combinations of features for a ███. *See Big Vision Private, Ltd. v. E.I. Dupont De Nemours & Co.*, 1 F. Supp. 3d 224, 261-62 (S.D.N.Y. 2014) (refusing to "allow a party belatedly and unilaterally to declare 'everything we do is confidential,' and thereby prevent another party who holds patents in the same space (here, one of the world's largest chemical companies) from doing anything that even hints at the wide variety of structures tested over a thirteen-month period").

In a case very similar to this one, Big Vision Private Ltd. asserted breach of confidentiality and misappropriation of a five-element trade secret by DuPont, where each individual element of the combination was publicly known. *Id*. at 270. Judge Failla, in a highly instructive opinion, found that Big Vision failed to identify the asserted combination with sufficient specificity where the trade secret description changed dramatically over the course of the litigation, and "Big Vision made virtually no effort to identify its alleged trade secret with particularity at the time of disclosure, and did nothing to separate its alleged trade secret from DuPont's own contributions to the trial or the latter company's considerable prior knowledge." *Id*. at 259-60. Judge Failla also suggested that Big Vision did not have a protectible trade secret in any event because: (*i*) "DuPont's own prior patents not only disclose the individual elements of Big Vision's alleged trade secret, but very nearly disclose the combination of those elements as well;" and (*ii*) "Big Vision has identified its trade secret by cherry-picking five concepts amidst 70 pages of laboratory materials; [but] those same five concepts can be cherry-picked from just two patents." *Id*. at 270-71. Big Vision, like Plaintiff in this case, cited *Monovis v. Aquino*, 905 F. Supp. 1205 (W.D.N.Y. 1994) for the proposition that New York courts reject a hindsight approach of cobbling together public information to defeat a compilation trade secret. (*See* Doc. 378 at 6.) Judge Failla rejected that argument as inapplicable, finding that DuPont properly rebutted Big Vision's trade secrets "where

9

the so-called 'belated state of the art' is of DuPont's *own* patents, or the patents that Plaintiff indisputably relied on in developing its alleged trade secrets (and discussed with DuPont at the time)." *Big Vision Private, Ltd.*, 1 F. Supp. 3d at 271 n.56. The same is true here.

Finally, Plaintiff's claim to a new compilation trade secret consisting of the six features identified in its opening brief is also contrary to the facts. Plaintiff cherry-picked those six features ████████████████████████████████████ after extensive discovery in this case. However, Plaintiff never adopted those six features – in combination – for its Veriton® product, and the specific combination is not a trade secret used in Plaintiff's business. *Schroeder v Cohen*, No. 652183/2013, 2017 N.Y. Misc. LEXIS 4516, at *38 (N.Y. Sup. Ct. Nov. 14, 2017) ("Plaintiffs themselves have not used the asserted combination and instead, have identified their trade secret by 'cherry-picking' from various concepts, and relying on at least three of their websites, and various undeveloped or private versions of them, in creating this 'unique' combination . . . . Plaintiffs attempt, in hindsight, to retroactively tailor their alleged trade secret to what was embodied in Pinterest.").) One of the features identified in Plaintiff's opening brief is a ████████████████████████████████. But, as previously revealed, Plaintiff selected █ ████████████████████████████████████ in its Veriton®. (Doc. 369 at 32-33.) Thus, Plaintiff does not even use the concocted combination now asserted in its reply.

## III.   CONCLUSION

For all of the foregoing reasons, as well as those in Defendants' Memorandum in Opposition (Doc. 369), the Court should deny Plaintiff's motion for preliminary injunction.

Dated: Atlanta, Georgia
      January 4, 2022

Respectfully submitted,

**THOMPSON HINE LLP**

/s/ *Marla R. Butler*
Marla R. Butler
Carl Wesolowski (*pro hac vice*)
Two Alliance Center
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
Tel.: (404) 541-2900 • Fax: (404) 541-2905
Marla.Butler@ThompsonHine.com
Lauren.Hogan@ThompsonHine.com

Jesse Jenike-Godshalk (*pro hac vice*)
312 Walnut Street, Suite 2000
Cincinnati, Ohio 45202
Tel.: (513) 352-6700 • Fax: (513) 241-4771
Jesse.Godshalk@ThompsonHine.com

Brian Lanciault
335 Madison Avenue, 12th Floor
New York, New York 10017
Tel.: (212) 344-5680 • Fax: (212) 344-6101
Brian.Lanciault@ThompsonHine.com

Jeffrey C. Metzcar (*pro hac vice*)
THOMPSON HINE LLP
Discovery Place
10050 Innovation Drive, Suite 400
Dayton, Ohio 45342
Telephone: (937) 443-6600
Jeff.Metzcar@ThompsonHine.com

*Attorneys for Defendants*
*General Electric Company, GE Healthcare,*
*Inc., GE Medical Systems Israel Ltd., Jean-*
*Paul Bouhnik, Sergio Steinfeld, Arie Escho,*
*and Nathan Hermony and for Non-Party*
*Yaron Hefetz*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the *Defendants' Sur-reply in Opposition to Plaintiff's Motion for Preliminary Injunction* was served today by electronic mail upon the following:

Neil F. Greenblum, Esq.
P. Branko Pejic, Esq.
Jeffrey H. Handelsman, Esq.
Danielle Pfifferling, Esq.
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, Virginia 20191
(703) 716-1191
ngreenblum@gbpatent.com
bpejic@gbpatent.com
jhandelsman@gbpatent.com
dpfifferling@gbpatent.com

Gregory D. Miller, Esq.
Jenna Gabay, Esq.
Rivkin Radler LLP
25 Main Street
Court Plaza North
Hackensack, NJ 07601
gregory.miller@rivkin.com
jenna.gabay@rivkin.com

*Attorneys for Spectrum Dynamics Medical Limited*

Dated: January 4, 2022                     */s/ Marla R. Butler*

 Neutral

As of: January 4, 2022 9:18 PM Z

# *Schroeder v Cohen*

Supreme Court of New York, New York County

November 14, 2017, Decided

652183/2013

**Reporter**

2017 N.Y. Misc. LEXIS 4516 *; 2017 NY Slip Op 32463(U) **

 **[**1]** THEODORE F. SCHROEDER, RENDEZVOO LLC, and SKOOP MEDIA ASSOCIATES, INC., Plaintiffs, -against- BRIAN S. COHEN and NEW YORK ANGELS, INC., Defendants. Index No.: 652183/2013

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Subsequent History:** Appeal dismissed by *Schroeder v. Cohen, 2019 N.Y. App. Div. LEXIS 839, 2019 NY Slip Op 838 (N.Y. App. Div. 1st Dep't, Feb. 5, 2019)*

**Prior History:** *Schroeder v. Pinterest Inc., 2014 N.Y. Misc. LEXIS 3083 (N.Y. Sup. Ct., July 8, 2014)*

## Core Terms

plaintiffs', misappropriation, trade secret, website, users, Media, concepts, confidential, principles, features, site, marks, quotation, publicly, allegations, usability, summary judgment, founders, summary judgment motion, trade secret protection, similarities, launch, secret, visual, breach of fiduciary duty, cause of action, emailed, skills, defendants', technology

**Judges:** **[**1]** O. PETER SHERWOOD, J.S.C.

**Opinion by:** O. PETER SHERWOOD

## Opinion

### DECISION AND ORDER

**O. PETER SHERWOOD, J.:**

This action, grounded in trade secret and idea misappropriation, arises out plaintiffs Theodore F. Schroeder (Schroeder), Rendezvoo LLC (Rendezvoo) and Skoop Media Associates, Inc.'s (Skoop Media) claims that defendant Brian S. Cohen (Cohen) stole and used plaintiffs' confidential and proprietary intellectual property, ideas and business plans to create the website Pinterest.com (Pinterest). Motions with sequence numbers 003 and 004 are hereby consolidated for disposition.

In motion sequence 003, defendant New York Angels, Inc. (NYA) moves, pursuant to *CPLR 3212*, for summary judgment dismissing the complaint.

In motion sequence 004, Cohen moves, pursuant to *CPLR 3212*, for summary judgment dismissing the complaint.

