UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                       :
SPECTRUM DYNAMICS MEDICAL                               :
LIMITED,                                                :
                                                       :
                              Plaintiff,                :         18-CV-11386 (VSB)
                                                       :
                - against -                             :         ▆▆▆▆ **OPINION & ORDER**
                                                       :
                                                       :
GENERAL ELECTRIC COMPANY, et al.,                      :
                                                       :
                              Defendants.               :
                                                       :
--------------------------------------------------------X

Appearances:

Neil F. Greenblum
P. Branko Pejic
Jeffrey H. Handelsman
Greenblum & Bernstein, P.L.C.
Reston, Virginia

Gregory D. Miller
Rivkin Radler LLP
Hackensack, New Jersey

*Counsel for Plaintiff*

Marla R. Butler
Carl Wesolowski
Lauren Hogan
Thompson Hine LLP
Atlanta, Georgia

Jesse Jenike-Godshalk
Thompson Hine LLP
Cincinnati, Ohio

Brian Lanciault
Thompson Hine LLP
New York, New York

Jeffrey C. Metzcar
Thompson Hine LLP
Dayton, Ohio

*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

      In this action, Plaintiff Spectrum Dynamics Medical Limited ("Spectrum") seeks

injunctive relief and damages from Defendants General Electric Company ("GE"), GE

Healthcare, Inc., GE Medical Systems Israel Ltd., Jean-Paul Bouhnik, Sergio Steinfeld, Arie

Eshco, Nathan Hermony, and Yaron Hefetz, (together, "GE" or "Defendants") for misuse and

misappropriation of confidential and proprietary information in breach of a 2009 non-disclosure

agreement.  Currently before me is Spectrum's motion for a preliminary injunction seeking to

enjoin Defendants from the future sales, marketing, or advertising of its competing device, the

StarGuide.  Because Spectrum has not demonstrated that it will experience irreparable harm in

the absence of an injunction, Spectrum's motion for a preliminary injunction is DENIED.

## I.    **Procedural History**

      Spectrum filed the initial complaint in this action under seal on December 6, 2018.  (Doc.

2 ("Compl.").)  On May 15, 2019, Spectrum filed an amended complaint.  (Doc. 38 ("Am.

Compl.").)  On June 14, 2019, Defendants filed a motion to dismiss, (Doc. 52), which I granted

in part and denied in part, (Doc. 74).  On September 9, 2020, Defendants moved to dismiss in

part Spectrum's counter-counterclaims.  (Doc. 107.)  On October 22, 2020, I referred the case to

Magistrate Judge Katharine Parker for general pretrial matters.  (Doc. 121.)  The parties

submitted a proposed Case Management Plan and Scheduling Order, which I granted on

November 5, 2020.  (Doc. 129.)

      On July 20, 2021, Spectrum moved for leave to file additional pages in support of its

motion for a preliminary injunction.[1]  (Doc. 302.)  On August 6, 2021, I held a status conference

on Spectrum's motion during which I inquired about the basis for Spectrum's motion for a

preliminary injunction and how the filing of such a motion might impact other scheduled dates in

the case.  (*See* Docs. 317–18.)  I subsequently granted Spectrum leave to file extensive briefing

and ordered the parties to meet and confer to determine how Spectrum's motion for a

preliminary injunction would affect the set discovery timeline and other scheduled briefing and

hearings.  (Doc. 318.)  On August 18, 2021, I issued an order adopting Defendants' proposed

briefing schedule and postponed several deadlines in the case pending my decision on

Spectrum's preliminary injunction motion, including adjourning the *Markman* hearing until

April 29, 2022, extending the close of discovery until January 27, 2023, and extending the

deadline to file summary judgment motions until March 3, 2023.  (Doc. 342.)  Magistrate Judge

Parker has since granted four extension requests to complete discovery.  (*See* Docs. 473, 499,

510, 525.)  Fact discovery is due by December 21, 2022, and expert discovery is due by July 26,

2023.  (Doc. 523.)

       Spectrum filed its motion for a preliminary injunction on September 3, 2021.  (Doc. 355.)

In support of the motion, Spectrum filed a memorandum of law, (Doc. 356 ("Pl. Mem.")), the

declaration of P. Branko Pejic, (Doc. 357 ("Pejic Decl.")), and 216 exhibits, (Docs. 357-1

through 357-216[2] ("Pejic Decl. Exs. 1–222")).  On November 2, 2021, Defendants filed their

memorandum of law in opposition to Spectrum's motion for a preliminary injunction, (Doc. 369

("Def. Opp.")), the declaration of Marla R. Butler in opposition, (Doc. 370 ("Butler Decl.")), and

71 exhibits, (Docs. 370-1 through 370-71 ("Butler Decl. Exs. 300–87")).  On December 14,

---

[1] I had not been previously aware that Spectrum intended to file a motion for a preliminary injunction.

[2] These 216 exhibits are not consecutively numbered.

2021, Spectrum filed its reply memorandum of law in support of its motion for a preliminary

judgment, (Doc. 378 ("Pl. Reply")), the reply declaration of P. Branko Pejic, (Doc. 379 ("Pejic

Reply Decl.")), and 32 exhibits, (Docs. 379-1 through 379-32[3] ("Pejic Reply Decl. Exs. 224–

441")).  On December 16, 2021, Defendants requested leave to file a sur-reply to address issues

raised for the first time in Spectrum's reply memorandum concerning standing and a subset of

alleged trade secrets.  (Doc. 385.)  I granted the request, (Doc. 396), and Defendants filed a sur-

reply memorandum of law, (Doc. 400 ("Def. Sur.")), the declaration of Marla Butler in

opposition, (Doc. 401), and eight exhibits, (Docs. 401-1 through 401-8 (("Butler Reply Decl.

