**HIGHLY CONFIDENTIAL**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPECTRUM DYNAMICS MEDICAL LIMITED,<br><br>               Plaintiff,<br><br>     v.<br><br>GE HEALTHCARE TECHNOLOGIES, INC., and GE PRECISION HEALTHCARE, LLC,<br><br>               Defendants. | Case No.: 18-cv-11386 (VSB)<br><br>**FILED UNDER SEAL** |

**THIRD AMENDED COMPLAINT**

Plaintiff Spectrum Dynamics Medical Limited (hereinafter "Plaintiff" or "Spectrum"), by and through its attorneys, files this Third Amended Complaint alleging, *inter alia*, breach of contract, trade secret misappropriation, correction of inventorship under 35 U.S.C. § 256 and other claims against Defendants GE HealthCare Technologies, Inc., and GE Precision Healthcare, LLC (collectively "GE," "GE Defendants," or "Defendants") and hereby alleges as follows:

**THE PARTIES**

1.  Plaintiff is a limited company organized under the laws of the British Virgin Islands having its principal offices at P.O. Box 957 Offshore Incorporations Centre Road Town, Tortola, British Virgin Islands. For purposes of this Complaint, "Spectrum" refers to Plaintiff Spectrum Dynamics Medical Limited and its "Predecessors in Interest" as defined below in ¶¶ 10-23.

2.  Upon information and belief, Defendant GE HealthCare Technologies, Inc., is a corporation organized under the laws of the State of Delaware having a place of business at 500 W. Monroe St., Chicago, IL 60661, USA.

3.  Upon information and belief, Defendant GE Precision Healthcare, LLC, is a limited

liability company organized under the laws of the State of Delaware having a place of business at 3000 N Grandview Blvd, Waukesha, WI 53188, USA.

4.    [Reserved.]

5.    [Reserved.]

6.    [Reserved.]

7.    [Reserved.]

8.    [Reserved.]

9.    [Reserved.]

**PLAINTIFF'S PREDECESSORS IN INTEREST IN THE SPECTRUM INFORMATION**

10.   Plaintiff Spectrum Dynamics Medical Limited's corporate history began in 1999-2000, with the formation of V-Target Technologies Ltd.

11.   V-Target LLC was formed and organized in Delaware in 2002.  In 2004, V-Target LLC acquired V-Target Technologies Ltd. and certain assets, including trade secrets and other intellectual property rights, as part of a reorganization in which V-Target Technologies Ltd. became a wholly owned subsidiary of V-Target LLC.

12.   V-Target Technologies Ltd., as a wholly owned subsidiary of V-Target LLC, performed research and development activities in, *inter alia*, the medical imaging field on behalf of V-Target LLC.  V-Target LLC held all intellectual property rights, including trade secrets resulting from such V-Target Technologies Ltd. research and development activities.

13.   In 2005, V-Target LLC changed its name to Spectrum Dynamics LLC (remaining a Delaware limited liability company), and V-Target Technologies Ltd. changed its name to Spectrum Dynamics (Israel) Ltd.  The entities' relationships remained the same; that is, (i) Spectrum Dynamics (Israel) Ltd. remained a wholly owned subsidiary of Spectrum

Dynamics LLC, and performed research and development in, *inter alia*, the medical imaging field on behalf of Spectrum Dynamics LLC and (ii) Spectrum Dynamics LLC held all intellectual property rights, including trade secrets resulting from such Spectrum Dynamics (Israel) Ltd. research and development activities.

14.    Starting in 2003 and continuing through the 2009-2012 time period, V-Target Technologies Ltd. and subsequently Spectrum Dynamics (Israel) Ltd. (after the name change in 2005) developed valuable intellectual property, including inventions, improvements, technology, know-how and trade secrets, through the expenditure of significant resources for V-Target LLC and subsequently Spectrum Dynamics LLC after the name change.

15.    As of January 1, 2007, Spectrum Dynamics (Israel) Ltd., as a wholly owned subsidiary of Spectrum Dynamics LLC, began providing manufacturing, supply and assembly services with respect to Spectrum Dynamics LLC's products.

16.    In 2013, Biosensors International Group Ltd. ("Biosensors"), a company organized under the laws of Bermuda, acquired all of the assets of Spectrum Dynamics LLC and of related company, Spectrum Dynamics (USA) Inc., including all trade secret and other intellectual property rights.

17.    At the same time in 2013, M. Maozos Ltd. (a company organized under the laws of Israel, wholly owned by Biosensors) acquired all of the assets of Spectrum Dynamics (Israel) Ltd.

18.    M. Maozos Ltd. subsequently attempted to change its name to Spectrum Dynamics Ltd., and ultimately changed its name to Spectrum Dynamics Medical Ltd. ("SDMIL").

19.    SDMIL performed research and development activities in the medical imaging field on behalf of Biosensors as well as manufacturing, supply and assembly services with respect

to Biosensors products. Biosensors held all intellectual property rights, including trade secrets, resulting from such SDMIL research and development activities, including the right to sue.

20. In November 2016, Biosensors formed Plaintiff Spectrum Dynamics Medical Limited, organized in the British Virgin Islands ("SDMBVI"). And, with effect as of January 2017, SDMBVI acquired from Biosensors all assets including trade secrets and other intellectual property rights related to the medical imaging field as acquired in 2013 from Spectrum Dynamics LLC by Biosensors and developed since then, including the right to sue.

21. Each of V-Target Technologies Ltd., V-Target LLC, Spectrum Dynamics LLC, Spectrum Dynamics (Israel) Ltd., Spectrum Dynamics (USA) Inc., Biosensors, M. Maozos Ltd., Spectrum Dynamics Ltd., SDMIL, are a "Predecessor in Interest" and collectively "Predecessors in Interest" to Plaintiff Spectrum.

22. Plaintiff Spectrum is the successor in interest under the "AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AND NON-USE AGREEMENT" (Ex. 1, the "2009 Agreement"), and has standing to assert breach of the non-disclosure and non-use provisions thereof.

23. Plaintiff Spectrum also owns all of the Spectrum Information (as defined in ¶ 47), including Spectrum Trade Secrets (the "Spectrum Trade Secrets" are identified, by way of non-limiting example, in ¶¶ 197-446) as well as all inventions embodied therein. The joint inventors of all of the Spectrum Trade Secrets, Yoel Zilberstien and Nathaniel Roth, were subject to employment agreements with Spectrum Predecessors in Interest which agreements automatically assigned any invention to the respective Predecessor in Interest employer including the right to sue for past damages, and placed confidentiality obligations

on these individuals as well. Further, joint inventors Shlomo Ben-Haim and Benny Rousso

of certain Spectrum Trade Secrets have assigned all rights to the invention of

PCT/IB2013/053721 ("'721 PCT") (filed as U.S. Application No. 14/399,975, and

published as U.S. Patent Pub. No. 2015/011970), which include the invention of Spectrum

Trade Secrets A, E, G, I AND J, to Plaintiff Spectrum's Predecessor in Interest, Spectrum

Dynamics LLC.   Messrs. Ben-Haim and Rousso were also subject to confidentiality

obligations in connection with the same.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§

1331 and 1338, and supplemental jurisdiction over Spectrum's state law and common law

claims which arise from the same operative body of facts pursuant to 28 U.S.C. §1367(a).

25.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the

amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs,

and there is diversity of citizenship between the Plaintiff and certain Defendants.

26.    This Court has personal jurisdiction over Defendant GE HealthCare Technologies, Inc.,

because GE HealthCare Technologies, Inc., transacts business in the State of New York

and this District thereby availing itself of the benefits of this District.  This Court also has

personal jurisdiction over Defendant GE HealthCare Technologies, Inc., by virtue of ¶ 6

of the 2009 Agreement.  (Ex. 1, *Id.*).

27.    This Court has personal jurisdiction over Defendant GE Precision Healthcare, LLC, at least

because it has a place of business, resides, and/or transacts business in the State of New

York pursuant to New York C.P.L.R. § 302, as well as having availed itself of the benefits

of this District by litigating patent disputes herein.  *See, e.g.*, *GE Healthcare Bio-Sciences*

*AB v. Bio-Rad Labs., Inc.*, 2015 U.S. Dist. LEXIS 159419 (S.D.N.Y. 2015). This Court also has personal jurisdiction over Defendant GE Precision Healthcare, LLC, by virtue of ¶ 6 of the 2009 Agreement (*Id.*).

28.  [Reserved.]

29.  [Reserved.]

30.  [Reserved.]

31.  [Reserved.]

32.  [Reserved.]

33.  [Reserved.]

34.  Jurisdiction over U.S. Patent No. 9,895,113 ("the '113 patent," Ex. 2); U.S. Patent No. 9,029,791 ("the '791 patent," Ex. 3); U.S. Patent No. 9,439,607 ("the '607 patent," Ex. 4); U.S. Patent No. 9,895,114 ("the '114 patent," Ex. 6); U.S. Patent No. 9,295,439 ("the '439 patent," Ex. 8); U.S. Patent No. 9,402,595 ("the '595 patent," Ex. 9); U.S. Patent No. 9,392,982 ("the '982 patent," Ex. 11); and U.S. Patent No. 11,156,731 ("the '731 patent," Ex. 28), which the respective named inventors have assigned to GE, is proper under 35 U.S.C § 256. These patents are referred to as the "Section 256 GE Patent(s)."

35.  There is Declaratory Judgment jurisdiction over the Section 256 GE Patent(s) as well as U.S. Patent No. 9,579,072 ("the '072 patent," Ex. 5), U.S. Patent No. 9,482,562 ("the '562 patent," Ex. 7), U.S. Patent No. 9,442,197 ("the '197 patent," Ex. 10), U.S. Patent No. 9,915,737 ("the '737 patent," Ex. 12), U.S. Patent No. 9,801,597 ("the '597 patent," Ex. 13), U.S. Patent No. 9,763,631 ("the '631 patent," Ex. 14), U.S. Patent No. 9,554,489 ("the '489 patent," Ex. 15), U.S. Patent No. 9,599,490 ("the '490 patent," Ex. 16), U.S. Patent Pub. No. 2018/0114096 ("the '096 publication," Ex. 17), and U.S. Patent Pub. No.

2018/0259659 ("the '659 publication," Ex. 18) because GE has threatened Plaintiff with an allegation of infringement. The Section 256 GE Patent(s) and these additional patents and publications are collectively referred to as the "Misappropriated GE Patent(s)."

36.    GE's outside counsel sent a letter warning Spectrum not to pursue this Action, and in a not so veiled threat stated that:

> Finally, as your client is well aware, GE has a formidable portfolio of patents in the nuclear medicine space. As GE's relationship with your client continues to sour, GE will have no choice but to prioritize comparison of your client's systems to the many nuclear medicine inventions owned by GE.

(Ex. 24, GE counsel October 12, 2018 letter).

37.    This threat to assert patent infringement against Spectrum is exacerbated by the fact that GE has access to Spectrum's "keys of the kingdom," *i.e.*, the Spectrum Information provided under the 2009 Agreement, and knew all facets of the Spectrum technology in development as well as the optimized configuration of Spectrum's breakthrough full-body multi-organ scanner, the VERITON® (as discussed in detail in ¶¶ 78-85), and Spectrum's licensors, vendors and suppliers. Given the unfettered access to this Spectrum Information, GE has been free to draft patent applications with claims consciously tailored to cover, inhibit and stop Spectrum's business on-going activities.

38.    With this potential existential threat to Spectrum posed by GE's enormous war-chest and menacing threat to assert patent infringement actions, Spectrum's counsel wrote a letter on April 3, 2019 to GE asking for confirmation as to whether GE thought that Spectrum devices infringed any GE intellectual property. (Ex. 27). GE has not responded.

39.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3).

## NATURE OF THE ACTION

40.    The instant action is an action for breach of contract, misappropriation and misuse of Spectrum's proprietary and/or confidential information including trade secrets relating generally to nuclear molecular imaging technologies, including Single Photon Emission Computed Tomography ("SPECT") technology, and related sensitive proprietary and/or confidential Spectrum business and commercial information as well as seeking correction of inventorship under 35 U.S.C. § 256.

41.    Prior to execution of the 2009 Agreement, Plaintiff Spectrum and GE had been involved in technical and business discussions under previous Non-Disclosure Agreements (2009 Agreement, Recital A), which focused on Spectrum's basic CZT technology and implementation for dedicated cardiac imaging. In 2008, GE initiated further discussions with Spectrum relating to the Spectrum D-SPECT® cardiac system as well as Spectrum's general SPECT technology.

42.    By 2009, GE's interests in Spectrum had evolved, and GE was considering acquiring Spectrum *en toto* or the Spectrum SPECT nuclear molecular imaging business and technologies. GE accordingly sought much more detailed information and materials from Spectrum, including full disclosure of Spectrum's new 360° SPECT gantry system with 12 swiveling detectors for full-body multi-organ scanning technology, which ultimately culminated in the Spectrum VERITON® as well as in virtually every aspect of Spectrum's business.

43.    GE was seeking the proverbial "keys to the kingdom," and Spectrum deemed it necessary to enter into a more stringent agreement, having more enhanced protections than previous Non-Disclosure Agreements, which led to the negotiation and execution of the 2009 Agreement.

44.   The 2009 Agreement, for example, had a much more detailed and broader definition of Spectrum Information than the previous Non-Disclosure Agreements, and expressly acknowledged that the Spectrum Information constituted "valuable trade secrets or other intellectual property." (Ex. 1, 2009 Agreement Recitals A, F).

45.   The 2009 Agreement also provided that "[a]ny breach or violation of this Agreement may cause the Disclosing Party immediate and irreparable harm for which money damages may not provide an adequate remedy…" and that Spectrum could seek an injunction to prevent violation of non-disclosure and non-use provisions of the 2009 Agreement "without bond…" (*Id.* ¶ 6).

46.   It was only with these enhanced protections, including strict non-disclosure and non-use provisions, and GE's express representations that Plaintiff Spectrum agreed to provide the full range of information and materials sought by the GE diligence personnel.

47.   Under the 2009 Agreement, the protected Spectrum Information comprises "proprietary or confidential information and know-how, including information or know-how relating to nuclear molecular imaging technologies and other information or know-how relating to Spectrum's research and development efforts, trade secrets, manufacturing processes, designs, clinical trials, field tests, product plans, vendor relationships, and business, including data, documents, and materials related thereto, technology, algorithms, formulas, analyses, modules, methods, procedures, processes and techniques ..." (*Id.* Recital C). This definition of "Spectrum Information" is used herein.

48.   This Spectrum Information went beyond typical technical information, and also included sensitive proprietary and/or confidential Spectrum business information and materials that go to the development of a breakthrough product sufficient to permit the GE diligence

personnel to fully understand Spectrum's technology and business plans required for a full assessment of commercial potential, including vendor relationships, in-licensing of technology and the viability of Spectrum's new full-body multi-organ scanning device, but which would never be apparent upon examination by the outside world.  As such, the Spectrum Information included both technical and non-technical Spectrum Trade Secrets as well as inventions embodied therein.

49.     The 2009 Agreement further contained separate provisions specifically prohibiting disclosure (confidentiality) and prohibiting use of the Spectrum Information, including Spectrum Trade Secrets.

50.     Specifically, Section 1.1(i) requires the Receiving Party to strictly protect the confidential nature of and not disclose confidential information (the Spectrum Information), including Trade Secrets as follows:

> Hold Information of the other party in strict confidence; (ii) exercise appropriate caution to maintain its secrecy; (iii) to use the same degree of care to prevent unauthorized use of such Information as used to protect Receiving Party's own confidential information; and (iv) not to disclose, discuss, communicate or transmit such Information to others, except to its Representatives to the extent necessary for the performance of the Purpose and then only so long as such persons agree to be bound by the terms of this Agreement.  The Receiving Party shall be liable to the Disclosing Party for any failure by the Receiving Party's Representatives to treat the [Spectrum] Information in the same manner as the Receiving Party is obligated to treat such [Spectrum] Information under the terms of this Agreement and shall otherwise be responsible for any breach of this Agreement by such Representatives.

(Ex. 1, 2009 Agreement ¶ 1.1(i)).

51.     Section 1.3 supplements this non-disclosure obligation prohibiting the disclosure of any confidential Spectrum Information, including Trade Secrets, to anyone other than party Representatives that may only use such Spectrum Information, including Trade Secrets,

for the stated Purpose of the 2009 Agreement.  (*Id.* ¶ 1.3)(¶¶ 1.1(i) and 1.3 collectively "non-disclosure provisions").

52.    Section 1.2 separately prohibits the ***use*** of any confidential Spectrum Information, including Spectrum Trade Secrets except for the express stated ***Purpose*** of the 2009 Agreement as follows:

> Each Party shall use Information of the other party solely for the Purpose and ***not use the Information or any part, portion, or element thereof, or any idea, concept, invention, technique, discovery or design deriving from the Information in any way whatsoever*** other than for the Purpose.

(*Id.* ¶ 1.2)(emphasis added)("the non-use provisions").

53.    The 2009 Agreement differentiates and distinguishes between the treatment of confidential Spectrum Information, including Spectrum Trade Secrets, under these separate non-disclosure and non-use provisions.

54.    The non-disclosure provisions are subject to the exclusions of Sections 2.1 and (3)[sic]2.2. Section 2.1 contains typical confidentiality exclusions where the information becomes publicly available or is independently developed, while Section 2.2 deals with a specific situation involving disclosure by NBC Universal, Inc. that "does not result from the provision of Spectrum Information to NBCU, its subsidiaries or controlled affiliates, or any other such affiliate of the Company, in breach of this Agreement."  (*See id.*).

55.    The *non-use provisions* of the 2009 Agreement are treated separately and are not subject to such exclusions.

56.    Further, while Section 5 of the 2009 Agreement entitled "*Parallel Development*" expressly permits GE to independently develop technology, the 2009 Agreement expressly prohibits the unauthorized ***use*** of confidential Spectrum Information, including Trade Secrets in such GE parallel development activities.  (*Id.* ¶ 5).

