UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPECTRUM DYNAMICS MEDICAL LIMITED,<br><br>                              Plaintiff,<br><br>          -against-<br><br>GE HEALTHCARE TECHNOLOGIES, INC. et al.,<br><br>                              Defendants. | **OPINION & ORDER ON _DAUBERT_ MOTIONS**<br><br>**18-CV-11386 (VSB) (KHP)** |

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

Before this Court are the parties' motions to exclude each other's expert's opinions

from being offered in this case. (ECF Nos. 848, 854, 876.)  For the reasons that follow, GE's

motions (ECF Nos. 848, 854) are **granted in part and denied in part**, and Spectrum's motion

(ECF No. 876) is **granted in part and denied in part**.

**BACKGROUND**

This case relates to alleged misappropriation of nuclear molecular imaging technologies.

Familiarity with the facts is presumed and the Court provides only certain facts for context.

Plaintiff Spectrum Dynamics Medical Limited ("Spectrum") asserts seven causes of action,

claiming it was damaged by GE Healthcare Technologies, Inc.'s and GE Precision Healthcare

LLC's (together, "GE" or "Defendants")[1] use of Spectrum's confidential information and/or

trade secrets in connection with GE's development of the StarGuide medical imaging machine,

---

[1] GE HealthCare and Precision Healthcare were substituted as Defendants after motion practice regarding same. (ECF No. 778.)  The Third Amended Complaint ("TAC") therefore does not name the original defendants but names only GE HealthCare and Precision Healthcare. (ECF Nos. 808, 822.)  To the extent the original defendants or predecessor entities are involved in the relevant underlying allegations of the TAC, the Court also uses GE to refer to the former parties for convenience and readability.

which competes with Spectrum's Veriton medical imaging machine in the marketplace. Both machines use technology known as Single Photon Emission Computed Tomography ("SPECT"), with twelve swiveling CZT[2] detectors, and provide high-resolution three-dimensional ("3D") images of internal organs and systems, generally for oncology, cardiology, and neurology. At least during the relevant period, Spectrum and GE were the two most prominent companies offering this technology in the marketplace.

In September 2009, the parties entered into a non-disclosure agreement (the "NDA") in connection with a potential corporate deal. The NDA expired in or about February 2013. The NDA contains a provision that says in sum and substance that confidential information could not be used for six years after disclosure unless it was disclosed to the public sooner through no fault of the receiving party. Spectrum contends it was developing its Veriton technology at the time the parties were considering entering into a corporate transaction and disclosed trade secrets to GE pursuant to the NDA but that GE stole up to 15 of its trade secrets and incorporated them into the StarGuide, which it started selling in or about February 2021.

At the time the StarGuide was launched, Spectrum had been selling the Veriton for about three to four years. As a result, Spectrum contends it lost sales of its Veriton to the StarGuide and GE was able to avoid certain costs and delays in developing its competing device by using Spectrum's trade secrets.

---

[2] As Judge Broderick noted in his Opinion on the Motion to Dismiss (ECF No. 73), CZT was not defined in the First Amended Complaint. (*Id.*at 3 n.4.) It appears the same is true of the Third Amended Complaint. (*See generally* ECF No. 822.) The Court incorporates by reference Judge Broderick's footnote four from the Opinion on the motion to dismiss as to what CZT means. Relevantly, it "stands for Cadmium Zinc Telluride, a semiconductor" used in the conversion of "x-ray or gamma photons into electrons and holes," with special properties that apparently make it advantageous to other types of semiconductors. (*Id.*)

The seven causes of action Spectrum asserts are: breach of contract (*i.e.*, of the NDA), misappropriation of ideas, unfair competition, fraud on the U.S. Patent & Trademark Office, misappropriation of trade secrets under New York law and the federal Defend Trade Secrets Act ("DTSA"), and correction of inventorship of the Section 256 GE patents under 35 U.S.C. § 256. (ECF No. 822 ¶¶ 490-674.)  Spectrum alleges, as noted above, that GE misappropriated as many as fifteen trade secrets both "individually and in combination as a whole." (*See* ECF No. 650-1, at 1 n.1.)  Spectrum assigned these alleged trade secrets letters from A to G, I to O, and Q. (*See generally id.*)

GE in turn has asserted a counterclaim against Spectrum for infringement of four claims in its so-called '439 patent that concern how its imaging machine uses detector arms and counterweights (and how they are configured) to take 3D images.  According to GE, the Veriton infringes on GE's technology.  Spectrum denies infringement and seeks a declaration of non-infringement and invalidity of the '439 patent. (ECF Nos. 824 ¶¶ 22-45; 802 ¶¶ 23-85.)

On June 2, 2020, the Honorable Vernon S. Broderick decided Defendants' motion to dismiss the FAC. (*See generally* ECF No. 73.)  In that Decision, Judge Broderick noted that Spectrum's alleged Trade Secrets A, E, G, I, J, and N, and parts of Trade Secret D, had been disclosed through one of Spectrum's patent applications in November 2013. (*Id.* at 6.) He ultimately determined that Spectrum could not maintain its claims for misappropriation of Trade Secrets E, G, I, J, and N (the "Disclosed Secrets") after November 14, 2013.[3] (*Id.* at 32.)

---

[3] The parties do not appear to dispute on this motion that a claim under the DTSA cannot be brought for misappropriation of trade secrets prior to the 2016 effective date of that statute.

In addition, on September 27, 2022, Judge Broderick denied Spectrum's motion for a preliminary injunction based primarily on his finding that Spectrum's claim that it would suffer irreparable harm absent the injunction was "conclusory and speculative" and thus not established. (ECF No. 530, at 11.)  In his opinion, Judge Broderick noted that Spectrum's "sales projections are entirely speculative and are therefore insufficient to demonstrate irreparable harm through loss of sales and its earlier domination of the market." (*Id.*)  He also stated that the projections were "higher than . . . actual sales prior to the introduction and commercialization of the StarGuide," and thus "any reliance on the projections for the years following the introduction of the StarGuide" were "self-serving speculation." (*Id.* at 12.)  He next found that Spectrum had "never shown a profit," which "undermine[d] its argument that the loss of sales, or related loss of opportunity or goodwill, purportedly caused by StarGuide's unfair competition, will cause irreparable harm in the future, and reinforces the speculative nature of this argument." (*Id.* at 14.)

## THE EXPERTS AT ISSUE

Spectrum offers a liability expert, Scott D. Metzler, Ph.D., and a damages expert, Eric J. Phillips, whose opinions GE seeks to exclude for various reasons including, *inter alia*, the inclusion of improper legal conclusions, unreliability of their respective methodologies, and/or their purported unhelpfulness to the factfinder.  GE offers Erez Levy, a GE employee, and damages expert Dr. Jonathan Putnam, an economist.  The parties dispute whether Mr. Levy, in part, gives expert testimony properly within the purview of Rule 702.  Spectrum contends that Levy's relevant testimony constitutes expert testimony but is not the product of reliable

4

principles and methods and that Dr. Putnum's opinion, which relies on Levy's testimony, is therefore also unreliable.  Below is a summary of each expert's background and opinions.

### 1.  Spectrum Expert Scott D. Metzler, Ph.D.

Dr. Metzler graduated from Pennsylvania State University with a Bachelor of Science in Physics and a minor in Mathematics.  He obtained a Ph.D. in Physics from the University of Pennsylvania ("UPenn").  Since 2000, he has worked in medical imaging, first as a Research Associate at Duke University, then as a Research Assistant Professor.  In 2004, he was hired by UPenn's Department of Radiology in the same capacity.  At the time of his preparing report, he held the title of Research Professor of Radiology at UPenn.

Dr. Metzler is proffered as an expert in SPECT imaging, particularly with experience in software.  He has worked in collimator design and characterization and published peer-reviewed research on a wide variety of designs.  He is familiar with the detector technologies used in SPECT imaging.  He received the Distinguished Investigator Award from The Academy for Radiology & Biomedical Imaging Research in 2020.

Among other opinions, Plaintiffs seek to have Dr. Metzler testify as to liability regarding GE's alleged use of Spectrum's confidential information and misappropriation of trade secrets in developing the StarGuide.  He summarizes his opinions as follows:

- GE used Spectrum's confidential information to develop the StarGuide;
- GE misappropriated Spectrum's trade secrets in developing the StarGuide and filing patent applications;
- GE violated the NDA;
- GE misappropriated Spectrum's ideas;
- GE misappropriated Spectrum's labor and expenditures;
- Yoel Zilberstien and Nathaniel Roth are the true inventors on several GE patents and should be named on them;
- the asserted claims of the '439 patent are invalid as anticipated and/or obvious;

- in prosecuting the '439 patent, GE withheld from the Patent Office material information about prior art and inventorship; and
- as relevant to this motion, that GE gained a "head start" of at least three to five years by misusing Spectrum's confidential information.

(ECF No. 856-1 to -2 ("Metzler Rep.") ¶¶ 5-10.)

### 2. Spectrum Expert Eric J. Phillips

Mr. Phillips is the President of VLF Consulting, Inc., a business advisory firm. His firm provides services focused on accounting, financial, economic, marketing, and other valuation assistance, particularly relating to intellectual property disputes. He holds a Bachelor of Science degree in Mechanical Engineering from Ohio State University, and a Master of Business Administration from Indiana University. He is a Certified Valuation Analyst and a Master Analyst in Financial Forensics through the National Association of Certified Valuators and Analysts. He has more than twenty years of experience specializing in intellectual property damages and valuation in a wide range of industries.

Mr. Phillips is offered to opine on Spectrum's damages. He conducts various calculations for unjust enrichment damages, lost profit damages, and the various components of each such as price erosion on Spectrum's Veriton caused by competition from the StarGuide, research and development ("R&D") costs GE avoided by misappropriating Spectrum's Trade Secrets, lost profits from service contracts associated with sales of the Veriton and StarGuide, and reasonable royalties on sales not subject to lost profits. Adopting the opinion of Dr. Metzler, he opines as to the amount that GE benefitted from avoiding a delay to the market with its StarGuide machine—which, like Dr. Metzler, he calls a "head start"—by using Spectrum's confidential information. He estimates this head-start period ranges from between

6

three to five years and calculates alternative damages scenarios that incorporate three-, four-, and five-year head start periods.

Mr. Phillips also opines that Spectrum's Veriton system would have captured most sales made by GE's StarGuide in connection with his lost profits analysis and also that Spectrum had the manufacturing capacity to sell a large number of Veriton machines had it been able to sell without competition from the StarGuide.

Alternatively to both unjust enrichment and lost profits damages, Mr. Phillips opines that a running royalty of $250,000 per system, unlimited in duration, would be appropriate by imagining a hypothetical negotiation for a royalty that would have taken place in or about 2013 and evaluating factors relevant to such a hypothetical negotiation. (ECF No. 850-1 ("Phillips Op. Rep.") ¶¶ 1-6, 13-21.)

In a reply report, he opines as to methodological, factual, and legal errors in Dr. Putnam's rebuttal report, which he says resulted in Dr. Putnam understating GE's unjust enrichment, as well as to understating Spectrum's lost profits and reasonable royalties. (ECF No. 850-2 ("Phillips Reb. Rep.") ¶ 2.)  More details about his opinions are set forth below in the section addressing GE's motion to exclude them.

### 3. **GE Witness Erez Levy**

Erez Levy is the General Manager of Global Molecular Imaging at GE (ECF No. 892, at 1) and has worked there for twenty-four years. (ECF No. 876-2, at 187:9-10.)  In his deposition, he testified he told Dr. Putnam that ███████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ (*Id.* at 183:13-185:4.)  In connection with meeting with Dr.

7

Putnam, he reviewed historical sales information of the GE imaging machines. (*Id.* at 193: 5-14.)