### BACKGROUND AND FACTUAL ALLEGATIONS

In 2005, while attending Columbia Law School,

Schroeder and Brandon Stroy (Stroy), a classmate, worked on developing "an idea for a socially networked bulletin Board where users came together to share their physical locations with their friends via the Internet." Complaint, ¶ 12. Schroeder spent "2000 hours" teaching himself the computer and programming skills required to build a **[*2]** computer application to support this idea. *Id.*, ¶ 13.

Towards the end of 2005, William Bocra (Bocra), another former classmate, joined Schroeder and Stroy, and they formed the limited liability company Rendezvoo, with Schroeder **[**2]** as President. In February 2006, Rendezvoo publicly released the first version of its website, Rendezvoo.com.

Shortly thereafter, Rendezvoo.com was expanded to allow users to share not only their physical locations, but also their personal interests. The second version of Rendezvoo.com (referred to as "RDV 2" in the complaint) was publicly launched in August 2006, and was described as a "website where people meet to share opinions, views, items and tastes on a variety of subjects - products, services, events, politics, economics - nearly anything of human interest." *Id.* ¶ 18.

By the end of 2006, Rendezvoo.com had more than 5000 users. As a way to further develop and enhance the website, the members of Rendezvoo started to explore fund-raising ideas. They submitted proposals and business plans to various capital venture firms, including NYA. NYA is a membership organization with approximately 125 individual angel investors, including Cohen. NYA's mission is "to **[*3]** have the members fund great, smart, young entrepreneurs." NYA's exhibit A, Vanessa Pestritto tr at 13-14.

On January 17, 2007, Rendezvoo presented its business model and plan to Cohen and Paul Sciabica (Sciabica), NYA's former executive director. After the presentation, Sciabica informed Bocra that NYA did not want to invest in Rendezvoo. Nonetheless, Bocra asked Sciabica for Cohen's contact information, as he might be interested in assisting Rendezvoo. Exhibit P-60 at 1.

Cohen did meet with Rendezvoo on multiple occasions and gave them different marketing and business plan strategies to pursue.[1] After meeting with Cohen, Schroeder and the other RDV members worked to create a more narrowly tailored application, which was referred to as the Launchbed platform. Launchbed was identified as a "website and user community where people and companies can launch new products, services, ideas and media in order to ignite word-of-mouth efforts and receive targeted feedback." Complaint, ¶ 26.

In May 2007, the members of Rendezvoo offered Cohen a partnership role, which he accepted. This was a "chairman type role," that was never formally memorialized. The four partners selected the name Skoopwire.com **[*4]** for the Launchbed platform, which was "the more **[**3]** narrowly-focused version of [Rendezvoo] Version 2." *Id.*, ¶ 37. Skoopwire.com "was to be a free, direct-to-customer news wire connecting businesses to bloggers . . . wanting the easiest access to information about new products and services. Skoopwire.com was designed to make it easy and convenient to launch, find, discover and discuss new products and services before they were covered in the mainstream media." *Id.*, ¶ 38.[2]

_____

[1] For example, in an email dated February 14, 2007, Cohen advised Schroeder that Rendezvoo should tell a memorable story. Plaintiffs' exhibit 28 at 1.

[2] Internal marketing notes include Skoopwire's mission statement as the following: "To Celebrate Everything New and Make Them Easy to Find." Plaintiffs' exhibit 50 at 2. Skoopwire is an "interactive announcer-user driven launch environment

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 18 of 34

Page 3 of 19

2017 N.Y. Misc. LEXIS 4516, *4; 2017 NY Slip Op 32463(U), **3

In June 2007, while creating the technology plan for Skoopwire.com, Schroeder distributed "usability principles" to Cohen and the members of Rendezvoo.

On June 29, 2007, the parties formally incorporated Skoop Media in Delaware. Rendezvoo was never dissolved or merged into Skoop Media. Between July 2007 and October 2007, Skoopwire.com was tested on focus groups consisting of family members, friends and others, none of whom signed nondisclosure agreements. Skoopwire.com compiled the results from the focus groups in order to eventually refine the website. Schroeder testified that some of the focus group members were outside designers who were "engaged to evaluate and provide feedback." Cohen's exhibit 8, Schroeder tr at 234. [*5]

In the fall of 2007, through Cohen, Skoop Media pitched the Skoopwire.com website to many public relations firms. However, by late 2007, due to conflicts among the Skoop Media principals, Skoopwire.com was never released to the public or developed further. According to plaintiffs, Cohen wanted an increased interest in Skoop Media and the company became essentially deadlocked as a result of the conflicts. "Cohen's efforts to deadlock the project and freeze out Schroeder from pursuing his own ideas were successful." Complaint, ¶ 49.

In any event, in early 2008, although Skoop Media's principals drafted a liquidation agreement, no agreement was ever executed. On July 1, 2008, Cohen emailed Schroeder, "I have absolutely NO interest in PROFITING from your specific design work on Skoopwire." *Id.*, ¶ 52. Plaintiffs believe that Cohen deliberately refused to sign the liquidation agreement and "abandoned RDV and SMA." *Id.*, ¶ 55. Skoopwire.com and Rendezvoo.com have not been

visible online since 2008, and never generated more than a few dollars in income.

 [**4]  In February 2009, Cohen met Ben Silbermann (Silbermann) and Evan Sharp (Sharp), two of the Pinterest founders, while Cohen was attending a business [*6] school competition at New York University. Silbermann and Paul Sciarra (Sciarra), another Pinterest founder, had founded Cold Brew Labs, Inc. (Cold Brew Labs), which was a mobile shopping start-up, in September 2008. At the competition, Cold Brew Labs presented Tote, a mobile shopping application that they had designed, consisting of a collection of catalogues that could be browsed on an Apple iPhone.

In May 2009, Cohen invited Cold Brew Labs to present a proposal to NYA. Cohen personally invested $25,000, which equaled approximately 5% of the total fund-raising contributions Cold Brew Labs had received from other NYA members and another venture capital firm. In September 2009, Tote was publicly launched as "a browsing, saving and shopping application."

By early 2010, Tote had transitioned into Pinterest, with a change in focus. Plaintiffs claim that, with the help of Cohen, Cold Brew Labs "mysteriously" changed from a mobile shopping start-up to "developing social commerce applications to make curating and sharing collections of products dead simple." *Id.*, ¶ 59. Plaintiffs believe that this was Schroeder's idea, and that Cohen, while working with Cold Brew Labs, gave them Schroeder's [*7] ideas and applications.

Although Pinterest was publicly launched in late 2010, Schroeder claims that he did not see the site until November 2011, after people told him about the similarities between Pinterest and Rendezvoo.[3]

---

for everything 'new' that provides for immediate customer inquiry and feedback." *Id.* at 3.

---

[3] Plaintiffs' opposition to summary judgment states that

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 19 of 34

Page 4 of 19

2017 N.Y. Misc. LEXIS 4516, *7; 2017 NY Slip Op 32463(U), **4

Schroeder believed that Pinterest was "nearly exactly what [he] conceived as RDV Version 2." *Id.*, ¶ 69.

In March 2012, Schroeder read an article about Pinterest, in which Cohen is quoted as stating that he was Pinterest's first investor and describes meeting the founders at the business plan competition. Schroeder claims that, after seeing this article, he "learned about Cohen's successful scheme to steal Schroeder's ideas and use them for his own gain despite promises and an obligation not to do so." *Id.*, ¶ 70.

In June 2013, plaintiffs commenced this action against Cohen, NYA and Pinterest, asserting causes of action for unjust enrichment (against all defendants); misappropriation (against **[\*\*5]** all defendants); misappropriation of skills and expenditures (against all defendants); promissory estoppel (against Cohen); breach of fiduciary duty (against Cohen); and aiding and abetting breach of fiduciary duty (against Pinterest). In brief, the complaint alleges that Cohen **[\*8]** purposefully stopped plaintiffs from pursuing Schroeder's ideas and then gave those ideas to the founders of Pinterest.

Plaintiffs maintain that the key similarities misappropriated from RDV 2, and incorporated into Pinterest, include the following:

•the concept of a "website for users to post their interests for their friends and other users of the site to see."
•the goal of "connect[ing] things that mattered to a user with other users. . . while providing a place for a product or event promoter to gain visibility for its product."
•the goal of covering a new product launch on Skoopwire.com "by its users and shared with friends of that user, thereby igniting word of mouth

about the product launch."
•adopting an infinite scroll user interface technique.
•allowing users to post to the main user interface, i.e., the Board.
•adopting a pink and purple color scheme to attract female users.