Exs. 1-8")).  On January 10, 2022, I granted Spectrum leave to file a sur-reply to respond to the

same new issues.  (Doc. 407.)  On January 18, 2022, Spectrum filed its sur-reply memorandum

of law, (Doc. 411 ("Pl. Sur.")), and four exhibits, ("Pl. Sur. Exs. 1–4").

I granted the parties' requests to file their memoranda of law and supporting materials

under seal, but in compliance with my orders granting those requests, the parties publicly filed

redacted versions of their submissions on ECF.  (Docs. 358–59, 371–72, 380–81, 409, 413.)

On March 22, 2022, I held a hearing on Plaintiff's motion for a preliminary injunction.

Prior to the hearing, I issued an order directing the parties to prepare answers to twenty

questions.  (Docs. 417, 429.)  I allowed the parties to file written responses to the questions,

which they both filed on March 18, 2022.  (Docs. 422 ("Pl. Resp."), 424 ("Def. Resp.").)

Following the hearing, on March 24, 2022, I issued an order with supplemental questions for the

parties.  (Doc. 433.)  The parties filed their responses to the supplemental questions on April 4,

2022.  (Docs. 446 ("Pl. Supp."), 451 ("Def. Supp.").)

---

[3] These 32 exhibits are not consecutively numbered.

## II.   **Findings of Fact**[4]

I assume familiarity with the factual background of this case as recited in my previous

Opinion & Order granting in part and denying in part Defendants' motion to dismiss.  (Doc. 74.)

A more detailed factual background can be found in that Opinion & Order, but I recite here the

facts relevant to the resolution of the motion for a preliminary injunction.

Spectrum is a limited liability company organized under the laws of the British Virgin

Islands that has developed and manufactured technology in the nuclear medicine space since

1999, including breakthrough SPECT[5] imaging devices.  (Am. Compl. ¶¶ 71–72.)  In 2007,

Spectrum launched the D-SPECT, a revolutionary cardiac-dedicated nuclear medicine device

that was the first to employ Cadmium Zinc Telluride detectors.  (*Id.* ¶ 73; Pl. Mem. Ex. 3 ¶ 26;

*id.* Ex. 4 ¶ 4.)  Beginning in or around 2009, Spectrum focused on developing a new device

called the Veriton, a SPECT technology full-body multi-organ imaging device comprising a

novel ███████████████████████████████████████

███████   (*Id.* ¶ 78; Pl. Mem. Ex. 5 ¶¶ 32–33.)  The Veriton launched in 2017.  (*Id.*)

In 2009, Defendant GE began considering acquiring Spectrum or the Spectrum nuclear

molecular imaging business and technologies.  (Am. Compl. ¶ 42.)  From 2009 to 2012, GE and

---

[4] "Pursuant to Federal Rule of Civil Procedure 52(a), in granting or refusing a preliminary injunction, the court shall set forth 'the findings of fact and conclusions of law' which constitute the grounds of its action."  *Ferring B.V. v. Serenity Pharm., LLC*, 348 F. Supp. 3d 236, 241 (S.D.N.Y. 2018).  "These findings are not conclusive, and may be altered after a trial on the merits."  *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981) (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).  The facts set forth in this section are based primarily on the various submissions filed by the parties in connection with the motions before me, including the Amended Complaint, declarations, and exhibits, and representations by counsel at the hearing on this motion.

[5] "SPECT" stands for single-photon emission computed tomography.  (Am. Compl. ¶ 40.)  It is "used in nuclear medicine procedures in which a patient is injected with a radioactive material in or near the location of interest (or otherwise provided to the patient), which radiates gamma rays.  A gamma camera (or radiation detector) then captures electronic images of the gamma rays emanating from the location of interest in the body from many angles, and a computer manipulates the captured images to form tomographic (cross-sectional) images of the locations of interest in the body."  (*Id.* at ¶ 74.)

Spectrum engaged in due diligence discussions where Spectrum shared its confidential information with GE.  (Pl. Mem. Ex. 4 ¶¶ 9–11, 14.)  To protect the parties' respective interests in their intellectual property during due diligence discussions, on September 16, 2009, Spectrum and Defendant GE signed an agreement entitled the Amended and Restated Mutual Confidentiality and Non-Use Agreement ("2009 Agreement" or "Agreement").  (Am. Compl. ¶¶ 42–44; *id*. Ex. 1 ("2009 Agreement").)

Spectrum alleges that in 2013, after GE was informed that Spectrum declined GE's bid to acquire Spectrum, GE misused the confidential information, including trade secrets, in violation of the 2009 Agreement, to design and develop a SPECT GPC[6] device, marketed as the "StarGuide," that now competes with the Veriton.  (Pl. Mem. 4; *id*. Ex. 4 ¶¶ 25–27.)  Spectrum asserts the many similarities between the two devices are the result of Defendants' misappropriation and misuse of Spectrum's confidential information and trade secrets.  (Pl. Mem. 4.)