57.    The stated Purpose of the 2009 Agreement was to facilitate the ongoing exchange of extensive confidential information (under earlier Non-Disclosure Agreements as well as continuing through the 2009 Agreement), such as the Spectrum Information, including Spectrum Trade Secrets, under appropriate non-disclosure and non-use provisions, "*for the sole purpose of evaluating a possible relationship between [GE] and Spectrum*", and to protect the confidentiality thereof.  (*Id*. Recitals B, E)(emphasis added).

58.    Pursuant to the non-disclosure and non-use provisions of the 2009 Agreement, Plaintiff Spectrum disclosed the Spectrum Information to numerous GE diligence personnel.

59.    Upon information and belief, the "GE diligence personnel" included, at least, the following individuals who were provided access to Spectrum Information, including Spectrum Trade Secrets, under the non-disclosure and non-use provisions of the 2009 Agreement: Nathan Hermony, Stephen Lightfoot, Kelly Londy, Kevin Boyle, Reuven Brenner, Arie Eshco, Terri Moench, Will Burgman, Terri Bresenham, Pascale Witz, Geoff Martha, Jeff Thomas, Shuchi Varandani, Kristin Reilly, Avi Dahan, Bertrand Weil, Tom Coleman, Ehud Kogot, Jan Van Der Zanden, Dave Jablonowski, Alexander Ganin, Floris Jansen, Riyad Mahameed, Sergio Steinfeld, Galia Pyura, Jean-Paul Bouhnik, Tim Erickson, Jean Luc Vanderheyden, Osnat Zak, Aharon Peretz, Arnold Jacobson, Erez Levy, Moshe Alfandari, Joel Wenger, Dalit Sapir, Raul Grable, Derek Vander Heide, Roger Cepeda, Tish Clyde, Peter Henderson, Allan Tiro, John D'Antico, George Kalfayan, Yossi Shmul, Vincent Giordano, Agata Smieja, Levi McKelphin, Helit Dovrin, Larry Bigio, Etty Haver, Allison Mueller, John Dunn, Arvind Sundar-Rajan, Jose-Luis Sanchez, Nadav Drori, Mark Colananni, Jacob Bachar, Mark Woods, Tom Gentile and Matan Beilin.

60.    Upon information and belief, all of the GE diligence personnel agreed to be bound by the

terms and conditions of the 2009 Agreement, specifically including the non-disclosure and non-use provisions, before being provided access to Spectrum Information.

61.    Upon information and belief, (outside) consultant Yaron Hefetz was provided access to Spectrum Information by one or more of the GE diligence personnel.

62.    Upon information and belief, several GE senior executives and numerous GE Israel employees, including but not limited to Nathan Hermony, Global Manager of GE's Nuclear Medicine Division, Jean-Paul Bouhnik, Sergio Steinfeld, Arie Eshco, and (outside) consultant Yaron Hefetz, intentionally, repeatedly, and with malice, and fraudulent intent, acting under false pretenses deceived Spectrum into disclosing to GE its proprietary and/or confidential Spectrum Information that was misused for a purpose other than the Purpose as defined under the 2009 Agreement.

63.    Instead of expending its own resources to develop and refine its own SPECT technology, GE exploited, misappropriated and misused the Spectrum Information, including the Spectrum Trade Secrets and inventions embodied therein, to (i) accelerate development of GE's own imitation 360° digital ring rotating gantry SPECT camera having 12 swiveling detectors ("Imitation Device") to compete directly with Spectrum's VERITON® and (ii) prepare and file patent applications incorporating and misappropriating, impermissibly disclosing and misusing Spectrum Information for GE's own benefits and purposes – not the express **Purpose** of the 2009 Agreement.

## PLAINTIFF SPECTRUM IS A SUCCESSOR IN INTEREST IN THE 2009 AGREEMENT

64.    According to Mr. Jim Haisler, who is currently employed by Spectrum Dynamics Medical, Inc. (a wholly owned subsidiary of Plaintiff Spectrum) and Chief Commercial Officer of a group of Spectrum Dynamics Medical companies (including Plaintiff Spectrum) and the

Spectrum signatory to the agreement, the 2009 Agreement contained a typographical error. That is, the Spectrum entity identified in the Recitals was "Spectrum Dynamics Limited, a limited liability company organized under the laws of Delaware (and together with its parent, subsidiaries and affiliates, "Spectrum") with an address at 22 Bareket Street, North Industrial Park, P.O. Box 3033, Caesarea, 30889 Israel."  (Ex. 19, Haisler Dec. ¶¶ 1, 2, 3, 5, 6).

65.    At the time that Mr. Haisler executed the 2009 Agreement, however, there was no Delaware company named Spectrum Dynamics Limited.  (*Id.* ¶ 7).

66.    The Spectrum Dynamics Delaware entity that Mr. Haisler was representing when he signed the 2009 Agreement was Spectrum Dynamics LLC.  (*Id.* ¶¶ 8-9).

67.    According to Mr. Haisler, "the corporate entity that I was signing on behalf of as well as the Spectrum Dynamics LLC 'parent, subsidiaries and affiliates' and the address given for the  purpose of the 2009 Agreement was  22 Bareket Street, North Industrial Park, P.O. Box 3033, Caesarea, 30889 Israel, the  address of Spectrum Dynamics (Israel) Ltd." (*Id.* ¶ 9).

68.    Accordingly, the named Spectrum entity to the 2009 Agreement was intended to be and should have been Spectrum Dynamics LLC.

69.    The 2009 Agreement provided that "[t]he terms and provisions hereof shall be for the benefit of the parties and their successors and assigns."  (Ex. 1, 2009 Agreement ¶ 8).

70.    Plaintiff Spectrum is a successor in interest to Spectrum Dynamics LLC as set forth in ¶¶ 10-23, and therefore has standing to enforce the 2009 Agreement, specifically including the non-disclosure and non-use provisions thereof, against GE.

## PLAINTIFF SPECTRUM AND SPECT TECHNOLOGY BACKGROUND

71.     Beginning in 1999-2000, Plaintiff Spectrum (through its Predecessor in Interest in the

Spectrum Information, including Spectrum Trade Secrets, V-Target Technologies Ltd. and

continuing through the subsequent Predecessors in Interest), while not the originator of

SPECT technology, has been an innovator and global leader, developer, manufacturer and

seller of specialized SPECT nuclear medicine imaging equipment.

72.     Spectrum is a high-growth company which relies on innovation for growth and value, and

has invested significant resources in high risk research and development, resulting in a

diverse and extensive intellectual property portfolio that includes over 70 patents, patent

applications and provisional applications, as well as technical data, know-how and trade

secrets.

73.     In 2007, Spectrum launched the D-SPECT®, which was the first cardiac-dedicated nuclear

medicine device to employ CZT detectors.  The Spectrum D-SPECT® device was a vast

improvement over conventional cardiac dedicated SPECT devices because D-

SPECT® allowed the patient to be imaged while in a sitting position instead of lying down

uncomfortably with their hands extended over their head, with higher image resolution and

shorter scan time.

74.     By way of further detail, SPECT technology is used in nuclear medicine procedures in

which a patient is injected with a radioactive material in or near the location of interest (or

otherwise provided to the patient), which radiates gamma rays.  A gamma camera (or

radiation detector) then captures electronic images of the gamma rays emanating from the

location of interest in the body from many angles, and a computer manipulates the captured

images to form tomographic (cross-sectional) images of the locations of interest in the

body.

75.     A very general depiction of such a procedure is provided below:



76.     SPECT devices initially used analog technology, which required photo-multiplier tubes to amplify the gamma ray signal and assist in the diagnosis, but over time (beginning around 2000), Spectrum digitized SPECT technology by, *inter alia*, employing CZT (digital semi-conductor solid state technology) detectors.

77.     SPECT digital technology improved over the existing analog diagnostic technology by improving image quality, and with it diagnostic accuracy, lowering the needed injected radioisotope dosage, with the ability to provide faster scan times.

**SPECTRUM'S VERITON® IS A SIGNIFICANT TECHNOLOGICAL LEAP FORWARD PROVIDING MANY ADVANTAGES OVER THE EARLIER TECHNOLOGY**

78.     Beginning in or around 2009, Spectrum was focusing on developing a revolutionary new device employing SPECT technology for a full-body multi-organ imaging device comprising a novel 360° Digital Ring-Gantry SPECT Camera configuration having 12 swivelling detectors, which would culminate in the VERITON® and combination SPECT/CAT Scan device VERITON-CT® (collectively the "Spectrum VERITON®"),

pictured below:



**VERITON®**                    **VERITON®-CT**

79.     The Spectrum VERITON® was the first successfully developed and commercialized full-body multi-organ scanning SPECT device which optimized the use of solid state CZT detectors to provide a cost-effective system capable of substantially enhanced image resolution.

80.     The Spectrum VERITON® was the result of years of research and development and tens of millions of dollars of investment, and was a technological breakthrough that provided high speed, high resolution, functional images for diagnosis of various conditions/diseases using reduced radiation.

81.     Spectrum's VERITON® design was/is the only available design that could bring digital benefits to the SPECT market, and truly transform the market on a massive scale from analog to digital.   GE, a medical imaging equipment market leader, well knew the commercial benefits of such analogue-to-digital conversions from similar transformations it had experienced in other related medical imaging equipment markets like X-Ray, Mammography and PET (positron emission tomography), which earned GE hundreds of millions of dollars in annual sales.

82.     The Spectrum VERITON® was a revolutionary and unique breakthrough because of the

following features (and others), with the emphasized features depicted in the pictures below:

- Image resolution was up to 2x times better compared to conventional imaging.
- Efficiency/sensitivity was 2 to 4 times higher than previous systems – resulting in faster scans and lower dose imaging.
- 18 minutes full-body multi-organ 3D bone SPECT in the same amount of time analog does a 2D scan.
- ***12 robotic detectors bring detectors right up close to the body, creating much better image resolution.***
- ***360° coverage prevents "leakage" of radiation, therefore less time is needed to build up the same number of counts augmenting throughput and image clarity.***
- ***Spectrum's design requires one-third the number of detectors as compared to existing gantry designs, resulting in significant design-related cost improvements.***



83.  This optimal balance of enhanced clinical performance and reduced cost to hospitals makes Spectrum's VERITON® very attractive commercially, and unique in the field.

84.  Spectrum first unveiled the VERITON® in Europe at the European Association of Nuclear Medicine (EANM) trade show in Vienna, Austria in October 2017.  At the EANM trade show, Mr. Hermony, accompanied by his boss at the time, Bich Le T. D. (Jade Le) and Reuven Brenner, visited Spectrum's booth to observe the Spectrum VERITON® system.  Hermony complimented Spectrum, including Yoel Zilberstien and other Spectrum employees, on Spectrum's rapid introduction of the VERITON®, which Hermony characterized as a revolutionary system.  None of the three mentioned anything that would

have led those at the booth to believe that GE was secretly developing an Imitation Device using Spectrum Information. If anything, the conduct of Hermony and the others was entirely consistent with Spectrum's understanding that GE's development efforts were focused on their NM/CT 670 full-body or multi-organ scanning device, which GE had recently introduced.

85. Spectrum first showed the VERITON® in the United States at the Society of Nuclear Medicine & Molecular Imaging ("SNMMI") trade show held during June 23-26, 2018 in Philadelphia, Pennsylvania.

## GE'S DUE DILIGENCE

86. After execution of the 2009 Agreement and continuing until approximately the end of 2012, the Spectrum and GE diligence personnel conducted numerous in-person meetings and engaged in on-going communications via email exchanges wherein Spectrum divulged the "keys to the kingdom" in the form of Spectrum Information.

87. As just one example illustrating the depth and extent of GE's due diligence, in or around June 2010, GE sent a team of approximately 20 diligence personnel comprising professionals of different GE business units, *e.g.*, technology, research, human resources, sales, to attend daily meetings with Spectrum for over one week.

88. During these 2010 meeting(s) and in related communications and meetings thereafter, Spectrum disclosed Spectrum Information including details of the D-SPECT® (i) design and adaptive scan capabilities, (ii) calibration and daily quality control procedures, (iii) market information and evidence of the D-SPECT® commercial success, and (iv) other aspects of non-cardiac imaging with D-SPECT®. The Spectrum Information disclosed also focused on Spectrum's ongoing design and development of the next generation of D-SPECT®, which would evolve into the VERITON®. This information included (i) 360°

Digital Ring-Gantry SPECT Camera feasibility prototypes, (ii) novel 360° Digital Ring-Gantry SPECT Camera simulation work, (iii) updates on the design, (iv) specifications, (v) demonstration videos, and (vi) details of the mechanical design of its integrated detector head, shield and unique parallel hole tungsten collimator design.

89.    The GE diligence personnel received presentations, conducted extensive in-depth due diligence interviews, inspected documents and materials in the data room, and prepared extensive questionnaires which were presented to Spectrum seeking additional Spectrum Information and clarifications, to which Plaintiff Spectrum responded.

90.    As per a 2011/2012 slide, there was a very clear understanding between Spectrum and GE as to the intellectual property owned by each respective party, which attributes standard components of a SPECT system, such as the table on which the patient is positioned, to GE, but expressly understood that Spectrum owned and was contributing components including the newly developed CZT SPECT System, gantry, detectors, and slice machine box.  The slide is reproduced below.



91.     GE's interest in the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, continued, and the GE diligence personnel continued seeking additional information and materials.   GE also pursued several follow-up visits to Spectrum's facility in Caesarea, Israel including on January 24-26 and during June 2012. There was extensive follow-up communication subsequent to each of the in-person meetings.

92.     During discussions with Spectrum, GE diligence personnel expressed that the GE R&D budget was insufficient to develop a new product to compete with the new full-body multi-organ scanner being developed by Spectrum.

93.     GE diligence personnel further conveyed, in this respect, that any investment in Spectrum would be paid for in part out of GE's R&D budget instead of GE expending its own resources to develop an Imitation Device.

94.     It was with these representations and understandings as well as the enhanced protections

of the 2009 Agreement that Spectrum was willing to completely open up and divulge the "keys to the kingdom" – the Spectrum Information.  Spectrum would not have provided GE with the proprietary and/or confidential Spectrum Information, including trade secrets, if Spectrum had the slightest notion that GE was and/or would be commencing development of an Imitation Device.

95.     During these diligence meetings, GE and Spectrum also engaged in detailed discussions concerning a potential joint-venture, and what each side would have to contribute towards development and marketing of a joint next generation D-SPECT® device based upon the 360° Digital Ring-Gantry SPECT Camera technology of Spectrum.

96.     In March 2012, GE's outside counsel prepared and sent Spectrum a Joint Development Agreement, wherein the mutually contemplated value of the Spectrum Information was defined, the precise amount depending on a number of variables.

97.     In a later proposal in 2012, GE was prepared to pay a very substantial sum to acquire the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, along with royalty payments.

98.     GE made a bid to actually purchase Spectrum in the 2012-13 timeframe, which was rejected by Spectrum in favor of a bid by Biosensors.

### SPECTRUM LEARNS OF GE'S PATENTS

99.     During the 2009-12 diligence period, the GE diligence personnel expressed considerable skepticism as to the feasibility/workability of the Spectrum technology embodied and disclosed in the Spectrum Information, and chose not to consummate a transaction with Spectrum on terms acceptable to Spectrum.  GE's actions led Spectrum to reasonably believe that GE had minimal (if any) interest in the Spectrum Information or the Spectrum VERITON® under development, which incorporated some of the Spectrum Trade Secrets.

100.    Spectrum further had every reason to believe that GE would abide by the express non-disclosure and non-use terms of the 2009 Agreement.

101.    On or about June 13, 2018, a Spectrum employee accidentally saw a beta version of the GE Imitation Device at the Rambam Medical Center in Haifa, Israel. This was the first time Spectrum could reasonably conclude that GE had misappropriated the Spectrum Trade Secrets.

102.    Spectrum became aware of some Misappropriated GE Patents earlier, but under the circumstances Spectrum could not reasonably conclude from those patents that GE had breached the non-disclosure and non-use provisions of the 2009 Agreement, and it reasonably relied upon GE's representations that GE had abided and continued to abide by those provisions.

103.    For example, Spectrum became aware of (i) the '791 patent in mid/late 2016 in connection with a due diligence in an unrelated transaction and (ii) the '072 patent when a third party vendor alerted Spectrum to the existence thereof in or about March 2017.

104.    Under the circumstances Spectrum could not reasonably conclude that GE had violated either of the non-disclosure or non-use provisions of the 2009 Agreement.

105.    Prior to Spectrum learning of the '791 patent or the '072 patent in late 2016/early 2017, GE had just introduced its own "new" CZT full-body scanner, the NM/CT 670 CZT in 2016, which was based on an "old platform design," *i.e.*, CZT detectors configured into a conventional flat detector gantry design that GE had been selling since 2008/2009 when GE introduced the Discovery NM 530c/Discovery NM/CT 570c cardiac dedicated nuclear medicine devices, and not based upon Spectrum Information. The GE NM/CT 670 CZT did not use sweeping CZT detectors, but instead used two opposing flat panels filled with

stationary CZT detectors.

106. The NM/CT 670 CZT was publicly presented in 2016 (link   https://www.youtube.com/watch?v=8tbmF2ylT2E).

107. Further, prior to Spectrum learning of the '791 patent or the '072 patent, Spectrum's '721 PCT had published on November 14, 2013, and disclosed some limited features of Spectrum's Trade Secrets.

108. Both the '791 patent application (filed December 20, 2013) and the '072 patent application (filed September 30, 2015) were filed after the '721 PCT published on November 14, 2013.

109. The 2009 Agreement exclusions to the non-disclosure provisions remove the confidentiality obligations and protections for, *inter alia*, Spectrum Information placed into the public domain by Spectrum.  (Ex. 1, 2009 Agreement ¶ 2.1).

110. The 2009 Agreement further did not prohibit GE from independently developing technology in parallel based upon internal GE information as well as materials and information already in the public domain.  (*Id.* ¶ 5).

111. This "*Parallel Development*" right under the 2009 Agreement did not otherwise allow GE to use Spectrum Information for any reason other than the expressly stated Purpose of the 2009 Agreement.  (*Id.*  ¶ 5).