He also met with two current or former product managers at GE, Reuven Brenner and Natalie

Shmuel, to arrive at the 90% figure. (*Id.* at 194:19-195:3, 197:9-198:2.)  He relied on non-public

information to generate this calculation. (*Id.*)  He did not perform any mathematical calculation

to arrive at that figure. (*Id.* at 199:17-200:8.)

He also spoke to customers who bought GE's 870 CZT, a 2D imaging machine, in

developing the 90% figure. (*Id.* at 184:1-185:4.)  According to his testimony, GE was trying "to

convince" customers who had already ordered the 870 CZT "to switch to StarGuide." (*Id.*)  He

noted GE "learned strongly that still the market is a planar market," so the introduction of the

StarGuide did not shift demand among GE's 2D customers to the newer 3D technology. (*Id.*)

Nevertheless, GE did not discontinue promoting StarGuide because it "want[ed] to promote

StarGuide" under the theory that it "will be the future platform" and GE could "convince the

market to switch from a 2D to a 3D scanning." (*Id.* at 200:23-201:3.)

### 4.  GE Expert Dr. Jonathan Putnam

Dr. Putnam is the founder and principal of Competition Dynamics Inc., a litigation and

management consulting firm located in greater Boston, where he specializes in economic and

financial analysis pertaining to intellectual property and antitrust-related litigation. He obtained

his Bachelor's, Master's, and Ph.D. degrees in economics from Yale University, studying

intellectual property, competition and international trade law under fellowships with the Yale

and Columbia Schools of Law.  (ECF No. 896-1 ("Putnam Op. Rep.") ¶¶ 1-5.)

Relevantly, Dr. Putnam is offered to opine as to "computed damages for past infringement" of GE's '439 patent. (*Id.* ¶ 9.) He calculates that "the royalty for an individual VERITON is expected to be about $12,000, with a range of $6,000 to $18,000." (*Id.* ¶ 11.)

Dr. Putnam is also offered as a rebuttal expert to rebut the opinions offered by Spectrum expert, Mr. Phillips, on Spectrum's asserted damages. In his Rebuttal Report, he opines that Mr. Phillips's opinions are "confused, factually incorrect and legally erroneous" and "vastly overstate Spectrum's damages claim." (ECF No. 896-2 ("Putnam Reb. Rep.") ¶ 4.) He adopts Mr. Levy's statement that ███████████████████████████████████████ ██████████████████████████████████████████████ and labels it a "substitution rate" and/or a "replacement rate" and then opines that ████████████████████████ ██████████████████████████████████████ in the marketplace. He points out that Mr. Phillips's computation measures GE's gain, not Spectrum's loss, and opines that GE's gain is not an appropriate proxy for Spectrum's loss; that Mr. Phillips improperly defined gain relative to zero sales instead of to its next-best alternative sales[4]; that he confuses the concepts of an accelerated sale and a lost sale in his head-start opinion computing unjust enrichment damages; that his head-start opinion fails to take into account when the trade secrets at issue were published to the public; that he improperly computes the unjust enrichment damages by computing the present value of expected future profits; that he does not compute the share of GE's incremental gains from alleged misappropriation in his reasonable royalty computation; and that he fails to take into account substitutes for the

---

[4] This criticism relates to Mr. Phillips's calculations making no allowance for the possibility that GEHC would have sold an 870CZT instead of a StarGuide (*i.e.*, the 90% substitution rate).

9

StarGuide offered by GE (such as the 870CZT) that customers may have purchased instead of the Veriton. (*Id.* ¶¶ 51-52, 55-110.)

**LEGAL STANDARDS**

**1.    Rules of Evidence 401 and 403**

Under Federal Rule of Evidence 401, evidence is deemed relevant where "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Relevant evidence is generally admissible, unless there is law requiring its exclusion.  Conversely, irrelevant evidence is not admissible. Fed. R. Evid. 402.  On the flip side, Rule 403 permits courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**2.  Rule of Evidence 702**

The admissibility of expert testimony is governed principally by Rule 702 of the Federal Rules of Evidence, which provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, the district court is "the ultimate gatekeeper" of expert testimony. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted).

The threshold question under Rule 702 is whether the witness is qualified to provide expert testimony on the subject matter at hand. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). To make this determination, a court must "ascertain whether the proffered expert has the educational background or training in a relevant field." *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, No. 99-cv-1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (citation omitted). A witness may be qualified based on any one or more of the qualities listed in Rule 702— knowledge, skill, experience, training, or education. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (citation omitted).  The court then "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

If the expert is qualified, the court must ascertain whether the testimony is reliable. *Nimely*, 414 F.3d at 396.  "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between" the expert's methodology and conclusions. *Id*.  The analysis must be reliable "at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," the opinion testimony must be excluded. *Id*. at 266.

While the Supreme Court has set forth factors to be considered when assessing reliability, no one factor is dispositive. Fed. R. Evid. 702, Adv. Comm. Note to 2000 amend. Some of the factors include:

- Whether the expert is proposing to testify about matters arising from research they conducted independent of the litigation;
- Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and
- Whether the expert has accounted for obvious alternative explanations.

*Id.* (citations omitted).

Finally, if an expert is qualified and his or her testimony is reliable, the court must determine whether the testimony "will 'assist the trier of fact.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 702).  In order to assist the trier of fact, the testimony must be relevant, and it may not be directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help. *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001).

If an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

Still, testimony that is admissible under Rule 702 may be excluded under Federal Rule of Evidence 403 if the court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Expert

testimony is particularly susceptible to these dangers, "given to the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595 (quotations omitted).

### 3.   Burden of Proof

When expert testimony is challenged, the burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony. Fed. R. Evid. 702 & Adv. Comm. Note to 2000 amend. (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)); *Williams*, 506 F.3d at 160 (citing *Daubert*, 509 U.S. at 593 n.10); *Koppell v. New York State Board of Elections*, 97 F. Supp. 2d 477, 479 (S.D.N.Y. 2000). Nonetheless, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Note to 2000 amend. "[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct[;] they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id*. (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994)). Thus, the court does not make a merits decision on a *Daubert* motion.

Finally, in a case that will be tried in a bench trial rather than before a jury, a court has greater flexibility to hear the expert evidence and later exclude it or disregard it if it determines it did not meet Rule 702's reliability standard. *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy*

*Hair Concepts, LLC*, 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009); 4 Weinstein's Federal

Evidence § 702.02[6][c]; *see also In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (noting that the

"gatekeeping role" of the Court under Rule 702 in a bench trial differs from that of a jury trial,

and courts do not err "in admitting the evidence subject to the ability later to exclude it or

disregard it if it turns out not to meet the standard of reliability established by Rule 702").

<b><u>DISCUSSION</u></b>

**I.      GE's Challenges to Spectrum Experts Dr. Metzler and Mr. Phillips**

    ***A.  Dr. Metzler***

The only opinion of Dr. Metzler challenged on this motion relates to the purported

"head start" that GE obtained by misappropriating Spectrum's confidential information and

trade secrets.  Defendants challenge his head-start opinion on two principal grounds: that (1)

his opinion incorporates and/or relies on impermissible legal opinions; and (2) his opinion is

excludable on multiple Rule 702 grounds.  The Court finds the Rule 702 issue to be decisive in

this case and does not reach the question of whether his opinion involves legal conclusions.

Defendants address the "First Prong," "Second Prong," and "Third Prong" of his head-

start opinion separately, which the Court interprets to refer successively to Paragraphs 965 to

967 of Dr. Metzler's Opening Report.  However, all three "prongs" suffer from the same

fundamental defect, so the Court addresses them together.

The opinions in all three paragraphs are excludable because they are unhelpful to the

factfinder.  Key to this assessment is that Dr. Metzler's head-start opinion involves no technical

or special expertise; rather, he merely reviews documents—including the 2009 NDA, emails,

and slide decks—and draws conclusions as to what the relevant dates were of GE's use of

14

Spectrum's information based on these sources and measures the length of time of the head start. He does not—as might be appropriate to his expertise—explain in Paragraphs 965 to 967 the various designs that GE contemplated and why they were likely to fail without Spectrum's information or trade secrets.[5] He does not explain in any detail the reasons why he concludes GE may never have reached the StarGuide design in the absence of Spectrum's information. As a design expert, he is plainly qualified to opine on these issues, but his head-start opinion fails to apply his expertise to the facts of this case. Nor does he reference other parts of his opinion in developing his head-start opinion which might suggest greater technical expertise was applied. Further, his expertise in design does not qualify him to opine on industry standards or development of products for market. Thus, his head-start opinion is excluded.

Defendants argue that the "First Prong" of Dr. Metzler's opinion (at Paragraph 965) – that GE got a head start in developing the StarGuide – is based on an improper legal opinion and/or conclusion about the 2009 NDA between Spectrum and GE, which Spectrum contends was breached by GE's use of its trade secrets in the StarGuide. For example, Dr. Metzler states that "the 2009 NDA required GE to wait four years and ten months longer than it did to use Spectrum's confidential information," and that the NDA was "effective and binding" until "six (6) year from the date of disclosure." (Metzler Rep. ¶ 965.) His discussion of the NDA ignores another provision of the NDA which relieves a receiving party from its obligation of confidentiality if confidential information is disclosed to the public through no fault of the receiving party. Dr. Metzler further states in Paragraph 965 of his report that the first time

---

[5] Spectrum also fails to point to any part of his deposition where Dr. Metzler applies his expertise to explain the design-related factors that might have impacted his head-start opinion.

Spectrum disclosed the full suite of trade secrets relevant to the design of the Veriton was February 2012, meaning that, in his opinion, GE could not use or disclose the information until February 2018.  He states that GE first used Spectrum's trade secrets as early as April 21, 2013. He opines that the fact that certain Spectrum trade secrets allegedly used in the StarGuide were disclosed before the launch of the StarGuide or earlier than February 2012 does not impact the length of the head-start period because, in his view, "the information that GE used most prematurely (i.e., in April 2013) defines how much of a head start it obtained." He goes on to opine that information Spectrum disclosed most recently was the most important to the creation of the StarGuide.

The Court has looked at Paragraph 965 and concluded it will not help Judge Broderick understand any technical issue in this case.  Indeed, it is worth noting that part of the law around excluding legal conclusions stems from the observation that "[e]ach courtroom comes equipped with a 'legal expert,' called a judge." *Burkhart v. Washington Metro. Area Trans. Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997).  Thus, since this case will have a bench trial and the factfinder is the same as the gatekeeper of expert opinion evidence, implied in GE's argument regarding Dr. Metzler's purported legal conclusions is an argument that this testimony will not be helpful to the factfinder under Rule 702.

To that end, Judge Broderick has ample expertise in interpreting contracts, understanding the relevant obligations of the parties, and measuring the date for the purpose of damages.  The argument that GE benefited from bringing a product to market earlier than it otherwise could have done also involves no application of technical or special expertise.  Judge Broderick is also more than capable of understanding that GE may have gotten a benefit from

early use of confidential information and/or trade secrets which it would not have had if it went through development in the ordinary course.  Dr. Metzler's opinion is based exclusively upon documentation which can be introduced in the factual record and interpreted by Judge Broderick for its factual content.  It is worth noting that Dr. Metzler's opinion in Paragraph 965 involves no discussion of what the particular trade secrets/confidential information allegedly used entailed, their development timeline, or how they compare to the designs of other devices on the market.  While Paragraph 965 references another part of Dr. Metzler's report where he says that Spectrum more recently disclosed the 12x1x7 configuration and double-pitch collimator, which he says provide the greatest benefits to the StarGuide, Dr. Metzler provides no new or novel expert analysis of these design elements and fails to connect them to the purported head-start period (or the delays which might have resulted from the absence of the use of this information).  The other parts of his Report he references, therefore, can stand on their own and inform Judge Broderick's view of the facts.  Given that no technical expertise has been applied, his opinion about the obligations under the NDA and interpretation of the evidence as to the timing of when alleged trade secrets were used is thus wholly unhelpful to the factfinder.