*Id.*, ¶ 79.

Plaintiffs claim that, as an officer of Skoop Media and Rendezvoo, Cohen owed them a fiduciary duty, and that he breached this duty by providing plaintiffs' business concepts to another venture. The complaint further alleges that Pinterest had actual knowledge of Cohen's breach, and that Pinterest **[\*9]** would not exist today but for Cohen telling Pinterest about Schroeder's ideas. Cohen is alleged to have misappropriated this information "while maintaining his senior status at NYA." *Id.*, ¶ 116. The complaint seeks compensatory damages of more than one million dollars, and a constructive trust over the earnings that defendants have derived from Pinterest.

In September 2013, Pinterest moved, pursuant to *CPLR 3211*, to dismiss the complaint. Cohen and NYA (collectively, the "Cohen defendants") also moved to dismiss the complaint. By order dated July 8, 2014, Justice Schweitzer granted Pinterest's motion in its entirety, the complaint was dismissed as against it, and Pinterest was dismissed from the case.[4]

---

Schroeder's wife had been using Pinterest and showed him the site, claiming, "this is Rendezvoo." Plaintiffs' mem of law at 1.

---

[4] The court granted the Cohen defendants' motion in part, and dismissed the causes of action for breach of fiduciary duty, misappropriation of trade secrets and unjust enrichment. However, the court declined to dismiss the causes of action for misappropriation of skills and expenditures, as against these defendants, and the cause of action for promissory estoppel, as against Cohen. The court noted that plaintiffs could not have a claim for idea misappropriation, because it was not included in the complaint.

Case 1:18-cv-11386-VSB-KHP Document 409 Filed 01/14/22 Page 20 of 34

Page 5 of 19

2017 N.Y. Misc. LEXIS 4516, *9; 2017 NY Slip Op 32463(U), **5

[**6] Upon appeal, the Appellate Division, First Department, affirmed the lower court's decision granting Pinterest's motion to dismiss the complaint and denying the Cohen defendants' motion to dismiss the claims for misappropriation of skills and expenditures. *See Schroeder v Pinterest Inc., 133 AD3d 12, 17 N.Y.S.3d 678 (1st Dept 2015)*. However, the Court modified the lower court's determination and granted the Cohen defendants' motion to dismiss the promissory estoppel claim. In addition, the Court reinstated plaintiffs' claims for misappropriation of trade secrets and [*10] ideas.

The Court further reinstated the breach of fiduciary duty claim, stating that plaintiffs' allegations "sufficiently state a cause of action for breach of fiduciary duty under Delaware law." *Id. at 23*. Specifically, the Court found that the complaint alleged that Cohen, as Chairman and Chief Executive Officer of both Rendezvoo and Skoop Media, owed fiduciary duties to plaintiffs, and that he breached those duties by, among other things, stealing confidential ideas. Further, although Cohen claimed to have "abandoned" the companies, viewing the complaint in the light most favorable to plaintiffs, the complaint sufficiently alleged that Cohen was still an officer at the time of the breach.

With respect to the misappropriation claims, the Court held that, for pleading purposes, plaintiffs had alleged a claim for trade secret misappropriation against Cohen. Plaintiffs alleged that they possessed a trade secret, and that Cohen used the trade secret in breach of a confidential relationship. The Court noted that, although it was upholding the misappropriation of trade secrets cause of action against Cohen, "the claim should be limited to the confidential information referenced in the complaint, [*11] and cannot extend to information in the public domain." *Id. at 28-29*.

The Court continued that RDV 2 had over 5000 users in January 2007. Although the complaint identified allegedly similar features between Pinterest.com and RDV 2, any features that were "readily ascertainable from the publicly-available Rendezvoo website . . . [were] not protectable trade secrets." *Id. at 29*. "On the other hand, trade secret protection [could] extend to plaintiffs' confidential technology, not readily ascertainable from the public Rendezvoo site, that led to the website's development." *Id.*

The Court further addressed the claim for misappropriation of ideas and found that, although the misappropriation cause of action did not specifically allege idea misappropriation, this claim was set forth in the complaint's factual allegations. The Court found that plaintiffs sufficiently pled that they had a fiduciary relationship with Cohen and that their ideas were [**7] novel. However, "[a]s with the trade secret claim, the idea misappropriation claim cannot extend to material in the public domain." *Id. at 30*.

Although the Court upheld the denial of the motion to dismiss the misappropriation of skills and expenditures claim, it noted that this [*12] claim, as with the other misappropriation claims, cannot be premised on the misappropriation of publicly-available information.

The Court did not dismiss the misappropriation claims as against NYA, holding that, "these allegations [were] sufficient to state a claim against [NYA] under respondeat superior." *Id. at 31*.

Current Motions:

NYA's motion for summary judgment (motion sequence 003)

NYA states that it is a not-for-profit organization that holds monthly gatherings where start-ups present business proposals to members of NYA. If members

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 21 of 34

Page 6 of 19

2017 N.Y. Misc. LEXIS 4516, *12; 2017 NY Slip Op 32463(U), **7

would like to invest in the start-up, they can invest their own money. NYA does not control where a member invests, nor does it derive any profit from its members' investments. NYA also states that it only has two employees who run the program, and that a member's only obligation is to pay a membership fee. In 2006, Cohen joined NYA as a member. In 2009, Cohen joined the board of directors. In 2012, Cohen became the Chairman.

NYA argues that it cannot be held liable for Cohen's actions on a theory of respondeat superior, because Cohen's relationship with NYA does not meet the standard to impose such liability.[6] First, NYA maintains that plaintiffs cannot demonstrate **[*13]** the first element of the doctrine, that is, a relationship indicating that NYA's control over Cohen was akin to an employer-employee relationship. Cohen is not an employee of NYA, and, in 2008, when his interactions with plaintiffs ended, Cohen was merely a member of NYA.

NYA further argues that plaintiffs cannot establish the second element of the doctrine, which is that the allegedly tortious acts were committed within the scope of the relationship at issue, because Cohen's relationships with Pinterest and plaintiffs were outside the scope of his role as a NYA member. In 2007, after plaintiffs presented a business proposal to NYA, they were informed that no NYA members wanted to invest. After this initial meeting, NYA maintains that **[**8]** it did not have any control over Cohen's investment or mentoring activities and that Cohen then met with plaintiffs in an individual capacity. Similarly, with Pinterest, NYA claims that it did not have any additional communications with Pinterest members after their initial proposal to NYA, and that Cohen invested

individually, and not on NYA's behalf.

Finally, plaintiffs cannot establish the third element of the doctrine, which is to demonstrate that **[*14]** Cohen's alleged misappropriations were done in furtherance of any NYA business. According to NYA, plaintiffs have conceded that Cohen's alleged misconduct was for his own personal gain, not for the benefit of NYA.

NYA further notes that NYA cannot be held liable for Cohen's actions on a theory of apparent authority, because NYA never gave the appearance that Cohen was acting on NYA's behalf when he worked with plaintiffs on Skoopwire.com, or when he allegedly gave ideas to the Pinterest founders. In addition, NYA argues that plaintiffs have no reasonable basis to conclude that Cohen was acting as NYA's agent. For example, plaintiffs never provided NYA with Skoop Media's shareholder agreement or proposed liquidation agreement.

In opposition, plaintiffs argue that NYA is liable for Cohen's actions because Cohen acted in furtherance of NYA's business in dealing with both plaintiffs and Pinterest. Plaintiffs maintain that NYA allegedly represented to them that Cohen had actual authority to act on its behalf Among other things, NYA's website advertises that it "mentor[s] and coach[es] the entrepreneurs in whom we invest," and that Cohen acted as a mentor to both plaintiffs and Cold Brew Labs. **[*15]**

Plaintiffs further argue that, even if Cohen lacked the actual authority to act on NYA's behalf, he still had apparent authority. They contend that NYA placed Cohen in a position where he had access to plaintiffs' confidential information, and that they were led to believe that their dealings with Cohen would be confidential. NYA then placed Cohen in a similar position with Cold Brew Labs, so that he then was able

---

[6] NYA joins the portions of Cohen's arguments in support of dismissing the causes of action grounded in misappropriation.