In its motion for a preliminary injunction, Spectrum seeks to enjoin Defendants from all future sales of the StarGuide, which Spectrum alleges Defendants developed by misusing Spectrum's confidential information to directly compete with sales of Spectrum's Veriton.

### III.    Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must show:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest is not disserved by the issuance of the injunction.  *See Salinger v. Colting*,

---

[6] "GPC" stands for General Purpose Camera.  (Pl. Mem. 1.)

607 F.3d 68, 79–80 (2d Cir. 2010).  The party seeking the injunction must demonstrate "by a clear showing" that the necessary elements are satisfied.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks omitted); *see Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 498 (S.D.N.Y. 2013).

"[A]n irreparable injury is an injury that is not remote or speculative but actual and imminent, [] for which a monetary award cannot be adequate compensation," *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (internal quotation marks omitted), and which cannot be remedied "if a court waits until the end of trial to resolve the harm," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Sterling v. Deutsche Bank Nat'l Tr. Co. as Tr. for Femit Tr. 2006-FF6*, 368 F. Supp. 3d 723, 727 (S.D.N.Y. 2019) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).  "A moving party must demonstrate that irreparable injury. . .  is likely before any other requirement for the issuance of an injunction may be considered." *Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 344 (S.D.N.Y. 2008).  "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999).  "Thus, if a party fails to show irreparable harm, a court need not [] address the remaining elements." *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019).

## IV.   Discussion

### A.   *Standing*

At the preliminary injunction stage, a plaintiff bears the burden of demonstrating standing to the same extent as on a motion for summary judgment.  *See New York v. U.S. Dep't of*

*Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020).  "Accordingly, to establish standing for a

preliminary injunction, a plaintiff cannot rest on mere allegations but must set forth by affidavit

or other evidence specific facts that establish the three familiar elements of standing."  *Id.*

(internal quotation marks omitted).  Those three elements are "(1) injury-in-fact, which is a

concrete and particularized harm to a legally protected interest; (2) causation in the form of a

fairly traceable connection between the asserted injury-in-fact and the alleged actions of the

defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied

by the requested relief."  *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d

100, 106–07 (2d Cir. 2008) (internal quotation marks omitted).  The "irreducible constitutional

minimum of standing" requires "an invasion of a legally protected interest."  *Port Wash.*

*Teachers' Ass'n v. Bd. of Educ.*, 478 F.3d 494, 498 (2d Cir. 2007) (internal quotation marks

omitted).

   To establish standing as a successor-in-interest to a contract, the plaintiff must show it

"received a valid transfer of claim" and it thus has a "legally protected interest."  *In re*

*Century/ML Cable Venture*, 311 F. App'x 455, 456 (2d Cir. 2009).  "Generally, a successor in

interest may be a person or entity who acquires the particular interest at stake in the litigation,

such as a certain piece of property or a contractual right, or who acquires all the assets and

liabilities of a party to the litigation."  *Koehler v. Bank of Bermuda Ltd.*, No. M18-302, 2002 WL

1766444, at *3 (S.D.N.Y. July 31, 2002).  A plaintiff does not have standing to assert a claim for

breach of contract if the plaintiff was "not involved in the transactions at issue" or was not a

successor-in-interest.  *Alzal Corp. v. I.F.C. Int'l Freight Corp.*, No. 13-CV-2577 (PKC) (JO),

2015 WL 1298585, at *5–6 (E.D.N.Y. Mar. 23, 2015); *see also In re Century*, 311 F. App'x at

456 (affirming that appellant lacked standing because "it never received a valid transfer of

claim" and therefore "has no legally protected interest."); *Port Wash. Teachers' Ass'n*, 478 F.3d at 498 (stating that the "irreducible constitutional minimum of standing" requires "an invasion of a legally protected interest" (internal quotation marks omitted).)

Defendants claim that Spectrum is "Spectrum Dynamics Medical Limited," a company that did not exist until 2016, and that "Spectrum Dynamics Limited" was party to the 2009 Agreement.  (Def. Opp. 40.)  Therefore, according to Defendants, Spectrum has not acquired rights under the 2009 Agreement, and Spectrum does not own the confidential information at issue in this action.  (Def. Sur. 1.)  Spectrum has demonstrated, through its supporting declarations and exhibits, that this is not the case.  Therefore, I find that Spectrum has standing to seek injunctive relief based on the 2009 Agreement either as a successor-in-interest or as an original party to the 2009 Agreement.

Jim Haisler, Chief Executive Officer ("CEO") of Spectrum Dynamics LLC, signed the 2009 Agreement on behalf of "Spectrum Dynamics Limited."  (Pejic Decl. Ex. 8.)  Defendants emphasize the fact that Haisler listed the address of Spectrum Dynamics Limited as that of V-Target (Israel) Ltd., an entity that was never activated.  (Def. Opp. 5–7, 41; Def. Sur. 1–4.)  However, when V-Target (Israel) Ltd. was not activated, V-Target Technologies Ltd., the predecessor to Spectrum Dynamics LLC, assumed all related agreements.  (Pl. Sur. Ex. 4 ("Zilberstein Decl.") ¶ 9.)  Biosensors International Group Ltd. ("Biosensors") acquired Spectrum Dynamics LLC in 2013 and then formed Plaintiff Spectrum Dynamics Medical Limited in 2016.  (*Id*. ¶¶ 13–17.)  Therefore, putting aside that Haisler signed the Agreement on behalf of "Spectrum Dynamics Limited," even if V-Target (Israel) Ltd. was an original party to the Agreement, those legally protected interests passed to Spectrum Dynamics Medical Limited, Plaintiff in this action, through Biosensors' acquisition and the subsequent entity formation.