112. In view of these provisions of the 2009 Agreement and the prior publication of the '721 PCT, Spectrum reasonably relied upon GE's conduct and assurances and reasonably concluded that GE had abided and continued to abide by the non-disclosure and non-use provisions of the 2009 Agreement given that GE had recently introduced its NM/CT 670 CZT full-body scanner which was based on an "old platform design," and not Spectrum Information.

113.   Spectrum could reasonably understand that GE was seeking to permissibly "patent-around" the Spectrum Information, and even potentially seek patents incorporating the Spectrum technology published in the '721 PCT because the '791 patent and the '072 patent did not inform that GE was internally impermissibly developing an Imitation Device, or using Spectrum Information to do it.

114.   Given that the '791 patent and '072 patent disclose a variety of features and embodiments which are generally described, viewing these patents alone could not reasonably reveal that GE (i) had violated the non-disclosure and non-use provisions of the 2009 Agreement or (ii) was developing the Imitation Device.

115.   For example, both the '791 patent and '072 patent describe detector units which operate using a variety of different types of collimators to collimate radiation going into the detectors.  The '791 patent discloses not only parallel hole collimators, but also alternative collimators 26b-26l of different types (*e.g.*, converging, diverging or pinhole) based on a desired or required sensitivity or resolution, as well as the position and orientation of the detector column 22 on which the collimator 26 is coupled.  Thus, the collimator 26 may be of any type and not necessarily the type disclosed by Spectrum. ('791 patent, col. 6, lines 39-45).

116.   Likewise, the configurations and number of detectors was variable ("The head may have any number of detector element locations, seven is just the example of this particular embodiment." ('791 patent, col. 13, lines 49-55).

117.   The '072 patent similarly discloses a device having "adjustable strips (or vanes) or adjustable pinhole(s)," which was once again different than what was disclosed to GE. ('072 patent, col. 8, lines 8-13).

118.  The motion of the detectors was also left open: "It should be noted that motion of one or more detector units 115 may be in directions other than strictly axially or radially, and motions in several motion directions may be used in various embodiments." ( '072 patent, col. 8, lines 14-17).

119.  To the extent that any of these features were in the public domain by virtue of the '721 PCT as per the 2009 Agreement GE was within its rights to disclose such features.

120.  The 2009 Agreement permitted GE to draft improvement patents based upon Spectrum's '721 PCT (placing certain features in the public domain), but there was no way of knowing the '791 patent and the '072 patent were the result of GE's misappropriation and misuse of the Spectrum Information, and specifically, that GE was developing an Imitation Device incorporating Spectrum Information, including one or more of the unique Spectrum Trade Secrets.

121.  Spectrum could also understand that such activities, while a business concern, were reasonably permissible under the 2009 Agreement provided GE independently developed the inventions disclosed and/or claimed in the '791 patent and '072 patent, and was not using Spectrum Information in so doing.

122.  Over the passage of time, Spectrum heard rumors that GE was seeking to develop an Imitation Device.  On or about May 3, 2018, Mr. Zilberstien called Mr. Hermony, and suggested that they meet for coffee.

123.  Mr. Hermony agreed, and the two met in a coffee shop in Caesarea, Israel.  During this meeting, Mr. Zilberstien directly confronted Mr. Hermony expressing Spectrum's concern that GE may be violating the 2009 Agreement, and asked whether that was true.

124.  Mr. Hermony reassured Mr. Zilberstien that GE was doing nothing wrong, and that he did

not wish to further discuss the matter.

125.    GE's denials of wrongdoing seemed consistent with what Spectrum had observed in the recently introduced NM/CT 670 CZT full-body scanner, which was based on an "old platform design," and not Spectrum Information.

126.    As such, Spectrum had no reason to suspect that GE was secretly impermissibly preparing and filing patent applications, specifically containing, or otherwise misappropriating, one or more of the Spectrum Trade Secrets.

127.    Spectrum reasonably relied upon its own observations, GE's statements doubting the viability of the Spectrum Information (including Spectrum Trade Secrets and inventions embodied therein), the denial and reassurance by Mr. Hermony, and GE's ongoing contractual obligations not to impermissibly disclose or use the Spectrum Information.

## SPECTRUM DISCOVERS THE GE IMITATION DEVICE INSTALLED AT RAMBAM MEDICAL CENTER

128.    After relying on GE's representations and denials of wrongdoing, Spectrum was shocked to first learn on or about June 13, 2018, that GE had actually built the Imitation Device when the Imitation Device was accidentally observed by Spectrum personnel during a patient visit at the Rambam Medical Center in Haifa, Israel.

129.    The Imitation Device was housed in its own room at the hospital, but the door was open such that it could be casually observed.

130.    The GE Imitation Device was photographed and reported to Spectrum management. A photograph of the system appears below:



131.  Upon seeing photographs of the GE Imitation Device, Spectrum personnel felt as if they were "looking into a mirror." These observed features and configurations include a 360° SPECT gantry system with 12 swiveling detectors for full-body multi-organ scanning, which configuration and assembly is all based upon Spectrum Information.

132.  Upon information and belief, the GE Imitation Device has not yet been approved by the United States Food and Drug Administration for promotion and sale in the United States, but the GE Defendants intend to offer for sale and/or sell the Imitation Device in the United States and globally after development and validation efforts are completed.

133.  Spectrum subsequently learned that GE has been showing and discussing its Imitation Device with highly important key global opinion leaders in the industry, in an effort to persuade current and future customers to stop or divert their purchasing decisions away from Spectrum's VERITON® in favor of GE's own Imitation Device.

134.  This will inevitably lead not only to a direct loss of sales for Spectrum, but also to adversely influencing the entire market which takes its purchasing queues from such opinion leaders.

135.  GE's Imitation Device is and will be in direct competition with Spectrum's VERITON®.

136.  This was the first time that, through external observation only, Spectrum accidentally

learned of the actual existence of the GE Imitation Device, and GE's violation of the non-disclosure and non-use provisions of the 2009 Agreement.

137.  Upon information and belief, GE was secretly and impermissibly developing the Imitation Device, while Mr. Hermony was denying that anything of the sort was occurring.

138.  Spectrum also began to receive comments from third parties to the effect that GE was introducing the Imitation Device during the SNMMI trade show held during June 2018, where the Spectrum VERITON® was being exhibited.

139.  For example, Spectrum personnel, Tia Maragos, was approached – while exhibiting the Spectrum VERITON® – by a random customer who stated "you know GE is working on something identical."  No other detail was provided.

140.  Additionally, Ryan Paul, an employee of Atlanta Cardiology came to Spectrum's booth at the SNMMI trade show on June 25, 2018, and informed that GE was coming out with a new version of the NM/CT 670 CZT including a ring gantry having multiple heads.  He referred to a GE European patent, and said the GE device looked very similar to Spectrum's VERITON®.

141.  Yet, GE continued denying that it was developing an Imitation Device even after Spectrum accidently observed it at Rambam Medical Center.

142.  For example, Spectrum's Christian O'Conner had a discussion, at the SNMMI trade show, with Ms. Cheri Gottke, who was manager of Nuclear Medicine for GE US and Canada. Mr. O'Conner informed Ms. Gottke that Spectrum suspected that GE was developing an Imitation Device.  Ms. Gottke acted very surprised, and as if she knew nothing of it.  Ms. Gottke maintained that no one on the GE sales team knew anything of any such Imitation Device.

143.    On June 26, 2018, Michael Joos of Spectrum talked with Mr. Hermony at the SNMMI

trade show in Philadelphia.  Mr. Joos told Mr. Hermony of Spectrum's obvious concerns

regarding the GE Imitation Device, and Mr. Hermony, apparently irritated, noted that there

was a "leak" in the GE organization.

144.    Mr. Hermony further advised Mr. Joos of GE's formidable patent portfolio and noted the

significant expense in time and money that a litigation would require.

145.    Taken in combination with Spectrum's interactions and dealings with GE after the 2009-

2012 diligence period, GE's independent business dealings, and the way GE embedded

and disguised what it was doing in its patents, GE's actions gave Spectrum no reason to

believe that GE had decided not to abide by the 2009 Agreement, or to suspect that GE had

misappropriated, impermissibly disclosed and/or misused any Spectrum Information,

including Spectrum Trade Secrets and inventions embodied therein, or indeed that GE was

developing an Imitation Device until Spectrum viewed the Imitation Device during the

patient visit at the Rambam Medical Center.

## THE GE IMITATION DEVICE WAS A MARKED DEPATURE FROM GE'S THEN CURRENT TECHNOLOGY

146.    Plaintiff Spectrum was shocked to see the GE Imitation Device given the Device's marked

departure from the then current "old platform design" technology GE employed in the

NM/CT 670 CZT full-body scanning device launched in 2016.  This device employed CZT

detectors first introduced by GE in its predecessor Discovery NM 530e and Discovery

NM/CT 570c device in late 2008/early 2009 to compete with Spectrum's D-

SPECT® cardiac system.

147.    The NM/CT 670 Device was launched in 2016, and upon information and belief, rebranded

as the NM/CT 870 in 2018.

148.  A depiction of the GE 870 device is shown below:



149.  Such a device suffered numerous disadvantages, namely:

- Flat detectors cannot contour effectively to the human body. They are too big, thus allowing radiation scatter, which results in inefficiency of the acquisition (as reflected by the green arrows), which in turn reduces precision.
- As the large detector plates cannot come within close proximity to the human body, radiation "leaks" out, reducing detector counts, image clarity, and scan efficiency.
- The number of CZT detectors in each of the flat detector modules is so numerous as to be excessively costly.
- Flat detectors only "look" broadly in one direction and can, therefore, do not focus on a specific organ or field of interest. Detectors mounted on robotic arms (such as in Spectrum's VERITON® unique design) can swivel, and therefore, look directly at the organ or region of interest. This allows collection of more target-specific information leading to provide better quality images, better efficiency, and shorter scan times.

150.  Upon information and belief, GE has sold and installed relatively few of these Devices incorporating flat panel digital detectors, possibly as few as 20-30, over a two-year period. From GE's perspective as the market leader, this has been a major failure.

151.  The incremental improvement which GE achieved by incorporating digital CZT detectors into a conventional two-flat-detector design was not enough to justify a 2-3X price-tag as compared to previous analog technology.  While image quality was incrementally better, image speed and dosage improvements were insufficient to justify the significant increase

in cost.

152.    Upon information and belief, GE recognized and was concerned that D-SPECT®
        "sweeping detectors" made it possible to design a circular gantry system using detector
        arms achieving advantages, which were impossible to achieve with their stationary
        detectors.  This in turn made it possible to design a circular gantry system using detector
        arms achieving technical and imaging advantages that were impossible with GE's
        stationary detectors.  It was this recognition and concern that resulted in GE initiating
        negotiations to acquire Spectrum in 2009.  GE feared that Spectrum's new technology
        would place GE at a severe commercial disadvantage.

153.    Upon information and belief, GE diligence personnel recognized during the 2009-12
        diligence process that no technology that GE could independently develop, including
        technology based upon the "old platform design," would be capable of achieving the
        difficult-to-reconcile performance and cost attributes in the designs and configurations
        embodied in the Spectrum Information.

## SPECTRUM FORMALLY CHALLENGES GE

154.    Very shortly after accidentally discovering the GE Imitation Device at Rambam Medical
        Center, Spectrum retained U.S. patent counsel who wrote an opening letter on June 20,
        2018, alerting GE that Spectrum believed that GE had violated the 2009 Agreement by
        misappropriating and/or misusing the Spectrum Information.  (Ex. 20).  Spectrum
        identified various features with specificity which it believed were misappropriated and
        offered to discuss the matter, but warned GE against continuing to pursue activities in
        breach of its obligations to Spectrum.

155.    Spectrum also notified GE that Spectrum intended to introduce the VERITON® at the June
        2018 SNMMI trade show, and expressed concern that by exhibiting and/or discussing the

Imitation Device, GE would inevitably interfere with Spectrum's business.

156. On June 22, 2018, GE in-house Counsel Devins responded with a one page, three paragraph, letter not addressing a single issue raised in Spectrum's letter, but instead warning Spectrum, by way of reference to a 2013 letter, against infringing certain GE patents. (Ex. 21).

157. In a letter dated September 6, 2018, Spectrum accused GE of actually marketing the Imitation Device and exhibiting the same to industry decision makers at least during the SNMMI trade show. The September 6, 2018, Spectrum letter extensively detailed examples of various unique Spectrum Trade Secrets that Spectrum believed GE to have misappropriated.

158. On September 18, 2018, GE Counsel Devins responded in a two paragraph letter stating that GE would "thoroughly investigate" Spectrum's claims.

159. Since GE had inexplicably delayed over three months after receiving Spectrum's letters, Spectrum Counsel responded on September 26, 2018 expressing dismay that GE had in effect done ***nothing to date***, and was only then beginning to investigate the matter. (Ex. 22).

160. GE then responded on October 1, 2018. (Ex. 23). Counsel Butler of Robins Kaplan stated (i) that she had been retained as outside counsel, (ii) that "GE is conducting a thorough investigation into Spectrum Dynamics' allegations of trade secret misappropriation," and (iii) that she was "currently working with GE to determine a timeline" to provide information necessary to dissuade Spectrum from pursuing the matter. Apparently, GE had until that point still done nothing to establish its position so as to be able to substantively respond to Spectrum's concerns.

161.  This letter continued the generalized denials made by Mr. Hermony and others at GE when confronted with the wrongdoing.

162.  Instead of providing the long-awaited substantive response, in a letter dated October 12, 2018, GE entirely avoided Spectrum's claims; but warned Spectrum not to accuse GE of infringing Spectrum patents, citing GE's own "formidable portfolio of patents" against Spectrum.

> Finally, as your client is well aware, GE has a formidable portfolio of patents in the nuclear medicine space. As GE's relationship with your client continues to sour, GE will have no choice but to prioritize comparison of your client's systems to the many nuclear medicine inventions owned by GE.

(Ex. 24, GE counsel October 12, 2018 letter).

163.  Ms. Butler then sent a follow up letter dated October 22, 2018, asking Spectrum for specifics as to its ownership of the technology, and then proceeded to interpose a series of litigation-type dilatory interrogatory objections to the detailed assertions that Spectrum had raised.  (Ex. 25).  The letter ended by asking Spectrum when it would respond.

164.  Spectrum responded, on November 2, that GE still had never provided the promised substantive response to the issues raised in Spectrum's letters.

Dear Ms. Butler:

      I first respond to your letter dated October 12, 2018. Your letter provides no specifics, and we have no idea what the alleged wrongful conduct you reference is. My client is and was entirely within its rights to alert the public to the existence of its intellectual property rights and has done nothing wrong.

      Turning to your letter of October 22, I find it absolutely incomprehensible that your response completely sidesteps the point.

      My client has straightforwardly accused GE of violating the express terms of the 2009 NDA. The typical response to a serious assertion of this sort is to insist that your client did not appropriate or use any of SPECTRUM's technology. Instead, your letter asks, in effect, whether the technology really belonged to my client, and then asks that my client provide additional detail so that we can prove to your satisfaction that its technology merits trade secret protection. From your failure to answer, I must conclude that GE used ideas, concepts, and technology, developed not from its own independent research and development, but rather that GE took the information right out of SPECTRUM's due diligence briefings.

(Ex. 26, Spectrum Counsel November 2, 2018 letter).

165.    Based on GE's failure to substantively challenge, refute, or deny Spectrum's claims for over five months, it can be fairly inferred that GE intentionally disclosed and used Spectrum's ideas, concepts, technology, and proprietary, confidential, and trade secret information to develop an Imitation Device, to compete directly with Spectrum's VERITON®.

166.    Given its seriously dilatory conduct, in the September 26 letter, Spectrum specifically asked that GE agree to toll any statutes of limitations and laches periods. GE has never responded or agreed.

167.    The fact that GE did not take the matter seriously by conducting an immediate investigation was an egregious dereliction of GE's corporate responsibility and is just one factor making this case exceptional.

## THE UNPATENTED INNOVATIONS UNDERLYING SPECTRUM'S 360° DIGITAL RING-GANTRY SPECT CAMERA ARE HEAVILY GUARDED TRADE SECRETS

168.    Since its inception, the research and development of Spectrum has been based on innovative and disruptive technologies in the nuclear imaging field.  Protection of its intellectual property resulting from its research and development activities, including its trade secrets, has been paramount, with numerous measures being taken to maintain the secrecy of the aforementioned Spectrum Information.

169.    The Spectrum Information is the result of extensive innovative research and development, and financial expenditure by Spectrum (tens of millions of dollars).  The Spectrum Information was developed through years of analysis, simulation, clinical testing, trial and error, and ingenuity by Spectrum and its employees.

170.    Spectrum made a calculated decision to protect many of its ideas and inventions by maintaining them as trade secrets, rather than disclosing them.

171.    At the time of disclosure to GE diligence personnel, these innovative features leading to the development of its VERITON® were not known by or available to the public or Spectrum's competitors, providing Spectrum with an immeasurable competitive advantage in the approximately $1.7 billion global market for SPECT full-body and/or multi-organ scanners.

172.    The Spectrum Information was the driving force behind the development of the VERITON®.

173.    The Spectrum Information constitutes independent economic value for Spectrum.

174.    Access to Spectrum Information was limited to a limited number of authorized Spectrum employees.

175.    All employees of Spectrum are required to sign a Non-Disclosure Agreement as part of their employment agreement.

176.    Spectrum's employees, including its R&D staff, are instructed not to discuss its technology with any third parties without the protection of a non-disclosure agreement.

177.    Any and all third parties exposed to Spectrum's technology are required to sign NDA's and are selectively exposed to the technology on a need-to-know basis, and Spectrum has entered into numerous such agreements.

### GE'S UNAUTHORIZED DISCLOSURE AND USE OF THE SPECTRUM INFORMATION AND SPECTRUM TRADE SECRETS

178.    The GE diligence personnel learned every aspect of both the earlier Spectrum D-SPECT® and new Spectrum VERITON® as well as the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein.  GE came to understand and appreciate that a device such as the VERITON® was possible, practical, and above all commercially viable.  In so doing, GE leapfrogged years of R&D efforts, as well as avoiding expensive clinical validation and post-market launch clinical trials.  Impermissibly using the Spectrum Information, GE was able to hasten the development of the competing GE Imitation Device.