Defendants next argue Dr. Metzler's proposed testimony based on Paragraph 966 of his report is inadmissible because his opinion is not based on sufficient facts, reliable principles, or specialized knowledge and/or unhelpful to the factfinder.  In this paragraph, he states that it probably would have taken GE at least four years to independently develop everything it copied, especially Trade Secrets A, C, F, and L, which he opines are particularly critical to the design.  He then goes on to discuss evidence in the case that he interprets to mean that GE was

not that interested in Spectrum's initial design or eager to take on development of a machine using SPECT technology.  GE takes issue with the assertions that Spectrum developed its product over the course of four years and that GE would have taken the same length of time and the evidence used to reach these conclusions.  GE also argues Paragraph 967, which merely summarizes GE documents produced in discovery, is inadmissible because it is not reliable and not based on specialized or expert knowledge.

While Dr. Metzler's expertise aids him in decoding the technical language in some of the communications, and he may certainly opine to the different designs contemplated by GE and the importance of certain alleged trade secrets to the design of the StarGuide, the Second Prong of his head-start opinion does not rely on the application of his specialized knowledge. Rather, the thrust of his conclusion is that (1) because internal communications at Spectrum expressed an interest in developing a product to follow D-SPECT (a predecessor to the Veriton), Spectrum's development process began after D-SPECT launched and took four years; (2) since the development process for Spectrum took four years, it would also have taken GE four years (or more), despite Dr. Metzler's acknowledgement that GE was "a larger organization with more resources than Spectrum"; (3) since internal communications at GE show it explored other designs and expressed doubts about a design with rotation of modules, GE must have intended to abandon the development of a SPECT/CT machine without the use of Spectrum's confidential information; and (4) since GE expressed such doubts, it likely would have taken GE far longer to design the StarGuide without use of Spectrum's confidential information and/or trade secrets.

Apart from Dr. Meltzer's general decoding of the technical specifications of various designs, the Second Prong of the head-start opinion essentially purports to opine on GE's state of mind from evidence in communications.  Thus, Spectrum essentially seeks to use Dr. Metzler as a backdoor for introducing expert opinion on GE's state of mind.  This approach is improper; experts may not opine directly on a defendant's state of mind, which is in the province of a factfinder. *See MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 577 (S.D.N.Y. 2017) (cleaned up) ("Opinions concerning state of mind are an inappropriate topic for expert opinion.").  For this same reason, Dr. Metzler does not in this part of his opinion apply any specialized knowledge or expertise which is outside the ken of the factfinder.

For example, Dr. Metzler does not explain in his head-start opinion why Spectrum and GE should be assumed to be equivalents in the development for the market of the novel technology that is the subject of this case—an opinion which, if detailed instead of assumed, might require some expertise.[6]  Nor do Spectrum's papers on this motion direct the Court's attention to other parts of Dr. Metzler's report that might support these assumptions in the head-start opinion.  Dr. Metzler infers the parties' development timelines seemingly exclusively from a documentary record that does not assess the relative design and manufacturing capacities of the parties.  His head-start opinion is only three paragraphs long and overwhelmingly suffused with communications and other documentary evidence from which he chiefly attempts to extrapolate the parties' intent to develop the technologies that are the subject of this action.  It may be this documentary evidence is probative of intent and

---

[6] Indeed, he acknowledges but dismisses out-of-hand the fact that GE is larger and has more resources than Spectrum, since GE explored other designs.  It is not clear how those observations connect.

19

supportive of an inference that there was (or was not) a head-start period of definite length, but the factfinder can reach that conclusion without applying any scientific or technical expertise to the communications cited.  And while Dr. Metzler includes a design from internal GE documents in Paragraph 966, he does so to show "GE was more interested in" this design than the ultimate design of the StarGuide.  He does not explain why this design would delay GE's design of the StarGuide or result in a different timeline for the product to be brought to market, if ever, apart from the bare inference that GE *intended* to develop that design rather than the StarGuide.  The same is true of the subsequent evidence on which Dr. Metzler opines—namely testimony and correspondence by Messrs. Jean-Paul Bouhnik, Floris Jansen, Alex Ganin, and Reuven Brenner regarding performance benefits and cost-savings from the other designs they explored—which mostly goes to show, in Dr. Metzler's opinion, that GE "would have canceled the project early on."  Dr. Metzler therefore improperly opines on GE's state of mind when exploring various designs, which is for Judge Broderick to decide. (Metzler Rep. ¶ 966.)  Thus, testimony based on Paragraph 966 is excluded.

Likewise, Paragraph 967 requires even less specialized knowledge.  This paragraph merely recites GE's view expressed in several documents that it would accelerate its own development timeline by three or four years by acquiring Spectrum as opposed to developing its own product.  For the avoidance of doubt, the Court does not on this motion express any view as to whether the documentary record shows that GE lacked the capacity or intent to develop the StarGuide on its own within a three- to four-year time frame (or some other time frame)—the meaning of these documents and their impact on liability and damages is before Judge Broderick.  This Court merely finds that any conclusion regarding whether GE might have

20

believed it would accelerate its development by acquiring Spectrum and its internal know-how

are within the ken of the factfinder based on the documentary record.  Dr. Metzler's head-start

opinion utilizes no special expertise that would help the factfinder determine whether GE's

apparent belief in this timeline was accurate; it merely accepts the timeline as given by GE in

the documents.  And again, Spectrum's papers fail to direct the Court's attention to the parts of

Dr. Metzler's Report or testimony showing that he applied expertise in evaluating this evidence.

*See Medidata Solutions, Inc. v. Veeva Systems, Inc.*, No. 17-cv-589 (LGS), 2021 WL 3773464, at

*2 (S.D.N.Y. Aug. 25, 2021) (finding the proposed head-start period "is well within the

comprehension of the jury, and expert testimony on that point is warranted only to the extent

that it explains *how* specific instances of alleged misappropriation would have reduced

[defendant's] development timelines").

Spectrum's arguments against exclusion of Dr. Metzler's proposed testimony are

unavailing.  Citing cases where Dr. Metzler's methodology purportedly has been approved,

Spectrum summarily argues that his expertise is technical in nature.  But this argument

confuses two different prongs of Rule 702—specifically, Rule 702(a) and Rule 702(c).  GE does

not argue that Dr. Metzler does not possess relevant technical expertise; rather, it argues that

Dr. Metzler's opinions are not helpful to the factfinder because he does not *apply* his technical

expertise in these paragraphs.  Nothing in Dr. Metzler's proffered opinions in these three

paragraphs relies on technical expertise – he simply proposes to interpret evidence in the

documentary record to opine on intent and capability of the parties, as well as the obligations

of the contract.

Spectrum asserts "Dr. Metzler's reasoning is robust and ties specific trade secrets to GEHC's time savings." But no expertise is applied to arrive at the alleged time savings. Certainly, this legal argument regarding a head start bears upon the issues in the case, and Dr. Metzler is qualified to testify as to the designs of the Veriton and StarGuide and the technology used and technical benefits that may have been conferred to the StarGuide's design by the technology and trade secrets that Spectrum claims were misappropriated. But nothing in Dr. Metzler's opinion in these three paragraphs explains why any *particular* design emphasized by GE in the documentary record would lead to development delays, nor does he expound the length of any delay and the reasons for the length. He does not clearly apply any technical knowledge or expertise to the designs contemplated in the correspondence and documents he recites, nor does he relate them to the final design of the StarGuide, which was launched in 2021. As a consequence, Dr. Metzler's head-start opinion must be excluded in full.[7]

The cases cited by Spectrum are no help to it. In *CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 708 F. App'x 654, 667 (Fed. Cir. 2017), the Court did not address any argument regarding whether the opinion of the expert involved technical expertise; it merely noted that the expert testified that his head-start opinion was "based on [his] experience in the [relevant] industry." *Id.* Here, Spectrum points to no similar assertion of Dr. Metzler as to the foundation of his opinion being his experience with collimator design timelines in the industry. Dr. Metzler's impressive curriculum vitae reveals extensive academic and research experience along with

---

[7] Because the Court concludes Dr. Metzler's head start opinion is inadmissible for failing Rule 702(a), it does not reach the other issues raised by the parties under Rule 702, notably that Dr. Metzler's opinion lacked sufficient facts and used an unreliable methodology. The Court's opinion is limited to finding that he did not apply any specialized or expert knowledge to the facts of the case.

some hospital administrative experience, but no apparent industry experience in preparing these technologies for the market, though he is indisputably qualified to opine on design and similar relevant aspects of the case. (*See* Metzler Rep., Attachment A.)  Rather, the challenged opinions are all plainly derived solely from the documentary record, distinguishing this case from those cited by Spectrum. *See CardiAQ Valve Techs.*, 708 F. App'x at 667 (emphasis added) ("It is not an unreliable methodology to use CardiAQ's timeline *and Mr. Ratz's experience-based opinion* on how fast any company could possibly work as a basis for Neovasc's head start."); *see also Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955 (8th Cir. 2007) (noting specifically that "[a]ppellants do not contest . . . whether the subject of [the expert's] proposed testimony would aid the jury," unlike in this case); *AMS Sensors USA Inc. v. Renesas Elecs. Am. Inc.*, No. 08-cv-451 (ALM), 2021 WL 12234726 (E.D. Tex. Dec. 14, 2021) (not determining any Rule 702(a) issues raised by the parties, but rather resolving questions of fact previously brought before an advisory jury)[8]; *Agilent Techs., Inc. v. Kirkland*, No. 3512-VCS, 2010 WL 610725, at *26-27 (Del.

---

[8] If the Court were to delve into the methodology involved in *AMS Sensors*, it would only further its conclusion.  It is not clear how the *AMS Sensors* court's holding that a 26-month head-start period was "reasonable given Plaintiff's independent development efforts" is analogous to this case.  First, the 26-month head-start period gained by defendants in *AMS Sensors* is substantially shorter—almost by half—than the four-year period it took the plaintiff in that case to develop the technology.  Here, although Dr. Metzler ultimately proposes a head-start period ranging three to five years, Dr. Meltzer's discussion nevertheless centers on a head-start period virtually coextensive with Spectrum's claimed four-year development timeline.  Spectrum's papers do not address this difference in the development timeline in *AMS Sensors*, which clearly suggests the application of different methodologies.  As the Court has noted, Dr. Metzler's head-start opinion does not include any meaningful information used to aid him in making an assessment that GE's development timeline would be coextensive with Spectrum's—so the Court cannot compare his methodology to that employed in *AMS Sensors*, where the Defendant was deemed to be substantially less capable of design and development than Plaintiff. *Id.* at *14.  Nor is it clear that Dr. Metzler possesses the relevant expertise to compare the development capacities of GE and Spectrum.  Further, the fact that Dr. Metzler opines elsewhere in his Report that certain elements of Spectrum's design could be reverse engineered by a skilled person based only on design renderings tendered to GE during a meeting tends to contradict the assumption that GE would take the same amount of time to develop the subject technologies, suggesting potentially an unreliable or incoherent methodology. (Metzler Rep. ¶¶ 662-63.) However, as the Court has stated, it does not reach any conclusions regarding Dr. Metzler's methodology given his head-start opinion is excluded as unhelpful under Rule 702(a).

Ch. Ct. Feb. 18, 2010) (not addressing, in a decision after trial, the issue of expert testimony being helpful to the jury; experts applied technical expertise to evidence which went beyond certain correspondence and written documents, inclusive of "the number of employees conducting experiments" and "the amount of time spent at [Plaintiff] researching").

Thus, Dr. Metzler's head-start opinion that GE had a three- to four-year head start in bringing the StarGuide to market is not based on technical, scientific, or industry expertise on the technology development timeline and is not helpful to the factfinder and is excluded for these reasons.