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 22 of 34

Page 7 of 19

2017 N.Y. Misc. LEXIS 4516, *15; 2017 NY Slip Op 32463(U), **8

to convey plaintiffs' information to Cold Brew Labs.

Cohen's Motion for Summary Judgment (motion sequence 004)

 [**9]  In his motion for summary judgment, in addition to the facts as presented above, Cohen adds the following, in pertinent part: In an effort to secure funding for Rendezvoo, its members pitched the website to multiple capital venture firms. None of these firms entered into confidentiality agreements, and neither did NYA when it received Rendezvoo's business plan.[6]

Regarding his relationship with Pinterest, Cohen maintains that he did not provide any Rendezvoo or Skoop Media content to Pinterest, regardless of whether or not plaintiffs' information was proprietary. After meeting Silbermann at the competition and seeing Tote, Cohen invited Cold Brew Labs to pitch Tote to [*16] NYA. Thereafter, his relationship to Pinterest was limited to conversations about Tote's public relations and marketing. These conversations took place in the fall of 2009, at least a year after plaintiffs and Cohen had worked together, and after Skoopwire.com and Rendezvoo were taken off the public internet.

Cohen contends that he did not have any role in Tote's technological design and only contributed to the marketing and public relations ideas. Further, Cohen claims that he had no influence on the pivot, or evolution of Tote to Pinterest, and that it was independently created by Pinterest's founders. Silbermann testified that Cohen was not involved at all in the shift from Tote

to Pinterest. *See* Cohen's exhibit 11, Silbermann tr at 209.[7] Cohen notes that he did not have a technological background, and that he owned less than 1% of the company's stock. Cohen claims that, in January 2011, he was unaware of Pinterest's features and emailed Silbermann, "[w]ill it be possible 'to pin' photo's [sic]?" Cohen's exhibit 90 at 1.

 [**10]  Finally, Cohen claims that plaintiffs cannot establish that Cohen provided Pinterest with any of the proprietary information alleged in plaintiffs' papers, such as [*17] the usability principles or purported similarities between RDV 2 and Pinterest. For example, Cohen notes that all the founders of Pinterest testified that they did not discuss Pinterest's product features with Cohen and that they never discussed Rendezvoo or Skoopwire with Cohen. *See e.g.* Silbermann tr at 226. In addition, the founders testified that Cohen never gave them any of plaintiffs' documents. *Id.*

In opposition, plaintiffs argue that Cohen was provided

---

[6] In 2006, although Rendezvoo had 5,000 users, it had received "some poor public reception, and had been called a virtual clone of then-immensely popular website Digg.com in a leading online tech publication." Cohen's statement of material facts, ¶ 23. Nevertheless, Cohen offered, in his personal capacity, to help RDV refine its business plan.

---

[7] Cohen maintains that there is no evidence that he played any role in the creation of Pinterest generally, or in selecting the features or technological infrastructure. According to Cohen, Pinterest evolved directly from Tote and was a natural pivot. Even prior to Tote's launch, Tote was introduced to NYA in May 2009 as a mobile shopping application whose vision was to "[b]uild the best mobile shopping platform for both online and in-store shopping." Tote further described itself as a mobile, interactive catalog where women could browse, save/preshop/share, buy/find deals. In the vision for its expansion, Cold Brew Labs wrote that visual browsing was crucial to purchasing. Exhibit 59 at 31. However, following Tote's launch, Silbermann found that users "liked visual browsing . . . . So we saw this pattern where we thought people would be really interested, in some visual way, browsing and saving things they were interested in." Cohen's exhibit 11, Silbermann tr at 207-208. Cohen adds that plaintiffs themselves had twice pivoted their own products, when they pivoted from RDV to RDV 2, and then to Skoopwire.com.

Case 1:18-cv-11386-VSB-KHP  Document 409  Filed 01/14/22  Page 23 of 34

Page 8 of 19

2017 N.Y. Misc. LEXIS 4516, *17; 2017 NY Slip Op 32463(U), **10

with confidential business ideas and concepts prior to the dissolution of the parties' relationships. Specifically, plaintiffs contend that the "unique combination of elements," as drafted in emails in June 2007 and then explained to Cohen, as well as the focus group results, is the protected information that Cohen gave to Pinterest. *See* plaintiffs' exhibits 61, 62. Cohen held focus groups where the participants were introduced to the concepts of curation and the use of third-party images.[8] While plaintiffs concede that Schroeder conceived of these usability principles from reviewing public sources, they dispute whether all of the design principles appeared directly in preexisting publications.

In response to the interrogatory requesting [*18] that plaintiffs identify with particularity "each and every alleged trade secret that YOU contend PINTEREST misappropriated," plaintiffs listed the following:

"Usability/design principles [which include]:

(i) minimize the use of metadata to reduce friction on the user experience;

(ii) let users drive the design the site [sic], not the site designer;

(iii) strongly limit choices available to users so that the site functions with narrowed user options;

(iv) develop a excruciatingly simple user interface to generate mass users; and

(v) create proper incentives in how information is structured."

Results of the focus groups, including:

"(i) the collection and analysis of potential users' uses of the site;

(ii) use of third party assets (i.e., photographs not

owned by the site and actual third party websites (but not hyperlinks) as the user interface's primary and sole method of communication to its users;

(iii) technical visual appearance of the site (i.e., color schemes to further attract target users);

 [**11]  (iv) refined definition of the target audience for the site and

(v) the refinement of branding language used to describe main concepts."

Cohen's exhibit 91, plaintiffs' objections and responses to [*19] Pinterest Inc.'s first interrogatories to plaintiffs at 3.

Subsequently, during discovery, plaintiffs' expert witness provided another version of plaintiffs' proprietary information, set forth as follows, in relevant part:

"It is my opinion that various characteristics that the Company was developing were unique including, for example (in no order of importance):

• addressing the browsing vs. searching market opportunity,

• developing a 'word of mouth' user engagement and advertising business model,

• developing 'promoted posts' advertising business model,

• developing design principles for a visual social media platform leveraging user generated content,

• leveraging third party assets — digital images for a visual social medial platform leveraging user generated content,

• developing a social media platform that highlights end users' intentions — the future, deploying the use of infinite scrolling and

• creating while gating demand with having the site initially being exclusively offered to end users by invitation only.

"[I]t is my opinion that the combination of elements is

---

[8] Schroeder testified, "the curation using third-party images is the predominant form, is something very similar to the way Pinterest communicates to its user community which is third-party images as the primary method of communication." Schroeder tr at 95.

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 24 of 34

Page 9 of 19

2017 N.Y. Misc. LEXIS 4516, *19; 2017 NY Slip Op 32463(U), **11

what made the Company's intellectual property unique." Plaintiffs' exhibit 20, expert report of Jonathan Bari (Bari Report) at 55. Plaintiffs contend [*20] that "in determining whether summary judgment is appropriate the Court must look at the Plaintiffs' unique combination of elements, rather than on any one single element." Plaintiffs' statement of material facts, ¶ 143.

Plaintiffs contend that, after Cohen became involved with Cold Brew Labs, he transferred plaintiffs' ideas and concepts to them in telephone calls and email exchanges, and that this transfer of information led to Pinterest's creation.[9] The relevant emails are as follows, in relevant part:

1) On June 20, 2007, Cohen emailed Schroeder, "We are not an aggregator! An aggregator takes existing information from various sources and centralizes their availability for a value-added purpose. We are cetainly [sic] NOT that.

We are in fact:

1. A/The primary source of information.

2. The leading Web 2.0 new product introduction news wire media service. (could happen quickly!)"

[**12] Plaintiffs' exhibit 59 at 1.

2) On October 26, 2009, with the subject line, "A compendium of stories on the winds of 'curation' instead of aggregation," Cohen emailed Cold Brew Labs:

"It's all about trends, changes and words . . . look at these articles about Curation.... I think you will find it interesting and perhaps [*21] even useful."

Plaintiffs' exhibit 71 at 1.