These corporate moves are "valid transfers of claim" and support Spectrum's argument that it maintains a protected interest in the litigation.  *See In re Century*, 311 F. App'x at 456. Spectrum is therefore successor-in-interest to Spectrum Dynamics Limited, the original party designated in the 2009 Agreement.

In any event, the parties' course of conduct confirms that Spectrum has standing.  *See Canada Life Assur. Co. v. Guardian Life Ins. Co. of Am.*, 242 F. Supp. 2d 344, 359 (S.D.N.Y. 2003) (ascertaining any ambiguity in contract based on "prior dealings" between the parties and "regular course of conduct spanning several years"). ██████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ Spectrum and GE's course of conduct, specifically ████████████████████

██████████████████████████████████████████[7] and their continued course of conduct, establishes standing.  Plaintiff Spectrum has a legal interest in the 2009 Agreement and this suit for injunctive relief.

---

[7] Spectrum's argument that "[n]o rational company ████████████████████████ offer if ownership questions existed" also supports a finding of standing.  (Pl. Reply. 3.)

### B.    *Irreparable Harm*

Having found that Spectrum has standing to move for injunctive relief, I begin my analysis by considering whether Spectrum has demonstrated by a clear showing that it will likely be irreparably injured absent such relief, the prerequisite to the issuance of a preliminary injunction.  *See Freedom Holdings, Inc.*, 408 F.3d at 114.  Spectrum argues that, if sales of the StarGuide continue, it will be irreparably harmed because it will lose the advantage of being the pioneer in the field, lose sales, suffer price erosion, lose market share, lose prospective goodwill and reputation, potentially lose its business, and lose competitive advantage.  (Pl. Mem. 46–55.)  Spectrum asserts that money damages would be difficult to calculate and would not sufficiently redress the harm.  (*Id*. at 55.)  I find that Spectrum's claims of irreparable injury are conclusory and speculative, and its argument for emergency injunctive relief is undermined by Spectrum's delay in filing this motion.  Spectrum therefore has not sufficiently established irreparable harm.

### 1.    Loss of Sales and Market Share and the Resulting Loss of Goodwill and Opportunity

When arguing irreparable harm, Spectrum primarily focuses on the loss of sales of the Veriton, its loss of market share in the industry, and the resulting loss of goodwill and reputation with its customers and investors.  There are a number of fundamental problems with Spectrum's argument.

First, Spectrum's sales projections are entirely speculative and are therefore insufficient to demonstrate irreparable harm through loss of sales and its earlier domination of the market.  "While a 'meaningful loss of market share' may demonstrate irreparable harm under certain circumstances, the 'burden of proof and persuasion rests squarely' on the party moving for a preliminary injunction to show that irreparable harm is likely."  *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 34 (2d Cir. 2015) (quoting *Grand River Enter. Six Nations,*

*Ltd.*, 481 F.3d at 66).  Spectrum has not carried its burden with regards to its proffered loss.  In its responses to my supplemental questions, Spectrum quotes two different projection models:



There is a noticeable disparity between Spectrum's ███████████ and its ██████████ ██████ a difference which Spectrum fails to explain in any of its briefing.  It is conceivable that Spectrum's higher projections in the ██████████ which Spectrum states it created █ ████████████████████████████████████████████████████████████████████ ████████████  Therefore, the ██████████ projections were likely more a marketing tool rather than reliable data on which I should rely in assessing whether Spectrum will be irreparably harmed, and support an inference that Spectrum's projections are exaggerated and therefore speculative.  Spectrum fails to adequately explain why I should find this data reliable and indicative of future lost sales.

Moreover, both the ██████████ and ██████████ projections are ██████████ ██████████████████████████████████████████████████ thereby making any reliance on the projections for the years following the introduction of the StarGuide self-serving speculation.[8]  Such optimistic speculation, without concrete and reliable data, cannot

---

[8] Relatedly, Spectrum does not assert that the COVID-19 pandemic disproportionately affected its sales as compared to others, such as GE.  In fact, Spectrum argues just the opposite.  (*See* Pl. Supp. at 1–2 ("[I]t is reasonable to expect that COVID impacted Spectrum, the same as our competitors including GE, with the overall cancellations and/or restrictions associated with tradeshows and hospital visits as well as delays of customer meetings and purchase orders generally.").)  In any event, Spectrum does not offer any factual support for how COVID-19 affected its sales or GE's sales, and its contention that its lost sales are due to GE as opposed to COVID-19-related issues are merely

support a claim for irreparable harm. *See Keurig Green Mountain, Inc*., 618 F. App'x at 34

(affirming that plaintiff's "optimistic" sales projections that were expected to increase in

subsequent years were "speculative and remote" and did not show that irreparable harm was

likely).  These projections also establish that ████████████████████████████████████████

████████████████████████████████████████████████████████████████  Therefore,

issuance of a preliminary injunction in such a case would alter the status quo, rather than

maintain it.