179.    With the wealth of sensitive, proprietary and/or confidential Spectrum Information provided by Plaintiff Spectrum up to and under the 2009 Agreement, GE went about misappropriating, impermissibly disclosing and misusing the Spectrum Information, including Spectrum Trade Secrets and inventions disclosed therein, by including and later disclosing such Spectrum Information in patent applications and misusing such Spectrum Information to develop the GE Imitation Device.

180.    As described in detail below, the Spectrum Information, including various unique and

distinct Spectrum Trade Secrets and inventions, provided to GE during the 2009-12 diligence period, comprised technical information, data, know-how, materials and concepts as well as financial data, economic/market information, testing, feasibility studies, and proof of principle related to a full-body multi-organ camera system.

181.    This proprietary and/or confidential Spectrum Information disclosed to GE included Spectrum's extensive sweeping detector design and development, an optimized gantry having only 12 detectors, the inclusion of 7 detector modules per detector, a rotating detector, a rounded detector head allowing swiveling/sweeping, multiple gantry positions, detector arms with counter-balance weights, an innovative detector head housing, how to perform a planar image, how to minimize blind spots, proof of concept images, full-body multi-organ rapid and area-focused scan modes, and highly effective calibration.  Virtually every aspect of Spectrum's present and future design was divulged.

182.    The aforementioned features are extremely crucial to commercial viability and success of a full-body multi-organ scanning device such as the VERITON®, as they optimize cost and performance to make such a device commercially attractive.

183.    GE's filing of applications for the Misappropriated GE Patent(s) impermissibly disclosing and/or claiming Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, strongly suggests in hindsight (and after seeing the GE Imitation Device) that GE was misusing the Spectrum Information to re-orient and re-direct their product development to substantially imitate Spectrum leading to the Imitation Device.

184.    This specific proprietary and/or confidential Spectrum Information is contained in the "2009 Due Diligence presentations," the "2010 Due Diligence presentations," "2012 Due Diligence presentations" and February 15, 2012 email from Nathaniel Roth of Spectrum to

Riyad Mahameed and attachment thereto.  Spectrum also disclosed other information both in writing and verbally to GE during the diligence period.

185.  The "2009 Due Diligence Presentations" comprised numerous proprietary and/or confidential materials, including presentations disclosing and discussing Spectrum's ongoing design and development of the next generation of D-SPECT and the concept of a 360° Digital Ring-Gantry SPECT Camera system.  These presentations included a high level overview of Spectrum's new technological developments and contained numerous proprietary and/or confidential images and graphics, including sample patient scans.

186.  Building on the Spectrum Information previously disclosed to GE, the "2010 Due Diligence Presentations" included extensive proprietary and/or confidential documents, presentations, drawings, and technical data provided to GE related both to D-SPECT® and the concept of a 360° Digital Ring-Gantry SPECT Camera system.  For example, the 2010 Due Diligence presentations included materials covering broad topics such as the feasibility of the 360° Digital Ring-Gantry SPECT Camera system, and more specific system features such as quality control and calibration of such a system.  Spectrum also provided numerous organ specific *patient scans and clinical results.*

187.  Throughout the 2009-12 diligence period, Spectrum responded to extensive questionnaires and requests for documents prepared by the GE diligence personnel.  These questionnaires consisted of voluminous requests for information and documents covering numerous topics such as technology, supply chain, regulatory, legal, finance, etc.

188.  Commencing in 2011-12, the Spectrum Information provided to the GE diligence personnel focused largely on Spectrum's 360° Digital Ring-Gantry SPECT Camera system.  The "2012 Due Diligence Presentations", included, but were not limited to,

Spectrum's latest updates on the design and configuration of the system, the system's specifications, and simulations and video animation demonstrations which were similar to the VERITON®.   The 2012 Due Diligence Presentations also included numerous presentations which provided an overview of Spectrum's system, including the detector specifications and operation, gantry configuration and operation, patient set up, camera specifications and operation, organ specific scans, etc.  In addition to the aforementioned technical disclosures, Spectrum disclosed to GE commercial development plans for the 360° Digital Ring-Gantry SPECT Camera system, which included development timelines/milestones, and financial and commercial data such as budget and cost projections.

189.    Throughout the 2009-12 diligence period, Spectrum provided the GE diligence personnel with numerous presentations which provided an overview of the Spectrum technology and inventions embodied in the Spectrum Information, including the detector specifications and operation, gantry configuration and operation, patient set up, camera specifications and operation, organ specific scans, etc.

190.    Spectrum also provided to the GE diligence personnel, throughout the 2009-12 diligence period, extensive technical drawings and design configurations of various components, along with scan simulations, and clinical performance data.

191.    In addition to these technical disclosures, Spectrum disclosed to the GE diligence personnel commercial development plans for the 360° Digital Ring-Gantry SPECT Camera system, which included development timelines/milestones, and financial and commercial data such as budget and cost projections.

192.    Spectrum Information was also placed in a data room, with access provided to the GE

diligence personnel.  Additionally, many of the Spectrum documents and presentations comprising Spectrum Information were shared and discussed with the GE diligence personnel during one or more of the various in-person due diligence meetings throughout 2009-12.

193.   The GE diligence personnel attending the due diligence meetings with Spectrum held during 2009-12, included, at least, Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, Jean-Paul Bouhnik, Sergio Steinfeld, Osnat Zak, Alexander Ganin, Floris Jansen, Geoff Martha, Shuchi Varandani and Erez Levy.

194.   Upon information and belief, one or more of these GE diligence personnel directly or indirectly provided Yaron Hefetz with the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, provided by Spectrum at the due diligence meetings as well as follow up communications.

195.   Upon information and belief, one or more of the GE diligence personnel and/or Yaron Hefetz directly or indirectly provided Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, to the following named inventors of the Misappropriated GE Patent(s) in violation of the non-disclosure and non-use provisions of the 2009 Agreement as these individuals were not part of the GE diligence personnel: Gil Kovalski, Jonathan Sachs, Yariv Grobshtein, Yulim Zingerman, Roee Khen, Shiran Golan, Michael Kogan, Michael Gaisinsky, Arie Shahar, Nati Herman, Jiang Hsieh, Moshe Levy, Gil Amisar, Michal Merman, Avi Bar-Shalev, and Omri Warshavski.

196.   At least the following Spectrum Trade Secrets comprising Spectrum Information, individually and in combination, were disclosed to the GE diligence personnel under the

2009 Agreement, and misappropriated, impermissibly disclosed and/or misused by Defendants:

### TRADE SECRET "A"

197.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret A and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret A.

198.    Trade Secret A was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

199.    Specifically, Trade Secret A was invented no later than June 2011 by Yoel Zilberstien, Nathaniel Roth, Shlomo Ben-Haim and Benny Rousso.

200.    Trade Secret A was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting, and in communications continuing through February 2012.

201.    The GE diligence personnel attending the meetings and to whom Trade Secret A was disclosed, included, at least, Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret A was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

202.    The information disclosed was included in (i) the 2010 Due Diligence presentations showing a preliminary ring gantry design, and (ii) the 2012 Due Diligence presentations showing the design of Trade Secret A.  The information disclosed was also included in materials from the data room as well as the February 15, 2012 email to Riyad Mahameed, of the GE diligence team, from Nathanial Roth forwarding the updated "Jaszczak simulation," which was a detailed simulation(s) based upon a digital "patient" provided by GE.

203.    Plaintiff Spectrum also provided GE with a video presentation demonstrating its Spectrum Device Alpha design, including the 12 IN/OUT independent robotic detector arms with swiveling detection heads:



204.    After disclosing Trade Secret A to the GE diligence personnel, Plaintiff first publicly disclosed Trade Secret A in the '721 PCT published November 14, 2013.

205.    In hindsight it is now clear that GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret A by including Plaintiff's invention in the patent application for the '113 patent (Ex. 2), filed September 27, 2013, published April 2, 2015 and issued on February 20, 2018. The named inventors of the '113 patent are Jean-Paul Bouhnik and Yaron Hefetz, who assigned the '113 patent to GE as shown at Reel/Frame No. 032532/0857.

206.    For example, claim 1 of the '113 patent recites an imaging system having a gantry with a

        plurality of detector units that move individually or as a group to acquire SPECT data.

        Although claim 1 does not specify the number of detector units, Figures 18-20 illustrate a

        rotatable 360° gantry having 12 detector units.  Claim 9 further recites a method to acquire

        two-dimensional (2D) Single Photon Emission Computed Tomography (SPECT) data.

207.    The '113 patent specification also, by way of further example, describes and discloses that

        the detector heads which, in some embodiments, are capable of a plurality of various types

        of movement such as rotation and parallel linear motion (col. 3, lines 30-34), swiveling

        (col. 7, lines 45-47; col. 11, lines 8-10) and methods for controlling these movements (col.

        3, lines 24-27).

208.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz

        also misappropriated, impermissibly disclosed and/or misused Trade Secret A by including

        Plaintiff's invention in the patent application for the '791 patent (Ex. 3), filed December

        20, 2013, and issued (before publishing) on May 12, 2015.  The named inventors of the

        '791 patent are Gil Kovalski, Jean-Paul Bouhnik, Jonathan Sachs, Yariv Grobshtein, Yulim

        Zingerman, Arie Eshco, and Yaron Hefetz, who assigned the '791 patent to GE as shown

        at Reel/Frame No. 031832/0172.

209.    For example: (i) claim 1 of the '791 patent recites an imaging system having a gantry with

        a plurality of detector units, wherein at least one of the detector units is movable

        independently; (ii) claim 5 recites that the detector head comprising detector elements are

        rotatable; (iii) claim 6 recites a sweep motor to generate a rotation angle change of the

        detector head, i.e., the detector heads can swivel; (iv) claim 17 recites that the detector unit

        can move in an orbiting motion around the gantry; and (v) Figures 4A, 4B, 9, 10, 11, 12,

14, 15, and 20c illustrate 12 detector units in a 360° gantry, and that the detector unit can move independently in and out toward the scanned subject.

210.     GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz also misappropriated, impermissibly disclosed and/or misused Trade Secret A by including Plaintiff's invention in the patent application for the '607 patent (Ex. 4), which was filed August 31, 2015 as a continuation-in-part of application No. 14/612,398, filed on February 3, 2015, which is a continuation of application No. 14/135,751, filed on December 20, 2013 (now the '791 patent), application No. 14/841,133, which is a continuation-in-part of application No. 14/327,178, filed on July 9, 2014.  The '607 patent application published January 28, 2016, and issued on September 13, 2016.  The named inventors of the '607 patent are Roee Khen and Yaron Hefetz, who assigned the '607 patent to GE as shown at Reel/Frame No. 036466/0307.

211.     For example: (i) claim 1 of the '607 patent recites a detector arm assembly which was provided by Plaintiff Spectrum to GE Defendants; (ii) the specification describes and discloses a detector controller to control the movement of the detector columns, which include rotation or orbiting the detector columns around the patient, moving the detectors closer or farther from the patient and pivoting/swiveling the detector columns (col. 5, line 61-col. 6, line 20); and (ii) Figures 4A, 4B, 9 – 12, 14, 15 and 25 illustrate a 360° gantry having 12 detector units that are capable of radial movement toward and of rotation around the scanned subject.  Figure 25 of the '607 patent is reproduced below:



FIG. 25

212.    [Reserved.]

213.    [Reserved.]

214.    [Reserved.]

215.    [Reserved.]

216.    Upon information and belief and in hindsight, the above patents establish that GE was using the information it obtained from Spectrum in violation of the non-disclosure and non-use provisions of the 2009 Agreement, and was using that information to prepare the respective applications that issued as the '791 patent and '607 patent prior to November 14, 2013 when Plaintiff's '721 PCT was published.

217.    Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms of the 2009 Agreement, and relied upon GE's representations that it would not improperly disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade Secrets and/or inventions disclosed therein.  As such, Plaintiff did not learn of GE's public disclosure of Trade Secret A in violation of the non-disclosure and non-use terms of the 2009 Agreement in the '113 patent, '791 patent, and '607 patent until June 13, 2018.

218.    Upon information and belief and in view of the '113 patent, '791 patent, and '607 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret A by

incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

219.   Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '113 patent (claims 1, 9 and all claims depending therefrom), the '791 patent (claims 1, 5, 6, 17 and all claims depending therefrom), and the '607 patent (claim 1 and all claims depending therefrom) and should therefore be named inventors thereof.

## TRADE SECRET "B"

220.   Spectrum incorporates by reference Ex. 29, which describes Trade Secret B and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret B.

221.   Trade Secret B was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

222.   Specifically, Trade Secret B was invented no later than May 2010 by Yoel Zilberstien and Nathaniel Roth.

223.   Trade Secret B was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting, and in communications continuing through February 2012.

224.   The GE diligence personnel attending the meetings and to whom Trade Secret B was disclosed, included, at least, Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret B was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

225.   The information disclosed was included in the 2010 and 2012 Due Diligence presentations as well as materials from the data room.

226.    Plaintiff Spectrum also provided GE with a video presentation demonstrating Spectrum's planar imaging technique:



227.    Plaintiff Spectrum has not publicly disclosed Trade Secret B.

228.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret B by including Plaintiff's invention in the patent application for the '113 patent (Ex. 2), filed September 27, 2013, published April 2, 2015, and issued February 20, 2018.  The named inventors of the '113 patent are Jean-Paul Bouhnik and Yaron Hefetz, who assigned the '113 patent to GE as shown at Reel/Frame No. 032532/0857.

229.    For example: (i) claim 1 of the '113 patent recites a circular SPECT system with plurality movable detector and the technique to acquire two-dimensional (2D or planar) SPECT data; (ii) claim 9 recites a method to acquire 2D SPECT data; and (iii) Figures 18-20 illustrate embodiments of the system and method of the invention wherein the system gantry has 12 movable detector units and the movement of detector units/arms and table to acquire the 2D SPECT data.  Figure 19 of the '113 patent is reproduced below:



FIG. 19

230.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz
also misappropriated, impermissibly disclosed and/or misused Trade Secret B by including
Plaintiff's invention in the patent application for the '631 patent (Ex. 14), filed September
17, 2014, published March 17, 2016, and issued September 19, 2017.  The named inventors
of the '631 patent are Yaron Hefetz, Jonathan Sachs, Gil Kovalski, and Avi Bar-Shalev,
who assigned the '631 patent to GE as shown at Reel/Frame No. 033807/0733.

231.    For example: (i) claim 7 of the '631 patent recites that the image reconstructed is a planar
image; and (ii) Figures 2-4 illustrate the gantry and 12 detector units of the imaging system
to acquire imaging information.

232.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz
again misappropriated, impermissibly disclosed and/or misused Trade Secret B by
including Plaintiff's invention in the patent application for the '114 patent (Ex. 6), filed
September 7, 2017 as a continuation of application No. 14/488,769 (now the '631 patent),
published January 11, 2018, and issued on February 20, 2018.  The named inventors of the
'114 patent are Yaron Hefetz, Jonathan Sachs, Gil Kovalski and Avi Bar-Shalev, who
assigned the '114 patent to GE as shown at Reel/Frame No. 043525/0609.

233.    For example: (i) each of claims 1, 9, 19 of the '114 patent and their dependent claims recite

imaging systems and methods to acquire a planar image; and (ii) Figures 2-4 illustrate the imaging systems having a gantry comprising 12 movable detector units.  Figures 2-4 are reproduced below.



234.  Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms of the 2009 Agreement and relied upon GE's representations that it would not improperly disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade Secrets and/or inventions disclosed therein.  As such, Plaintiff did not learn of GE's public disclosure of Trade Secret B in violation of the non-disclosure and non-use terms of the 2009 Agreement in the '113 patent, '631 patent or the '114 patent until June 13, 2018.

235.  Upon information and belief, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret B by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

236.  Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '113 patent (claim 1 and all claims depending therefrom) and the '114 patent (claims 1, 9, 19 and all claims depending therefrom) and should therefore be named inventors thereof.

**TRADE SECRET "C"**

237. Spectrum incorporates by reference Ex. 29, which describes Trade Secret C and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret C.

238. Trade Secret C was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

239. Specifically, Trade Secret C was invented no later than June 2011 by Yoel Zilberstien and Nathaniel Roth.

240. Trade Secret C was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting, and in communications continuing through February 2012.

241. The GE diligence personnel attending the meetings and to whom Trade Secret C was disclosed, included, at least, Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld. Trade Secret C was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

242. The information disclosed was included in the 2012 Due Diligence presentations, and materials from the data room.

243. Trade Secret C is intended to permit the detector to focus on a region of interest.

244. A sample depiction of the disclosure of this feature to GE is provided below:



245.    Plaintiff Spectrum has not publicly disclosed Trade Secret C.

246.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret C by including Plaintiff's invention in the patent application for the '562 patent (Ex. 7), filed August 18, 2015 as a continuation-in-part of application No. 14/671,039 (now the '490 patent) filed on March 27, 2015.  The '562 patent application published September 29, 2016, and issued November 1, 2016.  The named inventors of the '562 patent are Yaron Hefetz, Jean-Paul Bouhnik and Nati Herman, who assigned the '562 patent to GE as shown at Reel/Frame No. 036362/0520.

247.    For example: (i) claims 1 and 10 of the '562 patent and their dependent claims recite a swiveling detector head design and method of assembling a detector; and (ii) Figures 1, 3-6, 8 illustrate the detector head assembly for the ring gantry having 12 detectors as fully depicted in Figure 11.  Figures 6, 8 and 11 are reproduced below:



248.  GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz also misappropriated, impermissibly disclosed and/or misused Trade Secret C by including Plaintiff's invention in the patent application for the '197 patent (Ex. 10), filed September 15, 2014, published March 17, 2016 and issued on September 13, 2016.  The named inventor of the '197 patent is Arie Shahar, who assigned the '197 patent to GE as shown at Reel/Frame No. 033863/0090.

249.  For example, Figures 2-5 of the '197 patent illustrate a detector unit including a housing (respectively labelled as 170, 370, 470 and 570 therein).  (*See also id.* col. 7, line 62-col. 11, lines 20).  Figures 2-5 are reproduced below.