With that said, of course, nothing in this opinion should be read to preclude Spectrum from eliciting fact testimony or introducing documentary evidence at trial suggesting that GE obtained a head start from utilizing Spectrum's confidential information and/or trade secrets. Nor does this opinion operate as a bar to legal argument regarding the length of the purported head start. Rather, this opinion only precludes Dr. Metzler from testifying to the head-start period given that his proposed testimony does not utilize technical or other expertise to reach the head-start opinion.

### B. Dr. Phillips

The motion to exclude Mr. Phillips's testimony focuses primarily on the reliability of his various and alternative damages models, one which looks at unjust enrichment and another which looks at lost profits.

He computes total unjust enrichment damages in two ways, relying on GE's internal sales projections from 2020/2021 under both calculation methods. Under the first method, he adds the value of (1) the head start GE allegedly received from incorporating Spectrum's trade

24

secrets into the StarGuide, (2) avoided R&D costs from developing the StarGuide technology on its own, and (3) Spectrum's price erosion from competition with StarGuide to arrive at unjust enrichment damages of $188.9 million, $238.1 million, and $279.8 million depending on whether a three-, four-, or five-year head-start period is used.  Under the second method, he computes unjust enrichment by adding (1) GE's actual StarGuide Sales from 2021 through October 27, 2022, and profits from those sales and related service contracts, (2) GE's avoided R&D costs, and (3) Spectrum's price erosion damages to arrive at a total unjust enrichment figure of $47.56 million. (*See, e.g.*, Phillips Op. Rep. ¶¶ 18-19.)

He computes Spectrum's total lost profits in two ways as well, again relying on GE's internal sales projections from 2020/2021 in one method.  Under the first method, he adds (1) lost profits (past and future) from Veriton systems and related service contracts, (2) reasonable royalties on sales not subject to lost profits, (3) price erosion on Veriton sales, and (4) GE's avoided R&D costs, to arrive at lost profits of $79.45 million, $125.21 million, or $167.55 million depending on whether a three-, four-, or five-year head-start period is used.  Under the second method, based only on actual, not projected, StarGuide sales through October 27, 2022, he adds (1) lost profits from Veriton sales and related service contracts, (2) reasonable royalties on sales not subject to lost profits, (3) price erosion on Veriton sales, and (4) GE's avoided R&D costs to arrive at the total of $39.30 million in lost profit damages. (Metzler Rep. ¶¶ 20-21.)

Of note for both his unjust enrichment and lost profit calculations, GE's internal sales projections differ from what GE has actually made in sales, and Mr. Phillips did not make any adjustments to the projected future sales numbers in his calculations notwithstanding having actual sales data from 2021 and 2022. (*See* Phillips Op. Rep. ¶ 80.)

Mr. Phillips computes price erosion damages on the Veriton for the period 2021 through September 2022 to be ▮▮▮▮▮. (Phillips Op. Rep. ¶ 16.)  He computes a reasonable royalty number that GE should be required to pay Spectrum for use of its trade secrets to be $250,000 per StarGuide sold, which he multiplies by the 36 StarGuides sold between 2021 and October 27, 2022. (Phillips Op. Rep. ¶ 17.)

GE makes the following arguments with respect to the above calculations and proposed opinion testimony concerning same.  First, it argues Mr. Phillips's testimony should be stricken entirely because his damages models assume that all fifteen of Spectrum's alleged trade secrets are trade secrets and were improperly used by GE when in reality Judge Broderick found that certain of the alleged trade secrets were disclosed by Spectrum on November 14, 2013 (meaning they were no longer secret), and/or given that ten alleged secrets were not actionable under the DTSA until May 2016 and/or that Spectrum allegedly has admitted certain secrets were not secrets.  Accordingly, GE argues the damages models do not "fit" the theory and facts of the case, rendering them irrelevant.

Next, GE argues that Mr. Phillips's unjust enrichment and lost profit calculations are unreliable insofar as they (1) rely on speculative statements from Spectrum personnel that GE had a three to five-year head start in making its StarGuide (and Dr. Metzler's adoption of same) (2) rely on GE's internal sales projections that exceed actual sales without an independent determination of the method by which those sales projections were reached; (3) incorporate unreliable price erosion calculations based on target prices for Veriton set by Spectrum and its mere "belief" that competition from the StarGuide has required Spectrum to charge ▮▮▮▮▮ on average less than it otherwise would have charged but for the competition from GE without

26

independently evaluating pricing of imaging machines, market forces other than StarGuide competition contributing to pricing pressure, and the timing of when the pricing pressure began; and (4) rely on statements by Spectrum personnel about Spectrum's manufacturing capacity to arrive at the conclusion that Spectrum could have manufactured four to five times more Veriton machines in 2021 and 2022 than it actually made and sold in those years without conducting an independent investigation of Spectrum's sales projections and manufacturing capacity or taking into account how difficulties obtaining electronic components for the Veriton in those years would have impacted production.

GE additionally argues Mr. Phillips's opinions and calculations of a reasonable royalty are unreliable insofar as he relied primarily on unique "royalty indicators" that he came up with to the exclusion of other factors experts are supposed to consider under the fifteen-factor *Georgia-Pacific*[9] test for determining a royalty rate. It contends that he did not tie the royalty indicators to his royalty rate. Moreover, it contends his royalty analysis improperly relies on (1) the speculative GE sales projections referenced above that post-date when the hypothetical

---

[9] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The fifteen factors include: (1) royalties received by the patentee for comparable patents; (2) the rates paid by the licensee for use of comparable patents; (3) the nature and scope of the licenses (*i.e.*, as exclusive/non-exclusive, restricted/non-restricted in terms of territorial market); (4) the licensor's policy and marketing program to grant or not grant licenses; (5) the commercial relationship between the licensor and licensee; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee (*i.e.*, of generating derivative sales of non-patented items); (7) the duration of the patent and the term of the license; (8) the established profitability of the product made under the patent and its commercial success/popularity; (9) the competitive advantage of the patent property over older devices, if any; (10) the nature of the patented invention, its commercial character and benefits to end-users; (11) the extent to which the infringer has made use of the invention and evidence of the value of that use; (12) "the portion of the profit or of the selling price that may be customary in the particular business or comparable businesses to allow for the use of the invention or analogous inventions"; (13) "the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer"; (14) the opinions of experts; (15) the amount of a reasonable royalty that a licensor and licensee might have agreed upon "if both had been reasonably and voluntarily trying to reach an agreement . . . ." *Id.*

royalty negotiation would have taken place and (2) statements/opinions about what the parties knew or understood at the time a hypothetical negotiation would have taken place that are not factually supported by the record.  Examples of this include statements/opinions that Spectrum and GE understood that CZT technology was novel and advantageous over existing 2D SPECT machines in the market and that GE believed using Spectrum's confidential information would give it a 1.5-year advantage in developing a general purpose camera ("GPC") than if it had to replicate Spectrum's technology, and that GE understood it would be difficult to compete with Spectrum if it did not have GPC technology.

Finally, GE argues Mr. Phillips's opinions and computation of GE's avoided R&D costs are unreliable insofar as he did not use any methodology to arrive at his $10 million in avoided costs but rather based the number on his interpretation of a handful of documents from 2011 and 2012 in which GE personnel estimate that acquiring Spectrum's GPC would save GE $10-$15 million as compared to developing its own competing GPC.

I address these arguments below.

### (1) The "Fit" Requirement

Under *Daubert*, the so-called "fit" of an expert opinion to the facts of the case is an "aspect of relevancy" requiring testimony to be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual issue." 509 U.S. at 591.  "[E]ven if the methodology used by the expert is considered to be reliable, the expert's testimony will nevertheless fail to meet the 'fit' requirement and should be excluded if the data relied upon by the expert is materially different from the data relevant to the facts of the case." *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 401 (S.D.N.Y. 2007).  Where the expert "failed to consider the

28

necessary factors," or "the analysis is premised upon a faulty assumption," an opinion may be excluded. *Id.*

GE's arguments for exclusion on this basis are unpersuasive because they are dependent on its version of disputed facts and because Mr. Phillips testified that his damages computations would not change even if some of the fifteen trade secrets are ultimately deemed not to be trade secrets and/or not to have been improperly incorporated into the StarGuide in violation of the NDA or the DTSA. The cases GE cites, both not precedential in this Circuit, are distinguishable because they involved cases tried before a jury, and thus the court did not have the same discretion as in this case to hear the testimony and decide whether to exclude it or ignore it based on the testimony and the damages model might not match the liability finding.

That is, in both cases, the courts were concerned that the jury might not understand how to consider the expert's testimony if they decided that some trade secrets were not misappropriated. The same concern is not present here. Judge Broderick can determine as appropriate whether and which trade secrets were misappropriated and easily reject Mr. Phillips's calculations if he finds that these opinions do not fit his liability findings. *Cf., e.g.*, *Ford Motor Co. v. Versata Software, Inc.* No. 15-cv-10628 (MFL), 2018 WL 10733561, at *10 (E.D. Mich. July 9, 2018) (noting the expert "made no effort to apportion [the] claimed damages between those caused by [the] alleged misappropriation of trade secrets and . . . other alleged infringements of" the relevant intellectual property; expressing concern about jury confusion since it would be tasked with making "an independent determination – on a trade-secret-by-trade-secret basis – as to whether Ford misappropriated each of the relevant trade secrets");

29

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005) (finding, on motion for judgment as a matter of law after a verdict, there was no evidence to support the damages because plaintiff's expert failed to present a damages model limited to the five trade secrets the jury deemed were actually misappropriated out of eleven alleged misappropriated trade secrets).

Further, Mr. Phillips has testified that his damages opinions do not require every individual trade secret to have been misappropriated.[10] (ECF No. 850-3, at 32:9-35:8; 161:7-11.) This Court understands his testimony to mean that his damages computation is not impacted, in his view, if some of the trade secrets are not protected (either because the total combination of secrets and non-secrets is what was protected or because the damages arise from the remaining protected trade secrets allegedly incorporated into the StarGuide).  Thus, where there is a dispute about which trade secrets were and were not improperly incorporated into the StarGuide (and when), and where Spectrum challenges GE's characterization of its trade secrets theory, GE's argument is too tied up in the merits to exclude Mr. Phillips's opinions at this juncture.  Depending on the outcome of the summary judgment motion and trial, Judge Broderick will be able to disregard unhelpful and/or unreliable expert opinion evidence as failing to fit the facts of the case insofar as he deems it appropriate.

### (2)  Reliance on GE's Projections of Future Sales

Mr. Phillips adopted GE's internal sales projections from in or around 2020/2021 in his computation of future unjust enrichment damages and lost profits damages.  Although he used

---

[10] He testified that it was his understanding, based on discussions with Dr. Metzler, that Trade Secrets A, C, F, and L were most important. (Phillips Op. Rep. ¶ 78; *see also* ECF No. 850-3, at 159:16-160:19.)

actual sales of the StarGuide in 2021 through October 27, 2022, to ascertain profits on the units sold in that period in the calculations, he did not adjust projected sales based on GE's actual sales experience.  One of his unjust enrichment calculations relies on 2021 sales projections forecasting sales through 2029 and then shifts the sales from that forecast three, four, and five years into the future on the theory that gains relative to baseline constitute unjust enrichment from having a head start in bringing the StarGuide to market. (Phillips Op. Rep. ¶¶ 80-81.) Similarly, one of his lost profits calculations uses the head-start periods and sales forecasts to compute lost profits from 2021–2023, 2021–2024, and 2021–2025, without adjusting for actual sales experience. (*See* Phillips Op. Rep. ¶ 20 & Exh. 4.1, at 81.)  The failure to adjust for actual sales is a major criticism lodged against Mr. Phillips because the difference in experience and projections for the short period of actual sales considered was at least 16.7%.[11]  Additionally, GE criticizes Mr. Phillips's opinions because he adopted the sales projections without understanding how they were generated or conducting any type of market research or independent analysis of whether they were reliable.