3) On October 29, 2009, with the subject line, "Tote

Communications Plan," Cohen emailed Cold Brew Labs the following, in pertinent part:

"I sent you guys a link to a site that gives you an overview of the use of the word 'curation'

"I was giving a great deal of thought to the issue/word aggregation. First it's not a word that says, 'I really know what I'm doing or that I'm doing my best to give my customer what they want!'

"TOTE must be incredibly customer centric and knowledgeable about their needs (dah). The word curation or curator appeals to me much more than saying you're an aggregator.

"Frankly, I think you are more about fashion curation anyway!

"Please take a moment to consider that as a curator (maybe sounds artistic) you know a great deal about your customers [sic] needs and wants are [sic] and seek those solutions that make them most happy!"

Plaintiffs' exhibit 73 at 1.

Plaintiffs state that Pinterest was not a natural evolution or pivot from Tote, but rather a completely new product based on the ideas and concepts owned by plaintiffs. For example, they claim that Pinterest was branded on curation, and that "[c]uration was not a generic [*22] word as used by Cohen but rather shorthand for Plaintiff's ideas and concepts." Plaintiffs' opposition to Cohen's facts, ¶ 81.[10]

[**13] Trade Secret and Idea Misappropriation Claims

Cohen argues that the misappropriation claims against

---

[9] Plaintiffs rely on the timing of the email exchange referenced above to support the allegation of Cohen's conveyance of information to Cold Brew Labs and the resulting creation of Pinterest.

[10] Plaintiffs maintain that, while Pinterest was based on curation, Tote was based on ecommerce and shopping, and that, while Pinterest was based on user-generated content of third-party assets, Tote aggregated from third-party catalogues and products.

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 25 of 34

Page 10 of 19
2017 N.Y. Misc. LEXIS 4516, *22; 2017 NY Slip Op 32463(U), **13

him should fail, as there is no evidence of conveyance. He also maintains that he is entitled to summary judgment dismissing those claims, in light of the First Department's ruling on plaintiffs' misappropriation claims. According to Cohen, as plaintiffs' claims are premised on the visual, or surface, similarities between the features of Pinterest and RDV 2, they cannot serve as a basis for the misappropriation claims. As plaintiffs themselves maintain, it was Schroeder's wife who initially alerted Schroeder to the similarities between RDV 2 and Pinterest, and it is undisputed that Rendezvoo.com was publicly launched. As these features are all publicly recognizable to a layperson using the plaintiffs' website, they are not actionable as trade secrets.

Cohen further contends that none of the other professed misappropriated information is confidential. As Schroeder testified, the usability principles were shared with at least two web designers. In addition, Skoopwire.com [*23] was also shared publicly, when Skoop Media requested feedback on the site from web designers and public relations firms, and none of whom signed a nondisclosure agreement. Further, the allegedly confidential version Skoopwire.com was shared with two different focus groups, without requiring confidentiality agreements.

Cohen alleges that Schroeder did not even attempt to keep Skoop Media's information secret after the principals could not work out their differences. As proof of his allegations, Cohen provides a copy of an April 2008 email conversation, in which he informed Schroeder that he had found Schroeder's box of books and an old computer, and that Cohen would like to know what to do with them. Schroeder had responded that the books and computer were the company's property, and that Cohen could either donate the items or keep them

himself *See* Cohen's exhibit 47 at 1.[11]

Cohen further contends that the features allegedly misappropriated from plaintiffs' websites are not actionable as trade secrets, because they each had been publicly available on multiple other websites prior to the creation of Pinterest. Cohen's expert opined that every feature **[**14]** at issue had been in use on other websites [*24] prior to 2009, and that these features could be easily duplicated.[12]

Moreover, as indicated in the record, the Rendezvoo and Skoopwire.com websites were not visually similar to Pinterest in a side-by-side comparison. Regardless, Cohen maintains that plaintiffs' professed trade secrets, as enumerated in the usability principles and focus group results, are too vague to receive trade secret protection, as they are nothing more than categories of general concepts that were well known in the industry. Cohen adds that the usability principles are generic, and that Schroeder wrote them down after attending an industry conference the day before. Cohen further points to numerous preexisting writings that reference

---

[11] In that same email, Schroeder wrote that he, too, had two of the company's computers in his apartment. However, plaintiffs later allege that they were "unaware of the whereabouts of the two computers that were in Plaintiff Schroeder's possession on April 22, 2008 as referenced." Cohen's exhibit 49, plaintiffs' responses and objections to defendants' fifth set of interrogatories, ¶ 10 (2).

[12] *See e.g.* Cohen's exhibit 24, report of Dion Hinchcliffe (Hinchcliffe Report) at 96. Hinchcliffe listed and explained how over 30 websites are all "highly relevant predecessors to the Pinterest Website. . . . Each of these sites employs many of the claimed design principles of the Rendezvoo and Skoopwire Websites (such as I can understand them) as prominent parts of their design and demonstrate that such principles were common features in sites at the time, often before Rendezvoo was launched."

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 26 of 34

Page 11 of 19

2017 N.Y. Misc. LEXIS 4516, *24; 2017 NY Slip Op 32463(U), **14

some of the same principles.

Cohen contends that plaintiffs are unable to establish a claim for misappropriation of ideas, because the individual features that were identified as being misappropriated are not novel. For example, by 2006, there were several social shopping/commerce services that employed the use of product discovery, and by 2007, it was commonplace for social networking and blogging sites to allow users to post their interests and connect people to interests. [*25] Moreover, Schroeder did not invent the features that he references, such as the concept of an online bulletin board, the use of infinite scroll, and the concept of limiting metadata.

Cohen argues that plaintiffs also have not established that any of their ideas are concrete. Curation, for example, is "broad and malleable depending on the context . . . [and is the] concept of selecting content around a theme and displaying it to others." Hinchcliffe Report at 58. Cohen states that merely using the word curation would not enable someone to copy the design of plaintiffs' websites.

Further, Cohen claims that the combination of the referenced features would not result in a novel and concrete idea, because multiple other websites predating Pinterest were using the same features, and allowed users to post their interests and to collect and save third-party images.[13]

 [**15]  In any event, Cohen argues that plaintiffs cannot establish a claim for idea misappropriation because plaintiffs themselves were not using this combination of

features. Instead, Cohen claims that plaintiffs "cherry-picked" from Rendezvoo and Skoopwire.com to create a hypothetical website with those features that they alleged were [*26] misappropriated by Pinterest. For example, while Pinterest was by invite only, Rendezvoo was not. In addition, Pinterest did not introduce promoted pins until 2014, which was several years after its initial launch.

In opposition, plaintiffs argue that there was confidential technology that was not readily ascertainable from the Rendezvoo website, consisting of both the usability principles and the unreleased version of Skoopwire.com that were shared with Cohen, but not to the public. Plaintiffs argue that this confidential intellectual property is not too vague for trade secret protection, because it is not the individual elements but the combination of characteristics and components that make it unique. Relying on *Integrated Cash Mgt. Servs., Inc. v Digital Transactions, Inc. (920 F2d 171 [2d Cir 1990])*, plaintiffs argue that, while any individual design element may have been public, plaintiffs' unique combination of these elements entitles it to trade secret protection.[14]

Plaintiffs dispute Cohen's claim that the information could have been easily duplicated. They allege that Schroeder spent years developing his usability principles and that the manner in which plaintiffs combined the principles could not be easily acquired. They believe that Cohen has failed to identify [*27]

---

[13] For example, Hinchcliffe states, "[g]iven the wealth of pre-Pinterest websites that did use images as a primary design feature, it is hardly a leap - much less one that could be deemed proprietary to any single website of this era - to take the basics of one of these text-driven sites and add in images." Hinchcliffe Report at 96.

---

[14] "The manner in which plaintiffs combined the concepts of curation with the use of third party images to create a website - - based on Schroeder's usability principles, that focused on an individual's interests through browsing (rather than searching) and with limited metadata was generally not known or applied. Thus, while a third-party may have been able to easily acquire any individual piece of information, the Plaintiffs' genius was putting everything together." Plaintiffs' mem of law at 40.