      Second, Spectrum's proffered data in support of its loss of sales is faulty or, at the very

least, incomplete.  Spectrum initially indicated that it was ████████████████████████

████████████████████████████████████████  (Pl. Resp. 4–6.)  In its response to

my supplemental questions, Spectrum noted that ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████  (Pl. Supp. 5.)  Right after acknowledging this error, Spectrum then

proclaimed that the introduction of the StarGuide forced Spectrum to ████████████████

████ which was solely attributable to the introduction of the StarGuide.  (Pl. Resp. 5.)  The

figures in these two responses are inconsistent.[9]  It is Spectrum's burden to establish irreparable

harm.  *Keurig Green Mountain, Inc.*, 618 F. App'x at 34; *see also Leslie v. Minson*, No. 84 CIV.

8579-CSH, 1984 WL 1316, at \*2 (S.D.N.Y. Dec. 12, 1984) ("In order to obtain a preliminary

injunction in this circuit, a plaintiff bears the burden of showing. . . irreparable harm. . . ."

---

speculation.

[9] I also note that, when asked about head-to-head sales with ████████████████████

████████████████████████████████████████████  (Def. Supp. 3 n.3.)

Spectrum's list of total sales, however, appears to show that ████████████████████████.  (Pl. Supp. 2.)

These figures cannot be reconciled, and I cannot find that Spectrum lost sales due to the StarGuide's entrance into

the market, and thus will continue to suffer irreparable harm, based this data.  Moreover, GE cites a breakdown of

the specific institutions and locations of the sales, whereas Spectrum does not offer any additional information

beyond mere numbers.  (Def. Supp. 3 n. 3.)

(internal quotation marks omitted)).  Spectrum fails to meet its burden, not only through its

speculative assertions, but also assertions that are based on inadequate or incomplete data.

Third, Spectrum has ████████████████████████  (Pl. Supp. 1.)  The fact that

Spectrum has ████████████████  undermines its argument that the loss of sales, or related loss

of opportunity or goodwill, purportedly caused by StarGuide's unfair competition, will cause

irreparable harm in the future, and reinforces the speculative nature of this argument.  *See Albany*

*Patroons, Inc. v. Demperio Sports & Ent., LLC*, No. 121CV286FJSDJS, 2021 WL 4307264, at

*4 (N.D.N.Y. Sept. 22, 2021) (finding that any harm is not severe and irreparable because

plaintiff's business is not profitable and any "lost revenue. . . is monetary in nature"); *Int'l*

*Shoppes, Inc. v. Holder*, No. 99 CV 4638 (SJ), 1999 WL 993719, at *5 (E.D.N.Y. Sept. 6, 1999)

(denying motion for a preliminary injunction and finding that plaintiff has not suffered a loss of

goodwill or lost opportunity because plaintiff operated at a net loss).  The fact that Spectrum was

████████████████████████████████████████████████████████████  even

before the introduction of the StarGuide.  (*See* Pl. Resp. 7–9; Pl. Supp. 6–7.)  Spectrum does not

offer any argument why I can or should ignore this situation and assume that the StarGuide is the

reason for its losses.  As with its projections, Spectrum's argument that it will be irreparably

harmed when it has historically operated at a net loss is conclusory and lacks factual support.

I also note that Spectrum repeatedly highlights how this litigation has impacted its

goodwill and relationships with customers and investors, emphasizing customer confusion

between the two devices in its briefing.  (*See* Pl. Mem. 52 (including a screenshot of a LinkedIn

post portraying an image of a StarGuide with a user comment asking, "Is that the Spectrum

Dynamics [VERITON®] camera?"); *id*. at 51 ("Spectrum has participated in several meetings

with customers who voiced their confusion in seeing [the StarGuide and Veriton]" (citing Pl.

Mem. Ex. 4 ("Yoeli Decl.") ¶¶ 26–27, 36, 38, 40).)  Spectrum, however, concedes in its

responses that "[t]he confusion here is not that of a customer mistaking the source of the device,"

but rather "customers and potential investors/acquirers confusing GE as the innovator of

Spectrum's breakthrough SPECT technology," which potentially "results in lost sales in direct

competitions and injury to Spectrum's goodwill and reputation with potential investors. . ."  (Pl.

Resp. 20.)  Spectrum's argument is conclusory and is also at odds with Spectrum's other

arguments.  Spectrum avers that it will be irreparably harmed because, among other reasons, it

will lose its "first-mover advantage."  (Pl. Mem. 50; Pl. Resp. 5.)  According to Spectrum, it was

the "pioneering first mover with the [Veriton] in 2017" and "enjoyed the expected advantage of

exponential sales growth."  (Pl. Resp. 15.)  Now, Spectrum argues that purchasers of SPECT

devices will automatically assume GE is the innovator of the technology, thereby damaging

Spectrum's reputation and goodwill with investors and customers.  However, Spectrum does not

explain why purchasers would make such an assumption in the face of its filing this lawsuit

contradicting this assumption.  This claim does not align with Spectrum's other representations

and is no more than conclusory speculation

      In any event, the risk of customer confusion is much lower where the devices at issue are

as expensive as the Veriton and StarGuide.  *See Goat Fashion Ltd. v. 1661, Inc.*, No. 19 CIV.