FIG. 2







250.  Upon information and belief and in view of the disclosure in the '562 patent and '197 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret C by incorporating this invention, including the structure and method of assembling the detectors used in the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

251.  Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '562 patent (claims 1, 10 and all claims depending therefrom) and should therefore be named inventors thereof.

**TRADE SECRET "D"**

252.  Spectrum incorporates by reference Ex. 29, which describes Trade Secret D and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret D.

253.  Trade Secret D was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

254.  Specifically, Trade Secret D was invented no later than June 2011 by Yoel Zilberstien Nathaniel Roth, Shlomo Ben-Haim and Benny Rousso.

255. Trade Secret D was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting, and in communications continuing through February 2012.

256. The GE diligence personnel attending the meetings and to whom Trade Secret D was disclosed, included, at least, Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret D was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

257. The information disclosed was included in the 2012 Due Diligence presentations as well as materials from the data room as well as the February 15, 2012 email to Riyad Mahameed, of the GE diligence team, from Nathanial Roth forwarding the updated "Jaszczak simulation," which was a detailed simulation(s) based upon a digital "patient" provided by GE.

258. The following is an example of a Spectrum drawing provided to GE demonstrating the Spectrum detection arm assembly:



259. After disclosing Trade Secret D to the GE diligence personnel, Plaintiff first publicly disclosed portions of Trade Secret D in the '721 PCT published November 14, 2013.

260. GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz

misappropriated, impermissibly disclosed and/or misused Trade Secret D by including Plaintiff's invention in the patent application for the '607 patent (Ex. 4), which was filed August 31, 2015 as a continuation-in-part of application No. 14/612,398, filed on February 3, 2015, which is a continuation of application No. 14/135,751, filed on December 20, 2013 (now the '791 patent), application No. 14/841,133, which is a continuation-in-part of application No. 14/327,178, filed on July 9, 2014. The '607 patent application published January 28, 2016, and issued on September 13, 2016. The named inventors of the '607 patent are Roee Khen and Yaron Hefetz, who assigned the '607 patent to GE as shown at Reel/Frame No. 036466/0307.

261.    For example: (i) claim 1 of the '607 patent recites a design description for a detector arm comprising a stator, a detector head, a radial motion motor, and a detector head belt; (ii) claims 7, 8, and 18-20 recite the use of a counterweight which was disclosed to GE as necessary for safety reasons; and (ii) Figures 21-29 illustrate the detector arm design for the 360° gantry having 12 detectors as shown in Figure 25. Figures 21A and 25 are reproduced below:



FIG. 21A

FIG. 25

262.    Upon information and belief, the above patents, in hindsight, establish that GE was using the information it obtained from Spectrum in violation of the non-disclosure and non-use provisions of the 2009 Agreement, and was using that information to prepare the respective applications that issued as the '607 patent prior to November 14, 2013 when Plaintiff's '721 PCT was published.

263.    Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms of the 2009 Agreement, and relied upon GE's representations that it would not improperly disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade Secrets and/or inventions disclosed therein.  As such, Plaintiff did not learn of GE's public disclosure of Trade Secret D in violation of the non-disclosure and non-use terms of the 2009 Agreement  in the '607 patent until June 13, 2018.

264.    Upon information and belief and in view of the disclosure in the '607 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret D by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

265.    Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '607 patent (claims 1, 17 and all claims depending therefrom) and should therefore be named inventors thereof.

## TRADE SECRET "E"

266.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret E and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret E.

267.    Trade Secret E was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

268. Specifically, Trade Secret E was invented no later than June 2011 by Yoel Zilberstien, Nathaniel Roth, Shlomo Ben-Haim and Benny Rousso.

269. Trade Secret E was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting and in communications continuing through February 2012.

270. The GE diligence personnel attending the meetings and to whom Trade Secret E was disclosed, included, at least, Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret E was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

271. The information disclosed was included in the 2012 Due Diligence presentations, and materials from the data room as well as the February 15, 2012 email to Riyad Mahameed, of the GE diligence team, from Nathanial Roth which included the updated "Jaszczak simulation," which was a detailed simulation(s) based upon a digital "patient" provided by GE.

272. The use of a counterweight system with the detection arms serves to balance the detector unit's movements for easy and safe control.  Plaintiff Spectrum appreciated the potential danger associated with bringing movable detectors into close proximity to the body, and showed GE how to protect patients from harmful detector contact by employing a counterweight system.  Safety mechanisms such as the counterweight system invented by Spectrum are a crucial design component necessary for patient safety and regulatory submission, as evidenced by a recent GE recall of nearly 1,000 of its imaging devices after the top detector of one of its systems detached and fell on the detector below.  As noted by the FDA, "there remains a risk of potential life-threatening bodily harm if the detector were

to     detach     and     fall     during     a     patient     exam."
(https://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm625950.htm).

273.   A sample drawing which was provided to GE is provided below.  Spectrum also provided
       GE with a video presentation demonstrating Spectrum's counterweight in action in
       connection with its novel Digital Ring-Gantry SPECT Camera System:



274.   After disclosing Trade Secret E to the GE diligence personnel, Plaintiff first publicly
       disclosed Trade Secret E in the '721 PCT published November 14, 2013.

275.   GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz
       misappropriated, impermissibly disclosed and/or misused Trade Secret E by including

Plaintiff's invention in the patent application for the '439 patent (Ex. 8), filed July 9, 2014, published January 14, 2016, and issued on March 29, 2016. The named inventor of the '439 patent is Yaron Hefetz, who assigned the '439 patent to GE as shown at Reel/Frame No. 034148/0718.

276.    For example: (i) claims 1, 9, 17 of the '439 patent recite imaging systems comprising a weight-compensation/counter balanced weight to balance the movements of the detection units; and (ii) Figures 3-7 provide support for the claims and illustrate a weight compensation unit and an imaging system wherein some of the columns includes weight compensation units.

277.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz also misappropriated, impermissibly disclosed and/or misused Trade Secret E by including Plaintiff's invention in the patent application for the '607 patent (Ex. 4), which was filed August 31, 2015 as a continuation-in-part of application No. 14/612,398, filed on February 3, 2015, which is a continuation of application No. 14/135,751, filed on December 20, 2013 (now the '791 patent), application No. 14/841,133, which is a continuation-in-part of application No. 14/327,178, filed on July 9, 2014. The '607 patent application published January 28, 2016, and issued on September 13, 2016. The named inventors of the '607 patent are Roee Khen and Yaron Hefetz, who assigned the '607 patent to GE as shown at Reel/Frame No. 036466/0307.

278.    For example: (i) claims 7, 8, 16, 18-20 of the '607 patent recite the use of a counterweight system to improve the safety and/or reduce an amount of power or energy required to articulate detector arm assemblies; and (ii) Figures 22 and 27B illustrate the counterweights as also shown in Figures 25 and 26A and discussed in col. 21, lines 4-61. Figures 22 and

27B are reproduced below:



FIG. 22                FIG. 27B

279.    Upon information and belief and in hindsight, the above patents establish that GE was

using the information it obtained from Spectrum in violation of the non-disclosure and non-

use provisions of the 2009 Agreement, and was using that information to prepare the

respective applications that issued as the '439 patent and '607 patent prior to November

14, 2013 when Plaintiff's '721 PCT was published.

280.    Upon information and belief and in view of the disclosure in the '439 patent and '607

patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret E

by incorporating this invention into the prototype GE Imitation Device installed at Beta

site Rambam Medical Center.

281.    Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in

the '439 patent (claims 1, 9, 17 and all claims depending therefrom) and the '607 patent

(claims 7, 8, 16, 18-20 and all claims depending therefrom) and should therefore be named

inventors thereof.

<h3 align="center"><u>TRADE SECRET "F"</u></h3>

282. Spectrum incorporates by reference Ex. 29, which describes Trade Secret F and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret F.

283. Trade Secret F was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

284. Specifically, Trade Secret F was invented no later than June 2011 by Yoel Zilberstien and Nathaniel Roth.

285. Trade Secret F was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting, and in communications continuing through February 2012.

286. The GE diligence personnel attending the meetings and to whom Trade Secret F was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret F was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

287. The information disclosed was included in the 2012 Due Diligence presentations, and materials from the data room as well as the February 15, 2012 email to Riyad Mahameed, of the GE diligence team, from Nathanial Roth forwarding the updated "Jaszczak simulation," which was a detailed simulation(s) based upon a digital "patient" provided by GE.

288. Trade Secret F was developed through Plaintiff's careful analysis to be a cost effective configuration while maintaining the effective operation and efficiency of the detector units as well.

289.    A sample of the disclosure of this invention to GE is provided in the slide below:



290.    Plaintiff Spectrum has not publicly disclosed Trade Secret F.

291.    GE by and through the GE diligence personnel and its outside consultant/patent attorney Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret F by including Plaintiff's invention in the patent application for the '791 patent (Ex. 3), filed December 20, 2013, and issued (before publishing) on May 12, 2015.  The named inventors of the '791 patent are Gil Kovalski, Jean-Paul Bouhnik, Jonathan Sachs, Yariv Grobshtein, Yulim Zingerman, Arie Eshco, and Yaron Hefetz, who assigned the '791 patent to GE as shown at Reel/Frame No. 031832/0172.

292.    For example: (i) the '791 patent specification describes and discloses the use of 7 CZT modules in each detector units is an embodiment of the invention (col. 13, lines 45-48); and (ii) Figures 3, 16A illustrate a detector column fully populated with 7 detector elements.  Figure 3, which depicts 7 CTZ modules as disclosed to GE by Plaintiff, is reproduced below.



FIG. 3

293.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz

misappropriated, impermissibly disclosed and/or misused Trade Secret F by including

Plaintiff's invention in the patent application for the '595 patent (Ex. 9), filed January 29,

2014, published July 30, 2015 and issued on August 2, 2016.  The named inventors of the

'595 patent are Sergio Steinfeld, Avi Bar-Shalev, Yaron Hefetz and Gil Kovalski, who

assigned the '595 patent to GE as shown at Reel/Frame No. 032079/0918.

294.    For example: (i) the '595 patent specification described and discloses that in some

embodiments each detector unit includes an array of 1x7 CZT modules (col. 15, lines 5-7);

and (ii) Figure 9 illustrates a detector arm configuration in which the detector unit has 7

detector elements.  Figure 9, which depicts 7 CTZ modules as disclosed to GE by Plaintiff,

is reproduced below.



295. GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz also misappropriated, impermissibly disclosed and/or misused Trade Secret F by including Plaintiff's invention in the patent application for the '197 patent (Ex. 10), filed September 15, 2014, published March 17, 2016 and issued on September 13, 2016. The named inventor of the '197 patent is Arie Shahar, who assigned the '197 patent to GE as shown at Reel/Frame No. 033863/0090.

296. For example, the specification of the '197 patent describes and discloses detector units including an array of 1x7 CZT modules in some of its embodiments. (col. 4, lines 63-64).

297. GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz again misappropriated, impermissibly disclosed and/or misused Trade Secret F by including Plaintiff's invention in the patent application for the '607 patent (Ex. 4), which was filed August 31, 2015 as a continuation-in-part of application No. 14/612,398, filed on February 3, 2015, which is a continuation of application No. 14/135,751, filed on December 20, 2013 (now the '791 patent), application No. 14/841,133, which is a continuation-in-part of application No. 14/327,178, filed on July 9, 2014. The '607 patent application published January 28, 2016, and issued on September 13, 2016. The named inventors of the '607 patent are Roee Khen and Yaron Hefetz, who assigned the '607 patent

to GE as shown at Reel/Frame No. 036466/0307.

298.   For example: Figures 3 and 16A of the '607 patent illustrate a detailed view of a detector column design wherein the detector unit has 7 detector elements, which according to the specification the detector elements can be CZT.  (col. 5, lines 43-60).  Figures 3 and 16A are reproduced below:



299.   GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret F by including Plaintiff's invention in the patent application for the '072 patent (Ex. 5), filed September 30, 2015, and issued (before publishing) on February 28, 2017.  The named inventors of the '072 patent are Yariv Grobshtein, Shiran Golan, Yaron Hefetz, Gil Kovalski, Jean-Paul Bouhnik, Michael Kogan, Sergio Steinfeld, Michael Gaisinsky, and Avi Bar-Shalev, who assigned the '072 patent to GE as shown at Reel/Frame No. 037131/0776.

300.   For example, the '072 patent specification states that "In some embodiments, each detector unit 115 includes a plurality of modules, such as an array of 1×7 modules."  (col. 6, lines

37-39).

301.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret F by including Plaintiff's invention in the patent application for the '113 patent (Ex. 2), filed September 27, 2013, published April 2, 2015 and issued on February 20, 2018.  The named inventors of the '113 patent are Jean-Paul Bouhnik and Yaron Hefetz, who assigned the '113 patent to GE as shown at Reel/Frame No. 032532/0857.

302.    For example, the '113 patent specification describes and discloses the use of 7 modules for each detector unit.  (col. 4, lines 34-35).

303.    Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms of the 2009 Agreement, and relied upon GE's representations that it would not improperly disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade Secrets and/or inventions disclosed therein.  As such, Plaintiff did not learn of GE's public disclosure of Trade Secret F in violation of the non-disclosure and non-use terms of the 2009 Agreement in the '791 patent, '595 patent, '197 patent, '607 patent, '072 patent and '113 patent until about June 13, 2018.

304.    Upon information and belief, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret F by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

## TRADE SECRET "G"

305.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret G and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret G.

306.     Trade Secret G was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

307.     Specifically, Trade Secret G was invented no later than early 2009 by Yoel Zilberstien, Nathaniel Roth, Shlomo Ben-Haim and Benny Rousso.

308.     The operational concept of Trade Secret G was disclosed to GE during due diligence at least during the July 29-30, 2009 meeting.  Thereafter, Trade Secret G was disclosed to GE during at least the January 24, 2012 on-site due diligence meeting and in communications continuing through February 2012.

309.     The GE diligence personnel attending the 2009 diligence meeting and to whom the working concept of Trade Secret G was disclosed, included Nathan Hermony, Geoff Martha, Shuchi Varandani and Erez Levy.

310.     The GE diligence personnel attending the 2012 meetings and to whom Trade Secret G was disclosed, included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.   Trade Secret G was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

311.     The information disclosed was included in (i) the 2009 Due Diligence presentations showing the working concept of Trade Secret G, and (ii) the 2012 Due Diligence presentations showing Trade Secret G.  The information disclosed was also included in materials from the data room.

312.     Plaintiff Spectrum also provided GE with a video presentation demonstrating Spectrum's method to obtain full 360° imaging coverage by getting ███████████ during operation in connection with the novel Digital Ring-Gantry SPECT Camera System:

313. After disclosing Trade Secret G to the GE diligence personnel, Plaintiff first publicly disclosed Trade Secret G in the '721 PCT published November 14, 2013.

314. GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret G by including Plaintiff's invention in the patent application for the '791 patent (Ex. 3), filed December 20, 2013, and issued (before publishing) on May 12, 2015. The named inventors of the '791 patent are Gil Kovalski, Jean-Paul Bouhnik, Jonathan Sachs, Yariv Grobshtein, Yulim Zingerman, Arie Eshco, and Yaron Hefetz, who assigned the '791 patent to GE as shown at Reel/Frame No. 031832/0172.

315. For example, Figure 20B of the '791 patent illustrates the detector units are shown rotating together with the gantry to get full coverage of the scanned subject. (*See also id.* col 15, lines 63-65). Figure 20B is reproduced below:



FIG. 20B

316.    Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms

of the 2009 Agreement, and relied upon GE's representations that it would not improperly

disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade

Secrets and/or inventions disclosed therein.  As such, Plaintiff did not learn of GE's public

disclosure of Trade Secret G in violation of the non-disclosure and non-use terms of the

2009 Agreement in the '791 patent until June 13, 2018.

317.    Upon information and belief and in view of the disclosure in the '791 patent, GE also

misappropriated, impermissibly disclosed and/or misused Trade Secret G by incorporating

this invention into the prototype GE Imitation Device installed at Beta site Rambam

Medical Center.

**TRADE SECRET "H"**

318.    [Reserved.]

319.    [Reserved.]

320.    [Reserved.]

321.    [Reserved.]

322.   [Reserved.]

323.   [Reserved.]

324.   [Reserved.]

325.   [Reserved.]

326.   [Reserved.]

327.   [Reserved.]

328.   [Reserved.]

329.   [Reserved.]

330.   [Reserved.]

331.   [Reserved.]

## **TRADE SECRET "I"**

332.   Spectrum incorporates by reference Ex. 29, which describes Trade Secret I and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret I.

333.   Trade Secret I was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

334.   Specifically, Trade Secret I was invented no later than October 2009 by Yoel Zilberstien Nathaniel Roth, Shlomo Ben-Haim and Benny Rousso.

335.   An early concept of Trade Secret I was disclosed to GE during due diligence at least during the July 29-30, 2009 meeting, and thereafter a more comprehensive overview of Trade Secret I was disclosed to GE during at least the January 24, 2012 on-site due diligence meeting and in communications continuing through February 2012.

336.   The GE diligence personnel attending the 2009 meeting and to whom the working concept of Trade Secret I was disclosed included Nathan Hermony, Geoff Martha, Shuchi

Varandani and Erez Levy.

337.    The GE diligence personnel attending the 2012 meetings and to whom Trade Secret I was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.   Trade Secret I was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

338.    The information disclosed was included in the 2009 Due Diligence presentations and the 2012 Due Diligence presentations, and materials from the data room as well.

339.    Trade Secret I was developed to improve detector proximity by using only part of the detector population.

340.    Plaintiff Spectrum also provided GE with a video presentation demonstrating Spectrum's method to optimize proximity by using ███████████████████ in action in connection with its novel Digital Ring-Gantry SPECT Camera System:



341.    After disclosing Trade Secret I to the GE diligence personnel, Plaintiff first publicly disclosed Trade Secret I in the '721 PCT published November 14, 2013.