Experts generally are afforded latitude with respect to the data on which they rely and that challenges to reliability often present questions of weight, not admissibility. *See Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 337-38 (N.D.N.Y. 2021) (collecting cases).  Nevertheless, expert opinions still must be based on "sufficient facts or data" to be admissible under Rule 702. *AngioDynamics*, Inc., 537 F. Supp.3d at 338.  The parties cite various cases in which an

---

[11] Mr. Phillips and Spectrum state the sales projections were 16.7% higher than actual sales; GE says the projections were 20% higher than actual sales in the 2021-October 27, 2022 period. (*See* ECF Nos. 896, at 10; 849, at 18.)

expert's reliance on sales forecasts was found to be acceptable or not acceptable.  In cases where courts have excluded the damages opinions as unreliable, the expert was unfamiliar with the methods and reasons underlying the forecasts, did not independently conduct market research to test (and potentially adjust) the forecasts, did not adjust the forecasts based on actual sales and financial data, and/or where there was no evidence the forecasts were actually used in the course of the business to make business decisions. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (finding expert's lack of familiarity with data on which the expert relied warranted exclusion; it was not error to exclude expert damages opinion when expert relied on competitor's business plan and sales projections but did not know who prepared the projections or the methodology used to reach them); *AngioDynamics, Inc.*, 537 F. Supp. 3d at 339 (excluding damages expert's opinion as unreliable under Rule 702 where he did not know any details about how sales projections were reached or any basic facts underlying the date on which he was relying); *CJS Solutions Group, LLC v. Clowers,* 21-cv-223 (RP) (SH), 2022 WL 3088376, at *5 (W.D. Tex. Aug. 2, 2022) (excluding expert report that relied on projections because expert did not perform any research outside document provided to him by client; expert just assumed they were accurate; concluding the opinions were not based on sufficient data and were unreliable); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 127-30, 137-40 (M.D. Pa. 2015) (excluding expert damages calculations based on sales projections based on absence of independent verification and use of them when they far exceeded actual sales); *Target Market Publishing, Inc. v. ADVO, Inc.,* 136 F.3d 1139, 1142-45 (7th Cir. 1998) (affirming exclusion of plaintiff expert's contract damages analysis under *Daubert* because it relied on assumptions from which no reasonable inference of lost profits could be drawn; noting it did

32

not matter that plaintiff relied on the defendant's sales projections, and that projections exceeded actual sales, leading to implausible assumptions).

Spectrum fails to persuasively explain why use of GE's sales projections for this purpose is sufficiently reliable to pass muster under Rule 702.  Mr. Phillips's own deposition testimony shows a blanket acceptance of GE's numbers without any understanding of how they were reached or the data underlying the projections.  There is no evidence he conducted any market research to evaluate the projections, and he did not even adjust them based on the actual sales data he did have that showed sales were between 16% and 20% below what was projected in just the first year and a half of sales. While Dr. Phillips did discuss his comparison between actual sales and projections as a test of reliability, he never explains why it is appropriate to extrapolate from less than two years of actual sales that exhibited a significantly different "ramp up".[12] timeline from the one projected by GE.

It also is worth noting that year one actual sales were better than expected, and year two sales lagged expectations.  This trend fundamentally differs from the business projections. It would appear, rather, that the trajectory of sales of the StarGuide may be fundamentally different than the "ramp up" pattern Mr. Phillips (or GE's projections) suggests.  Nor is it clear why it is appropriate to compare cumulative sales over two years when the basis of the projections (as well as the actual sales) was annual sales. Spectrum's citation to *i4i Ltd. Partnership v. Microsoft Corp.* only underscores the issues with Mr. Phillips's computations

---

[12]  Mr. Phillips uses this term in Paragraph 79 of his opening report.  He explains that in this market, "sales need time to ramp up after introduction" of the product to the market.  He does not provide any foundation for this statement.  Accepting GE's numbers at face value despite an obvious discrepancy in the "ramp up" of sales is an "analytical gap between the data and the opinion proffered" which is "simply too great." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

relying on the sales projections. 598 F.3d 831, 852, 856 (Fed. Cir. 2010).  In that case, the expert

not only relied on internal documents, but also publicly available information about competitive

products and a survey designed to estimate the amount of infringing use to come up with an

opinion about a reasonable royalty.  That is, he did not blindly rely on internal projections and

was not opining about lost profits or unjust enrichment. *Id.*

In sum, Spectrum's argument that Mr. Phillips conducted a careful vetting of the

projections and that he used a reliable methodology to arrive at the portions of his damages

opinions that rely on the projections is unconvincing, especially when it fails to point to any

investigation he conducted independent of a review of discovery conducted in this case.

The shortcomings in Mr. Phillips's opinions that rely on the GE sales projections also do

not pass muster under Rule 703, which limits the data or facts on which an expert may rely to

those reasonably relied upon by experts in the field. Fed. R. Evid. 703.  This is a narrower

inquiry than the one conducted under Rule 702.  Spectrum cites this rule saying only that Mr.

Phillips "properly vetted" the information without any citations to the record or his testimony

explaining that vetting or discussion about a competitor's sales projections being taken at face

value by economists generally.

In sum, while this Court acknowledges that in some circumstances it could be

permissible to rely on GE's sales projections, the facts here render the damages computations

relying on them too unreliable to be admissible for the purposes of proving GE's alleged unjust

enrichment and Spectrum's alleged lost profits.

### (3) Price Erosion Damages

GE challenges Mr. Phillips's price erosion opinions and proposed testimony, arguing that his calculations, based in part on information from Spectrum executives, are speculative. (*See* Phillips Op. Rep. ¶¶ 16, 18-21, 128-29, 140, 154, 190(b), 193, 194(a)-(b).)  Spectrum responds that Mr. Phillips performed his own analysis which supports the "conservative" estimate in paragraphs 128 and 129. (ECF No. 850-3, at 238:23-241:9.)

As noted above, "[a] trial court must decide whether a qualified expert's testimony rests on a reliable foundation, or is simply based on 'subjective belie[f] or unsupported speculation.'" *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011) (quoting *Daubert*, 509 U.S. at 590).  Expert testimony "will be excluded if it is 'speculative or conjectural.'" *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95-cv-8136 (RCC), 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).  "[T]he court must determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Id.* (cleaned up).  "Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Id.* (citing *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985)).

Unlike his reliance on GE's sales projections and damages calculations incorporating same, the Court finds that the price erosion damages opinions pass muster under Rule 702. The price erosion calculations are at Exhibits 4.3 and 4.9 of Mr. Phillips's Opening Report, which cross-references Exhibits 4.3, 5.1, and 5.2. (Phillips Op. Rep. at 83, 89.)  The key exhibits supporting Mr. Phillips's price erosion calculations are Exhibits 5.1 to 5.2 to his opening report.

(*See* Phillips Op. Rep., Exhs. 5.1, 5.2, at 91-93.)  These exhibits collate sales of the various Veriton models and the system price of each and calculate the average sales prices.

While Mr. Phillips may have inartfully phrased his report as relying on Spectrum's beliefs (which word choice is discussed later in this opinion), his references to the prices in Exhibits 5.1 and 5.2 to his opening report demonstrate that there will be no issue with cross-examining him on this subject.  The underlying fact that Spectrum ███████████████████████████ ████████████████████████████████ is likewise an appropriate matter for cross-examination of lay witnesses offered by Spectrum. (*See* ECF No. 850-3, at 240:9-15.)  These numbers are based on personal experience and business decision making of the lay witnesses. Nor can Mr. Phillips be said to have relied, as GE suggests, on unsupported assertions from an interested party.  Rather, he relied on concrete numbers in performing his own analysis.  He specifically cited to Exhibit 5.2 at his deposition to note that it confirmed his reliance on the numbers from his discussions with Spectrum personnel since he referenced actual sales figures in performing his review.  GE's reliance on *EcoFactor, Inc. v. Google LLC*, is unavailing because unlike here, the expert in the case did not evaluate sales data.  137 F.4th 1333, 1341-44 (Fed. Cir. 2025) (involving an opinion about reasonable royalty that was improperly admitted because expert relied on lump-sum settlement licenses where plain language undermined opinion that parties agreed to a certain per unit royalty rate and where reliance on testimony of company CEO about royalty rate was unsupported by any record evidence and expert had not evaluated sales data).  GE's other cases are also distinguishable. *CIT Group*, 815 F. Supp. 2d at 677-78 (involving hypothetical pricing based on subjective beliefs to arrive at lost profit estimation, whereas here, Mr. Phillips computed price erosion based on actual sales data and lay testimony

regarding the Veriton); *Agron v. Trs. of Columbia Univ.*, No. 88-cv-6294 (MJL), 1998 WL 427620, at *4-5 (S.D.N.Y. July 29, 1998) (noting an opinion was impermissibly speculative where "[t]he only possible basis for assuming a complete break with Plaintiff's work history is Plaintiff's subjective belief that her Hunter College degree was inadequate to find employment").

The Court expresses no view on the merits of Dr. Phillips's opinion regarding price erosion.  Rather, it merely finds that Mr. Phillips may testify as to price erosion because it is based on a reliable methodology that can be tested at trial through cross-examination.  His opinion is not based on impermissibly speculative information.

### (4)  Opinions Incorporating Three- to Five-Year Head Start

GE asserts Mr. Phillips's opinions and calculations incorporating a three- to five-year head start are unreliable to the extent they rely on Dr. Metzler's head-start opinion  and because it assumes all of the 15 trade secrets identified by Spectrum were misappropriated without regard to the timeline of when they may have been disclosed and/or whether they were incorporated into the StarGuide improperly.

The argument about Mr. Phillips's creating alternate damages models using a three-, four-, and five-year head-start period are unpersuasive standing alone.  Although the Court is excluding Dr. Metzler's opinion about the three- to five-year head start, it does not preclude Spectrum from introducing documents and fact witness who will testify about the timeline for developing the Veriton and the StarGuide and internal projections about same.  Nor is Spectrum precluded from arguing that GE moved too quickly after disclosure of its confidential information.  Spectrum may be able to argue that GE had a three- to five-year head start in bringing the StarGuide to market based on the factual record and, if Judge Broderick finds that

37

is so, then Mr. Phillips's calculations looking at the impact of a head start may be relevant and admissible (but only to the extent they are not otherwise unreliable because they incorporate unreliable assumptions about future sales as set forth above).

As for the argument about the Mr. Phillips making assumptions about trade secrets, as set forth above, the Court finds it is premature to strike Mr. Phillips's calculations or find them unreliable based on assumptions about how many trade secrets (if any) were improperly incorporated into the StarGuide and when they were incorporated.  Certainly, a party may ask its expert to present different damages computations based on various assumptions.  For example, an expert may wish to assume the alleged trade secrets were incorporated into the final product and assume there was a four-year head start, which yields one or more definite damages calculations.  And, as noted above, Mr. Phillips has testified his models are not dependent on a factual finding that all fifteen trade secrets were improperly incorporated into the StarGuide.  Thus, Mr. Phillips is not precluded from presenting alternate damages models based on different head-start periods that Judge Broderick can consider based on potential alternative factual findings. However, as also noted above, to the extent his damages calculations are premised on the GE sales projections, they are inadmissible (subject to the exception identified in the Court's discussion regarding the reasonable royalty calculation).

### (5) Manufacturing Capacity

In evaluating lost profits from Spectrum's lost sales, Mr. Phillips purported to reconstruct what the sales would have looked like but for GE's alleged infringement of Spectrum's trade secrets.  Additionally, he considered factors set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  These factors include market

38

demand for the product, the plaintiff's market share of sales and/or impact of other competing products in the market other than the infringing product, the manufacturing and marketing capabilities of the plaintiff, and the amount of profit plaintiff would have earned in the hypothetical scenario.