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 27 of 34

Page 12 of 19

2017 N.Y. Misc. LEXIS 4516, *27; 2017 NY Slip Op 32463(U), **15

websites that were based on the same ideas and concepts as Pinterest. Although Cohen's expert listed 32 websites, plaintiffs claim that the websites cannot be considered to be a matter of general knowledge in the industry, because defendants' expert was either not aware of, or did not use them, at the relevant time period.[15]

[**16] Although plaintiffs concede that Skoopwire.com was shared with consultants and focus groups without a confidentiality agreement, they claim that it was shared with the understanding of confidentiality.

Plaintiffs do not address defendants' claim that they "cherry picked" from different websites to generate the list of features used by Pinterest, but reiterate that their claims are based on the unique combination of intellectual property that related to Rendezvoo's private development server and the unreleased version of Skoopwire.com.[16] In opposition to defendants' motions, Schroeder submits an affidavit stating that Cohen had access to the Rendezvoo private development server, which had unreleased versions of Rendezvoo, and that he left this computer with Cohen. While there is no submission of these alleged screen shots, Schroeder states, "the screen shots [*28] provided [in the record] are not the final versions of Rendezvoo and Skoopwire." Schroeder aff, ¶ 10.

---

[15] "Defendants have failed to identify any commonly recognized websites that were doing the same thing as Pinterest . . . . Defendants' expert did not even know about or use the other websites Defendants cite . . . to support their assertion that Plaintiffs' ideas and concepts were not unique." Plaintiffs' mem of law at 37; see also id. at 28.

[16] Defendants put forth the "cherry picking" concept in their discussion of idea misappropriation while relying on a case discussing the concept in the context of trade secret misappropriation.

Further, Schroeder adds that "Rendezvoo Version I was by invitation only, meaning that the public at-large did not have free access to the website. Plaintiffs discussed with Cohen the concept of having an invitation-only website at various points in connection with the design and concept for Skoopwire." Id. ¶¶ 4, 5. Schroeder further states that, although Skoopwire's focus was on posting about new things, events and ideas, users were still able to post about any interest.

In support of their claim for misappropriation of ideas, plaintiffs argue that the combination of elements in their intellectual property made it novel. Plaintiffs believe that they have established concreteness, in that Pinterest was able to be created from their combination of ideas. In response to Cohen's claim that plaintiffs' websites are not visually similar to Pinterest, plaintiffs contend that the focus should not be based on the look, but on the concepts, as Silbermann explained that what made Pinterest unique is its concepts, not looks. They maintain, "a screenshot fails to capture a website's purpose and functionality." [*29] Plaintiffs' mem of law at 28.

Plaintiffs similarly allege that Cohen has failed to identify websites predating Pinterest that were based on the same ideas and concepts.

[**17] Misappropriation of Skills and Expenditures

Cohen maintains that he did not act in bad faith in his communications with Pinterest's founders. As discussed above, Cohen states that he did not disclose any of plaintiffs' information, proprietary or not, with Pinterest's founders. As a result, Cohen states that the requisite element of bad faith cannot be established to support a claim for skills misappropriation.

In opposition, plaintiffs argue that Cohen acted in bad faith because, during the time Cohen was a fiduciary to

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 28 of 34

Page 13 of 19

2017 N.Y. Misc. LEXIS 4516, *29; 2017 NY Slip Op 32463(U), **17

plaintiffs, he misappropriated the fruits of plaintiffs' investment by giving their ideas and concepts to Pinterest.

## Breach of Fiduciary Duty

According to Cohen, plaintiffs cannot establish that he owed them a fiduciary duty at the time of the alleged misappropriations in 2009. First, Cohen argues that he was never a fiduciary of Rendezvoo, and only worked with the members of Rendezvoo until he became an officer of Skoop Media. Second, although he was an officer of Skoop Media, the company ceased operations [*30] in 2008, prior to when he met Silbermann. Cohen alleges that all members of Skoop Media parted ways and that, despite no formal dissolution, he functionally resigned in 2008.

Cohen also argues that there is no basis for plaintiffs' claim that he breached a fiduciary duty by purposefully deadlocking Skoopwire.com in 2007, so that he could steal plaintiffs' ideas. Rather, during this time, he claims to have been genuinely promoting Skoopwire.com to public relations firms.

In opposition, plaintiffs maintain that Cohen continued to have a fiduciary relationship to them, and an obligation to not disclose their intellectual property to Cold Brew Labs, regardless of when he left Skoop Media. In any event, plaintiffs believe that, as Skoop Media never dissolved or formally liquidated, Cohen never resigned from his fiduciary position.

Plaintiffs argue that, even if Cold Brew Labs could have obtained plaintiffs' confidential information from publicly available sources, and even if this confidential information did not qualify for trade secret protection, Cohen would still be liable for breach of a fiduciary duty. According to plaintiffs, Cold Brew Labs did not obtain this information from public [*31] sources, but from Cohen's unauthorized disclosures.

## [**18] DISCUSSION

## Summary Judgment

"The proponent of a motion for summary judgment must demonstrate that there are no material issues of fact in dispute, and that it is entitled to judgment as a matter of law." *Dallas-Stephenson v Waisman, 39 AD3d 303, 306, 833 N.Y.S.2d 89 (1st Dept 2007)*. The movant's burden is "heavy," and "on a motion for summary judgment, facts must be viewed in the light most favorable to the non moving party." *William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475, 982 N.Y.S.2d 813, 5 N.E.3d 976 (2013)* (internal quotation marks and citation omitted). Upon proffer of evidence establishing a prima facie case by the movant, "the party opposing a motion for summary judgment bears the burden of produc[ing] evidentiary proof in admissible form sufficient to require a trial of material questions of fact." *People v Grasso, 50 AD3d 535, 545, 858 N.Y.S.2d 23 (1st Dept 2008)* (internal quotation marks and citation omitted). "A motion for summary judgment should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility." *Ruiz v Griffin, 71 AD3d 1112, 1115, 898 N.Y.S.2d 590 (2d Dept 2010)* (internal quotation marks and citation omitted).

## Misappropriation of Trade Secrets

In order to successfully plead a claim for misappropriation of trade secrets, a plaintiff must demonstrate, "(1) that it possessed a trade secret, and (2) that the defendants [*32] used that trade secret in breach of an agreement, confidential relationship or

2017 N.Y. Misc. LEXIS 4516, *32; 2017 NY Slip Op 32463(U), **18

duty, or as a result of discovery by improper means." _Schroeder v Pinterest, Inc., 133 AD3d at 27_ (internal quotation marks and citations omitted). A trade secret is: "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." _Id._ (internal quotation marks and citations omitted).

In determining whether information constitutes a trade secret,

> "several factors should be considered: (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

_Id._ (internal quotation marks and citations omitted).

[**19] "An essential prerequisite to legal protection against the misappropriation [*33] of a trade secret is the element of secrecy." _Atmospherics, Ltd. v Hansen, 269 AD2d 343, 343, 702 N.Y.S.2d 385 (2d Dept 2000)_. Information that is "readily ascertainable" is not afforded trade secret protection. _Id.; see also Big Vision Private, Ltd. v E.I. Dupont De Nemours & Co., 1 F Supp 3d 224, 270 (SD NY 2014)_, affd _610 Fed Appx 69 (2d Cir 2015)_ (internal quotation marks and citation omitted) ("It is . . . well-established that information that is public knowledge or that is generally known in an industry cannot be a trade secret, including information that is available in publications").

In this case, the First Department has narrowed the possibility of trade secret protection to "plaintiffs' confidential technology, not readily ascertainable from the public Rendezvoo site, that led to the website's development." _Schroeder v Pinterest, Inc., 133 AD3d at 29_. In support of their motions for summary judgment, defendants have met their burden of demonstrating the lack of confidential technology at issue. Among other things, defendants have shown that plaintiffs' Skoopwire.com website, usability principles, and focus group information were not a secret, as they were shared with others without a confidentiality agreement. In addition, the visual similarities alleged between Pinterest and RDV 2, including aspects such as infinite scrolling, were all publicly visible. Lastly, the elements identified could easily have been **[*34]** acquired, because they were in use by numerous other websites at the time.

In addition, Cohen has shown that plaintiffs' professed trade secrets, enumerated in the usability principles and focus group results, are too vague to receive trade secret protection, as they are nothing more than categories of general concepts that were well known in the industry. Finally, even if these features were combined, the result would not be a unique combination that is a protectable secret or idea, because it is premised on a hypothetical website to which plaintiffs compare some, but not all, of their website versions to Pinterest.