11045 (PAE), 2020 WL 5758917, at *14 (S.D.N.Y. Sept. 28, 2020) ("In general, 'the greater the

value of an article, the more careful the typical consumer can be expected to be.'" (quoting

*McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979)) (referencing the low

risk of customer confusion of fashion designer clothing)); *Louis Vuitton Malletier v. Dooney &*

*Bourke, Inc*., 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008) ("If the goods are expensive, the

reasonably prudent buyer does not buy casually, but only after careful consideration.  Thus,

confusion is less likely than where the goods are cheap and bought casually." (quoting *McCarthy on Trademarks* § 23:96) (referencing the low risk of customer confusion of designer handbags)); *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (holding that risk of customer confusion is low when, putting aside identical names, the devices "in question are expensive items and thus even the ordinary purchaser would be expected to make more than a casual inspection of the product before buying," referencing the low risk of customer confusion of high-end cameras).   Therefore, any purchaser of a SPECT device would be expected to, at a minimum, inquire into the specifics of the device with some detail, thereby decreasing the risk of confusion.   Spectrum's argument that potential customers will confuse the Veriton and the StarGuide, or the party responsible for their innovation, is not persuasive evidence that Spectrum's relationships with its customers will be irreparably harmed.

Further in support of its argument regarding ████████ Spectrum contends that



(Pl. Resp. 7–8 ████████

████████.)   It is true that "a threat to customer goodwill constitutes a threat of irreparable harm for which preliminary injunctive relief is appropriate," *Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 401 (W.D.N.Y. 2014), but Spectrum brought this lawsuit to combat the alleged misappropriation and now claims that the lawsuit itself is irreparably injuring Spectrum.   Spectrum has not cited—and I have not located—any case law to support their argument that a lawsuit initiated by a plaintiff can result in actionable irreparable

harm to that plaintiff.  Moreover, Spectrum asserts that ████████████████████

████████████████████████████ (Pl. Supp. 6 ████████████████████████

████████████████████████████████████████████████████████

████████████ ), thereby reducing the weight of its argument that the ████████████

████████████████  Spectrum also does not assert that it attempted to carve out this

litigation in its negotiations with potential investors such as ██████ or ████████████ or

that investors viewed this dispute as more significant than other disputes in which Spectrum was

involved.  Furthermore, Spectrum concedes that one potential investor, ██████ did not directly

state that this lawsuit was a factor in ████████████████████ again establishing the

speculative nature of this argument.[10]  *See In re Keurig Green Mountain Single-serve Coffee*

*Antitrust Litig.*, No. 14-MC-2542 (VSB), 2014 WL 12778832, at *10 (S.D.N.Y. Sept. 19,

2014), *aff'd sub nom. JBR, Inc. v. Keurig Green Mountain, Inc.,* 618 F. App'x 31 (2d Cir. 2015)

(determining that "'concern' among major retailers" and "decisions adverse to [plaintiff] after

meeting with [defendant's] representatives" did not meet "the requisite showing that its lost sales

or opportunities will amount to irreparable injury").  Spectrum's assertion that these ████████

████████████████████████████████████████████████████████

████████████████████ further weakens Spectrum's argument.  (Pl. Supp. 6–

_____

[10] In its responses to my supplemental questions, Spectrum repeatedly references certain ████████
████████████████ (*See* Pl. Supp. 6–10.)  Spectrum offers that these ██████ may shed
light on ████████████████████████████████████████████████████████
As the movant, it is Spectrum's burden to prove irreparable harm, *see Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275
(2d Cir. 1985), so I find that these vague references to the impact of this litigation on Spectrum's overall business,
shown through confidential documents mentioned for the first time during the third round of briefing on irreparable
harm, and nonetheless not provided as direct support, are nothing more than speculation and are thus insufficient and
unpersuasive.  Furthermore, "[a]rguments may not be made for the first time in a reply brief," and any new
argument must be rejected.  *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993); *see also ABN Amro Verzekeringen
BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument
raised for the first time in a reply brief.").  In other words, when it filed its motion, Spectrum presumably could have
sought permission from the counterparties to the ██████ to disclose those portions of the ██████ it believes would
further clarify issues.

7.)

I also note that Spectrum issued and distributed a press release to its clients and partners that not only mentioned this lawsuit and my Opinion & Order denying in part Defendants' motion to dismiss, but also asked its clients and partners to "hold GE accountable" because GE misappropriated Spectrum's trade secrets, committed fraud against a United States patent office, and committed piracy.  (*See* Butler Decl. Ex. 381.)  Spectrum purposefully drew attention to this lawsuit through this press release, which undermines any contention that the StarGuide's entrance into the market, and the negative public perception of this litigation, will cause irreparable harm to Spectrum's goodwill and reputation.  If anything, Spectrum was attempting to do just that to GE, and in doing so, Spectrum diminishes its arguments that its relations with its clients were harmed.

## 2.  Spectrum's Delay

Separately, I also find that Spectrum unjustifiably delayed filing the instant motion. Spectrum filed the Complaint in this case on December 6, 2018, alleging that "GE's continued use of Spectrum's trade secrets to unfairly compete with Spectrum would cause irreparable harm to Spectrum."  (Compl. ¶ 300.)  Spectrum also claimed it was "entitled to preliminary and permanent injunctive relief" throughout the Complaint.  (*Id.* ¶¶ 333, 347, 373, 384, 391, 402, 418, 426, 433, 444, 451.)  In the prayer for relief in its Amended Complaint filed on May 1, 2019, Spectrum explicitly sought preliminary and permanent injunctive relief to enjoin Defendants from marketing, advertising, and selling the StarGuide.  (*See* Am. Compl.) However, Spectrum did not file a motion for preliminary injunction at the time it filed its Complaint or Amended Complaint.  Instead, over two years later, on July 21, 2021, Spectrum moved for leave to file extensive briefing in support of its motion for a preliminary injunction.