342.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret I by including Plaintiff's invention in the patent application for the '595 patent (Ex. 9), filed January 29,

2014, published July 30, 2015 and issued on August 2, 2016. The named inventors of the '595 patent are Sergio Steinfeld, Avi Bar-Shalev, Yaron Hefetz and Gil Kovalski, who assigned the '595 patent to GE as shown at Reel/Frame No. 032079/0918.

343.    For example, (i) claim 1 of the '595 patent recites a method for using part of the 12 detector heads to improve proximity to target (internal detectors) while the remaining external detectors could be also used; and (ii) Figure 5A illustrates that the gantry's detector heads are to be partially used to form smaller gantry bore sizes (from 12 detectors heads to 6 and 3) and improve the proximity to target. Figure 5A is reproduced below:



344.    Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms of the 2009 Agreement, and relied upon GE's representations that it would not improperly disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade Secrets and/or inventions disclosed therein. As such, Plaintiff did not learn of GE's public disclosure of Trade Secret I in violation of the non-disclosure and non-use terms of the 2009 Agreement in the '595 patent until June 13, 2018.

345.    Upon information and belief and in view of the disclosure in the '595 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret I by incorporating

this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

346.    Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '595 patent (claim 1 and all claims depending therefrom) and should therefore be named inventors thereof.

### TRADE SECRET "J"

347.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret J and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret J.

348.    Trade Secret J was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

349.    Specifically, Trade Secret J was invented no later than October 2009 by Yoel Zilberstien Nathaniel Roth, Shlomo Ben-Haim and Benny Rousso.

350.    An early concept related to Trade Secret J was disclosed to GE during due diligence at least during the July 29-30, 2009 meeting, and thereafter a more comprehensive overview of Trade Secret J was disclosed to GE during at least the January 24, 2012 on-site due diligence meeting and in communications continuing through February 2012.

351.    The GE diligence personnel attending the 2009 meeting and to whom Trade Secret J was disclosed included Nathan Hermony, Geoff Martha, Shuchi Varandani and Erez Levy.

352.    The GE diligence personnel attending the 2012 meetings and to whom Trade Secret J was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret J was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

353.    The information disclosed was included in the 2009 Due Diligence presentations and the

2012 Due Diligence presentations, and materials from the data room as well.

354.    Plaintiff Spectrum also provided GE with a video presentation(s) illustrating the concept

of the design and Spectrum further explained that within the same ring gantry design,

different numbers of detector units could be installed, such that the system can be upgraded

at a later stage:



355.    Trade Secret J was further disclosed in a presentation to the GE diligence personnel in June

2012 at an in-person meeting with Tom Gentile at Spectrum's facilities.



356.    After disclosing Trade Secret J to the GE diligence personnel, Plaintiff first publicly

disclosed Trade Secret J in the '721 PCT published November 14, 2013.

357.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz

misappropriated, impermissibly disclosed and/or misused Trade Secret J by including Plaintiff's invention in the patent application for the '791 patent (Ex. 3), filed December 20, 2013, and issued (before publishing) on May 12, 2015. The named inventors of the '791 patent are Gil Kovalski, Jean-Paul Bouhnik, Jonathan Sachs, Yariv Grobshtein, Yulim Zingerman, Arie Eshco, and Yaron Hefetz, who assigned the '791 patent to GE as shown at Reel/Frame No. 031832/0172.

358.    For example: (i) claims 2 and 7 of the '791 patent recites a gantry design with partially populated detector units that can be adapted to fully populated detector units; and (ii) Figure 7A illustrates this concept. (*See also id.* col 7:40-49). Figure 7A is reproduced below:



FIG. 7A

359.    Upon information and belief, the '791 patent establishes that GE was using the information it obtained from Spectrum in violation of the 2009 Agreement, and was using that information to prepare the respective applications that issued as the '791 patent prior to November 14, 2013 when Plaintiff's '721 PCT was published.

360. Plaintiff reasonably believed that GE would abide by the non-disclosure and non-use terms of the 2009 Agreement, and relied upon GE's representations that it would not improperly disclose and/or misuse Plaintiff's Spectrum Information, including any Spectrum Trade Secrets and/or inventions disclosed therein.  As such, Plaintiff did not learn of GE's public disclosure of Trade Secret J in violation of the non-disclosure and non-use terms of the 2009 Agreement in the '791 patent until June 13, 2018.

361. Upon information and belief and in view of the disclosure in the '791 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret J by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

## TRADE SECRET "K"

362. Spectrum incorporates by reference Ex. 29, which describes Trade Secret K and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret K.

363. Trade Secret K was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

364. Specifically, Trade Secret K was invented no later than early 2009 by Yoel Zilberstien and Nathaniel Roth.

365. An early concept related to Trade Secret K was disclosed to GE during due diligence at least during the July 29-30, 2009 meeting, and thereafter a more comprehensive overview of Trade Secret K was disclosed to GE during at least the January 24, 2012 on-site due diligence meeting and in communications continuing through February 2012.

366. The GE diligence personnel attending the 2009 meeting and to whom Trade Secret K was disclosed included Nathan Hermony, Geoff Martha, Shuchi Varandani and Erez Levy.

367.    The GE diligence personnel attending the 2012 meetings and to whom Trade Secret K was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.   Trade Secret K was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

368.    The information disclosed was included in the 2010 Due Diligence presentations and the 2012 Due Diligence presentations, and in materials from the data room as well.

369.    Plaintiff Spectrum also provided GE with a presentation depicting the calibration and daily QC concept during GE's June 2010 visit.



370.    Plaintiff Spectrum has not publically disclosed Trade Secret K.

371.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret K by including Plaintiff's invention in the patent application published as the '496 publication (Ex. 17), filed October 20, 2016, and published April 26, 2018.   The currently named inventors of the '496 application are Moshe Levy, Jean-Paul Bouhnik, Yariv Grobshtein, Gil Amisar, and Yaron Hefetz, who assigned the '496 publication to GE as shown at Reel/Frame No. 040081/0127.

372.    For example: (i) claim 1 of the '496 publication recites a calibration method using a

radioactive line source while pivoting the detector unit; and (ii) Figure 6 illustrates a block

diagram illustrating an example calibration source positioned within a NM imaging system.

Figure 6 is reproduced below:



**FIG. 6**

373.    Upon information and belief and in view of the disclosure in the '496 publication, GE also

misappropriated, impermissibly disclosed and/or misused Trade Secret K by incorporating

this invention into the prototype GE Imitation Device installed at Beta site Rambam

Medical Center.

**TRADE SECRET "L"**

374.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret L and cites

additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret

L.

375.    Trade Secret L was developed by Plaintiff's Predecessors in Interest, and is owned by

Plaintiff Spectrum.

376.    Specifically, Trade Secret L was invented no later than October 2009 by Yoel Zilberstien

and Nathaniel Roth.

377.    An early concept related to Trade Secret L was disclosed to GE during due diligence at least during the July 29-30, 2009 meeting, and thereafter a more comprehensive overview of Trade Secret L was disclosed to GE during at least the January 24, 2012 on-site due diligence meeting and in communications continuing through 2012.

378.    The GE diligence personnel attending the 2009 meeting and to whom Trade Secret J was disclosed included Nathan Hermony, Geoff Martha, Shuchi Varandani and Erez Levy.

379.    The GE diligence personnel attending the 2012 meetings and to whom Trade Secret L was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.   Trade Secret L was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

380.    The information disclosed was included in the 2009 Due Diligence presentation, the 2010 Due Diligence presentations, and the 2012 Due Diligence presentations, and materials from the data room as well.

381.    Plaintiff Spectrum also provided GE with a slide presentations depicting and explaining this invention; below is a sample slide from a presentation to GE.



382.    Plaintiff Spectrum has not publically disclosed Trade Secret L.

383.    GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret L by including

Plaintiff's invention in the patent application published for the '659 publication (Ex. 18), filed March 7, 2017, and published September 13, 2018.  The currently named inventors of the '496 application are Michal Merman and Yariv Grobshtein, who assigned the '659 publication to GE as shown at Reel/Frame No. 042140/0931.

384.    For example, claims 1, 10 and 19 of the '659 publication recite methods for acquisition of focus and background information and reconstruction of an image using those focus and background information.

385.    Upon information and belief and in view of the disclosure in the '659 publication, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret L by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

## TRADE SECRET "M"

386.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret M and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret M.

387.    Trade Secret M was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

388.    Specifically, Trade Secret M was invented no later than October 2009 by Yoel Zilberstien and Nathaniel Roth.

389.    Trade Secret M was disclosed to GE during due diligence at least during the January 24, 2012 on-site due diligence meeting and in follow up communications continuing through 2012.

390.    The GE attendees of the 2012 diligence meeting to whom Trade Secret M was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio

Steinfeld.  Trade Secret M was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

391.   The information disclosed was included in the 2012 Due Diligence presentations, and materials from the data room as well.

392.   Plaintiff Spectrum also provided GE with a video demonstration depicting this invention:



393.   Plaintiff Spectrum has not publically disclosed Trade Secret M.

394.   GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret M by including Plaintiff's invention in the patent application for the '072 patent (Ex. 5), filed September 30, 2015, and issued (before publishing) on February 28, 2017.  The named inventors of the '072 patent are Yariv Grobshtein, Shiran Golan, Yaron Hefetz, Gil Kovalski, Jean-Paul Bouhnik, Michael Kogan, Sergio Steinfeld, Michael Gaisinsky, and Avi Bar-Shalev, who assigned the '072 patent to GE as shown at Reel/Frame No. 037131/0776.

395.   For example, claim 1 of the '072 patent claims imaging systems in which detection units are rotated so that the first detector unit face and the second detector unit face in opposite

directions to one another.  Figure 9B which shows this configuration is reproduced below:



FIG. 9B

396.    Upon information and belief and in view of the disclosure in the '072 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret M by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

397.    Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '072 patent (claims 1, 9 and all claims depending therefrom), and should therefore be named inventors thereof.

## TRADE SECRET "N"

398.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret N and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret N.

399.    Trade Secret N was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

400.    Specifically, Trade Secret N was invented no later than October 2009 by Yoel Zilberstien and Nathaniel Roth.

401.    An early concept related to Trade Secret N was disclosed to GE during due diligence at

least during the July 29-30, 2009 meeting, and thereafter a more comprehensive overview of Trade Secret N was disclosed to GE during at least the January 24, 2012 on-site due diligence meeting and in communications continuing through 2012,

402.   The GE diligence personnel attending the 2012 meetings and to whom Trade Secret M was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret N was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

403.   The information disclosed was included in the 2012 Due Diligence presentation and communications continuing through 2012, during site visits, and materials from the data room as well.

404.   After disclosing Trade Secret N to the GE diligence personnel, Plaintiff first publicly disclosed Trade Secret N in the '721 PCT published November 14, 2013.

405.   [Reserved.]

406.   [Reserved.]

407.   Upon information and belief, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret N by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

## TRADE SECRET "O"

408.   Spectrum incorporates by reference Ex. 29, which describes Trade Secret O and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret O.

409.   Trade Secret O was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

410.  Specifically, Trade Secret O was invented no later than early 2009 by Yoel Zilberstien and Nathaniel Roth.

411.  Trade Secret O was disclosed to GE during at least the 2009 meeting, January 24, 2012 on-site due diligence meeting and in communications continuing through February 2012.

412.  The GE diligence personnel attending the meetings and to whom Trade Secret O was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, and Sergio Steinfeld.  Trade Secret O was also disclosed to other GE diligence personnel including Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

413.  The information disclosed was included in the 2009 Due Diligence presentations, 2012 Due Diligence presentations, and materials from the data room as well.

414.  Plaintiff Spectrum has not publicly disclosed Trade Secret O.

415.  GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret O by including Plaintiff's invention in the patent application for the '737 patent (Ex. 12), filed March 31, 2016 as a continuation-in-part of application No. 14/871,091 filed September 30, 2015 (now the '072 patent), published March 30, 2017 and issued on March 13, 2018.  The named inventors of the '737 patent are Yariv Grobshtein, Jean-Paul Bouhnik, Gil Kovalski, and Shiran Golan, who assigned the '737 patent to GE as shown at Reel/Frame No. 038161/0251.

416.  For example: (i) claim 1 of the '737 patent recites a nuclear medicine multi-head imaging system that may be used for brain scanning; (ii) claim 9 recites a method for acquiring image data of an object within a bore of a nuclear medicine multi-head imaging system that may be used for brain scanning; and (iii) claim 16 recites a tangible and non-transitory

computer readable medium comprising one or more software modules configured to direct one or more processors to: rotate a first detector unit; rotate a second detector unit, wherein the first and second detector units are disposed about a bore of a gantry that may be used for brain scanning.  Although the claims do not recite brain scanning, Figures 5 and 8 depict "the imaging arrangement … in which the detector units have been positioned for brain persistence imaging."  (col. 2, lines 37-40, 45-48, col. 11, lines 12-27 and col. 13, 12-24).

417.    Figures 5 and 8 are reproduced below:



418.    Upon information and belief and in view of the disclosure in the '737 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret O by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

419.    Additionally, Yoel Zilberstien and Nathaniel Roth contributed to the inventions claimed in the '737 patent (claims 1, 9, 16 and all claims depending therefrom), and should therefore be named inventors thereof.

**TRADE SECRET "P"**

420.    [Reserved.]

421.    [Reserved.]

422.    [Reserved.]

423.    [Reserved.]

424.    [Reserved.]

425.    [Reserved.]

426.    [Reserved.]

427.    [Reserved.]

428.    [Reserved.]

429.    [Reserved.]

430.    [Reserved.]

431.    [Reserved.]

## TRADE SECRET "Q"

432.    Spectrum incorporates by reference Ex. 29, which describes Trade Secret Q and cites additional evidence of Spectrum's disclosure and GE's misappropriation of Trade Secret Q.

433.    Trade Secret Q was developed by Plaintiff's Predecessors in Interest, and is owned by Plaintiff Spectrum.

434.    Specifically, Trade Secret Q was invented no later than early 2010 by Yoel Zilberstien and Nathaniel Roth.

435.    Trade Secret Q was disclosed to GE during at least during the 2010 and January 2012 on-site due diligence meetings and in communications continuing through February 2012.

436.    The GE diligence personnel attending the meetings and to whom Trade Secret Q was disclosed included Nathan Hermony, Reuven Brenner, Arie Eshco, Riyad Mahameed, Sergio Steinfeld, Jean-Paul Bouhnik, Osnat Zak, Alexander Ganin, and Floris Jansen.

437.    An air cooling systems using air flow circulated by fan(s). Such a cooling design works effectively to help decrease the size of the detector head. With the first GE Dedicated CZT

cardiac system, GE used a very expensive and inefficient water-cooling system, which, upon information and belief, caused them many problems.

438.     The information disclosed was included in the 2010 Due Diligence presentations, 2012 Due Diligence presentations, and materials from the data room as well.

439.     Plaintiff Spectrum has not publicly disclosed Trade Secret Q.

440.     GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret Q by including Plaintiff's invention in the patent application for the '489 patent (Ex. 15), filed September 15, 2014, published March 17, 2016 and issued on January 24, 2017.  The named inventors of the '489 patent are Yaron Hefetz, Gil Kovalski, and Jean-Paul Bouhnik, who assigned the '489 patent to GE as shown at Reel/Frame No. 033862/0616.

441.     For example, the specification of the '489 patent describes an air-cooling system, which is depicted at least in Figure 6.  (*See also id.* col. 8, lines 66-67, col. 9, lines 1-9 and col. 13, lines 42-47).   Figure 6 is set forth below:



FIG. 6

442.     GE by and through the GE diligence personnel and its outside consultant Yaron Hefetz misappropriated, impermissibly disclosed and/or misused Trade Secret Q by including Plaintiff's invention in the patent application for the '490 patent (Ex. 16), filed March 27,

2015. The named inventors of the '490 patent are Roee Khen, Yaron Hefetz, and Jean-Paul Bouhnik, who assigned the '490 patent to GE as shown at Reel/Frame No. 035449/0148.

443. For example, the specification of the '490 patent describes and discloses an air-cooling system based upon forced flow fans, which is depicted at least in Figure 4. (*See also id.* col. 11, lines 50-61). Figure 4 is set forth below:



FIG. 4

444. Upon information and belief and in view of the disclosure in the '489 patent and the '490 patent, GE also misappropriated, impermissibly disclosed and/or misused Trade Secret Q by incorporating this invention into the prototype GE Imitation Device installed at Beta site Rambam Medical Center.

445. Spectrum's disclosure of the Spectrum Information demonstrated to GE the viability (and in fact preferability) of a system employing a vastly reduced number of CZT detectors to drastically reduce the cost of a nuclear medicine imaging system.

446. Spectrum not only showed GE how such a system would be configured, but then demonstrated proof of concept data to a GE team which doubted the technical and

commercial feasibility of such a system.  These disclosures included extensive data and modeling data, software design, concepts, patient acquisition methods, focus and adaptive scanning methods, design and engineering know-how.

## MISAPPROPRIATION/FRAUD BY GE BY FILING PATENTS DIRECTED TO SPECTRUM INVENTIONS AND NAMING YARON HEFETZ AND GE PERSONNEL AS INVENTORS

447.    Yaron Hefetz is a registered Israeli Patent Agent/Attorney working with the Gold Law Firm in Israel.

448.    Upon information and belief, GE diligence personnel disclosed proprietary and/or confidential Spectrum Information to Yaron Hefetz.

449.    Upon information and belief, Yaron Hefetz, working as an outside consultant/patent attorney for GE, was responsible for drafting the patent applications which matured into the Misappropriated GE Patent(s).

450.    In addition to drafting the Misappropriated GE Patent(s), Yaron Hefetz had Declarations prepared and then filed in conjunction with almost all of such patent applications asserting that he was an inventor in several of these claimed inventions.

451.    Upon information and belief, each of the applications, with associated Declarations, was transmitted to the Small Patent Law Firm in St. Louis, Missouri, which then filed these applications in the United States Patent and Trademark Office ("USPTO") in Alexandria, Virginia.