He offers calculations of lost profits for 2021 to 2022 based on actual sales of the StarGuide, as well as projected lost profits from future sales for three-, four-, and five-year periods. His calculations rely on Spectrum internal sales projections for the Veriton; an assessment of market demand based on actual sales of the Veriton and StarGuide; his assumption that the misappropriated trade secrets were the core reason the StarGuide (and Veriton) were superior to other imaging machines; his evaluation of GE's sales of its other imaging machine, the 870 CZT, and Spectrum sales of its other machines; Spectrum's manufacturing capacity and whether it could actually produce the number of machines it wanted and expected to sell but for the StarGuide competition; and Spectrum's marketing capacity. (Phillips Op. Rep. ¶ 91-117.) He cites Spectrum's existing manufacturing capacity of ███████ machines per year and its plans to scale to an ability to make ███████ machines a year based on discussions with Spectrum executives and other considerations. (*Id.* ¶¶ 105-10.)

In evaluating the above factors, he examined documents produced in litigation, including, *inter alia*, GE documents evaluating how it could compete with Veriton and gain greater market share of buyers of the 3D technology; financial and sales records of the imaging machines; costs of production of the machines; and discussions with Spectrum personnel about its manufacturing capacity and plans to scale up its capacity, including how it would do so in light of the production process, which primarily involves assembly of purchased components

and in light of delays in electronic component deliveries (which he learned had not impacted Spectrum's production levels). He concluded Spectrum had sufficient manufacturing capacity to manufacture ███ systems per year and capture lost sales to StarGuide. Lost sales thus range from ████ machines in a given year. In general, his conclusions led him to opine that Spectrum could have manufactured and sold █ machines and up to █ machines in the 2021 to 2022 period instead of █. He also used the same assumptions about manufacturing capacity in his reasonable royalty analysis.

GE challenges Mr. Phillips's analysis of Spectrum's manufacturing capacity on the grounds it is based solely on the say-so of Spectrum executives about that capacity and projected sales and that Mr. Phillips did not perform an independent analysis of either.

The Court views GE's arguments as going more to the weight that should be afforded to the testimony about profits from lost sales than to admissibility. Manufacturing capacity was used to construct a hypothetical scenario where Spectrum would sell the total number of machines sold by Spectrum and GE during the period they competed and potentially more machines in future years based on Spectrum's own sales projections. The number of machines sold in any year does not differ significantly from Spectrum's purported existing manufacturing capacity and, unlike his reliance on internal sales projections, it is not correct that he failed to test Spectrum's statements about manufacturing capacity. He evaluated various things that could impact manufacturing including actual manufacturing numbers, the method of manufacturing, global supply disruptions in electronic components. Moreover, Mr. Phillips is not offered as an expert on manufacturing capacity per se – Spectrum's own witnesses will testify about that. Rather, Mr. Phillips was simply evaluating whether he should potentially

40

change his damages calculations if the information he received suggested there was no possibility that Spectrum could produce additional Veriton machines in the hypothetical scenario where it wasn't competing with the StarGuide. GE will be able to test his assumptions through introduction of evidence and cross-examination. While Judge Broderick may ultimately find that GE did not have the manufacturing capacity to produce all the same number of machines that Mr. Phillips assumed could be produced in his calculations, this will be based on his evaluation of the evidence. This may cause him to reject Mr. Phillips's calculations. This is the risk Spectrum takes when Mr. Phillips did not perform calculations with different manufacturing capacity assumptions. Accordingly, GE's arguments to exclude Mr. Phillips's "opinion" on Spectrum's manufacturing capacity is unpersuasive.

### (6) Spectrum's Sales Projections

GE also challenges Mr. Phillips's reliance on Spectrum's sales projections in some of his calculations, and, in particular, in his opinion about Spectrum's lost sales and the reasonable royalty rate. GE argues Mr. Phillips conducted no investigation into the sales figures and that his methodology using them is therefore unreliable. This argument is persuasive.

When asked about Spectrum's sales projections for the Veriton, Mr. Phillips said he did not know "exactly for what purpose" Spectrum was using them, and said it was "difficult to call a set of projections reliable or unreliable if the person who created them used their best judgment and used reasonable expectations." (ECF No. 850-3, at 114:9-115:6.) Nor did he know who created the projections, when, how, or why. (*Id.* at 109:12-114:23.) These answers do not inspire confidence in the application of any reliable methodology. And it is clear that he conducted no independent investigation to ascertain whether the projections were reliable.

41

GE also persuasively cites Judge Broderick's opinion on Spectrum's preliminary injunction motion.[13]  Judge Broderick noted "Spectrum's sales projections . . . entirely speculative and therefore insufficient to demonstrate irreparable harm." (ECF No. 530, at 11.) He further identified "a noticeable disparity" between Spectrum's projections in its Business Plan and those in its Annual Budget, which was unexplained in the briefing on that motion.  He stated that "optimistic speculation, without concrete and reliable data, cannot support a claim for irreparable harm." (*Id.* at 12-13 (citing *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 34 (2d Cir. 2015).)  Thus, his calculations of lost profits that depend on Spectrum's sales projections are the result of unreliable methodology and are not admissible.

GE's arguments that Mr. Phillips's entire analysis of the *Panduit* factors[14] fails as a result of his reliance on Spectrum's sales projections, however, are not persuasive.  The Court will conduct a complete *Panduit* analysis, weighing pertinent opinion testimony, in determining whether Spectrum is entitled to lost profits.  While Mr. Phillips has referenced *Panduit* in his report, he does not in fact perform a "*Panduit* analysis," which is a job reserved for Judge Broderick.  Mr. Phillips's other opinions regarding lost profits and other elements of the *Panduit* analysis, to the extent not otherwise excluded herein, can still help Judge Broderick determine the issues in this case and are admissible.[15]

---

[13]  While it is true the standard on a preliminary injunction differs from the standard on this motion, the Court finds Judge Broderick's conclusion persuasive even after considering this difference.

[14] As stated above, the *Panduit* factors are "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) [the patent owner's] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [the patent owner] would have made." 575 F.2d at 1156.

[15]  It should go without saying that this qualification on the undersigned's opinion does not preclude Judge Broderick from finding that reliance on Spectrum's projections creates merits issues with the remainder of Mr. Phillips's opinions.  This opinion deals only with issues of admissibility.

**(7) Reasonable Royalty Damages**

Mr. Phillips has computed a reasonable royalty as an alternative form of damages. He adopts a framework for arriving at a reasonable royalty described in *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 186 n. 7 (S.D.N.Y. 2002), and *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971), and has purported to analyze only the relevant factors based on the facts of the case.

GE argues the Court should exclude Mr. Phillips's opinions and calculations of a reasonable royalty because : (1) Mr. Phillips's did not apply a reliable methodology by not applying the appropriate factors and by starting with the *LinkCo* factors[16]; (2) Mr. Phillips impermissibly opines on the parties' states of mind; and (3) Mr. Phillips based his opinion on unreliable projections post-dating the date when the alleged misappropriation began.

(a) Methodology

When performing a *Georgia-Pacific* analysis, courts have held that damages experts "must not only analyze the applicable factors, but also carefully tie those factors to the proposed royalty rate." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1350 (Fed. Cir. 2018). Experts are not required to "use any or all of the *Georgia-*

---

[16] The *LinkCo* factors are

> (1) the resulting and foreseeable changes in the parties' competitive posture[s];
> (2) the prices past purchasers or licensees may have paid; (3) the total value of
> the secret to the plaintiff, including plaintiff's development costs and the
> importance of the secret to the plaintiff's business; (4) the nature and extent of
> the use the defendant intended for the secret; (5) whatever other unique
> factors in the particular case might have affected the parties' agreement, such
> as the ready availability of alternative processes.

232 F. Supp. 2d at 186 n.7.

*Pacific* factors when testifying about damages." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012). Further, "estimating a reasonable royalty is not an exact science. The record may support a range of reasonable royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

GE suggests that Mr. Phillips is required to tie each and every single *LinkCo* and *Georgia-Pacific* factor to the reasonable royalty rate, citing *Exmark*, 879 F.3d at 1350. But, as Mr. Phillips aptly explains in his Opening Report, not every factor applies in this case. And, at least in general, Mr. Phillips does tie the applicable factors to the reasonable royalty rate and sets forth the basis for arriving at that rate. Moreover, his analysis is founded upon the documentary record insofar as GE and Spectrum were approaching the "hypothetical negotiation" with certain costs and expected revenues which would have shaped that negotiation. There is thus no defect in his methodology warranting exclusion of his opinion that a reasonable royalty rate would be $250,000 per unit.

Unlike the experts in GE's cited cases, Mr. Phillips has comprehensively examined the costs and expected benefits of GE during the relevant period and used them to calculate a reasonable royalty range and rate. *Cf. Speedfit LLC v. Woodway USA, Inc.*, No. 13-cv-1276 (KAM) (AKT), 2019 WL 1436306, at *8 (E.D.N.Y. Mar. 29, 2019) (finding royalty rate appeared to have been "plucked" out of thin air) (citing *Exmark*, 879 F.3d at 1351); *Exmark*, 879 F.3d at 1351 (finding the damages expert's opinion to be inadmissible for failing to adequately tie the proposed royalty rate to the facts of the case). He routinely connected his analysis of the applicable factors to the way they would pressure the reasonable royalty rate. (*See, e.g.*,

44

Phillips Op. Rep. ¶¶ 160, 168, 170, 177, 180, 183, 187.)  Likewise, the Court is not persuaded

that Mr. Phillips's opinion should be excluded because he developed the reasonable royalty

range first in connection with the *LinkCo* factors, and then analyzed that range further to come

to a more specific rate in connection with the *Georgia-Pacific* factors. (*Compare* Philips Op. Rep.

¶¶ 154, 193, *with id.* ¶¶ 194-98.).  In practice, the *Linkco* factors sometimes function merely as

a subset of or corollary to the *Georgia-Pacific* factors, particularly in cases like this one, where

not all of the factors may be present or there are shortcomings in the *Georgia-Pacific*

methodology to the facts of the case.  GE appears to argue that Mr. Phillips must reach a

*different* (and therefore, potentially inconsistent) conclusion under the *LinkCo* and *Georgia-*

*Pacific* factors, rather than the same conclusion about a royalty rate.  This argument does not

make sense.  First, Mr. Phillips expressly and appropriately incorporates his *LinkCo* factor five

analysis (of "unique factors") into his *Georgia-Pacific* analysis. (*Id.* ¶¶ 173, 191.)  Even if he had

not done so, GE's argument would apparently require that even when an expert makes a

reliable analysis in connection with the *LinkCo* factors, unless they produce a different

projection in connection with the *Georgia-Pacific* factors, their analysis is not reliable.  But, in

fact, if an expert's analysis substantively differed between those two factor-based tests, it

would be at least theoretically possible that such an inconsistency would show one or the other

test (and perhaps both) was *not* reliable.  It makes sense, therefore, to view the two factor-

based tests as related.

        (b) <u>State of Mind</u>

       GE next argues that in several paragraphs, Mr. Phillips references what the parties to

this litigation "knew," "understood," or "believed." (*See* Phillips Op. Rep. ¶¶ 67, 140, 142, 146,

147, 150, 152, 153, 161, 167, 169, 173-75, 178; Phillips Reb. Rep. ¶ 20 & nn.22, 45; *see also* Phillips Dep. at 104:8-10, 223:4-224:1, 230:9-21.)[17]  As this Court has observed in this opinion, such state of mind evidence is inadmissible because it encroaches on the duty of the factfinder. *See MF Global Holdings Ltd.*, 232 F. Supp. 3d at 577.  Mr. Phillips may not opine on the state of mind of the parties or their employees.