In opposition to summary judgment, plaintiffs do not dispute that the elements of their trade secret were publicly known, but claim that their misappropriation claims are based on their unique combination of these elements, which was not generally known or applied. The Court, in _Integrated Cash Mgt. Servs., Inc. v Digital Transactions, Inc. (920 F2d at 174_ [internal quotation marks and citations omitted]), held that:

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 30 of 34

Page 15 of 19

2017 N.Y. Misc. LEXIS 4516, *34; 2017 NY Slip Op 32463(U), **19

"a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation **[\*35]** of which, in unique combination, affords a competitive advantage and is a protectable **[\*\*20]** secret. As the district court found, the architecture of ICM's product, or the way in which [ICM's] various components fit together as building blocks in order to form the unique whole, was secret."

However, as set forth below, plaintiffs cannot rely on the premise set forth in *Integrated Cash Mgt. Servs., Inc.*, and have not met their burden of raising an issue of fact as to whether they are entitled to any trade secret protection.

At the outset, "New York and Second Circuit law establish that compilation trade secrets are protectable but . . . the law requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique." *Next Communs, Inc. v Viber Media, Inc., 2016 US Dist Lexis 43525, \*9 (SD NY 2016)*, quoting *Sit-Up Ltd. v IAC/Interactive Corp., 2008 US Dist Lexis 12017, \*29, 2008 WL 463884, \*10 (SD NY 2008)*. "[S]pecificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation, and can divine the line between secret and non-secret information" *Sit-Up Ltd., 2008 US Dist Lexis 12017 at \*33-34*.

Here, plaintiffs have failed to describe their trade secret with sufficient specificity, given that the components of the trade secret formula vary throughout the **[\*36]** record. In the complaint, plaintiffs allege that their claims are premised on the visual similarities between RDV 2 and Pinterest. Plaintiffs alleged then, and also in the opposition to summary judgment, that it was

Schroeder's wife who alerted Schroeder to the similarities in Pinterest, by showing him the site and saying "this is Rendezvoo."[17] Now, plaintiffs contend that the similarities are not in the visual comparisons, but in the concepts. They claim that, although the visual similarities are not important, the screen shots reflected in the record are not the most updated versions of their websites. However, they offer no updated versions of these sites, and offer no explanation for the disappearance of two company computers that were in Schroeder's possession. In addition, when plaintiffs' expert drafted his report, he relied on the same screen shots provided in the record (*see* Bari report at 92).

**[\*\*21]** In their interrogatory responses, plaintiffs maintained that the combination of usability principles and focus group results constitute the trade secrets, and that this information was given to Cohen and was only contained in their private development servers. In plaintiffs' response **[\*37]** to Cohen's 19-a statement, paragraph 5, they maintain that 95% of the Skoopwire.com code came from code developed by Rendezvoo.[18] Plaintiffs' expert then provides yet another formula to show what unique elements, taken together, made plaintiffs' intellectual property unique. For example, although acknowledging that Rendezvoo was not the first website to use a word-of-mouth platform, Bari maintains that Schroeder was developing the word-of-mouth concept, and that this envisioned word-of-mouth platform was, in fact, unique, based on

---

[17] Further, in their response to Cohen's statement pursuant to *Rule 19-a*, plaintiffs add that they dispute Cohen's recitation of their interrogatory responses, as their "factual investigation was not yet complete and . . . Plaintiffs' misappropriation claims were based on the misappropriation of ideas and not only misappropriation of trade secret (*see* ¶ 133).

[18] As noted, Rendezvoo was undisputedly shared with the public.

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 31 of 34

Page 16 of 19

2017 N.Y. Misc. LEXIS 4516, *37; 2017 NY Slip Op 32463(U), **21

the combination of elements (*see* Bari Report at 56).

Furthermore, even the terms within the proposed trade secret elements are vague and refer to common concepts in the industry. For example, Schroeder testified that plaintiffs' proprietary information consists of the combination of factors that made up RDV 2 and Skoopwire, "and the curation aspects inherent in those two applications" (Schroeder tr. at 50). Curation is a broad concept, defined, even by plaintiffs' expert, as an industry "buzz word." Moreover, Schroeder never actually used the word curation in the complaint, in the usability principles, or in plaintiffs' website descriptions. Yet, plaintiffs **[*38]** insist that Schroeder was explaining the concept of curation to Cohen, and that curation was shorthand for plaintiffs' ideas and concepts. Taking another example, the design principle of "minimizing the use of metadata to reduce friction on the user experience," is not "sufficiently particular, because [minimize] . . . [is] subjective and not defined" *Big Vision Private, Ltd. v E.I. Dupont De Nemours & Co., 1 F Supp 3d at 265* (in reference to the terms "minimal" and "expensive").

Regardless, in addition to failing to describe their trade secret with sufficient specificity, plaintiffs have failed to establish a "unified process, design and operation" of their trade secret (*see id. at 270*). Plaintiffs themselves have not used the asserted combination and instead, have identified their trade secret by "cherry-picking" from various concepts, and relying on at least three of their websites, and various undeveloped or private versions of them, in creating this "unique" combination (*see e.g. id. at 271* ["Big Vision has identified its trade secret by cherry-picking five concepts amidst 70 pages of laboratory materials; those same five concepts can be cherry-picked **[**22]** from just two patents"]). Plaintiffs attempt, in hindsight, to retroactively tailor their alleged trade secret to what was **[*39]** embodied in Pinterest. For instance, the Bari report states that the "key drivers to Pinterest's success was its use of a by invitation only approach . . . ." Bari report at 61. Plaintiffs do not dispute that, while Rendezvoo.com version 1 was by invitation only, version 2 was not. Now, Schroeder's affidavit attempts to redefine and shift the trade secret formula, by stating that he spoke to Cohen about the importance of having an invitation-only site. Further, although Schroeder testified that the key aspects of RDV 2 and Skoopwire.com included "the use of third-party images to reflect the idea of curation," plaintiffs concede that the public version of RDV 2 did not have third-party images of notable size, and that these images were only present on the non-public development version of Rendezvoo.[19] Moreover, this alleged unique combination was not embodied in Pinterest at the time of Pinterest's launch. For example, plaintiffs' expert claims that the concept of promoted posts was unique when plaintiffs discussed it with Cohen. However, plaintiffs concede that Pinterest did not implement this concept of promoted posts until 2014.

Accordingly, plaintiffs have not demonstrated that "the **[*40]** way in which [their] various components fit together as building blocks in order to form the unique whole, was secret." *Integrated Cash Mgt. Servs., Inc. v Digital Transactions, Inc., 920 F2d at 174* (internal quotation marks and citations omitted). "A plaintiff asserting a combination trade secret must demonstrate that the way in which the publicly-available components fit together is unique and not publicly known" *Big Vision Private, Ltd. v E.I. Dupont De Nemours & Co., 1 F Supp 3d at 271*. Plaintiffs cannot rely on conclusory allegations and have not presented a triable issue of

---

[19] And, while in 2007, Skoopwire.com was also touting itself as focusing on new products only, Schroeder's affidavit states that Skoopwire also allowed users to post about any and all interests.

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 32 of 34

Page 17 of 19

2017 N.Y. Misc. LEXIS 4516, *40; 2017 NY Slip Op 32463(U), **22

fact as to the existence of a trade secret. "A motion for summary judgment cannot be defeated by [a] shadowy semblance of an issue" *Hatzis v Belliard, 13 AD3d 106, 106, 786 N.Y.S.2d 40 (1st Dept 2004)* (internal quotation marks and citation omitted).

In addition, other factors militate towards granting defendants' motions. Among other things, plaintiffs have not demonstrated that they took precautionary measures to guard the secrecy of the information. Although plaintiffs claim that there was an understanding of confidentiality, it is undisputed that plaintiffs' information was shared with public relations firms, web designers, and focus group participants, among others, without any confidentiality agreements. "While **[**23]** absolute secrecy is not required, if an individual discloses his trade secret to others who are under no obligation **[*41]** to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished" *Structured Capital Solutions, LLC v Commerzbank AG, 177 F Supp 3d 816, 832 (SD NY 2016)* (internal quotation marks and citations omitted).