(Doc. 302.)  Spectrum filed its motion on September 3, 2021.  (Doc. 355.)

A plaintiff's delay in moving for a preliminary injunction may "standing alone, . . .
preclude the granting of preliminary injunctive relief because the failure to act sooner undercuts
the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests
that there is, in fact, no irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d
964, 968 (2d Cir. 1995) (internal quotation marks and citations omitted).  "As a factual matter,
such delay suggests that irreparable harm does not exist as the moving party, for some significant
period of time, declined to exercise rights that may have mitigated the irreparable harm it was
suffering."  *Schick Mfg. v. Gillette Co.*, 372 F.Supp.2d 273, 284 (D. Conn. 2005).  Courts in this
district have denied emergency relief based on much shorter delays than the over-two-year delay
here.  *See, e.g.*, *Procter & Gamble Co.*, 574 F. Supp. 2d at 354 (denying motion for preliminary
injunction and finding that six-month delay "weighs strongly against a finding of irreparable
harm"); *The Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y.
1989) (denying motion after delay of three months); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp.
2d 345, 350 (S.D.N.Y. 2000) (delay of eighteen weeks); *Magnet Communications LLC v.
Magnet Communications, Inc.*, No. 00 Civ. 5746, 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19,
2001) (delay of twelve weeks).

Spectrum cites a number of reasons for its delay, all of which are unpersuasive and
unavailing.  Spectrum asserts that it did not initially move for a preliminary injunction before the
Food and Drug Administration ("FDA") approved the Veriton because its argument was not yet
ripe, and an order granting injunctive relief at that time would have resulted in an advisory
opinion.[11]  As established at the hearing on this motion and through Spectrum's and Defendants'

---

[11] Multiple times, in support of its argument attempting to justify the delay, Spectrum cites comments made by
Magistrate Judge Parker during a conference in which she stated that she did not know whether it made sense to

responses to my supplemental questions, it is clear that Spectrum had economic reasons to seek

injunctive relief long before July 2021.  *See E.I. du Pont de Nemours & Co. v. Polaroid

Graphics Imaging, Inc.*, 706 F. Supp. 1135, 1145 (D. Del.), *aff'd*, 887 F.2d 1095 (Fed. Cir. 1989)

(holding that a motion for injunctive relief is appropriate as soon as there is "economic reason to

take action").  Spectrum demonstrates that it had reason to believe, or did believe, that the harm

was sufficient, and it thus had economic reason to take action, when it moved for injunctive

relief in its initial complaint in 2018, and again when its explicitly prayed for "preliminary and

permanent injunctive relief" in the Amended Complaint in 2019.  (*See* Compl. ¶¶ 333, 347, 373,

384, 391, 402, 418, 426, 433, 444, 451; Am. Compl.)  Spectrum had seen or at least was familiar

enough with the StarGuide in 2018 to assert the allegations for misappropriation and misuse of

its own technology and information in the complaint.

Additionally, the fact that Spectrum now seeks a worldwide preliminary injunction

undercuts any argument that it must wait for FDA approval before moving for injunctive relief.

(*See* Doc. 356, at 59.)  GE had already begun marketing the StarGuide in Europe by 2020, and

officially entered the European market by early 2021.  (Def. Resp. Ex. 29; Butler Decl. Ex. 7;

Def. Resp. 13.)  Spectrum voiced concerns about GE's commercialization of the StarGuide and

its entrance into the market at least by February 2021.  (Doc. 200 at 28:7–19.)

Spectrum argues that it did not delay, but even if it did, good reason existed for its delay.

(Pl. Supp. 12.)  "[G]ood-faith attempts at settlement and investigations are acceptable

---

move for a preliminary injunction before the FDA authorized the Veriton.  (Pl. Mem. 6–7; Pl. Reply 2 (citing Doc.
200).)  Nowhere during that conference did Judge Parker specifically state that Spectrum could not move for
injunctive relief before the FDA's approval.  (*See* Doc. 200.)  Nor did Spectrum inform Judge Parker that it intended
to seek a worldwide injunction.  Judge Parker also did not indicate whether the preliminary injunction motion would
be appropriate at some other time, but only that any relief may be mooted if the FDA did not approve the device as
anticipated.  (*See id*. at 207:10-16.)  For its part, Spectrum does not explicitly argue that it relied on Judge Parker's
comments and therefore delayed filing this motion.  I do not find Judge Parker's comments, on their own,
convincing to negate the law dictating that extensive delays undermine the argument for irreparable harm when
seeking emergency injunctive relief.

justifications for delay." *Goat Fashion Ltd.*, 2020 WL 5758917, at \*6.  In support of this

argument, Spectrum seemingly posits that it delayed because it took "additional time to examine

the infringing product."  (Pl. Reply 3 (citing *Weight Watchers v. Luigino's*, 423 F.3d 137, 144

(2d Cir. 2005)); Pl. Resp. 11–12.)  This argument is unpersuasive because Spectrum had seen the

device in Israel in 2018 and was familiar enough with the particulars of the device to assert

infringement in its initial complaint back in 2018.  (*See* Compl.)  Moreover, Plaintiff sought

preliminary and permanent injunctive relief when it filed the Complaint and Amended Complaint

more than two years before it notified me that it intended to seek a preliminary injunction.  (*See

id*.; Am. Compl.)  Additionally, since there had not been any settlement discussions at the time of

the hearing on this motion, (Pl. Resp. 19), Spectrum cannot claim it delayed because it was

pursuing settlement.