452.    For Yaron Hefetz to be an inventor, as well as the person drafting the applications for the Misappropriated GE Patent(s), Yaron Hefetz must have been in contact with other co-inventors on such GE patents.  Since at least three of these inventors were GE diligence personnel, information learned through due diligence by the other GE diligence personnel inventors was inevitably transmitted to Yaron Hefetz.

453.  Given the extensive number of patents which GE filed based upon what they had learned during the due diligence, Yaron Hefetz became a hub of misappropriated technical information which he used to write and file patents which incorporated, disclosed and claimed proprietary and/or confidential Spectrum Information.

454.  Upon information and belief, Yaron Hefetz would have known the Spectrum Information and inventions that he was being given originated with Spectrum, and that the true inventors of the technology that he was claiming were Spectrum employees.

455.  Yaron Hefetz, as well as the named GE inventors on each of the Misappropriated GE Patent(s), was/is subject to 37 CFR §§1.56, 1.98 and 1.99, and was obligated as a matter of law to inform the USPTO that, with respect to the claimed subject matter:

    1)  He was not an inventor;

    2)  That at least some of the claimed subject matter was invented by employees of Spectrum; and

    3)  That at least some of the claimed subject matter was derived from employees of Spectrum;

456.  None of the GE diligence personnel named as inventors nor Yaron Hefetz did any of the above.

457.  The repeated "failure to disclose" evidences a clear intent to deceive for purposes of converting ownership of the Spectrum Information, and all inventions and Spectrum Trade Secrets embodied therein.  The absence of candor was repeated and unconscionable.

458.  Upon information and belief, in his role as a GE consultant, Yaron Hefetz was completely aware that GE was interested in concluding some kind of a deal with Spectrum.  Yaron Hefetz would have known this to the extent that GE maintains that he was acting as a consultant, he came to fully know what Spectrum was planning and designing, and then

took advantage of his privileged position as a patent attorney to effectively steal Spectrum's

intellectual property, including naming himself as an inventor of several of the Spectrum

inventions.

## MISAPPROPRIATION/FRAUD BY BOUHNIK, STEINFELD, ESHCO AND GE BY FILING ITS PATENTS

459.    Jean-Paul Bouhnik, Sergio Steinfeld, Arie Eshco, and Nathan Hermony were all members

of the GE diligence personnel and each attended in-person due diligence-related meetings

with Spectrum.

460.    As GE diligence personnel, Bouhnik, Steinfeld, Eshco, and Hermony each had full access

to the Spectrum Information under, *inter alia*, the non-disclosure and non-use provisions

of the 2009 Agreement.  (*See* 2009 Agreement ¶ 1.1.)

461.    These individuals used the Spectrum Information, and the inventions and Spectrum Trade

Secrets embodied therein, to spur the development of GE's Imitation Device.

462.    Further, Messrs. Bouhnik, Steinfeld, Eshco and Hefetz used the Spectrum Information to

file the Misappropriated GE Patent(s), claiming to be the inventors of such inventions.

463.    Messrs. Bouhnik, Steinfeld, Eshco and Hefetz knew that the true inventors of the

inventions that they were claiming were Spectrum employees.

464.    Messrs. Bouhnik, Steinfeld, Eshco and Hefetz were/are subject to 37 CFR §§ 1.56, 1.98

and 1.99, and were obligated as a matter of law to inform the USPTO that, with respect to

the claimed subject matter:

1)    He was not an inventor;

2)    That at least some of the claimed subject matter was invented by employees of
Spectrum; and

3)    That at least some of the claimed subject matter was derived from employees of
Spectrum;

465.    None of the other GE diligence personnel, nor Bouhnik, Steinfeld, Eshco, nor Hefetz ever did any of the above.

466.    The constant repetition of the "failure to disclose" evidences a clear intent to deceive by these individuals for purposes of converting ownership of Spectrum's intellectual property. The absence of candor was repeated and unconscionable.

## MISAPPROPRIATION/FRAUD BY NATHAN HERMONY

467.    Upon information and belief, Mr. Hermony is Global Manager of GE's Nuclear Medicine Division.

468.    Mr. Hermony was a key negotiator and decision maker on behalf of GE in connection with the GE-Spectrum due diligence and GE's efforts to invest in and/or acquire Spectrum.

469.    As one of GE's decision makers, Mr. Hermony was present at significant due diligence meetings at Spectrum's facilities.

470.    Upon information and belief, Mr. Hermony orchestrated GE's misappropriation, unauthorized disclosure and misuse of the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein.

471.    In discussions with Spectrum during the due diligence, Mr. Hermony expressed to Spectrum that GE's R&D budget was insufficient to invest, come up with, design and develop their own novel CZT-based general purpose SPECT device.

472.    Mr. Hermony also conveyed that any cooperation with Spectrum would be paid for in part out of GE's R&D budget, but that GE could not otherwise undertake the necessary R&D to develop a novel CZT-based general purpose SPECT device.

473.    Based upon the prohibitions of the 2009 Agreement in combination with these assurances from Mr. Hermony, Spectrum was willing to divulge the Spectrum Information comprising all the details of its technology and business during due diligence.

474.  Upon information and belief, Mr. Hermony was ultimately responsible for deciding to proceed and develop the Imitation Device, and file patent applications based upon the misappropriated, impermissibly disclosed and misused Spectrum Information.

## DAMAGE TO SPECTRUM

475.  The global market for SPECT and SPECT-CT full-body and/or multi-organ scanning devices and related annual technical services is approximately $1.7 billion, with approximately 3-4% annual growth.

476.  Approximately 1,400 of such systems are sold annually around the world, making SPECT an important market in medical imaging such as adjacent markets including CT (computer tomography), MR (Magnetic resonance) PET (positron emission tomography), Ultrasound, etc.

477.  As discussed above, Spectrum has invented the only commercially viable technology to transform the full-body/multi-organ SPECT system market from analog to digital, the Spectrum VERITON® which received FDA and CE mark approval on or about November 2018, while some FDA approvals are still pending on some of the models.

478.  If GE is permitted to bring its Imitation Device to market, GE will usurp significant market share from Spectrum, as GE has considerably more sales and marketing power, can price-bundle its multiple products to lower the effective acquisition price to hospitals, and has considerable cost advantages emanating from its scale.

479.  Spectrum could see upwards of $1.0 billion in lost earnings over a 10-year period, and a loss of many hundreds of million dollars in valuation of the company as a result of GE's wholesale misappropriation, impermissible disclosure and misuse of the Spectrum Information, including all inventions and Spectrum Trade Secrets embodied therein.

480.    Demonstration by GE in open or closed presentations or otherwise presenting initial results from the Imitation Device is having a highly deleterious impact on Spectrum's VERITON®.

481.    Spectrum has come to understand that GE has been discussing the Imitation Device with key opinion leaders in the industry.  Such leaders provide input on purchasing decisions being made by those in the industry.  GE is thus alerting the market that the Imitation Device would be coming to the market.

482.    In so doing, GE was seeking to ruin Spectrum's exclusive 2018 market entry position.  Given GE's size, it is in a position to exert influence on such market leaders to the detriment of Spectrum.

483.    GE has major integration/scalability advantages, in addition to an expansive marketing team.

484.    By misappropriating, impermissibly disclosing and misusing, and then patenting, Spectrum's inventions, GE is in a position to undermine Spectrum's entire marketing and sales effort.  Indeed, in a letter dated October 12, 2018, GE has already raised the specter of asserting its patents against Spectrum.

485.    If Spectrum does not have exclusive control/ownership of its inventions, Spectrum will have difficulty competing and risks being forced out of the market.

486.    Spectrum enjoys a reputation in the industry for cutting edge innovation.

487.    Others in the industry have sought and continue to seek relationships with Spectrum based upon its tremendously innovative products.

488.    GE's tortious activities will inevitably have an adverse impact on Spectrum's reputation and good will, and adversely impact these potential relationships.

489.    GE's continued misappropriation, impermissible disclosure and misuse of the Spectrum Information, including all inventions and Spectrum Trade Secrets embodied therein, to unfairly compete with Spectrum has and will continue to cause irreparable harm to Spectrum.

## COUNT ONE – BREACH OF CONTRACT
### (All Defendants)

490.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 489 above, as if fully set forth herein.

491.    The elements of a breach of contract under New York law are: (1) the existence of a contract; (2) plaintiff's performance of its obligations; (3) breach of the agreement by the defendant; and (4) damages attributable to the breach.

492.    The 2009 Agreement is a valid, binding, and enforceable contract, which "shall be for the benefit of the parties and their successors and assigns." (2009 Agreement ¶8).

493.    Plaintiff is the owner of all rights, interests and benefits under the 2009 Agreement.

494.    Plaintiff is the successor in interest to the 2009 Agreement, and has standing to assert breach thereof.

495.    Plaintiff also owns all of the unique Spectrum Trade Secrets and inventions embodied in the Spectrum Information, and Spectrum has taken extensive and reasonable steps to maintain the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, proprietary and/or confidential, and has not publicly disclosed any such Spectrum Information, including Spectrum Trade Secrets other than as expressly noted herein.

496.    Pursuant to the non-disclosure and non-use, as well as other, provisions of the 2009 Agreement, Spectrum provided GE by and through its GE diligence personnel and Yaron

Hefetz access to the Spectrum Information for the sole purpose of evaluating a possible relationship between GE and Spectrum, which Spectrum Information GE agreed "constitutes valuable trade secrets." (2009 Agreement Recitals C, E, F).

497.   The Spectrum VERITON®, including its optimized design features, which were the result of years of extensive research and development, was a breakthrough SPECT imaging device, and was not publicly known in the industry.

498.   GE agreed to limit dissemination of the Spectrum Information to individuals "to the extent necessary for the performance of the Purpose and then only so long as such person agree to be bound by the terms of this Agreement…", and further that "[a]ny breach or violation of [the 2009 Agreement] may cause the Disclosing Party immediate and irreparable harm for which money damages may not provide an adequate remedy…".  (2009 Agreement ¶¶1.1 and 6).

499.   Plaintiff Spectrum performed its contractual obligations, including without limitation disclosing Spectrum Information to and providing GE with access thereto under the 2009 Agreement for the sole purpose of evaluating a possible acquisition by or business relationship with GE.

500.   Jean-Paul Bouhnik, Sergio Steinfeld, Arie Eshco, and Nathan Hermony, as well as other GE diligence personnel were provided access to the proprietary and/or confidential Spectrum Information during the due diligence period beginning in 2009, thereby subjecting these individuals to the terms of the 2009 Agreement.  (*See* 2009 Agreement ¶ 1.1).

501. Upon information and belief, GE disclosed proprietary and/or confidential Spectrum Information to Yaron Hefetz, thereby subjecting Yaron Hefetz to the terms of the 2009 Agreement. (*See* 2009 Agreement ¶ 1.1.)

502. Defendants (alone and acting in concert) breached the 2009 Agreement by misappropriating, impermissibly disclosing and/or misusing the Spectrum Information other than for the Purpose specified in the 2009 Agreement, including but not limited to the preparation and filing of the Misappropriated GE Patent(s) as well as development of the GE Imitation Device.

503. GE further breached the non-use provisions of the 2009 Agreement by developing, introducing and marketing the Imitation Device based upon the Spectrum Information.

504. Upon information and belief, Defendants' actions acting alone and in concert have been intentional, willful, and malicious.

505. Plaintiff has been and continues to be injured by Defendants' improper and prohibited disclosure and misuse of the Spectrum Information.

506. Unless enjoined by this Court, Defendants will continue to misappropriate, impermissibly disclose and misuse the Spectrum Information in violation of the terms of the 2009 Agreement thereby irreparably harming and damaging Spectrum's goodwill and reputation, as well as resulting in Plaintiffs' loss of sales, damage to customer relations and the like.

507. Plaintiff is entitled to permanent injunctive relief to prevent Defendants' continued unauthorized disclosure and misuse of the proprietary and/or confidential Spectrum Information.

508.    As a result of Defendants' breach of the 2009 Agreement, Plaintiff Spectrum has suffered

damages - both compensatory and punitive - in an amount to be determined at trial, plus

attorney's fees, costs, and interest.

## COUNT TWO – MISAPPROPRIATION OF TRADE SECRET
### (All Defendants)

509.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 508 above, as if

fully set forth herein.

510.    The elements of a misappropriation of trade secret under New York law are (1) Plaintiff's

possession of a trade secret, and (2) that the defendants used that trade secret in

breach of an agreement, confidential relationship or duty, or as a result of discovery

by improper means.

511.    Plaintiff owns the valuable Spectrum Trade Secrets and inventions embodied in the

Spectrum Information, and has taken extensive and reasonable steps to maintain the

Spectrum Information proprietary and/or confidential, and has not publicly disclosed any

such Spectrum Information, including Spectrum Trade Secrets other than as expressly

noted herein.

512.    The numerous and unique Spectrum Trade Secrets and inventions comprising the Spectrum

Information constitute independent economic value.

513.    The Spectrum VERITON®, including its optimized design features, which were the result

of years of extensive research and development, was a breakthrough molecular SPECT

imaging device, and was not publicly known in the industry.

514.    Between at least 2009-12, Plaintiff Spectrum disclosed and allowed GE access to the

Spectrum Information, including all Spectrum Trade Secrets and inventions embodied

therein, subject to the confidentiality and non-use provisions of the 2009 Agreement.

515. Defendants (alone and acting in concert) misappropriated, by way of non-limiting example, the Spectrum Trade Secrets identified at ¶¶ 197-446, by impermissibly disclosing and/or misusing the Spectrum Information, including but not limited to the preparation and filing of the Misappropriated GE Patent(s) as well as development of the GE Imitation Device.

516. The 2009 Agreement expressly identifies the Spectrum Information as comprising Spectrum's proprietary and confidential trade secret(s).  (2009 Agreement Recital F).

517. Defendants acting alone and in concert also misappropriated, at least, the Spectrum Trade Secrets in violation of the 2009 Agreement by using and exploiting such trade secrets to develop the GE Imitation Device to directly compete with Spectrum's VERITON®.

518. Unless enjoined by this Court, Defendants will continue to misappropriate and misuse the proprietary and/or confidential Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, thereby irreparably harming and damaging Spectrum's goodwill and reputation, as well as resulting in Plaintiff's loss of sales, damage to customer relations and the like.

519. Plaintiff is entitled to permanent injunctive relief to prevent Defendants' continued misappropriation of the Spectrum Information, and Spectrum Trade Secrets and inventions embodied therein, including unauthorized disclosure and use thereof.

520. Defendants' actions acting alone and in concert have been intentional, wanton and malicious, and have been taken in conscious disregard of Plaintiff's rights, such that Defendants are also liable for punitive damages of up to three times damages.

521. As a result of Defendants' misappropriation, Plaintiff Spectrum has suffered damages - both compensatory and punitive - in an amount to be determined at trial, plus attorney's fees, costs, and interest.

## COUNT THREE—MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, et seq.)
### (All Defendants)

522.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 521 above, as if fully set forth herein.

523.    Under the Defend Trade Secrets Act, a party must show an unconsented disclosure or use of a trade secret by one who (1) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.

524.    Plaintiff owns the valuable Spectrum Trade Secrets and inventions embodied in the Spectrum Information, and has taken extensive and reasonable steps to maintain the Spectrum Information proprietary and/or confidential, and has not publicly disclosed any such Spectrum Information, including Spectrum Trade Secrets other than as expressly noted herein.

525.    The numerous and unique Spectrum Trade Secrets and inventions comprising the Spectrum Information constitute independent economic value.

526.    The Spectrum VERITON®, including its optimized design features, which were the result of years of extensive research and development, was a breakthrough SPECT imaging device, and was not publicly known in the industry.

527.    Plaintiff Spectrum disclosed and allowed GE access to the Spectrum Information, and all Spectrum Trade Secrets and inventions embodied therein, subject to the non-disclosure and non-use provisions of the 2009 Agreement.

528.    Defendants (alone and acting in concert) misappropriated, by way of non-limiting example, the Spectrum Trade Secrets identified at ¶¶ 197-446, by impermissibly disclosing and/or

misusing the Spectrum Information, including but not limited to the preparation and filing of the Misappropriated GE Patent(s) as well as development of the GE Imitation Device.

529.   The 2009 Agreement expressly identifies the Spectrum Information as comprising Spectrum's proprietary and confidential trade secret(s).  (2009 Agreement, Recital F).

530.   Defendants acting alone and in concert misappropriated, at least, the Spectrum Trade Secrets and inventions embodied in the Spectrum Information in violation of the non-disclosure and non-use provisions of the 2009 Agreement by using and exploiting such Spectrum Information to develop the Imitation Device to directly compete with Spectrum's VERITON®.

531.   Unless enjoined by this Court, Defendants will continue to misappropriate and misuse the proprietary and/or confidential Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, thereby irreparably harming and damaging Spectrum's goodwill and reputation, and resulting in loss of sales, damage to customer relations and the like.

532.   Plaintiff is entitled to permanent injunctive relief to prevent Defendants' continued misappropriation of all Spectrum Trade Secrets and inventions embodied in the Spectrum Information, including unauthorized disclosure and use thereof.

533.   Defendants' actions acting alone and in concert have been intentional, wanton and malicious, and have been taken in conscious disregard of Plaintiff's rights, such that Defendants are also liable for punitive damages of up to three times damages.

534.   As a result of Defendants' misappropriation, Plaintiff Spectrum has suffered damages - both compensatory and punitive - in an amount to be determined at trial, plus attorney's fees, costs, and interest.

## COUNT FOUR – MISAPPROPRIATION OF IDEAS
### (All Defendants)

535.   Plaintiff incorporates by reference the allegations of paragraphs 1 through 534 above, as if fully set forth herein.

536.   The elements of misappropriation of ideas claim under New York law are 1) the existence of a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in fact contract, or quasi-contract; and (2) the idea must be novel and concrete.

537.   The 2009 Agreement created a legal relationship between Spectrum and Defendants.

538.   Defendants violated the non-disclosure and non-use provisions of the 2009 Agreement by disclosing and using the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, without authorization.

539.   Plaintiff owns the valuable Spectrum Trade Secrets and inventions embodied in the Spectrum Information, and has taken extensive and reasonable steps to maintain the Spectrum Information proprietary and/or confidential, and has not publicly disclosed any such Spectrum Information other than as expressly noted herein.