Nonetheless, this does not render his entire reasonable royalty computation inadmissible.  He can point to evidence to explain how he used it in the hypothetical negotiation, which necessarily involves some guesswork, albeit based on documentary and testimonial evidence.  Further, he can appropriately discuss what a hypothetical negotiator reasonably would consider and weigh in a hypothetical negotiation.  But Judge Broderick will draw inferences from the evidence about the parties' state of mind during the negotiations to evaluate Mr. Phillips's calculations and application of the *LinkCo* and *Georgia-Pacific* factors.  All this means is that Mr. Phillips will be precluded from stating, for example, that "Both Spectrum and GE *knew* that unauthorized use by GE of Spectrum CI in a GPC would result in direct competition with the system that Spectrum was developing" and that "Spectrum would understand" a certain fact about competing products and firms.

Spectrum's argument that *Georgia-Pacific,* and in particular, its factor fifteen, provides otherwise is incorrect.  *Georgia-Pacific* factor fifteen states:

> 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount

---

[17] While Spectrum also cites Mr. Phillips's opening report at Paragraph 63(d) n.118, the use of what GE "sought" and was "seeking" cannot be excluded at this juncture and on these grounds.  These words could impermissibly refer to state of mind; however, they could also refer to what GE *did* during this time, per the documentary record.

> which a prudent licensee—who desired, as a business proposition,
> to obtain a license to manufacture and sell a particular article
> embodying the patented invention—would have been willing to
> pay as a royalty and yet be able to make a reasonable profit and
> which amount would have been acceptable by a prudent
> patentee who was willing to grant a license.

318 F. Supp. at 1120.  Nothing in this section requires consideration of the parties' *actual* states

of mind.  Rather, it contemplates a hypothetical prudent licensor and licensee and what they

would have been willing to pay.  Even this factor would not permit Mr. Phillips to opine that GE

or Spectrum "knew," "believed," or "understood" something.  It does, however, permit him to

say what GE and Spectrum might have *done* given their budget constraints, expected costs, and

anticipated revenues.[18]  Thus, to the extent Mr. Phillips proposes to opine as to the parties'

states of mind, such opinions are excluded.

### (c)  Use of the 2020-2021 Projections

Finally, GE argues that Mr. Phillips's reasonable royalty opinions must be excluded

because (1) the projections upon which they are based are unreliable and (2) the projections

post-date the alleged misappropriation.  But GE cites no portion of Mr. Phillips's calculation of

the reasonable royalty which expressly relies upon the 2020-2021 projections.

While this Court held above that reliance on these projections rendered certain opinions

unreliable, this holding was in connection with opinions about unjust enrichment and lost

profits.  Here, in constructing a hypothetical negotiation, more flexibility is required and

whether sales projections were reliable is less of an issue than whether the parties during the

---

[18] Nor is it persuasive that GE's expert, Dr. Putnam, uses similar phrases.  If so, then Spectrum may ask to exclude similar statements.  The Court does not now consider any statements of Dr. Putnam for this purpose, given Spectrum has not moved to exclude such opinions.

hypothetical negotiation utilized or would have made reference to such projections to arrive at

a royalty rate. *See Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir.

1988) ("The methodology [of creating a hypothetical negotiation scenario] encompasses

fantasy and flexibility; fantasy because it requires a court to imagine what warring parties

would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of

the time infringement began, yet permits and often requires a court to look to events and facts

that occurred thereafter and that could not have been known to or predicted by the

hypothesized negotiators.").  Thus, the Federal Circuit in *Fromson* followed the "book of

wisdom" doctrine, where "if years have gone by before the evidence is offered," as here, then

"[e]xperience is . . . available to correct uncertain prophecy." *See id.* (citing *Sinclair Ref. Co. v.*

*Jenkins Petroleum Process Co.*, 289 U.S. 689, 698-99 (1933)).  Here, flexibility is needed in

assessing Mr. Phillips's hypothetical negotiation that would have taken place in 2013.  While

Mr. Phillips recognizes that the passage of many years may have shown some of the projections

to be too rosy, he notes that the parties continue to expect some market and sales growth.

Thus, where there was an analytical gap between the projections and the opinions offered on

unjust enrichment and lost profits, any gap is less of a concern in the reasonable royalty

negotiation opinion.

GE argues that projections post-dating the alleged misappropriation cannot be used in

this litigation.  GE cites *LinkCo* and *Medidata* to support its position.  It is true that the *LinkCo*

court found that "sales projections are only relevant in a reasonable royalty calculation when

they are available before the time of the misappropriation and would have been considered by

the parties." *LinkCo*, 232 F. Supp. 2d at 189; *see also Medidata*, 2021 WL 4243309, at \*4-5 (endorsing the *LinkCo* analysis).

However, the problem here is that GE has not demonstrated to the Court that Mr. Phillips actually used the 2020-2021 projections to *calculate* the reasonable royalty.  Rather, as GE admits, Mr. Phillips uses the projections "to show that the parties foresaw and experienced great value and growth from use of Spectrum's alleged trade secrets." (ECF No. 849, at 41.) While Mr. Phillips does appear to make passing references to the later projections, he plainly bases his central calculations on the projections available to GE and Spectrum at the time of the hypothetical negotiation, which he sets in 2013.  To the extent GE asserts Mr. Phillips uses the projections to show that GE and Spectrum "experienced great value and growth" (ECF No. 849, at 35), the Court does not see that anywhere in the paragraphs of Mr. Phillips's opening report or deposition excerpts cited by GE.  That the parties "saw the market respond" to an article detailing the coming changes in nuclear medicine and then developed forecasts of exponential growth does not mean that they "experienced great value and growth." (*See* Phillips Op. Rep. ¶¶ 25-26.)  On the other hand, the Court does see where Mr. Phillips discusses the parties' later growth *forecasts* relating to their competing products.  Regardless, it is certainly admissible as a part of the "book of wisdom" for him to opine that ongoing projections of profitability further support the reasonableness of his underlying royalty rate calculations based on projections from the relevant period.  Thus, the Court is not persuaded on this motion that this case is like *LinkCo* and *Medidata*, where the actual calculation of the reasonable royalty was explicitly done using projections which "were not available until several months after the hypothetical negotiation." *LinkCo*, 232 F. Supp. 2d at 191.

To be sure, this Court agrees with the *Medidata* opinion, where the Court agreed that the *LinkCo* opinion correctly concluded "post-negotiation sales projections are of little use." 2021 WL 4243309, at *5. That does not mean, however, that they are always of no use.[19] And given that Spectrum does not assert that Mr. Phillips used the post-dating 2020-2021 projections to calculate the reasonable royalty (rather than, as he did, cite them to provide further support to the reasonableness of his calculation)—and the Court finds no evidence he did—GE cannot vaguely gesture toward relatively insignificant sentences and paragraphs in a wider opinion to support its motion to exclude the whole reasonable royalty calculation. The Court likewise will not exclude the small portions mentioning the 2020-2021 projections since more flexibility is required in arriving at this hypothetical negotiation and the "book of wisdom" doctrine counsels in favor of admission for the limited purpose of providing an additional check on the hypothetical negotiation and the reasonable royalty rate Mr. Phillips develops.

Thus, the motion to exclude Mr. Phillips's opinions about the reasonable royalty rate is denied, except that he will be precluded from offering opinions on state of mind.

### (8) Avoided Costs

GE argues that Mr. Phillips's analysis of GE's avoided research and development costs should be excluded because he merely summarizes figures in GE's documents and does not apply any expert methodology. (Phillips Op. Rep. ¶¶ 18-21, 87-89, 130.) Spectrum responds that Mr. Phillips used his valuation expertise to arrive at the $10 million figure for GE's avoided costs.

---

[19] It is worth noting that the *Medidata* court was concerned about presentation of numbers to the jury. *See* 2021 WL 4243309, at *4-5. This is a bench trial, so the same concern is not present.

50

The Court agrees with Spectrum that the lion's share of Mr. Phillips's analysis will be helpful to the factfinder.  While Mr. Phillips does in part summarize GE's presentations in Paragraph 88(a) through 88(c) of his Opening Report, he also provides more concrete analysis in Paragraph 88(d) to (e).  He will be able to explain to Judge Broderick the relationship between the term sheet and due diligence documents and the $10 million valuation of the avoided costs.  The fact that he has reviewed documents and made an inference does not, as GE suggests, automatically warrant exclusion of this opinion.  Experts commonly make inferences from documents; the question is whether there is expertise involved in their analysis.  Here, I find there is enough of a reliable methodology applied in the opinion such that it should not be excluded.  Thus, the motion to exclude the opinion about avoided costs is denied.

### (9) Legal Conclusions and Factual Narratives

GE claims that Mr. Phillips's reports contain legal conclusions which should be excluded. (Phillips Op. Rep. ¶¶ 87 & n.162; 91 & nn.170-71; 98 & n.184; 133-34 & nn.218-21; 136 & nn.223-26; 137 & n.227; Phillips Reb. Rep. ¶¶ 38-40 & nn.68-69; 65 & n. 101.)  Spectrum argues he does not draw legal conclusions.  It is true that experts may not opine on matters of law; that is the providence of the judge. *See In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 62-63 (S.D.N.Y. 2001); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

Here, however, the trial judge and factfinder are the same.  This fact has two implications.  First, Mr. Phillips's statements regarding what the law is will not be helpful to Judge Broderick, as the Court has noted in this opinion.  But second, it means that when Mr. Phillips testifies, Judge Broderick will be more than equipped to distinguish between admissible

opinion evidence which merely references legal propositions as a framework for the expert's analysis and improper legal conclusions (and/or legal argument). While the parties' experts cannot opine on the law at trial, the Court on this issue nevertheless denies the motion without prejudice and defers to Judge Broderick regarding exclusion of any purported legal conclusions.

Finally, GE next challenges testimony based on the "Background" section of Mr. Phillips's Opening Report, at Paragraphs 22 to 76. Spectrum argues (1) there will be no jury confusion; (2) Dr. Putnam also included a factual background section of his report; and (3) the information in Mr. Phillips's background section is providing context for his opinions.

The Court agrees with Spectrum. Courts in this district have recognized "the value of providing in an expert report a short introductory statement of the underlying facts of the case." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 677 (S.D.N.Y. 2007). Of course, "at trial, those facts should . . . be proved by admissible evidence and not expert assertion." *Id.* But GE has not shown any part of Mr. Phillips's deposition, rather than his report, where he testifies impermissibly to the factual background contained in his report. Here, Mr. Phillips is plainly not presented "*solely* for the purpose of constructing a factual narrative based upon record evidence." *See Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (emphasis added). Rather, he is presented chiefly as a valuation and damages expert, and the background informs his valuation and damages opinions. Accordingly, the Court denies the motion to exclude the factual background contained in his report. This decision will not preclude GE from renewing this motion if Mr. Phillips's testimony at trial veers impermissibly into factual narrative.

In sum, the motion to exclude Mr. Phillips's proposed opinion testimony and calculations is **granted in part** and **denied in part** consistent with the above.

II.    **Spectrum's Motion to Exclude Portions of GE Expert Mr. Levy and Dr. Putnam's Opinions**

A. *Mr. Levy*

Spectrum asks the Court to exclude the testimony of Mr. Levy to the extent he testified that ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. It argues that his testimony on this point constitutes an expert opinion, rather than a lay opinion. Spectrum acknowledges Mr. Levy was not identified as an expert witness. GE counters by arguing Mr. Levy is testifying as a lay witness and his opinion is admissible.