Alternatively, plaintiffs' compilations of allegedly misappropriated features or design principles are not protectable, because marketing concepts, new product ideas, and "information consisting simply of business possibilities or goals is not a trade secret" *LinkCo, Inc. v Fujitsu Ltd., 230 F Supp 2d at 499-500*. For example, the focus group results, defined as "information to be used in furtherance of the development of the concepts and implementation that were Rendezvoo and Skoopwire," consist of strategies, possibilities and goals that plaintiffs sought to achieve in the future, and are not protectable as trade secrets. Moreover, information that is kept a secret or may have been considered confidential does not automatically qualify as a trade secret (*see Wiener v Lazard Freres & Co., 241 AD2d 114, 124, 672 N.Y.S.2d 8 [1st Dept 1998]*).

As there is no protectable trade secret, there is no need to address conveyance, the second prong of a trade secret misappropriation claim (*see e.g. Hudson Hotels Corp. v Choice Hotels Int'l, 995 F2d 1173, 1176 [2d Cir 1993]* ["We need not reach the second prong of the above conjunctive analysis because, as a matter of law, the [] concept is not a protectable trade secret"]). **[*42]**

Misappropriation of Ideas

"This cause of action [for misappropriation of ideas] requires proof of two elements: (1) a legal relationship between the parties in the form of a fiduciary relationship, an express contract, implied contract, or quasi contract; and (2) an idea that is novel and concrete" *Schroeder v Pinterest Inc., 133 AD3d at 29-30*. In accordance with the First Department's determination, plaintiffs' claim for idea misappropriation "cannot extend to material in the public domain" *id. at 30*. It is plaintiffs' burden to establish "proof of novelty" and courts apply a "stringent test" in determining whether an idea qualifies as novel (*see Paul v Haley, 183 AD2d 44, 53, 588 N.Y.S.2d 897 [2d Dept 1992]*). "Novelty requires a showing of true innovation, not merely that a particular idea has not been used before" *Brown v Johnson & Johnson Consumer Prods., Inc., 1994 US Dist Lexis 9339, *9-10, 1994 WL 361444, *3 (SD NY 1994)* (internal citation omitted), *affd 60 F3d 811 (2d Cir 1995)*.

Although plaintiffs claim that their ideas and concepts are novel, it is unclear what ideas were allegedly misappropriated by Cohen. In any event, plaintiffs cannot sustain a claim for idea **[**24]** misappropriation because they have not identified any ideas that are not in the public domain. For example, the use of infinite scroll was not invented by plaintiffs, was a common technique used by web developers, and was a feature

Case 1:18-cv-11386-VSB-KHP   Document 409   Filed 01/14/22   Page 33 of 34

Page 18 of 19

2017 N.Y. Misc. LEXIS 4516, *42; 2017 NY Slip Op 32463(U), **24

that could be publicly seen on [*43] the Rendezvoo website.

Further, plaintiffs cannot rely on a combination of public ideas to satisfy the novelty requirement, because "a combination of pre-existing elements is not considered 'novel'" *Brandwynne v Combe Intl, Ltd., 74 F Supp 2d 364, 376 (SD NY 1999)*; *see also Paul, 183 AD2d at 53* (internal quotation marks and citations omitted) ("an idea which is a variation on a basic theme will not support a finding of novelty . . . [as] the mixture of known ingredients in somewhat different proportions— all the variations on a basic theme—partake more of the nature of elaboration and renovation than of innovation").

As "[l]ack of novelty in an idea is fatal to any cause of action for its unlawful use," *id. at 52* (internal quotation marks and citation omitted), a discussion on concreteness is not warranted at this time.[20]

## Misappropriation of Skills and Expenditures

"To properly assert this claim, which is a subset of New York's unfair competition law, a plaintiff must allege that a defendant misappropriated plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so" *Schroeder v Pinterest Inc., 133 AD3d at 30*; *see also Out of the Box Promotions, LLC v Koschitzki, 55 AD3d 575, 578, 866 N.Y.S.2d 677 (2d Dept 2008)* (internal marks and citations omitted) ("A cause of action based on unfair competition may be predicated . . . upon the alleged bad faith misappropriation of [*44] a commercial advantage

belonging to another by exploitation of proprietary information or trade secrets"). The complaint alleges, in relevant part, that Cohen, in bad faith, misappropriated technology and information that had been developed as the result of Schroeder's efforts.

As a result of the First Department's narrowly tailored decision, as with the other misappropriation claims, the claim for misappropriation of skills and expenditures has been limited and "cannot be premised on the misappropriation of publicly-available information." *Schroeder v Pinterest Inc., 133 AD3d at 31 n 11*. Plaintiffs concede that no single feature may serve as the basis for their misappropriation claims, and rely instead on their purported "unique combination" [**25] of features. As discussed in the context of plaintiffs' trade secret claim, this "combination" changes throughout the record. Thus, because plaintiffs have not stated with precision what their unique combination is, plaintiffs have failed to raise an issue of fact regarding the existence of a non-public "unique combination" to serve as a basis for this claim. Accordingly, defendants are granted summary judgment dismissing this claim.

## Breach of Fiduciary Duty

The First Department held in response [*45] to defendants' motion to dismiss, that plaintiffs' allegations had been sufficient under Delaware law to state a cause of action for breach of fiduciary duty against Cohen. This claim was grounded on allegations that Cohen stole proprietary information from plaintiffs and gave it to Pinterest. As previously mentioned, all of plaintiffs' claims for misappropriation fail because the identified trade secrets and ideas were in the public domain, and their combination does not entitle them to protection. Accordingly, as there was no proprietary information for Cohen to have given to Pinterest, Cohen is granted summary judgment dismissing the claim for breach of

---

[20] In any event, plaintiffs' arguments regarding concreteness are speculative, as it is dubious that a user would be able to copy the design of a website from plaintiffs' allegedly unique ideas, which consist of generic and vague industry concepts.

2017 N.Y. Misc. LEXIS 4516, *45; 2017 NY Slip Op 32463(U), **25

fiduciary duty.

Citing *Beard Research, Inc. v Kates (8 A3d 573, 602 [Del Ch 2010])*, plaintiffs argue that, even if their confidential information does not qualify for trade secret protection, Cohen would still be liable for breaching a fiduciary duty by not preserving this information. A breach of fiduciary duty "claim can be premised on the misuse of a plaintiffs confidential information, even if that information does not rise to the level of a trade secret" *id.* Here, however, there is nothing in the record beyond speculation that Cohen "stole or misused" plaintiffs' information, confidential **[*46]** or otherwise (*see id*). As plaintiffs have not presented any evidence of conveyance, they cannot rely on attacking the credibility of Cohen and the Pinterest founders to defeat the motion for summary judgment (*see e.g. Tomasini v Walt Disney Co., 84 F Supp 2d 516, 521 [SD NY 2000]* [internal quotation marks and citations omitted] ["If the most that can be hoped for is the discrediting of defendants' denials at trial no question of material facts is presented"]).

### NYA's Liability

The First Department held that the misappropriation causes of action were sufficiently pled against NYA, under the theory of respondeat superior. However, in light of the above decision dismissing the underlying claims of misappropriation, the issue of NYA and Cohen's relationship, **[**26]** and NYA's potential liability based thereon, is now moot. Accordingly, NYA is granted summary judgment dismissing the complaint.

The court has considered plaintiffs' remaining contentions and finds them to be without merit.

### CONCLUSION AND ORDER

Accordingly, it is

**ORDERED** that the motion (motion sequence 003) of New York Angels, Inc. for summary judgment dismissing plaintiffs' complaint is granted, and the complaint is dismissed with costs and disbursements to defendant as taxed by the Clerk upon the **[*47]** submission of an appropriate bill of costs; and it is further

**ORDERED** that the motion (motion sequence 004) of Brian S. Cohen for summary judgment dismissing plaintiffs' complaint is granted, and the complaint is dismissed with costs and disbursements to defendant as taxed by the Clerk upon the submission of an appropriate bill of costs; and it is further

**ORDERED** that the Clerk is directed to enter judgment accordingly.

This constitutes the decision and order of the court.

**DATED: November 14, 2017**

**ENTER,**

/s/ O. Peter Sherwood

**O. PETER SHERWOOD J.S.C.**