 For these reasons, I find that Spectrum was aware of the allegedly infringing product

when it filed its initial complaint in 2018, or at least in 2019 when it specifically sought

preliminary and injunctive relief in the Amended Complaint, and Spectrum cannot justify its

more than two-year delay in moving for a preliminary injunction.  Spectrum's delay, therefore,

separately warrants denial of injunctive relief, further undermines its efforts to demonstrate

irreparable harm, and supports my decision that emergency injunctive relief is not warranted

here.

### 3.  Availability of Monetary Damages

 Putting to the side the remote and speculative injuries cited by Spectrum in its motion,

any injury Spectrum claims it will suffer from GE's alleged misappropriation is compensable

with money damages.  "Where the loss of a product with a sales record will not affect other

aspects of a business, a plaintiff can generally prove damages on a basis other than speculation."

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).  This is particularly true when only one competitor threatens competition in the market.  *See Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*, No. 11-CV-6183T, 2011 WL 3555833, at *6 (W.D.N.Y. Aug. 11, 2011) ("[C]ourts have found that where there are only two competitors in a given market, the absence of other competitors militates *against* issuing a preliminary injunction." (emphasis in original) (collecting cases)); *see also MMJK Inc. v. Ultimate Blackjack Tour LLC*, 513 F.Supp.2d 1150, 1157 (N.D. Cal. 2007) (explaining that presence of only two competitors in the market suggests that any lost market share would be recoverable, and monetary damages would be sufficiently compensable if plaintiff prevailed).  Spectrum's argument is premised on the existence of only two competing companies, Spectrum and GE, and two competing devices, Veriton and StarGuide, and the same reasoning controls here.  (*See* Pl. Resp. 4.)

Nor is any injury to Spectrum's goodwill irreparable.  Here, "any loss of goodwill would result from [Spectrum's] inability to continue operating [the Veriton] business as [it] had in the past."  *Dexter 345 Inc.*, 663 F.3d at 63.  Consequently, Spectrum's "history of operation . . . ensures that [it] will be able to calculate money damages for any loss of goodwill [it] may have suffered."  *Id.*; *see also Toltec Fabrics Inc. v. August Inc.*, 29 F.3d 778, 780–81 (2d Cir. 1994) (collecting cases calculating damages for loss of goodwill).  In general, injury resulting from the loss of goodwill is irreparable only when "the very viability of the plaintiff's business, or substantial losses of sales beyond those of the terminated product, have been threatened."  *Tom Doherty Assocs.*, 60 F.3d at 38 (citations omitted).  Spectrum acknowledges that the Veriton is based on technology developed from the D-SPECT, "a cardiac imaging device that was immediately recognized as a revolutionary product that changed nuclear cardiology," (Pl. Mem.

1; Pejic Decl. Ex. 5 ("Roth Decl.") ¶¶ 32–33), and that D-SPECT's share of the cardiac scanner market is approximately ███████████ (Pl. Resp. 1).  Spectrum's sales of the D-SPECT, even after introduction of the Veriton, also ███████████████████████████ (*Id*. at 2 ████████ ███████████████████████████████████████.)  Spectrum provides no evidence to suggest that any alleged harm to its goodwill in the cardiac imaging device market has affected its reputation or its sales of the D-SPECT, the sales of which Spectrum admits ████████████████████████ (*See* Pl. Resp. 1.)  Therefore, any harm proven by Spectrum is compensable by money damages.

### 4.  Remaining Factors

Having concluded that Spectrum "failed to meet its burden of demonstrating a likelihood of irreparable harm if the requested relief is denied," I need not further analyze the other required factors for issuance of a preliminary injunction, "the likelihood of success on the merits or the balance of the equities."  *Procter & Gamble Co.*, 574 F. Supp. 2d at 356 (citation omitted); *see also Keurig Green Mountain, Inc.*, 618 F. App'x at 36 ("Because irreparable harm is the '*sine qua non* for preliminary injunctive relief,' we conclude that [plaintiff's] motion for a preliminary injunction fails at the irreparable harm stage, and we do not reach the other components of the preliminary injunction inquiry.").  Therefore, I do not express any view as to the merits of Spectrum's claims of misappropriation and misuse of proprietary and confidential information or infringement.

23

## V.       __Conclusion__

For the foregoing reasons, Spectrum's motion for a preliminary injunction is DENIED.

The Clerk of Court is respectfully directed to file this Opinion & Order under seal so that it is

viewable to only the Court and the parties.  The parties are ordered to meet and confer and,

within thirty (30) days of the entry of this Opinion & Order, submit proposed redactions to this

Opinion & Order so that it can be filed publicly on the docket.  The Clerk of Court is respectfully

directed to close the open motions at Docs. 275 and 355.

SO ORDERED.

Dated: September 27, 2022
        New York, New York

Vernon S. Broderick
United States District Judge