540.   The Spectrum Information, including numerous and unique Spectrum Trade Secrets and inventions embodied therein, are novel and constitute independent economic value.

541.   By way of example, claim 1 of GE's '439 patent recites "a weight compensation unit positioned with the gantry…".  This feature was invented by Spectrum and was considered to be novel by GE as reflected by filing of a patent application claiming this feature.

542.   The Spectrum VERITON®, including its optimized design features, which were the result of years of extensive research and development, was a breakthrough SPECT imaging device, and were not publicly known in the industry.

543.    Defendants acting alone and in concert misappropriated the Spectrum Information and
ideas by way of non-limiting example by disclosing and claiming the Spectrum
Information in the Misappropriated GE Patent(s) as well as development of the GE
Imitation Device.

544.    Upon information and belief, Yaron Hefetz coordinated the filing of multiple patent
applications which include, disclose and claim the Spectrum Information, and then named
himself as an inventor thereby misappropriating Spectrum Information for his own and
GE's benefit.

545.    Unless enjoined by this Court, Defendants will continue to misappropriate and misuse the
proprietary and/or confidential Spectrum Information and ideas, irreparably harming and
damaging Spectrum's goodwill and reputation, and resulting in loss of sales, damage to
customer relations and the like.

546.    Plaintiff is entitled to permanent injunctive relief to prevent Defendants' continued
unauthorized disclosure, misappropriation and misuse of and use of the proprietary and/or
confidential Spectrum Information and ideas.

547.    Defendants' actions alone and in concert have been intentional, wanton and malicious, and
have been taken in conscious disregard of Plaintiff's rights, such that Defendants are also
liable for punitive damages of up to three times damages.

548.    As a result of Defendants' misappropriation, Spectrum has suffered damages - both
compensatory and punitive - in an amount to be determined at trial, plus attorney's fees,
costs, and interest.

## COUNT FIVE – UNFAIR COMPETITION
### (All Defendants)

549.  Plaintiff incorporates by reference the allegations of paragraphs 1 through 548 above, as if fully set forth herein.

550.  The elements of unfair competition under New York law are that a defendant misappropriated plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so.

551.  Defendants obtained the proprietary and/or confidential Spectrum Information under the 2009 Agreement, while leading Spectrum into believing that GE would not develop the GE Imitation Device, and then misused and impermissibly exploited the Spectrum Information to develop the Imitation Device, and file the Misappropriated GE Patent(s).

552.  Defendants have misused and exploited the Spectrum Information including labor, skills, expenditures and goodwill of Spectrum in unfair competition, including developing the Imitation Device to directly compete with Spectrum's VERITON® and to solicit customers away from Spectrum.

553.  GE has been demonstrating and discussing the Imitation Device with key U.S. opinion leaders in the industry, in an effort to persuade current and future customers to stop or divert their purchasing decisions away from Spectrum's VERITON® in favor of the GE Imitation Device.

554.  Defendants' acts, practices, and conduct (alone and in concert) in improperly misusing and exploiting the Spectrum Information, including all inventions and Spectrum Trade Secrets embodied therein, constitute acts of unfair competition under New York common law.

555.   Defendants' acts, practices and conduct (alone and in concert) have been committed intentionally and in bad faith with the intent to harm and prejudice Plaintiff Spectrum as well as cause confusion, mistake and/or to deceive.

556.   Unless enjoined by this Court, Defendants will continue to misuse and exploit the proprietary and/or confidential Spectrum Information and engage in unfair competition, thereby irreparably harming and damaging Spectrum's goodwill and reputation, and resulting in loss of sales, damage to customer relations and the like.

557.   Plaintiff is entitled to permanent injunctive relief to prevent Defendants' continued misuse and prohibited exploitation of the proprietary and/or confidential Spectrum Information and thereby engagement in unfair competition with Plaintiff Spectrum.

558.   Defendants' actions alone and in concert have been intentional, wanton and malicious, and have been taken in conscious disregard of Plaintiff's rights, such that Defendants are also liable for punitive damages.

559.   Plaintiff is entitled to damages - both compensatory and punitive - in an amount to be determined at trial, plus attorney's fees, costs, and interest.

## **COUNT SIX – [RESERVED]**

560.   [Reserved.]

561.   [Reserved.]

562.   [Reserved.]

563.   [Reserved.]

564.   [Reserved.]

565.   [Reserved.]

566.   [Reserved.]

567.   [Reserved.]

## <u>COUNT SEVEN – [RESERVED]</u>

568.    [Reserved.]

569.    [Reserved.]

570.    [Reserved.]

571.    [Reserved.]

572.    [Reserved.]

573.    [Reserved.]

574.    [Reserved.]

575.    [Reserved.]

576.    [Reserved.]

577.    [Reserved.]

578.    [Reserved.]

579.    [Reserved.]

580.    [Reserved.]

## <u>COUNT EIGHT – [RESERVED]</u>

581.    [Reserved.]

582.    [Reserved.]

583.    [Reserved.]

584.    [Reserved.]

585.    [Reserved.]

586.    [Reserved.]

587.    [Reserved.]

588.    [Reserved.]

589.    [Reserved.]

590.    [Reserved.]

591.    [Reserved.]

592.    [Reserved.]

593.    [Reserved.]

594.    [Reserved.]

595.    [Reserved.]

596.    [Reserved.]

597.    [Reserved.]

598.    [Reserved.]

## COUNT NINE – [RESERVED]

599.    [Reserved.]

600.    [Reserved.]

601.    [Reserved.]

602.    [Reserved.]

603.    [Reserved.]

604.    [Reserved.]

605.    [Reserved.]

606.    [Reserved.]

607.    [Reserved.]

608.    [Reserved.]

609.    [Reserved.]

610.    [Reserved.]

## COUNT TEN – [RESERVED]

611.    [Reserved.]

612.    [Reserved.]

613.    [Reserved.]

614.    [Reserved.]

615.    [Reserved.]

616.    [Reserved.]

617.    [Reserved.]

618.    [Reserved.]

## COUNT ELEVEN – [RESERVED]

619.    [Reserved.]

620.    [Reserved.]

621.    [Reserved.]

622.    [Reserved.]

623.    [Reserved.]

624.    [Reserved.]

625.    [Reserved.]

626.    [Reserved.]

627.    [Reserved.]

628.    [Reserved.]

629.    [Reserved.]

630.    [Reserved.]

## COUNT TWELVE – [RESERVED]

631.    [Reserved.]

632.    [Reserved.]

633.    [Reserved.]

634.    [Reserved.]

635.    [Reserved.]

636.    [Reserved.]

637.    [Reserved.]

638.    [Reserved.]

## COUNT THIRTEEN – FRAUD ON THE UNITED STATES PATENT AND TRADEMARK OFFICE
### (All Defendants)

639.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 638 above, as if fully set forth herein.

640.    Defendants and Yaron Hefetz have engaged in a systematic and continuous effort to intentionally and fraudulently misappropriate the proprietary and/or confidential Spectrum Information, including filing patent applications in the names of some GE diligence personnel, who in turn have assigned such applications to GE.

641.    Defendants were first exposed to the Spectrum Information during numerous negotiations and the ongoing 2009-12 due diligence.

642.    Beginning in the early 2000s, GE and Spectrum's Predecessors in Interest had discussed the possibility of cooperation and possible acquisition by GE of Spectrum and the Spectrum Information.

643.    Spectrum disclosed the proprietary and/or confidential Spectrum Information to the GE diligence personnel pursuant to the 2009 Agreement.

644.    The GE diligence personnel visited Spectrum's premises on several occasions, including in June 2010, January 2012 and June 2012, in connection with the due diligence to obtain a complete overview and details of the keys to the kingdom, *i.e.*, proprietary and/or confidential Spectrum Information.

645.    During the 2009-12 diligence period, Defendants were given confidential access to a highly confidential "data room" containing much of the Spectrum Information, such as trade secrets as well as other confidential data, financial data, projections, technology and the like.  This "data room" was accessed by the GE diligence personnel, who followed up with extensive questioning to obtain yet further information.

646.    Upon information and belief, Defendants and Yaron Hefetz obtained access to the Spectrum Information that was misused to develop the Imitation Device during these exchanges and through the data room.

647.    Upon information and belief, Defendants and Yaron Hefetz further misappropriated and misused the Spectrum Information to file each of the Misappropriated GE Patent(s).

648.    In each instance, on information and belief, the patent applications were first drafted by Yaron Hefetz, an Israeli Patent Attorney, who was himself named as an inventor on numerous of the Misappropriated GE Patent(s).

649.    Yaron Hefetz then proceeded to procure signed false Declarations from each of the inventors knowing full well that he and the other named GE "inventors" required for the filing of the patent applications for the Misappropriated GE Patent(s) pursuant to 37 CFR §§ 1.56 and 1.98 and 1.99 were not the true inventors.

650.    The patent applications prepared by Yaron Hefetz were then forwarded by him to the Small Patent Law Firm which filed the applications with the USPTO.

651.    Hefetz also proceeded to procure signed Assignments which wrongfully deprived Spectrum of ownership in each of the patents, and forwarded these documents to be filed in the USPTO.

652.    In each of the above applications for the Misappropriated GE Patent(s), Defendants and
Yaron Hefetz concealed and did not identify the true inventor(s) of the claimed inventions,
*i.e.*, Yoel Zilberstien and Nathaniel Roth, who were employed by the Spectrum
Predecessors in Interest and continue to be employees of Spectrum.

653.    In each patent application for the Misappropriated GE Patent(s), Yaron Hefetz engaged in
a pattern of conduct naming one or more GE employees and agents including one or more
of Bouhnik, Steinfeld, Eshco, who received proprietary and/or confidential Spectrum
Information subject to the non-disclosure and non-use provisions of the 2009 Agreement
– as the inventors of these patent applications, together with himself.

654.    When the Small Patent Law firm filed the patent applications for the Misappropriated GE
Patent(s), the Small Firm submitted a false declaration in each application executed by
individuals identified by GE (*i.e.,* Bouhnik, Steinfeld, Eshco, and Hefetz) as the inventors
fraudulently stating that the identified individuals were the sole inventors of the claimed
invention(s).

655.    Because Spectrum is not in a position to know the precise involvement or knowledge of
the Small Patent Law Firm at this time, they are not being named as a Defendant.

656.    In direct violation of 37 CFR §§ 1.56 and 1.98 and 1.99, Messrs. Bouhnik, Steinfeld, Eshco
and Hefetz repeatedly, consistently and intentionally concealed from the USPTO the fact
that the true inventors on each of the Misappropriated GE Patent(s) were not named, with
intent to deceive, and that the claimed invention(s) have been derived from Spectrum.

657.    If the USPTO had been made aware of the fact that in each case the claimed inventions had
been derived from Spectrum employees, the USPTO would not have allowed one or more

of the claims of each of the Misappropriated GE Patent(s) in the absence of the true inventors.

658.    The improper conduct has rendered each of the above patents unenforceable.

659.    The intentional, bold and outrageous nature of repeatedly and continuously naming themselves as inventors of the very information that they stole constitutes fraud on the USPTO, and constituted a fraudulent effort to steal Plaintiff's technology and undermine Plaintiff's commercial efforts.

660.    An example of its efforts to undermine Plaintiff's commercial  efforts was GE's not-so-veiled threat in the October 12, 2018 letter:

> Finally, as your client is well aware, GE has a formidable portfolio of patents in the nuclear medicine space. As GE's relationship with your client continues to sour, GE will have no choice but to prioritize comparison of your client's systems to the many nuclear medicine inventions owned by GE.

(Ex. 24).

## COUNT FOURTEEN – CORRECTION OF INVENTORSHIP OF THE SECTION 256 GE PATENT(S) PURSUANT TO 35 U.S.C. § 256 (All Defendants)

661.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 660 above, as if fully set forth herein.

662.    The cause of action in this Count Fourteen arises under 35 U.S.C. § 256.

663.    There is a real, immediate, substantial, and continuing justiciable controversy between Spectrum and GE concerning the inventorship of the Section 256 GE Patent(s) for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

664.    Yoel Zilberstien and Nathaniel Roth are the true and joint inventors of the patentable inventions disclosed and claimed in the Section 256 GE Patent(s).

665.    Yoel Zilberstien and Nathaniel Roth conceived of, diligently reduced to practice, and provided significant contributions to the inventions disclosed and claimed in each of the Section 256 GE patent(s).

666.    The Spectrum Information, including inventions and various Spectrum Trade Secrets embodied therein, were disclosed to GE diligence personnel through the 2009-12 diligence period.

667.    As described above, Yoel Zilberstien and Nathaniel Roth are true inventors of an innovative element that is essential to, and recited in, at least one of the claims of the Section 256 GE Patent(s).

668.    Yoel Zilberstien and Nathaniel Roth, without their participation, were omitted as inventors in the applications that issued as the Section 256 GE Patent(s), and these omissions were in error.

669.    Neither Yoel Zilberstien nor Nathaniel Roth were provided with or aware of GE's patent activities until well after the applications that issued as the Section 256 GE Patent(s) were filed.    At no time during the prosecution of the Section 256 GE Patent(s) was Yoel Zilberstien and/or Nathaniel Roth given an opportunity to review the specification or claims presented in the patent applications which issued as the Section 256 GE Patent(s), nor were they advised about the possibility of being co-inventors on the information being disclosed and claimed in the Section 256 GE Patent(s).

670.    Yoel Zilberstien and Nathaniel Roth have notice of and have consented to this action to correct inventorship of the Section 256 GE Patent(s).

671.    Plaintiff Spectrum owns all inventions of Yoel Zilberstien and Nathaniel Roth by virtue of their employment agreements.

672.    Plaintiff Spectrum therefore has standing and is otherwise entitled to have the inventorship of the Section 256 GE Patent(s) corrected to add Yoel Zilberstien and Nathaniel Roth as inventors of the subject matter claimed therein.

673.    The omission of Yoel Zilberstien and Nathaniel Roth from the Section 256 GE Patent(s) has injured and will injure Plaintiff Spectrum by depriving it of an ownership interest and financial stake in the Section 256 GE Patent(s), which can be redressed by correction of inventorship.

674.    Under 35 U.S.C. § 256, the Section 256 GE Patent(s) should be corrected to properly name Yoel Zilberstien and Nathaniel Roth as inventors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants as follows:

a.    that the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, disclosed to Defendants is solely owned and the sole property of Plaintiff;

b.    that Defendants intentionally and/or negligently breached the 2009 Agreement;

c.    that Defendants misappropriated Plaintiff's trade secrets;

d.    that Defendants misappropriated Plaintiff's ideas;

e.    that Defendants engaged in unfair competition against Plaintiff;

f.    [reserved];

g.    [reserved];

h.    [reserved];

i.    [reserved];

j.    [reserved];

k.      that Yoel Zilberstien and Nathaniel Roth are the joint inventors of the Section 256 GE Patent(s);

l.      placing the Misappropriated GE Patent(s) in a constructive trust for the benefit of Spectrum;

m.      directing the Director of the United States Patent and Trademark Office, pursuant to 35 U.S.C. § 256, to correct inventorship of the Section 256 GE Patent(s), by adding Yoel Zilberstien and Nathaniel Roth as the joint inventors and adding Spectrum as an assignee thereof;

n.      declaring that the Misappropriated GE Patent(s) as well as any other GE patents covering Spectrum's VERITON$^{TM}$ device are unenforceable against Plaintiff, its affiliates and successors;

o.      declaring that Defendants obtained the Misappropriated GE Patent(s) by fraud on the United States Patent and Trademark Office;

p.      permanently enjoining Defendants, including but not limited to, GE and its officers, directors, agents, employees, servants, attorneys, successors, assigns and all others controlling, controlled by, or affiliated with GE, and all those in privity or active concert or participation with any of the foregoing, from:

(i) directly or indirectly misappropriating or attempting to misappropriate the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein, in any manner whatsoever;

(ii) marketing, advertising, offering for sale, or selling the GE Imitation Device or any device which incorporates or otherwise utilizes the Spectrum Information, including all Spectrum Trade Secrets and inventions embodied therein;

(iii) disclosing to any third party any of the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein; and

(iv) filing any patent applications which use or otherwise incorporate the Spectrum Information, including Spectrum Trade Secrets and inventions embodied therein.

q.    permanently enjoining Defendants from seeking regulatory approval of the GE Imitation Device with the U.S. Food and Drug Administration ("FDA");

r.    awarding compensatory and punitive damages in an amount to be determined at trial;

s.    awarding Spectrum its costs, disbursements, and reasonable attorney's fees in connection with this action; and

t.    awarding such other and further relief as the Court may deem just and proper.

Dated:  November 6, 2023                    Respectfully submitted,

By:  */s/ Esha Bandyopadhyay*
       Esha Bandyopadhyay (*Pro Hac Vice*)
       Fish & Richardson P.C.
       500 Arguello Street, Suite 400
       Redwood City, CA 94063
       Tel:  650 839 5070
       Fax:  650 839 5071
       Email:  bandyopadhyay@fr.com

       Michael F. Autuoro (MA 2932)
       Fish & Richardson P.C.
       7 Times Square, 20th Floor
       New York, NY 10036
       Tel:  212 765 5070
       Fax:  212 258 2291
       Email:  autuoro@fr.com

       Roger A. Denning (*Pro Hac Vice*)
       James Yang (*Pro Hac Vice*)
       Fish & Richardson P.C.
       12860 El Camino Real, Suite 400
       San Diego, CA 92130
       Tel: 858 678 5070
       Fax: 858 678 5099
       Email: denning@fr.com; jyang@fr.com

       Adam J. Kessel (*Pro Hac Vice*)
       Philip K. Chen (*Pro Hac Vice*)
       Alexander Pechette (*Pro Hac Vice*)
       Daniel H. Wade (CT 443482)
       Fish & Richardson P.C.
       One Marina Park Drive
       Boston, MA 02210
       Tel: 617 542 5070
       Fax: 617 542 8906
       Email:  kessel@fr.com; pchen@fr.com;
       pechette@fr.com; wade@fr.com

       ***Attorneys for Plaintiff***
       ***Spectrum Dynamics Medical Limited***