Rule 701 of the Federal Rules of Evidence governs lay opinions. It says:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. "The rational-basis requirement is the familiar requirement of first-hand knowledge or observation." *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (cleaned up). "If the opinion rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (cleaned up). In connection with Rule 701(c), courts "must focus on the reasoning process by which a witness reached his proffered opinion, and

that, to constitute lay opinion, an opinion must be the product of reasoning processes familiar to the average person in everyday life, rather than scientific, technical, or other specialized knowledge." *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equipment, Ltd.*, 716 F. App'x 5, 10 (2d Cir. 2017) (summary order) (cleaned up) (quoting *Garcia*, 413 F.3d at 215).  "The purpose of these pre-requisites to admissibility under Rule 701 is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements for expert testimony" under Rule 26 of the Federal Rules of Civil Procedure. *Id.* (cleaned up) (citing *Garcia*, 413 F.3d at 215).  "The burden is on the party wishing to introduce lay opinion testimony to establish the proper foundation." *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004).

The Advisory Committee note to the 2000 Amendment of Rule 701 noted that "[t]he amendment does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*.  Certainly it is possible for the same witness to provide both lay and expert testimony in a single case." Fed. R. Evid. 701, Adv. Comm. Note to 2000 amend.  But if "any part of a witness'[s] testimony . . . is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702," that testimony will be governed by Rule 702. *Id.*  The amendment was not "intended to affect the prototypical examples of the type of evidence contemplated by the adoption of Rule 701 relating to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." *Id.* (cleaned up) (quoting *Asplundh Mfg. Div. v. Benton Harbor*

*Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)).  The Advisory Committee provided the example that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." *Id.*  The Committee went on:  "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.  The amendment does not purport to change this analysis." *Id.*  The Committee also referenced *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992), in which the Tennessee state court "declared that the distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Fed. R. Evid. 701 (quoting *Brown*, 836 S.W.2d at 549).

Following this amendment, the Second Circuit decided *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 180-81 (2d Cir. 2004), where it considered a question of how to characterize testimony from an employee named Huang of plaintiff Bank of China.  Applying the "rational basis" prong of Rule 701(a), the Court noted "[t]he fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge" would "not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking." *Id.*  Such testimony, the Second Circuit said, is "based on his *perceptions*." *Id.* at 181-82.  However, it also stated that "Huang's explanations regarding typical international banking transactions or definitions of banking

55

terms, and any conclusions that he made that were not a result of his investigation, were improperly admitted." *Id.*  While they could have been deemed admissible because a single witness may provide expert and lay testimony in the same case, Bank of China had not at that point satisfied "the reliability requirements set forth in" Rule 702 or "disclose[d] Huang as an expert." *Id; see also Carson Optical, Inc. v. RQ Innovasion, Inc.*, No. 16-cv-1157 (SIL), 2019 WL 13422977, at *3 (E.D.N.Y. Dec. 18, 2019) (concluded that the president of a company could "opine on what he has observed to motivate his own customers' purchases," such that wholesale preclusion of such testimony was not warranted because it was deemed permissible lay opinion); *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 534 (7th Cir. 2003) (collecting cases) (noting "experienced businessmen know a great deal about what consumers think; that is personal knowledge").

In a non-precedential summary order, *Dynamic Concepts*, the Second Circuit affirmed the district court's finding that the declarations of two CEOs (including plaintiff's CEO) included expert testimony. 716 F. App'x at 10.  The district court's finding that "the declarants' proffered testimony as to the uniqueness of certain elements" of the relevant computer programs "as compared with other programs in the industry drew not on their experience as CEOs of their company, but on their technical and specialized knowledge of software design and industry standards." *Id.*  The Second Circuit carefully explained the district court's holding, noting that it "did not hold that mere descriptions of the programs and their features—however technical— were expert opinions." *Id.*  Rather, "the court noted that the declarations did not simply include descriptions of the underlying programs, but offered opinions designed to situate elements of

those programs in the industry as a whole in order to demonstrate that the programs included original—and thus potentially copyrightable—elements." *Id.*

The Court rejected the plaintiffs' arguments that "in forming these opinions," the declarants "relied on their personal experiences as CEOs . . . and thus based the opinions on reasoning processes familiar to average persons." *Id.*  Although both declarants had familiarity with their programs because of their experience as CEOs, the Court noted that the reasoning process employed in reaching the opinions relied on technical knowledge of software design and industry standards, not just personal experience and investigation as part of their CEO job. Therefore, the opinions were not proper lay opinions.

Based on the foregoing caselaw, the Court deems Mr. Levy's testimony to the 90% figure to be a permissible lay opinion, not an expert opinion.[20]  The processes Mr. Levy used to arrive at this opinion were substantially similar to those permissibly used by Huang in *Bank of China* and involved his own knowledge of GE's customers and their buying habits and interviews with them.  The fact that his conclusion involves a percentage also does not automatically transform it into expert opinion.  Rather, the topic and expertise needed to arrive at the opinion differ from the excluded opinion in *Bank of China*, where Huang testified to "the concept of a 'trust receipt,' how it works in the context of an international commercial transaction" and "that it is considered fraud when an importer presents a trust receipt to a bank to obtain a loan knowing that there are no real goods involved." *See Bank of China*, 359 F.3d at 180.  Thus, his testimony is admissible to the extent that he discusses his investigation

---

[20]  No other piece of testimony given by Mr. Levy has been challenged as impermissible expert opinion.  Thus, the Court's analysis is limited to the testimony regarding the 90% figure.

57

and his opinion developed from that investigation, which the Court concludes was rationally related to his perception (as with Huang's investigation in the *Bank of China* case).

Spectrum's arguments to the contrary are unpersuasive. While it is true that Mr. Levy only interviewed 870 CZT customers—not StarGuide customers—to see if they would switch to StarGuide, this point does not establish that he lacks "first-hand knowledge" of StarGuide customers' mindsets or preferences. It likely would have been more probative[21] for him to interview StarGuide customers, but the only issue on this motion is whether his opinion is rationally based on his perception and personal knowledge, as opposed to specialized industry or similar knowledge.

Likewise, the fact that Mr. Levy had internal or proprietary knowledge of GE does not render his knowledge expert, technical, or specialized. This knowledge of sales information and customer motivation does not involve mastery of a specialized field; it only required that he utilize a familiar process of reasoning based on his perceptions of customers who would or would not switch from the 870 CZT to the StarGuide. Similarly, the fact that he has years of experience at GE does not transform his testimony into expert testimony. While he looked at the United States and Canadian markets in developing the 90% figure, his opinion remains in the nature of lay testimony because he only looked at the market for his own company's products, not the broader market,[22] and understanding how one's sales fit into the market is

---

[21] To be clear, the Court does not consider on this motion whether the 90% figure testimony is relevant under Rule 401 or prejudicial under Rule 403. This opinion is constrained to whether the evidence is inadmissible under Rules 701 and 702.

[22] The mere fact that he concluded that customers were still primarily interested in 2D modeling technologies does not mean his investigation involved looking at any products other than his own company's. That piece of testimony is not challenged on this motion; regardless, the only investigation he performed, based on the record presented on this motion, involved his own company's products.

58

the type of company knowledge a CEO would acquire in that role.  Nor does Mr. Levy's

testimony involve commentary on industry standards, as in *Dynamic Concepts*.  He discusses

some of the technical specifications of the two GE products, but chiefly to explain why the

company did not discontinue the StarGuide when sales apparently lagged— he merely says the

870 CZT was more costly to produce, and it was a long-term marketing decision by GE to

continue marketing the StarGuide.  He also connects the technical components to how GE's

marketing would have changed in the absence of the StarGuide.  But that is not sufficient to

make his testimony in the form of an expert; the testimony itself goes to the business decisions

of GE and how it evaluated how to market its own products.  Thus, the fact that his testimony

mentions technical specifications does not transform his 90% figure into expert opinion

testimony.

Having concluded that Mr. Levy's testimony is admissible under Rule 701, the Court

does not address its reliability under Rule 702.  However, the Court emphasizes that its review

is constrained to whether his opinion is admissible under Rules 701 and 702.  The Court does

not consider any other bases for admission or exclusion in this opinion.

### B.  *Dr. Putnam*

Spectrum's motion to exclude Dr. Putnam's opinions focus primarily on his adoption of

the 90% figure as a substitution and/or replacement rate.  At his deposition, Dr. Putnam

testified he did not know how Mr. Levy arrived at the 90% number and that "[p]eople make

these kinds of estimates all the time because there isn't an economic model of – for this

question because it's not an actual – it's not based on data.  It's a counterfactual question."

(ECF No. 878-3, at 187:3-188:6.)  He called the 90% figure "a quantitative summary of a bunch

of qualitative factors which, by definition, can't be placed into a formula." (*Id.*)  He said that his method involved doing "the best thing that an economist can do under the circumstances, which is to say:  Under what circumstances does a customer prefer StarGuide or 870 CZT or Veriton?  Let's bring to bear all the information we have on that question.  That information by itself cannot yield the 90 percent." (*Id.* at 182:3-13.)

While the Court has denied the motion to exclude Levy's opinion about the 90% figure under Rule 701, GE still bears the burden to prove the reliability of Dr. Putnam's methodology in relying on the figure as a "substitution" or "replacement" rate.  Levy does not use the term "substitution rate" or "replacement rate" and is not opining on that figure as a technical or economic expert.  GE says "Dr. Putnam testified that he did in fact conduct his own independent analysis regarding the validity of the 90% number.  At Dr. Putnam's deposition, he testified that the 90% figure was "the result of a – in addition to my own analysis, it's also the result of conversations with Mr. Levy . . . ." (ECF No. 893-2, at 179:7-12.)  He also testified that "paragraphs 51 and 52 . . . summarize[] the factors which I have discussed – also discussed elsewhere that led to the conclusion – to Mr. Levy's conclusion that 90 percent was the best number." (ECF No. 893-2, at 180:20-181:4.)  When pressed, Dr. Putnam said he "analyze[d] a lot of factors" and the information he had "by itself cannot yield the 90 percent." (*Id.* at 181:19-182:21.)  He acknowledged that he could not produce such a number in this case because there was no "large sample analysis." (*Id.*)  He also said that the 90% figure was "not [his] number" but "Mr. Levy's," though he added it was "based on things that I considered." (*Id.*)  As he continued, he noted the 90% figure is "not based on data." (*Id.* at 187:3-20.)

GE has not met its burden.  There is no independent methodology here, much less a reliable one.  It is plain, rather, that Dr. Putnam accepted the 90% figure as a "substitution rate" or "replacement rate" without performing any meaningful independent analysis.  His reliance on this figure, then, fails for the same reason that parts of Mr. Phillips's analysis fail:  He relies on mostly self-serving assertions of Mr. Levy without engaging in an independent analysis using a reliable method.  As Dr. Putnam admits, the 90% figure is an "estimate[]" and the question of whether people would choose Veriton over the 870 CZT in the absence of the StarGuide is a "counterfactual" which cannot be modeled.  But moreover, Dr. Putnam admits the 90% figure is a quantitative estimate of qualitative information.  Courts do accept qualitative expert testimony, but haphazardly mixing qualitative and quantitative assessments, with no explanation as to how that mixing could be reliable (and, in fact, a number of statements in his deposition suggesting it could not be reliable), as Dr. Putnam has done, has not been shown reliable and cannot be admitted.  Therefore, Dr. Putnam's opinions that rely on a 90% "substitution" or "replacement" rate between StarGuide and 870 CZT (to the exclusion of Spectrum's Veriton) are excluded.

## CONCLUSION

For the foregoing reasons, the Court **grants** the motion to exclude Dr. Metzler's head-start opinion (ECF No. 854); **grants in part** the motion to exclude Mr. Phillips's opinions to the extent consistent with this opinion and otherwise **denies** that motion (without prejudice as to the questions of legal conclusions in Mr. Phillips's reports and testimony) (ECF No. 848); and **grants in part** the motion to exclude Dr. Putnam's opinions to the extent they rely on Mr. Levy's 90% figure and otherwise **denies** the motion (ECF No. 876).

62

**The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 848, 854, and 876.  <u>The Clerk of the Court is further directed to file this Opinion and Order provisionally under seal, pending further order of the Court.</u>**

**SO ORDERED.**

Dated:    March 20, 2026
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge